**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| P.J.E.S., A MINOR CHILD, by and through his father and NEXT FRIEND, Mario Escobar Francisco, on behalf of himself and others similarly situated, *Plaintiff*, v. CHAD F. WOLF, Acting Secretary of Homeland Security, in his official capacity, et al., *Defendants*. | ) ) ) ) ) ) ) ) ) ) ) ) ) )  No. 20-cv-02245-EGS |

## <u>MEMORANDUM IN SUPPORT OF PLAINTIFF'S MOTION FOR CLASSWIDE PRELIMINARY INJUNCTION</u>

## TABLE OF CONTENTS

TABLE OF AUTHORITY .................................................................................. iii

INTRODUCTION ........................................................................................... 1

BACKGROUND .............................................................................................. 3

    A. Immigration Laws' Protections for Unaccompanied Children ........................... 3

    B. The Immigration Laws' Protections for Asylum Seekers .................................. 4

    C. Immigration Laws' Treatment of Communicable Diseases ............................... 6

    D. The Title 42 Process ............................................................................. 7

    E. The Proposed Class ............................................................................ 10

LEGAL STANDARD ...................................................................................... 11

ARGUMENT ................................................................................................ 12

    I. THE CLASS IS LIKELY TO SUCCEED ON THE MERITS .......................... 12

        A. Section 265 Does Not Authorize Deportations At All ................................ 13

            1. The text, context, and structure of § 265 demonstrate that it does not authorize deportations ................................................................................... 13

            2. Section 265 Was Designed To Regulate Transportation ........................... 16

        B. Section 265 Does Not Override the Immigration Laws' Protections for Unaccompanied Children ................................................................................ 22

        C. Defendants' Actions Are Arbitrary and Capricious .................................... 27

    II. SUBJECTING UNACCOMPANIED CHILDREN TO THE TITLE 42 PROCESS HAS CAUSED AND WILL CONTINUE TO CAUSE THEM IRREPARABLE HARM ........... 29

    III. THE BALANCE OF HARMS AND THE PUBLIC INTEREST BOTH WEIGH DECIDEDLY IN FAVOR INJUNCTIVE RELIEF FOR CLASS MEMBERS .................. 32

CONCLUSION.................................................................................................................. 34

# TABLE OF AUTHORITY

**Cases**

*Air All. Houston v. EPA,*
  906 F.3d 1049 (D.C. Cir. 2018) ...................................................................... 26

*Brown v. GSA,*
  425 U.S. 820 (1976) ...................................................................................... 26

*Clark v. Martinez,*
  543 U.S. 371 (2005) ...................................................................................... 15

*Clinton v. City of New York,*
  524 U.S. 417 (1998) ...................................................................................... 26

*Damus v. Nielsen,*
  313 F. Supp. 3d 317 (D.D.C. 2018) ........................................................... 1, 11

*Demjanjuk v. Holder,*
  563 F.3d 565 (6th Cir. 2009) ......................................................................... 32

*Dep't of Homeland Sec. v. Regents of the Univ. of California,*
  140 S. Ct. 1891 (2020) .................................................................................. 27

*Devitri v. Cronen,*
  289 F. Supp. 3d 287 (D. Mass. 2018) ........................................................... 32

*Dir., Office of Workers' Comp. Programs, Dep't of Labor v. Newport News Shipbuilding & Dry Dock Co.,*
  514 U.S. 122 (1995) ...................................................................................... 22

*East Bay Sanctuary Covenant v. Trump,*
932 F.3d 742 (9th Cir. 2018) ......................................................................... 25

*FCC v. Fox Television Stations, Inc.,*
  556 U.S. 502 (2009) ...................................................................................... 28

*FDA v. Brown & Williamson Tobacco Corp.,*
  529 U.S. 120 (2000) .......................................................................... 25, 26, 27

*Fong Yue Ting v. United States,*
  149 U.S. 698 (1893) ...................................................................................... 14

*Grace v. Barr,*
  965 F.3d 883 (D.C. Cir. 2020) ................................................................. 28, 31

*Grace v. Whitaker,*
  344 F. Supp. 3d 96 (D.D.C. 2018) ................................................................. 31

*Indep. Ins. Agents of Am., Inc. v. Hawke,*
  211 F.3d 638 (D.C. Cir. 2000) ....................................................................... 26

*Innovation Law Lab v. Wolf*,
   951 F.3d 1073 (9th Cir. 2020) ........................................................................ 5

*INS v. Aguirre-Aguirre*,
   526 U.S. 415 (1999) ........................................................................................ 5

*INS v. Cardoza-Fonseca*,
   480 U.S. 421 (1987) ........................................................................................ 5

*INS v. Stevic*,
   467 U.S. 407 (1984) ........................................................................................ 5

*J.B.B.C. v. Wolf*,
   No. 20-cv-1509, (D.D.C. June 24, 2020) ....................................................... 2

*J.D. v. Azar*,
   925 F.3d 1291 (D.C. Cir. 2019) ........................................................... 1, 3, 11

*League of Women Voters of U.S. v. Newby*,
   838 F.3d 1 (D.C. Cir. 2016) .......................................................................... 31

*Merck & Co. v. U.S. Dep't of Health & Human Servs.*,
   962 F.3d 531 (D.C. Cir. 2020) .......................................................... 15, 16, 22

*Michigan v. EPA*,
   576 U.S. 743 (2015) ...................................................................................... 27

*Mori v. Dep't of the Navy*,
   917 F. Supp. 2d 60 (D.D.C. 2013) ........................................................... 27, 28

*Motor Vehicle Mfrs. Assn. of U.S., Inc. v. State Farm Mut. Auto. Insc. Co.*,
   463 U.S. 29 (1983) ................................................................................... 28, 29

*Nasrallah v. Barr*,
   140 S. Ct. 1683 (2020) .................................................................................. 18

*Nat'l Lifeline Ass'n v. FCC*,
   921 F.3d 1102 (D.C. Cir. 2019) .............................................................. 28, 29

*Negusie v. Holder*,
   555 U.S. 511 (2009) ........................................................................................ 6

*Nken v. Holder*,
   556 U.S. 418 (2009) ................................................................................. 11, 32

*Orantes-Hernandez v. Meese*,
   685 F. Supp. 1488 (C.D. Cal. 1988) ............................................................. 32

*Padilla v. Kentucky*,
   559 U.S. 356 (2010) ...................................................................................... 14

*Radzanower v. Touche Ross & Co.*,
   426 U.S. 148 (1976) ...................................................................................... 26

*Sottera, Inc. v. FDA*,
   627 F.3d 891 (D.C. Cir. 2010) ............................................................ 11

*Trump v. Hawaii*,
   138 S. Ct. 2392 (2018) ..................................................................... 25

*United States v. Juvenile Male*,
   670 F.3d 999 (9th Cir. 2012) ......................................................... 26, 27

*Util. Air Reg. Grp v. EPA*,
   573 U.S. 302 (2014) ..................................................................... 13, 14

*Valentine v. U.S. ex rel. Neidecker*,
   299 U.S. 5 (1936) ............................................................................ 14

*Walsh v. Preston*,
   109 U.S. 297 (1883) ........................................................................ 17

*Wisc. Cent. Ltd. v. United States*,
   138 S. Ct. 2067 (2018) ..................................................................... 15

## Statutes and Legislative History

6 U.S.C. § 279(a) ............................................................................... 23

6 U.S.C. § 279(b)(1)(B) ................................................................... 3, 23

8 U.S.C. § 1158 .................................................................................... 4

8 U.S.C. § 1158(a)(1) ..................................................................... 4, 24

8 U.S.C. § 1158(a)(2)(C) ..................................................................... 4

8 U.S.C. § 1158(a)(2)(E) .............................................................. 4, 5, 24

8 U.S.C. § 1158(b)(2)(A)(i) ................................................................. 4

8 U.S.C. § 1158(b)(2)(A)(ii) ............................................................... 4

8 U.S.C. § 1158(b)(2)(A)(iii) .............................................................. 4

8 U.S.C. § 1158(b)(2)(A)(iv) ............................................................... 4

8 U.S.C. § 1158(b)(2)(A)(v) ................................................................ 4

8 U.S.C. § 1158(b)(2)(A)(vi) ............................................................... 4

8 U.S.C. § 1158(b)(3)(C) ................................................................. 5, 24

8 U.S.C. § 1182(a)(1) ..................................................................... 6, 15

8 U.S.C. § 1182(a)(1)(i) ....................................................................... 6

8 U.S.C. § 1182(f) ............................................................................. 25

8 U.S.C. § 1222 ................................................................................. 15

8 U.S.C. § 1222(a) ................................................................................................ 6

8 U.S.C. § 1222(b) ................................................................................................ 7

8 U.S.C. § 1225(b)(2)(c) ...................................................................................... 14

8 U.S.C. § 1229a ................................................................................................. 28

8 U.S.C. § 1231 ....................................................................................... 6, 14, 24

8 U.S.C. § 1231(b)(3) ................................................................................... 5, 24

8 U.S.C. § 1231(b)(3)(B) ...................................................................................... 5

8 U.S.C. § 1231(b)(3)(B)(i) ................................................................................. 5

8 U.S.C. § 1231(b)(3)(B)(ii) ............................................................................... 5

8 U.S.C. § 1231(b)(3)(B)(iii) .............................................................................. 5

8 U.S.C. § 1231(b)(3)(B)(iv) .............................................................................. 5

8 U.S.C. § 1232(a)(2)-(4) ..................................................................................... 4

8 U.S.C. § 1232(a)(2)(A) ................................................................................ 4, 23

8 U.S.C. § 1232(a)(2)(C) ...................................................................................... 4

8 U.S.C. § 1232(a)(4) .......................................................................................... 23

8 U.S.C. § 1232(a)(5) ............................................................................................ 4

8 U.S.C. § 1232(a)(5)(D)(ii) ............................................................................... 23

8 U.S.C. § 1232(a)(5)(D)(iii) ............................................................................... 4

8 U.S.C. § 1232(b)(3) ............................................................................. 4, 23, 33

8 U.S.C. § 1232(c)(2)-(3) ............................................................................... 4, 23

8 U.S.C. § 1232(c)(5) .......................................................................................... 23

18 U.S.C. § 3185 ................................................................................................. 14

18 U.S.C. § 3186 ................................................................................................. 14

18 U.S.C. § 3196 ................................................................................................. 14

24 Cong. Rec. 359 (1893) ................................................................................... 19

24 Cong. Rec. 378 (1893) ................................................................................... 17

42 U.S.C. § 271 ................................................................................................... 13

42 U.S.C. § 271(a) ............................................................................................ 7, 8

42 U.S.C. § 265 ......................................................................................... passim

153 Cong. Rec. H14098-01, H14118 (Dec. 4, 2007) ................................. 23, 24

154 Cong. Rec. S10886-01, S1086, 2008 WL 5169970 (Dec. 10, 2008)...................................... 23

Act of Feb. 15, 1893, ch. 114................................................................................................... 17

Act of February 15, 1893, ch. 114, 27 Stat. 449, 452 ............................................................ 7, 16

Act of Mar. 3, 1891, ch. 551, 26 Stat. 1084......................................................................... 6, 15, 18

Act of March 3, 1903, chap. 1012, §§ 8, 9, 19, 20, 21, 32 Stat. 1213 ......................................... 18

Chinese Exclusion Act of May 6, 1882, ch. 126, §§ 2, 12, 22 Stat. 58, 59, 61 ........................... 18

Foreign Affairs Reform and Restructuring Act of 1998 § 2242(a), Pub. L. No. 105-207, Div. G.
      Title XXI, 112 Stat. 2681 .......................................................................................................... 6

Public Health Service Act, Pub. L. 78-410, § 362, 58 Stat. 682, 704 (1944). ......................... 7, 16

William Wilberforce, Trafficking Victims Protection Reauthorization Act of 2008,
      Pub L. No. 110-457, 122 Stat. 5044 (2008), 8 U.S.C. § 1232 ..................................................... 3

## Other Authorities

A. Scalia & B. Garner, Reading Law: The Interpretation of Legal Texts 93 (2012) ................... 22

Camilo Montoya-Galvez, *As Trump pushes to reopen, U.S. continues expelling migrants at
      border, citing pandemic*, CBS News (June 1, 2020), https://www.cbsnews.com/news/as-
      trump-pushes-to-reopen-u-s-officials-continue-border-expulsion-policy-citing-pandemic. .... 25

Convention Against Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment
      art. 3, Dec. 10, 1984, S. Treaty Doc. No. 100-20 (1988) ......................................................... 6

*Hearing on CBP Oversight Before the U.S. Senate Committee on Homeland Security and
      Government Affairs (June 25, 2020), available at https://www.hsgac.senate.gov/cbp-oversight-
      examining-the-evolving-challenges-facing-the-agency* ....................................................... 8, 9

*Introduce*, *Webster's Collegiate Dictionary* 453 (1st ed. 1898)................................................... 17

*Letter to HHS Secretary Azar and CDC Director Redfield Signed by Leaders of Public Health
      Schools*, Medical Schools, Hospitals, and Other U.S. Institutions, Columbia Mailman School
      of Public Health (May 18, 2020), https://tinyurl.com/y8q3asun............................................. 33

*Twenty Days Quarantine*, N.Y Times, (Sept. 2, 1892),
      https://www.nytimes.com/1892/09/02/archives/twenty-days-quarantine-the-government-takes-
      decisive-action-a.html ........................................................................................................ 21

*Universal English Dictionary* 1067 (John Craig ed. 1861) ....................................................... 17

*U.S. Dept' of State, 2019 Country Reports on Human Rights Practices: Guatemala*, *available at*
      https://www.state.gov/wp-content/uploads/2020/02/GUATEMALA-2019-HUMAN-RIGHTS-
      REPORT.pdf ........................................................................................................................ 31

*U.S. Dept' of State, 2019 Country Reports on Human Rights Practices: Honduras*, *available at* https://www.state.gov/wp-content/uploads/2020/02/ HONDURAS-2019-HUMAN-RIGHTS-REPORT.pdf ................................................................................................ 31

*U.S. Dept' of State, 2019 Country Reports on Human Rights Practices: El Salvador*, *available at* https://www.state.gov/wp-content/uploads/2020/02/EL-SALVADOR-2019-HUMAN-RIGHTS-REPORT.pdf ................................................................................................ 31

**Regulations and Orders**

42 C.F.R. § 71.40(a) ................................................................................................ 8

8 C.F.R. § 1208.16(a) ................................................................................................ 5, 6

8 C.F.R. § 1208.16-.18 ................................................................................................ 6

70 Fed. Reg. 71,891 (Nov. 30, 2005) ................................................................................................ 20

80 Fed. Reg. 16,400 (Mar. 27, 2015) ................................................................................................ 20

85 Fed. Reg. 7874 (Feb. 12, 2020) ................................................................................................ 20

85 Fed. Reg. 17067 (Mar. 26, 2020) ................................................................................................ 33

Amendment and Extension of Order Under Sections 362 and 365 of the Public Health Service Act,
85 Fed. Reg. 31,503 (May 26, 2020) ................................................................................................ 7, 8

Control of Communicable Diseases; Foreign Quarantine: Suspension of Introduction of Persons into United States From Designated Foreign Countries or Places for Public Health Purposes,
85 Fed. Reg. 16,559 (Mar. 24, 2020) ................................................................................................ 7, 8

Control of Communicable Diseases,
Fed. Reg. 54230 (Aug. 15, 2016) ................................................................................................ 20

Extension of Order Under Sections 362 and 365 of the Public Health Service Act,
85 Fed. Reg. 22,424 (Apr. 22, 2020) ................................................................................................ 7, 8

Order Under Sections 362 and 365 of the Public Health Service Act Suspending Introduction of Certain Persons From Countries Where a Communicable Disease Exists,
85 Fed. Reg. 17,060 (Mar. 26, 2020) ................................................................................................ 7, 8

Security Bars and Processing,
85 Fed. Reg. 41,201 (July 9, 2020) ................................................................................................ 5

## INTRODUCTION

Plaintiff P.J.E.S. is a 16-year-old boy from Guatemala who fled to the United States by himself (and so is deemed by statute an "unaccompanied minor") and was apprehended by U.S. Customs and Border Protection ("CBP"). Under longstanding safeguards in the immigration statutes for unaccompanied children and asylum seekers, P.J.E.S. was entitled to various protections—including expeditious transfer from CBP to the care of the Office of Refugee and Resettlement ("ORR"), release to his father in the United States as soon as possible, and a full hearing before an immigration judge on his asylum claim. Instead, Defendants moved to summarily deport him based on an unprecedented and unlawful Order issued by the Centers for Disease Control and Prevention ("CDC") authorizing the expulsion of unaccompanied minors without any hearing, even where, as here, the minor has no symptoms of COVID-19.

While Defendants have now agreed not to expel P.J.E.S., they have already expelled at least 2,000 unaccompanied children pursuant to the CDC Order, which is based on the government's supposed expulsion powers under the public health provisions of Title 42. And more children face the same fate every day. Plaintiff therefore respectfully moves this Court, in conjunction with his previously filed motion for class certification, for a preliminary injunction barring the expulsion of any unaccompanied child under this new, unlawful deportation system. [1]

---

[1] Because the Named Plaintiff was subjected to the Title 42 Process when the class complaint and class certification motion were filed, the Court can certify the class and issue class relief. *See J.D. v. Azar*, 925 F.3d 1291, 1311 (D.C. Cir. 2019). Plaintiff respectfully requests the Court to resolve both the pending Motion for Class Certification and this Motion together. *See* ECF No. 2 (Motion for Class Certification); *see also Damus v. Nielsen*, 313 F. Supp. 3d 317, 328-35 (D.D.C. 2018) (explaining that plaintiffs "need only provisional class certification in order for the Court to grant their preliminary injunction," and describing standards that govern provisional class certification).

The government's new Title 42 expulsion process, based on a new regulation, several iterations of the CDC Order, and an implementation memo (hereafter collectively the "Title 42 Process"), is patently unlawful.  Judge Nichols in this District has already found the Process likely is unlawful in the only ruling thus far on the issue.  *See* Kang Decl., ECF No. 2-2, Ex. D, (Transcript of June 24, 2020 Preliminary Injunction Hearing and Oral Ruling) (hereinafter "*J.B.B.C.* PI Ruling"); Order, *J.B.B.C. v. Wolf*, No. 20-cv-1509, (D.D.C. June 24, 2020), ECF No. 38.

Judge Nichols's decision is correct, for at least two reasons.  First, Title 42 does not authorize deportations at all.  Rather, it authorizes testing, and in extreme cases, detention and quarantine.  In short, Title 42 provides for public health measures.  It is not a deportation statute. Second, even assuming that Title 42 somehow could be construed to authorize deportations of some noncitizens, it does not override later-enacted statutes protecting children and those seeking protection.  Indeed, Congress specifically addressed communicable diseases in the immigration laws.  Those laws allow the government to bar entry of some individuals with communicable diseases, but it is well established that unaccompanied children and those seeking protection must be provided the protections to which they are entitled, and may not be automatically expelled even if they actually have a communicable disease.

At bottom, this is a separation of powers case.  The Administration has circumvented the process created by Congress to deal with unaccompanied minors, those seeking protection and those with communicable diseases.  And, because of the government's unlawful actions, unaccompanied children are suffering and will continue to suffer irreparable harm.  The Court should therefore grant provisional class certification and a preliminary injunction prohibiting Defendants from subjecting unaccompanied children to the Title 42 Process.

## BACKGROUND

### A. Immigration Laws' Protections for Unaccompanied Children

Congress has carefully and repeatedly worked to ensure that unaccompanied children are afforded unique, mandatory, and protective procedures when they face deportation.

Specifically, two laws guarantee the children's proper care and facilitate their efforts to seek humanitarian protection.  First, in 2002, Congress included provisions in the Homeland Security Act ("HSA") to "ensur[e] that the interests of the child are considered in decisions and actions relating to the care and custody of an unaccompanied alien child."  6 U.S.C. § 279(b)(1)(B).  Through the HSA, Congress vested responsibility for the care of unaccompanied children, including the provision of housing and access to legal services to pursue claims for immigration relief, in the Office of Refugee Resettlement ("ORR"), a component of the Department of Health and Human Services ("HHS").  ORR had demonstrated experience working with vulnerable immigrants and refugees, and thus more suitable to oversee the care of unaccompanied children than immigration enforcement authorities.

Second, in 2008, Congress enacted the Trafficking Victims Protection Reauthorization Act ("TVPRA"), which strengthened those protections by creating specific mechanisms for processing the claims of unaccompanied children who had claims for relief from removal. Among those protections was that certain unaccompanied children, like Plaintiff here, should be swiftly referred to ORR, which would then take responsibility for their care, and release them to family members or other suitable sponsors in the United States.  *See J.D. v. Azar*, 925 F.3d 1291, 1301-02 (D.C. Cir. 2019) (describing TVPRA statutory scheme and ORR shelter system).

Thus, Congress has prescribed a careful and comprehensive set of directions to federal agencies for how unaccompanied children should be processed and cared for upon their

apprehension.  *See, e.g.*, 8 U.S.C. § 1232(a)(2)(C), (a)(5), (c)(2)-(3).  Congress has also set forth

specific instructions concerning the procedures Defendants must follow before removing

unaccompanied children.[2]  *See, e.g.*, 8 U.S.C. § 1232(a)(2)(A), (a)(5).

**B.  The Immigration Laws' Protections for Asylum Seekers**

More generally, Congress also has proscribed longstanding protections for noncitizens,

including children, seeking protection from persecution and torture.  First, the asylum statute, 8

U.S.C. § 1158, provides that any noncitizen in the United States has a right to apply for asylum,

regardless of their status.  *See* 8 U.S.C. § 1158(a)(1) (providing that "[a]ny alien who is

physically present in the United States or who arrives in the United States (whether or not at a

designated port of arrival . . .), irrespective of such alien's status, may apply for asylum").  The

asylum statute provides a narrow list of bars to asylum., none of which apply here.[3]  Moreover,

Congress expressed a special concern with expanding access to asylum for unaccompanied

children by, e.g., exempting them from the one-year deadline that ordinarily applies to asylum

applications and preventing their removal to a "safe third country," *id.* 8 U.S.C. § 1158(a)(2)(E),

---

[2] For children from "noncontiguous" countries, like Plaintiff P.J.E.S., Congress directed that such children be expeditiously transferred to ORR custody within 72 hours.  8 U.S.C. § 1232(b)(3).  For children from contiguous countries, i.e. Canada and Mexico, Defendants may conduct a screening for them prior to transfer to ORR.  *Id.* § 1232(a)(2)-(4).  Children in ORR care cannot be deported via fast-track proceedings, and instead must receive full removal proceedings before an immigration judge, along with other statutory protections.  *Id.* § 1232(a)(5)(D)(iii).  The Title 42 process does not comply with the TVPRA's mandates.
[3] The statute makes asylum unavailable to an applicant who, inter alia, previously applied for and was denied asylum, *id.* § 1158(a)(2)(C) (previous denial bar); engaged in persecution or terrorist activities, *id.* § 1158(b)(2)(A)(i) (persecution of others bar); *id.* at § 1158(b)(2)(A)(v) (terrorist bar); *id.* § 1158(b)(2)(A)(iv) (national security bar); has committed certain crimes, *id.* §§ 1158(b)(2)(A)(ii) (particularly serious crime bar), 1158(b)(2)(A)(iii) (serious non-political crime bar); and who "was firmly resettled in another country prior to arriving in the United States," *id.* § 1158(b)(2)(A)(vi) (firm settlement bar).

and providing them the opportunity to apply for asylum in the first instance before an asylum

officer in a non-adversarial setting, *id.* § 1158(b)(3)(C).

Second, the withholding of removal statute, 8 U.S.C. § 1231(b)(3), provides that a

noncitizen "may not" be removed to a country where their "life or freedom" would be threatened

based on a protected ground.  A grant of withholding is mandatory if the individual meets the

statutory criteria.  *INS v. Aguirre-Aguirre*, 526 U.S. 415, 420 (1999).  Congress enacted this

statute to "conform[] it to the language of Article 33 [of the 1951 U.N. Convention of

Refugees]," *INS v. Stevic*, 467 U.S. 407, 421 (1984), in several respects, including by making

withholding "mandatory" where the eligibility criteria are satisfied, *INS v. Cardoza-Fonseca*,

480 U.S. 421, 440 n.25 (1987), and by giving it broad application where the government seeks to

return a noncitizen to a country where he fears persecution, *see Innovation Law Lab v. Wolf*, 951

F.3d 1073, 1089 (9th Cir. 2020).  Congress again outlined specific and narrow bars to

withholding of removal; none apply here.[4]  Notably, moreover, only an immigration judge can

determine whether a minor faces a risk of persecution and is entitled to withholding of removal

after full removal proceedings in immigration court.  8 C.F.R. § 1208.16(a).

Third, protections under Convention Against Torture ("CAT") prohibit returning a

noncitizen to a country where it is more likely than not that he would face torture.  Article 3 of

---

[4]  A withholding applicant who assisted in Nazi persecution is barred from withholding.  8
U.S.C. § 1231(b)(3)(B).  The other bars address persecutors, *id.* § 1231(b)(3)(B)(i); particularly
serious crimes, *id.* § 1231(b)(3)(B)(ii); serious non-political crimes, *id.* § 1231(b)(3)(B)(iii); and
security and terrorism, *id.* § 1231(b)(3)(B)(iv).

The Department of Homeland Security recently issued a notice of proposed rulemaking
for a rule providing, among other things, that the national security bars to asylum and
withholding of removal would "apply in the context of public health emergencies related to the
possible threat of introduction or further spread of international pandemics into the United
States."  Security Bars and Processing, 85 Fed. Reg. 41,201 (July 9, 2020).  This proposed rule
has not gone into effect and is not at issue in this case.

CAT provides that "[n]o State Party shall expel, return ('refouler') or extradite a person to another State where there are substantial grounds for believing that he would be in danger of being subjected to torture."  Convention Against Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment art. 3, Dec. 10, 1984, S. Treaty Doc. No. 100-20, at 20 (1988). Congress subsequently implemented Article 3 of CAT.  *See* Foreign Affairs Reform and Restructuring Act of 1998 ("FARRA") § 2242(a), Pub. L. No. 105-207, Div. G. Title XXI, 112 Stat. 2681 (codified at 8 U.S.C. § 1231 note); 8 C.F.R. § 1208.16-.18 (implementing regulations).  There are no bars to eligibility for CAT protection.  *See, e.g.*, *Negusie v. Holder*, 555 U.S. 511, 514 (2009).  As with withholding, only an immigration judge, after full removal proceedings in immigration court, can determine whether a minor faces a risk of torture if removed from the United States.  8 C.F.R. § 1208.16(a).

### C.  Immigration Laws' Treatment of Communicable Diseases

Congress has specially addressed communicable diseases in the immigration laws.  From the earliest days of immigration regulation, Congress has explicitly authorized the deportation of individuals based on public health concerns.  *See* Act of Mar. 3, 1891, ch. 551, 26 Stat. 1084, 1085.  Similar statutes exist today.  There are several "[h]ealth-related grounds" of inadmissibility that authorize the deportation of noncitizens based on specified public health concerns, 8 U.S.C. § 1182(a)(1), including if a noncitizen is determined to have "a communicable disease of public health significance," *id.* § 1182(a)(1)(i).  Immigration statutes also provide for medical examination and detention as part of immigration processing.  *See id.* § 1222(a) (authorizing detention of arriving noncitizens who might have a communicable disease or is "coming from a country or have embarked at a place where any of such diseases are prevalent or epidemic," but only "for a sufficient time to . . . subject [them] to observation and an

examination"); *id.* § 1222(b) (authorizing physical and mental examination of arriving noncitizens). But these statutes do not permit the summary deportation of children in violation of the TVPRA, or deportation without a screening for persecution or torture.

### D. The Title 42 Process

Announced by the President on March 20, 2020, the Title 42 Process is a new shadow immigration system purportedly established under the government's public health powers codified in Title 42 of the U.S. Code. Specifically, in a series of agency documents, the CDC has invoked 42 U.S.C. § 265 to bar and expel noncitizens who arrive at the border or enter the country without documents.[5]

Section 265 of Title 42 was first enacted in 1893 and was later reenacted in substantially the same language in the Public Health Service Act of 1944. Act of February 15, 1893, § 7, ch. 114, 27 Stat. 449, 452; Public Health Service Act, Pub. L. 78-410, § 362, 58 Stat. 682, 704 (1944). It provides in relevant part that the Surgeon General may "prohibit . . . the introduction of persons or property" from designated places where "by reason of the existence of any communicable disease in a foreign country there is serious danger of the introduction of such disease into the United States."[6] 42 U.S.C. § 265. The penalties for violating § 265 include "a

---

[5] *See* Control of Communicable Diseases; Foreign Quarantine: Suspension of Introduction of Persons into United States From Designated Foreign Countries or Places for Public Health Purposes, 85 Fed. Reg. 16,559 (Mar. 24, 2020) (effective date Mar. 20, 2020); Order Under Sections 362 and 365 of the Public Health Service Act Suspending Introduction of Certain Persons From Countries Where a Communicable Disease Exists, 85 Fed. Reg. 17,060 (Mar. 26, 2020) (effective date Mar. 20, 2020); Extension of Order Under Sections 362 and 365 of the Public Health Service Act, 85 Fed. Reg. 22,424 (Apr. 22, 2020) (effective date Apr. 20, 2020); Amendment and Extension of Order Under Sections 362 and 365 of the Public Health Service Act, 85 Fed. Reg. 31,503 (May 26, 2020) (effective date May 21, 2020); U.S. Customs and Border Protection and U.S. Border Patrol "Operation Capio" Memo [hereinafter "CBP Memo"], *see* Decl. of Adrienne Harrold ("Harrold Decl."), Ex. E.
[6] This authority of the Surgeon General has been transferred to HHS and delegated to the CDC. *See* 85 Fed. Reg. 16,559, 16,560 n.1 (explaining reorganizations and transfers of authority).

fine of not more than $1,000 or . . . imprisonment for not more than one year, or both." *Id.*
§ 271(a).  Deportation is not an available penalty.  *See id.*

Shortly after the President's announcement, the CDC published an interim final rule
providing that the CDC may prohibit the "introduction into the United States of persons" from
foreign countries.  85 Fed. Reg. 16,559, 16,563; *see* 42 C.F.R. § 71.40(a).  Pursuant to this new
regulation, the CDC issued an Order to forcibly return asylum seekers back to the country from
which they entered, their home country, or another location.  *See* 85 Fed. Reg. 17,060, 17,067.
The initial March 20 Order, which was set to expire in 30 days, was extended for an additional
30 days on April 20, 85 Fed. Reg. 22,424, and then extended indefinitely on May 20, 85 Fed.
Reg. 31,503.

On April 2, 2020, CBP issued a memorandum describing the agency's implementation of
the Title 42 Process, an effort it calls "Operation Capio."  *See* CBP Memo, Harrold Decl., Ex. E.
The CBP Memo clarifies that the only humanitarian protection provided under the Title 42
Process is limited to an inadequate CAT screening, and does not include screenings for
persecution.  CBP Memo at 4.  The CAT screenings, moreover, are not conducted by
immigration judges, and lawyers report that even these limited CAT screenings are not uniformly
undertaken, and when they are, they lack the most rudimentary procedural safeguards.  *See*
Declaration of Linda Corchado ("Corchado Decl."), ¶¶ 13-14; Declaration of Lisa Frydman
("Frydman Decl."), ¶¶ 32; Declaration of Taylor Levy ("Levy Decl."), ¶ 6

CBP Chief Operating Officer Mark Morgan testified on June 25, 2020, that over two
thousand unaccompanied children had been summarily deported under the Title 42 as of that
date.  *See Hearing on CBP Oversight Before the U.S. Senate Committee on Homeland Security
and Government Affairs* 1:10:09 (June 25, 2020), https://www.hsgac.senate.gov/cbp-oversight-

examining-the-evolving-challenges-facing-the-agency.  Unaccompanied children subject to the Title 42 Process regularly spend multiple days in hotels or CBP facilities while waiting for deportation flights.  *See* Interim Report on the Use of Temporary Housing for Minors and Families Under Title 42 by Independent Monitor, ECF No. 873 at 8, *Flores v. Barr*, No. 85-cv-04544 (C.D. Cal July 22, 2020) [hereinafter "Monitor Report"], Harrold Decl., Ex. H; *see id.* at 11 (describing an average of 4 to 5 days, and one child held in a hotel for 11 days).  These detention locations are not made public. Frydman Decl., ¶ 31; Corchado Decl., ¶¶ 5-8; Levy Decl., ¶ 5.  While children are sometimes allowed to call parents or other relatives, DHS officers are usually on the line during those calls, and often prevent the children from disclosing any information concerning their locations.  Levy Decl., ¶ 5; Corchado Decl., ¶¶ 7, 10.

Defendants' court filings, news reports, and Congressional testimony state that Defendants test all or "virtually all" children in its care for COVID-19 before expulsion, often as a condition of their expulsion agreements with the receiving countries.  *See* Dara Lind & Lomi Kriel, *ICE Is Making Sure Migrant Kids Don't Have COVID-19—Then Expelling Them to 'Prevent the Spread' of COVID-19*, ProPublica (Aug. 10, 2020), Harrold Decl., Ex. G.[7]  If the child tests positive for COVID-19, the child is quarantined in the United States; only if the child tests negative is he or she expelled under Title 42.  *Id.*

In short, the government has implemented this Title 42 process as an alternative immigration system, ignoring the various protections for vulnerable noncitizens, including unaccompanied minors, and deporting people with no hearings, purportedly under its Title 42 authority rather than the immigration system established under Title 8 of the U.S. Code.

---

[7] Available at https://www.propublica.org/article/ice-is-making-sure-migrant-kids-dont-have-covid-19-then-expelling-them-to-prevent-the-spread-of-covid-19

### E.  The Proposed Class

Plaintiff P.J.E.S. seeks provisional class certification and a preliminary injunction on

behalf of a proposed class of unaccompanied children subjected to the unlawful Title 42 Process,

defined as:

> All unaccompanied immigrant children who (1) are or will be detained in U.S.
> government custody in the United States, and (2) are or will be subjected to the
> Title 42 Process.

*See* ECF No. 2-1 (Plaintiff's Memorandum in Support of Class Certification).  There are

hundreds of unaccompanied children subjected to the Title 42 Process every month.  *See id.*

Plaintiff's counsel here, and immigration lawyers who work with unaccompanied children, have

collectively advocated for dozens of unaccompanied children facing expulsion under Title 42,

but those dozens comprise only a small fraction of the total number of unaccompanied children

expelled every month without contacting any lawyers or advocates.  *See* Kang Decl., ECF No. 2-

2, ¶¶ 2-12 & Exs. A-C.

P.J.E.S.'s story is emblematic of other proposed class members' experiences.  P.J.E.S. is

a 16-year-old boy from Guatemala.  He comes from an indigenous Mayan family.  He and his

family members faced death threats for his father's political opinions.  P.J.E.S. also was

threatened by gang members after he refused to join them.  He was ultimately forced to flee

persecution and possibly death.  P.J.E.S. journeyed to the United States to seek safety and to

reunite with his father, who previously fled Guatemala and currently resides in the United States.

*See* Complaint, ECF No. 1, ¶¶ 77-81; Declaration of Mario Escobar Francisco ("Escobar

Francisco Decl."), ¶¶ 2-11.

On or around August 11, 2020, P.J.E.S entered the United States.  CBP apprehended him

and took him to a CBP facility in McAllen, Texas.  At the time the Complaint and Class

Certification Motion were filed in this case, P.J.E.S. was subject to the Title 42 Process and faced imminent expulsion back to Guatemala.  Stefaniak Decl., ECF No. 2-4, ¶¶ 1-3; Escobar Francisco Decl., ¶¶ 10-11.  After Plaintiff filed this lawsuit and his counsel met and conferred with government counsel, Defendants voluntarily agreed to take him out of the Title 42 Process and transfer him to ORR custody.  Escobar Francisco Decl., ¶ 11.

The Proposed Class Members are often fleeing circumstances of extreme danger and harm in their home countries.  Many unaccompanied children come from El Salvador, Guatemala, and Honduras, where the danger to children is well-documented.  Frydman Decl., ¶¶ 5-20.  Many are also eligible for various forms of humanitarian relief in the United States, which the Title 42 Process stops them from seeking.

## LEGAL STANDARD

On a motion for a preliminary injunction, a court must consider "whether (1) the plaintiff has a substantial likelihood of success on the merits; (2) the plaintiff would suffer irreparable injury were an injunction not granted; (3) an injunction would substantially injure other interested parties; and (4) the grant of an injunction would further the public interest."  *Sottera, Inc. v. FDA*, 627 F.3d 891, 893 (D.C. Cir. 2010) (internal quotation marks and citation omitted).  The first two prongs of the inquiry (likelihood of success and irreparable harm) are the "most critical."  *Nken v. Holder*, 556 U.S. 418, 434 (2009).  Where, as here, a plaintiff seeks preliminary relief on behalf of a proposed class, the Court may grant provisional certification of the class and issue classwide relief.  *See, e.g.*, *J.D.*, 925 F.3d at 1305-06 (observing that district court had resolved pending motions for class certification and classwide preliminary injunction in tandem); *Damus*, 313 F. Supp. 3d at 328-35 (certifying class of detained asylum seekers for purpose of granting preliminary injunction).

**ARGUMENT**

## I.   THE CLASS IS LIKELY TO SUCCEED ON THE MERITS.

The proposed class of unaccompanied children are likely to succeed on the merits of their

challenge to the government's unprecedented process of subjecting them to rapid expulsion

under the supposed authority of 42 U.S.C. § 265.  As explained below, § 265 does not authorize

deportation at all.  But even if such deportations were permitted, unaccompanied children are

entitled to explicit statutory procedures and protections.  Those specific, later-enacted statutes

control over whatever § 265 may authorize in general.  Moreover, subjecting Class Members to

the Title 42 Process is arbitrary and capricious in violation of the Administrative Procedure Act

("APA").

The only court to have considered these claims thus far recently held the plaintiff in that

case had demonstrated likelihood of success on the merits.  Specifically, Judge Nichols held in

an oral ruling that:

> In my view, the plaintiff is likely to succeed on the question of whether 42 U.S.C.
> 265 grants the director of the CDC the power the government articulates here for
> three related reasons.  The first is that the statute authorizes the director of the CDC
> to prohibit the introduction of persons and property by its plain terms.  There's a
> serious question about whether that power includes the power also to remove or
> exclude persons who are already present in the United States.  There are other
> provisions, obviously, in the immigration statutes that reference the power to return
> or to remove.  The fact that Congress did not use those terms here, I think, is –
> suggests at a minimum that the power to remove is not granted by section 265.
>
> Even if the power to remove were read [into] section 265, the plaintiff has
> likelihood of success because the provision, in the Court's view, should be
> harmonized, to the maximum extent possible, with immigration statutes, including
> those already referenced that grant special protections to minors and also those
> immigration statutes that deal with communicable diseases and quarantines.
>
> . . . The Court, in addition, does not believe that the CDC director is likely entitled
> to *Chevron* deference; whereas, here the provision at issue, 42 U.S. Code 265, needs
> to also be read in light of statutes that the CDC director quite plainly has no special
> expertise regarding, and also whereas, here the order does very little by way of an

analysis of what exactly the power to prohibit the introduction of persons and property means.

*J.B.B.C.* PI Ruling, Kang Decl., ECF No. 2-2, Ex. D at 49-51.

### A.  Section 265 Does Not Authorize Deportations At All.

The Title 42 Process has been created under the purported authority of 42 U.S.C. § 265, a provision that has lain dormant and largely forgotten in the U.S. Code for over a hundred years. Defendants claim to have discovered in this statute a source of unlimited authority to execute summary deportations as they see fit, without regard for the carefully crafted policy judgments of the Nation's immigration laws.  But when an agency claims to discover "an unheralded power" lying dormant "in a long-extant statute," courts "typically greet its announcement with a measure of skepticism."  *Util. Air Reg. Grp v. EPA*, 573 U.S. 302, 324 (2014).  And, indeed, this novel, sweeping assertion of Executive dominance in the realm of immigration exceeds the power granted by § 265.  Nothing in § 265, or Title 42 more generally, purports to authorize *any* deportations (much less deportations in violation of the specific protections described below, *infr*a Section I.B).

### 1.  The text, context, and structure of § 265 demonstrate that it does not authorize deportations.

Section 265 authorizes the CDC to prohibit the "introduction of persons" under certain circumstances.  It says nothing about any power to physically remove people from the United States.  Nor does a neighboring provision laying out the "penalties" for violation of "any regulation prescribed" under § 265 make any mention of such expulsion authority.  *See* 42 U.S.C. § 271.  Instead, § 271 provides for fines and imprisonment of individuals for violation of public health regulations.  Nowhere in Title 42 does any statute mention the newly asserted

13

power to deport, in the name of public health, independent of Congress's carefully reticulated immigration scheme.

That silence speaks volumes.  The Supreme Court has "long recognized that deportation is a particularly severe 'penalty.'"  *Padilla v. Kentucky*, 559 U.S. 356, 365 (2010) (quoting *Fong Yue Ting v. United States,* 149 U.S. 698, 740 (1893)).  Thus, the extreme exercise of governmental power involved in physically removing a person from the country is one that must be granted by Congress, as "the Constitution creates no executive prerogative to dispose of the liberty of the individual."  *Valentine v. U.S. ex rel. Neidecker*, 299 U.S. 5, 9 (1936) (holding that extradition power "does not exist save as it is given by act of Congress" or a treaty).

Such powers of physical removal from the country—whether called deportation, removal, extradition, or expulsion—"must be *affirmatively* granted" by Congress.  *Id.* at 12 (emphasis added) (rejecting argument that power to extradite U.S. citizens could be implied from provision stating that United States was not bound to extradite them).  Accordingly, where Congress seeks to authorize that extraordinary physical control, it does so in explicit terms.  *See, e.g.*, 8 U.S.C. § 1231 (immigration removals); *id.* § 1225(b)(2)(c) ("may return the alien" to contiguous country); 18 U.S.C. §§ 3185, 3186, 3196 (extradition authority).  Courts do not—and, given the gravity of the asserted power, must not—lightly read an expulsion power into statutes that do not explicitly grant it.  *Valentine*, 299 U.S. at 12; *cf. Util. Air Reg. Grp.*, 573 U.S. at 324 ("We expect Congress to speak clearly if it wishes to assign to an agency decisions of vast economic and political significance.") (internal quotation marks omitted).  Nowhere in Title 42 has Congress granted that power.

That is not to say that Congress has ignored public health considerations in crafting immigration policy.  To the contrary, from the earliest days of immigration regulation—

predating the 1893 enactment of the predecessor to § 265—Congress has explicitly authorized the deportation of individuals based on public health concerns. *See* Act of Mar. 3, 1891, ch. 551, 26 Stat. 1084, 1085. And similar statutes exist today. *See* 8 U.S.C. § 1182(a)(1) ("[h]ealth-related grounds" of inadmissibility, including communicable diseases); 8 U.S.C. § 1222 (medical detention and examination as part of immigration processing). Because courts "presume differences in language like this convey differences in meaning[,]" particularly where contemporaneous statutes address related issues, Congress's decision to grant deportation power in the immigration statutes but not in Title 42 is conclusive. *See Wisc. Cent. Ltd. v. United States*, 138 S. Ct. 2067, 2071-72 (2018) (internal quotation marks omitted).

Critically, § 265, the provision on which Defendants rely for their new power, could not be read to authorize expulsions because that section refers only to "persons," and in no way differentiates between citizens and noncitizens. If the government is correct that § 265 authorizes expulsions, it would therefore mean that Congress gave the executive branch the power to expel U.S. citizens as well as noncitizens. *See Clark v. Martinez*, 543 U.S. 371, 386 (2005) (rejecting "the dangerous principle that judges can give the same statutory text different meanings in different cases" even if only some applications raise constitutional concerns). It is inconceivable that Congress would seek to give the executive branch that (plainly unconstitutional) power, must less that it would do so without any explicit statutory language.[8]

---

[8] Moreover, nothing in the text of § 265 would limit Defendants' claim of an implied enforcement regime to *deportation*. In theory, the government could assert an implied power for even more extreme measures. *See Merck & Co. v. U.S. Dep't of Health & Human Servs.*, 962 F.3d 531, 540 (D.C. Cir. 2020) (rejecting agency's "construction of the statute [which] would seem to give it unbridled power").

## 2.   Section 265 Was Designed To Regulate Transportation.

The omission of deportation authority from § 265 was no mistake.  To the contrary, it reflects Congress's design of that statute—as a means to stop travel from countries experiencing an outbreak of disease by regulating the *transportation* companies that bring people to the United States.  Section 7 of the Act of February 15, 1893, ch. 114, 27 Stat. 449, 452, which became § 265 without material change in the Public Health Service Act, Pub. L. 78-410, § 362, 58 Stat. 682, 704 (1944), was designed to regulate transportation entities that brought persons and goods to the United States, and it imposed fines and imprisonment on such transportation entities if they violated a public health order.  *See also* Harrold Decl., Ex. A (copy of 1893 Act).  If an individual's entry or presence was unlawful, the *immigration* system provided the sole mechanism for returning the individual to his home country.  Past practice bears out this design: When § 265 was used in 1929 to combat meningitis, another deadly disease transmitted by asymptomatic carriers via airborne respiratory droplets, deportation was not authorized.  It therefore makes sense that § 265 does not silently authorize a whole new deportation process, devoid of the procedural protections Congress created for noncitizens, including for those with communicable diseases.  Defendants cannot now create such an unauthorized system out of whole cloth.  *See Merck*, 962 F.3d at 536 (agencies are "bound" by Congress's choice of "means").

**a.**   The text of the 1893 provision demonstrates that the "means" Congress chose was the regulation of *transportation*, not of individual travelers, and underscores that Congress never authorized deportations.  Section 7 of the 1893 Act granted the "power to prohibit, in whole or in part, the *introduction* of persons and property" into the country.  27 Stat. 452 (emphasis added).  That term—"introduction"—meant then, as now, "'the act of bringing into a country.'"

*Introduce*, *Universal English Dictionary* 1067 (John Craig ed. 1861)); *see also Introduce*, *Webster's Collegiate Dictionary* 453 (1st ed. 1898) ("[t]o lead, bring, or usher in").  As a matter of ordinary language and usage, introducing a person into a country or place is an action taken by a *third party*—here, the shipping company.  *See, e.g.*, *Walsh v. Preston*, 109 U.S. 297, 298, 314, 315 (1883) ("colonization" contract requiring party to "introduce" immigrant families into Texas was unsatisfied, where there was no evidence individuals who came "were brought to Texas by [the party];" rather, "they came and settled of their own accord").  The plain text of § 265 is thus directed not at individuals seeking to *come to* the United States, but rather those proposing to *bring* such individuals here.

**b.**  The statutory context reinforces the plain text.  The 1893 Act was shot through with provisions specifically directed at the regulation of ships.  *See* Act of Feb. 15, 1893, ch. 114, § 1 (unlawful for ships to enter U.S. ports from abroad except in accordance with public health regulations); § 2 (requiring ships abroad to obtain a bill of health); § 3 (authorizing, *inter alia*, regulation of "vessels sail[ing] from any foreign port or place"); § 4 (charging the Surgeon General with, *inter alia*, obtaining sanitary information about foreign ports); § 5 (issuance of regulations for, *inter alia*, "vessels in foreign ports," and prohibition on vessels arriving without a bill of health); § 6 (providing for "an infected vessel" to be "remand[ed]" to quarantine station).

Critically, the 1893 Act imposed penalties *only* against ships—and set them high enough to deter those vessels from sailing to this country in violation of the Act.  *See id.* § 1 ($5000.00 fine for "vessel" violating the Act); *id.* § 2 (same for "vessel" entering United States without bill of health); *see also id.* § 3 (conditioning penalties on "any vessel or owner or officer thereof" on posting of regulations in consular offices abroad); 24 Cong. Rec. 378 (raising penalties).

17

Furthermore, an examination of immigration statutes in force in 1893 makes plain that Congress knew exactly how to provide for the removal of individuals. Those statutes covered those coming by ship and individually by land, and *explicitly* authorized deportations, separate and apart from regulations they imposed on ships involved in transporting immigrants. *See, e.g.*, Chinese Exclusion Act of May 6, 1882, ch. 126, §§ 2, 12, 22 Stat. 58, 59, 61 (establishing penalties for vessels, and separately providing for unauthorized immigrants "to be removed . . . to the country whence [they] came"); Act of Mar. 3, 1891, ch. 551, §§ 10, 11, 26 Stat. 1084, 1086 (establishing penalties for "master, agent, consignee, or owner of" a "vessel" who violates the Act's provisions, and separately providing for unauthorized immigrants to "be immediately sent back on the vessel by which they were brought in" and that "any alien who shall come into the United States in violation of law may be returned"); *id.* § 8 (providing "the Secretary of the Treasury may prescribe rules for inspection along the borders of Canada, British Columbia, and Mexico"); Act of Mar. 3, 1903, ch. 1012, §§ 8, 9, 19, 20, 21, 32 Stat. 1213 1215-16, 1218-19, 1221 (providing for noncitizens to "be immediately sent back . . . on the vessels bringing them," "deported," or "taken into custody and returned to the country whence he came").

It would have been "easy enough for Congress" to include the same kind of provisions in the 1893 Act. *Nasrallah v. Barr*, 140 S. Ct. 1683, 1692 (2020). Instead, Congress imposed penalties *only* on those involved in transportation, and used the term "introduction" to refer to the penalty-triggering conduct of such third parties. But Congress said nothing about any power to deport individuals who came to our shores. The government nevertheless now seeks to read into the statute's silence and implicit power to expel; but "it is not the proper role of the courts to rewrite [a law] passed by Congress and signed by the President." *Id.*

18

**c.**  The legislative history of the 1893 Act further confirms what is demonstrated by the text, context, and structure: Section 7 was a regulation of transportation entities.

The 1893 Act responded to a specific public health threat—a cholera epidemic in Europe. *See, e.g.*, 24 Cong. Rec. 359 (1893) (letter from physician explaining the "considerable" danger of an imminent cholera outbreak from Europe).  A principal proponent of the 1893 Act, Senator Chandler, explained that "90 or 95 percent of the immigration into the United States comes into the city of New York, and that the most danger of cholera is to be apprehended from vessels arriving at that port."  *Id.* at 360.  He expressed confidence that controlling travel by ship would effectively protect the country.  *Id.* at 363 ("there will be no great danger of the introduction of cholera this year unless it comes in the steerages," a class of ship travel).

As one of the 1893 Act's sponsors, Senator Harris, further explained, Section 7 therefore allowed the President "to prevent the coming at all" of "vessels, passengers, crews, and cargo, which are sailing to this country."  *Id*. at 392.  Congress expected that an invocation of Section 7 would cause shipping companies to refuse boarding, halting travel from designated locations at the source, thereby addressing the public health risk.

Indeed, when Senator Harris was asked about individuals crossing at *land* borders, he explained that an *earlier* Act providing general authority to quarantine and inspect individuals— not the new 1893 legislation—"clothes the Marine Hospital Service with ample power to protect the Mexican and Canadian borders."  *Id*. at 370.  The new authority to regulate transportation entities was simply part of the larger framework already in place that included not just the immigration laws but also the public health quarantine powers.

**d.**  The use of the statute since its enactment in 1893 reinforces the absence of any deportation power.  To Plaintiff's knowledge, the only time the statute has been invoked to

prohibit the introduction of persons was in 1929, and it did not authorize deportations.[9]

President Hoover issued an Executive Order invoking Section 7 of the 1893 Act to restrict the

"Transportation of Passengers" from China and the Philippines because of a meningitis outbreak.

Exec. Order No. 5143 (June 21, 1929), Harrold Decl., Ex. B.  The Order provided that "no

persons may be introduced directly or indirectly, by transshipment or otherwise into the United

States" except as permitted by the Treasury Secretary.  The use of passive voice—"may be

introduced"—makes clear that the Order was directed to third parties, namely transportation

companies.  The Treasury Department also issued associated regulations "governing the

embarkation of passengers and crew" at ports in those countries "and their transportation to

United States ports."[10]  The regulations further addressed how to handle vessels which arrived in

the United States when a meningitis case had occurred during the voyage, but, notably, only

authorized detention, quarantine, and testing—not deportation.

> **e.**  Finally, any suggestion that the correct interpretation of § 265 renders that statute

ineffective would be seriously mistaken.  Congress vested the government with a significant

power totally separate from any need to deport individuals from the country: shutting down all

---

[9] Most invocations of § 265 have involved regulation of goods or delegation of authority to particular officers or agencies.  In addition to the 1929 use of § 265, the provision has been invoked, with additional statutory authorities, four other times to address persons.  None of the four purported to authorize deportations.  One addressed the Do Not Board list, a mechanism to control transportation access, and the Public Health Lookout, a means to refer individuals at ports to CDC for isolation.  Criteria for Requesting Federal Travel Restrictions for Public Health Purposes, 80 Fed. Reg. 16,400 (Mar. 27, 2015).  Another proposed, but unadopted, regulation repeated the language of § 265 without elaboration.  Control of Communicable Diseases, 70 Fed. Reg. 71,891, 71,910 (Nov. 30, 2005).  The two others addressed quarantine and information gathering.  Control of Communicable Diseases, 81 Fed. Reg. 54230 (Aug. 15, 2016); Control of Communicable Diseases; Foreign Quarantine, 85 Fed. Reg. 7874 (Feb. 12, 2020).

[10] Regulations Governing the Embarkation of Passengers and Crew at Ports in China and the Philippine Islands and Their Transportation to the United States Ports Prescribed in Accordance with Executive Order Approved June 21, 1929, Harrold Decl., Ex. C.

international transportation from a particular country by regulating those who made such travel possible, the transportation companies.  And, despite the age of the statute, that tool remains powerful today: § 265 permits the government to halt the vast majority of international travel by barring ships, planes, trains, and other modes of transportation from bringing people from designated places to this country.

The efficacy of that approach was clear from the beginning.  The statute was passed against the backdrop of an extraordinary Executive action taken just months before, in September 1892.  *See* U.S. Dep't of Treasury, Quarantine Restrictions Upon Immigration to Aid in the Prevention of the Introduction of Cholera into the United States (Sept. 1, 1892), Harrold Decl., Ex. D.  The Surgeon General explained that "vessels conveying" immigrants from certain countries experiencing cholera outbreaks were a "direct menace to the public health," and ordered that "no vessel from any foreign port carrying immigrants shall be admitted" to any U.S. port "until said vessel shall have undergone" 20 days of quarantine.  *Id.*  Contemporaneous media coverage explained this step would "practically put a stop to immigration, for no steamship company will continue to transport people to this country" given the costs of quarantine.  *Twenty Days Quarantine*, N.Y Times (Sept. 2, 1892).[11]  The crisis triggered significant debate among the Cabinet as to the President's authority to take such a drastic step without clear statutory authority.  *See id.*  Shortly afterward, Congress enacted the 1893 Act granting the authority to regulate vessels to prevent the spread of disease.

Thus, while Congress's *goal* was to keep out disease, the *means* it authorized was regulation of transportation entities, not the deportation of individuals outside of the extensive

---

[11] https://www.nytimes.com/1892/09/02/archives/twenty-days-quarantine-the-government-takes-decisive-action-a.html

immigration system Congress has enacted and refined over the decades.  *Merck*, 962 F.3d at 536

("[A]gencies are bound, not only by the ultimate purposes Congress has selected, but by the

means it has deemed appropriate, and prescribed, for the pursuit of those purposes.") (internal

quotation marks omitted).  "The withholding of agency authority is as significant as the granting

of it, and we have no right to play favorites between the two."  *Dir., Office of Workers' Comp.*

*Programs, Dep't of Labor v. Newport News Shipbuilding & Dry Dock Co.*, 514 U.S. 122, 136

(1995); *see also* A. Scalia & B. Garner, Reading Law: The Interpretation of Legal Texts 94

(2012) ("[A]n absent provision cannot be supplied by the courts.").

*      *      *

In sum, § 265 authorizes no deportations at all.  Rather, it provides authority to halt

transportation companies from introducing people from countries suffering an epidemic to the

United States, by, for example, ship, train, and, in modern times, aircraft.

### B.  Section 265 Does Not Override the Immigration Laws' Protections for Unaccompanied Children.

Even if § 265 did authorize deportation in general, the specific protections Congress

enacted for unaccompanied children and those fleeing persecution prohibit the deportation of

members of the putative class.  Congress has carefully and repeatedly enacted special safeguards

for unaccompanied children and persons fleeing persecution.  These statutes contain specific

exceptions from their coverage, but no exception for communicable diseases or public health

crises.  Section 265 must be read in conjunction with the specific protections for those groups.

**1.** Congress has carefully and repeatedly worked to ensure that unaccompanied children

like the Class Members are afforded unique, mandatory, and protective procedures when they

face deportation.  *See* Background, Part I.  Defendants have jettisoned that entire statutory

scheme.

Congress included provisions in the HSA to "ensur[e] that the interests of the child are considered in decisions and actions relating to the care and custody of an unaccompanied alien child," 6 U.S.C. § 279(b)(1)(B), vesting responsibility for the care of unaccompanied children, including the provision of housing and access to legal services to pursue claims for immigration relief, in an agency—ORR—that had demonstrated experience working with vulnerable immigrants and refugees, *id.* § 279(a).  Congress subsequently strengthened those protections in the TVPRA by providing for important procedural safeguards before they could be removed. *See* Background, Part A.

Thus, Congress prescribed a careful and comprehensive set of directions to federal agencies for how unaccompanied children should be processed and cared for upon their apprehension.  Among other protections, Congress required federal agencies to expeditiously transfer children from noncontiguous countries, and children from contiguous countries after an initial screening, to ORR custody.  8 U.S.C. § 1232(a)(4), 1232(b)(3).  It then required ORR to provide safe and secure placements for all children in its care, and to facilitate their release to sponsors.  8 U.S.C. § 1232(c)(2)-(3).  It prevented DHS from removing such children through fast-track processes applicable to adults, 8 U.S.C. § 1232(a)(2)(A), *id.* § 1232(a)(5)(D)(ii), and guaranteed their access to counsel, *id.* § 1232(c)(5).  Through these provisions, Congress sought to satisfy its domestic and international obligations to protect a uniquely vulnerable set of children, who have claims for various forms of humanitarian protection.  Indeed, the legislative history of the TVPRA is replete with statements describing this country's "special obligation to ensure that [unaccompanied] children are treated humanely and fairly."  154 Cong. Rec. S10886-01, S1086, 2008 WL 5169970 (Dec. 10, 2008); *see also* 153 Cong. Rec. H14098-01, H14118 (Dec. 4, 2007) (discussing statute's purpose of "provid[ing] critical immigration mechanisms to

protect children").  Through their creation of an alternative immigration system, Defendants have circumvented the carefully-drawn scheme Congress set forth for the treatment and care of unaccompanied children.

Unaccompanied children also have a right to seek protection from persecution and torture, as Congress has long prescribed.  As explained above, children—like others seeking protection—are entitled to seek asylum, withholding, and CAT protection.  *See* 8 U.S.C. §§ 1158(a)(1), 1231(b)(3), 1231 Note.  And Congress has taken steps to specially safeguard unaccompanied children's access to humanitarian protection, exempting them from various limitations on asylum and providing them with access to a special non-adversarial proceeding. *See* 8 U.S.C. §§ 1158(a)(2)(E), 1158(b)(3)(C).

In short, Congress carefully crafted the statutory provisions governing asylum, withholding, and CAT protection to ensure that noncitizens within our country or at the border could seek relief from persecution.  In so doing, Congress sought to satisfy its domestic and international obligations to protect those fleeing persecution and torture.  And, critically, Congress enshrined procedural access to these forms of protection before a person—particularly an unaccompanied child—can be deported from the country.  The Title 42 Process jettisons all those protections and safeguards, subjecting these children to summary deportation back to persecution and torture.[12]

---

[12] The only humanitarian protection provided under the Title 42 Process is limited to CAT, and is totally inadequate—especially for unrepresented unaccompanied children.  Noncitizens are only referred for a CAT screening if they "make an *affirmative, spontaneous and reasonably believable* claim that they fear being tortured in the country they are being sent back to."  CBP Memo 4 (emphasis added).  This means that children must know precisely what to say when they arrive in the U.S., and may be summarily returned to the countries they fled without the government ever even asking whether they would face torture in that country.

**2.** The government has refused to provide these statutory protections to unaccompanied children subject to the Title 42 Process because, in its view, the powers granted by § 265 render the entire set of legislation regarding immigration irrelevant.  But whatever Title 42 authorizes in general, it cannot override the provisions of the immigration laws designed to ensure protection for unaccompanied minors and those seeking protection, even where such individuals are suspected of having a communicable disease.

Such an interpretation would violate numerous canons of statutory construction.  As with all potential conflicts, the Court must read § 265 and the child protection and refugee statutes together, to make sense of all Congress's work without discarding any of it.  *See FDA v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 143 (2000) ("The classic judicial task of reconciling many laws enacted over time, and getting them to make sense in combination, necessarily assumes that the implications of a statute may be altered by the implications of a later statute.") (internal quotation marks omitted).  Thus, as Judge Bybee explained in another asylum case, "the President may not 'override particular provisions of the INA' through the power granted him in" 8 U.S.C. § 1182(f), despite the breadth of language in that emergency provision.  *East Bay Sanctuary Covenant v. Trump*, 932 F.3d 742, 760 (9th Cir. 2018) (quoting *Trump v. Hawaii*, 138 S. Ct. 2392, 2411 (2018)).

---

Unsurprisingly, this screening offers essentially no protection: As of May 27, 2020, out of thousands of expulsions under Title 42, Defendants reportedly conducted a mere 85 screening interviews for CAT, of which only four applicants passed the screening stage.  Camilo Montoya-Galvez, *As Trump pushes to reopen, U.S. continues expelling migrants at border, citing pandemic*, CBS News (June 1, 2020), https://www.cbsnews.com/news/as-trump-pushes-to-reopen-u-s-officials-continue-border-expulsion-policy-citing-pandemic.  Advocates working with unaccompanied children report that children typically do not receive CAT assessments until a lawyer intervenes; until then, the child may not even be aware that such an assessment is available.  *See* Corchado Decl., ¶¶ 13-14; Frydman Decl., ¶ 32; Levy Decl., ¶ 6.

So too with § 265.  As Judge Nichols explained in finding a likelihood of success on the merits of this claim, § 265 "should be harmonized, to the maximum extent possible, with immigration statutes, including those . . . that grant special protections to minors and also those immigration statutes that deal with communicable diseases and quarantines."  *J.B.B.C.* PI Ruling, Kang Decl., Ex. D at 50.  Even if § 265 could be read to authorize some summary deportations (which it cannot), it must be read to accommodate Congress's subsequent specific legislative commands.  *See Indep. Ins. Agents of Am., Inc. v. Hawke*, 211 F.3d 638, 643 (D.C. Cir. 2000) ("A broad statute when passed 'may have a range of plausible meanings,' but subsequent acts can narrow those meanings . . . .") (quoting *Brown & Williamson*, 529 U.S. at 143).

Moreover, the specific should be read to control over the general.  *See, e.g.*, *Air All. Houston v. EPA*, 906 F.3d 1049, 1061 (D.C. Cir. 2018) ("[A]n agency may not circumvent specific statutory limits on its actions by relying on separate, general rulemaking authority.").  The TVPRA embodies Congress's focus on a particularly vulnerable group of noncitizens seeking safety in this country.  It is "a precisely drawn, detailed statute," *Brown v. GSA*, 425 U.S. 820, 834 (1976), that comprehensively delineates what the government must do before it seeks to remove an unaccompanied child.  By contrast, § 265 says nothing at all about removal; or children; or steps the government must take or may skip.  The general terms of § 265 cannot be construed to bypass the specific provisions of the TVPRA.  *See Radzanower v. Touche Ross & Co.*, 426 U.S. 148, 159 n.2 (1976) (explaining that "the more specific legislation will usually take precedence over the more general"); *cf. Clinton v. City of New York*, 524 U.S. 417, 443 (1998) (holding Congress may not give the President "the power to cancel portions of a duly enacted statute").  This interpretive principle has particular force where the more specific statute is the later-enacted one; that is the case here, as all the child protective and refugee statutes postdate § 265.  *See*

*United States v. Juvenile Male*, 670 F.3d 999, 1008 (9th Cir. 2012) (explaining that "[w]here two statutes conflict, the later-enacted, more specific provision generally governs").  Recent Congresses have spoken clearly and explicitly regarding the required treatment of unaccompanied minors; the Executive is not at liberty to ignore those commands.

*       *       *

For decades, Congress—fully aware that exigent circumstances might emerge—has enacted and reinforced unique protections for vulnerable children and asylum seekers, including those with communicable diseases, subject to narrow exceptions not applicable here.  Congress has, moreover, specifically chosen *not* to erase those protections even for those with diseases, relying instead on quarantine as the proper way to balance health concerns and the safety of children and those fleeing danger.  To permit Defendants to obliterate those protections would "contradict Congress' clear intent as expressed in its more recent, [child and asylum seeker] specific legislation."  *Brown & Williamson*, 529 U.S. at 143.  If there is to be a public health exception to those critical protections, Congress must be the Branch to enact it.

**C.  Defendants' Actions Are Arbitrary and Capricious.**

Defendants' application of the Title 42 Process to unaccompanied children is also arbitrary and capricious for failure to "engage in 'reasoned decisionmaking'" as the APA requires.  *Dep't of Homeland Sec. v. Regents of the Univ. of California*, 140 S. Ct. 1891, 1905 (2020) (quoting *Michigan v. EPA*, 576 U.S. 743, 750 (2015)).  Specifically, Defendants have provided no reasoned explanation for their actions.  Nowhere do any of the documents setting forth the Title 42 Process offer any reasoned explanation for applying the Process to unaccompanied children, including those fleeing abuse, persecution, and torture.  "An agency

action that lacks explanation is a textbook example of arbitrary and capricious action." *Mori v. Dep't of the Navy*, 917 F. Supp. 2d 60, 64 (D.D.C. 2013).

This new deportation system represents an extraordinary break from prior agency policy and practice with regard to unaccompanied children.  Defendants have long recognized their mandatory obligations under the TVPRA to transfer unaccompanied minors into ORR custody and refer them to full removal proceedings under 8 U.S.C. § 1229a.  As the D.C. Circuit recently reiterated, "reasoned decision-making requires that when departing from precedents or practices, an agency must offer a reason to distinguish them or explain its apparent rejection of their approach." *Grace v. Barr*, 965 F.3d 883, 900 (D.C. Cir. 2020) (internal quotation marks and alterations omitted).  But the CDC Orders and the promulgated regulations do not even acknowledge that the Process will be applied to unaccompanied children, much less justify the decision to begin summarily removing such children.  Nor do the Orders or regulations anywhere "grapple with how the new policy affected . . . [Defendants'] statutory mandate" to protect unaccompanied children.  *Id.* at 901 (internal quotation marks and alterations omitted).  "An agency may not . . . depart from a prior policy *sub silentio* or simply disregard rules that are still on the books." *FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 515 (2009).

Relatedly, Defendants have "entirely failed to consider . . . important aspect[s] of the problem." *Motor Vehicle Mfrs. Assn. of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983).  In the Orders and regulations, Defendants are silent on the Process's *impact* on unaccompanied children and those seeking protection.  CDC's reasoning does not address that it is keeping children from seeking protection and is returning them to danger, contrary to the TVPRA and protection statutes.  *Nat'l Lifeline Ass'n v. FCC*, 921 F.3d 1102, 1112-13 (D.C. Cir.

2019) (finding action arbitrary and capricious where it "failed to address the problem that would be created as a result" of its conduct).

Publicly-available information concerning Defendants' implementation of the Title 42 Process underscores its irrationality. For one, DHS selectively exempts certain noncitizens from the Title 42 Process when it chooses, without any public health-related justification for those exemptions. CBP's Implementation Memo states that individuals with certain criminal histories must be removed from the Title 42 Process and placed into the ordinary immigration and criminal system. *See* CBP Memo at 3 (exempting those with certain criminal convictions as "[s]ubjects not amenable to being expelled"). Defendants cannot claim that having a prior conviction makes one less likely to transmit COVID-19, yet they choose to detain such individuals in ICE custody (presumably for lengthy periods), rather than expel them. Yet they refuse to exempt unaccompanied children. Moreover, public reports show that Defendants are testing every unaccompanied child for COVID-19 prior to expulsion, because their deportation agreements with receiving countries forbid them from expelling children who are positive for COVID-19. Harrold Decl., Ex. G (ProPublica article). It is irrational to ban children from this country because of COVID-19, but expel *only* those children who are free of infection.[13]

## II.   SUBJECTING UNACCOMPANIED CHILDREN TO THE TITLE 42 PROCESS HAS CAUSED AND WILL CONTINUE TO CAUSE THEM IRREPARABLE HARM.

Plaintiff P.J.E.S.'s experiences are emblematic of the experiences of the children in the Proposed Class. He is a sixteen-year-old boy of indigenous Mayan ancestry. His father was

---

[13] The Title 42 Process is arbitrary and capricious for other reasons as well, including that it "runs counter to the evidence before the agency." *State Farm*, 463 U.S. at 43. In the interest of obtaining interim relief, Plaintiff does not rely on those other reasons in this Motion, but will do at later stages of this case, once the administrative record has been produced.

targeted because of his political views, and had to flee Guatemala to escape threats on his life. Escobar Francisco Decl., ¶¶ 2-7.  P.J.E.S. has similarly been targeted for numerous reasons.  *Id.,* ¶¶ 8-9.  Once he came to the United States, he was detained for several days and was facing imminent deportation, before his immigration lawyers and undersigned counsel learned of him. *See* Stefaniak Decl., ECF No. 2-4, ¶ 3; Escobar Francisco Decl., ¶ 10.  Only after counsel's intervention did Defendants voluntarily take him out of the Title 42 Process and transfer him to ORR; he has since begun the process of reunifying with his father in this country.  Otherwise, he would have been sent summarily back to Guatemala without any meaningful opportunity to assert his claims for relief, and where he would have faced grave harm from those he sought to escape.

The experiences of other immigration lawyers and advocates, confirmed by news reports and other public sources, demonstrate that P.J.E.S.'s story is typical.  *See* Frydman Decl., ¶¶ 26-32; Corchado Decl., ¶¶ 5-14; Levy Decl., ¶¶ 3-6; *see also* Kang Decl., ECF No. 2-2, ¶¶ 2-11 & Exs. A-C.  Their clients are other unaccompanied children who come to the United States seeking protection.  Most, if not all, of them have bona fide claims for humanitarian relief, including asylum, trafficking-related relief, or visas available to young people who have experienced abuse, abandonment, or neglect at the hands of their parents.  *See* Frydman Decl., ¶¶ 5-20; Corchado Decl., ¶¶ 6-13; Levy Decl., ¶ 6; *see also* Declaration of Chris Palusky ("Palusky Decl."), ¶ 4.  When they come to this country seeking help, children are housed in unknown hotels or CBP locations, with strict limits on their access to relatives or counsel.  They are then deported in a matter of days or weeks.  *See* Monitor Report at 12, Harrold Decl., Ex. H (describing lengths of custody for children subject to Title 42); Kang Decl., ECF No. 2-2, ¶¶ 2-11 & Exs. A-C.

Lawyers in the United States sometimes hear of unaccompanied children's cases only *after* the child has already been expelled back to danger.  They have been returned to dangerous circumstances, often with limited resources and family support, where they may be unable to avoid serious harm or even death.  Frydman Decl., ¶¶ 21-25.

Moreover, many unaccompanied children in the Title 42 Process come from El Salvador, Guatemala, and Honduras, which are widely recognized as being among the most dangerous countries in the world, particularly for children.  Frydman Decl., ¶¶ 5-20.  The U.S. Department of State has itself acknowledged that extreme gang violence is prevalent in these countries, including homicide, torture, kidnapping, extortion, or other forms of persecution.  *See, e.g.*, U.S. Dept' of State, *2019 Country Reports on Human Rights Practices: Guatemala* at 18, 28, https://www.state.gov/wp-content/uploads/2020/02/GUATEMALA-2019-HUMAN-RIGHTS-REPORT.pdf (describing that gangs coerce vulnerable children to joining them and exploit children in sex trafficking).[14]

These facts more than satisfy the preliminary injunction standard, which requires "only a likelihood of irreparable injury."  *League of Women Voters of U.S. v. Newby*, 838 F.3d 1, 8-9 (D.C. Cir. 2016) (preliminary injunction request).  Numerous courts have held that similar showings suffice to show irreparable injury.  *See, e.g.*, *Grace v. Whitaker*, 344 F. Supp. 3d 96, 146 (D.D.C. 2018), *aff'd in part, rev'd in part on other grounds sub nom., Grace v. Barr*, 965 F.3d 883 (D.C. Cir. 2020) (finding fear of "domestic violence, beatings, shootings, and death in

---

[14] *See also* U.S. Dept' of State, *2019 Country Reports on Human Rights Practices: Honduras* at 1-2, https://www.state.gov/wp-content/uploads/2020/02/ HONDURAS-2019-HUMAN-RIGHTS-REPORT.pdf (describing extreme gang violence directed at vulnerable populations, including "acts of homicide, torture, kidnapping, extortion, human trafficking, intimidation, and other threats"); U.S. Dept' of State, *2019 Country Reports on Human Rights Practices: El Salvador* at 1, https://www.state.gov/wp-content/uploads/2020/02/EL-SALVADOR-2019-HUMAN-RIGHTS-REPORT.pdf (similar).

their countries of origin" constitute irreparable injury); *Demjanjuk v. Holder*, 563 F.3d 565, 565

(6th Cir. 2009) (granting stay for noncitizen who asserted removal would violate CAT); *Devitri*

*v. Cronen*, 289 F. Supp. 3d 287, 296–97 (D. Mass. 2018) (risk of persecution if removed is

irreparable harm); *Orantes-Hernandez v. Meese*, 685 F. Supp. 1488, 1504–05 (C.D. Cal. 1988)

(plaintiffs would suffer irreparable harm if they were summarily removed without being afforded

opportunity to exercise their right to apply for asylum); *see also J.B.B.C.* PI Ruling, Kang Decl.,

ECF No. 2-2, Ex. D at 51 (Judge Nichols finding that unaccompanied child had shown "he is

likely to suffer irreparable harm in the absence of an order" staying his expulsion under Title 42);

And there is "a public interest in preventing aliens from being wrongfully removed . . . to

countries where they are likely to face substantial harm."  *Nken v. Holder*, 556 U.S. 418, 436

(2009).

**III.   THE BALANCE OF HARMS AND THE PUBLIC INTEREST BOTH WEIGH
DECIDEDLY IN FAVOR INJUNCTIVE RELIEF FOR CLASS MEMBERS.**

Preventing Defendants from removing unaccompanied children until final disposition of

this case would not substantially injure the government for several reasons.

First, unaccompanied children referred to ORR care are typically released to sponsors

under the TVPRA, which in most cases will be a parent or close relative who can ensure the

child will self-quarantine as needed and will be subject to local health restrictions.  Insofar as

children must spend short periods in ORR's juvenile facilities before release, that network can

deal with communicable diseases.  *See* Palusky Decl., ¶¶ 5-7; Monitor Report at 19 n.12, Harrold

Decl., Ex. H.  Moreover, the ORR shelter network is currently operating at a very small fraction

of its total capacity, meaning that quarantine and social distancing measures are feasible in those

facilities.  *See* Kang Decl., ECF No. 2-2, Ex. B; *see also* Palusky Decl., ¶¶ 3-5.  And again,

Defendants apparently have the capacity to test all unaccompanied children in their care prior to

expulsion.  *See* Harrold Decl., Ex. G (ProPublica article).  If so, there is no reason why they cannot do so before sending them to ORR custody, to further minimize the risk of infection in ORR facilities.

Second, contrary to the CDC Orders' stated justifications, the Title 42 Process does not make DHS officers safer, and in fact, likely increases any potential exposure.  Under the TVPRA, juveniles like Plaintiff must be transferred to ORR or a sponsor within 72 hours, *see* 8 U.S.C. § 1232(b)(3)—and can often be transferred much faster.  Yet deporting children under Title 42 generally takes DHS longer than that, due to the need to make travel arrangements and obtain any necessary travel permissions.  Monitor Report at 8, Harrold Decl., Ex. H (explaining that, under Title 42 Process, unaccompanied children "routinely spend multiple days temporarily housed in hotels"); *id.* at 11 (describing "[o]ne unaccompanied minor had been held in a hotel for 11 days").

Third, public health officials have overwhelmingly noted there are numerous safety measures that can be taken to avoid the spread of COVID-19, including quarantines.[15]  *See* Declaration of Les Roberts & Stephen P. Kachur, ¶¶ 10-16.  The CDC Orders do not reach a different conclusion, but note only that in the government's view it is not worth the resources or not worth trying to safely process asylum seekers.  *See, e.g.*, 85 Fed. Reg. at 17067 (speculating that brief detention of noncitizens in Border Patrol stations would "divert [healthcare] resources away from the domestic population").  Thus, the Administration has chosen to de-prioritize those fleeing danger, even as it permits or even encourages large recreational activities (such as beach outings), air travel by tens of thousands of foreign visitors, and other events and activities.

---

[15] *Letter to HHS Secretary Azar and CDC Director Redfield Signed by Leaders of Public Health Schools, Medical Schools, Hospitals, and Other U.S. Institutions*, Columbia Mailman School of Public Health (May 18, 2020), https://tinyurl.com/y8q3asun.

## CONCLUSION

For these reasons, the Court should provisionally certify the proposed Class, issue a classwide preliminary injunction, and enjoin Defendants from applying the Title 42 Process to the Class.

Dated: August 20, 2020

Respectfully submitted,

/s/Lee Gelernt_____

| | |
|---|---|
| Stephen B. Kang* | Lee Gelernt* |
| Cody Wofsy** | Daniel A. Galindo* |
| Morgan Russell* | Celso J. Perez (D.C. Bar No. 1034959) |
| Adrienne Harrold* | Omar Jadwat** |
| American Civil Liberties Union Foundation, | American Civil Liberties Union Foundation, |
| Immigrants' Rights Project | Immigrants' Rights Project |
| 39 Drumm Street | 125 Broad Street, 18th Floor |
| San Francisco, CA 94111 | New York, NY 10004 |
| Tel: (415) 343-0770 | Tel: (212) 549-2600 |

Andre Segura
Kathryn Huddleston
Rochelle Garza
Brantley Shaw Drake
American Civil Liberties Union Foundation
of Texas, Inc.
5225 Katy Freeway, Suite 350
Houston, Texas 77007
Tel. (713) 942-8146

Karla M. Vargas***
Efren C. Olivares***
Texas Civil Rights Project
1017 W. Hackberry Ave.
Alamo, Texas 78516
Tel: (956) 787-8171

Robert Silverman***
Oxfam America
Boston, MA 02115, Suite 500
Tel: (617) 482-1211

Scott Michelman (D.C. Bar No. 1006945)
Arthur B. Spitzer (D.C. Bar No. 235960)
American Civil Liberties Union Foundation of
the District of Columbia
915 15th Street NW, Second Floor
Washington, D.C. 20005
Tel: (202) 457-0800

*Attorneys for Plaintiff*

*Admitted pro hac vice
**Pro hac vice application pending
***Pro hac vice application forthcoming*

## CERTIFICATE OF SERVICE

I hereby certify that on August 20, 2020, I electronically filed the foregoing document with the Clerk of the Court for the United States District Court for the District of Columbia by using the CM/ECF system.  Counsel for Defendants in this case are registered CM/ECF users and service will be accomplished by the CM/ECF system.

By: /s/ *Lee Gelernt*__
LEE GELERNT