# DECLARATION OF LISA FRYDMAN

1. I, Lisa Frydman, make the following declaration based on my personal knowledge and declare under penalty of perjury pursuant to 28 U.S.C. § 1746 that the following is true and correct to the best of my knowledge.

## Information about KIND and the Declarant

2. I am Vice President of International Programs at Kids in Need of Defense ("KIND"), a nonprofit advocacy and legal services organization based in the United States. I am an attorney and have been, since March 2020, Vice President of International Programs at KIND. From 2017-2020 I was Vice President for Regional Policy and Initiatives ("Regional Team") at KIND. From 2015-2017 I served as KIND's Director for Regional Policy and Initiatives. In my work at KIND, I supervise KIND's International Team with programming in Central America, Mexico, and Europe, and regularly visit the northern countries of Central America and Mexico (referred to collectively herein as "the Region") to carry out the organization's work described here.

3. KIND's International Team offers direct programming with children and adolescents in the northern countries of Central America. The International Team, through civil society partner organizations, provides reintegration support services for unaccompanied and separated children repatriating to Guatemala and Honduras, as well as sexual and gender-based violence prevention programming for children in certain high migration communities in Guatemala and Honduras. Through its Reintegration Program and other Regional programming and visits, KIND's International Team communicated with approximately 550 Central American children in 2019. From 2015-2017, the Regional Team provided support services to children in Honduras and El Salvador with pending cases for refugee resettlement in the United States under

1

an in-country refugee processing and parole effort known as the Central American Minors ("CAM") Program. In 2018 the Regional Team, through civil society partners, conducted a project in the Region to empower adolescent refugees and migrants, as well as internally displaced adolescents from El Salvador, Guatemala, and Honduras, to tell their stories related to immigration and internal displacement. In 2020, KIND launched a broader set of programming in Mexico, with staff located along the U.S.-Mexico border and in Mexico City.

4. An attorney from KIND's Legal Programs unit represents plaintiff P.J.E.S. in his immigration proceedings. I am not directly involved in that representation, and this Declaration does not include information arising from that representation.

**Risks to Unaccompanied Children Expelled to Countries of Origin**

5. Unaccompanied children expelled to Guatemala, Honduras, and El Salvador under Title 42 are returning to three of the most dangerous countries in the world. Guatemala, Honduras, and El Salvador all rank among the top ten most dangerous countries by homicide rates globally.[1] Accordingly, these countries send significant numbers of asylum seekers with *bona fide* claims to the United States each year. In 2017, the United States granted asylum to 8,473 individuals from these countries.[2] The only country accounting for more grants of asylum that year than Guatemala, Honduras, and El Salvador was China, which only accounted for 5,548 asylum grants, despite having a population more than 42 times larger than these three countries

---

[1] According to the United Nations Office on Drugs and Crime (UNODC), in 2017, El Salvador ranked first in the world by homicide rate, followed by Honduras (third) and Guatemala (ninth). UNODC, *Global Study on Homicide* (2019), *available at* https://dataunodc.un.org/GSH_app.
[2] Dep't of Homeland Security, Office of Immigration Statistics, *Annual Flow Report, Refugees and Asylees: 2017* (Mar. 2019), at 9, *available at* https://www.dhs.gov/sites/default/files/publications/Refugees_Asylees_2017.pdf.

combined.[3]

6.      Violence, in combination with impunity and a failure of protection, causes children to flee their homes in the northern countries of Central America and seek safety in the United States. Unaccompanied children from these countries seek to escape violence inflicted by criminal gangs or other organized crime, for example by drug cartels; sexual and gender-based violence, including violence and extreme discrimination based on sexual orientation and/or gender identity; and domestic abuse. Women and girls, and lesbian, gay, bisexual, transgender, and intersex ("LGBTI") individuals, face very high levels of sexual and gender-based violence. Children are also frequently trafficked from rural to urban areas and across borders or to border areas, where they are often sexually exploited or subject to exploitative labor. Femicide, or the gender-motivated killing of women and girls, is also pervasive in these countries.[4]

7.      Alarming rates of sexual violence against children exist in the northern countries of Central America, and may be on the rise as a result of COVID-19 curfews. In El Salvador, for example, during the first trimester in 2020, 80 children under the age of 12 were treated for injuries caused by sexual violence, as compared to 115 in all of 2019.[5] In Guatemala, between January and June of 2020, the National Institute of Forensic Science conducted 2,045 forensic

---

[3] *See* World Bank Microdata Data Catalog, *available at* https://data.worldbank.org/indicator/SP.POP.TOTL?end=2017&locations=CN-HN-GT-SV&start=2017&view=bar (last visited Jan. 15, 2020).

[4] *See* UNODC, *Global Study on Homicide* (2019), *supra* note 4 (reporting that in 2017, El Salvador and Honduras ranked first and third in the world for female homicide rates); Mimi Yagoub, *Why Does Latin America Have the World's Highest Female Murder Rates*, InSight Crime (Feb. 11, 2016), *available at* https://www.insightcrime.org/news/analysis/why-does-latin-america-have-the-world-s-highest-female-murder-rates/ (reporting Guatemala ranked third in the world by female murder rate).

[5] *Alerta por aumento de violencia sexuales en menores de edad durante la pandemia* (Alert regarding increase in sexual violence against children during the pandemic), *Diario CoLatino* (Aug. 17, 2020) *available at:* https://www.diariocolatino.com/alerta-por-aumento-de-violencia-sexuales-en-menores-de-edad-durante-la-pandemia-2/.

exams on children for sexual abuse, including 14 babies under the age of one year-old, while the Observatory on Sexual and Reproductive Health identified 1,962 pregnancies in girls between the ages of 10-14.[6]

8. Gangs now dominate much of the urban areas of the northern countries of Central America (Guatemala, Honduras, and El Salvador), and their control has increasingly spread to rural areas as well, where international drug cartels also, increasingly, operate. The most recent U.S. State Department Travel Advisory for Guatemala illustrates this point, issuing a level 3 travel advisory for the departments of Guatemala, Escuintla, Chiquimula, Quetzaltenango, Izabal, and Petén.[7] The departments of San Marcos and Huehuetenango have also experienced significant growth of organized crime in recent years. Where these criminal groups dominate, women and girls are in constant danger of being targeted for sexual violence, as they use rape and the threat of rape as a tactic of control in the areas where they operate. Women and girls are also frequently targeted for forced sexual relationships with organized crime members, and those who resist these advances face violence or even death.

9. Gangs also forcibly recruit boys and girls and, once invited to join, those who resist face threats, torture, and ultimately death. These same consequences also face individuals who fail to comply with violent extortion demands from these groups, which have become very common in recent years. When victims attempt to escape by relocating within their countries, gangs often track them down and ruthlessly punish them.

---

[6] *INACIF practico 2,045 exámenes por posible violación a niñas en los últimos seis meses* (INACIF performed 2,045 forensic exams for possible rape of girls in the previous six months), El Periodico (Aug. 10, 2020), *available at:* https://elperiodico.com.gt/nacion/2020/08/10/inacif-practico-2045-examenes-por-posible-violacion-a-ninas-en-los-ultimos-seis-meses/
[7] U.S. Dep't of State, *Guatemala Travel Advisory*, https://travel.state.gov/content/travel/en/traveladvisories/traveladvisories/guatemala-travel-advisory.html (last visited Jan. 15, 2020).

10. Children targeted by gangs and cartels, LGBTI children, Indigenous Guatemalan children, and children targeted for other sexual and gender-based violence cannot rely on the governments of Guatemala, Honduras, or El Salvador to protect them. As a result, these forms of violence—which pervade these countries—are highly underreported, and even those crimes that do get reported rarely result in justice. In the vast majority of cases the perpetrator is never punished. Over 90% of homicide cases in the northern countries of Central America end in impunity, and in cases involving sexual and gender-based violence the impunity rate is even higher—at 95%. Law enforcement officers sometimes target LGBTI individuals precisely when they come in to report violence. Violence against women and children has increased during the pandemic, at the same time that severe restrictions on movement and reduced staff at government agencies in Guatemala, El Salvador, and Honduras, have made reporting it even more difficult.

11. Indigenous Guatemalan children are among the least likely to be protected from violence and harm. Marginalization, social exclusion of, and discrimination against Indigenous peoples in Guatemala lead to particularly high rates of impunity for violence directed at this population.[8] Lack of police presence in Indigenous Guatemalan communities makes reporting crime more difficult, and multiple barriers to accessing justice exist for those who do report crime, from language barriers to cultural barriers, lack of judicial or other justice related offices in Indigenous communities, and outright discrimination.[9]

---

[8] *Statement by U.N. High Commissioners for Human Rights Zeid Ra'ad Al Hussein at the end of his mission to Guatemala* (Nov. 19, 2017), https://www.ohchr.org/EN/NewsEvents/Pages/DisplayNews.aspx?NewsID=22415&LangID=E.
[9] Inter-American Human Rights Commission, *Situation of Human Rights in Guatemala*, (Dec. 31, 2017), https://www.oas.org/en/iachr/reports/pdfs/Guatemala2017-en.pdf (noting that "only around ten percent of indigenous peoples [in Guatemala] have adequate and effective access to justice.").

12. Child welfare agencies throughout the region are underfunded, highly centralized (meaning no shelters outside of the capital cities), and weak, and often have inappropriate conditions for children. For example, in March 2017 a fire broke out at a Guatemalan shelter for abused, abandoned, and neglected children that led to the death of 40 teenagers. Following the incident numerous media articles came out detailing accounts of physical, psychological, and sexual abuse of children in the shelter that had never been investigated despite repeated complaints by children. When conducting research for a report published by KIND, KIND's International Team heard from child welfare officials in the northern Central America countries that they could not take children fleeing gang violence into shelters because they could not protect those children.

13. Already weak child protection systems across all three countries have been further weakened as a result of COVID.[10] Reduced personnel, lack of personal protective equipment, and restrictions on movement have further reduced capacity of these systems to screen returning children for protection needs and to respond when protection is needed.

14. Closely related to impunity are the well-documented problems of corruption and repression in all three of these countries. In one notable example, the former Guatemalan president, Jimmy Morales, recently expelled the International Commission against Impunity in Guatemala ("CICIG"), an entity created by agreement with the United Nations to prosecute corruption. In its final report, CICIG described the Guatemalan government as a "mafia coalition," noting that corruption in that country could not be solved without "a profound

---

[10] *COVID-19: Dangers mount for migrant children forcibly returned to northern Central America and Mexico during pandemic*, UNICEF (May 21, 2020), *available at:* https://www.unicef.org/press-releases/covid-19-dangers-mount-migrant-children-forcibly-returned-northern-central-america.

restricting of the state."[11] In October 2019, the brother of Honduran president Juan Orlando Hernández was convicted on charges of drug trafficking, in a trial in which multiple witnesses testified that President Hernández himself was aware of the activity, but accepted bribes and political support in exchange for turning a blind eye.[12] In January 2020 President Hernández shut down the mandate for the Mission to Support the Fight Against Corruption and Impunity in Honduras (MACCIH), the anti-graft body backed by the Organization for American States.

15. I am aware of numerous cases involving domestic violence or sexual violence perpetrated by a male involved in organized crime in which the perpetrator was able to "buy off" law enforcement, as well as examples of police officers and judges being bought off. I have spoken with numerous women, including some adolescent girls, who fled abusive domestic partners in the northern countries of Central America whose partners had either money or family connections that protected them from prosecution.

16. Severely repressive measures by state security forces, including military police, army, and other security forces in Honduras and El Salvador, in particular, have frequently targeted adolescent boys from neighborhoods under control of organized crime. Extrajudicial killings of youth by security forces in these countries have been well-documented, but other measures including mass arrests or threats against the young males of a particular neighborhood also erode public trust in law enforcement or security forces in these countries.

17. In addition to these forms of violence, children expelled to Guatemala, El

---

[11] *Guatemala in grip of 'mafia coalition', says UN body in scathing corruption report*, The Guardian (Aug. 8, 2019), *available at* https://www.theguardian.com/world/2019/aug/28/guatemala-corruption-mafia-coalition-jimmy-morales.

[12] *Honduran President's Brother is Found Guilty of Drug Trafficking*, N.Y. Times (Oct. 18, 2019), *available at* https://www.nytimes.com/2019/10/18/world/americas/honduras-president-brother-drug-trafficking.html.

Salvador, and Honduras face discrimination from those fearful that they will introduce COVID-19 to the community. Expelled migrants have faced threats of lynching or burning in some cases.[13] As the U.S. Department of State's Level 4 travel advisory warns, children expelled to other countries, such as Haiti and Nicaragua, risk suffering "crime, civil unrest, and kidnapping," as well as slavery and other dangers.[14]

18. Children expelled to Mexico on their own under Title 42 are vulnerable to homicide, sexual violence, kidnapping, falling prey to human traffickers, and extortion, and the overwhelming majority of these crimes result in impunity. Mexican children risk return to the same dangers they fled, typically violence at the hands of drug cartels, sexual abuse, and violence in the family. Central American children expelled to Mexico face the additional risk of being targeted because of their status as migrants.[15]

19. Mexico ranks in the top 20 countries with the highest global homicide rates, and

---

[13] *U.S. returns migrant children despite risks worsened by Coronairus: UNICEF*, Reuters (May 21, 2020), *available at:* https://www.reuters.com/article/us-health-coronavirus-usa-mexico/us-returns-migrant-children-despite-risks-worsened-by-coronavirus-unicef-idUSKBN22X1RP.
[14] *Haiti Travel Advisory Level 4, Do not Travel*, U.S. Dept. of State (Aug. 6, 2020), *available at:* https://travel.state.gov/content/travel/en/traveladvisories/traveladvisories/haiti-travel-advisory.html*; Nicaragua Travel Advisory Level 4, Do not Travel,* U.S. Dept. of State (Aug. 6, 2020), *available at:* https://travel.state.gov/content/travel/en/international-travel/International-Travel-Country-Information-Pages/Nicaragua.html;
 *'There is no Hope," Crisis Pushes Haiti to Brink of Collapse*, New York Times (Oct. 20, 2019), *available at:* https://www.nytimes.com/2019/10/20/world/americas/Haiti-crisis-violence.html; *Forced into a Life of Domestic Servitude, Haiti's Child Slaves*, Idependent (Oct. 25, 2019), *available at:* https://www.independent.co.uk/arts-entertainment/photography/haiti-children-enslaved-life-domestic-servitude-schools-charity-a9168041.html.
[15] According to Human Rights First, as of May 13, 2020 there were over 1,114 reported cases of "murder, rape, torture, kidnapping, and other violence assaults against asylum seekers and migrants" at the U.S. Mexico border, *available at:* https://www.humanrightsfirst.org/campaign/remain-mexico; *More People Kidnapped, Abused on Migration Route in Southern Mexico*, Doctors Without Borders (Oct. 30, 2019), *available at* https://www.msf.org/increase-kidnappings-and-violence-against-migrants-southern-border-mexico.

border towns in Mexico—where many children are expelled to—have some of the highest rates of homicide, kidnapping, and femicide in the country. In 2016 the average homicide rate per capita in 35 Mexican border municipalities was over four times the rate in the corresponding U.S. border counties.[16] In the border state of Tamaulipas, children face high rates of kidnappings and murder. From 2006 to 2014 at least 2,000 children were murdered or mutilated, and in the first five months of this year, 265 children have already been reported missing.[17] Children in Mexico's border regions are particularly vulnerable to human trafficking, sexual exploitation, and forced labor, in many cases at the hands of organized criminal groups. Over the past five years, rates of femicide, or gender-motivated killing of women and girls have increased 137 percent and in many cases these murders are accompanied by torture, mutilation, and sexual violence. The border states of Sonora, Nuevo León, and Chihuahua had the highest femicide rates in the country, almost twice the rate of Mexico City. Femicide rates in the border city of Ciudad Juarez have been on the rise since 2019, and historical data show that young women are disproportionately targeted, with half of victims under the age of 19.[18]

20.     The vast majority of gender-based crimes in Mexico go unpunished due to widespread underreporting, corruption, and the failure of government institutions to effectively

---

[16] *Here's What Violence Along the U.S.-Mexico Border Really Looks Like*, Igarape Institute (Jul 3, 2017), *available at:* https://igarape.org.br/en/heres-what-violence-along-the-u-s-mexico-border-really-looks-like/.

[17] *Relatoría sobre los Derechos de la Niñez culmina su visita a México* (Rapporteur on children's rights completes visit to Mexico), Organization of American States (Oct. 20, 2014), *available at:* http://www.oas.org/es/cidh/prensa/comunicados/2014/125.asp; https://www.hrw.org/news/2020/06/02/dhs-oig-formal-complaint-regarding-remain-mexico.

[18] Femicide in Juárez is Not a Myth, Texas Observer (Sept. 28, 2015), *available at:* https://www.texasobserver.org/femicide-in-juarez-is-not-a-myth/. In July 2020 there were 161 homicides in Juarez, which was only the third-highest month this year; 15 of the victims were female, including a two-year-old child. Luz del Carmen Sosa, Cobra julio 161 víctimas de homicidio (In July, 161 victims of homicide), *El Diario* (Aug. 1, 2020), *at* https://diario.mx/juarez/cobra-julio-161-victimas-de-homicidio-20200801-1691599.html.

investigate and prosecute crimes. As many as 99 percent of femicides result in impunity.[19] Migrant women and children who are victims of gender-based violence in Mexico face even greater barriers to accessing protection and justice, including fear of discrimination or deportation if they report violence. Ninety-nine percent of crimes committed against migrants in Mexico similarly end in impunity.[20]

### KIND's Work with Expelled Children

21.     KIND works with civil society partners in Honduras and Guatemala to provide reintegration services to assist children returning to these countries, and with local governments and international organizations throughout Central America to assist returning children in need of other protective services. While we are aware that hundreds of children have returned to Central America since late March, due to the secrecy of the Title 42 expulsions and the danger to migrants returning from the United States who are stigmatized as possible carriers of COVID-19, KIND has largely been unable to identify individual children who have been expelled under the policy. The expelled children that KIND has identified generally face serious threats to their lives and physical safety that, as noted above, their home governments are not equipped to address. The majority of the children have been rapidly returned to unstable and unsafe situations where their lives and needs are not adequately protected.

22.     To date, KIND has had some interaction with 11 children who have been expelled

---

[19] *Despite the Coronavirus Mexican Women are Fighting Femicide*, Foreign Policy (May 20, 2020), *available at*: https://foreignpolicy.com/2020/05/20/coronavirus-mexico-women-fighting-femicide/.
[20] *Access to Justice for Migrants in Mexico: a Right that Exists Only on the Books*, Washington Office on Latin America, Fundar, Fundacion Para la Justicia, Hermandos del Camino, Red Migrantes Sonora, La 72, Casa del Migrante Saltillo (Jul. 2017), *available at:* file:///Users/mark/Downloads/Access-to-Justice-for-Migrants_July-2017%20(2).pdf.

from the United States to Central America under Title 42. Nearly all of the children were seeking reunification with a parent in the United States. Of these children, five are currently in temporary safehouses or shelters due to imminent threats of persecution, including two children under the age of 12 and an adolescent mother with her infant. The children and their families have and continue to experience extreme fear and stress due to the trauma inflicted on the children by their expulsions, the very real possibility that the children's persecutors could locate them in their countries, and their inability to reunify with their parents to care for them.

23. KIND has also identified serious protection concerns for the remaining children, but many were too fearful to disclose their protection claims even to international organizations operating in their home countries, and much less to reception personnel from their own governments. As a result the children were rapidly returned to danger or unsafe situations in their communities or in their own homes due to their expulsions:

    a. Three of the children are currently displaced, including two who are now living with non-customary caregivers due to their inability to return to their homes—a 13-year-old who was forced out of the family home after a sexual assault, and a child who was not returned to the country of residence because the child has citizenship in another country. The child's living situation is unstable in the country of citizenship, but the child also experienced abuse in the country of residence and does not feel safe returning there.

    b. Another child returned to an abusive home after expulsion, as the child had no alternative caregiver other than a parent in the United States, and was terrified of being placed into institutional care due to the conditions noted in this declaration. The child expressed despair and hopelessness at the inability to reunify with the

parent in the United States who could provide care and safety.

c. Two other children were pushed out of their caregivers' home due to the fear that the gang members who had forced the children's parents to flee the country would target their caregivers for harboring them. The children have nowhere else to return in the country.

24. While this represents only a small sample of the hundreds of children who have been expelled to Central America under Title 42, and the children come from diverse backgrounds and circumstances, their expulsions have placed all of them in situations that threaten their lives and well-being. All but one of these children were seeking reunification with a parent in the United States, and the majority have not been able to return to their customary caregivers due to their serious protection concerns. Those who have been returned to unsafe caregivers face the risk of further abuse. The children's lives and well-being have been seriously harmed by their expulsions under Title 42 without an opportunity to present their claims for protection and family reunification in the United States, and they continue to be at risk of persecution and other harm in their home countries.

25. In addition to working with children expelled from the United States directly to Central America, KIND is also aware of Central American children who have been expelled to areas near the U.S.-Mexico border in Mexico. To date, KIND has had some interaction with at least 5 Central American children who appear to have been expelled from the United States to Mexico under Title 42. Some of these children have ended up in the custody of Mexican child welfare officials.

**KIND's Work with Children Facing Title 42 Expulsion from the United States**

26. KIND serves thousands of children each year who have arrived unaccompanied in

the United States seeking protection, many of them through our work as legal service subcontractors to the Department of Health and Human Services (HHS) Office of Refugee Resettlement (ORR).

27.     Since the Title 42 process began, the nature of our work with unaccompanied children in the United States has changed fundamentally. Because the overwhelming majority of children subject to the Title 42 process never reach ORR custody, we only hear of those rare cases where a parent or relative in the United States learns that a child has been detained and will be returned to the home country and is independently able to seek help in time. Even then, the parent or relative is not always informed about the risk that their child will be rapidly expelled, and, unlike in ORR, neither children nor their parents are provided with information about how to seek help or legal assistance.

28.     Sometimes a parent or relative reaches out to lawyers they know, and those lawyers refer the relatives to us. In other instances, desperate parents have called KIND's main phone number. In some other cases, other non-profit organizations become aware of the cases and have reached out to KIND for support. Due to the speed of the expulsions, and the secrecy concerning where the children are held, by the time we hear of the child's case, in some instances the child has already been deported before we can intervene. In one case, a girl who had fled her country after being attacked and raped was expelled from the United States, where she was seeking safety, before KIND could locate her.

29.     For the first months the Title 42 process was in operation, we heard of no children who were in the course of a Title 42 expulsion while they were still in the United States. But in some recent cases, we have managed to have contact with the child's family while the child is still in the country. In almost every case, our intervention has succeeded in officials re-

processing the children under Title 8, rather than Title 42, meaning that the child is transferred to ORR custody instead of being placed on a flight for removal.

30.    In the approximately 27 cases in which KIND became aware of a child facing Title 42 expulsion and intervened by taking the steps outlined above, DHS moved the children to Title 8 processing and the children were transferred to ORR custody. In one case, KIND found out about a child too late and the child had already been expelled on a flight earlier in the day.

31.    Even though we have achieved limited success in these cases, the operation of the Title 42 Process prevents us from reaching the vast majority of children subject to it. The secrecy around the process prevents meaningful access to a lawyer: children have reported to KIND attorneys that while they were held in hotels or other unlicensed placements subject to Title 42, they were not told that they had a right to speak to a lawyer. News stories published only in the past few weeks and the *Flores* Monitor's report revealed that unaccompanied children were being held in hotels in different cities along or near the U.S.-Mexico border.[21] In some cases that KIND was involved with, children were in DHS custody for approximately eight days, but we understand from these reports that other children are held in motels for weeks.

32.    Although the U.S. government has claimed that they screen all unaccompanied children in the Title 42 Process for claims of trafficking or fear of persecution, some children have said that they were asked if they had family members in their countries of origin, but were not asked about why they had left their countries or if they had a fear of return, despite the fact that some affirmatively stated that they were afraid to go back. When we have asserted a child's right to be screened for, at minimum, fear of torture, the government has transferred the child to

---

[21] *E.g.*, Nomaan Merchant, Associated Press, "Migrant kids held in US hotels, then expelled" (July 22, 2020), *available at* https://apnews.com/c9b671b206060f2e9654f0a4eaeb6388 (last visited July 23, 2020).

Title 8. However, children who were expelled prior to our intervention have reported that they did not receive any such screening.

    I declare under penalty of perjury under the laws of the United States and California that the foregoing is true and correct to the best of my knowledge and belief. Executed in Berkeley, California.


Dated: August 20, 2020                    */s/Lisa Frydman*
                                              LISA FRYDMAN