# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

P.J.E.S., a MINOR CHILD, by and
through his father and Next Friend,
Mario Escobar Francisco,

      *Plaintiff*,

    v.

CHAD WOLF, Acting Secretary of
Department of Homeland Security,
et al.,

      *Defendants*,

Civil Action No. 1:20-cv-02245 (EGS)

**BRIEF FOR SCHOLARS OF REFUGEE AND IMMIGRATION LAW
AS AMICI CURIAE IN SUPPORT OF PLAINTIFF'S
MOTION FOR CLASSWIDE PRELIMINARY INJUNCTION**

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ........................................................................................................ ii

INTEREST OF AMICI ............................................................................................................1

STATEMENT ..........................................................................................................................2

ARGUMENT ...........................................................................................................................5

I.      THE CDC ORDERS VIOLATE STATUTES PROVIDING FOR ASYLUM, WITHHOLDING OF
REMOVAL, PROTECTION AGAINST TORTURE, AND PROTECTION OF UNACCOMPANIED
CHILDREN ..................................................................................................................5

        A.     United States Statutes Protect From Removal Noncitizens Facing Persecution Or
Torture In Their Home Countries, And Extend Special Protections To
Unaccompanied Children..................................................................................5

        B.     Section 362 Of The 1944 Public Health Service Act Does Not Override The
Specific Protections From Removal That Congress Has Enacted In The
Intervening Decades.........................................................................................7

CONCLUSION.........................................................................................................................11

# TABLE OF AUTHORITIES

Page(s)

## CASES

*Epic Sys. Corp. v. Lewis*, 138 S. Ct. 1612 (2018) ..............................................................8

*FDA v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120 (2000) ...........................................10

*INS v. Aguirre-Aguirre*, 526 U.S. 415 (1999) ....................................................................6

*United States v. Fausto*, 484 U.S. 439 (1988) ...................................................................10

## STATUTES, RULES, AND REGULATIONS

8 C.F.R.
    § 208.16.............................................................................................7
    § 208.17.............................................................................................7
    § 235.3..............................................................................................9

42 C.F.R.
    § 71.40..............................................................................................2
    Part 71..............................................................................................11

85 Fed. Reg.
    16,559 (Mar. 24, 2020) .............................................................................2
    17,061 (Mar. 26, 2020) .........................................................................3, 4
    31,503 (May 26, 2020)..............................................................................3
    41,201 (July 9, 2020) ..............................................................................6

8 U.S.C.
    § 1101................................................................................................5
    § 1158................................................................................................6
    § 1182................................................................................................8
    § 1225..........................................................................................3, 4, 9
    § 1229a........................................................................................6, 8, 9
    § 1231............................................................................................6, 7
    § 1232................................................................................................7

42 U.S.C.
    § 265....................................................................................2, 7, 8, 9, 10, 11
    Part G..............................................................................................11

Act of Mar. 3, 1891, 26 Stat. 1084.....................................................................8

Act of Feb. 15, 1893, 27 Stat. 449 ....................................................................2

Foreign Affairs Reform and Restructuring Act of 1998,
Pub. L. No. 105-277, 112 Stat. 2681 ...................................................................6

Trafficking Victims Protection Reauthorization Act of 2008,
Pub. L. No. 110-457, 122 Stat. 5044 .................................................................7

## OTHER AUTHORITIES

COVID-19 Capio Memorandum, https://www.documentcloud.org/documents/
6824221-COVID-19-CAPIO.html (visited August 21, 2020)............................................4

## INTEREST OF AMICI[1]

Amici curiae are scholars with expertise in United States and international law governing refugees and United States immigration law.

- T. Alexander Aleinikoff is University Professor at The New School and Director of the Zolberg Institute on Migration and Mobility; from 2010 to 2015, served as United Nations Deputy High Commissioner for Refugees; and is co-author of a leading textbook, *Immigration and Citizenship: Process and Policy*.

- Deborah Anker is Clinical Professor of Law at Harvard Law School; Founder, Harvard Immigration and Refugee Clinic; and author of a leading treatise, *Law of Asylum in the United States*.

- James C. Hathaway is the James E. and Sarah A. Degan Professor of Law at Michigan Law, University of Michigan; founding director of Michigan Law's Program in Refugee and Asylum Law; and the author of *The Rights of Refugees under International Law*.

- Gerald L. Neuman is the J. Sinclair Armstrong Professor of International, Foreign, and Comparative Law at Harvard Law School; a Co-Director of the Human Rights Program at Harvard Law School; and the author of *Strangers to the Constitution: Immigrants, Borders and Fundamental Law*.

Amici have collectively spent decades researching and writing about refugee and immigration law.  This brief is submitted to provide an overview of the protections that Congress has enacted into United States law for refugees and minors, often to effectuate principles of international law and United States treaty obligations.

---

[1]    No counsel for a party authored this brief in whole or in part, and no entity or person other than amici and its counsel made a monetary contribution intended to fund the preparation or submission of this brief.

**STATEMENT**

This case concerns an attempt by the Executive Branch to circumvent statutory protections against removal by creating a surrogate system of removal, assertedly in reliance on public health considerations arising from COVID-19.  The Executive Branch has carried this out through a two-step process.

First, the Centers for Disease Control and Prevention ("CDC") issued an interim final rule amending its Foreign Quarantine Regulations to authorize the CDC Director to issue orders suspending "the introduction into the United States of persons from designated foreign countries … or places" if necessary to address a "serious danger of the introduction of … communicable disease into the United States."  85 Fed. Reg. 16,559, 16,566 (Mar. 24, 2020) (42 C.F.R. § 71.40(a)).  The CDC rule purports to rest not on any authority granted by the Immigration and Nationality Act ("INA"), which Congress enacted in 1952 and has amended multiple times since then, but rather on a public health provision originally enacted in 1893 and later re-enacted as section 362 of the 1944 Public Health Service Act.  *See* 85 Fed. Reg. at 16,563; *see also* Act of Feb. 15, 1893, ch. 114, § 7, 27 Stat. 449, 452.  Now codified at 42 U.S.C. § 265, the public health provision authorizes the Director of the CDC to address "a serious danger of the introduction of" a "communicable disease" from a foreign country "into the United States" by "prohibit[ing], in whole or in part, the introduction of persons and property from such countries or places as he shall designate in order to avert such danger, and for such period of time as he may deem necessary for such purpose."  While the CDC interprets this authority expansively, the CDC Rule does not apply to all persons entering the United States.  Rather, United States citizens, lawful permanent residents, and certain members of the U.S. military are excluded entirely from the scope of the authority that the rule creates.  *See* 85 Fed. Reg. at 16,567 (42 C.F.R. § 71.40(f)).

Second, exercising his new authority under the interim final rule, the CDC Director issued an order suspending for 30 days the introduction of persons traveling across the land borders with Mexico or Canada who would otherwise enter a "congregate setting" in a land port of entry or Border Patrol station.  85 Fed. Reg. 17,061, 17,067 (Mar. 26, 2020) ("CDC Order" or "Order").  The Order does not apply to (1) United States citizens, lawful permanent residents, and their spouses or children; (2) members of the United States military, and their spouses or children; or (3) persons who arrive at a port of entry who either have valid travel documents or are in the visa waiver program and not otherwise subject to travel restrictions.  *See id.* at 17,061.  Those persons who remain covered after application of these exceptions are denominated "covered aliens."  *Id.*  The CDC Order requests that the Department of Homeland Security return such "covered aliens" immediately or as rapidly as possible "to the country from which they entered the United States, to their country of origin, or another location as practicable."  *Id.* at 17,067.  The CDC Director has twice extended his suspension order (collectively, "CDC Orders"), most recently doing so for an indefinite period of time.  *See* 85 Fed. Reg. 31,503, 31,504 (May 26, 2020).  In the same order, the Director also extended its scope to cover coastal ports of entry and border patrol stations.  *Id.*  Airports remain uncovered.  *Id.* at 31,504 n.1.

Even before the CDC issued its interim final rule and the Director issued the CDC Orders, the INA already authorized expedited removal of noncitizens without valid entry documents who arrive at the United States border, or who are apprehended in the United States after having entered the country without inspection and who are unable to prove that they have been physically present in the country for two years.  *See* 8 U.S.C. § 1225(b)(1)(A)(i), (iii).  Immigration officers may proceed immediately to remove such noncitizens unless they indicate an intention to apply for asylum, in which case asylum officers evaluate whether the noncitizens

have a credible fear of persecution, subject to additional review.  *See id.* § 1225(b)(1)(B).  In light of this existing authority, the actual scope of new authority granted by the CDC Orders is effectively targeted to a particular group—namely, those "covered aliens," and particularly unaccompanied minors, who would seek asylum or withholding of removal based on persecution or torture they would face if returned to their country of origin.  And, as the CDC Orders themselves state, the Orders' intent includes return of these very persons to those very countries of origin where they face persecution.

The CDC Orders purport to provide an exception for persons who "should be excepted based on the totality of the circumstances, including consideration of significant law enforcement, officer and public safety, humanitarian, and public health interests," 85 Fed. Reg. at 17,061.  But nothing in the Orders indicates how this exception is to be applied or whether it will accommodate applications for asylum or withholding of deportation on the grounds of persecution or torture in the noncitizen's home country.  A subsequently leaked April 2020 Customs and Border Protection memorandum refers only to treatment of a "Convention Against Torture Claim," but even as to that, the protection described by the memo is sparse: "Aliens that make an affirmative, spontaneous and reasonably believable claim that they fear being tortured in the country they are being sent back to, will be taken to the designated station and referred to USCIS."[2]  There is no mention of asylum or other grounds for withholding of deportation.

---

[2]    COVID-19 Capio Memorandum, at 4, https://www.documentcloud.org/ documents/6824221-COVID-19-CAPIO.html (visited August 21, 2020).

## ARGUMENT

I.   **THE CDC ORDERS VIOLATE STATUTES PROVIDING FOR ASYLUM, WITHHOLDING OF REMOVAL, PROTECTION AGAINST TORTURE, AND PROTECTION OF UNACCOMPANIED CHILDREN**

A.   **United States Statutes Protect From Removal Noncitizens Facing Persecution Or Torture In Their Home Countries, And Extend Special Protections To Unaccompanied Children**

Since 1980, and continuing through 2008, Congress has enacted a series of protections for noncitizens arriving in, or physically present in, the United States who face persecution or torture in their home countries, including special procedural protections for unaccompanied noncitizen children before they may be removed from the United States.  These statutes seek to effectuate fundamental principles of international law and international treaty obligations of the United States, including those enshrined in the 1951 United Nations Convention relating to the Status of Refugees and its 1967 Protocol.

The first of these protections is asylum.  Congress established the asylum process in the Refugee Act of 1980.  In that Act, Congress largely adopted the definition of refugee in the 1951 Convention and 1967 Protocol, the latter of which the United States had ratified in 1968.  As relevant to the "covered aliens" at issue in this case, United States law defines a "refugee" as "any person who is outside any country of such person's nationality … and who is unable or unwilling to return to, and is unable or unwilling to avail himself or herself of the protection of, that country because of persecution or a well-founded fear of persecution on account of race, religion, nationality, membership in a particular social group, or political opinion."  8 U.S.C. § 1101(a)(42); *compare* 1951 Convention art. 1(A)(2); 1967 Protocol art. 1(2).  With certain exceptions not relevant here, none of which concerns public health, the INA guarantees to "[a]ny alien who is physically present in the United States"—like Plaintiff here—the right to apply for

asylum protection as a refugee.  *Id.* § 1158(a)(1), (b)(1)(A).  While the determination of whether

to grant such a person asylum is discretionary, the right to apply for asylum is not.

A second protection is withholding of removal on the basis of persecution.  While the

INA authorizes removal of noncitizens from the United States for specified reasons, *see, e.g.*, 8

U.S.C. § 1229a(a)(2), the INA prohibits such removal (again, with certain exceptions not

relevant here that do not concern public health) to a country if "the alien's life or freedom would

be threatened in that country because of the alien's race, religion, nationality, membership in a

particular social group, or political opinion," *id.* § 1231(b)(3)(A).  In contrast with asylum, if the

requirements for withholding of removal are satisfied, then withholding is mandatory.  *See, e.g.*,

*INS v. Aguirre-Aguirre*, 526 U.S. 415, 419-20 (1999).  This prohibition on forcible return to a

country where a person's life or freedom would be threatened derives from the international law

principle of non-*refoulement*, which is set forth in, among other sources, the 1951 Convention.

*See* 1951 Convention, Art. 33(1) ("No Contracting State shall expel or return ('refouler') a

refugee in any manner whatsoever to the frontiers of territories where his life or freedom would

be threatened on account of his race, religion, nationality, membership of a particular social

group or political opinion.").[3]

Yet a third protection provided to noncitizens is protection from torture, derived from the

United States' implementation of the United Nations Convention Against Torture and Other

Cruel, Inhuman or Degrading Treatment or Punishment ("CAT").  *See* Foreign Affairs Reform

and Restructuring Act of 1998. Pub. L. No. 105-277, § 2242, 112 Stat. 2681, 2681-822 (codified

---

[3]      Earlier this summer, the Department of Homeland Security and Executive Office for
Immigration Review issued a notice of proposed rulemaking, seeking to amend their regulations
to provide that international pandemic threats may be considered for purposes of applying the
"danger to the security of the United States" exception to asylum and withholding of deportation.
*See* 85 Fed. Reg. 41,201 (July 9, 2020).

at 8 U.S.C. § 1231 note).  Under the regulations implementing that statute, withholding or deferral of removal is mandatory if the applicant shows that it is "more likely than not that he or she would be tortured if removed to the proposed country of removal."  8 C.F.R. §§ 208.16(c)(2), 208.17(a).  In contrast to asylum and withholding of deportation, the torture need not be on the grounds of the person's race, religion, nationality, membership in a particular social group, or political opinion.

Finally, in addition to these protections available to noncitizens facing persecution or torture in their countries of origin, Congress legislated special protections for unaccompanied noncitizen children in the Trafficking Victims Protection Reauthorization Act of 2008.  *See* Pub. L. No. 110-457, 122 Stat. 5044 (Dec. 23, 2008).  In addition to provisions regarding custody, the TVPRA requires the government to adhere to specific procedures before removing unaccompanied children from the United States, including opportunities for such children to invoke protections based on a fear of persecution.  *See* 8 U.S.C. § 1232(a).

### B. Section 362 Of The 1944 Public Health Service Act Does Not Override The Specific Protections From Removal That Congress Has Enacted In The Intervening Decades

The CDC Orders' instruction that "covered aliens" be immediately or rapidly removed from the United States with no opportunity to invoke asylum, withholding of removal, or the TVPRA—and with no provision for the processing of CAT claims other than "affirmative, spontaneous" statements by the noncitizen—appears to rest on the proposition that an authority granted by section 362 of the Public Health Service Act, 42 U.S.C. § 265, overrides the statutory protections from removal described above.  But there is no reason why section 265 need be, or should be, read to conflict with (or override) those statutes, for several reasons.

First, it is a longstanding rule of statutory construction that "[w]hen confronted with two Acts of Congress allegedly touching on the same topic, [a] Court is not at liberty to pick and

choose among congressional enactments and must instead strive to give effect to both." *Epic Sys. Corp. v. Lewis*, 138 S. Ct. 1612, 1624 (2018) (internal quotation marks and citation omitted).  That is not only possible here, but doing so would give effect to the most natural construction of the text of the public health statute.  Section 265 is about the prohibition of "the introduction of persons and property" into the United States.  It is not about removal (or expulsion) of persons from the United States.  Nor, importantly, does section 265 address in any way the myriad protections against the forcible return of persons to countries where they face persecution or torture, or protections for unaccompanied children.  For these reasons, there is no reason why section 265 must, or should, be read to address a subject about which it says nothing—removal or expulsion of persons from the United States—or to negate fundamental, internationally recognized, and congressionally legislated protections that section 265 never mentions.

Second, congressional action in the more-than-half century since the Public Health Service Act was enacted further confirms that Congress would not have understood that public health authority to have overridden the statutory protections described in Part I.A of this brief.  To start, Congress has addressed communicable diseases in the immigration laws since 1891.  *See* Act of Mar. 3, 1891, ch. 551, 26 Stat. 1084, 1084 (excluding from admission "persons suffering from a loathsome or a dangerous contagious disease").  The current INA states that a noncitizen is inadmissible if he or she has "a communicable disease of public health significance," which determination is to be made "in accordance with regulations prescribed by the Secretary of Health and Human Services."  8 U.S.C. § 1182(a)(1)(A)(i).  In making this an inadmissibility ground, Congress also made it a ground for removal of persons who have arrived at a port of entry or entered the country without inspection.  *See id.* § 1229a(a)(2) (authorizing

charging of "alien" in removal proceedings "with any applicable ground of inadmissibility under section 1182(a)").  Yet, having provided for removal on this communicable disease ground, Congress also subjected that removal power to the normal defenses to removal, *see id.* § 1229a(c)(4)—which include the protections of asylum, withholding of removal, and CAT. Given what Congress actually did do when it turned its attention to the issue of "communicable diseases" in the INA, it would be unreasonable to read section 265—a provision from an earlier public health law—to free the Executive Branch from the restrictions against removal in those later-enacted laws.

Congress also has specifically addressed the authority of the Executive Branch to conduct expedited removal of persons who arrive at the country's land borders or cross them without inspection.  It did so in the Illegal Immigration Reform and Immigrant Responsibility Act of 1996 ("IIRIRA").  And while those provisions purport to grant broad authority to the Attorney General and immigration officers, the provisions nevertheless require that noncitizens subject to expedited removal be given an opportunity to present any grounds they may have for asylum, withholding of deportation, or CAT protection.  *See* 8 U.S.C. § 1225(b)(1) (authorizing removal without substantial hearing "unless the alien indicates either an intention to apply for asylum under section 1158 of this title or a fear of persecution"); 8 C.F.R. § 235.3(b)(4) (providing for interview "[i]f an alien subject to the expedited removal provisions indicates an intention to apply for asylum, or expresses a fear of persecution or torture, or a fear of return to his or her country").  The CDC Orders deny these protections to the same persons covered by the INA's expedited removal procedures—the persons denominated "covered aliens" by those Orders.  But Congress already considered the circumstances in which inadmissible noncitizens could be removed expeditiously, and it made clear that even in those circumstances, the noncitizen is

entitled to a substantial hearing (at minimum, an asylum officer interview, subject to further review) on claims of persecution or torture giving rise to protection from removal.  Again, given what Congress actually did do when it turned its attention to the issue of expedited removal in IIRIRA, it would be unreasonable to read section 265—a public health provision addressing the prohibition of introduction of persons into the United States—to free the Executive Branch from the restrictions enacted in expedited removal provisions themselves.

In sum, in the many decades after Congress enacted section 265, it developed, enacted, and repeatedly modified a comprehensive set of immigration laws that *both* address the issues at the heart of the CDC Orders—communicable diseases and expedited removal—*and* impose specific restrictions on the authority of the Executive Branch to remove noncitizens from the United States in service of important broadly-recognized principles, including non-*refoulement* and protection of minors.  That history is significant because, as courts recognize, "the meaning of one statute may be affected by other Acts, particularly where Congress has spoken subsequently and more specifically to the topic at hand."  *FDA v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 133 (2000).  Given the substantial history of legislative action since Congress enacted section 265, that public health provision cannot be read as broadly as the CDC Director does in his Orders to simply negate the myriad statutory protections from removal that Congress subsequently enacted.  As the Supreme Court has explained, the "classic judicial task of reconciling many laws enacted over time, and getting them to 'make sense' in combination, necessarily assumes that the implications of a statute may be altered by the implications of a later statute."  *United States v. Fausto*, 484 U.S. 439, 453 (1988).  That is, at minimum, the case here.

There is no reason why section 265 should be read, or needs to be read, to authorize the Executive Branch to remove persons seeking protection from persecution and torture without

granting those persons the hearings to which Congress said they are entitled on such claims. Nor is there any need or reason for section 265 to be read to authorize the Executive Branch to expel unaccompanied minors from the United States without first requiring the procedures that Congress mandated take place.

The current legal structure provides the government with various public health tools to address communicable diseases without sacrificing the right of noncitizens to seek protection established by this Nation's laws. Testing and quarantine of noncitizens, including those seeking our protection, can be implemented in a manner consistent with our treaty obligations; indeed, Congress has provided for that power, *see* 42 U.S.C. Part G (Quarantine and Inspection), and the CDC has issued Foreign Quarantine Regulations pursuant to that authority, *see* 42 C.F.R. Part 71 (Foreign Quarantine).

## CONCLUSION

For the foregoing reasons, the Court should hold that section 265 is part of the larger legal landscape and cannot be read to free the Executive Branch from the asylum, withholding of removal, CAT, and TVPRA protections mandated by Congress.

Dated:  August 21, 2020

Respectfully submitted,

/s/ Paul R.Q. Wolfson

PAUL R.Q. WOLFSON (#414759)
WILMER CUTLER PICKERING
  HALE AND DORR LLP
1875 Pennsylvania Avenue N.W.
Washington, D.C. 20006
Tel.:  (202) 663-6000
Fax:  (202) 663-6363

NOAH A. LEVINE (*pro hac vice forthcoming*)
WILMER CUTLER PICKERING
  HALE AND DORR LLP
7 World Trade Center

- 11 -

250 Greenwich Street
New York, NY 10007
Tel.:  (212) 230-8875
Fax:  (212) 230-8888