# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

P.J.E.S., A MINOR CHILD, by and through
his father and NEXT FRIEND, Mario Escobar
Francisco, on behalf of himself and others
similarly situated,

        Plaintiff,

   v.

CHAD WOLF, Acting Secretary of Homeland
Security, et al.,

        Defendants.

Civil Docket No. 1:20-cv-02245-EGS

**[REDACTED]**

**DEFENDANTS' COMBINED OPPOSITION TO PLAINTIFF'S MOTIONS FOR CLASS
CERTIFICATION AND FOR CLASSWIDE PRELIMINARY INJUNCTION**

### TABLE OF CONTENTS

INTRODUCTION ................................................................................................................. 1

BACKGROUND .................................................................................................................. 5

I.  FACTUAL BACKGROUND ....................................................................................... 5

    A.  The COVID-19 Pandemic .................................................................................... 5

    B.  COVID-19 in Canada and Mexico ...................................................................... 7

    C.  CBP's Operations at or Near the U.S.-Canada and U.S.-Mexico Borders ............ 8

II. STATUTORY AND REGULATORY BACKGROUND................................................. 9

    A.  The Public Health Service Act.............................................................................. 9

    B.  The Interim Final Rule ...................................................................................... 10

    C.  The CDC's Section 265 Order ............................................................................ 11

    D.  General Immigration Processing of Aliens at the Border ..................................... 14

III. Plaintiff and His Request for Class Certification and Emergency Relief ........................ 15

ARGUMENT ..................................................................................................................... 16

I.  PLAINTIFF IS NOT AN ADEQUATE CLASS REPRESENTATIVE .......................... 16

II. PLAINTIFF IS UNLIKELY TO SUCCEED ON THE MERITS ................................... 17

    A.  Section 265 Authorizes the CDC Director to Expel Aliens Like Plaintiff
          Who Are Apprehended After Crossing Illegally Between the Ports of
          Entry......................................................................................................... 18

    1.  The language of Section 265 plainly authorizes expulsion, and even if the
          language is ambiguous, the Secretary's interpretation is reasonable................... 18

    2.  Plaintiff's argument that Section 265 is limited to the regulation of
          transportation companies has no merit or historical basis. .................................. 23

    B.  Section 265 Authorizes the Secretary to Temporarily Suspend
          Immigration Laws That Otherwise Allow the Introduction of Persons into
          the United States ...................................................................................... 29

    1.  Section 265 plainly takes precedence over the identified immigration
          provisions.................................................................................................. 29

2.      The CDC's interpretation of Section 265 as temporarily suspending the
        effect of immigration laws allowing the introduction of covered aliens is
        reasonable. ................................................................................................................ 36

C.      Plaintiff Is Unlikely to Succeed on His Arbitrary and Capricious
        Challenge ...................................................................................................................... 38

III.    THE BALANCE OF HARMS WEIGHS AGAINST ENTRY OF A PRELIMINARY
        INJUNCTION ............................................................................................................................ 42

CONCLUSION .................................................................................................................................... 45

# TABLE OF AUTHORITIES

## Cases

*Ashley v. Bd. of Sup'rs of Presque Isle Cnty.*,
   83 F. 534 (6th Cir. 1897) .................................................................................. 26

*Balt. Gas & Elec. Co. v. Nat. Res. Def. Council, Inc.*,
   462 U.S. 87 (1983) ........................................................................................... 38

*Bostock v. Clayton Cnty.*,
   140 S. Ct. 1731 (2020) .................................................................................... 29

*Bragdon v. Abbott*,
   524 U.S. 624 (1998) ......................................................................................... 45

*Bulova Watch Co. v. United States*,
   365 U.S. 753 (1961) ......................................................................................... 33

*Cardinal Health, Inc. v. Holder*,
   846 F. Supp. 2d 203 (D.D.C. 2012) ............................................................... 40

*Chaplaincy of Full Gospel Churches v. England*,
   454 F.3d 290 (D.C. Cir. 2006) ....................................................................... 43

*Castro v. U.S. Dep't of Homeland Sec.*,
   835 F.3d 422 (3d Cir. 2016) ........................................................................... 19

*Chevron, USA, Inc. v. Nat. Res. Def. Council, Inc.*,
   467 U.S. 837 (1984) .................................................................................. 21, 30

*City of Arlington, Tex. v. FCC*,
   569 U.S. 290 (2013) ......................................................................................... 21

*Clapper v. Amnesty Int'l USA*,
   568 U.S. 398 (2013) ......................................................................................... 17

*Coal. for Common Sense in Gov't Procurement v. United States*,
   576 F. Supp. 2d 162 (D.D.C. 2008) ............................................................... 43

*Cruz v. Dep't of Homeland Sec.*,
   No. 19-CV-2727, 2019 WL 8139805 (D.D.C. Nov. 21, 2019) ...................... 19

*Davis v. Mich. Dep't of Treasury*,
   489 U.S. 803 (1989) ......................................................................................... 22

*Dep't of Homeland Sec. v. Thuraissigiam,*
   140 S. Ct. 1959 (2020) ................................................................ 19

*Dir., Office of Workers' Comp. Programs, Dep't of Labor v. Newport News
   Shipbuilding & Dry Dock Co.,*
   514 U.S. 122 (1995) .................................................................... 35

*Epic Sys. Corp. v. Lewis,*
   138 S. Ct. 1612 (2018) ................................................................ 35

*Epsilon Elecs., Inc. v. U.S. Dep't of Treasury,*
   857 F.3d 913 (D.C. Cir. 2017) .................................................... 38

*FERC v. Elec. Power Supply Ass'n,*
   136 S. Ct. 760 (2016) .................................................................. 38

*Fiallo v. Bell,*
   430 U.S. 787 (1977) .................................................................... 36

*Fourco Glass Co. v. Transmirra Prods. Corp.,*
   353 U.S. 222 (1957) .................................................................... 33

*Garcia v. Johanns,*
   444 F.3d 625 (2006) .................................................................... 16

*Garcia v. San Antonio Metro. Transit Auth.,*
   469 U.S. 528 (1985) ...................................................................... 5

*Guttenberg v. Emery,*
   26 F. Supp. 3d 88 (D.D.C. 2014) ................................................ 42

*Haig v. Agee,*
   453 U.S. 280 (1981) .................................................................... 26

*Hickox v. Christie,*
   205 F. Supp. 3d 579 (D.N.J. 2016) ............................................ 21

*Hutchins v. District of Columbia,*
   188 F.3d 531 (D.C. Cir. 1999) .................................................... 26

*In re Approval of Judicial Emergency Declared in Eastern District of California,*
   956 F.3d 1175 (9th Cir. 2020) .................................................... 21

*Inv. Co. Inst. v. CFTC,*
   720 F.3d 370 (D.C. Cir. 2013) .................................................... 42

*Jacobson v. Massachusetts,*
   197 U.S. 11 (1905) ......................................................... 5, 40, 44

*Jama v. ICE,*
    543 U.S. 335 (2005) .................................................................................. 27

*JD v. Azar,*
    925 F.3d 1291 (D.C. Cir. 2019) ................................................................ 17

*Kaseman v. District of Columbia.,*
    444 F.3d 637 (D.C. Cir. 2006) .................................................................. 22

*Knauff v. Shaughnessy,*
    338 U.S. 537 (1950) .................................................................................. 36

*Landon v. Plasencia,*
    459 U.S. 21 (1982) .................................................................................... 19

*League of Women Voters of United States v. Newby,*
    838 F.3d 1 (D.C. Cir. 2016) ...................................................................... 43

*Luis v. United States,*
    136 S. Ct. 1083 (2016) .............................................................................. 21

*Marshall v. United States,*
    414 U.S. 417 (1974) .................................................................................... 5

*Maryland v. King,*
    133 S. Ct. 1 (2012) .................................................................................... 45

*Mathews v. Diaz,*
    426 U.S. 67 (1976) .................................................................................... 36

*Mayo v. Reynolds,*
    875 F.3d 11 (D.C. Cir. 2017) .................................................................... 38

*Mazurek v. Armstrong,*
    520 U.S. 968 (1997) .................................................................................. 17

*Medellin v. Texas,*
    552 U.S. 491 (2008) .................................................................................. 32

*Milner v. Dep't of Navy,*
    562 U.S. 562 (2011) .................................................................................. 28

*Morton v. Mancari,*
    417 U.S. 535 (1974) .................................................................................. 35

*Motor Vehicle Mfrs. Ass'n of the U.S., Inc. v. State Farm Mut. Auto. Ins. Co.,*
    463 U.S. 29 (1983) .................................................................................... 38

*Munaf v. Geren,*
    553 U.S. 674 (2008) ................................................................................................ 17

*NLRB v. SW Gen., Inc.,*
    137 S. Ct. 929 (2017) .............................................................................................. 28

*Nat'l Cable & Telecomms. Ass'n v. Brand X Internet Servs.,*
    545 U.S. 967 (2005) ................................................................................................ 36

*Nat'l Immigration Project of Nat'l Lawyers Guild v. Exec. Office [for]
    Immigration Review,*
    --- F. Supp. 3d ---, No. 1:20-CV-00852 (CJN), 2020 WL 2026971,
    (D.D.C. Apr. 28, 2020) ............................................................................. 42, 43, 45

*Nat'l Lifeline Ass'n v. FCC,*
    921 F.3d 1102 (D.C. Cir. 2019) .............................................................................. 41

*Nat'l Propane Gas Ass'n v. U.S. Dep't of Homeland Sec.,*
    534 F. Supp. 2d 16 (D.D.C. 2008) .......................................................................... 45

*Nitro-Lift Techs., LLC v. Howard,*
    568 U.S. 17 (2012) .................................................................................................. 33

*Nken v. Holder,*
    556 U.S. 418 (2009) ........................................................................................... 42, 43

*Old Wagon Works v. Benedict,*
    67 F. 1 (8th Cir. 1895) ............................................................................................ 26

*Padilla v. Kentucky,*
    559 U.S. 356 (2010) ................................................................................................ 25

*Radzanower v. Touche Ross & Co.,*
    426 U.S. 148 (1976) ................................................................................................ 33

*Randall v. Loftsgaarden,*
    478 U.S. 647 (1986) ................................................................................................ 34

*Reno v. Flores,*
    507 U.S. 292 (1993) ................................................................................................ 26

*Robinson v. Shell Oil Co.,*
    519 U.S. 337 (1997) ........................................................................................... 18, 20

*Rural Cellular Ass'n v. FCC,*
    588 F.3d 1095 (D.C. Cir. 2009) .............................................................................. 40

*Russello v. United States,*
    464 U.S. 16 (1983) ............................................................................. 3, 23, 24, 27

*S. Bay United Pentecostal Church v. Newsom,*
    140 S. Ct. 1613 (2020) ........................................................................ 5, 40, 45

*Sch. Bd. of Nassau Cnty. v. Arline,*
    480 U.S. 273 (1987) ..................................................................................... 45

*Sherley v. Sebelius,*
    644 F.3d 388 (D.C. Cir. 2011) .................................................................... 42

*Skidmore v. Swift & Co.,*
    323 U.S. 134 (1944) ..................................................................................... 36

*Stewart v. Smith,*
    673 F.2d 485 (D.C. Cir. 1982) .................................................................... 33

*Sullivan v. Everhart,*
    494 U.S. 83 (1990) ....................................................................................... 19

*Trinidad y Garcia v. Thomas,*
    683 F.3d 952 (9th Cir. 2012) ...................................................................... 32

*Trump v. Hawaii,*
    138 S. Ct. 2392 (2018) ........................................................................... 33, 36

*Twelve John Does v. District of Columbia,*
    117 F.3d 571 (D.C. Cir. 1997) .................................................................... 16

*U.S. Parole Comm'n v. Geraghty,*
    445 U.S. 388 (1980) ..................................................................................... 16

*United States v. Ron Pair Enter., Inc.,*
    489 U.S. 235 (1989) ..................................................................................... 20

*United States v. Steinfels,*
    753 F.2d 373 (5th Cir. 1985) ...................................................................... 18

*United States v. Trek Leather, Inc.,*
    767 F.3d 1288 (Fed. Cir. 2014) .................................................................. 26

*Valentine v. United States ex rel. Neidecker,*
    299 U.S. 5 (1936) ......................................................................................... 25

*Virginia v. Tennessee,*
    148 U.S. 503 (1893) ..................................................................................... 20

*Winter v. Nat. Res. Def. Council, Inc.*,
    555 U.S. 7 (2008) ................................................................................................ 18, 42, 43

*Zadvydas v. Davis*,
    533 U.S. 678 (2001) ...................................................................................................... 19

**<u>Constitutional Provisions</u>**

U.S. Const. art. I, § 9, cl. 2 ............................................................................................ 3, 30

**<u>Statutes</u>**

5 U.S.C. § 553 ....................................................................................................................... 10

6 U.S.C. § 279 ....................................................................................................................... 15

8 U.S.C. § 1182 ............................................................................................................... 32, 35

8 U.S.C. § 1222 ............................................................................................................... 32, 35

8 U.S.C. § 1225 ............................................................................................................... 14, 15

8 U.S.C. § 1229 ..................................................................................................................... 14

8 U.S.C. § 1229a ............................................................................................................. 14, 15

8 U.S.C. § 1231 (note) .......................................................................................................... 31

8 U.S.C. § 1232 ..................................................................................................................... 15

10 U.S.C. § 123 ..................................................................................................................... 30

19 U.S.C. § 1401 ..................................................................................................................... 9

20 U.S.C. § 3508 ..................................................................................................................... 9

42 U.S.C. § 264 ............................................................................................................... 22, 23

*42 U.S.C. § 265 .............................................................................................................. passim

42 U.S.C. § 268 ................................................................................................................. 9, 11

42 U.S.C. § 271 ..................................................................................................................... 25

80 Stat. 1610 (1966) ............................................................................................................... 9

93 Stat. 668 (1979) ................................................................................................................. 9

Act of February 15, 1893, ch. 114, 27 Stat. 449 ................................................................... 9

Act of March 3, 1891, ch. 551, 26 Stat. 1084 ........................................................ 30, 32

Act of March 27, 1890 Act, ch. 51, Pub. L. No. 51-51, 26 Stat. 31 ............................ 28

Foreign Affairs Reform and Restructuring Act of 1998 ("FARRA"), Pub. L. No. 105-277,
112 Stat. 2681............................................................................................................ 31

Public Health Service Act of 1944, Pub. L. No. 78-410, 58 Stat. 682 .......................... 9

Pub. L. No. 96-88............................................................................................................ 9

William Wilberforce Trafficking Victims Protection and Reauthorization Act of 2008
("TVPRA"), Pub. L. No. 110-457............................................................................. 15

## Rules

Fed. R. Civ. P. 23(a) .................................................................................................... 16

## Regulations

8 C.F.R. § 1003.1 ........................................................................................................ 14

8 C.F.R. § 208.16 ........................................................................................................ 31

8 C.F.R. § 1208.16 ...................................................................................................... 31

31 Fed. Reg. 8855 (June 25, 1966) ............................................................................... 9

42 C.F.R. Part 71.................................................................................................. *passim*

85 Fed. Reg. 16,559-01 (Mar. 24, 2020) .............................................................. *passim*

*85 Fed. Reg. 17,060-02 (Mar. 26, 2020) ............................................................. *passim*

85 Fed. Reg. 22,424 (Apr. 22, 2020) .......................................................... 7, 12, 13

85 Fed. Reg. 31,503-02 (May 26, 2020)................................................................ *passim*

85 Fed. Reg. 51,633 (Aug. 21, 2020)............................................................................ 6

## Other Authorities

1 J. Kent, *Commentaries on American Law* (13th ed. 1884)........................................ 21

24 Cong. Record 370-471 (Jan. 10, 1893)................................................ 26, 28, 30, 31

CBP COVID-19 Updates and Announcements,
https://www.cbp.gov/newsroom/coronavirus (last visited Sept. 5, 2020).................................. 6

CDC, Corona Virus Disease 2019 (COVID-19),
  https://www.cdc.gov/coronavirus/2019-ncov/cases-updates/cases-in-us.html ........................ 6

Fact Sheet: DHS Measures on the Border to Limit the Further Spread of Coronavirus,
  https://www.dhs.gov/news/2020/06/16/fact-sheet-dhs-measures-border-limit-further-spread-
  coronavirus (last visited Sept. 5, 2020) .................................................................................... 6

HHS Memo, Delegation of Authority Under Title III of the Public Health Service Act, As
  Amended, General Powers and Duties of the Public Health Service, dated Sept. 12, 1988 ...... 9

H.R. 9757, 52nd Cong., 2d Sess., Report No. 2210 (Jan. 9, 1893) ............................................. 31

*Nationwide Enforcement Encounters: Title 8 Enforcement Actions and Title 42 Expulsions,*
  https://www.cbp.gov/newsroom/stats/cbp-enforcementstatistics/title-8-and-
  title-42-statistics ...................................................................................................................... 14

Oxford English Dictionary (1933) .................................................................................. 19, 26, 29

Testimony of Mark A. Morgan, CBP, Before the U.S. Senate Committee on Homeland Security
  and Governmental Affairs, June 25, 2020,
  https://www.hsgac.senate.gov/imo/media/doc/Testimony-Morgan-2020-06-25-
  REVISED.pdf ............................................................................................................................ 14

Thomas Cooley, *Constitutional Limitations* 1868) ...................................................................... 21

*Universal English Dictionary* (John Craig ed. 1869) ........................................................... 19, 29

WHO Coronavirus 2019,
  https://covid19.who.int/region/amro/country/mx .................................................................... 7

WHO Coronavirus Disease (COVID-19) Dashboard,
  https://covid19.who.int/table ................................................................................................... 7

**INTRODUCTION**

Facing a historic, unprecedented outbreak of the Coronavirus Disease 2019 ("COVID-19"), the U.S. Centers for Disease Control & Prevention ("CDC") exercised its long-standing statutory authority and applied its scientific and technical expertise to protect the health and safety of the United States population, migrants in U.S. Customs and Border Patrol ("CBP") facilities, and CBP personnel.  Although this public health strategy has proven effective in mitigating the serious danger that COVID-19 presents, Plaintiff requests that this Court prevent the CDC Director—the Nation's designated public health expert—from taking statutorily authorized, science-based action necessary to protect public health during one of the worst pandemics the country has ever faced.  But there is no reason to allow Plaintiff to hamper the CDC Director's lawful and demonstrably effective response to the pandemic, and second-guessing the Director's judgment at this juncture potentially could lead to devastating public health consequences.

Plaintiff, a Guatemalan minor who had illegally crossed the U.S.-Mexico border into the United States, brought this putative class action to challenge a CDC Order—as extended, amended, and implemented—which temporarily prohibits the introduction of certain aliens traveling from Mexico and Canada into the United States.  Plaintiff acknowledges that he has since been excepted from the Order (or as Plaintiff calls it, the "Title 42 Process") and cannot claim any injury from it.  Nevertheless, he seeks certification of a class of all unaccompanied alien children who both are or will be subject to the Title 42 Process and are or will be detained in Government custody in the United States.  Speculating as to the harm that might be suffered by the putative class members, Plaintiff also seeks a classwide preliminary injunction to enjoin the application of the Title 42 Process to the putative class.

This Court should deny both motions.  Class certification is improper because Plaintiff, who no longer has a personal stake in this case, cannot adequately represent the class.  Even if he could, Plaintiff is not likely to succeed on his challenge to the Title 42 Process because the CDC Director plainly has the statutory authority to issue the Order, and neither the Order nor its implementation is arbitrary and capricious.  As the Court is aware, COVID-19 is a communicable

disease that spreads easily and quickly across national borders and for which there are no widely available therapeutics or vaccines.  Countries across the world have implemented emergency measures to help curb its spread, including closing their borders and imposing severe travel restrictions.  In the United States, the Secretary of Health and Human Services declared a Public Health Emergency in January 2020, and the President declared a National Emergency in March 2020.  The United States and its two neighboring countries, Mexico and Canada, mutually agreed to temporarily limit non-essential travel along the U.S.-Canada and U.S.-Mexico land borders.

To help avert the serious danger of COVID-19 further spreading into the United States, the CDC Director invoked his authority under Section 362 of the Public Health Service Act, 42 U.S.C. § 265 [hereinafter Section 265], to temporarily prohibit the introduction of certain aliens who are without valid travel documents into the United States from Canada and Mexico.  Based on his expert judgment, the Director found that a suspension of the right to introduce such aliens is necessary because aliens covered by the Order are potential carriers of COVID-19 and are typically held for hours or days in congregate settings at border facilities for immigration processing.  The border facilities' holding areas were not designed, and are not equipped, to quarantine, isolate, or enable social distancing of detainees, and to use them for such purposes would present a significant risk of transmitting COVID-19 to other travelers, CBP personnel, detained aliens, and the American public.  Given such public health risks, the Director determined that it is imperative to expel covered aliens as quickly as possible.

Plaintiff seeks to preliminarily enjoin the application of the Title 42 Process to the putative class, arguing that (1) Section 265 does not authorize the expulsion of individuals after they have crossed the border into the United States; (2) such expulsion would violate certain immigration laws; and (3) the Title 42 Process is arbitrary and capricious.  Plaintiff is unlikely to succeed on any of these arguments.

*First*, Section 265 evinces Congress's intent to authorize the expulsion of aliens subject to a Section 265 Order.  The statute grants the Executive Branch "the power to prohibit, in whole or in part, the introduction of persons" into the United States during an outbreak of a communicable

disease in order to avert the danger of the disease spreading into the United States.  42 U.S.C. § 265.  By granting that broad power, Congress necessarily gave the Executive Branch the authority to take actions needed to exercise that power.  That includes the power to prevent persons from entering the country who might further the spread of a communicable disease and, necessarily, the power to promptly expel persons who managed to surreptitiously cross over the U.S. border from a designated foreign country in violation of a Section 265 order and then are halted while in the process of moving into the interior.

Although Judge Carl Nichols found in a similar case that the CDC likely has no such authority because Section 265 does not use terms like "return" or "remove" as found in immigration statutes, *see J.B.B.C. v. Wolf*, No. 20-cv-1509, June 24, 2020 Tr. at 50 ["June Tr."], Ex. D to ECF No. 2-2, the Supreme Court has rejected this kind of interpretative approach.  As the Supreme Court has observed, "[l]anguage in one statute usually sheds little light upon the meaning of different language in another statute, even when the two are enacted at or about the same time." *Russello v. United States*, 464 U.S. 16, 25 (1983).  This is particularly the case, the Court explained, when the statutes have different aims, *see id.*, as is the case here:  Section 265 is designed to prohibit the introduction of persons into the United States to avoid the spread of a communicable disease into the country, whereas the immigration statutes identified by Plaintiff are designed to confer immigration benefits based on an alien's individual circumstances.

*Second*, Section 265 makes clear that an emergency order issued under the provision would suspend the effect of other laws otherwise permitting introduction.  It provides for "a suspension of the right to introduce [] persons and property" from designated foreign countries or places "[as] required in the interest of the public health."  42 U.S.C. § 265.  The term "suspend" means temporarily ceasing the effect of laws, a meaning that has been well understood since the Founding.  *See, e.g.*, U.S. Const. art. I, § 9, cl. 2 (the Suspension Clause).  The phrase "suspension of the right to introduce" thus naturally means the temporary cessation of the effect of any laws, including immigration laws, pursuant to which a person might otherwise claim a right to be introduced into the United States.

3

The legislative history similarly indicates a clear congressional intent to grant the Executive the broad power to temporarily suspend immigration from specified foreign countries if the United States is faced with an invasion of a communicable disease from those countries. Judge Nichols found in *J.B.B.C.* that Section 265 must be harmonized with the immigration statutes.  But the statutes are in harmony—the immigration statutes are of general applicability, and their effects are suspended temporarily by Section 265 only when there is a serious danger of the introduction of a communicable disease into the United States through mass migration during an outbreak. Any other purported harmonization would render Section 265 a nullity.  In the circumstances here, application of the immigration provisions would permit covered aliens to be held in congregate settings for hours or days during immigration processing and thus allow the disease to spread, frustrating the very purpose of the Section 265 Order to curb the potentially irreversible and devastating spread of COVID-19 into the United States.

*Third*, neither the CDC Order nor its implementation is arbitrary and capricious.  The CDC acted in the midst of a historic pandemic with COVID-19 spreading rapidly.  In issuing the Order, the CDC Director fully explained why he chose to focus on CBP's operations at or near the border. His determination is reasonable and particularly entitled to deference because it is based on the CDC's expert, science-based, predictive public health judgment during a global pandemic.  To the extent Plaintiff argues for the first time in his brief that the Order has been implemented in an irrational manner because DHS purportedly tests every unaccompanied alien child for COVID-19 and expels only those who receive negative test results, Plaintiff is wrong. ████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

█████████████████████████████████████

Finally, the equities weigh decidedly against granting the requested emergency relief here. As Chief Justice Roberts recently observed, "[o]ur Constitution principally entrusts '[t]he safety and the health of the people' to the politically accountable officials of the [government] 'to guard and protect,'" and "[w]hen those officials 'undertake[ ] to act in areas fraught with medical and scientific uncertainties,' their latitude 'must be especially broad.'" *S. Bay United Pentecostal Church v. Newsom*, 140 S. Ct. 1613, 1613 (2020) (Roberts, C.J., concurring in denial of application for injunctive relief) (first quoting *Jacobson v. Massachusetts*, 197 U.S. 11, 38 (1905), and then quoting *Marshall v. United States*, 414 U.S. 417, 427 (1974)). "Where those broad limits are not exceeded, they should not be subject to second-guessing by an 'unelected federal judiciary,' which lacks the background, competence, and expertise to assess public health and is not accountable to the people." *Id.* at 1613–14 (quoting *Garcia v. San Antonio Metro. Transit Auth.*, 469 U.S. 528, 545 (1985)). "That is especially true where, as here, a party seeks emergency relief . . . while [] officials are actively shaping their response to changing facts on the ground." *Id.* at 1614.

## BACKGROUND

### I.      FACTUAL BACKGROUND

#### A.   The COVID-19 Pandemic

COVID-19 is a communicable disease that spreads easily and rapidly without regard to national borders. Notice of Order Under Sections 362 & 365 of the Public Health Service Act Suspending Introduction of Certain Persons From Countries Where A Communicable Disease Exists, 85 Fed. Reg. 17,060-02 (Mar. 26, 2020) ["Order"] at 3 (attached as Exhibit A). To curb the spread of COVID-19, countries have imposed sweeping travel restrictions. *See* Interim Final Rule, Control of Communicable Diseases; Foreign Quarantine: Suspension of Introduction of Persons Into The United States From Designated Foreign Countries of Places for Public Health Purposes, 85 Fed. Reg. 16,559-01 (Mar. 24, 2020) ["IFR"] at 10-11 (attached as Exhibit B). In addition to restricting the entry of certain aliens from certain countries, *see id.* at 10, since March 20, 2020, the United States has temporarily limited any non-essential travel from Mexico and Canada into the United States at land ports of entry along the U.S.-Mexico and U.S.-Canada

5

borders.[1]  The United States and Mexico have mutually determined that non-essential travel between the two countries places the populace of both nations, as well as personnel staffing land ports of entry, at increased risk of exposure to COVID-19.[2]  Indeed, in the United States, more than 1,000 CBP employees in States bordering Mexico have tested positive for COVID-19, and some have died.[3]

As of May 9, 2020, the United States reported 1,274,036 confirmed cases of COVID-19 and 77,034 deaths.  *See* Amendment and Extension of Order Suspending Introduction of Certain Persons from Countries Where a Communicable Disease Exists, 85 Fed. Reg. 31503-02 (May 26, 2020) ["May Order"] at 6 (attached as Exhibit C).  By September 2, 2020, there were more than six million confirmed cases and the death toll reached 184,083.[4]  Many cities and states, including those located along the U.S.-Mexico border, have experienced recent surges in community transmission and new cases.  Final Rule at 53–54 (.pdf file), 42 C.F.R. Part 71, (filed Sept. 4, 2020).[5]  As of August 30, 2020, for instance, California reported cumulative totals of 699,909 confirmed cases of COVID-19, and 12,905 deaths; California and Texas led the country with the highest 7-day case counts; and Arizona had the third highest number of cases per 100,000 people over that same period.  *Id*. at 53–54, 56.

---

[1] Fact Sheet: DHS Measures on the Border to Limit the Further Spread of Coronavirus, https://www.dhs.gov/news/2020/06/16/fact-sheet-dhs-measures-border-limit-further-spread-coronavirus (last visited Sept. 5, 2020).

[2] *See* Notification of Temporary Travel Restrictions Applicable to Land Ports of Entry and Ferries Service Between the United States and Mexico, 85 Fed. Reg. 51633 (extending the restriction until September 21, 2020); Notification of Temporary Travel Restrictions Applicable to Land Ports of Entry and Ferries Service Between the United States and Canada, 85 Fed. Reg. 51634 (same).

[3] CBP COVID-19 Updates and Announcements, https://www.cbp.gov/newsroom/coronavirus (last visited Sept. 5, 2020).

[4] *See* CDC, Corona Virus Disease 2019 (COVID-19), https://www.cdc.gov/coronavirus/2019-ncov/cases-updates/cases-in-us.html.

[5] *Available at* https://www.federalregister.gov/documents/2020/09/11/2020-20036/control-of-communicable-diseases-foreign-quarantine-suspension-of-the-right-to-introduce-and.

From the outset, CDC and the Department of Health and Human Services ("HHS") have played a critical role in addressing COVID-19, including assisting in the implementation of quarantine measures to minimize the risk of transmission posed by persons traveling to the United States. For example, following outbreaks on the *Diamond Princess* and the *Grand Princess* cruise ships, HHS, CDC, and other agencies conducted massive operations to disembark and quarantine or isolate thousands of travelers from the ships at Federal sites. *Id.* at 14, 25–27. The combined federal quarantine and isolation of individuals from the cruise ships along with flights repatriating U.S. citizens from China were the largest federal quarantine and isolation operations in modern American history. *Id.* at 25–26.

### B. COVID-19 in Canada and Mexico

The pandemic has severely impacted, and continues to impact, Canada and Mexico. As of August 27, 2020, Canada reported a cumulative total of over 126,000 confirmed cases of COVID-19, and over 9,000 deaths. *Id.* at 49. Canada's public health agency expects that the number of confirmed COVID-19 cases will continue to increase. May Order at 4.

Mexico declared a state of health emergency on March 30, 2020, and announced its highest level of public health emergency on April 20, 2020. *See* Extension of Order Suspending Introduction of Certain Persons From Countries Where A Communicable Disease Exists, 85 Fed. Reg. 22,424 (Apr. 22, 2020) ["April Order"] at 4, 5 (attached as Exhibit D); May Order at 5. As of September 2, 2020, the World Health Organization ("WHO") reported that Mexico had 599,560 confirmed cases and 64,414 deaths,[6] and ranks among the top ten nations in COVID-19 cases.[7] Some observers postulate that the actual numbers of COVID-19 infections and deaths are multiples (likely between 10 to 20 times) of reported data, as Mexico has the lowest diagnostic testing per capita of any country in the Organization for Economic Co-operation and Development. Final Rule at 59. Evidence suggests that the epicenter of the COVID-19 pandemic in Mexico is shifting

---

[6] *See* WHO Coronavirus 2019, https://covid19.who.int/region/amro/country/mx.

[7] *See* WHO Coronavirus Disease (COVID-19) Dashboard, https://covid19.who.int/table.

from Mexico City to the Mexican border states, a shift that likely will have a negative impact on community transmission and public health in the United States, given that all covered aliens crossing the U.S.-Mexico border travel through the region. *Id*. at 60.

### C.  CBP's Operations at or Near the U.S.-Canada and U.S.-Mexico Borders

The U.S.-Canada border spans nearly 4,000 miles, and the U.S.-Mexico border runs approximately 2,000 miles.  Order at 7, 10.  CBP operates land ports of entry along the borders where it processes aliens to determine their admissibility.  CBP also operates 136 Border Patrol stations to apprehend, process, and temporarily hold aliens who seek to unlawfully enter the country between ports of entry.  *Id.* at 12.

Through February of Fiscal Year ("FY") 2020, CBP processed more than 20,000 inadmissible aliens at ports of entry along the U.S.-Canada border and apprehended nearly 1,200 inadmissible aliens.  *Id.* at 7.  The number of inadmissible aliens CBP processed along the U.S.-Mexico border is much higher; as of March, CBP processed more than 34,000 inadmissible aliens at ports of entry and apprehended more than 117,000 inadmissible aliens in FY 2020.  *Id.* at 10.  Thousands of the inadmissible or apprehended individuals were nationals of countries other than Mexico that have been experiencing sustained human-to-human COVID-19 transmission.  *Id.*

Aliens who lack proper travel documents would typically be deemed inadmissible and therefore generally take longer to process at ports of entry than U.S. citizens and those aliens with valid travel documents.  *Id.* at 11.  During the time that such aliens must be processed and held pending transfer to another agency—which may run from several hours to several days—they typically remain in close proximity to CBP personnel and other travelers.  *Id.*  For aliens apprehended between ports of entry, who are then taken to a Border Patrol station, they too are held in close proximity to others during immigration processing and holding pending transfer to another agency.  Although Border Patrol stations vary significantly in size and layout, they generally have congregate holding areas that can temporarily hold only 150 to 300 people standing shoulder-to-shoulder.  *Id.* at 12.  A typical station also has only two to five separate holding areas. *Id.*  If not released by CBP, an alien subject to the Order would spend an average of roughly 78

hours in a Border Patrol station before being transferred to U.S. Immigration and Customs Enforcement ("ICE").  *Id.*  Only 46 of CBP's 136 Border Patrol stations offer any medical services at all, and those services are limited to basic emergency care, as well as testing for glucose, pregnancy, and influenza.  *Id.*

## II.  STATUTORY AND REGULATORY BACKGROUND

### A.  The Public Health Service Act

The CDC Order was issued under the authority found in Section 265, which provides:

> Whenever [the Secretary] determines that by reason of the existence of any communicable disease in a foreign country there is serious danger of the introduction of such disease into the United States, and that this danger is so increased by the introduction of persons or property from such country that a suspension of the right to introduce such persons and property is required in the interest of the public health, the [Secretary], in accordance with regulations approved by the President, shall have the power to prohibit, in whole or in part, the introduction of persons and property from such countries or places as he shall designate in order to avert such danger, and for such period of time as he may deem necessary for such purpose.

42 U.S.C. § 265.[8]  The provision is substantially similar to its predecessor statute, the Act of February 15, 1893, ch. 114, § 7, 27 Stat. 449, 452, which initially vested the authority in the President.  That authority was later vested in the Surgeon General by the Public Health Service Act of 1944, Pub. L. No. 78-410, 58 Stat. 682, and then in the Secretary of Health and Human Services in 1966.  The Secretary in turn has delegated his authority to the CDC Director.[9]  A separate provision of the Public Health Service Act authorizes "customs officers" to assist in implementing any Section 265 order.  *See* 42 U.S.C. § 268(b).  Pursuant to 19 U.S.C. § 1401(i), CBP agents and officers and ICE Enforcement and Removal Operations officers have been designated as "customs officers."

---

[8] *See* HHS Memo., Delegation of Authority Under Title III of the Public Health Service Act, As Amended, General Powers and Duties of the Public Health Service, dated Sept. 12, 1988.

[9] *See* 31 Fed. Reg. 8855 (June 25, 1966), 80 Stat. 1610 (1966); *see also* Pub. L. No. 96-88, § 509(b), 93 Stat. 668, 695 (1979) (codified at 20 U.S.C. § 3508(b)).

### B.  The Interim Final Rule

The COVID-19 pandemic highlighted the need for an efficient regulatory mechanism to suspend the right to introduce persons who would otherwise increase the serious danger of introducing a communicable disease into the United States.  *See* IFR at 11.  As the CDC found, "[i]nternational travel and migration play a significant role in the global transmission of infectious biological agents or their toxic products," as travelers can serve as carriers of pathogenic agents and potential sources of infection for others.  *Id.* at 6.  That risk increases when travelers are in congregate settings with shared sitting, sleeping, eating, or recreational areas.  *Id*. at 7.

Accordingly, on March 20, 2020, HHS issued an Interim Final Rule to allow the CDC Director to invoke the authority in Section 265.  The rule took effect immediately due to the national emergency, *see* 5 U.S.C. § 553(b)(B) and (d), and defines "introduction into the United States of persons from a foreign country" or place to mean "the movement of a person from a foreign country" or place into the United States (1) "so as to bring the person into contact with persons" in the United States or (2) to cause the contamination of property in the United States "in a manner that the Director determines to present a risk of transmission of a communicable disease to persons or property, even if the communicable disease has already been introduced, transmitted, or is spreading within the United States."  IFR at 27.  The CDC explained that "introduction" can encompass those who have physically crossed the U.S. border and are in the process of moving into the interior in a manner the Director determines to present a risk of transmission of a communicable disease.  Halting the travel of such persons and rapidly moving them outside the United States constitutes preventing their "introduction" into the United States.  *Id.* at 16.

On September 4, 2020, HHS filed a Final Rule, which is scheduled to be published on September 11, 2020 in the Federal Register.  *See* Final Rule at 1.  The Rule will become effective 30 days after from the publication date unless the IFR ceases to be in effect before that time, in which case the Final Rule will become effective immediately.  *Id.* at 119.

### C.  The CDC's Section 265 Order

The same day the Interim Final Rule took effect the CDC Director issued the challenged Order temporarily prohibiting the introduction of certain aliens traveling from Canada and Mexico into the United States because of the serious danger of the introduction of COVID-19 into the border facilities as well as the interior of the country through those aliens.  Order at 15–16. Consistent with 42 U.S.C. § 268(b), the CDC requested DHS's assistance in implementing the Order because the CDC lacks the capability and resources to do so.  *Id.* at 16.

Based on information provided by DHS and a U.S. Public Health Service Scientist Officer's visit to the El Paso Port of Entry, Paso del Norte Border Crossing, *see* Order at 13; Ex. 1 to Order, the CDC Director determined that ports of entry and Border Patrol stations at or near the northern and southern borders are not structured or equipped to effectively mitigate the risks presented by COVID-19—*i.e.*, to implement quarantine, isolation, or social distancing protocols— for even small numbers of aliens.  Order at 14.  Rather, these facilities were designed for short-term holding in a congregate setting where aliens (typically those who lack valid travel documents and would therefore be found inadmissible) are held in the common areas in close proximity to one another for hours or days as they undergo immigration processing.  *Id.* at 1, 14.

The CDC Director also found CBP's then-existing screening protocol for COVID-19 to be unworkable for large numbers of individuals.  An influx of infected, asymptomatic aliens would present significant infection control challenges because the screening of such aliens might not trigger testing (to the extent that testing resources are available).  *Id.* at 12.  The aliens would remain in congregate areas while CBP completed screening and processing.  *Id.*  During that time, the alien could infect CBP personnel or other aliens with COVID-19.  *Id.*  Specifically, if CBP determined that an alien may be exposed to or infected with COVID-19, it would notify the local health department and CDC personnel, if available, to determine whether the individual should be tested for COVID-19 and where that testing should occur.  *Id.*  If testing was to occur, CBP followed guidance from CDC and local health officials regarding transport to the testing site, including disinfecting the vehicles used for such transport.  *Id.*  And testing often required

11

analyzing collected specimens in a laboratory setting with results available only after three to four days. *Id.* at 4. The CDC Director determined that rapid testing—which is not yet widely available—should be prioritized at places such as hospitals to increase care providers' availability by eliminating any need for them to self-isolate while awaiting results. April Order at 5-6.

The Director also found that, for those aliens who tested positive for COVID-19 under the above protocol, ports of entry and Border Patrol stations largely lacked the capacity to provide medical services, and even when they did, such services were relatively limited. Final Rule at 35. DHS must rely on local and regional hospitals (which sometimes can be far away) and emergency medical resources. April Order at 15. But States along the southern border have some of the lowest numbers of hospital beds per 1,000 inhabitants in the United States. *Id.* Moreover, Arizona, California, and Texas also have some of the largest numbers of residents living in primary care shortage areas. *Id.* Shifting these limited medical resources to large numbers of infected aliens, the Director found, would divert them away from the domestic population, while increasing the risk of exposure to the virus for healthcare workers. Order at 15; *see* Final Rule at 55. Experience has also proven that a surge in the number of COVID-cases could overtax these border States' healthcare systems. *See* Final Rule at 57–59 (discussing Arizona's experience).

Finally, the Director found that conditional release is not a viable option because there is significant uncertainty that covered aliens could effectively self-quarantine, self-isolate, or otherwise comply with existing social distancing guidelines, not to mention that the CDC lacks the resources and personnel necessary to effectively monitor a large number of people so released. Order at 15; May Order at 11; *see also* Final Rule 11–12, 104–06.[10]

To mitigate the risks presented by COVID-19, the CDC Order requires returning all "covered aliens" as rapidly as possible and with as little time spent in congregate settings as is

---

[10] The CDC Director later also determined that it would be inadvisable to structurally expand border facilities and to equip and train DHS personnel to contain COVID-19 because such an endeavor would consume a significant amount of scarce medical resources that could otherwise be used to meet the needs of the domestic population. May Order at 7.

feasible, to the country from which they entered the United States, their country of origin, or to another location as practicable and appropriate.  Order at 16.  "Covered aliens" are those persons traveling from Canada or Mexico (regardless of their country of origin) who would otherwise be introduced into a congregate setting in a land (and, as amended, coastal) port of entry or Border Patrol station at or near the U.S. borders with Canada and Mexico, and excludes, among others, U.S. citizens, Lawful Permanent Residents, and those who arrive at a port of entry with valid travel documents.  *Id.* at 2; May Order at 7.  In addition, customs officers may, with supervisor approval, except otherwise covered aliens from the Order based on the totality of the circumstances, including considerations of significant law enforcement, officer and public safety, humanitarian, and public health interests.  Order at 2.

Although the Order was initially effective for thirty days, the CDC Director has since extended the Order's effectiveness—subject to periodic review—until he determines that the danger of further introduction of COVID-19 into the United States has ceased to be a serious danger to the public health, and that continuation of the Order is no longer necessary to protect the public health.  *Id.* at 1, 10; April Order at 2; May Order at 10.

The CDC Director found that the Order has reduced the number of covered aliens in congregate settings in border facilities, thereby reducing the danger of COVID-19 transmission into the United States.  May Order at 3 (Order mitigated public health risk by reducing covered alien population at border facilities by 88 percent); Final Rule at 52.  The Director has also found that the Order has reduced the utilization of local health care systems by covered aliens: in the 50 days preceding the Order, for instance, CBP officers made over 1,600 trips to community hospitals to facilitate advanced medical care for detainees, but in the first 80 days after the Order's implementation, CBP officers made only 400 trips for detainees to receive medical care from community hospitals, thereby preserving vital resources for the domestic population during the COVD-19 pandemic.  Final Rule at 39.  As for the implementation of the Order, DHS makes every

13

effort to immediately expel covered aliens to their country of last transit or to return them to their country of origin as expeditiously as possible.[11]

### D. General Immigration Processing of Aliens at the Border

DHS's infection control challenges must be assessed against the backdrop of immigration processes occurring at ports of entry and Border Patrol stations.  The Immigration and Nationality Act ("INA") establishes general procedures for DHS to process aliens who are "applicant[s] for admission" to the United States, whether they arrive at a port of entry or cross the border between ports of entry.  8 U.S.C. § 1225(a)(3).  Under the INA, all such aliens must be inspected by immigration officers concerning their right to enter the United States.  *Id.* § 1225(b)(1), (b)(2)(A). A removal proceeding is authorized for any "applicant for admission" whom an immigration officer determines is "not clearly and beyond a doubt entitled to be admitted."  *Id.* § 1225(b)(2)(A); *see also id.* §§ 1229, 1229a; 8 C.F.R. § 1003.1.  In removal proceedings, an alien may seek asylum, withholding of removal, or any other form of relief or protection from removal from the United States.  *See* 8 U.S.C.§ 1229a(a)(2), (c)(4).  An immigration officer, however, may elect to place certain aliens in an expedited removal proceeding described in 8 U.S.C. § 1225(b)(1), in which the alien will be removed from the United States without further hearing or review, unless he claims

---

[11] *See* Testimony of Mark A. Morgan, CBP, Before the U.S. Senate Committee on Homeland Security and Governmental Affairs, June 25, 2020, at 3, *available at* https://www.hsgac.senate.gov/imo/media/doc/Testimony-Morgan-2020-06-25-REVISED.pdf; *Nationwide Enforcement Encounters: Title 8 Enforcement Actions and Title 42 Expulsions*, https://www.cbp.gov/newsroom/stats/cbp-enforcementstatistics/title-8-and-title-42-statistics.

Minors slated for expulsion who cannot be immediately expelled have been housed in hotels. On September 4, 2020, in a suit concerning a class action settlement, the court ordered DHS to "cease placing minors at hotels by no later than September 15, 2020," and to transfer them to licensed facilities as expeditiously as possible as provided in the agreement.  *See Flores v. Barr*, No. CV 85-4544-DMG (C.D. Cal.), Minutes of In Chambers – Order Re Plaintiffs' Motion to Enforce Settlement as to "Title 42" Class Members at 4-5, 17, ECF No. 976 (emphasis omitted). The Government respectfully disagrees with that decision.  In any event, the court acknowledged that it was not evaluating the validity of the Government's Title 42 policy.

a fear of persecution or torture, or expresses an intent to apply for asylum.  *Id.* § 1225(b)(1)(A)(i); 8 C.F.R. § 235.3(b)(4).

Section 235 of the William Wilberforce Trafficking Victims Protection Reauthorization Act of 2008 ("TVPRA"), Pub. L. No. 110-457 (codified in principal part at 8 U.S.C. § 1232), provides certain additional procedures to unaccompanied alien children, as the term is defined in 6 U.S.C. § 279(g)(2).  For example, an unaccompanied child from a non-contiguous country generally must be placed in removal proceedings under 8 U.S.C. § 1229a, in lieu of expedited removal proceedings, *see* 8 U.S.C. § 1232(a)(5)(D)(i).  And an unaccompanied child who is processed for removal proceedings must be transferred to the custody of HHS's Office of Refugee Resettlement ("ORR"), which then must place the child in the least restrictive setting that is in the best interest of the child, subject to certain considerations.  *See id.* § 1232(c)(2)(A).[12]

All of these immigration procedures affect an alien's length of stay at a port of entry or Border Patrol station and in the United States, and potentially present the public health concerns of further spread of COVID-19 into the United States.  Even expedited removal proceedings require both examination by immigration officers and temporarily holding an alien in a congregate setting that could put both the alien and DHS personnel at risk of contracting COVID-19.

### III.   Plaintiff and His Request for Class Certification and Emergency Relief

Plaintiff is a 16-year-old from Guatemala.  Compl. ¶ 3, ECF No. 1.  On August 11, 2020, he was apprehended after illegally crossing the U.S.-Mexico border into the United States.  DHS determined that he was a "covered alien" subject to expulsion under the CDC Order.  *Id.*  On

---

[12] In addition, in the ordinary course, any federal department or agency that has custody of an unaccompanied child must transfer custody of the child to ORR within 72 hours of determining that the child is an unaccompanied alien child.  *See id.* § 1232(b)(3).  This requirement does not apply "in the case of exceptional circumstances."  *Id.*  The current public health emergency plainly qualifies as an "exceptional circumstance[]."  Moreover, although Defendants use the term "unaccompanied alien children" throughout this brief, they do not concede that the putative class members are "unaccompanied alien child[ren]" as defined by 6 U.S.C. § 279(g)(2).  CBP does not make a determination whether an alien child fits the definition when determining that the child is subject to the CDC Order.

August 14, 2020, he brought this suit on behalf of a putative class that he defined as: "All unaccompanied noncitizen children who (1) are or will be detained in U.S. government custody in the United States, and (2) are or will be subjected to the Title 42 Process." *Id.*¶ 101; *see also* Mot. Class Cert. & Br. in Supp. at 1, ECF No. 2-1.  Plaintiff seeks an order to stay their expulsion, to remove them from "the Title 42 Process," and to require Defendants to process them under the immigration procedures that applies absent the CDC Order.  Compl. at 28.  Following the filing of the complaint, Plaintiff was excepted from the CDC Order and processed pursuant to the requested immigration procedures.  *See* Pl.'s PI Motion & Br. in Supp. ["Mot."] at 11, ECF No. 15-1.

## ARGUMENT

### I.      PLAINTIFF IS NOT AN ADEQUATE CLASS REPRESENTATIVE

This Court should deny Plaintiff's motion to certify a class because he cannot serve as an adequate class representative.  For class certification to be proper under Rule 23, a plaintiff must establish four requirements: numerosity, commonality, typicality, and adequacy.  *See* Fed. R. Civ. P. 23(a); *Garcia v. Johanns*, 444 F.3d 625, 631 (D.C. Cir. 2006).

Plaintiff lacks a sufficiently strong connection to this litigation to adequately serve as class representative.  *See* Fed. R. Civ. P. 23(a)(4).  Plaintiff already effectively received the individual relief he sought in this lawsuit:  to be processed pursuant to Title 8's immigration procedures as opposed to being expelled under the CDC Order.  Because his individual claims are moot, the Court must specially assure itself of Plaintiff's adequacy as a class representative under Rule 23. *See U.S. Parole Comm'n v. Geraghty*, 445 U.S. 388, 404 (1980) (where class representative's claims are moot, court must determine "that vigorous advocacy can be assured through means other than the traditional requirement of a 'personal stake in the outcome'").  A determination of legal adequacy is based on two inquiries: (1) "the representative must appear able to vigorously prosecute the interests of the class through qualified counsel," and (2) "the named representative must not have antagonistic or conflicting interests with the unnamed members of the class." *Twelve John Does v. District of Columbia*, 117 F.3d 571, 575 (D.C. Cir. 1997) (citation omitted).

Plaintiff had only minimal involvement in this case when his individual claims became moot on the day the complaint was filed, and there is no prospect that he will again be subject to the Title 42 Process.  There is no evidence that Plaintiff would vigorously pursue class claims, and his interest is presumably now focused on his own Title 8 immigration proceeding.  In fact, the only mention of Plaintiff serving as a class representative is a single sentence that "P.J.E.S.'s father agreed, on his behalf, for the child to be a class representative in this action."  *See* Decl. of Nicholas Stefaniak, ECF No. 2–4, ¶ 3.  Because Plaintiff has not demonstrated that he will vigorously advocate for the interests of the class, he is not an adequate class representative.

Defendants recognize that the D.C. Circuit has held that the fact that a putative class representative's case is moot at the time of certification does not alone moot the case or otherwise render the putative class representative inadequate.  *See JD v. Azar*, 925 F.3d 1291, 1307–12 (D.C. Cir. 2019) (per curiam) (court may relate a certification back to the date the claims were alive where "individual claims are 'inherently transitory'").  That is, a person who has no personal stake in the specific claims may nevertheless seek class certification and represent the class if certified. Defendants respectfully disagree with that holding because it is an improper relaxation of Article III's strict requirement of a case or controversy, *see Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 408 (2013), and does not comport with longstanding principles underlying the Rule 23 class action vehicle.  In any event, the D.C. Circuit did not hold that any such plaintiff is necessarily an adequate class representative, and Plaintiff fails to make the requisite showing here.  This Court should deny Plaintiff's motion for class certification.

## II.    PLAINTIFF IS UNLIKELY TO SUCCEED ON THE MERITS

This Court should also deny Plaintiff's motion for a preliminary injunction.  "A preliminary injunction is an extraordinary and drastic remedy."  *Munaf v. Geren*, 553 U.S. 674, 689 (2008) (citation omitted).  It is "never awarded as of right," *id.* at 690, and "should not be granted unless the movant, *by a clear showing*, carries the burden of persuasion," *Mazurek v. Armstrong*, 520 U.S. 968, 972 (1997) (citation omitted).  The movant must establish "that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that

the balance of equities tips in his favor, and that an injunction is in the public interest." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008).  Here, Plaintiff fails to meet his burden.

### A. Section 265 Authorizes the CDC Director to Expel Aliens Like Plaintiff Who Are Apprehended After Crossing Illegally Between the Ports of Entry

Plaintiff argues that Section 265 does not allow the Government to expel aliens who are apprehended after they have physically crossed the border between ports of entry into the United States in violation of the CDC Order.  *See* Mot. at 12–13.  He is unlikely to succeed on that argument because the text and structure of Section 265 evince Congress's intent to provide the Executive Branch this authority in combating a public health crisis such as the current pandemic.

### 1. The language of Section 265 plainly authorizes expulsion, and even if the language is ambiguous, the Secretary's interpretation is reasonable.

The language of Section 265 is unambiguous in authorizing expulsion of persons who cross the Nation's borders between ports of entry in violation of a Section 265 order.  *See Robinson v. Shell Oil Co.*, 519 U.S. 337, 341 (1997) ("Our first step in interpreting a statute is to determine whether the language at issue has a plain and unambiguous meaning with regard to the particular dispute in the case . . . .").  Section 265 gives the CDC Director the authority to "prohibit, in whole or in part, the introduction of persons" from "a foreign country" when he determines that there is a serious danger of the introduction of a communicable disease into the United States from that country. 42 U.S.C. § 265.  Plaintiff erroneously assumes that "introduction" refers only to crossing the border.  But Congress's use of the broad terms "prohibit[ing] . . . the introduction . . . to avert such danger" signals that the Executive's authority under Section 265 is not limited to stopping a person precisely at the Nation's borders.  Rather, the term "introduction" suggests a continuing process and is most naturally read to extend beyond a person's immediate physical crossing of the border, particularly given that the border is merely an invisible line defined in cartographic terms. *Cf. United States v. Steinfels*, 753 F.2d 373, 377 (5th Cir. 1985) (finding that "introduction into commerce commences upon the arrival of imported goods upon United States soil, but introduction does not necessarily end there").  And to "prohibit . . . the introduction" naturally means to

intercept or prevent such a process. *See Universal English Dictionary* 458 (John Craig ed. 1869) (to "prohibit" meant "to forbid; to interdict by authority; to hinder; to debar; to prevent; [or] to preclude"); Prohibit, *Oxford English Dictionary* 1441 (1933) ("to forbid (an action or thing) by or as by a command or statute; to interdict"). Thus, the Section 265 authority includes intercepting and halting persons who have already crossed the border—but are in the process of being introduced—into the United States in a manner that the Executive could prevent their further movement into the country so as to avert the risk of the spread of a communicable disease.[13]

In the context of the "language and design of the statute as a whole," *Sullivan v. Everhart*, 494 U.S. 83, 89 (1990), it is also clear that Section 265 allows for the expulsion of aliens whose introduction has been intercepted. The statute's reference to prohibiting the introduction "in whole or in part" supports the interpretation that a person may be intercepted and then quarantined in the United States or intercepted and then expelled. Moreover, Section 265 is a public health statute that charges the Government with preventing the danger of introducing a communicable disease into the United States from a foreign country. Construing the statute to authorize only the prevention of the physical entry of persons at the moment of border crossing—but not the expulsion of such persons when they are intercepted while moving into the interior of the United States—ignores the reality that a communicable disease does not respect national borders and that aliens without valid travel documents often try to illegally enter the country between ports of entry without detection. An interpretation that limits the Government's ability to expel such aliens would frustrate the statute's purpose because the Government could not effectively avert the public

---

[13] Indeed, even in the immigration context, "an alien" like Plaintiff "who is detained shortly after unlawful entry cannot be said to have 'effected an entry.'" *Dep't of Homeland Sec. v. Thuraissigiam*, 140 S. Ct. 1959, 1982 (2020) (quoting *Zadvydas v. Davis*, 533 U.S. 678, 693 (2001)). Aliens who are "apprehended within hours of surreptitiously entering the United States" are still treated as "'alien[s] seeking initial admission to the United States.'" *Castro v. U.S. Dep't of Homeland Sec.*, 835 F.3d 422, 445 (3d Cir. 2016) (quoting *Landon v. Plasencia*, 459 U.S. 21, 32, (1982)); *see also Cruz v. Dep't of Homeland Sec.*, No. 19-CV-2727, 2019 WL 8139805, at *5 (D.D.C. Nov. 21, 2019) (fact that plaintiff was apprehended within the territorial bounds of the United States after crossing the U.S.-Mexico border does not overcome the fact that he has not "effected entry into this country").

health danger otherwise.  *See United States v. Ron Pair Enter., Inc.*, 489 U.S. 235, 242 (1989) (noting that a statute should not be construed to produce "a result demonstrably at odds with the intentions of its drafters").

Although Plaintiff characterizes the Executive's invocation of Section 265 as an improper attempt to regulate immigration, *see* Mot. at 13–14, he ignores both the purely public health purpose of the statute and the explicit language in Section 265 authorizing the prohibition of persons (or property) from "a foreign country" to protect against "the introduction of such disease into the United States."  In this context, the prohibition clearly includes expulsion.  *See Robinson*, 519 U.S. at 341 (determining meaning of statute "by reference to . . . the specific context in which that language is used, and the broader context of the statute as a whole"); *Virginia v. Tennessee*, 148 U.S. 503, 519 (1893) ("It is a familiar rule in the construction of terms to apply to them the meaning naturally attaching to them from their context.").

Importantly, rather than specifying that the power to prohibit the introduction of persons is limited to the Nation's borders, Congress specifically charged the Secretary with utilizing Section 265's capacious grant of authority in seeking to achieve the statutory purpose.  *See* 42 U.S.C. § 265 ("the [Secretary], *in accordance with regulations* approved by the President, shall have the power to prohibit, in whole or in part, the introduction of persons . . . in order to avert such danger" (emphasis added)).  This must be so because public health experts must be able to flexibly respond to the exigency posed by the spread of communicable diseases.  Accordingly, in the face of the pandemic, the Secretary issued an Interim Final Rule, interpreting "the introduction of persons" to "encompass those who have physically crossed a border of the United States and are in the process of moving into the interior in a manner the Director determines to present a risk of transmission of a communicable disease."  IFR at 16.  As the Secretary explained, "halt[ing] the travel of such persons and rapidly moving them outside the United States constitutes preventing their 'introduction' into the United States."  *Id.*  Consistent with this, the CDC Order "requires the movement of all [covered] aliens to the country from which they entered the United States, [ ] their

country of origin, or another location as practicable, as rapidly as possible, with as little time spent in congregate settings as practicable under the circumstances."  Order at 16.

Even if Section 265 is ambiguous, the Secretary's interpretation is reasonable and entitled to *Chevron* deference.  *See Chevron, USA, Inc. v. Nat. Res. Def. Council, Inc.*, 467 U.S. 837, 842-43 (1984).  Not only is the interpretation of "introduction" within the Secretary's statutory authority, *City of Arlington v. FCC*, 569 U.S. 290, 296 (2013) ("Congress knows to speak . . . in capacious terms when," as here, "it wishes to enlarge[] agency discretion"), but it is also within the Secretary's expertise.  In interpreting "introduction" within the statutory context, the Secretary necessarily is informed by his scientific and technical knowledge and experience regarding communicable diseases generally and the threat that such diseases can pose to public health.[14]

As the current pandemic illustrates, the insidious nature of communicable diseases does not lend itself to limitation by geographic boundaries, and the public health concerns that Section 265 is designed to address do not evaporate the instant an alien crosses the border into the United States.  In order to fulfill the statutory purpose of preventing the spread of a communicable disease into the United States, the Secretary must have the power to stop the further movement of persons who have crossed the border in violation of a CDC Order, and to quarantine, isolate, or expel such persons as appropriate.  Indeed, it has long been recognized that "where a general power is conferred or duty enjoined, every particular power necessary for the exercise of the one, or the performance of the other, is also conferred."  *Luis v. United States*, 136 S. Ct. 1083, 1097 (2016) (Thomas, J., concurring) (quoting Thomas Cooley, *Constitutional Limitations* 63 (1868)); *see also* 1 J. Kent, *Commentaries on American Law* 464 (13th ed. 1884) ("whenever a power is given by a statute, everything necessary to the making of it effectual or requisite to attain the end is implied").

---

[14] Courts routinely recognize the CDC's public health expertise.  *See, e.g.*, *In re Approval of Judicial Emergency Declared in Eastern District of California*, 956 F.3d 1175, 1181 (9th Cir. 2020) (determining that it would not be safe to resume normal court operations until "the CDC lifts its guidance regarding travel-associated risks and congregate settings and physical distancing"); *Hickox v. Christie*, 205 F. Supp. 3d 579, 598-99 (D.N.J. 2016) (relying on CDC recommendations to determine legality of state-mandated quarantine in light of the risk of Ebola posed by person entering the United States after treating Ebola patients).

In the specific circumstance of COVID-19, the CDC Director found that the risk of transmission by aliens who have crossed the border unlawfully between ports of entry is no less than that posed by aliens without travel documents seeking admission at a port of entry. *See* Order at 11–13. In both situations, the aliens would be processed or otherwise held for hours or days in congregate settings during immigration processing. *Id.* Indeed, "covered aliens" are not likely to voluntarily present themselves at ports of entry or Border Patrol stations, and in such instances can be apprehended only after they have crossed the border into the United States. These practicalities underscore the reasonableness of the Secretary's interpretation of Section 265 in the Interim Final Rule that Congress did not intend to exempt aliens who are able to surreptitiously cross the border into the United States. Were it otherwise, the applicability of a Section 265 order would perversely turn on whether an alien is able to successfully evade the law, even when he or she poses the same risk as those who do not defy the law. *See Kaseman v. District of Columbia.*, 444 F.3d 637, 642 (D.C. Cir. 2006) ("[S]tatutes should be interpreted to avoid . . . unreasonable results, or unjust or absurd consequences." (citation and internal quotation marks omitted)).

The Secretary's interpretation of Section 265 to authorize expulsion is also consistent with Congress's broad grant of powers in the context of the federal quarantine laws, which generally defer to the judgment of the public health officials to determine how best to protect the country from the dangers of a communicable disease. *See Davis v. Mich. Dep't of Treasury*, 489 U.S. 803, 809 (1989) ("[T]he words of a statute must be read . . . with a view to their place in the overall statutory scheme"). Specifically, like the language in Section 265, which grants significant discretion to the Secretary, the adjacent provision, section 264, empowers the Secretary to "make and enforce such regulations as *in his judgment are necessary* to prevent the introduction, transmission, or spread of communicable diseases from foreign countries into the States." 42 U.S.C. § 264(a) (emphasis added). Subsections 264(b) through (d) further indicate that the Secretary's powers in this area are especially broad with respect to foreign travelers, authorizing the Secretary to use various public health measures—apprehension, detention, conditional release, and examination—to prevent the introduction, transmission, or spread of communicable diseases.

And even as to the narrower apprehension and detention powers with respect to domestic travelers, *see id.* § 264(d)(1) (a domestic traveler may be apprehended only if he is "reasonably believed to be infected with a communicable disease in a qualifying stage," and detained only if he is determined to be infected), the subsection makes clear that an individual "reasonably believed to be infected" need only be "in a precommunicable stage, if the disease would be likely to cause a public health emergency if transmitted to other individuals." *Id.* § 264(d)(2). These provisions show that through the federal quarantine laws, Congress gave the Secretary sweeping authority to protect the country from potentially devastating communicable diseases, and read together, sections 264 and 265 give the Secretary a robust set of public health mitigation tools that include the power of expulsion if the Secretary determines that other mitigation measures are insufficient to offset the danger posed by an individual's introduction to the United States.

## 2. Plaintiff's argument that Section 265 is limited to the regulation of transportation companies has no merit or historical basis.

Plaintiff nevertheless argues that Section 265 does not authorize expulsion but governs only transportation companies. He is unlikely to succeed on that argument.

*First*, Plaintiff argues that Congress knew how to regulate the removal of persons but did not do so here. Plaintiff relies on immigration statutes in effect in 1893—when Section 265's predecessor, the Act of February 15, 1893, was enacted—which provided for unauthorized immigrants to be "removed" or "returned" to the country from which they came or be "sent back" on the vessel that brought them. *See* Mot. at 18 (citations omitted). In *J.B.B.C.*, Judge Nichols's oral TRO ruling prohibiting the expulsion of an alien under the CDC Order similarly noted that because "immigration statutes [] reference the power to return or to remove," the absence of those terms in Section 265 "suggests at a minimum that the power to remove is not granted by section 265." Mot. at 12 (quoting June Tr. at 50). The Supreme Court, however, has rejected this type of interpretative approach, cautioning that "[l]anguage in one statute usually sheds little light upon the meaning of different language in another statute, even when the two are enacted at or about the same time." *Russello*, 464 U.S. at 25.

*Russello* itself dealt with whether insurance proceeds from arson activities constitute an "interest" within the meaning of the Racketeer Influenced and Corrupt Organizations ("RICO") statute and thus are subject to forfeiture.  In concluding that they do, the Court reasoned that Congress undoubtedly "did not wish the forfeiture provision . . . to be limited by rigid and technical definitions drawn from other areas of the law" because it "selected the broad term 'interest' to describe those things that are subject to forfeiture under the statute."  *Id.* at 21.  And because a RICO enterprise rarely has identifiable assets, the Court further reasoned, to interpret "interest" in an enterprise as limited to profits or assets "would blunt the effectiveness of the provision in combatting illegitimate enterprises, and would mean that 'whole areas of organized criminal activity would be placed beyond' the reach of the statute."  *Id.* (citation omitted).

Significantly, the Court rejected the petitioner's and the Ninth Circuit's reliance on the fact that the Controlled Substances Act ("CSA")—passed by the same Congress that enacted RICO—limits forfeiture to "profits" obtained in a continuing criminal drug enterprise, which would not include insurance proceeds.  *Id.* 24–25.  The Court did so because it found that the CSA's use of the specific term "profits" is not an indication that the general term "interest" in RICO was not meant to reach profits as well as other types of property interests.  As a matter of statutory construction, the Court said, "[t]he use of the specific in the one statute cannot fairly be read as imposing a limitation upon the general provision in the other statute."  *Id.* at 25.  In addition, the Court considered the statutes' different purposes: "the RICO statute was aimed at organized crime's economic power in all its forms, and it was natural to use the broad term 'interest' to fulfill that aim[,]" whereas the narcotics activity proscribed by the CSA usually generates only monetary profits, a fact which would explain the use of the narrower term "profit."  *Id.*

Similarly here, the fact that immigration statutes contemporary to the Act of 1893 used specific terms such as "return," "remove" or "send back" by no means suggests that the broad phrase "prohibit . . . the introduction" in the Act of 1893 was not meant to include those and other actions necessary to avert the serious danger of a contagious disease being transmitted into the United States.  To so narrowly construe the phrase in this manner would "blunt the effectiveness"

of Section 265 in combatting communicable diseases. *Id.* at 24. Moreover, it is hardly surprising that Congress used specific terms such as "return," "remove," or "send back" in immigration statutes because the purpose of those statutes was to regulate, among other things, the disposition of "unauthorized immigrants," Mot. at 18, whereas Section 265 has an entirely different aim—to protect public health in times of an outbreak. There is no basis to construe "prohibit . . . the introduction" by relying on words used in immigration statutes.

*Second*, Plaintiff contends that expulsion is an unauthorized penalty under 42 U.S.C. § 271(a), which prescribes "[p]enalties for violation of quarantine laws" but does not mention "removal" from the United States. Mot. at 13. But halting the introduction of a person by returning him to his home country is not a criminal punishment like that specified in section 271(a). It is a measure designed to mitigate the spread of a communicable disease into the interior of the United States. And it is irrelevant whether "deportation" is a "severe penalty" in the Title 8 immigration context as Plaintiff asserts, *see* Mot. at 14, because Plaintiff's situation is unlike the cases he cites where the individual being extradited or deported is either a U.S. citizen or a Lawful Permanent Resident ("LPR") who was not in the process of being introduced into the United States, but was instead a long-time resident here. *See* Mot. at 14 (citing *Valentine v. United States ex rel. Neidecker*, 299 U.S. 5, 6 (1936) (extradition of native-born U.S. citizens charged with the commission of crimes in France), and *Padilla v. Kentucky*, 559 U.S. 356, 359 (2010) (LPR who lived in the United States for 40 years was being deported because of criminal conviction)).

*Third*, Plaintiff argues that Congress could not possibly have intended to authorize "expulsion" because Section 265 applies to citizens and non-citizens alike. Mot. at 15. "It is inconceivable," Plaintiff asserts, "that Congress would seek to give the executive branch that (plainly unconstitutional) power[.]" *Id.* Plaintiff's argument hinges on the faulty premise that the government is constitutionally prohibited from temporarily prohibiting a U.S. citizen's introduction into the United States. Unlike "interstate travel[, which] is a fundamental right subject to a more exacting standard," "international travel is no more than an aspect of liberty that is subject to reasonable government regulation within the bounds of due process." *Hutchins v.*

*District of Columbia*, 188 F.3d 531, 537 (D.C. Cir. 1999) (citing *Haig v. Agee*, 453 U.S. 280, 306–07 (1981)).  And even if strict scrutiny applies, any required temporary delay would still be constitutional if it is narrowly tailored to serve a compelling government interest.  *Reno v. Flores*, 507 U.S. 292, 302 (1993).  Section 265's inclusion of U.S. citizens thus does not serve to limit the scope of the Secretary's authority under the provision.  To the contrary, the statute's use of the term "persons" was meant to give the Secretary broad powers to address outbreaks of communicable diseases.  Indeed, as initially proposed, Section 265's predecessor statute would have given the President the power to suspend "immigration."  *See* H.R. 9757, 52nd Cong., 2d Sess., Report No. 2210 at 3 (Jan. 9, 1893); 24 Cong. Rec. 470–71 (Jan. 10, 1893).  But "immigration" was substituted with "persons" to give the President even broader authority.  *See* 24 Cong. Rec. at 471 (Senator William Chandler: "A discretion to do an act of this kind in a great emergency certainly ought to have the authority coupled with it to act either in whole or in part according to the exigency.").

*Fourth*, Plaintiff argues that Congress only intended Section 265 to address a more limited problem relating to vessels or transportation companies bringing infected people into U.S. ports, and thus did not authorize expulsion.  *See* Mot. at 16–22.  According to Plaintiff, the term "introduction" necessarily means that "it is an action taken by a third party—here, the shipping company."  Mot. at 17.  But the ordinary meaning of the term is not so limited—a person may "introduce" himself or herself without relying on any third party.  *See, e.g.*, Introduce, *Oxford English Dictionary* ("to lead or bring into a place"; "He used such mean[s] that he introduced himself[] into this Castle.") (https://www.oed.com/view/Entry/98707?redirectedFrom=introduce #eid); *Ashley v. Bd. of Sup'rs of Presque Isle Cnty.*, 83 F. 534, 540 (6th Cir. 1897) (referring to a "party [who] introduces himself as a witness in his own behalf"); *Old Wagon Works v. Benedict*, 67 F. 1, 4 (8th Cir. 1895) (discussing an "intervener who introduces himself into a pending action in a state court"); *cf. United States v. Trek Leather, Inc.*, 767 F.3d 1288, 1298 (Fed. Cir. 2014) ("introduce" as used in "introduce merchandise into the United States" is "a flexible and broad term").  That is, the "introduction" of a person into the United States can include the person's

bringing of himself or herself into the United States, which makes sense also in the context of Section 265's design to deny the introduction of all persons who possibly may carry a communicable disease into the United States.  And again, to the extent there is any ambiguity, Congress has charged the Secretary to interpret the term "introduction."

Plaintiff also argues that the Act of February 15, 1893, which contains Section 265's predecessor statute, "was shot through with provisions specifically directed at the regulation of ships" and "imposed penalties *only* against ships."  Mot. at 17.  But Plaintiff fails to acknowledge that Section 265's predecessor statute was section 7 of the 1893 Act, which contains no reference to vessels—unlike several other sections of that Act.  That omission therefore actually supports Defendants' interpretation of Section 265, as Congress clearly knew how to reference vessels in the Act, yet conspicuously chose not to do so in Section 265's predecessor.  *See Russello*, 464 U.S. at 23 ("Where Congress includes particular language in one section of a statute but omits it in another section of the same Act, it is generally presumed that Congress acts intentionally and purposely in the disparate inclusion or exclusion." (citation omitted)); *see also Jama v. ICE*, 543 U.S. 335, 341 (2005) ("We do not lightly assume that Congress has omitted from its adopted text requirements that it nonetheless intends to apply, and our reluctance is even greater when Congress has shown elsewhere in the same statute that it knows how to make such a requirement manifest.").

It makes no difference that the impetus of section 7 of the 1893 Act was a concern about vessels carrying immigrants from European countries experiencing cholera outbreaks, or that section 7 had been invoked in the context of preventing a communicable disease that would have been transmitted to the United States only by passengers from ships.  *See* Mot. at 19–21.  Plaintiff cites President Herbert Hoover's invocation of section 7 in 1929 in response to a meningitis outbreak in Asia.  *See* Exec. Order 5143, Preface, ECF No. 15-5, Ex. B (noting that a total of 17 trans-pacific passenger-carrying vessels had epidemic cerebrospinal meningitis infection existing on board).  The Executive Order prohibited any person from being "introduced directly or *indirectly* by transshipment or *otherwise* into the United States . . . from any port in China (including Hong Kong) or the Philippine Islands for such period of time as may be deemed

27

necessary." *Id.* (emphasis added).  The plain language, of course, would have barred individuals who introduced themselves into the United States by swimming or walking ashore, and not simply those arriving at a port by ship.  But more importantly, the mitigation measure imposed by the Executive Order merely tracked the problem—a communicable disease was being transmitted into the United States by people who were travelling to the United States by ship.  Neither the Executive Order nor the accompanying Treasury Department regulations (*see* Regulations, ECF No. 15-5, Ex. C) purported to set forth a final interpretation or framework for implementing section 7.

Plaintiff also recites some stray floor statements that he asserts show that Section 265 only regulates transportation companies.  Mot. at 19.  But Plaintiff cannot use "ambiguous legislative history to muddy clear statutory language," *Milner v. Dep't of Navy*, 562 U.S. 562, 572 (2011), particularly given that "floor statements by individual legislators rank among the least illuminating forms of legislative history," *N.L.R.B. v. SW Gen., Inc.*, 137 S. Ct. 929, 943 (2017).  In any event, even that history belies Plaintiff's theory that Congress was narrowly focused on only vessels.  Although Plaintiff cites Senator Chandler as purportedly limiting the proposed section 7 to vessels, the Senator later explained that "if the exigency demands," the President could "exclude all other passenger travel *as well as immigration*."  24 Cong. Rec. at 471 (emphasis added).

Plaintiff also suggests that Senator Harris proposed section 7 to be limited to prohibiting only "vessels, passengers, crews, and cargo," *see* Mot. at 19, when the Senator was merely contrasting the Treasury Secretary's power to make rules and regulations in respect to those categories with the President's power to prohibit the coming at all of vessels, passenger, crews, and cargo.  24 Cong. Rec. at 392.  Similarly, Plaintiff's reference to Senator Harris's cryptic comment "suggest[ing] . . . that the act of 1890 clothes the Marine Health Service with ample power to protect the Mexican and Canadian borders," *id.* at 370, underscores that his cited legislative history sheds no light here.  The Senator apparently was referring to the Act of March 27, 1890 Act, ch. 51, Pub. L. No. 51-51, 26 Stat. 31, which states, in relevant part, that if the President thinks "cholera, yellow-fever, small-pox, or plague exists in any State or Territory, or in the District of Columbia, and that there is danger of the spread of such disease into other States,

Territories, or the District of Columbia," he may cause the Treasury Secretary "to promulgate such rules and regulations as in his judgment may be necessary to prevent the spread of such disease." There is no reason to think that the Act applies to the borders with Canada or Mexico.

Finally, even if Congress had contemplated only the spread of a communicable disease by vessels, that still would not constrain the Government's power to expel aliens subject to the CDC Order. As the Supreme Court recently confirmed, "the limits of the drafters' imagination supply no reason to ignore the law's demands." *Bostock v. Clayton Cnty.,* 140 S. Ct. 1731, 1737 (2020). "When the express terms of a statute give us one answer"—which Section 265 plainly does in authorizing the CDC Director to prohibit the introduction of persons—and "extratextual considerations" like Plaintiff's "suggest another, it's no contest." *Id.* The statutory text controls, and the limitation Plaintiff suggests improperly "seeks to displace the plain meaning of the law in favor of something lying beyond it," which should be rejected. *Id.*

### B. Section 265 Authorizes the Secretary to Temporarily Suspend Immigration Laws That Otherwise Allow the Introduction of Persons into the United States

Plaintiff also contends that even if Section 265 authorizes expulsion, it must be harmonized with provisions of immigration laws that otherwise would allow unaccompanied alien children to be introduced into the United States. Plaintiff is unlikely to succeed on this argument because his proffered interpretation ignores Section 265's clear text and would also render it a nullity

### 1. Section 265 plainly takes precedence over the identified immigration provisions.

Section 265 authorizes the "suspension of the right to introduce [] persons . . . in the interest of public health," 42 U.S.C. § 265, which means that immigration laws conferring a right of introduction may be temporarily suspended by a Section 265 order. The term "suspend" means temporarily ceasing the operation or effect of laws. *See Universal English Dictionary* 815 (John Craig ed. 1869) (defining "suspend" in part as "to cause to cease for a time from operation or effect, as, to *suspend* the habeas corpus act"); *Oxford English Dictionary* 255 (1933) (defining "suspend" as to "cause (of a law or the like) to be for the time no longer in force; to abrogate or

make inoperative temporarily"). The meaning of this term has been well understood since the Founding. *See, e.g.*, U.S. Const. art. I, § 9, cl. 2 ("The Privilege of the Writ of Habeas Corpus shall not be suspended, unless when in Cases of Rebellion or Invasion the public Safety may require it."); 10 U.S.C. § 123(a) ("In time of war, or of national emergency . . . the President may suspend the operation of any provision of law relating to the promotion, involuntary retirement, or separation of commissioned officers . . . ."). The phrase "suspension of the right to introduce" thus naturally means the temporary cessation of the effect of any laws pursuant to which a person might otherwise claim the right to be introduced into the United States. This includes the immigration laws Plaintiff identifies. Because section 265's language is plain, this Court should give effect to Congress's express statutory intent. *See Chevron*, 467 U.S. at 843 n.9.

Plaintiff claims that the legislative history supports his view, but in fact the legislative history confirms Defendants' interpretation of Section 265. As Plaintiff recognizes, Section 265's predecessor statute—section 7 of the 1893 Act—was enacted against the backdrop of a cholera epidemic in Europe. Mot. at 19. The exigency of the cholera outbreak taught that it was necessary to convey a broad power to the Executive Branch to use in rare times of emergency to protect public health. Indeed, two years earlier Congress had enacted the Immigration Act of 1891, ch. 551, section 1, 26 Stat. 1084, which authorized the exclusion from admission into the United States aliens "suffering from a loathsome or a dangerous contagious disease." Despite the existence of the Immigration Act of 1891 that applied against individual aliens suffering from a communicable disease, Congress enacted section 7 in response to the cholera outbreak, making it clear that it deemed section 7 a necessary public health tool to combat a pandemic.

Moreover, the debates surrounding the passage section 7 of the 1893 Act showed a clear and consistent theme that the provision was intended to give the Executive the authority to suspend any right to introduce persons into the United States under the immigration laws. *See, e.g.*, 24 Cong. Rec. 470 (Jan. 10, 1893) (statement of Senator George Gray explaining that the exigency posed by "invasion of contagious disease, is sufficient . . . to justify this extraordinary power of the entire suspension of immigration"); *id.* at 393 (statement of Senator George Hoar indicating

that section 7 would grant the "power to suspend immigration altogether, either temporarily or permanently as a health device"; "this section should be added, declaring in terms whenever the health or protection of the country from infection requires the total suspension of immigration"); *id.* at 393–94 (statement of Senator Chandler recognizing that section 7 would give the President the power to suspend immigration in his discretion, whenever there is danger of infection); *see also* H.R. 9757, 52nd Cong., 2d Sess., Report No. 2210 at 4 (Jan. 9, 1893) (noting that "[t]housands of immigrants may pass through inspection at a port of entry, and still upon arriving at their destination . . . may disseminate the poison that has been slumbering in their midst and imperil the lives of any community in which they happen to locate").

Even those opposed to the enactment of Section 7 recognized that it would grant the President the authority to suspend immigration. *See, e.g.*, 24 Cong. Rec. 370–71 (1893) (Senator Roger Mills: "I shall vote very cheerfully against placing in the hands of the President of the United States, whether he be a Republican or a Democrat, any such extraordinary power as that, to suspend immigration to this country at his pleasure."). As noted before, the specific reference to the "power to suspend immigration" ultimately was removed and replaced with the power to prohibit the introduction of all *persons*. *See* 24 Cong. Rec. 470–71. The change was not to limit the President's authority but to give him even broader power to respond to a public health crisis. *Id.*

The above plain language and legislative history of Section 265 therefore clearly indicate that the Secretary has the authority to suspend temporarily the effect of immigration laws that otherwise would allow the introduction of persons into the United States.[15]

---

[15]  DHS's implementation of the CDC Order is consistent with the United States' international obligations under Article 3 the Convention Against Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment ("CAT"), as implemented through the Foreign Affairs Reform and Restructuring Act of 1998 ("FARRA"), Pub. L. No. 105-277, § 2242, 112 Stat. 2681 (codified at 8 U.S.C. § 1231 note); *see also* 8 C.F.R. §§ 208.16-.18, 1208.16-.18. As Plaintiff acknowledges, *see* Mot. at 24 n.12, in implementing the CDC Order, DHS will refer an alien to U.S. Citizenship and Immigration Services for a CAT screening if the alien claims a fear of torture. An asylum officer will assess whether it is more likely than not that the alien would be tortured in the country to which he or she would be sent. *See* Draft CBP Memo ("Covid-19 CAPIO") at 4, ECF No. 15-5, Ex. E. If the alien meets the threshold screening standard, DHS will except him or

Plaintiff's contrary argument that he and the putative class members nevertheless are entitled to the procedures afforded under the immigration laws is unlikely to succeed.

*First*, Plaintiff cites the fact that Congress has accounted for public health concerns about communicable diseases in the immigration laws, citing 8 U.S.C. § 1182(a)(1) ("[h]ealth-related grounds" of inadmissibility, including communicable diseases), and 8 U.S.C. § 1222 ("[d]etention of aliens for physical and mental examination"). *See* Mot. at 15. But Congress clearly did not intend for those provisions to address a national public health emergency. Indeed, in the circumstances here, it would take too long to test everyone for COVID-19 while holding them in congregate settings, as discussed above. Rather, those provisions are focused on individual aliens' circumstances when assessing their eligibility for immigration benefits. By contrast, Section 265 is specifically designed to address public health consequences of allowing large groups of persons to be introduced into the United States during an outbreak of a communicable disease when doing so would risk transmitting the disease into the United States.

Moreover, Plaintiff himself concedes that health-related grounds of inadmissibility have been in existence since "the earliest days of [the Nation's] immigration regulation—predating the 1893 enactment of the predecessor to § 265." Mot. at 14–15 (citing Act of Mar. 3, 1891, ch. 551, 26 Stat. 1084, 1085 [the Immigration Act]). As discussed above, Congress enacted Section 265's predecessor statute in response to the cholera outbreak in Europe, despite the fact that the Immigration Act had been enacted just two years earlier. This clearly indicates that Congress intended Section 265 to address threats posed by an outbreak of a communicable disease and to operate independently from the immigration provisions barring admission of individual aliens

_____

her from the Order. *See id.*; Order at 2 (allowing DHS to except otherwise covered aliens from the Order based on the totality of the circumstances, including humanitarian considerations). In any event, international treaties such as the CAT are not self-executing and, accordingly, the domestic statutes that implement these obligations and their corresponding regulations would control as a matter of domestic law. *See Medellin v. Texas*, 552 U.S. 491, 504–05, 505 n.2 (2008). Under the FARRA, if the process to determine whether alien will not be subject to torture has been applied, "the court's inquiry shall have reached its end." *Trinidad y Garcia v. Thomas*, 683 F.3d 952, 957 (9th Cir. 2012) (en banc).

suffering from a communicable disease.  In fact, not only did Congress see fit to enact the 1893 Act after the enactment of the Immigration Act, but it re-codified the 1893 Act in the Public Health Service Act of 1944, fully aware of the existence of these health-related immigration law provisions.  There is accordingly no reasonable basis to construe those immigration provisions as narrowing Section 265.  *Cf. Trump v. Hawaii*, 138 S. Ct. 2392, 2415 (2018) (refusing to interpret anti-discrimination provision applicable to issuance of immigrant visas to constrain separate provision authorizing the President to suspend entry of classes of aliens because the two provisions "operate in different spheres"; observing that if the interpretation were correct, the President would not be permitted to suspend entry from particular foreign states in response to an epidemic confined to a single region, among other possible actions, which is an illogical result).

*Second*, Plaintiff argues that the canon of "the specific governs the general" supports his interpretation because immigration provisions governing unaccompanied minors purportedly are more specific. Mot. at 26–27. This canon applies to disentangle the interplay between "laws of equivalent dignity," *Nitro-Lift Techs., LLC v. Howard*, 568 U.S. 17, 21 (2012), and resolves the perceived conflict by "carving out an exception from the more general enactment for the more specific statute," *Stewart v. Smith*, 673 F.2d 485, 492 (D.C. Cir. 1982) (citing *Fourco Glass Co. v. Transmirra Prods. Corp.*, 353 U.S. 222, 228-29 (1957)); *see also Radzanower v. Touche Ross & Co.*, 426 U.S. 148, 153 (1976) (explaining that the "reason and philosophy of the [specific-over-general] rule is, that when the mind of the legislator has been turned to the details of a subject, and he has acted upon it, a subsequent statute in general terms, or treating the subject in a general manner, and not expressly contradicting the original act, shall not be considered as intended to affect the more particular or positive previous provisions" (citation omitted)).  It does not matter that the specific statute was enacted earlier than the more general statute.  *See Radzanower*, 426 U.S. at 153 ("It is a basic principle of statutory construction that a statute dealing with a narrow, precise, and specific subject is not submerged by a later enacted statute covering a more generalized spectrum."); *Bulova Watch Co. v. United States*, 365 U.S. 753, 758 (1961) (same).

Contrary to Plaintiff's argument, *see* Mot. at 26, Section 265 is more specific than the immigration laws he cites.  This is so because it applies only in a rare and specific circumstance— when the CDC Director determines that there is a serious danger of a communicable disease spreading into the United States from a foreign country and that a temporary suspension of the right to introduce persons from that country is necessary to protect public health.  The immigration laws, by contrast, apply in general circumstances when an alien seeks to enter the United States.  The fact that in the 127 years since its original enactment, the Government has invoked Section 265 to suspend the right to introduce persons into the United States only twice (the first time being the 1929 meningitis outbreak) underscores the specific, targeted nature of the provision.

*Third*, Plaintiff points to Judge Nichols's oral ruling when issuing a TRO, where he said that Section 265 "should be harmonized, to the maximum extent possible, with immigration statutes, including those . . . that grant special protections to minors and . . . that deal with communicable diseases and quarantines." Mot. at 12 (quoting June Tr. at 50).  As a general matter, it is true that two statutes perceived to be in conflict should be harmonized whenever possible.  But that interpretative tool has no utility where, as here, one of the statutes expressly suspends the effect of the other.

Moreover, to apply the immigration provisions in tandem with Section 265, as Plaintiff suggests, would render Section 265 a nullity.  *Randall v. Loftsgaarden*, 478 U.S. 647, 661 (1986) (repeal by implication "[is] not favored").  When the CDC Director invokes Section 265, by definition, he has determined that there is a "serious danger" that a communicable disease in a foreign country would be spread into the United States by persons arriving from that foreign country, and, as such, it is necessary to prohibit their introduction to avoid the spread of the disease.  *See* 42 U.S.C. § 265.  As the preamble to the Interim Final Rule recognizes, the danger of transmitting a communicable disease through international travel can be significant, and the Government must "respond promptly and effectively" to halt the potential transmission.  *See* IFR at 4; *see also id.* at 5–6 ("travelers can serve as unwitting vectors of disease, and . . . the risk increases when travelers are in congregate settings").  Applying the health-related grounds of

34

inadmissibility under the INA would frustrate the purpose of Section 265 because to determine whether an alien has a communicable disease, the alien must be detained for a sufficient period of time for observation and examination.  *See* 8 U.S.C. §§ 1182(a)(1)(A)(i); 1222.

Similarly, in the circumstances here, in the CDC's expert judgment, it is imperative to prevent the covered aliens' introduction because they otherwise would be held for hours or days in congregate settings during immigration processing, creating dangerous consequences for public health.   Order at 11; *id.* at 12 (alien apprehended between ports of entry spend on average approximately 78 hours in a Border Patrol station before being transferred to ICE).   If, in prohibiting the introduction of an alien in order to avert danger to public health, the Government must concurrently provide the panoply of procedures to that alien, thereby creating the very public health dangers that the prohibition seeks to avoid, then Section 265 would have no effect.  Not only would such an approach defeat the Government's compelling interest in preventing a public health threat to the life and safety of its citizenry, but it would also directly contradict the means by which Section 265 is designed to achieve its purpose—*i.e.*, by suspending the right to introduce persons who would otherwise increase the serious danger of spreading a communicable disease into the United States.  *See Dir., Office of Workers' Comp. Programs, Dep't of Labor v. Newport News Shipbuilding & Dry Dock Co*., 514 U.S. 122, 136 (1995) ("Every statute proposes, not only to achieve certain ends, but also to achieve them by particular means.").

Temporarily suspending the right of introduction that might otherwise be permitted under the immigration laws, on the other hand, would not frustrate those laws' general purpose of providing immigration benefits outside the context of a global pandemic (or other threat to public health of comparable magnitude).  As noted before, Section 265 fairly can be read to create an exception to the immigration laws' general application, which would still give effect to both sets of statutes.  That is, such a reading would honor clearly expressed congressional intent in both the immigration and public health provisions, consistent with the Supreme Court's admonition that "[w]hen confronted with two Acts of Congress allegedly touching on the same topic," the Court

"must . . . strive 'to give effect to both.'" *Epic Sys. Corp. v. Lewis*, 138 S. Ct. 1612, 1624 (2018) (quoting *Morton v. Mancari*, 417 U.S. 535, 551 (1974)).

Such an interpretation would also be consistent with established principles governing the admission and exclusion of aliens: (1) that aliens have no "claim of right" to enter the United States, *Knauff v. Shaughnessy*, 338 U.S. 537, 542–543 (1950), as "the admission and exclusion of foreign nationals is a 'fundamental sovereign attribute exercised by the Government's political departments,'" *Trump*, 138 S. Ct. at 2418 (quoting *Fiallo v. Bell,* 430 U.S. 787, 792 (1977)); and (2) that in reviewing immigration-related decisions, courts must exercise the "greatest caution" to avoid inhibiting the political branches' "flexibility . . . to respond to changing world conditions," *Mathews v. Diaz*, 426 U.S. 67, 81 (1976); *cf. Knauff*, 338 U.S. at 543 ("because the power of exclusion of aliens is also inherent in the executive department of the sovereign, Congress may in broad terms authorize the executive to exercise the power . . . for the best interests of the country during a time of national emergency").

## 2. The CDC's interpretation of Section 265 as temporarily suspending the effect of immigration laws allowing the introduction of covered aliens is reasonable.

Even if this Court finds that Section 265 does not clearly authorize "a suspension of the right to introduce" covered aliens into the United States under the immigration laws, 42 U.S.C. § 265, the CDC's interpretation of Section 265 as operating without regard to the immigration laws is permissible and entitled to deference under *Chevron*. *See Nat'l Cable & Telecomms. Ass'n v. Brand X Internet Servs.*, 545 U.S. 967, 980 (2005) ("*Chevron* requires a federal court to accept the agency's [permissible] construction of the statute, even if the agency's reading differs from what the court believes is the best statutory interpretation."). At a minimum, it is entitled to deference under *Skidmore v. Swift & Co.*, 323 U.S. 134 (1944).

Plaintiff quotes Judge Nichols's oral ruling in *J.B.B.C.* that the agency was not likely to succeed in showing that it is entitled to *Chevron* deference because the CDC Director "has no special expertise regarding" the immigration laws. Mot. at 12 (June Tr. at 51). But here, the CDC's interpretative task is not to reconcile statutes perceived to be in conflict, over some of

which CDC is not administering and has no expertise.  In the unusual context where the statute can be read to authorize the temporary suspension of the effects of other contrary laws, the agency's reasonable interpretation of the statute is entitled to deference.  As discussed in detail above, the term "suspend" has a well-settled meaning since the Founding.  In light of the public health consequences of allowing persons to be introduced from countries where a communicable disease exists, the CDC fairly could construe "suspension of the right to introduce" to mean that all laws allowing the introduction are temporarily without effect when a Section 265 order determines that the suspension is required in the interest of public health.  And, precisely because the CDC does not administer any such laws, the Secretary is not obligated to examine them when interpreting the term "suspension of the right to introduce."

Further, the interpretation is reasonable because in issuing the Interim Final Rule, the Secretary was also informed by the CDC's expertise in how best to respond to a public health crisis presented by a pandemic.  As discussed before, the CDC Director determined that the limited size and capacity of the congregate holding areas at ports of entry and Border Patrol stations—and the sheer number of covered aliens seeking to enter the United States—presented a serious public health risk during the COVID-19 outbreak.  Moreover, an alien exposed to or infected with COVID-19 would most likely go to healthcare facilities for testing or medical care, increasing the risk of introducing COVID-19 to domestic healthcare workers as well as straining the domestic healthcare system.  Order at 15.  Thus, the CDC Director reasonably concluded, "the faster a covered alien is returned to the country from which [he] entered the United States, to [his] country of origin, or another location as practicable, the lower the risk the alien poses of introducing, transmitting, or spreading COVID-19 into [ports of entry], Border Patrol stations, other congregate settings, and the interior."  *Id.* at 16.  That is, the concurrent application of Section 265 and laws allowing the introduction of persons into the United States is unworkable and contrary to Section 265's authorization to temporarily suspend the effect of all laws that otherwise allow introduction.

### C.  Plaintiff Is Unlikely to Succeed on His Arbitrary and Capricious Challenge

Finally, Plaintiff argues that the Title 42 Process is arbitrary and capricious because Defendants purportedly failed to (1) explain why they did not except from the scope of the Title 42 Process "unaccompanied children, including those fleeing abuse, persecution, and torture"; (2) justify the "break" from prior agency policy regarding unaccompanied children; and (3) consider the impact of the Title 42 Process on such children.  *See* Mot. at 27–28.  Plaintiff further asserts that DHS's implementation of the CDC Order is irrational because allegedly only those children tested negative for COVID-19 are expelled.  *Id.* at 29.  Plaintiff is unlikely to succeed on this claim.  *See* June Tr. at 51 ("[T]he government's arguments regarding the current pandemic steps that would be appropriate to ensure the . . . reduced communication of the disease and similar questions are well founded and if the Court were to reach the arbitrary and capricious question, the Court would likely conclude that the [CDC] order is not arbitrary and capricious.").

The scope of review under the "arbitrary and capricious" standard is "narrow," *Motor Vehicle Mfrs. Ass'n of the U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983), and "highly deferential," *Epsilon Elecs., Inc. v. U.S. Dep't of Treasury*, 857 F.3d 913, 918 (D.C. Cir. 2017).  "A court is not to ask whether [an agency's] decision is the best one possible or even whether it is better than the alternatives." *FERC v. Elec. Power Supply Ass'n*, 136 S. Ct. 760, 782 (2016).  Nor is the court to "substitute its own judgment for that of the agency." *Mayo v. Reynolds*, 875 F.3d 11, 19–20 (D.C. Cir. 2017) (citation and alteration omitted).  Rather, the court's "only task is to determine whether the [agency] has considered the relevant factors and articulated a rational connection between the facts found and the choice made," and to ensure that the agency remained "within the bounds of reasoned decisionmaking." *Balt. Gas & Elec. Co. v. Nat. Res. Def. Council, Inc.*, 462 U.S. 87, 105 (1983).  Even if the agency decision is "of less than ideal clarity," it must be upheld "if the agency's path may reasonably be discerned." *State Farm*, 463 U.S. at 43 (citation omitted).  The court only considers "whether there has been a clear error of judgment." *Id.* (citation omitted).

Here, the agency's action easily satisfies this highly deferential review, and Plaintiff is unlikely to show otherwise for the following reasons.

*First*, the agency's path is clear and there is no clear error of judgment, which is all the APA requires.  For the same reasons that this Court should defer to the CDC Director's interpretation of Section 265, the Court should also uphold the CDC Order as a reasonable exercise of the agency's authority.  The CDC acted in the midst of a historic pandemic with COVID-19 spreading rapidly.  With international travel and migration playing a significant role in spreading the highly transmissible disease, IFR at 5–6, countries around the globe responded with sweeping travel restrictions, and the United States, Mexico, and Canada temporarily limited non-essential travel along the U.S.-Canada and U.S.-Mexico land borders, Order at 5, 8.  The CDC Order is part of the Government's response to the public health crisis, and is based on the CDC's scientific and technical knowledge and expert experience in infectious disease control.  Indeed, the CDC has played a critical role in guiding the country to address challenges posed by COVID-19.   Its experience in conducting massive operations to disembark and quarantine or isolate thousands of cruise ship travelers as well as U.S. citizens repatriated from China strongly supports the reasonableness of the CDC Director's determination that similar efforts are not feasible for the much larger migration at the border.

As already discussed above, the CDC Director fully explained why he chose to focus on DHS's operations at or near the borders.  There are significant practical and operational constraints on DHS's ability to implement effective infection control measures in congregate settings in border facilities.  And allowing aliens to spend hours or days in those congregate settings during the pandemic "would be fraught with public health risks for not only the aliens but also DHS personnel nearby." Order at 11–14.  Because the presence of covered aliens in congregate settings—whether adult or children—would undermine public health, the CDC Director determined that their introduction must be prohibited.  The Director also found that conditional release is not a viable option due to significant uncertainty that covered aliens could effectively self-quarantine, self-isolate, or otherwise comply with social distancing guidelines, particularly in light of the CDC's

inability to effectively monitor such a large number of people so released.  Order at 15; May Order at 11.  These public health determinations are reasonable and entitled to deference because they are based on the CDC's expert, science-based, predictive public health judgment.  *See Jacobson*, 197 U.S. at 30 (explaining that "[i]t is no part of the function of a court or a jury to determine" how best to protect the public from a disease); *S. Bay United Pentecostal Church*, 140 S. Ct. 1613, 1613 (2020) (Roberts, C.J., concurring) (explaining that the latitude "to guard and protect" "[t]he safety and the health of the people" "must be especially broad" when acting "in areas fraught with medical and scientific uncertainties"); *Rural Cellular Ass'n v. FCC*, 588 F.3d 1095, 1105 (D.C. Cir. 2009); *Cardinal Health, Inc. v. Holder*, 846 F. Supp. 2d 203, 225 (D.D.C. 2012).

*Second*, Plaintiff is mistaken that the CDC Director was required to explain why he did not exempt unaccompanied alien children from the scope of the Order or otherwise examine impact of the Title 42 Process on such children.  *See* Mot. at 27.  The APA requires only that an agency explain its action well enough for a court to discern the path of the agency's decision-making.  The CDC Order prohibits the introduction of covered aliens without regard to the alien's age because no one is immune from this disease.  Given the public health objective of the Order, the CDC Director need not explain why the age of an alien does not render that alien exempt, when the Director's determination is that all ages should be covered (unless DHS separately determines on a case-by-case basis whether the otherwise covered alien should be excepted based on humanitarian and other factors, as discussed below).  Similarly, the Director need not consider the impact of the Title 42 Process on discrete age groups, just as Section 265 does not require the CDC Director to examine laws whose effect may be suspended temporarily.  That makes sense because the CDC does not administer such laws or regulate the parties governed by them.

*Third*, for similar reasons, the CDC Order need not justify the sudden "break" from the Government's immigration policy—administered by another agency—regarding unaccompanied children.  The very nature of a CDC Order issued under Section 265 is to address a public health crisis in a way that will involve suspending the effect of laws otherwise allowing the introduction of persons into the United States.  That is, the "break" is necessitated by the unexpected and sudden

nature of the pandemic and is naturally justified by the need to protect public health.  This case thus bears no resemblance to the principal case Plaintiff cites, *National Lifeline Association v. FCC*, in which the agency's failure to consider statutory directives—that had been "long-stated primary tenets for the program" the agency was charged with implementing—was found to be arbitrary and capricious.  921 F.3d 1102, 1111 (D.C. Cir. 2019).

*Fourth*, Plaintiff is simply wrong that DHS tests every unaccompanied alien minor for COVID-19 and expels only those who test negative for the virus.  *See* Mot. at 29.



Plaintiff's arbitrary and capricious challenge—premised on the idea that unaccompanied alien children are expelled only if they test negative for COVID-19—therefore is without merit.

Equally without merit is Plaintiff's argument that the Title 42 Process cannot be justified on public health grounds because DHS has discretion to except certain otherwise covered aliens from the Order without public-health-related justification.  Mot. at 29; *see* Order at 2 (customs officers of DHS may, with supervisor approval, except otherwise covered aliens from the Order based on the totality of the circumstances, including considerations of significant law enforcement, officer and public safety, humanitarian, and public health interests).  The CDC's measured approach to allow DHS to exercise enforcement discretion in implementing the Order is reasonable

because it recognizes that in an individual case, the public health concern may be outweighed by other important government interests.  The Director reasonably could also determine that excepting an alien based on his or her individualized circumstances would not pose the type of public health threat that the CDC Order is designed to address.  Ultimately, Plaintiff's argument is a mere disagreement with the CDC Director's policy judgment that case-by-case exceptions would not undermine the public health purpose of the CDC Order.  *See Inv. Co. Inst. v. CFTC*, 720 F.3d 370, 380 (D.C. Cir. 2013) ("This argument amounts to nothing more than another policy disagreement with [the agency], so we must reject it.").

In sum, the CDC Order and its implementation are reasonable.  *Nat'l Immigration Project of Nat'l Lawyers Guild v. Exec. Office [for] Immigration Review*, --- F. Supp. 3d ---, No. 1:20-CV-00852 (CJN), 2020 WL 2026971, at *11 (D.D.C. Apr. 28, 2020) ("In the wake of the first pandemic the United States has faced since the early twentieth century and the rapidly changing facts and circumstances relating to it, the Court cannot say that Defendants' policies and practices are arbitrary and capricious or otherwise reviewable.").

## III.   THE BALANCE OF HARMS WEIGHS AGAINST ENTRY OF A PRELIMINARY INJUNCTION

Because Plaintiff has failed to establish a likelihood of success on the merits, this Court need not consider the remaining factors for emergency injunctive relief.  *See Winter*, 555 U.S. at 20; *Sherley v. Sebelius*, 644 F.3d 388, 393 (D.C. Cir. 2011) ("we read *Winter* at least to suggest if not to hold that a likelihood of success is an independent, free-standing requirement for a preliminary injunction" (internal quotation marks and citation omitted)); *see also Nken v. Holder*, 556 U.S. 418, 438 (2009) (Kennedy, J., concurring); *Guttenberg v. Emery*, 26 F. Supp. 3d 88, 100 n.5 (D.D.C. 2014).  But even if the Court does, the remaining factors—irreparable injury, the

balance of the equities, and the public interest[16]—strongly support the denial of Plaintiff's request for emergency relief.

Because Plaintiff has already been excepted from the CDC Order and cannot claim that he will face any irreparable harm absent injunctive relief, he claims that the putative class members face such harm. *See* Mot. at 30–31. But the irreparable harm requirement "erects a very high bar for a movant." *Coal. for Common Sense in Gov't Procurement v. United States*, 576 F. Supp. 2d 162, 168 (D.D.C. 2008). In addition to the fact that DHS has a process for determining a covered alien's claim for protection under the Convention Against Torture even when implementing the CDC Order, Plaintiff's speculation about the putative class members' individual circumstances— some of whom have not even traveled yet to the United States—does not show that imminent "irreparable injury is *likely* in the absence of an injunction." *Winter*, 555 U.S. at 22; *see also League of Women Voters of United States v. Newby*, 838 F.3d 1, 7–8 (D.C. Cir. 2016) (harm must be "'certain and great,' 'actual and not theoretical,' and so 'imminen[t] that there is a clear and present need for equitable relief to prevent irreparable harm'" (alteration in original) (quoting *Chaplaincy of Full Gospel Churches v. England*, 454 F.3d 290, 297 (D.C. Cir. 2006)); *cf. Nken*, 556 U.S. at 435 (even removal in immigration context "is not categorically irreparable"). The Court is more than capable of ruling on individual claims as they arise. *See, e.g.*, *J.B.B.C. v. Wolf*, No. 20-cv-1509, Order at 1, ECF No. 38.

On the other side of the balance, "[i]t goes almost without saying, of course, that promoting public health—especially during a pandemic—is in the public interest." *Nat'l Immigration Project of Nat'l Lawyers Guild*, 2020 WL 2026971, at *12. The Government and public have a significant interest in continuing to take action that the CDC Director—the Nation's designated public health expert—determines is necessary to protect the country during the worst pandemic since 1918. *See* Order at 2, 3, 14 (concluding Order is in public interest). As noted above, at least 184,000 deaths

---

[16] The balance of harms and the public interest "merge when the Government is the opposing party." *Nken*, 556 U.S. at 435.

in the United States have involved COVID-19, and the death toll continues to rise.  In addition to the significant strain that the pandemic has had on border States (and the rest of the Nation), more than 1,000 CBP employees in States bordering Mexico have tested positive for COVID-19, and some have died.  The Government has a particularly significant interest in ensuring the protection of DHS personnel, who perform not only immigration and law enforcement functions but also critical work to ensure the smooth flow of the country's food and manufacturing supply chains.

Plaintiff suggests that Defendants could instead test the putative class members and then transfer them to the Office of Refugee Resettlement, where he incorrectly assumes that there is capacity for effective social distancing and quarantine measures.  Mot. at 32–33.  Plaintiff also opines that "numerous safety measures . . . including quarantines" could be used in lieu of the CDC Order.  *Id.* at 33.  But Plaintiff ignores that covered aliens—including the putative class members—would otherwise first be held in congregate settings in border facilities before any transfer to ORR.  As the CDC Director explained, such facilities "are not structured or equipped for quarantine or isolation for COVID-19," and "[t]he numbers of aliens and the size and capacity of the congregate holding areas are not at all conducive to effective social distancing . . . ."  Order at 14.  And, they are not equipped to provide on-site care to infected persons.  Final Rule at 34; *see also id.* at 34–39 (discussing infectious control challenges at border facilities, and noting that in the 75-day period before the issuance of the CDC Order on March 20, 2020, an average of 3,292 of individuals who would be covered aliens under the CDC Order were in custody at ports of entry and Border Patrol stations each day).

Further, Plaintiff's approach risks jeopardizing ORR's mitigation and containment system, which was developed in close consultation with the CDC and based on the historically low rates of referral and facility capacity.  *See* Declaration of Jallyn Sualog, ¶¶ 8, 17, 30, 33 (attached as Exhibit E).  The ORR system would likely come under significant stress if ORR were to begin to receive on a regular basis approximately 75 to 100 referrals of unaccompanied children per week, with approximately 30% of them having tested positive or been exposed to COVID-19.  *Id.* ¶ 11.

44

At bottom, Plaintiff would structure the Nation's response to this public health crisis differently. *See* Mot. at 33. But that is not a sufficient reason for this Court to substitute its judgment for that of Government officials tasked with ensuring the public health and safety of our Nation. *See Jacobson*, 197 U.S. at 30 (explaining that "[i]t is no part of the function of a court or a jury to determine" how best to protect the public from a disease); *S. Bay United Pentecostal Church*, 140 S. Ct. at 1613 (Roberts, C.J., concurring) (explaining that the latitude "to guard and protect" "[t]he safety and the health of the people" "must be especially broad" when acting "in areas fraught with medical and scientific uncertainties"); *Nat'l Immigration Project of Nat'l Lawyers Guild*, 2020 WL 2026971, at *12 ("where[, as here,] the Court is . . . certainly not well-positioned to second-guess" the CDC Director's health and safety determinations, "the public interest does not point in favor of granting injunctive relief"); *see also Bragdon v. Abbott*, 524 U.S. 624, 650 (1998) ("the views of public health authorities, such as the U.S. Public Health Service, CDC, and the National Institutes of Health, are of special weight and authority"); *Sch. Bd. of Nassau Cnty. v. Arline*, 480 U.S. 273, 288 (1987). Second-guessing the CDC's determination here risks increasing the transmission of COVID-19 to DHS personnel, migrants, and the American public, which, in turn, may overtax the limited healthcare resources and hamper DHS's operational capacity in performing its law enforcement, immigration, and other important functions.

Finally, an injunction would cause additional harm because "[a]ny time [the government] is enjoined by a court from effectuating statutes enacted by representatives of its people, it suffers a form of irreparable injury." *Maryland v. King*, 133 S. Ct. 1, 3 (2012) (Roberts, C.J., in chambers) (citation omitted); *see also Nat'l Propane Gas Ass'n v. U.S. Dep't of Homeland Sec.*, 534 F. Supp. 2d 16, 20 (D.D.C. 2008).

For these reasons, the balance of equities tip against granting injunctive relief.

## CONCLUSION

For the foregoing reasons, this Court should deny Plaintiff's motions for class certification and preliminary injunction.

Dated:  September 8, 2020

Respectfully submitted,

JEFFREY BOSSERT CLARK
Acting Assistant Attorney General

DAVID MORRELL
Deputy Assistant Attorney General

/s/ *Jean Lin*
JEAN LIN (NY Bar 4074530)
Special Litigation Counsel
KEVIN SNELL
BRADLEY CRAIGMYLE
TANYA SENANAYAKE (D.C. Bar 1006218)
Trial Attorneys
Federal Programs Branch
Civil Division, Department of Justice
1100 L Street, N.W.
Washington, D.C. 20005
(202) 514-3716
Jean.Lin@usdoj.gov
*Attorneys for Defendants*

46