**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| P.J.E.S., A MINOR CHILD, by and through his father and Next Friend, Mario Escobar Francisco, on behalf of himself and others similarly situated,<br><br>*Plaintiff*,<br><br>v.<br><br>CHAD F. WOLF, ACTING SECRETARY OF HOMELAND SECURITY, in his official capacity, et al.,<br><br>*Defendants*. | No. 20-cv-02245-EGS-GMH |

**PLAINTIFF'S COMBINED REPLY MEMORANDUM IN SUPPORT OF MOTIONS FOR CLASSWIDE PRELIMINARY INJUNCTION AND CLASS CERTIFICATION**

**TABLE OF CONTENTS**

INTRODUCTION ................................................................................................................. 1

ARGUMENT ........................................................................................................................ 2

  I. PLAINTIFF HAS SHOWN A STRONG LIKELIHOOD OF SUCCESS ON THE MERITS
    OF HIS STATUTORY CLAIMS ......................................................................................... 2

    A. Section 265 Does Not Authorize Expulsions ................................................................ 2

      1. Section 265 provides no implied expulsion power ...................................................... 2

      2. Defendants' statutory interpretation arguments are meritless ..................................... 5

      3. No deference is owed to the claimed expulsion power .................................................. 9

    B. Even If § 265 Did Authorize Expulsions, It Would Not Override The Specific Statutory
      Protections For Unaccompanied Children And Asylum Seekers.................................... 11

      1. Defendants' statutory interpretation arguments fail ................................................... 11

      2. No deference is due to the claimed power to override other statutes ........................... 15

      3. The Title 42 Process violates the class members' statutory rights ............................... 17

    C. The Court Should Defer Decision On Plaintiff's Arbitrary And Capricious Claims Until
      Summary Judgment In Light of the Forthcoming Final Rule .......................................... 17

  II. THE CLASS WILL SUFFER IRREPARABLE INJURY ABSENT A PRELIMINARY
    INJUNCTION, AND THE BALANCE OF HARMS WEIGHS HEAVILY IN FAVOR OF
    INTERIM RELIEF......................................................................................................... 18

  III. DEFENDANTS' CHALLENGE TO PLAINTIFF'S MOTION FOR CLASS
     CERTIFICATION IS UNFOUNDED .............................................................................. 23

  IV. THE COURT SHOULD EXPRESSLY CONFIRM THAT ITS PRELIMINARY
     INJUNCTION APPLIES TO THE FINAL RULE AND ANTICIPATED NEW CDC
     ORDER, SUBJECT TO FUTURE COURT ORDER ...................................................... 24

CONCLUSION.................................................................................................................... 25

# TABLE OF AUTHORITIES

**Cases**

*Amalgamated Transit Union v. Skinner*,
  894 F.2d 1362 (D.C. Cir. 1990) ................................................................................. 4

*Barron v. Burnside*,
  121 U.S. 186 (1887) ................................................................................................ 13

*Bostock v. Clayton County*,
  140 S. Ct. 1731 (2020) .............................................................................................. 8

*Chamber of Commerce of U.S. v. Fed. Election Comm'n*,
  69 F.3d 600 (D.C. Cir. 1995) ................................................................................... 10

*Chevron, U.S.A., Inc. v. Nat. Res. Def. Council, Inc.*,
  467 U.S. 837 (1984) ............................................................................... 9, 10, 11, 16

*Clark v. Martinez*,
  543 U.S. 371 (2005) .................................................................................................. 4

*Damus v. Nielsen*,
  313 F. Supp. 3d 317 (D.D.C. 2018) ......................................................................... 19

*Dessouki v. Attorney Gen. of United States*,
  915 F.3d 964 (3d Cir. 2019) .................................................................................. 3, 10

*District of Columbia v. Dep't of Labor*,
  819 F.3d 444 (D.C. Cir. 2016) ............................................................................. 10, 25

*Doe v. Mattis*,
  928 F.3d 1 (D.C. Cir. 2019) ...................................................................................... 3

*Eagle Pharm., Inc. v. Azar*,
  952 F.3d 323 (D.C. Cir. 2020) .................................................................................. 4

*East Bay Sanctuary Covenant v. Trump*,
  932 F.3d 742 (9th Cir. 2018) .......................................................................... 1, 13, 25

*Epic Sys. Corp. v. Lewis*,
  138 S. Ct. 1612 (2018) .................................................................................... passim

*FCC v. AT&T Inc.*,
  562 U.S. 397 (2011) .................................................................................................. 6

*FedEx Home Delivery v. NLRB*,
  849 F.3d 1123 (D.C. Cir. 2017) ............................................................................... 10

*Flores v. Barr*,
  85-cv-04544 (C.D. Cal. Mar. 28, 2020) ............................................................... 19, 21

*Gordon v. New York Stock Exchange, Inc.*,
  422 U.S. 659 (1975) ........................................................................................ 15

*Gratz v. Bollinger*,
  539 U.S. 244 (2003) ........................................................................................ 23

*Hazeltine v. Miss. Valley Fire Ins. Co.*,
  55 F. 743 (C.C.W.D. Tenn. 1893) .................................................................... 13

*Her Majesty the Queen v. EPA*,
  912 F.2d 1525 (D.C. Cir. 1990) ...................................................................... 12

*J.B.B.C. v. Wolf*,
  No. 20-cv-1509, (D.D.C. June 24, 2020) ................................................... passim

*J.D. v. Azar*,
  925 F.3d 1291 (D.C. Cir. 2019) ...................................................................... 23

*J.L. v. Cissna*,
  341 F. Supp. 3d 1048 (N.D. Cal. 2018) ........................................................... 19

*Kansas v. Garcia*,
  140 S. Ct. 791 (2020) ...................................................................................... 12

*King v. Burwell*,
  576 U.S. 473 (2015) ........................................................................................ 11

*Kirwa v. U.S. Dep't of Defense*,
  285 F. Supp. 3d 21 (D.D.C. 2017) ................................................................... 18

*Kisor v. Wilkie*,
  139 S. Ct. 2400 (2019) ................................................................................. 9, 10

*Larsen v. Ins. Co. of N. Am.*,
  252 F. Supp. 458 (W.D. Wash. 1965) ................................................................ 9

*League of Women Voters of United States v. Newby*,
  838 F.3d 1 (D.C. Cir. 2016) ....................................................................... 18, 22

*Loving v. IRS*,
  742 F.3d 1013 (D.C. Cir. 2014) ........................................................................ 9

*Luis v. United States*,
  136 S. Ct. 1083 (2016) .................................................................................. 4, 5

*McGirt v. Oklahoma*,
  140 S. Ct. 2452 (2020) ...................................................................................... 7

*MCI Telecomms. Corp. v. Am. Tel. & Tel. Co.*,
  512 U.S. 218 (1994) ........................................................................................ 13

*Merck & Co. v. U.S. Dep't of Health & Human Servs.*,
  962 F.3d 531 (D.C. Cir. 2020) ............................................................................. 4

*Michigan Citizens for an Indep. Press v. Thornburgh*,
  No. CIV.A. 88-2322, 1988 WL 90388 (D.D.C. Aug. 17, 1988)............................. 24

*Moreno Galvez v. Cuccinelli*,
  387 F. Supp. 3d 1208 (W.D. Wash. 2019) .......................................................... 19

*Nasrallah v. Barr*,
  140 S. Ct. 1683 (2020) ......................................................................................... 1

*National Association of Home Builders v. Defenders of Wildlife*,
  551 U.S. 644 (2007) ........................................................................................... 16

*New York v. NHTSA*,
  No. 19-2395, __ F.3d __, 2020 WL 5103860 (2d Cir. Aug. 31, 2020)................... 15

*Nken v. Holder*,
  556 U.S. 418 (2009) ........................................................................................... 22

*NLRB v. United Ins. Co. of Am.*,
  390 U.S. 254 (1968) ........................................................................................... 10

*NRDC v. Daley*,
  209 F.3d 747 (D.C. Cir. 2000) ............................................................................. 9

*NRDC v. Morton*,
  337 F. Supp. 167 (D.D.C. 1971) ........................................................................ 24

*Nunez v. Boldin*,
  537 F. Supp. 578 (S.D. Tex. 1982) ..................................................................... 19

*Osorio-Martinez v. Att'y Gen.*,
  893 F.3d 153 (3d Cir. 2018)................................................................................ 22

*Pereira v. Sessions*,
  138 S. Ct. 2105 (2018) ......................................................................................... 9

*Radzanower v. Touche Ross & Co.*,
  426 U.S. 148 (1976) ........................................................................................... 14

*Ramirez v. ICE*,
  310 F. Supp. 3d 7 (D.D.C. 2018) ........................................................................ 22

*Rotkiske v. Klemm*,
  140 S. Ct. 355 (2019) ........................................................................................... 7

*Russello v. United States*,
  464 U.S. 16 (1983)................................................................................................ 7

*SAS Inst., Inc. v. Iancu*,
  138 S. Ct. 1348 (2018) ........................................................................................... 10

*S. Bay United Pentecostal Church v. Newsom*,
140 S. Ct. 1613 (2020) .............................................................................................. 22

*Sierra Club v. Jackson*,
  724 F. Supp. 2d 33 (D.D.C. 2010) ......................................................................... 12

*Soeung v. Holder*,
  677 F.3d 484 (1st Cir. 2012) ................................................................................. 17

*Strawberry v. Albright*,
  111 F.3d 943 (D.C. Cir. 1997) ............................................................................... 14

*Texas v. United States*,
  798 F.3d 1108 (D.C. Cir. 2015) ............................................................................. 23

*United States v. Mead Corp.*,
  533 U.S. 218 (2001) ............................................................................................... 16

*United States v. Ron Pair Enters., Inc.*,
  489 U.S. 235 (1989) ................................................................................................. 4

*United States v. Trek Leather, Inc.*,
  767 F.3d 1288 (Fed. Cir. 2014) .............................................................................. 5

*Util. Air Regul. Grp v. EPA*,
  573 U.S. 302 (2014) ...................................................................................... 2, 9, 11

*Valentine v. United States ex rel. Neidecker*,
  299 U.S. 5 (1936) .................................................................................................... 4

*Walsh v. Preston*,
  109 U.S. 297 (1883) ................................................................................................. 5

*Wisc. Cent. Ltd. v. United States*,
  138 S. Ct. 2067 (2018) ........................................................................................... 15

**Statutes and Legislative History**

24 Cong. Rec. 359 (1893) ............................................................................................ 14

24 Cong. Rec. 471 (Jan. 10, 1893) ................................................................................ 8

42 U.S.C. § 264 ............................................................................................................. 7

42 U.S.C. § 264(b) ........................................................................................................ 7

42 U.S.C. § 264(c) ..................................................................................................... 7, 24

42 U.S.C. § 264(d) ........................................................................................................ 7

42 U.S.C. § 265 ............................................................................................................ passim

42 U.S.C. § 271 .................................................................................................................. 2, 25

8 U.S.C. § 1158(a)(1) ............................................................................................................. 2

8 U.S.C. §§ 1182(a)(1) ......................................................................................................... 24

8 U.S.C. § 1182(a)(1)(A)(i) ................................................................................................. 14

8 U.S.C. § 1182(f) .......................................................................................................... 13, 25

8 U.S.C. §1222 ....................................................................................................................... 24

8 U.S.C. § 1225(b)(1) ........................................................................................................... 25

8 U.S.C. § 1232(a)(5)(D) ..................................................................................................... 14

8 U.S.C. § 1232(b)(3) ........................................................................................................... 14

8 U.S.C. § 1325 ..................................................................................................................... 25

98 Cong. Rec. 4423 (1952) .................................................................................................. 25

1835 Statutes at Large of South Carolina 470-72 (Act No. 2653) ................................... 5

1842 Code of Mississippi 538 (Art. 17) .............................................................................. 5

Act of Aug. 5, 1892,
   Pub. L. No. 52-380, 27 Stat. 349, 366 (1892) ............................................................. 12

Act of Feb. 28, 1871, ch. 100, §§ 15-20, 16 Stat. 440 ..................................................... 13

Act of February 15, 1893 ............................................................................................... passim

**Other Authorities**

Convention Against Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment
   art. 3, Dec. 10, 1984, S. Treaty Doc. No. 100-20 (1988) ............................... 17, 18, 24

CBP COVID-19 Updates and Announcements, available at
   https://www.cbp.gov/newsroom/coronavirus .................................................................. 20

Coronavirus Aid, Relief, and Economic Security Act,
   Pub. L. No. 116-136, 134 Stat. 281 (Mar. 27, 2020) ................................................. 25

Coronavirus Preparedness and Response Supplemental Appropriations Act,
   Pub. L. No. 116-123, 134 Stat. 146 (Mar. 6, 2020) ................................................... 25

COVID-19 Platform: Temporary Measures and Impact on Protection, U.N. High Commissioner
   for Refugees, available at https://im.unhcr.org/covid19_platform ..................... 22, 23

Dan Diamond, *Trump officials interfered with CDC reports on Covid-19*, Politico (Sept. 11,
   2020), available at https://tinyurl.com/y33z7usf ....................................................... 11

Families First Coronavirus Response Act,
  Pub. L. No. 116-127, 134 Stat. 178 (Mar. 18, 2020) ............................................................ 25

Lena H. Sun, *Trump officials seek greater control over CDC reports on coronavirus*, Wash. Post
  (Sept. 12, 2020),available at https://tinyurl.com/yx9erx9d ...................................................... 11

Nick Valencia, et al., *CDC was pressured 'from the top down' to change coronavirus testing
  guidance, official says*, CNN (Aug. 27, 2020), available at https://tinyurl.com/y24vlx9d ....... 11

Order in Council, Minimizing the Risk of Exposure to COVID-19 in Canada Order (Prohibition
  of Entry into Canada from the United States), P.C. 2020-0161, § 4(2)(d) (Mar. 20, 2020),
  available at https://tinyurl.com/y888f7yh ................................................................................. 23

Oxford English Dictionary (1933) ............................................................................................... 5

Paycheck Protection Program and Health Care Enhancement Act,
  Pub. L. No. 116-139, 134 Stat. 620 (Apr. 24, 2020) ................................................................ 25

Sharon LaFraniere, *Trump Health Aide Pushes Bizarre Conspiracies and Warns of Armed
  Revolt*, N.Y. Times (Sept. 14, 2020), available at
  https://www.nytimes.com/2020/09/14/us/caputo-virus.html ..................................................... 11

YouthCare Statement on Illegal Border Closure (Sept. 14, 2020) ........................................ 21, 22

**Rules**

LCvR 7(b) .................................................................................................................................... 23

**Regulations**

85 Fed. Reg. 16,559 (Mar. 24, 2020) .......................................................................................... 25

85 Fed. Reg. 56424 (Sept. 11, 2020) ..................................................................................... 17, 24

**INTRODUCTION**

This case is not about whether the Administration believes it is good policy to close the border to unaccompanied children.  It is about whether the Executive Branch is correct that Congress has given it the breathtaking power in Title 42 to expel people and to do so without any process, in a shadow immigration system.  As Judge Nichols correctly concluded in rejecting the same arguments advanced here, Congress has not provided that power.  *See J.B.B.C. v. Wolf*, 1:20-cv-01509-CJN, Oral Ruling at 47-54 (available at Kang Decl., ECF No. 2-2, Ex. D) ["*J.B.B.C.* Oral Ruling"].   "[I]t is not the proper role of the courts to rewrite the laws passed by Congress."  *Nasrallah v. Barr*, 140 S. Ct. 1683, 1692 (2020); *see also East Bay Sanctuary Covenant v. Trump*, 932 F.3d 742, 774-75 (9th Cir. 2018) ("revision of the laws is left with the branch that enacted the laws in the first place—Congress").

Nor is there any question that the balance of hardships tips decisively in favor of Plaintiff.  Defendants do not, and cannot, seriously dispute the gravity on Plaintiff's side of the ledger: the fate of children who have journeyed without their parents to the United States and are overwhelmingly fleeing grave danger.  Defendants contend, however, that their Title 42 Process is a necessary safety measure.  But insofar as Defendants claim that the policy is necessary to protect agents at the border, that justification is patently irrational, as the policy results in children remaining in DHS custody for *longer* periods of time than if the children were transferred to an ORR facility within the 72 hours required by statute.  Insofar as Defendants claim that this policy is actually for the benefit of the children, that contention is contradicted by Defendants' own statements about the ability of ORR facilities to protect children.  It also ignores that it is within Defendants' control to release children as quickly as possible to sponsors, and that quarantine protocols are readily available once children are released.

To resolve this Motion, the Court need not make any determination about the true impetus for Defendants' Title 42 Process.  It is telling, though, that an Administration that has been seeking to close the border to children and asylum seekers for four years now asserts that it is necessary to do so for public health—even though the Administration's response to the virus has been markedly different in virtually every other area.  Not only does the Administration

allow thousands of others to cross the land border every week who present no less risk of transmitting the virus, but it has even chosen to stop screening air travelers arriving in the United States.  Yet the Administration continues to claim that unaccompanied children present too great a risk to the country to provide them with their statutory right to seek safety.  In any event, the dispositive legal issue here is not whether the Title 42 Process is irrational or discriminatory in singling out unaccompanied children and asylum seekers, but whether it is beyond the statutory authority granted by Congress.  As Judge Nichols found, it is.

**ARGUMENT**

**I.    PLAINTIFF HAS SHOWN A STRONG LIKELIHOOD OF SUCCESS ON THE MERITS OF HIS STATUTORY CLAIMS.**

**A.  Section 265 Does Not Authorize Expulsions.**

Defendants assert that 42 U.S.C. § 265 empowers them to expel people, including the unaccompanied children in the putative class.  Yet Title 42 nowhere explicitly grants any expulsion power—indeed, the concept is never mentioned in § 265.  Although Defendants have *never*, in the 127 years since § 265 was first enacted, used the statute to expel anyone from the country, they claim to have discovered an *implied* expulsion power in this long-dormant, nearly forgotten statute.  Courts properly greet such claims with "skepticism," *Util. Air Regul. Grp. v. EPA*, 573 U.S. 302, 324 (2014), and here all the tools of statutory construction underscore that expulsions are not authorized, Pl.'s PI Mot. & Br. in Supp. ("PI Mot.") 13, 22, ECF No. 15-1.[1]

**1.  Section 265 provides no implied expulsion power.**

Nothing in § 265 grants Defendants any expulsion power.  To the contrary, Congress established specific penalties for violations of a § 265 order, *see* 42 U.S.C. § 271, and has *explicitly* authorized deportations in the immigration laws when vesting the government with that

---

[1] As an initial matter, Defendants appear to misapprehend Plaintiff's argument, suggesting that Plaintiff seeks to distinguish between individuals at ports of entry and those who enter between ports.  Opp. 18-19 & n.13.  But Plaintiff's position is that § 265 does not authorize expulsions *at all* once a person is on U.S. soil, whether the person seeks entry at or between ports.  Congress's asylum laws expressly state that individuals may seek asylum "whether or not" they enter at or between a "port of arrival."  8 U.S.C. § 1158(a)(1).  The TVPRA and other relevant statutes likewise draw no distinction between those at or between ports.

2

extreme power.  PI Mot. 13-14.  Defendants' central response is that the Court should

nevertheless read an *implied* power to expel into the statute.  Defs' Combined Opp. to Pl.'s Mots.

for Class Cert. & Classwide PI ("Opp.") 21, ECF No. 42.

The consequences of Defendants' implied-power argument are enormous.  If expulsion

could be implied as a power to effectuate § 265, that would be true for all "persons" covered by

the statute—including citizens.  PI Mot. 15.  Indeed, Defendants have previously conceded that

their interpretation of Title 42 would grant them the power to expel U.S. citizens from this

country in the name of public health.[2]  Yet in their brief here, Defendants shrink from the clear

consequence of their position, addressing only whether the government could "temporar[ily]

delay" a citizen's return home.  *See* Opp. 25-26.  But temporarily delaying a citizen's return is

very different from forcibly ejecting a U.S. citizen from the United States.

Defendants' interest in changing the subject is understandable—the idea that Congress

silently authorized the expulsion of citizens is astonishing.  *See Doe v. Mattis*, 928 F.3d 1, 8

(D.C. Cir. 2019) ("A fundamental attribute of United States citizenship is a right to . . . remain in

this country . . . .") (internal quotation marks omitted); *Dessouki v. Attorney Gen. of United

States*, 915 F.3d 964, 967 (3d Cir. 2019) ("The Executive cannot deport a citizen.").  Thus,

Defendants have offered an interpretation of § 265 under which they would have the

---

[2] *J.B.B.C.* Oral Ruling at 26-27:

> THE COURT: . . . the CDC, I take it, in your view, would have the power both to
> prohibit all entry from Mexico to the United States by anyone and then to effect the
> return to Mexico of anyone who slipped through, including citizens?

> [GOVERNMENT]: Yes, Your Honor.  I mean, obviously right now, the—the language is
> broad.  It says persons, and that would include both citizens and noncitizens . . .

> THE COURT: And for your argument to work, for the power for the introduction of
> persons to include the power to remove or return someone in the plaintiff's situation, I
> think you have to acknowledge that this would—that that language would also permit the
> removal of U.S. citizens who, in my hypothetical, make it into the United States from
> Mexico in the context of the Ebola outbreak.

> [GOVERNMENT]: Yes.  If, Your Honor, the CDC order—the CDC director determines
> that—that such a removal is also required—remember, the language of section 265 itself
> is it's broad and unambiguous . . .

extraordinary, unprecedented power to expel U.S. citizens without any protections; Plaintiff has offered an interpretation that does not yield that result.  "If one [proposed statutory construction] would raise a multitude of constitutional problems, the other should prevail—whether or not those constitutional problems pertain to the particular litigant before the Court."  *Clark v. Martinez*, 543 U.S. 371, 380-81 (2005).

The same concession dooms Defendants' attempt to evade the Supreme Court's requirement that an expulsion power must be "affirmatively granted."  *Valentine v. United States ex rel. Neidecker*, 299 U.S. 5, 12 (1936).  *Valentine* rejected the government's suggestion to imply the power to extradite, holding that "in order to exist" such a broad power "must be affirmatively granted."  *Id.*; *see also* PI Mot. 14, 18 (collecting express statutory authorities). Defendants note that *Valentine* involved the extradition of a citizen.  Opp. 25.  But Defendants have conceded that on their view § 265 *implicitly* authorizes the expulsion of citizens, which is squarely at odds with *Valentine*'s demand for *express* authorization.

Ultimately, Defendants are incorrect that because Congress's *goal* was to keep out disease, it implicitly authorized any and all means to do so.[3]  That is not how statutes are interpreted; rather, "agencies are 'bound, not only by the ultimate purposes Congress has selected, but by the means it has deemed appropriate, and prescribed, for the pursuit of those purposes.'"  *Merck*, 962 F.3d at 536; *see also Amalgamated Transit Union v. Skinner*, 894 F.2d 1362, 1364, 1372 (D.C. Cir. 1990) (applying principle to drug testing for public transit employees); PI Mot. 21-22.[4]  Defendants' reliance on a concurring opinion in *Luis v. United*

---

[3] Indeed, on Defendants' reasoning, *see, e.g.*, Opp. 19, § 265 could be read to authorize additional extraordinary powers, without any textual limit on what might be deemed necessary, *see* PI Mot. 15 n.8—a point which Defendants do not contest.  There is good reason to reject a "construction of the statute [that] would seem to give [an agency such] unbridled power."  *Merck & Co. v. U.S. Dep't of Health & Human Servs.*, 962 F.3d 531, 540 (D.C. Cir. 2020).

[4] *United States v. Ron Pair Enters., Inc.*, 489 U.S. 235, 242 (1989), does not help Defendants. Courts "will ignore what the Congress has written only if" abiding by the text would "lead to results that are so unreasonable or so bizarre that the Congress could not have meant what it said"; this is not that kind of "rare case."  *Eagle Pharm., Inc. v. Azar*, 952 F.3d 323, 332, 335, 340 (D.C. Cir. 2020) (internal quotation marks omitted) (citing *Ron Pair*, 489 U.S. at 242). Indeed, here, the text and statute's results both point in Plaintiff's favor.

*States*, 136 S. Ct. 1083 (2016), is thus misplaced. Properly interpreting § 265 to exclude any expulsion power would not render it "meaningless." *Id.* at 1097 (Thomas, J., concurring). The authority to halt all flights from China, for example, for foreign nationals and U.S. citizens alike, is hardly meaningless. PI Mot. 16-22. Section 265 is a powerful tool without the expulsion power Congress withheld, and Congress's choice must be honored.

### 2. Defendants' statutory interpretation arguments are meritless.

1. The text—especially Congress's use of the term "introduction" into the country—demonstrates that it was directed at the regulation of transportation companies, not individuals. PI Mot. 16-18. Defendants contest the meaning of "introduction," insisting that "a person may 'introduce' himself or herself without relying on any third party." Opp. 26. "Introduce" is used that way in distinct contexts—to introduce oneself to a new neighbor, for example. But the context here is that § 265 refers to introduction into a *place*.[5] As previously explained, in 1893 as today, that is an action taken by a third party. PI Mot. 17. The only evidence Defendants can muster to the contrary—a dictionary quote from 1639—is so dated that they resorted to repeatedly modernizing its spelling in their brief. *See* Introduce, *Oxford English Dictionary* ("He used such meanes that he introduced himselfe into this Castle.") (quote modified at Opp. 26).

Sources contemporaneous with the enactment of the 1893 Act, however, paint a very different picture. *See* PI Mot. 17 (citing *Walsh v. Preston*, 109 U.S. 297, 298, 314, 315 (1883)). For example, nineteenth century state statutes made it unlawful "for any free . . . person of color to migrate into this State, or be brought or introduced into its limits." 1835 Statutes at Large of South Carolina, at 470-72 (Act No. 2653), Second Declaration of Stephen Kang ("2d Kang Decl."), Ex. A; *see also* 1842 Code of Mississippi, at 538 (Art. 17) (similar), 2d Kang Decl., Ex. B. This contrast between *migrating* and being *introduced* into the state by someone else reflects the ordinary meaning of the term "introduce."[6]

---

[5] Defendants' cases using the term "introduce" in technical legal senses—such as introducing oneself into evidence as a witness—are thus inapposite.

[6] Defendants' cases about introduction of inanimate objects into the country further support Plaintiff's interpretation, underscoring that it is an action a person does *to something else*. *See, e.g.*, *United States v. Trek Leather, Inc.*, 767 F.3d 1288, 1299 (Fed. Cir. 2014).

Defendants also collect dictionary definitions of the term "prohibit," but none remotely suggests that that term provides a power of expulsion, which Defendants themselves seem to recognize.  *See* Opp. at 19 (merely interpreting "prohibit" as "intercepting and halting persons").  Defendants further emphasize that the statute provides the "power to prohibit, *in whole or in part*, the introduction of persons and property."  42 U.S.C. § 265 (emphasis added).  But the modifier "in whole or in part" has no logical connection with the asserted power to expel, and Defendants do not explain why they believe it bolsters their case.  Defendants also note the statute's requirement that orders issued under § 265 be "*in accordance with regulations.*"  Opp. 20 (emphasis in original).  But, again, the requirement to promulgate regulations concerning *introduction* has no bearing on whether the statute authorizes expulsions.

2. Defendants' contextual arguments likewise fall short.  As Plaintiff pointed out, the 1893 Act was singularly focused on regulating ships transporting people to the United States.  PI Mot. 17.  Defendants argue, however, that because Section 7 (the predecessor to § 265) does not use the term "vessels," the context "actually supports Defendants' interpretation."  Opp. 27.  That is wrong for several reasons.  First, as explained above, Section 7 *does* contain language limiting its scope to regulation of third parties—namely, the term "introduction."  Second, Plaintiff's interpretation already accounts for the use of the term "vessels" in other parts of the 1893 Act.  While the latter provisions are limited to ships, the terms of Section 7 were broad enough to permit regulation of all manner of transportation, including trains (and the modern day § 265 reaches, for example, airplanes).  PI Mot. 21-22.  Third, the striking overall focus of the statute on regulating transportation is a powerful contextual indication that Plaintiff's reading of the text of Section 7 is the correct one.  *See, e.g.*, *FCC v. AT&T Inc.*, 562 U.S. 397, 407 (2011) ("the purpose and scope" of a provision "becomes even more apparent" "against the backdrop of" other parts of the same statute).

Congress's choice not to include deportation provisions in the 1893 Act was particularly telling because it had, in the years leading up to that statute, repeatedly enacted immigration provisions that specifically authorized deportation, including for communicable diseases, so it plainly knew how to do so.  PI Mot. 14-15, 18.  Defendants assert that the Supreme Court "has

6

rejected this type of interpretative approach," and argues that language in one statute "usually sheds little light" on others.  Opp. 23 (internal quotation marks omitted).  That is plainly wrong.  In fact, the Supreme Court routinely points to other statutes as evidence that Congress knows how to legislate in particular ways.  *See, e.g.*, *McGirt v. Oklahoma*, 140 S. Ct. 2452, 2462 (2020) ("History shows that Congress knows how to withdraw a reservation . . . ."); *Rotkiske v. Klemm*, 140 S. Ct. 355, 361 (2019) ("Atextual judicial supplementation is particularly inappropriate when, as here, Congress has shown that it knows how to adopt the omitted language or provision.  Congress has enacted statutes that expressly include the language [petitioner] asks us to read in . . ."); *Epic Sys. Corp. v. Lewis*, 138 S. Ct. 1612, 1626 (2018) (explaining that "when Congress wants to mandate [certain] procedures it knows exactly how to do so," and "Congress has spoken often and clearly" to the issue in other statutes).

Defendants' only case on this issue, *Russello v. United States*, 464 U.S. 16 (1983), is not to the contrary.  There, the defendant argued that the RICO statute's provision subjecting an "interest" to forfeiture had to exclude profits, because a drug statute provided for forfeiture specifically of "profits."  *Id*. at 24-25.  The Court rejected that argument, reasoning that "profit" was a subset of the broad term "interest" so there was no inference to be drawn from the RICO statute's failure to refer to profit specifically.  *Id*. at 25.  Here, by contrast, a power of expulsion is not a subset of any broader power granted in § 265.

Defendants further contend that their interpretation is bolstered by a neighboring provision, 42 U.S.C. § 264, arguing that its general rulemaking authority indicates Congress's deference to the Executive "to determine how best to protect the country from the dangers of a communicable disease."  Opp. 22.  But tellingly, in creating the Title 42 Process, Defendants did not rely on § 264.  In any event, insofar as it has any relevance, § 264 actually supports Plaintiff's position.  That section distinguishes between those arriving from abroad and those already in the country, and provides more authority as to the former.  But even with regard to those traveling from abroad, the outer bounds of the Executive's public health powers are limited to the "apprehension, detention, [and] conditional release of individuals."  42 U.S.C. § 264(b)-(d).  Congress viewed such powers as extreme and limited them in various ways.  *See id*.  Yet

7

here Defendants claim powers far more extreme than detention, including the power to expel U.S. citizens from the country, even though such powers are nowhere expressly granted.

3. Defendants' legislative history arguments fare no better. Plaintiff previously explained that the legislative history, while not necessary to resolve his claims, confirms his interpretation because it reflects the problem Congress was confronting—an impending cholera epidemic that would arrive from Europe on ships—and the solution Congress deemed effectual—the regulation of those ships. PI Mot. 19. In response, Defendants mostly quibble with how to interpret particular statements, to little effect. For example, Defendants point out that Senator Chandler said that under Section 7 "the President could 'exclude all other passenger travel *as well as immigration*,'" Opp. 28 (quoting 24 Cong. Rec. at 471) (emphasis in original). But that quote underscores Plaintiff's point. With the inclusion of the word "other," Chandler's phrasing demonstrates that he understood "immigration" to be a *form* of passenger travel—of noncitizens intending to remain permanently—and that he saw the amended language of Section 7 as encompassing such travel and "all other passenger travel." Regulation of the "introduction" of persons by transportation companies would address the dangers posed by *all* passenger travel.

In any event, it is notable that Defendants point to no indications in the legislative history to support their view that Section 7 authorized expulsion. Instead, they invoke *Bostock v. Clayton County*, 140 S. Ct. 1731 (2020), to argue that Plaintiff is relying on legislative intent rather than statutory text. Opp. 29. But that gets it exactly backwards. *Defendants*' argument is ultimately that, because Congress wanted to protect the country from disease, and because Defendants now deem expulsions to be necessary to achieve that *purpose*, Congress *must* have authorized expulsions—even though the statute says nothing about expulsions. It is *Plaintiff*, by contrast, whose interpretation is firmly grounded in the text, context, and structure of the statute. Thus, *Bostock*'s observation that "extratextual considerations" are irrelevant "when the express terms of a statute give us [an] answer," *id*. (quoting 140 S. Ct. at 1737), bolsters Plaintiff's case.

4. Finally, Defendants' attempt to grapple with past practice also fails. As Plaintiff explained, the one time that Section 7 of the 1893 Act was used to bar the introduction of persons, it operated precisely as expected under Plaintiff's interpretation. PI Mot. 19-20.

Defendants' responses miss the mark.  They assert that the 1929 Executive Order's "plain
language" would have applied to "individuals who introduced themselves into the United States
by swimming or walking ashore."  Opp. 28.  That is simply not so, and the title of that order
speaks for itself: "Restricting for the time being the transportation of passengers from certain
ports in the Orient to a United States port."  Harrold Decl., ECF No. 34-1, Ex. B at 1.[7]
Defendants further argue that the 1929 invocation of the statute sheds no light because it "merely
tracked the problem" by regulating ships.  Opp. 28.  But if Defendants' view was correct, the
1929 order and accompanying regulations could have (like Defendants' actions) purported to
authorize expulsions for those who arrived on our shores in violation of its terms.  Instead, the
government invoked the power exactly as limited by the terms of the statute: as a means to
regulate transportation companies.  That the government has never before claimed that § 265 or
its predecessor authorized expulsions, and that previously it carefully hewed to Plaintiff's
interpretation, are powerful reasons for "skepticism" of Defendants' claim to have just
discovered such long-dormant, "unheralded power."  *Util. Air Regul. Grp.*, 573 U.S. at 324.

<strong>3.  No deference is owed to the claimed expulsion power.</strong>

Defendants fall back on a claim for deference under *Chevron, U.S.A., Inc. v. NRDC*, 467
U.S. 837 (1984).  Opp. 21.  But *Chevron* is not a "rubber stamp," *NRDC v. Daley*, 209 F.3d 747,
755 (D.C. Cir. 2000), so courts must not embrace statutory interpretations with "reflexive"
deference, *Kisor v. Wilkie*, 139 S. Ct. 2400, 2415 (2019) (quoting *Pereira v. Sessions*, 138 S. Ct.
2105, 2120 (2018) (Kennedy, J., concurring)).

Here, deference fails at *Chevron*'s first step because Defendants' asserted new expulsion
power is at odds with "the traditional tools of statutory interpretation—including the statute's
text, history, structure, and context."  *Loving v. IRS*, 742 F.3d 1013, 1021-22 (D.C. Cir. 2014).

---

[7] Defendants' note that the order "prohibited any person from being 'introduced directly or
*indirectly* by transshipment or *otherwise* into the United States . . .'"  Opp. 27 (emphasis added
in Defendants' brief).  The order spoke of "indirect" introduction to make clear that a passenger
was covered regardless of stops at ports along the way.  And "transshipment" had a specific
meaning: Transferring something from one ship to another.  *See Larsen v. Ins. Co. of N. Am.*, 252
F. Supp. 458, 473 (W.D. Wash. 1965).  It is unexceptional that the order would specify that all
transportation was covered, whether by "transshipment or otherwise."

9

"[U]nder *Chevron*, we owe an agency's interpretation of the law no deference unless, after 'employing traditional tools of statutory construction,' we find ourselves unable to discern Congress's meaning."  *SAS Inst., Inc. v. Iancu*, 138 S. Ct. 1348, 1358 (2018) (quoting *Chevron*, 467 U.S. at 843 n.9); *see id.* (rejecting agency's argument that, "[e]ven though the statute says nothing about [agency's] asserted 'partial institution' power," that silence made statute "at least ambiguous on the propriety of the practice").

For all the reasons already explained, the lack of an expulsion power is clear from the text, context, and history of § 265.  And that reading is strongly reinforced by the extraordinary implications of Defendants' reading and the grave constitutional questions raised by their assertion of an *implicit* power to deport U.S. citizens in the name of public health.  *See Chamber of Commerce of U.S. v. Fed. Election Comm'n*, 69 F.3d 600, 605 (D.C. Cir. 1995) (constitutional avoidance warrants rejection of *Chevron* deference); *Dessouki*, 915 F.3d at 967 (avoiding "serious constitutional concerns" regarding deportation of purported U.S citizen).  For similar reasons, Defendants' interpretation warrants no deference at *Chevron*'s second step "because it is unreasonable in light of the statute's text, history, structure, and context."  *Loving*, 742 F.3d at 1022; *see also District of Columbia v. Dep't of Labor*, 819 F.3d 444, 454 (D.C. Cir. 2016) (rejecting "novel reading" that would "significantly enlarge" longstanding statute's effect); *J.B.B.C.* Oral Ruling at 50-51 (declining to defer to conclusory interpretation).

Defendants' claim to deference based on CDC's "expertise" is likewise flawed.  The question for this claim is purely legal—does § 265 authorize expulsions, or does it not?  The CDC's "scientific and technical knowledge," Opp. 21, have no bearing on that question of statutory interpretation.  *Cf. FedEx Home Delivery v. NLRB*, 849 F.3d 1123, 1128 (D.C. Cir. 2017) (no deference where agency has "no special administrative expertise that a court does not possess") (quoting *NLRB v. United Ins. Co. of Am.*, 390 U.S. 254, 260 (1968)); *Kisor*, 139 S. Ct. at 2417 ("When the agency has no comparative expertise in resolving a regulatory ambiguity, Congress presumably would not grant it that authority.").[8]

---

[8] Although unnecessary to resolve now, the suggestion that agency expertise is at work here (Opp. 21 & n.14), warrants skepticism.  There have been many troubling indications that

Finally, Congress must "speak clearly if it wishes to assign to an agency decisions of vast economic and political significance." *Util. Air Regul. Grp.*, 573 U.S. at 324 (internal quotation marks omitted); *see also King v. Burwell*, 576 U.S. 473, 486 (2015) (rejecting *Chevron* deference because, "had Congress wished to assign [such a] question to an agency, it surely would have done so expressly"). That is particularly so here given Defendants' concession that their interpretation of § 265 implies a power to summarily expel U.S. citizens from the country.

### B. Even If § 265 Did Authorize Expulsions, It Would Not Override The Specific Statutory Protections For Unaccompanied Children And Asylum Seekers.

Defendants do not dispute that Congress has carefully and repeatedly enacted special safeguards for unaccompanied children and persons fleeing persecution. These statutes contain specific exceptions from their coverage, but no exception for communicable diseases or public health crises. PI Mot. 22-24. Defendants incorrectly quibble with the scope of some of those protections, but do not dispute that (absent § 265) class members are entitled to special procedures by virtue of Congress's solicitude for children and asylum seekers. As Judge Nichols correctly held, § 265 must be read in conjunction with the specific protections for those groups. *J.B.B.C.* Oral Ruling at 50 (finding that, even if § 265 authorized expulsions, it must "be harmonized" with the immigration statute's "special protections to minors"). Defendants' argument that § 265 permits the Executive to override all such protections is unsupported by the ordinary tools of statutory construction, and not entitled to deference.

### 1. Defendants' statutory interpretation arguments fail.

Defendants argue that "Section 265 plainly takes precedence" over the immigration laws' protections for unaccompanied children. Opp. 29. But a party seeking to establish that Congress

---

political goals have compromised or overridden CDC's public health judgments. *See, e.g.*, Dan Diamond, *Trump officials interfered with CDC reports on Covid-19*, Politico (Sept. 11, 2020), https://tinyurl.com/y33z7usf; Lena H. Sun, *Trump officials seek greater control over CDC reports on coronavirus*, Wash. Post (Sept. 12, 2020), https://tinyurl.com/yx9erx9d; Sharon LaFraniere, *Trump Health Aide Pushes Bizarre Conspiracies and Warns of Armed Revolt*, N.Y. Times (Sept. 14, 2020), https://www.nytimes.com/2020/09/14/us/caputo-virus.html; Nick Valencia, et al., *CDC was pressured 'from the top down' to change coronavirus testing guidance, official says*, CNN (Aug. 27, 2020), https://tinyurl.com/y24vlx9d.

intended to permit one statutory provision to "override" a separate statutory regime "bears the heavy burden of showing a clearly expressed congressional intention that such a result should follow." *Epic Sys.*, 138 S. Ct. at 1624 (internal quotation marks omitted). "The intention must be clear and manifest." *Id.* Here, it is not.

The usual way for Congress to "override conflicting provisions" when drafting a new law is with the phrase "notwithstanding any other provision of [law]." *See, e.g.*, *id.* at 1626 ("Congress has . . . shown that it knows how to override the [Federal] Arbitration Act when it wishes," by stating "'[n]otwithstanding any other provision of law[.']"). Such clauses were well known to Congress in 1893. The Constitution's Supremacy Clause contains one, and they have featured regularly in legislation ever since. *See Kansas v. Garcia*, 140 S. Ct. 791, 807 (2020) (Thomas, J., concurring); *see, e.g.*, Act of Aug. 5, 1892, Pub. L. No. 52-380, 27 Stat. 349, 366 (1892) (appropriations bill addressing immigration, quarantine, and epidemic prevention and separately providing for certain taxes, "any other law to the contrary notwithstanding"). Congress declined to use this settled formulation in Section 7.

Defendants grasp at § 265's requirement that an order be preceded by the agency's finding that "a *suspension of the right* to introduce . . . persons and property [from the designated country] is required in the interest of public health." 42 U.S.C. § 265 (emphasis added); *see* Opp. 29-30. Defendants suggest that "suspension" refers to the suspension of *laws*, and that "the right to introduce . . . persons and property" should be read to "include[] the immigration laws." Opp. 29-30. This attempt to turn language about a required predicate finding into a sweeping power to disregard other statutes fails.

"Statutory grants of enforcement authority commonly condition enforcement on a prior finding, and courts recognize those conditions precedent as a prerequisite to an agency's exercise of its authority." *Sierra Club v. Jackson*, 724 F. Supp. 2d 33, 41 (D.D.C. 2010) (citing *Her Majesty the Queen v. EPA*, 912 F.2d 1525, 1533 (D.C. Cir. 1990)). Section 265 is clear about the substantive power it grants: "the power to prohibit, in whole or in part, the introduction of persons and property from [designated] countries." 42 U.S.C. § 265. Defendants do not suggest that this grant of substantive authority itself explicitly allows the Executive to override the

immigration laws.  *See* Opp. 29-31.  They instead assert that Congress conveyed such authority in a subordinate clause describing a *finding* the agency must make before exercising that substantive power: that the danger of a disease "is so increased by the introduction of persons or property from [a foreign] country that a *suspension of the right to introduce* such persons and property [from that country] is required in the interest of the public health."  42 U.S.C. § 265 (emphasis added); *see* Opp. 29-30.

It defies common sense (not to mention the English language) that Congress would delegate authority to override all other federal statutes in a dependent clause describing not the power being granted, but a background finding the agency must make.  *See Epic Sys.*, 138 S. Ct. at 1626-27 (rejecting interpretation that "runs afoul of the usual rule that Congress 'does not . . . hide elephants in mouseholes,'" *i.e.*, "'does not alter the fundamental details of a regulatory scheme in vague terms or ancillary provisions"); *id.* at 1627 ("It's more than a little doubtful that Congress would have tucked into the mousehole of [one statutory provision]'s catchall term an elephant that tramples the work done by [three] other laws . . . ."); *MCI Telecomms. Corp. v. Am. Tel. & Tel. Co.*, 512 U.S. 218, 231 (1994) ("It is highly unlikely that Congress would leave the determination of whether an industry will be entirely, or even substantially, rate-regulated to agency discretion—and even more unlikely that it would achieve that through such a subtle device as permission to 'modify' rate-filing requirements.").  Even the President's statutory power within Title 8 itself to suspend entry does not reach so far.  PI Mot. 25; 8 U.S.C. § 1182(f); *see East Bay Sanctuary Covenant*, 932 F.3d at 760.

In fact, the "suspension of the right" language reinforces Plaintiff's argument, *supra* Part I.A, that § 265 authorizes regulation of transportation entities.  That phrase most naturally refers to suspension of international carriers' *licenses* conferring "the right" to ply certain routes.  *See, e.g.*, Act of Feb. 28, 1871, ch. 100, §§ 15-20, 16 Stat. 440 (setting forth grounds upon which various types of "license[s] [issued to steamship operators] shall be suspended or revoked"); *Barron v. Burnside*, 121 U.S. 186, 200 (1887) (addressing "permit from the state" granting corporation "its right to carry on . . . commerce"); *Hazeltine v. Miss. Valley Fire Ins. Co.*, 55 F. 743, 746 (C.C.W.D. Tenn. 1893) (state law authorized agency to "suspend the right of a licensed

13

foreign insurance company 'to do business in the state[]'").[9]  Indeed, Defendants betray their own deviation from the statutory text by seeking to transform § 265's reference to "the *right to introduce*" into a "cessation of . . . laws pursuant to which a person might otherwise claim the *right to be introduced*."  Opp. 30.  But the statute says nothing about a right to *be introduced*.[10]

Defendants' remaining contentions likewise fail.  They assert that the specific-governs-the-general canon favors § 265 over the TVPRA because the former applies only during health emergencies.  Opp. 34.  But the TVPRA unambiguously sets forth highly specific, *mandatory* obligations—including that Defendants must transfer putative class members to HHS custody and place them in regular removal proceedings.  8 U.S.C. § 1232(a)(5)(D), (b)(3).  And it admits of no public health exception, even as to children *known* to have a communicable disease.  *Cf. id.* § 1182(a)(1)(A)(i).  It "offers the more on-point instruction" because its mandatory provisions speak directly to the question before the Court—whether unaccompanied children may be deported without a hearing—which § 265 does not address.  *See Epic Sys.*, 138 S. Ct. at 1631-32 ("[T]he question before us is whether courts must enforce particular arbitration agreements according to their terms.  And it's the Arbitration Act that speaks directly to the enforceability of arbitration agreements, while the NLRA doesn't mention arbitration at all.");  *see also Radzanower v. Touche Ross & Co.*, 426 U.S. 148, 152-54 (1976) ("mandatory" provision "focus[ed] on the particularized problems of national banks" controlled over "broad" provision of separate statute); *Strawberry v. Albright*, 111 F.3d 943, 947 (D.C. Cir. 1997) (per curiam) ("general prohibition of age discrimination" did not negate subsequently-enacted "mandatory retirement provisions" for particular subset of federal employees).

---

[9] Defendants claim that noncitizens have no constitutional right to enter.  Opp. 36.  But Plaintiff does not assert any constitutional right; he seeks to vindicate protections expressly afforded by Congress, and the Title 42 Process cannot abrogate those statutory rights.

[10] Defendants' legislative history argument likewise fails.  Opp. 28, 30-31.  It is undisputed that Members of Congress stated that under Section 7 of the 1893 Act, the President could "suspend immigration."  But the means provided to halt immigration was the same as that for halting the arrival of more temporary visitors: "prevent[ing] the coming at all" of "vessels, passengers, crews, and cargo, which are sailing to this country."  24 Cong. Rec. 359, 392 (1893); *see* PI Mot. 19.  Nothing in the legislative history indicates an intention to override all other laws, much less a clear and manifest intention.

Defendants next argue that that Plaintiff's straightforward reading of "the right to introduce . . . persons and passengers" "would render Section 265 a nullity." Opp. 34. But as already explained, § 265 grants the Executive significant authority to bar airlines and other entities from bringing cargo and passengers into the United States. PI Mot. 21-22; *supra* Part I.A. The nullity canon does not apply because on *any* interpretation, § 265 would do *at least* that significant work. *See Wisc. Cent. Ltd. v. United States*, 138 S. Ct. 2067, 2073 (2018) (provision not rendered superfluous even if it only does "modest work" compared to government's interpretation). That § 265 does not authorize *this particular invocation*—an order singling out particular noncitizens, including unaccompanied children, and overriding protections for those individuals—does not remotely make the statute meaningless.

### 2. No deference is due to the claimed power to override other statutes.

Defendants claim deference is due to "CDC's interpretation of Section 265 as operating without regard to the immigration laws." Opp. 36. But as Judge Nichols concluded, HHS and CDC are not entitled to deference because § 265 must "be read in light of" the mandatory protections for unaccompanied children and asylum seekers, about which HHS and CDC "quite plainly ha[ve] no special expertise." *J.B.B.C.* Oral Ruling at 50. That is correct: "[T]he 'reconciliation' of distinct statutory regimes 'is a matter for the courts,' not agencies." *Epic Sys.*, 138 S. Ct. at 1629 (quoting *Gordon v. New York Stock Exchange, Inc.*, 422 U.S. 659, 685-86 (1975)). Allowing an agency "to diminish [another] statute's scope in favor of a more expansive interpretation of its own" would "threaten[] to undo rather than honor legislative intentions" and upend "the balance Congress struck." *Id.*

Defendants resist that conclusion, arguing this is an "unusual context where the statute can be read" to override other statutes. Opp. 37. But that is just the type of interpretation to which *Epic Systems* held no deference is due. Here, as there, the agencies have not "just sought to interpret [their] statute"—§ 265—"in isolation." *Epic Sys.*, 138 S. Ct. at 1629. They have instead "sought to interpret this statute *in a way that limits the work of a second statute*." *Id.* (emphasis added); *see also New York v. NHTSA*, No. 19-2395, __ F.3d __, 2020 WL 5103860, at *4, *7 n.69 (2d Cir. Aug. 31, 2020) (applying *Epic Systems* and refusing to defer to agency

interpreting its own statute to limit "mandatory" requirements of statute it does not administer).

Defendants expressly seek to "diminish[] th[e] . . . scope" of the TVPRA—and the immigration

laws generally—"in favor of a more expansive interpretation of [§ 265]." *Epic Sys.*, 138 S. Ct. at

1629.[11]  Just as the agency interpretation in *Epic Systems* would have "seat[ed] the Board as

supreme superintendent . . . under a statute it doesn't even administer," *id.* at 1627, Defendants

here assert that the CDC Director wields veto authority over all immigration laws.

Additionally, no deference is due here because, after "employing traditional tools of

statutory construction," there is no "unresolved ambiguity" as to whether § 265 overrides the

immigration statutes.  *See id.* at 1630 (quoting *Chevron*, 467 U.S. at 843 n.9); *see supra* Part

I.A.3.  Section 265's plain language and the established interpretive tools employed above—the

strong presumption against one statute authorizing the override of another, the no-elephants-in-

mouseholes canon, the principle that subsequent enactments narrow earlier statutes, the specific-

over-general canon—all give the same unambiguous answer.[12]  Likewise, for all these reasons,

Defendants' interpretation is also unreasonable at *Chevron*'s second step.  *See supra* Part I.A.3.

And the agencies' claims of technical expertise are likewise irrelevant to this statutory question.

*See id.*  Even assuming the agencies' asserted policy objectives are rational and properly

motivated, Defendants' policy justifications cannot cure the illegality of actions exceeding the

agencies' statutory authority.  *See, e.g.*, *Epic Sys.*, 138 S. Ct. at 1619 ("As a matter of policy

these questions are surely debatable.  But as a matter of law the answer is clear.").

---

[11] *National Association of Home Builders v. Defenders of Wildlife*, 551 U.S. 644 (2007), cited by
Defendants' proposed amicus (ECF No. 48-1 at 6-7), does not aid Defendants.  In that case,
agencies facing potentially conflicting commands from different statutes jointly interpreted one
of the commands narrowly, so as not to "override express statutory mandates" in the other
statute.  551 U.S. at 647.  Here, there are no conflicting statutory commands; rather, the CDC
director is attempting to use the *authority* of § 265 to "override otherwise mandatory statutory
duties" in the immigration laws—precisely the result avoided in *Home Builders*.  *See id.* at 669.

[12] Defendants' alternative plea for *Skidmore* deference fails for the same reasons.  *Skidmore*
deference applies only "to an agency *administering its own statute*."  *United States v. Mead
Corp.*, 533 U.S. 218, 228 (2001) (emphasis added).  And under *Skidmore*, an agency's
interpretation only "is eligible to claim respect according to its persuasiveness."  *Id.* at 221.  For
the reasons already given, Defendants' interpretation is not persuasive.

### 3.   The Title 42 Process violates the class members' statutory rights.

Defendants half-heartedly claim they are complying with some immigration provisions, but do not even try to claim compliance with all the provisions applicable here.

<u>First</u>, Defendants' sole TVPRA argument is that the statute purportedly allows them to take longer than 72 hours to transfer a minor to ORR in "exceptional circumstances."  Opp. 15 n.12.  But Defendants are seeking to *expel* class members, not transfer them to ORR after a delay.  <u>Second</u>, Defendants do not claim that they are complying with the asylum and withholding statutes.  Nor could they; the CBP Implementation Memo does not instruct agents even to screen for asylum or withholding.  <u>Third</u>, Defendants' claim that they are providing Convention Against Torture ("CAT") screenings (Opp. 31-32 n.15) does not save the Title 42 Process, as the TVPRA requires much more than just CAT screenings, and the screening fails to address asylum and withholding entirely.  *See, e.g.*, *Soeung v. Holder*, 677 F.3d 484, 487 (1st Cir. 2012) (standard for CAT requires showing of likelihood of torture, rather than harm or persecution).  Moreover, Defendants' cursory CAT screenings are not being lawfully conducted, as children are entitled to have their CAT claims decided in full removal proceedings.  *See also* PI Mot. 24 n.12 (describing numerous flaws with Title 42 CAT assessments).  More fundamentally, Defendants' claim that they are providing CAT screenings only undermines their own statutory arguments, as there is no reason why CAT should be viewed as somehow more mandatory than the INA's other obligations.

### C.  The Court Should Defer Decision On Plaintiff's Arbitrary And Capricious Claims Until Summary Judgment In Light of the Forthcoming Final Rule.

After expelling thousands of unaccompanied minors under § 265, Defendants have only recently issued a final version of the regulation at issue here.  85 Fed. Reg. 56424 (Sept. 11, 2020).  Because Plaintiff has shown a likelihood of success on the merits of his statutory claims, and the Final Rule does not alter those claims, *see infra*, Plaintiff believes that the Court should issue an injunction based on the statutory claims and defer decision on the arbitrary and capricious claims until summary judgment.  This would allow the parties to fully address any new justifications Defendants advance in the Final Rule, as well as the administrative record.

II.    **THE CLASS WILL SUFFER IRREPARABLE INJURY ABSENT A PRELIMINARY INJUNCTION, AND THE BALANCE OF HARMS WEIGHS HEAVILY IN FAVOR OF INTERIM RELIEF.**

The remaining preliminary injunction factors also weigh heavily in favor of Plaintiff.[13]

1.  Plaintiff has put forward substantial, unrebutted evidence regarding the irreparable injury that class members would confront if they were expelled, including persecution, physical harm, and the deprivation of the right to seek humanitarian relief.  *See* ECF Nos. 15-6, 15-10, 15-11, 15-12.  The class members' fears of injury are more than merely speculative, and as the D.C. Circuit has recognized, "a preliminary injunction requires only a *likelihood* of irreparable injury," such that "Damocles's sword does not have to actually fall on all [plaintiffs] before the court will issue an injunction."  *League of Women Voters of United States v. Newby*, 838 F.3d 1, 8-9 (D.C. Cir. 2016) (emphasis added).

Defendants argue that the Title 42 Process's procedure for assessing a noncitizen's claims under CAT mitigates such risks, Opp. 43, disregarding that this assessment does not screen for asylum or withholding claims (which are distinct from CAT), and is rife with deficiencies even as to CAT.  PI Mot. 24 n.12; *supra* Part I.B.3.  Defendants' further assertion that the Court can "rul[e] on individual claims as they arise" in litigation is hard to take seriously, given their tactical decision to "pick off" any such child's claims and thereby prevent a court ruling that would benefit other children.  Opp. 43; *see* ECF No. 2-2, ¶ 5-12; 2d Kang Decl., ¶¶ 1-4.  And class actions importantly avoid unnecessarily flooding the courts with individual actions, and provide a mechanism to review transitory claims.

Defendants also suggest that class members' "individual circumstances" preclude a classwide finding of irreparable harm, Opp. 43, but do not dispute that all class members face the deprivation of statutory procedures for seeking protection in the United States.  *See Kirwa v. U.S. Dep't of Defense*, 285 F. Supp. 3d 21, 42 n.22 (D.D.C. 2017) ("[I]t is well-established that acts by Government agencies in derogation of statutory rights of the public or certain individual

---

[13] Plaintiff's counsel has learned that Plaintiff may be 15, not 16 (as counsel had previously represented). Counsel is investigating and will update the Court.

members of the public can constitute irreparable injury.") (citation and quotation marks omitted); *J.L. v. Cissna*, 341 F. Supp. 3d 1048, 1068 (N.D. Cal. 2018) (identifying multiple common harms resulting from deprivation of right to seek humanitarian benefits for abused, abandoned, and neglected juveniles); *Moreno Galvez v. Cuccinelli*, 387 F. Supp. 3d 1208, 1218 (W.D. Wash. 2019) (similar).  Moreover, Defendants offer no evidence that class members face materially disparate harms if unlawfully expelled, or that the harms P.J.E.S. faced are unique.  Numerous courts in this District and others have granted classwide injunctions where all class members face similar (but not identical) harms.  *See* PI Mot. 31-32 (collecting cases); *see also, e.g.*, *Nunez v. Boldin*, 537 F. Supp. 578, 586-87 (S.D. Tex. 1982) (granting classwide injunction because "[d]eportation to a country where one's life would be threatened obviously would result in irreparable injury"); *cf. Damus v. Nielsen*, 313 F. Supp. 3d 317, 342 (D.D.C. 2018) (rejecting contention that individualized parole reviews could mitigate irreparable harm arising from unlawful detention of asylum seekers).

      2.   The harm faced by the class members also outweighs any burden on Defendants.  First, Defendants claim that the CDC Order is necessary to protect DHS personnel.  Opp. 44.  Yet Defendants ignore that expelling children under Title 42 takes DHS longer—sometimes substantially longer—than the time required to refer them to ORR custody.  An independent monitor's report, recently filed in other litigation, shows that unaccompanied children in the Title 42 Process are held in hotels for an average of "approximately 5 days," on top of any time they spend in CBP custody immediately after apprehension.  Interim Report by Independent Monitor & Dr. Paul Wise in *Flores v. Barr* at 10, 2d Kang Decl., Ex. C.  Some children were held in custody for as long as *10 days* awaiting expulsion.  *Id.* at 14.  Defendants have chosen to implement a program that lengthens, rather than shortens, the time that children spend in DHS custody.[14]

---

[14] Defendants also say that some CBP officers have died of COVID-19.  Opp. 43.  But they do not state whether the officers who passed away contracted the virus due to their work, or even where geographically they contracted COVID-19.  The webpage they cite shows that many officers tested positive far from the U.S-Mexico border, where the vast majority of



Such a policy undermines Defendants' purported public health justifications.

Further, Defendants acknowledge that they exempt from the Title 42 Process all individuals with certain criminal histories.  *See* CBP Memo at 3.  They do not dispute that an individual's criminal history bears no relationship to his likelihood of having COVID-19, but suggest that "the public health concern may be outweighed by other important government interests."  Opp. 41-42.  Yet their selection of which "important interests" warrant exemption from Title 42 is telling.

Defendants also assert that referring class members to ORR custody would undermine efforts to mitigate the spread of COVID-19 in ORR facilities.  Opp. 44.  This concern is misplaced.  Under the TVPRA unaccompanied children like Plaintiff are released to sponsors, most often parents or close relatives who can ensure the children will self-quarantine as needed and will be subject to local restrictions.  Such children need not spend substantial periods of time in ORR facilities.  Defendants' declarant nonetheless claims that "the ORR system would likely come under significant stress if ORR were to begin to receive on a regular basis approximately 75 to 100 referrals of [unaccompanied children] per week."  ECF 42-5, ¶ 11.  Yet in March 2020, at the beginning of the pandemic, this same ORR officer testified in another case that "ORR currently has additional capacity and more opportunity to ensure social distancing and isolation

---

unaccompanied children are apprehended.  *See* CBP COVID-19 Updates and Announcements, https://www.cbp.gov/newsroom/coronavirus.

within the care provider network."  March 27, 2020, Declaration of Jallyn Sualog ("Sualog *Flores* Decl."), ¶ 13, 2d Kang Decl., Ex. D.

Critically, at that time the ORR population was over *three times higher* than it is now. *Id.*, ¶ 12 (over 3,300 children in care in late March 2020).  Despite such numbers, both Defendants' ORR declarant and a CDC officer testified that "ORR has adequate space within its facilities to isolate any UAC suspected of or confirmed to be infected with COVID-19," and "the overall risk to UAC is lower in the facilities than traveling and placing children in home environments in some locations in the U.S."  March 27, 2020, Declaration of Dr. Amanda Cohn, ¶ 23, 2d Kang Decl., Ex. E; *see also* Sualog *Flores* Decl., ¶¶ 13-14.  A federal district court relied on this evidence to conclude that ORR was "provid[ing] adequate routine medical care and adequate living accommodations."  Order at 15, ECF No. 740, *Flores v. Barr*, 85-cv-04544 (C.D. Cal. Mar. 28, 2020).

As Defendants acknowledge, the current population in the ORR shelter network is exceptionally low.  ECF 42-5, ¶¶ 6, 31-32.  Mark Greenberg, a former HHS official who oversaw ORR operations, has conducted a statistical analysis showing that ORR can absorb a substantial number of children—certainly more than 75-100 children per week—without reaching even the March 2020 levels that Defendants' own declarant said were reasonably safe. As Mr. Greenberg explains, this is both because the ORR facilities are so far under capacity, and also because each week children are discharged to sponsors, as required by statute.  *See* Declaration of Mark Greenberg, ¶¶ 6-11, 14-16.  Moreover, the record shows that ORR's grantees and Defendants have found ways to mitigate the dangers posed by the pandemic.[15]  *See* Palusky Decl., ECF No. 15-6; Sualog Decl., ECF 42-5, ¶¶ 16-35 (describing safety measures implemented within ORR network); YouthCare Statement on Illegal Border Closure (Sept. 14,

---

[15] Defendants invoke the government's response to COVID-19 outbreaks on the Diamond Princess and the Grand Princess cruise ships.  Opp. 7, 39.  However, as explained above, ORR facilities can deal with children who may have had COVID-19 exposure.

2020), https://youthcare.org/blog/youthcare-statement-on-illegal-border-closure/ (discussing

measures that ORR shelter provider has taken to mitigate COVID-19 risks).[16]

    3. Although Defendants claim that an injunction here would prevent the government

"from effectuating statutes enacted by . . . its people," Opp. 45, they have it backwards.

Defendants are the ones seeking to contradict clear statutory provisions.  "To the contrary, there

is a substantial public interest in having governmental agencies abide by the federal laws that

govern their existence and operations."  *League of Women Voters*, 838 F.3d at 12 (internal

quotation marks omitted); *see also Osorio-Martinez v. Att'y Gen.*, 893 F.3d 153, 179 (3d Cir.

2018) ("[I]t is squarely in the public interest to enable [children] to partake of statutory . . . rights

. . . where, as here, it is consistent with the process prescribed by Congress."); *Ramirez v. ICE*,

310 F. Supp. 3d 7, 33 (D.D.C. 2018) ("The public interest surely does not cut in favor of

permitting an agency to fail to comply with a statutory mandate.").  The Supreme Court has

likewise recognized the "public interest in preventing aliens from being wrongfully removed,

particularly to countries where they are likely to face substantial harm."  *Nken v. Holder*, 556

U.S. 418, 436 (2009).[17]

    Finally, while Defendants assert that "countries around the globe" have issued travel

restrictions to prevent the spread of COVID-19, Opp. 39, they omit that many countries,

especially in Western Europe, have kept their doors open to asylum seekers.  *See* COVID-19

Platform: Temporary Measures and Impact on Protection, U.N. High Commissioner for

---

[16] There are other unanswered questions concerning Ms. Sualog's testimony in this case, including how she arrived at her assumption that 30% of children referred to ORR custody will be infected with COVID or "exposed to COVID-19."  ECF No. 42-5, ¶ 11.

[17] Defendants again ask this Court to defer to "Government officials tasked with ensuring the public health," Opp. 45, arguing that the "Constitution principally entrusts" such matters "to the politically accountable officials of the [government]," *id.* at 5 (quoting *S. Bay United Pentecostal Church v. Newsom*, 140 S. Ct. 1613, 1613 (2020) (Roberts, C.J., concurring) (internal quotation marks omitted, alteration in original)).  But the question here is whether Defendants are exceeding the authority Congress granted.  And as discussed above, CDC is operating far beyond its historical and Congressionally-authorized role.

    Similarly, Defendants' claims that they need to "protect the country" during the pandemic, Opp. 43, ring hollow given this Administration's numerous actions undermining or contradicting the recommendations of public health officials.  *See, e.g.*, *supra* n.8.

Refugees, https://im.unhcr.org/covid19_platform (identifying countries that exempt persons seeking protection, including France, Italy, the Netherlands, and Spain). Canada, moreover, has *an express exemption for unaccompanied children. See* Order in Council, Minimizing the Risk of Exposure to COVID-19 in Canada Order (Prohibition of Entry into Canada from the United States), P.C. 2020-0161, § 4(2)(d) (Mar. 20, 2020), https://tinyurl.com/y888f7yh.

## III.   DEFENDANTS' CHALLENGE TO PLAINTIFF'S MOTION FOR CLASS CERTIFICATION IS UNFOUNDED.

Defendants' only argument concerning class certification is that Plaintiff "lacks a sufficiently strong connection to this litigation," and thus is an inadequate representative, because Defendants took him out of Title 42 proceedings shortly after the filing of this case. Opp. 16. But Defendants concede, as they must, that the D.C. Circuit has held that even if a class plaintiff's claim quickly becomes moot after filing for class certification, that "says nothing on its own about [a class plaintiff's] fitness or commitment to prosecuting the action." *J.D. v. Azar*, 925 F.3d 1291, 1313 (D.C. Cir. 2019) (per curiam). Rather, the "short-lived duration" of a class plaintiff's claim "only reinforces [the claim's] inherently transitory nature," and makes certifying a class *more* appropriate, not less. *Id.* ("[T]he ephemerality of individual claims makes class-action treatment 'particularly important' so as to 'ensur[e] that a justiciable claim is before the Court.'") (quoting *Gratz v. Bollinger*, 539 U.S. 244, 268 (2003)). And the claims of the class members here are even more ephemeral than in *J.D.*, as a result of Defendants' strategic effort to take any child that Plaintiff's counsel identifies out of the Title 42 Process. *See* ECF No. 2-1 at 5-6, 10; 2d Kang Decl., ¶¶ 1-4.

Defendants state their "disagree[ment]" with *J.D.*, Opp. 17, but offer no way of distinguishing this binding precedent. And despite Defendants' unsupported speculation that "presumably" Plaintiff is "now focused on his own Title 8 immigration case," *id.*, Plaintiff remains willing to vigorously represent the class, *see* Declaration of P.J.E.S. Any other challenges to class certification are now waived. *See, e.g.*, *Texas v. United States*, 798 F.3d 1108, 1113-15 (D.C. Cir. 2015) (citing LCvR 7(b)).

**IV.    THE COURT SHOULD EXPRESSLY CONFIRM THAT ITS PRELIMINARY INJUNCTION APPLIES TO THE FINAL RULE AND ANTICIPATED NEW CDC ORDER, SUBJECT TO FUTURE COURT ORDER.**

As Defendants note, they have provided in the new Final Rule that it will become effective immediately if "the IFR ceases to be in effect" before October 13, 2020.  Opp. 10; *see* 85 Fed. Reg. at 56424.  Thus, if the Court issues an injunction but does not specify that it encompasses the Final Rule and any substantially similar CDC Order granted under its terms, Defendants are likely to argue that the injunction would have no effect because the Final Rule would displace the IFR.  The Court should not countenance such gamesmanship, forcing Plaintiff to seek a new injunction and allowing the government to continue to illegally expel children indefinitely—in addition to the months of delay and thousands of illegal expulsions Defendants have already achieved by frustrating review through their tactical attempts to consistently moot individual cases.  The Title 42 Process, as applied to the proposed class members, violates § 265 because that statute includes no power of expulsion, and denies class members their rights under the TVPRA, the asylum and withholding statutes, and our obligations under CAT.  Nothing in the Final Rule changes that.  If Defendants want to argue otherwise, they should be required to file a motion to amend or vacate the injunction.[18]

\*         \*         \*

Section 265 is a powerful tool permitting the government to prohibit transportation to this country.  It is also not Defendants' only tool.  Individuals entering from a foreign country can be detained, examined, and quarantined.  42 U.S.C. § 264(c).  Noncitizens can be deported under the immigration laws, subject to any applicable substantive and procedural protections.  *See* 8 U.S.C. §§ 1182(a)(1), 1222.  Adults without documentation can be put into a special system

---

[18] The Court should dispense with any bond requirement in granting Plaintiff classwide interim relief.  "Rule 65(c) gives the Court wide discretion in the matter of requiring security."  *NRDC v. Morton*, 337 F. Supp. 167, 168 (D.D.C. 1971).  "[C]ourts have held that security is not necessary where requiring security would have the effect of denying the plaintiffs their right to judicial review of administrative action."  *Id.*; *Michigan Citizens for an Indep. Press v. Thornburgh*, No. CIV.A. 88-2322, 1988 WL 90388, at \*8 n.12 (D.D.C. Aug. 17, 1988).  Here, proposed class members are unaccompanied children seeking humanitarian relief who have limited access to financial resources.

Congress set up to speed deportations while protecting certain vulnerable migrants.  *See* 8 U.S.C. § 1225(b)(1) ("expedited removal").  Defendants can prosecute and fine individuals who violate quarantines, 42 U.S.C. § 271, or enter without inspection, 8 U.S.C. § 1325.

Further, the President has the power to "suspend the entry of all aliens or any class of aliens as immigrants or nonimmigrants" where such entry would be "detrimental to the interests of the United States."  8 U.S.C. § 1182(f).  Notably, Congress specifically contemplated this power might be used in the case of an epidemic abroad.  *See* 98 Cong. Rec. 4423 (1952) (statement of Rep. Walter, bill sponsor) (calling provision "absolutely essential" to have such power "when there is an outbreak of an epidemic in some country").  And the President has used his § 1182(f) authority to address COVID-19.  *See* 85 Fed. Reg. 16,559, 16562 (Mar. 24, 2020).  But even the substantial power under § 1182(f) does not override the TVPRA and protection statutes.  *See* PI Mot. 25 (citing *East Bay Sanctuary Covenant*, 932 F.3d at 760).

If Defendants believe these vast powers are insufficient, the Constitution prescribes the solution: "When a new situation arises outside the scope of an old statute, the proper approach under our system of separation of powers is for Congress to amend the statute, not for the Executive Branch and the courts to rewrite the statute beyond what the statute's terms can reasonably bear."  *District of Columbia*, 819 F.3d at 450.[19]

## CONCLUSION

This Court should grant Plaintiff's Motions for Class Certification and for a Classwide Preliminary Injunction, and explicitly confirm that the injunction applies to the Final Rule.

---

[19] Congress has responded to COVID-19 with *extensive* legislation and can do so again if it wishes to provide additional authority to the agencies.  *See* Coronavirus Preparedness and Response Supplemental Appropriations Act, Pub. L. No. 116-123, 134 Stat. 146 (Mar. 6, 2020); Families First Coronavirus Response Act, Pub. L. No. 116-127, 134 Stat. 178 (Mar. 18, 2020); Coronavirus Aid, Relief, and Economic Security Act, Pub. L. No. 116-136, 134 Stat. 281 (Mar. 27, 2020); Paycheck Protection Program and Health Care Enhancement Act, Pub. L. No. 116-139, 134 Stat. 620 (Apr. 24, 2020).

Dated: September 15, 2020                   Respectfully submitted,

                                            /s/ *Lee Gelernt*

Stephen B. Kang*                            Lee Gelernt*
Cody Wofsy*                                 Daniel A. Galindo*
Morgan Russell*                             Celso J. Perez (D.C. Bar No. 1034959)
Adrienne Harrold*                           Omar Jadwat*
American Civil Liberties Union Foundation,  American Civil Liberties Union Foundation,
Immigrants' Rights Project                  Immigrants' Rights Project
39 Drumm Street                             125 Broad Street, 18th Floor
San Francisco, CA 94111                     New York, NY 10004
Tel: (415) 343-0770                         Tel: (212) 549-2600

Andre Segura                                Robert Silverman***
Kathryn Huddleston                          Oxfam America
Rochelle Garza                              Boston, MA 02115, Suite 500
Brantley Shaw Drake                         Tel: (617) 482-1211
American Civil Liberties Union Foundation
of Texas, Inc.                              Scott Michelman (D.C. Bar No. 1006945)
5225 Katy Freeway, Suite 350                Arthur B. Spitzer (D.C. Bar No. 235960)
Houston, Texas 77007                        American Civil Liberties Union Foundation of
Tel. (713) 942-8146                         the District of Columbia
                                            915 15th Street NW, Second Floor
Karla M. Vargas*                            Washington, D.C. 20005
Efren C. Olivares*                          Tel: (202) 457-0800
Texas Civil Rights Project
1017 W. Hackberry Ave.                      Jamie Crook (D.C. Bar No. 1002504)
Alamo, Texas 78516                          Blaine Bookey
Tel: (956) 787-8171                         Karen Musalo
                                            Center for Gender & Refugee Studies
                                            200 McAllister St.
                                            San Francisco, CA 94102
                                            Tel: (415) 565-4877
                                            *Attorneys for Plaintiff*

                                            *Admitted pro hac vice*
                                            ****Pro hac vice application forthcoming*