# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

<table>
<tr>
<td>

**P.J.E.S., a minor child by and through his father and next friend, Mario Escobar Francisco, on behalf of himself and others similarly situated,**

                    **Plaintiff,**

     **v.**

**CHAD F. WOLF, Acting Secretary of Homeland Security, in his official capacity,** *et al.***,**

                    **Defendants.**

</td>
<td>

**Case No. 1:20-cv-2245 (EGS/GMH)**

</td>
</tr>
</table>

## MAGISTRATE JUDGE'S
## REPORT AND RECOMMENDATION

     Plaintiff is a 15-year-old minor from Guatemala who crossed into the United States from Mexico in August 2020 unaccompanied by a responsible adult and was apprehended by Customs and Border Patrol shortly thereafter.  Recent agency action in response to the COVID-19 pandemic—specifically, an interim final rule promulgated by the Department of Health and Human Services and a series of orders issued by Defendant Robert R. Redfield, Director of the Centers for Disease Control and Prevention ("CDC"), pursuant to Section 362 of the Public Health Service Act, 42 U.S.C. § 265 ("Section 265")—allowed the government to detain Plaintiff pending expulsion from the United States without many of the legal protections that he would otherwise have enjoyed under various immigration laws.  In his present action against various federal officials ("Defendants" or the "government"), Plaintiff seeks an injunction prohibiting enforcement of those procedures, which Plaintiff collectively calls the "Title 42 Process," against those situated similarly to Plaintiff—that is, unaccompanied non-citizen children detained in the United States by the

government after entering the country.  He argues that the Title 42 Process violates the Administrative Procedure Act, 5 U.S.C. §§ 706(1), 706(2)(A), because the expulsion of non-citizens from the United States in the manner contemplated and practiced exceeds the authority granted by Section 265; conflicts with certain immigration laws—specifically, the Trafficking Victims Protection Reauthorization Act of 2008 ("TVPRA"), 8 U.S.C. § 1232, various provisions of the Immigration and Nationality Act ("INA"), 8 U.S.C. § 1101 *et seq.*, and the Foreign Affairs Reform and Restructuring Act of 1998 ("FARRA"), 8 U.S.C. § 1231 Note; and constitutes arbitrary and capricious agency action because the agency did not offer a reasoned explanation for applying the Title 42 Process to unaccompanied children.

Currently before the Court are (1) Plaintiff's request for provisional certification of a class defined as all unaccompanied non-citizen children who are or will be detained in U.S. government custody in the United States and who are or will be subjected to the Title 42 Process and (2) his request for a preliminary injunction prohibiting enforcement of that process against members of the putative class.[1]  For the reasons that follow, Plaintiff's motion for class certification should be provisionally granted and his motion for a preliminary injunction should be granted.

---

[1] Judge Sullivan referred this case to the undersigned for full case management.  The docket entries relevant to this Report and Recommendation are (1) Plaintiff's Complaint (ECF No. 1), (2) his motion for class certification and its exhibits (ECF Nos. 2 through 2-4), (3) his motion for preliminary injunction and its exhibits (ECF No. 14-1 (sealed exhibit); ECF Nos. 15 through 15-12 (redacted opening brief and non-sealed exhibits)), (4) the government's combined opposition to both motions and its exhibits (ECF Nos. 42 through 42-5 (redacted opposition brief and non-sealed exhibits); ECF Nos. 44-2, 44-3 (sealed, unredacted brief and sealed exhibit)), (5) Plaintiff's combined reply and its exhibits (ECF No. 51-1 (sealed, unredacted reply); ECF Nos. 52 through 52-4 (redacted reply and non-sealed exhibits)), (6) the government's motion to strike or, in the alternative, motion for leave to file an additional declaration and its exhibits (ECF No. 58), (7) Plaintiff's response to the government's motion to strike/motion for leave to file (ECF No. 61), and (8) the government's reply in further support of its motion to strike/motion for leave to file (ECF No. 63).  In addition, the undersigned has considered the briefs of *amici curiae* Scholars of Refugee and Immigration Law (ECF No. 36), the International Refugee Assistance Project (ECF No. 37), and the Immigration Reform Law Institute ("IRLI") (ECF No.57).  Page numbers cited herein are those assigned by the Court's CM/ECF system.

## I.     BACKGROUND

Because resolution of Plaintiff's preliminary injunction motion hinges, at least in part, on
the legal question of whether the agency regulations, orders, and guidance implementing the Title
42 Process conflict with various federal statutes, this section begins with an outline of the statutory
and regulatory enactments comprising the Title 42 Process, then discusses a similar prior case in
this District brought by an unaccompanied minor who had been subjected to the Title 42 Process,
and concludes with Plaintiff's participation in that process.

### A.     Statutory and Regulatory Background

Section 265 states:

> Whenever the Surgeon General determines that by reason of the existence of any
> communicable disease in a foreign country there is serious danger of the introduc-
> tion of such disease into the United States, and that this danger is so increased by
> the introduction of persons or property from such country that a suspension of the
> right to introduce such persons and property is required in the interest of the public
> health, the Surgeon General, in accordance with regulations approved by the Pres-
> ident, shall have the power to prohibit, in whole or in part, the introduction of per-
> sons and property from such countries or places as he shall designate in order to
> avert such danger, and for such period of time as he may deem necessary for such
> purpose.

42 U.S.C. § 265.  The parties agree that this provision passed in 1944 as part of the Public Health
Service Act, Pub. L. 78-410, § 362, 58 Stat. 682, 704 (1944), is based on and substantially similar
to a provision in a statute enacted in 1893 (the "1893 Act") that gave the President "the power to
prohibit, in whole or in part, the introduction of persons or property" from foreign countries that,
"by reason of the existence of cholera or contagious diseases" in those countries, "posed a serious
danger of introduction of the same into the United States."  ECF No. 5-5 at 5 (attaching Act of
February 15, 1893, ch. 114, § 7, 27 Stat. 449, 452).  Since the enactment of Section 265, the au-
thority of the Surgeon General passed to the Secretary of the Department of Health and Human

Services, who then delegated it to the Director of the CDC.  *See* Control of Communicable Diseases; Foreign Quarantine: Suspension of Introduction of Persons into United States from Designated Foreign Countries or Places for Public Health Purposes [hereinafter, "Interim Final Rule"], 85 Fed. Reg. 16,559-01, 16560 & n.1 (Mar. 24, 2020) (effective Mar. 20, 2020) (codified at 42 C.F.R. § 71.40).

Relying on that authority, and in light of the COVID-19 pandemic, on March 24, 2020, the CDC published the Interim Final Rule to implement Section 265 "and other applicable provisions of the [Public Health Service] Act" to provide a "robust, efficient mechanism for exercising the authority . . . to suspend the introduction of persons into the United States, should the public health require it."  Interim Final Rule, 85 Fed. Reg. 16,559-01, 16,562.  The rule enabled the CDC Director to

> prohibit the introduction into the United States of persons from designated foreign countries (or one or more political subdivisions and regions thereof) or places . . . by issuing an order in which the Director determines that:
>
> > (1)     By reason of the existence of any communicable disease in a foreign country (or one or more political subdivisions or regions thereof) or place, there is serious danger of the introduction of such communicable disease into the United States, and
> >
> > (2)     This danger is so increased by the introduction of persons from such country (or one or more political subdivisions or regions thereof) or place that a suspension of the introduction of such persons into the United States is required in the interest of the public health.

Interim Final Rule, 85 Fed. Reg. 16,559-01, 16,563.  It further defined

> "introduction into the United States of persons" from a foreign country . . . to clarify that "introduction" can encompass those who have physically crossed a border of the United States and are in the process of moving into the interior in a manner the Director determines to present a risk of transmission of a communicable disease. This additional mechanism to halt the travel of such persons and rapidly moving them outside the United States constitutes preventing their "introduction" into the United States.

Interim Final Rule, 85 Fed. Reg. 16,559-01, 16,563.

Two days later, the CDC Director issued the first of a series of three orders (the "CDC Orders") directed to preventing the "introduction" of certain persons into the United States in the interest of public health.  The order asserts that

> a serious danger of the introduction of COVID-19 into the land [ports of entry] and Border Patrol stations at or near the United States borders with Canada and Mexico, and into the interior of the country as a whole, because COVID-19 exists in Canada, Mexico, and the other countries of origin of persons who migrate to the United States across the land borders with Canada and Mexico.

Notice of Order Under Sections 362 and 365[2] of the Public Health Service Act Suspending Introduction of Certain Persons from Countries Where a Communicable Disease Exists [hereinafter, "March 20 Order"], 85 Fed. Reg. 17,060-02, 17,061 (Mar. 26, 2020) (effective Mar. 20, 2020). The CDC Director found that "persons travelling from Canada or Mexico (regardless of their country of origin)" who must be held for significant periods of time in "congregate settings" at land ports of entry and Border Patrol stations as they undergo immigration processing "would typically be aliens seeking to enter the United States at [ports of entry] who do not have proper travel documents, aliens whose entry is otherwise contrary to law, and aliens who are apprehended near the border seeking to unlawfully enter the United States."  March 20 Order, 85 Fed. Reg. at 17,061. The order further states that land Ports of Entry and Border Patrol stations "are not equipped to[ ] quarantine, isolate, or enable social distancing by persons who are or may be infected with COVID-19" and that the "public health tool called conditional release, which involves the release of potentially infected individuals from federal custody subject to conditions calculated to mitigate the risk of disease transmission, such as mandatory self-isolation and CDC monitoring at home"

---

[2] Section 365 of the Public Health Act, codified at 42 U.S.C. § 268, assigns to customs and Coast Guard officers the "duty . . . to aid in the enforcement of quarantine rules and regulations."

is "not a viable solution" because many such aliens "may lack homes or other places in the United States where they can self-isolate, and CDC lacks the resources and personnel necessary to effectively monitor such a large number of persons."  March 20 Order, 85 Fed. Reg. at 17,061, 17,067. Therefore, as "[t]he introduction into [those] congregate settings" of these "covered aliens"—defined as "persons travelling from Canada or Mexico (regardless of their country of origin) who would otherwise be introduced into a congregate setting in a land Port of Entry or Border patrol station at or near the United States border with Canada and Mexico"—increased the public health risk posed by the pandemic, the CDC Director "suspend[ed] the introduction of all covered aliens into the United States for a period of 30 days," noting that "[t]he faster a covered alien is returned to the country from which they entered the United States, to their country of origin, or another location as practicable, the lower the risk the alien poses of introducing, transmitting, or spreading COVID-19" in the United States.[3]  March 20 Order, 85 Fed. Reg. at 17,061, 17,067.

The duration of the March 20 Order was extended for another 30 days on April 22, 2020. Extension of Order Under Sections 362 and 365 of the Public Health Service Act; Order Suspending Introduction of Certain Persons from Countries Where a Communicable Disease Exists, 85 Fed. Reg. 22,424-01 (Apr. 22, 2020) (effective date Apr. 20, 2020).  And, in an order known as the "May 20 Order," the CDC Director amended the March 20 Order (as extended) to "clarify that it applies to land and coastal Ports of Entry and Border Patrol stations that would otherwise hold aliens in a congregate setting"[4] and extended its duration "until he determines the risk of further

---

[3] The March 20 Order exempts from its coverage U.S. citizens, lawful permanent residents, and military personnel; the spouses and children of those individuals; individuals from foreign countries who hold valid travel documents; and individuals from foreign countries in the visa waiver program not otherwise subject to travel restrictions.  March 20 Order, 85 Fed. Reg. at 17,061.  It also allows customs officers to make individualized exceptions on a case-by-case basis under a totality of the circumstances, "including consideration of significant law enforcement, officer and public safety, humanitarian, and public health interests."  March 20 Order, 85 Fed. Reg. at 17,061.

[4] The May 20 Order "recognizes that in certain limited instances, a fact-based inquiry may be required to determine whether individuals are covered aliens within the meaning of the [May 20 Order].  For example, it may be unclear

COVID-19 into the United States from covered aliens has ceased to be a serious danger to the public health."  Amendment and Extension of Order Under Sections 362 and 365 of the Public Health Service Act; Order Suspending Introduction of Certain Persons from Countries Where a Communicable Disease Exists [hereinafter, "May 20 Order"], 85 Fed. Reg. 31,503-02, 31,504 (May 26, 2020) (effective May 21, 2020).

On September 11, 2020, the CDC published a final rule with an effective date of October 13, 2020, unless the Interim Final Rule "is vacated or enjoined by a court, in which case the Secretary [of Health and Human Services] will publish a document in the Federal Register announcing an updated effective date for th[e] [final] rule."  Control of Communicable Diseases; Foreign Quarantine: Suspension of the Right to Introduce and Prohibition of Introduction of Persons into United States from Designated Foreign Countries or Places for Public Health Purposes [hereinafter, "Final Rule"], 85 Fed. Reg. 56,424-01, 56,424 (Sept. 11, 2020) (effective Oct. 13, 2020) (to be codified at 42 C.F.R. 71.40).  The Final Rule makes some changes to the Interim Final Rule: the title is changed to replace the term "communicable disease" with the term "quarantinable communicable disease," it adds a requirement that the CDC Director include in any order issued under the regulation a statement about the danger of introduction of the disease in the places from which people are being prohibited, and it no longer uses the word "vector" to refer to humans.  Final Rule, 85 Fed. Reg. at 56,443–56,444.  However, the material provisions remain the same and are "clarified" by explanations of the agency's interpretations of the language of Section 265.  For example, the Final Rule states that the term "introduction" includes the situation "when a person on U.S. soil moves further into the United States"; that the phrase "prohibit, in whole or in part, the introduction

whether individuals who arrive at a coastal border by boat departed from Mexico, or another country, such as Haiti."
May 20 Order, 85 Fed. Reg. at 31,507 n.28.  The CDC "defer[red]" to the Department of Homeland Security "regarding the operational considerations necessary to address such scenarios."  May 20 Order, 85 Fed. Reg. at 31,507 n.28.

into the United States of persons" includes the power of "physically expelling from the United

States some or all of the persons"; and that the phrase "suspension of the right to introduce" means

"to cause the temporary cessation of the effect of any law, rule, decree, or order pursuant to which

a person might otherwise have the right to be introduced or seek introduction into the United

States."  Final Rule, 85 Fed. Reg. at 56,425–56,426.  Further, the Final Rule declares that "[n]o

action can or will be taken under this final rule absent an administrative Order issued by the [CDC]

Director."[5]  Final Rule, 85 Fed. Reg. at 56,425.

---

[5] Pursuant to the Final Rule, 42 C.F.R. § 71.40 will read:

Suspension of the right to introduce and prohibition of the introduction of persons into the United States from designated foreign countries or places for public health purposes.

(a)　　The Director may prohibit, in whole or in part, the introduction into the United States of persons from designated foreign countries (or one or more political subdivisions or regions thereof) or places, only for such period of time that the Director deems necessary to avert the serious danger of the introduction of a quarantinable communicable disease, by issuing an order in which the Director determines that:
> (1)　　 By reason of the existence of any quarantinable communicable disease in a foreign country (or one or more political subdivisions or regions thereof) or place there is serious danger of the introduction of such quarantinable communicable disease into the United States; and
> (2)　　This danger is so increased by the introduction of persons from such country (or one or more political subdivisions or regions thereof) or place that a suspension of the right to introduce such persons into the United States is required in the interest of public health.

(b)　　 For purposes of this section:
> (1)　　Introduction into the United States means the movement of a person from a foreign country (or one or more political subdivisions or regions thereof) or place, or series of foreign countries or places, into the United States so as to bring the person into contact with persons or property in the United States, in a manner that the Director determines to present a risk of transmission of a quarantinable communicable disease to persons, or a risk of contamination of property with a quarantinable communicable disease, even if the quarantinable communicable disease has already been introduced, transmitted, or is spreading within the United States;
> (2)　　Prohibit, in whole or in part, the introduction into the United States of persons means to prevent the introduction of persons into the United States by suspending any right to introduce into the United States, physically stopping or restricting movement into the United States, or physically expelling from the United States some or all of the persons;
> (3)　　Serious danger of the introduction of such quarantinable communicable disease into the United States means the probable introduction of one or more persons capable of transmitting the quarantinable communicable disease into the United States, even if persons or property in the United States are already infected or contaminated with the quarantinable communicable disease;
> (4)　　The term Place includes any location specified by the Director, including any carrier, as that term is defined in 42 C.F.R. 71.1, whatever the carrier's flag, registry, or country of origin; and
> (5)　　Suspension of the right to introduce means to cause the temporary cessation of the effect of any law, rule, decree, or order pursuant to which a person might otherwise have the right to be introduced or seek introduction into the United States.

(c)　　Any order issued by the Director under this section shall include a statement of the following:

Meanwhile, on April 2, 2020, Customs and Border Protection issued a memorandum regarding its implementation of the Title 42 Process.  ECF No. 15-4, ¶ 6; ECF No. 15-5 at 15–18.

---

(1)    The foreign countries (or one or more political subdivisions or regions thereof) or places from which the introduction of persons shall be prohibited;

(2)    The period of time or circumstances under which the introduction of any persons or class of persons into the United States shall be prohibited;

(3)    The conditions under which that prohibition on introduction shall be effective in whole or in part, including any relevant exceptions that the Director determines are appropriate;

(4)    The means by which the prohibition shall be implemented; and

(5)    The serious danger posed by the introduction of the quarantinable communicable disease in the foreign country or countries (or one or more political subdivisions or regions thereof) or places from which the introduction of persons is being prohibited.

(d)    When issuing any order under this section, the Director shall, as practicable under the circumstances, consult with all Federal departments or agencies whose interests would be impacted by the order. The Director shall, as practicable under the circumstances, provide the Federal departments or agencies with a copy of the order before issuing it. In circumstances when it is impracticable to engage in such consultation before taking action to protect the public health, the Director shall consult with the Federal departments or agencies as soon as practicable after issuing his or her order, and may then modify the order as he or she determines appropriate. In addition, the Director may, as practicable under the circumstances, consult with any State or local authorities that he or she deems appropriate in his or her discretion.

    (1)    If the order will be implemented in whole or in part by State and local authorities who have agreed to do so under 42 U.S.C. 243(a), then the Director shall explain in the order the procedures and standards by which those authorities are expected to aid in the enforcement of the order.

    (2)    If the order will be implemented in whole or in part by designated customs officers (including any individual designated by the Department of Homeland Security to perform the duties of a customs officer) or Coast Guard officers under 42 U.S.C. 268(b), or another Federal department or agency, then the Director shall, in coordination with the Secretary of Homeland Security or other applicable Federal department or agency head, explain in the order the procedures and standards by which any authorities or officers or agents are expected to aid in the enforcement of the order, to the extent that they are permitted to do so under their existing legal authorities.

(e)    This section does not apply to:

    (1)     Members of the armed forces of the United States and associated personnel if the Secretary of Defense provides assurance to the Director that the Secretary of Defense has taken or will take measures such as quarantine or isolation, or other measures maintaining control over such individuals, to prevent the risk of transmission of the quarantinable communicable disease into the United States; or

    (2)    Other United States government employees or contractors on orders abroad, or their accompanying family members who are on their orders or are members of their household, if the Director receives assurances from the relevant head of agency and determines that the head of the agency or department has taken or will take, measures such as quarantine or isolation, to prevent the risk of transmission of a quarantinable communicable disease into the United States.

(f)    This section shall not apply to U.S. citizens, U.S. nationals, and lawful permanent residents.

(g)    Any provision of this section held to be invalid or unenforceable by its terms, or as applied to any person or circumstance, shall be construed so as to continue to give the maximum effect to the provision permitted by law, unless such holding shall be one of utter invalidity or unenforceability, in which event the provision shall be severable from this section and shall not affect the remainder thereof or the application of the provision to persons not similarly situated or to dissimilar circumstances.

85 Fed. Reg. at 56,459–56,460.

The memorandum directs agents to determine whether a non-citizen who has been intercepted near the border is a "covered alien" as defined in the CDC Orders "[b]ased on training, experience, physical observation, technology, questioning[,] and other considerations."  ECF No. 15-5 at 15. If an individual is determined to be a "covered alien" and therefore "amenable to expulsion under [the CDC Orders]," the individual is to be "transported to the nearest [port of entry] and immediately returned to Mexico or Canada, depending on their point of transit"; those who "are not amenable to immediate expulsion to Mexico or Canada" are to be "transported to a dedicated facility"—"a tent, soft-sided facility[,] or predesignated [Customs and Border Protection/Border Patrol] facility with dedicated space"—"for limited holding prior to expulsions to the alien's country of citizenship."  *Id.* at 16–17.  "Covered aliens" who make "an affirmative, spontaneous[,] and reasonably believable claim that they fear being tortured in the country they are being sent back to" are to be referred to Citizenship and Immigration Services to determine if they should be provided an asylum hearing.  *Id.* at 18.  Those who are not "covered aliens" are to be "process[ed] under existing statutory authorities found in Title 8 of the U.S. Code," which includes the TVPRA, the INA, and the FARRA, among other immigration statutes.  ECF No. 15-5 at 16.

### B.    *JBBC v. Wolf*

In an action filed on June 9, 2020, a minor from Honduras proceeding pseudonymously as J.B.B.C, who was apprehended by Customs and Border patrol agents after he crossed unaccompanied into the United States from Mexico, challenged the Title 42 Process, making substantially similar allegations as those made by Plaintiff here, with the exception of the class allegations. *Compare* ECF No. 1, *with* Complaint, *JBBC v. Wolf*, No. 20-cv-1509 (D.D.C. June 9, 2020), ECF No. 1.  J.B.B.C. also filed a motion for a temporary restraining order seeking to enjoin his expulsion from the United States, arguing, as Plaintiff does here, that Section 265 does not authorize

expulsion of non-citizens; that the Title 42 Process violates mandatory protections for unaccompanied non-citizen children included in the TVPRA as well as rights under the asylum and withholding of removal provisions of the INA; and that the Title 42 Process constitutes arbitrary and capricious agency action because it lacks a reasoned explanation as to why the agency failed to exempt unaccompanied children from its purview. Memorandum of Law in Support of Emergency Motion for Temporary Restraining Order at 8–16, *JBBC*, No. 20-cv-1509 (D.D.C. June 9, 2020), ECF No. 2-1. The government agreed not to return J.B.B.C. to Honduras pending resolution of that motion, and Judge Nichols entered an order temporarily staying his removal. Scheduling Order, *JBBC*, No. 20-cv-1509 (D.D.C. June 11, 2020), ECF No. 9; Hearing Transcript at 47, *JBBC*, No. 20-cv-1509 (D.D.C. June 26, 2020), ECF No. 39 [hereinafter, "*JBBC* Transcript"].

Judge Nichols held a hearing on June 24, 2020, on Plaintiff's motion for a temporary restraining order and announced his ruling from the bench. He found that J.B.B.C. was likely to succeed on the merits of his claim. He stated, first, that there was a "serious question" about whether Section 265's grant of the power "to prohibit the introduction of persons and property" could be read to "include[ ] the power also to remove or exclude persons who are already present in the United States," noting that, while immigration statutes "reference the power to return or to remove," Section 265 dies not include those terms. *JBBC* Transcript at 50. Second, he found that, even if Section 265 were read to include the power to remove, it would still have to be harmonized with immigration statutes, including those that "grant special protection to minors" and that "deal with communicable diseases and quarantines." *JBBC* Transcript at 50. He further found that the CDC Director's definition of "introduction" to include the power to expel from the United States was likely not entitled to deference under *Chevron U.S.A., Inc. v. Natural Resources Defense Council*, 467 U.S. 837 (1984), because Section 265 "needs to be read in light of [immigration]

11

statutes that the CDC director quite plainly has no special expertise reading" and because the CDC Director provided "little by way of analysis of what the power to prohibit the introduction of persons and property means." *JBBC* Transcript at 50–51. Judge Nichols did not reach the question of whether the Title 42 Process is arbitrary and capricious, but indicated that he would "likely conclude that [it] . . . was not" because the steps the government has taken were "appropriate to ensure . . . the reduced communication of the disease." *Id.* at 51. In addition, Judge Nichols ruled that J.B.B.C. had established that he was likely to suffer irreparable harm in the absence of a temporary restraining order and that the balance of harms and public interest weighed in favor of granting the motion in light of the fact that only a single individual was at issue and he had no symptoms of COVID-19. *Id.* at 51–52.

Although at the hearing, the parties in *JBBC* anticipated an expedited schedule for summary judgment briefing (*id.* at 53–54 ("I will stress that I would like the merits briefing to move quickly."); Order, *JBBC*, No. 20-cv-1509 (D.D.C. June 24, 2020), ECF No. 38 (giving the parties five days to propose a summary judgment briefing schedule)), such briefing was ultimately unnecessary. On June 29, 2020, the parties filed a document stating that the government had "transferred the custody of [J.B.B.C.] to the Office of Refugee Resettlement"—presumably pursuant to the TVPRA, which directs that "unaccompanied alien child[ren]" from non-contiguous countries who are in the custody of the federal government must be transferred to the custody of that office "not later than 72 hours after determining that such child is an unaccompanied alien child," 8 U.S.C. § 1232(b)(3); *see also* 6 U.S.C. § 279(b)(1)(A) (describing the functions of the Office of Refugee Resettlement)—"for immigration processing under Title 8 of the U.S. Code." Notice to the Court at 1, *JBBC*, No. 20-cv-1509 (D.D.C. June 29, 2020). The government therefore planned to file a motion to dismiss the case as moot. *Id.* On July 2, 2020, an amended complaint was filed, adding

E.Y., an unaccompanied non-citizen minor from Guatemala, as a plaintiff.  Amended Complaint, *JBBC*, No. 20-cv-1509 (D.D.C. July 2, 2020), ECF No. 42.  Declarations filed in connection with the government's motion to dismiss the amended complaint represented that both J.B.B.C. and E.Y. had been excepted from the Title 42 Process and transferred to the custody of the Office of Refugee Resettlement in order that their cases could proceed in immigration court.  Second Declaration of Robert Danley, ¶ 4, *JBBC*, No. 20-cv-1509 (D.D.C. July 23, 2020), ECF No. 47-1; Second Declaration of Danielle Hernandez, ¶ 4, *JBBC*, No. 20-cv-1509 (D.D.C. July 23, 2020), ECF No. 47-2.  Thereafter, the plaintiffs filed a notice of voluntary dismissal on August 6, 2020. Plaintiffs' Notice of Voluntary Dismissal Without Prejudice, *JBBC*, No. 20-cv-1509 (D.D.C. Aug. 6, 2020), ECF No. 48.

### C.    Plaintiff's Complaint and Subsequent Developments

According to the Complaint, Plaintiff is a 15-year-old boy from an indigenous Mayan family in Guatemala.  ECF No. 1, ¶¶ 77, 79.  His father resides in the United States and has a pending immigration case.  *Id.*, ¶ 78.  Plaintiff alleges that he fled Guatemala after being threatened with death due to his father's political opinions and also because he refused to join a gang.  *Id.*, ¶ 79. He entered the United States from Mexico and was apprehended by Border Patrol agents on or around August 11, 2020.  *Id.*  He was placed in custody in McAllen, Texas, and subjected to the Title 42 Process.  *Id.*

The Complaint further alleges that, according to Congressional testimony by the Acting Commissioner of Customs and Border Protection, as of June 25, 2020, "over 2,000 unaccompanied children had been deported under the Title 42 Process."  *Id.*, ¶ 70.  Correspondingly, the total number of children in the custody of the Office of Refugee Resettlement has plummeted: whereas

in April, the office had 12,500 children in its custody, in May it had approximately 1,600 and in

June, approximately 975. *Id.*, ¶ 73.

The Complaint pleads seven causes of action:

(1)     The Title 42 Process violates mandatory provisions in the TVPRA relating
        to the processing, custody, release, and removal of unaccompanied children;

(2)     The Title 42 Process was not authorized by Section 265, the provision under
        which it was purportedly established;

(3)     The Title 42 Process violates provisions in the INA governing the processes
        by which a non-citizen can be granted withholding of removal;

(4)     The Title 42 Process violates provisions in the INA governing the granting
        of asylum;

(5)     The Title 42 Process violates the provision in the FARRA governing the
        determination of whether a non-citizen minor can be returned to a country
        where he is likely to face torture;

(6)     The Title 42 Process violates provisions in the INA establishing the proce-
        dure by which the government may determine whether a non-citizen minor
        should be removed; and

(7)     Applying the Title 42 Process to unaccompanied minors constitutes arbi-
        trary and capricious agency action because the government failed to articu-
        late a reasoned explanation and to consider relevant factors in making the
        decision to do so.

ECF No. 1, ¶¶ 108–146.  In the Complaint and in his simultaneously-filed motion for class certi-

fication, Plaintiff seeks certification of a class comprising "[a]ll unaccompanied noncitizen chil-

dren who (1) are or will be detained in U.S. government custody in the United States, and (2) are

or will be subjected to the Title 42 Process"; he also requests appointment of class counsel. *Id.* at

30; *see generally* ECF No. 2-1.  He further seeks a declaration that the Title 42 Process is unlawful

as applied to Plaintiff and the putative class and an order requiring Defendants to stay their expul-

sion from the United States under the Title 42 Process and afford the protections of the TVPRA,

INA, and FARRA.  ECF No. 1 at 30.

On August 14, 2020, after Plaintiff filed this action and his counsel met and conferred with counsel for the government, Defendants agreed not to subject Plaintiff to the Title 42 Process and to transfer him to the custody of the Office of Refugee Resettlement—a program of the Department of Health and Human Services responsible for the care of unaccompanied non-citizen children in the United States—to be processed pursuant to normal immigration procedures under Title 8 of the U.S. Code.  ECF No. 15-1 at 20; ECF No. 44-2 at 28; *see also* ECF No. 14-1, ¶ 11.  Plaintiff is currently residing in a shelter run by the Office of Refugee Resettlement.  ECF No. 52-1, ¶ 3. Thereafter, on August 20, 2020, Plaintiff filed a motion for a preliminary injunction seeking an order enjoining Defendants from applying the Title 42 Process to the putative class members.  ECF No. 15-2 at 1.

## II.    DISCUSSION

### A.    Motion for Class Certification

A party seeking class certification must show that it meets the "four threshold require-ments" of Rule 23(a) of the Federal Rules of Civil Procedure: "(1) numerosity (a 'class [so large] that joinder of all members is impracticable'); (2) commonality ('questions of law or fact common to the class'); (3) typicality (named parties' claims or defenses 'are typical . . . of the class'); and (4) adequacy of representation (representatives 'will fairly and adequately protect the interests of the class')."  *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 613 (1997) (alterations in original) (quoting Fed. R. Civ. P. 23(a)).  Where, as here, the plaintiff seeks certification of a class under Rule 23(b)(2), he must also show that "the party opposing the class has acted or refused to act on grounds generally applicable to the class, so that final injunctive relief or corresponding declara-tory relief is appropriate respecting the class as a whole."  Fed. R. Civ. P. 23(b)(2).

Plaintiff has clarified that, at this point, he seeks only *provisional* class certification.  ECF No. 15-1 at 2, 10 n.1.  Although a plaintiff requesting provisional certification must still demonstrate that Rule 23's requirements are met, the court's normally "rigorous analysis" is "tempered [ ] by the understanding that such certifications 'may be altered or amended before the decision on the merits.'"  *Damus v. Nielsen*, 313 F. Supp. 3d 317, 329 (D.D.C. 2018) (first quoting *Gen. Tel. Co. of Sw. v. Falcon*, 457 U.S. 147, 161 (1982), then quoting *Bame v. Dillard*, No. 05-cv-1833, 2008 WL 2168393, at *5 (D.D.C. May 22, 2008)); *accord Kirwa v. Dep't of Def.*, 285 F. Supp. 3d 21, 44 (D.D.C. 2017); *see also, e.g., Afghan and Iraqi Allies Under Serious Threat Because of their Faithful Service to the U.S. v. Pompeo*, No. 18-cv-1388 (TSC), 2019 WL 367841, at *1 n.1 (D.D.C. Jan. 30, 2019) (granting provisional class certification "for the sole purpose of resolving" a motion for preliminary injunction, a motion for partial dismissal, and a motion for expedited discovery).

As noted, Plaintiff seeks to certify a class of "[a]ll unaccompanied noncitizen children who (1) are or will be detained in U.S. government custody in the United States, and (2) are or will be subjected to the Title 42 Process."  ECF No. 1 at 30; ECF No. 2-1 at 7.  Defendants do not address whether Plaintiff has made the required showing as to the first three Rule 23(a) requirements—numerosity, commonality, and typicality—or the Rule 23(b) cohesiveness requirement, that the government has acted or refused to act on grounds generally applicable to the class.  Rather, the government argues only that Plaintiff is not an adequate class representative because he has "already effectively received the individual relief he sought in this lawsuit: to be processed pursuant to Title 8's immigration procedures as opposed to being expelled under the CDC Order[s]."  ECF

No. 44-2 at 28.  Nevertheless, the discussion below addresses each of the pertinent Rule 23 re-

quirements.  *See, e.g.*, *Damus*, 313 F. Supp. 3d at 329 (addressing each of the Rule 23 requirements

but only "briefly analyz[ing]" those that were uncontested).

              1.     Numerosity

A putative class is sufficiently numerous to justify class action treatment when there are

enough members that joinder would be impractical.  *See, e.g.*, *Amchem*, 521 U.S. at 613.  "Gener-

ally speaking, courts have found that a proposed class of at least forty members will satisfy" this

requirement.  *Bynum v. District of Columbia*, 214 F.R.D. 27, 32 (D.D.C. 2003) (collecting cases).

Moreover, "classes including future claimants generally meet the numerosity requirement due to

the 'impracticality of counting such class members, much less joining them.'"  *JD v. Azar*, 925

F.3d 1291, 1322 (D.C. Cir. 2019) (per curiam) (quoting 1 Rubenstein, *Newberg on Class Actions*

§ 3.15).  "[P]recise quantification of the class members is not necessary because the court may

make common sense assumptions to support a finding of numerosity."  *Bynum*, 214 F.R.D. at 32

(quoting *Civic Ass'n of Deaf of N.Y.C. v. Giuliani*, 915 F. Supp. 622, 632 (S.D.N.Y. 1996)).  Thus,

the plaintiff must only provide a "reasonable basis for the estimate provided."  *Damus*, 313 F.

Supp. 3d at 330 (quoting *Kifafi v. Hilton Hotels Retirement Plan*, 189 F.R.D. 174, 176 (D.D.C.

1999)).

Here, Plaintiff has provided evidence, including government and news reports, that in the

period between April and July 2020, almost 6,000 unaccompanied non-citizen children were ap-

prehended at the southwest border; that more than 2,000 unaccompanied non-citizen children had

been expelled from the United States pursuant to the Title 42 Process as of late June 2020; and

that, between June 24, 2020 (when Judge Nichols issued his ruling in *JBBC*) and August 14, 2020

(when the motion for class certification in this case was filed) counsel for Plaintiff have themselves

identified dozens of unaccompanied non-citizen children subject to the Title 42 Process.  ECF No.
2-2 at 1–2, 11–29.  The undersigned thus finds that the numerosity requirement is met.

2.  Commonality

"The commonality requirement asks whether 'there are questions of law or fact common
to the class.'"  *JD*, 925 F.3d at 1321.  A class' claims depend on a "common contention" such that
this requirement is met where "determination of its truth or falsity will resolve an issue that is
central to the validity of each one of the claims in one stroke."  *Id.* (quoting *Wal-Mart Stores, Inc.
v. Dukes*, 564 U.S. 338, 350 (2011)).  "[E]ven a single common question will do."  *Wal-Mart*, 564
U.S. at 359.

This case challenges expulsion under the Title 42 Process, which is "a uniform policy or
practice that affects all class members."  *RIL-R v. Johnson*, 80 F. Supp. 3d 164, 181 (D.D.C. 2015)
(quoting *DL v. District of Columbia*, 713 F.3d 120, 128 (D.C. Cir. 2013)).  Determination that the
Title 42 Process is not permitted by existing law because Section 265 does not provide authority
for expulsion of unaccompanied non-citizen children from the United States will resolve the core
issue in this action "in one stroke."  *JD*, 925 F.3d at 1321.  And "there [ ] is no evident variation
among [the putative class members] concerning their ultimate entitlement to relief: if any person
in the class has a meritorious claim, they all do."  *Id.*  Therefore, the commonality requirement is
met.

3.  Typicality

"[T]ypicality concerns the relationship between the representative's individual claims and
the class' claims rather than the relatedness of the entire class' claims."  *Id.* at 1322.  That is, "the
typicality requirement focuses on whether the *representatives* of the class suffered a similar injury
from the same course of conduct" that injured the putative class members.  *Bynum*, 214 F.R.D. at

18

34.  Where "the claims or defenses of the representatives and the members of the class stem from a single event or unitary course of conduct, or if they are based on the same legal or remedial theory," typicality is satisfied.  *JD*, 925 F.3d at 1322 (quoting 7A Mary Kay Kane, *Federal Practice and Procedure* § 1764).  The claim Plaintiff has pleaded in the Complaint is on all fours with the claims of the putative class.  They stem from a unitary course of conduct—expulsion of unaccompanied non-citizen children from the United States under the Title 42 Process—and are based on the same legal theories.  Hence, this requirement is also met.

4.    Adequacy

"Adequacy of representation imposes two criteria on plaintiffs seeking to represent a class: '(1) the named representative must not have antagonistic or conflicting interests with the unnamed members of the class, and (2) the representative must appear able to vigorously prosecute the interests of the class through qualified counsel.'"  *Ramirez v. ICE*, 338 F. Supp. 3d 1, 47 (quoting *Twelve John Does v. District of Columbia*, 117 F.3d 571, 575 (D.C. Cir. 1997)).

Defendants have not identified any interest that Plaintiff has that is antagonistic to or conflicts with the putative class members and none are apparent.  Indeed, courts have found that where, as here, the plaintiff "seek[s] identical relief for all class members, [ ] there are no conflicting interests that might derail certification on this prong."  *Coleman ex rel. Bunn v. District of Columbia*, 306 F.R.D. 68, 84 (D.D.C. 2015) (Sullivan, J.).  The government instead argues that, it having voluntarily excepted Plaintiff from expulsion under the Title 42 Process—as the government has apparently done with all other unaccompanied non-citizen minors that Plaintiff's counsel has brought to its attention, including the two plaintiffs in *JBBC* (ECF No. 2-2 at 2–3)—Plaintiff is no longer motivated to prosecute the interests of the class.  For that reason, the government contends

that "[t]here is no evidence that Plaintiff would vigorously pursue class claims, and his interest is presumably now focused on his own Title 8 immigration proceeding."  ECF No. 44-2 at 28–29.

First, as Defendants recognize, "the D.C. Circuit has held that the fact that a putative class representative's case is moot at the time of certification does not alone moot the case or otherwise render the putative class representative inadequate."  *Id.* at 29 (citing *JD*, 925 F.3d at 1313).  Indeed, "the Supreme Court has specifically recognized that a plaintiff with a moot claim may serve as a class representative."  *JD*, 925 F.3d at 1313 (citing *U.S. Parole Comm'n v. Geraghty*, 445 U.S. 388, 404 (1980), and *Sosna v. Iowa*, 419 U.S. 393, 402–03 (1980)).  As Plaintiff points out, the "short-lived duration" of a putative class representative's claim "only reinforces [the claim's] inherently transitory nature," and makes certifying a class more appropriate, not less. *JD*, 925 F.3d at 1313 (noting further that "the ephemerality of individual claims makes class-action treatment 'particularly important' so as to 'ensur[e] that a justiciable claim is before the Court.'" (alteration in original) (quoting *Gratz v. Bollinger*, 539 U.S. 244, 268 (2003))).  That is precisely what happened in *JD*—the D.C. Circuit allowed two named plaintiffs to serve as class representatives notwithstanding the fact that their claims were moot.[6]  *JD*, 925 F.3d at 1313.  And, in a declaration filed with his Reply, Plaintiff has reaffirmed his willingness to act as class representative and to "vigorously pursue this case."  ECF No. 52-1 at 1 (Declaration of P.J.E.S.).  Defendants' speculation that Plaintiff's attention is "presumably" focused elsewhere does not undermine that evidence.  *See, e.g.*, *JD*, 925 F.3d at 1313 (rejecting the government's objection that the named plaintiffs with moot claims were inadequate to represent the class where "beyond noting the mootness of [their] claims, [it] identifie[d] no reason to doubt their ability to vigorously press the action"); *Ramirez*,

---

[6] Defendants do not claim that the entire action is moot because Plaintiff's claim is moot.  Therefore, there is no need to address whether the exceptions to mootness for practices that are capable of repetition yet evading review or those that the defendant has voluntarily ceased to engage in apply here.

338 F. Supp. 3d at 47 (finding that the plaintiffs had met their burden to show that the proposed

class representatives were adequate based on "declarations attesting their willingness and abilities

to take an active role in th[e] litigation and to protect the interests of absent plaintiffs").

Finally, the government has not suggested that counsel here is unqualified to act as class

counsel.  *See, e.g.*, *In re Rail Freight Fuel Surcharge Antitrust Litig.*, 292 F. Supp. 3d 14, 94–95

(D.D.C. 2017) (noting that a proposed representative is adequate if his interests do not conflict

with the interests of other class members and "he will vigorously prosecute the interests of the

class through qualified counsel" (quoting *Lindsay v. Gov't Emps. Ins. Co.*, 251 F.R.D. 51, 55

(D.D.C. 2008)).  Plaintiff is represented by attorneys from the American Civil Liberties Union and

the American Civil Liberties Union of the District of Columbia, who have submitted declarations

detailing their extensive experience in complex class actions, including class actions involving

immigration rights.  ECF No. 2-2, ¶¶ 13–33; ECF No. 2-3, ¶¶ 2–4.  The undersigned thus finds

that Plaintiff is an adequate class representative who, with his counsel, will vigorously pursue the

claims of the putative class.  *See, e.g.*, *Damus*, 313 F. Supp. 3d at 331 (finding the adequacy re-

quirement met where "[n]o trace of a conflict exist[ed] [ ], and Plaintiffs [were] represented by

very capable counsel from the American Civil Liberties Union . . . .").

        5.    Cohesiveness

    Plaintiff seeks certification under Rule 23(b)(2), which, as noted, requires that (1) "the

party opposing the class has acted or refused to act on grounds that apply generally to the class,"

and (2) "final injunctive relief or corresponding declaratory relief is appropriate respecting the

class as a whole."  Fed. R. Civ. P. 23(b)(2).   "A principal purpose of Rule 23(b)(2) class actions

is to enable class resolution of civil-rights claims alleging classwide deprivations of protected

rights." *JD*, 925 F.3d at 1314.  Both of the Rule's requirements are met here—a conclusion that

the government again does not contest.

First, the Complaint alleges that the government "has acted or refused to act on grounds

that apply generally to the class."  Fed. R. Civ. P. 23(b)(2); *see* ECF No. 1 at 25.  The gravamen

of the claims here is that the government applied the allegedly illegal Title 42 Process to the puta-

tive class members—indeed, the class definition makes clear that the class includes only unaccom-

panied non-citizen minors who are or will be "subjected" to that process.  ECF No. 1 at 25, 30;

ECF No. 2-1 at 7.  That is sufficient.  *See, e.g.*, *Nio v. Dep't of Homeland Sec.*, 323 F.R.D. 28, 34–

35 (D.D.C. 2017) (finding that Rule 23(b)(2)'s requirements were satisfied where the plaintiffs

"challeng[ed] the application of standardized [immigration] policies that generally appl[ied] to the

class").  Second, the Complaint seeks the same injunctive and declaratory relief for the entire

class—*i.e.*, an injunction enjoining enforcement of the Title 42 Process against Plaintiff and the

putative class members, an order requiring the government to remove Plaintiff and the putative

class members from that process, and a declaration that the Title 42 Process is unlawful as applied

to Plaintiff and the putative class members.  ECF No. 1 at 30.  That, too, is sufficient.  *See, e.g.*,

*Ramirez*, 338 F. Supp. 3d at 48 (finding that Rule 23(b)(2)'s requirements were met where the

plaintiffs sought "injunctive relief requiring only [ ] compliance" with the TVPRA and not "a court

order mandating any particular outcome with respect to any particular former unaccompanied mi-

nor" under the statute).

For these reasons, Plaintiff's motion for class certification should be provisionally granted.

**B.       Preliminary Injunction**

A preliminary injunction is an "extraordinary remedy" that "should be granted only when the party seeking the relief, by a clear showing, carries the burden of persuasion." *Cobell v. Norton*, 391 F.3d 251, 258 (D.C. Cir. 2004).  To be entitled to a preliminary injunction, a plaintiff "must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008). "The first two factors of the [ ] standard are the most critical." *Nken v. Holder*, 556 U.S. 418, 434 (2009).  The last two factors—the balance of hardships and public interest—merge when the government is the party opposing the preliminary injunction. *Ctr. for Pub. Integrity v. Dep't of Def.*, 411 F. Supp. 3d 5, 14 (D.D.C. 2019) (citing *Nken*, 556 U.S. at 435).

1.        Likelihood of Success on the Merits

Plaintiff contends that Section 265, the provision upon which the CDC primarily relied to promulgate the Interim Final Rule and, by extension, the CDC Orders, does not authorize the government to expel him or the putative class members from the United States outside of the removal process of the INA and without other safeguards included in Title 8 of the U.S. Code, including special protection for unaccompanied minors mandated in the TVPRA and the ability to make an asylum claim.[7]  ECF No. 15-1 at 10–11; ECF No. 55-1 at 9.  He relies on interpretations of the vocabulary of Section 265, its context within the subsection of the Public Health Service Act it occupies, its relationship to other relevant statutes, and its legislative and enforcement history.

---

[7] Plaintiff has requested that the Court defer ruling on its claim that the Interim Final Rule and the CDC Orders constitute arbitrary and capricious agency action in light of the promulgation of the Final Rule, which will shortly become effective, and also because the Court does not have a full administrative record.  ECF No. 51-1 at 25.  Because the undersigned finds that Plaintiff has demonstrated that he is likely to succeed on the merits of his claims that the statute at issue—Section 265—did not authorize expulsion from the United States under the Title 42 Process, the undersigned will not address that claim, consideration of which will benefit from access to the administrative record.

Application of these traditional tools of statutory interpretation establish that Plaintiff is likely to prevail in his argument that the CDC Orders instituting the Title 42 Process exceed the authority granted by Congress pursuant to Section 265. *See Chevron*, 467 U.S. at 842–43 & n.9 (stating that, when a court "employing traditional tools of statutory construction" determines that a statute is unambiguous, it must "give effect to the unambiguously expressed intent of Congress" and "reject administrative constructions which are contrary" to that intent).

The "interpretation of [Section 265] 'begins where all such inquiries must begin: with the language of the statute.'" *U.S. Ass'n of Reptile Keepers, Inc. v. Zinke*, 852 F.3d 1131, 1135 (D.C. Cir. 2017) (quoting *United States v. Ron Pair Enters., Inc.*, 489 U.S. 235, 241 (1989)). The provision states that, when the CDC Director determines that a serious danger of the introduction of a communicable disease that exists in a foreign country into the United States is "so increased by the introduction of persons or property from such country that a suspension of the right to introduce such persons and property is required in the interest of public health," then the CDC Director shall, in accordance with valid regulations, "have the power to prohibit, in whole or in part, the introduction of persons and property" from such countries for the amount of time he deems necessary to protect the public health. 42 U.S.C. § 265.

The government has made clear, both in its briefing here and in the Final Rule, that it interprets the word "introduction" to "suggest[ ] a continuing process that is most naturally read to extend beyond a person's immediate physical crossing of the border" and that "to 'prohibit . . . the introduction' naturally means to intercept or prevent such a process." ECF No. 44-2 at 31; *see also* Final Rule, 85 Fed. Reg. at 56,425–56,426 (stating that the term "introduction" includes the situation "when a person on U.S. soil moves further into the United States").

Assuming without deciding that the government's interpretations of the word "introduction" and the phrase "prohibit . . . the introduction" are legally sound,[8] Defendants parsing of the plain text of the statute makes an unsupported (and unwarranted) logical leap at that point by asserting that "[t]he statute's reference to prohibiting the introduction 'in whole or in part' supports the interpretation that a person may be intercepted and then quarantined in the United States or intercepted *and then expelled*."  ECF No. 44-2 at 31(emphasis added); *see also* Final Rule, 85 Fed. Reg. at 56,425–56,426 (stating that the phrase "prohibit, in whole or in part, the introduction into the United States of persons" includes the power of "physically expelling from the United States some or all of the persons").  Put simply, accepting that "to 'prohibit . . . the introduction'" means "to intercept or prevent such a process" does not lead to the conclusion that "prohibition," "interception," or "prevention" includes "expulsion."  Indeed, the primary definition of "prohibit" is "to forbid by authority or command," to "enjoin" or "interdict," *Prohibit*, Merriam-Webster Unabridged Dictionary; of "intercept" is "to take, seize, or stop by the way or before arrival at the destined place: stop or interrupt the progress or course of," *Intercept*, Merriam-Webster Unabridged Dictionary; of "prevent" is "to deprive of power or hope of acting, operating, or succeeding in a purpose," *Prevent*, Merriam-Webster Unabridged Dictionary. These each connote stopping

---

[8] Plaintiff has not conceded that they are so.  Rather, he has constructed an intricate argument contending that, because "[a]s a matter of ordinary language and usage," relying on dictionary definitions of the word, "introducing a person into a country or place is an action taken by a *third party*," the use of the word "introduction" in the statute must be "directed not at individuals seeking to *come to* the United States, but rather those proposing to *bring* such individuals here." ECF No. 15-1 at 25–26.  That interpretation is, according to Plaintiff, reinforced by the statutory context of the 1893 Act, which was "shot through with provisions specifically directed at the regulation of ships"—that is, vessels that were bringing "persons and property" into the country—whereas statutes authorizing deportations of people at the time explicitly authorized the removal or return of the person.  *Id.* at 27. Moreover, examining the remarks of proponents of the 1893 Act in the Senate, Plaintiff finds evidence that they, too, were focused on the ships arriving in the United States, rather than those arriving on their own steam at land borders.  *Id.* at 28.  Finally, Plaintiff notes that, "to [his] knowledge, the only time the [1893 Act] has been invoked to prohibit the introduction of persons was in 1929, and it did not authorize deportations."  *Id.* at 28–29 & n.10.  Thus, Plaintiff argues, Section 265 reflects that Congress designed the statute "as a means to stop travel from countries experiencing an outbreak of disease by regulating the *transportation* companies that bring people to the United States."  *Id.* at 25.  The undersigned does not pass on the soundness of that argument because there is a more direct route to determine the statute's meaning, which is discussed below.

something before it begins, rather than remedying it afterwards. That is reinforced by the title of

the Section 265: "Suspension of *entries* and imports from designated places to prevent spread of

communicable diseases."  42 U.S.C. § 265 (emphasis added); *see Almendarez-Torres v. United

States*, 523 U.S. 224, 234 (1998) ("[T]he title of a statute and the heading of a section are tools

available for the resolution of a doubt about the meaning of a statute." (quoting *Bhd. of R.R. Train-

men v. Balt. & Ohio R.R. Co.*, 331 U.S. 519, 528–29 (1947))).

    The government purports to find support for its interpretation that the statute encompasses

the authority to expel individuals from the United States in the phrase "in whole or in part": "[t]he

statute's reference to prohibiting the introduction 'in whole or in part' supports the interpretation

that a person may be intercepted and then quarantined in the United States or intercepted and then

expelled."  ECF No. 44-2 at 31.  The government stretches the syntax of that clause well past its

breaking point.  Its argument works only if one believes that Congress, through the statutory lan-

guage, intended "prohibit[ion] . . . in part" to mean "apprehension and quarantine" and "pro-

hibit[ion][ ] in whole" to mean "apprehension and expulsion."  But regular English usage does not

consider "prohibition"—or "introduction," for that matter—to be a quantity that can be divided

into pieces.  There is a far more natural reading of the clause in its context: that the CDC Director

"shall have the power to prohibit, in whole or in part, the introduction of persons and property

from such countries or places as he shall designate," 42 U.S.C. § 265, means that he may prohibit

the introduction of some persons or property from those places or all persons or property from

them.  That is, "in whole or in part" relates to the proportion of persons or property from designated

places to be intercepted and denied entry; it does not purport to define the type of actions that the

CDC Director may take in order to intercept and deny entry.  Surely, then, the most natural reading

of the provision is that it contemplates interception to prevent an individual from arriving in the United States, rather than to expel him once he has arrived.

Indeed, that interpretation is further supported by the statutory context. *FDA v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 132–33 (2000) ("It is a 'fundamental canon of statutory construction that the words of a statute must be read in their context and with a view to their place in the overall statutory scheme.'" (quoting *Davis v. Mich. Dep't of Treasury*, 489 U.S. 803, 809 (1989))).  Adjacent to Section 265 of the Public Health Service Act, 42 U.S.C. § 264 ("Section 264"), entitled "Regulations to control communicable diseases," is one of the provisions on which the CDC relied in promulgating both the Interim Final Rule and the Final Rule.  *See* Interim Final Rule, 85 Fed. Reg. at 16,563 ("In addition to section 362"—that is, 42 U.S.C. § 265—"other sections of the [Public Health Service] Act are relevant to this rulemaking, including . . . 42 U.S.C. section 264 . . . ."); Final Rule, 85 Fed. Reg. at 56,443 (same).  That provision addresses regulations that the government is "authorized to make and enforce . . . to prevent the introduction, transmission, or spread of communicable diseases from foreign countries into the United States or possessions," 42 U.S.C. § 264(a), that is, regulations governing situations similar to those addressed by Section 265.  Tellingly, Section 264 does not contemplate regulations that authorize expulsion from the United States.  Rather, the provision mentions only regulations that "provide for the apprehension, detention, or conditional release of individuals."[9]  42 U.S.C. § 264(b).  More, those regulations allow for the "apprehension, detention, examination, or conditional release of individuals" but only if the individual is "coming into a State or possession from a foreign country or

---

[9] As noted, conditional release is a public health tool that "involves the release of potentially infected individuals from federal custody subject to conditions calculated to mitigate the risk of disease transmission, such as mandatory self-isolation and CDC monitoring at home."  March 20 Order, 85 Fed. Reg. at 17,061.

possession."[10]   42 U.S.C. § 264(c).   Importantly, the power to expel such individuals from the United States is not mentioned.   That is, in a section where one would expect the term to appear—where Congress has delineated the government's power to prevent the spread of contagious disease from individuals coming into the United States from a foreign country—it does not.

Indeed, expulsion from the United States is nowhere mentioned in the statute.   The statute is shot through with references to quarantine—unsurprising given the provisions at issue are part of the Public Health Act and address the power of the Surgeon General to mitigate the risk of contagious disease—but it contains not a word about the power of the Surgeon General to expel anyone who has come into the country.   *See, e.g.*, 42 U.S.C., Chap. 6A, Subchap. II, Part G (entitled "Quarantine and Inspection."); 42 U.S.C. § 267 (entitled "Quarantine stations, grounds, and anchorages"); 42 U.S.C. § 268 (entitled "Quarantine duties of consular and other officers"); 42 U.S.C. § 270 (entitled "Quarantine regulations governing civil air navigation and civil aircraft"); 42 U.S.C. § 271 (entitled "Penalties for violation of quarantine laws"); 42 U.S.C. § 272 (entitled "Administration of oaths by quarantine officers").   Even the provision governing "[s]pecial quarantine powers in time of war" provides for only examination and detention—arguably the opposite of expulsion.   42 U.S.C. § 266.   The statute also prescribes the penalty for violating "any regulation prescribed under section 264 to 266" as punishment by fine or imprisonment of up to one year. 28 U.S.C. § 271(a).   Again, there is no mention of expulsion.

It is unlikely then that, having repeatedly identified the tools the government can use to prevent the introduction and spread of communicable diseases—none of which expressly include

---

[10] There is an exception allowing apprehension and examination of individuals already in the country but only if they are "reasonably believed" to be (1) "infected with a communicable disease in a qualifying stage" and either (2) "moving or about to move from a State to another State" or (3) "a probable source of infection to individuals who . . . will be moving from a State to another State."   42 U.S.C. § 264(d)(1).   Upon a finding that such an individual is infected, regulations may also provide for detention "for such time and in such manner as may be reasonably necessary."   42 U.S.C. § 264(d)(1).

expulsion of individuals from the United States—Congress intended by that silence, and the language it chose for Section 265, to give the government that power.  A power which, as the Plaintiff points out without contradiction from the Defendant, the government has not claimed in the more than 75 years Section 265 was enacted.  ECF No. 15-1 at 28–29 & n.10.  "When an agency claims to discover in a long-extant statute an unheralded power," courts should "greet its announcement with a measure of skepticism.  *Util. Air Regulatory Grp. v. EPA*, 573 U.S. 302, 324 (2014) (rejecting an agency's interpretation of its governing statute when it claimed a significant expansion of regulatory authority "without clear congressional authorization").

That interpretation is buttressed by the fact that, as Plaintiff points out, when Congress wants to grant the power to expel individuals out of the United States, it does so plainly.  Plaintiff cites statutes from as early as 1882 that explicitly authorize removal of individuals from the country.  The statute known as the Chinese Exclusion Act stated that "any Chinese person found unlawfully within the United States shall be caused to be removed therefrom to the country from whence he came" after a court had found that the individual was "not lawfully entitled to be or remain in the United States."  An Act to Execute Certain Treaty Stipulations Relating to the Chinese, ch. 126, § 12, 22 Stat. 58, 61 (May 6, 1882).  A 1891 statute concerning the importation of aliens under contract to perform labor provided that "all aliens who may unlawfully come to the United States shall, if practicable, be immediately sent back on the vessel by which they were brought in" and that "any alien who shall come into the United States in violation of law may be returned as by law provided."  An Act in Amendment to the Various Acts Relative to Immigration and the Importation of Aliens Under Contract or Agreement to Perform Labor, ch.551, §§ 10–11, 26 Stat. 1084, 1086 (Mar. 3, 1891).  The same is true of modern statutes.  *See, e.g.*, 8 U.S.C. § 1225(b)(2)(A), (C) (allowing an alien who has arrived on land from a contiguous country and who

is "not clearly and beyond a doubt entitled to be admitted" to be "return[ed] . . . to that territory pending a proceeding"); 8 U.S.C. § 1231(a)(1)(A) ("Except as otherwise provide in this section, when an alien is ordered removed, the Attorney General shall remove the alien from the United States within a period of 90 days . . . ."); 8 U.S.C. § 1232(a)(2)(B) (allowing "an immigration officer who finds an unaccompanied alien child" who is a national or habitual resident of a contiguous country "at a land border or port of entry of the United States and determines that such child is inadmissible" to "return such child to the child's country of nationality or country of last habitual residence"); 18 U.S.C. § 3186 (authorizing a fugitive from another country found in the United States to be "take[n] [ ] to the territory of such foreign government" by an agent of that government). Moreover, as Plaintiff emphasizes, Congress has made clear when public health concerns merit disallowing a non-citizen to remain in the United States. Section 1182 of Title 8 makes inadmissible "[a]ny alien . . . who is determined (in accordance with regulations prescribed by the Secretary of Health and Human Services) to have a communicable disease of public health significance." 8 U.S.C. § 1182(a)(1)(A)(i). But Section 265 contains no such clear language, which indicates that Congress did not intend to grant that power.[11] *See JBBC* Transcript at 49–50 (finding that Section 265 does not "permit[ ] the return of individuals" to their home countries in part because Congress did not use terms like "return" or "remove," which are used in immigration statutes); *cf. Epic Sys.*, __ U.S. at __, 138 S. Ct. at 1626 (noting other statutes in which Congress had

---

[11] Relying on a single statement in dicta from a 1983 Supreme Court case, the government argues that an "interpretative approach" that looks to the language used in one statute to interpret the meaning of another has been "rejected." ECF No. 44-2 at 15 (citing *Russello v. United States*, 464 U.S. 16, 25 (1983)). Not so. As Plaintiff points out, the Supreme Court regularly uses that "interpretive approach." ECF No. 51-1 at 15 (citing *McGirt v. Oklahoma*, 140 S. Ct. 2452, 2462 (2020) ("History shows that Congress knows how to withdraw a reservation . . . ."); *Rotkiske v. Klemm*, __ U.S. __, __, 140 S. Ct. 355, 361 (2019) ("A textual judicial supplementation is particularly inappropriate when, as here, Congress has shown that it knows how to adopt the omitted language or provision. Congress has enacted statutes that expressly include the language [the petitioner] asks us to read in . . . ."); *Epic Sys. Corp. v. Lewis*, __ U.S. __, __,138 S. Ct. 1612, 1626 (2018) (explaining that "when Congress wants to mandate [certain] procedures[,] it knows exactly how to do so," and "Congress has spoken often and clearly" to the issue in other statutes)).

mandated particular dispute resolution procedures to find that Section 7 of the National Labor Relations Act does not confer a right to class or collective actions because "[w]hen Congress wants to mandate particular dispute resolution procedures it knows exactly how to do so"); *Merck & Co. v. Dep't of Health and Human Servs.*, 385 F. Supp. 3d 81, 96 (D.D.C. 2019) (stating that the fact that Congress "precisely legislated" in an area in one statute indicates that such power was not granted by a different statute because "Congress knows how to speak on that subject when it wants to"), *aff'd*, 962 F.3d 531 (D.C. Cir. 2020).

Indeed, the power the government claims under Section 265 is breathtakingly broad.  The Interim Final Rule notes that, by speaking of "persons," rather than "non-citizens" or "aliens," Section 265 also applies to citizens.  Interim Final Rule, 85 Fed. Reg. at 16,564.  The Final Rule also indicates that Section 265 covers citizens.  Final Rule, 85 Fed. Reg. at 56,448.  The government consequently admitted before Judge Nichols that the section authorizes the government to expel even U.S. citizens who arrive from a foreign country during a pandemic.  *JBBC* Transcript at 26–27.  Yet, it is unlikely that Congress would grant the CDC Director the power to expel citizens from the United States without making a clear statement to that effect.  Indeed, as Plaintiff points out (ECF No. 15-1 at 23; ECF No. 51-1 at 12), the Supreme Court has stated that the power to remove a citizen from the country "must be affirmatively granted" in order to exist.  *Valentine v. United States ex rel. Neidecker*, 299 U.S. 5, 12 (1936).  Section 265 includes no such affirmative grant.  And if Section 265 were read to include that power, it would raise serious constitutional issues.  *See, e.g.*, *Doe v. Mattis*, 928 F.3d 1, 8 (D.C. Cir. 2019) ("A fundamental attribute of United States citizenship is a 'right to . . . remain in this country' . . . .") (first alteration in original) (quoting *Mandoli v. Acheson*, 344 U.S. 133, 139 (1952))); *Dessouki v. Att'y Gen. of U.S.*, 915 F.3d 964, 967 (3d Cir. 2019) ("The Executive cannot deport a citizen.").  The government has acknowledged

the "complex and important legal and policy questions presented by the potential application of [Section 265] to U.S. citizens, U.S. nationals, and [legal permanent residents]." Final Rule, 85 Fed. Reg. 56,424-01, 56,448; *see also* Interim Final Rule 85 Fed. Reg. 16,559-01, 16,564 ("Determining the appropriate protections for U.S. citizens and lawful permanent aliens requires complex balancing of numerous interests and would benefit from additional consideration and public comment."). As the Supreme Court has instructed, "[i]f one [proposed statutory construction] would raise a multitude of constitutional problems, the other should prevail—whether or not those constitutional problems pertain to the particular litigant before the Court." *Clark v. Suarez Martinez*, 543 U.S. 371, 380-81 (2005).

Furthermore, as Judge Nichols also found, Section 265 must be read in conjunction with statutes governing immigration under Title 8 of the U.S. Code. *JBBC* Transcript at 50 ("Even if the power to remove were read [into] [S]ection 265, the plaintiff has [a] likelihood of success because the provision . . . should be harmonized, to the maximum extent possible, with immigration statutes, including those . . . that grant special protections to minors and also those . . . that deal with communicable diseases and quarantines."). The Supreme Court has recently reaffirmed that "[i]t is [a] [c]ourt's duty to interpret Congress' statutes as a harmonious whole rather than at war with one another." *Epic Sys.*, __ U.S. at __, 138 S. Ct. at 1619. Here, if Section 265 is read to allow expulsion from the United States of unaccompanied minors like Plaintiff and the putative class members, it conflicts with various rights granted in the TVPRA and the INA.[12]

---

[12] The Complaint also claims that the Title 42 Process conflicts with provisions in FARRA, which implements Article 3 of the Convention Against Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment ("CAT"). ECF No. 1, ¶¶ 130–136 (citing the Foreign Affairs Reform and Restructuring Act of 1998, Pub. L. No. 105-277, § 2242, 112 Stat. 2681 (codified at 8 U.S.C. § 1231 note)). Defendants point out that the implementation of the CDC Orders allows CAT screenings and, moreover, that because the CAT is not self-executing, domestic statutes implementing the obligations under the treaty are controlling. ECF No. 44-2 at 43 n.15 (citing *Medellin v. Texas*, 552 U.S. 491, 504–05 & n.2 (2008), and *Trinidad y Garcia v. Thomas*, 683 F.3d 952, 957 (9th Cir. 2012) (en banc)). In its Reply, Plaintiff focuses on asylum screenings under the TVPRA rather than the CAT or FARRA. ECF No. 55-1 at

First, the TVPRA.  The statute was passed "to enhance the efforts of the United States to prevent trafficking in persons," specifically unaccompanied alien children in the United States.  8 U.S.C. § 1232(a)(1).  It imposes certain mandatory obligations on the government and provides certain rights to unaccompanied alien minors, including that an unaccompanied alien child (other than one from a contiguous country, to whom special rules apply) must be placed in removal proceedings under the INA and must be provided access to counsel.  8 U.S.C. § 1232(a)(5)(D).  They must also be transferred into the custody of the Office of Refugee Resettlement within 72 hours after it has been determined that the individual is an unaccompanied alien child.  8 U.S.C. § 1232(b)(3); 6 U.S.C. § 279(a), (b)(1)(A); *see also JD*, 925 F.3d at 1300–02 (describing the TVPRA's statutory scheme).  Second, the INA provides additional protections for non-citizens, including unaccompanied children.  Section 1231(b)(3) prohibits the removal of a non-citizen to a country where he is likely to face persecution because of his race, religion, nationality, membership in a particular social group, or political opinion.  8 U.S.C. § 1231(b)(3).  The decision regarding whether "the exclusion, deportation, or removal of an alien" to such country shall be withheld must be made by an immigration judge.  8 C.F.R. § 1208.16(a).  Similarly, the INA provides that "[a]ny alien who is physically present in the United States or who arrives in the United States . . . may apply for asylum," 8 U.S.C. § 1158(a)(1), with certain exceptions not relevant here.  Unaccompanied alien children are excepted from the one-year deadline that normally applies to asylum applications and from the option to be removed to a third country where the asylee would not be subject to persecution and would have access to a fair asylum procedure.  8 U.S.C. § 1158(a)(2)(A), (B), (E).  It is undisputed that the summary expulsions of the Title 42 Process render these protections and procedures unavailable.  ECF No. 44-2 at 41–48.

---

25.  Because the question of whether the Title 42 Process likely violates FARRA is unnecessary to the determination here, the undersigned does not address it.

The government contends that Section 265 "takes precedence over the identified immigra-

tion provisions."  ECF No. 44-2 at 41.  But "[a] party seeking to suggest that two statutes cannot

be harmonized, and that one displaces the other, bears the heavy burden of showing 'a clearly

expressed congressional intention' that such a result should follow."  *Epic Sys.*, __ U.S. at __, 138

S. Ct. at 1624 (some internal quotation marks omitted) (quoting *Vimar Seguros y Reaseguros, S.A.*

*v. M/V Sky Reefer*, 515 U.S. 528, 533 (1995)).  The conventional way to signal that one statutory

provision is intended to override conflicting provisions is the construction, "Notwithstanding any

other provision of law."  *See, e.g.*, *Cisneros v. Alpine Ridge Grp.*, 508 U.S. 10, 18 (1993) ("As we

have noted previously in construing statutes, the use of such a 'notwithstanding' clause clearly

signals the drafter's intention that the provisions of the 'notwithstanding' section override con-

flicting provisions of any other section.  Likewise, the Courts of Appeal generally have 'interpreted

similar "notwithstanding" language . . . to supersede all other laws, stating that "[a] clearer state-

ment is difficult to imagine."'" (alterations in original) (internal citation omitted) (some internal

quotation marks omitted) (quoting *Liberty Mar. Corp. v. United States*, 928 F.2d 413, 416 (D.C.

Cir. 1991))); *see also, e.g.*, *Epic Sys.*, __ U.S. at __, 138 S. Ct. at 1626 ("Congress has [ ] shown

that it knows how to override the Arbitration Act when it wishes—by explaining, for example,

that, '[n]otwithstanding any other provision of law, . . . arbitration may be used . . . only if' certain

conditions are met . . . ." (some alterations in original) (quoting 15 U.S.C. § 1226(a)(2))).

Here, the government attempts to find such a clear statement of congressional intent to

override the provisions of Title 8 of the U.S. Code in the statement Section 265's language refer-

ring to a "suspension of the right to introduce such persons and property," asserting that "[t]he

phrase 'suspension of the right to introduce' [ ] naturally means the temporary cessation of the

effect of any laws, including immigration laws, pursuant to which a person might otherwise claim a right to be introduced into the United States."  ECF No. 44-2 at 42.

Defendants' argument is not likely to succeed.  The phrase in Section 265 is not "a clearly expressed congressional intention," *Epic Sys.*, __ U.S. at __, 138 S. Ct. at 1624, that an order promulgated under that section can override conflicting provisions of Title 8 of the U.S. Code.  Unlike the "notwithstanding" clause that the Supreme Court has approved as sufficiently clear, the phrase contains no reference to the suspension of laws or specific rights.  Indeed, the examples the government provides to support its notion that the term "suspension" overrides the operation of conflicting laws help to prove the opposite.  For example, Defendants cite 10 U.S.C. § 123(a), which allows—during wartime or national emergency—the President to "suspend the operation of any provision of law relating to the promotion, involuntary retirement, or separation of commis-sioner officers."  ECF No. 44-2 at 42.  But that statute explicitly suspends the "operation of any provision of law," much like a "notwithstanding" clause explicitly identifies "any other provision of law."  Similarly, the Suspension Clause of the Constitution specifically identifies the right sus-pended by stating that "[t]he Privilege of the Writ of Habeas Corpus shall not be suspended, unless when in Cases of Rebellion or Invasion the public Safety may require it."  U.S. Const. art I, § 9, cl. 2, *quoted in* ECF No. 44-2 at 42.  In short, Defendants have not shown that the vague language of Section 265 evinces congressional intention to allow an order by the CDC Director to suspend the operation of all immigration laws.

Defendants' remaining contentions are no more successful.  They cite the canon of statu-tory construction that a more specific provision targeting a particular issue will generally trump a provision more generally covering the issue, arguing that Section 265 is more specific than the immigration laws Plaintiff cites "because it applies only in a rare and specific circumstance."  ECF

No. 44-2 at 46.  That canon is most often applied when the two provisions "are interrelated and closely positioned, both in fact being parts of [the same statutory scheme]."  *RadLAX Gateway Hotel, LLC v. Amalgamated Bank*, 566 U.S. 639, 645 (2012) (alterations in original) (quoting *HCSC-Laundry v. United States*, 450 U.S. 1, 6 (1981) (per curiam)).  That is not the case here.  Moreover, the immigration laws cited are clearly part of a "comprehensive scheme [that] has deliberately targeted specific problems with specific solutions."  *RadLAX*, 566 U.S. at 645 (quoting *Varity Corp. v. Howe*, 516 U.S. 489, 519 (1996) (Thomas, J., dissenting)).  It is not clear how Section 265–which Defendants suggest is a broad grant of discretion to the CDC Director to regulate the introduction of communicable diseases into the United States (*see, e.g.*, ECF No. 44-2 at 14–15 (describing the "broad power" granted by Section 265))—could be considered more specifically targeted to matters of immigration or as providing more specific solutions.

Finally, Defendants suggest that a reading of Section 265 that does not authorize the CDC Director to issue orders allowing expulsion from the United States of unaccompanied non-citizen children outside the processes mandated by Title 8 of the U.S. Code renders the statute a nullity.  That point requires little discussion.  Plaintiff's concede that the CDC Director has authority to bar entry into the country, at least through the regulation of vessels (including airplanes) arriving in the United States.  ECF No. 15-1 at 28–30 & n.9 (citing Criteria for Requesting Federal Travel Restrictions for Public Health Purposes, 80 Fed. Reg. 16,400 (Mar. 27, 2015), which addresses the "Do Not Board" list, "enabling domestic and international public health officials to request that individuals with communicable diseases who meet specific criteria . . . be restricted form boarding commercial aircraft arriving into, departing from, or traveling within the United States."); ECF No. 51-1 at 16; ECF No. 15-5 at 7 (attaching Executive Order No. 5143, which reads, "[I]n order to prevent the further introduction of epidemic cerebrospinal meningitis form foreign ports into

the United States, by virtue of the authority vested in me by Section 7 of the Act of Congress approved February 15, 1893 [now 42 U.S.C. § 265] . . . it is ordered that no persons may be introduced directly or indirectly by transshipment or otherwise into the United States or any of its possessions or dependencies from any port in China (including Hong Kong) or the Philippine Islands . . . ."). Again, those violating a barring order may be prosecuted and face up to one year of imprisonment. 42 U.S.C. § 271(a). The CDC Director can also, pursuant to valid regulations, apprehend, examine, quarantine, or conditionally release persons traveling into the United States from a foreign country.[13] 42 U.S.C. § 264(a), (c). What the statute has not authorized him to do, however, is to summarily expel members of the class from the United States in derogation of its immigration laws. But as Plaintiff points out, that Section 265 "does not authorize *this particular invocation*—an order singling out particular noncitizens, including unaccompanied children, and overriding protections for those individuals—does not [ ] make the statute meaningless."[14] ECF No. 51-1 at 23.

The fact that the government may believe that, without the power to summarily expel unaccompanied non-citizen children, Section 265 is not up to the task of preventing the introduction or spread of a communicable disease in the United States does not change the legal question of what the statute allows. "[A]gencies are 'bound, not only by the ultimate purposes Congress has

---

[13] And presumably, while quarantined, the immigration process can go forward, including medical examination under 8 U.S.C. § 1222(a) (authorizing examination and detention of aliens to determine whether they have a communicable disease) and application of 8 U.S.C § 1182(a)(1)(i) (making inadmissible any alien who is determined to have a communicable disease of public health significance).

[14] For this reason, IRLI's *amicus* brief misses the mark. The organization argues that immigration statutes governing asylum, removal of non-citizens, and the trafficking of children in the INA and TVPRA do not implicitly repeal Section 265. *See generally* ECF No. 48-1. But there is no question of implicit repeal here because neither is Section 265 "in irreconcilable conflict" with those immigration provisions—they can co-exist—nor were those immigration provisions "clearly intended as a substitute" for Section 265. *Radzanower v. Touche Ross & Co.,* 426 U.S. 148, 154 (1976) (identifying the "two well-settled categories of repeals by implication—(1) where provisions in the two acts are in irreconcilable conflict . . . ; and (2) [where] the later act covers the whole subject of the earlier one and is clearly intended as a substitute" (quoting *Posadas v. Nat'l City Bank of N.Y.*, 296 U.S. 497, 503 (1936)).

selected, but by the means it has deemed appropriate, and prescribed, for the pursuit of those purposes.'" *Merck*, 962 F.3d at 536 (quoting *Colo. River Indian Tribes v. Nat'l Indian Gaming Comm'n*, 466 F.3d 134, 139–40 (D.C. Cir. 2006)).   To the extent those means seem insufficient, "the proper approach under our system of separation of powers is for Congress to amend the statute, not for the Executive Branch and the courts to rewrite the statute beyond what the statute's terms can reasonably bear." *District of Columbia v. Dep't of Labor*, 819 F.3d 444, 450 (D.C. Cir. 2016).

For these reasons, Plaintiff is likely to succeed on the merits of his claim.[15]

### 2.   Irreparable Injury

To show irreparable injury sufficient to merit a preliminary injunction, the plaintiff must establish that the injury is "certain and great" and "of such imminence that there is a 'clear and present need for equitable relief.'"   *Chaplaincy of Full Gospel Churches v. England*, 454 F. 3d 290, 297 (D.C. Cir. 2006) (emphasis omitted) (quoting *Wisc. Gas Co. v. FERC*, 758 F.2d 669, 674 (D.C. Cir. 1985)).   That said, "a preliminary injunction requires only a likelihood of irreparable injury[;] Damocles' sword does not have to actually fall on all [plaintiffs] before the court will issue an injunction." *League of Women Voters of U.S. v. Newby*, 838 F.3d 1, 8–9 (D.C. Cir. 2016) (internal citation omitted).   Plaintiff has met his burden on this requirement.

---

[15] Because the undersigned finds, "using the traditional tools of statutory construction," that the statute is not ambiguous, "that is the end of the matter" and there is no need to determine whether it is appropriate to defer to the agency's interpretation. *Chevron*, 467 U.S. at 842–43 & n.9.   However, even if there were ambiguity, the undersigned would find, as did Judge Nichols, that deference to the government's interpretation of the statute would not be justified. *JBBC* Transcript at 50–51.   The question for this claim is purely legal: does Section 265 authorize expulsions from the United States, or does it not? The CDC's "scientific and technical knowledge" (ECF No. 33 & n.14) has no bearing on that question of statutory interpretation. *Cf. FedEx Home Delivery v. NLRB*, 849 F.3d 1123, 1128 (D.C. Cir. 2017) (no deference where agency has "no special administrative expertise that a court does not possess" (quoting *NLRB v. United Ins. Co. of Am.*, 390 U.S. 254, 260 (1968))); *Kisor v. Wilkie*, __ U.S. __, __, 139 S. Ct. 2400, 2417 (2019) ("When the agency has no comparative expertise in resolving a regulatory ambiguity, Congress presumably would not grant it that authority.").   "[T]he 'reconciliation' of distinct statutory regimes 'is a matter for the courts,' not agencies." *Epic Sys.*, __ U.S. at __, 138 S. Ct. at 1629 (quoting *Gordon v. N.Y. Stock Exch., Inc.*, 422 U.S. 659, 685-86 (1975)).

Plaintiff has presented declarations from attorneys representing numerous unaccompanied children who have crossed the border and have bona fide clams for humanitarian relief, including fear of persecution on the basis of protected characteristics, but have been subjected to the Title 42 Process and threatened with deportation prior to receiving any of the protections the immigration laws provide. *See, e.g.*, ECF No. 15-10, ¶¶ 5–14 (declaration of attorney Linda Corchado); ECF No. 15-11, ¶¶ 3–6 (declaration of attorney Taylor Levy); *see also, e.g.*, ECF No. 15-12, ¶¶ 26–32 (declaration of Lisa Frydman, Vice President of International Programs at Kids in Need of Defense, an advocacy and legal services organization). Many come from El Salvador, Guatemala, and Honduras, dangerous countries in which children are often targeted for sexual and other violence and face the possibility of torture and death. ECF No. 15-12, ¶¶ 5–11. Similar showings have been held sufficient to demonstrate irreparable injury. *See, e.g.*, *Grace v. Whitaker*, 344 F. Supp. 3d 96, 146 (D.D.C. 2018) (finding that declarations asserting fear of "rape, domestic violence, beating, shootings, and death" in the plaintiffs' countries of origin sufficed to establish likelihood of irreparable injury), *aff'd in part, rev'd in part on other grounds sub nom. Grace v. Barr*, 965 F.3d 883 (D.C. Cir. 2020); *Devitri v. Cronen*, 289 F. Supp. 3d 287, 296–97 (D. Mass. 2018) (declaration asserting likelihood of persecution if removed sufficient); *Orantes-Hernandez v. Meese*, 685 F. Supp. 1488, 1504–05 (C.D. Cal. 1988) (finding that plaintiffs would suffer irreparable harm if they were summarily removed without being afforded the opportunity to exercise their right to apply for asylum). Indeed, Judge Nichols found a likelihood that a plaintiff similarly-situated to Plaintiff here would likely suffer irreparable harm in the absence of injunctive relief. *JBBC* Transcript at 51 ("It is certainly the case that plaintiff has not established that those harms are certain to occur, but there is at a minimum the risk that those harms, which are specified in

some detail, could occur.  And so the Court concludes that the plaintiff has established . . . that he is likely to suffer irreparable harm in the absence of an order here.").

There is the additional risk that, once expelled from the United States, Plaintiff's harm will no longer be remediable.  In other contexts, courts have found that the movement of a minor beyond the jurisdiction of the court can constitute irreparable harm when it interferes with the ability of the court to provide relief.  *See, e.g.*, *Mendoza v. Pascual*, No. CV 615-40, 2015 WL 1880309, at *5 (S.D. Ga. Apr. 24, 2015) (applying the Hague Convention on the Civil Aspects of International Child Abduction); *Velasquez v. Velasquez*, No. 14-cv-1688, 2014 WL 7272934, at *5 (E.D. Va. Dec. 15, 2014) (finding that petitioner had shown irreparable harm from the possibility that his children would be removed from the jurisdiction because that would "frustrate the effort of th[e] Court in resolving the [dispute]").  To be sure, in *Nken*, the Supreme Court held that "the burden of removal alone cannot constitute the requisite irreparable injury."  556 U.S. at 435.  But that holding rested on the ability of a removed alien to "continue to pursue [a] petition[ ] for review [of the removal order]," which afforded the opportunity to return to the United States "with a restoration of the immigration status" the alien had enjoyed upon removal.  *Id.*  Here, however, the putative class members are being returned without any opportunity to apply for asylum or withholding of removal.  Once expelled from the United States and outside the jurisdiction of the Court, it is not clear that a remedy can be provided.[16]  *Cf. Doe*, 928 F.3d at 22 (finding irreparable harm likely to flow from the transfer of a dual citizen detained in Iraq to an unidentified third

---

[16] That is precisely the argument the government has made in a different case in this jurisdiction challenging the Title 42 Process.  In *GYJP v. Wolf*, the plaintiff, an unaccompanied 13-year-old girl from El Salvador, crossed into the United States and was apprehended by Customs and Border Patrol officers.  Complaint, ¶¶ 76–80, *GYJP*, No. 20-cv-1511 (TNM) (D.D.C. June 9, 2020), ECF No. 3.  Approximately six days later, she was expelled from the United States pursuant to the Title 42 Process and flown back to El Salvador.  *Id.*, ¶¶ 80–85.  In that litigation, the government has taken the position that the court is without jurisdiction to hear the case because the plaintiff lacks constitutional standing.  *See generally* Motion to Dismiss, *GYJP*, No. 20-cv-1511 (TNM) (D.D.C. Aug. 17, 2020), ECF No. 38.

country because he would then be in the custody of that third country "without continuing over-sight by—or recourse to—the United States").

Lastly, "[i]t is well-established that acts by [g]overnment agencies in derogation of statu-tory rights of the public or certain individual members of the public can constitute irreparable injury." *Kirwa*, 285 F. Supp. 3d at 42 n.22 (quoting *Gates v. Schlesinger*, 366 F. Supp. 797, 800 (D.D.C. 1973)); *see also JL v. Cissna*, 341 F. Supp. 3d 1048, 1068 (N.D. Cal. 2018) (identifying multiple common harms resulting from deprivation of right to seek humanitarian benefits for abused, abandoned, and neglected juveniles); *Tefel v. Reno*, 972 F. Supp. 608, 619–20 (S.D. Fla. 1997) ("[T]he Court finds . . . that Plaintiffs and class members would suffer irreparable harm if they are deported to their native countries after having been denied an opportunity to have a hear-ing on their claims for suspension of deportation."). In light of the finding above in Section II.B.1 that the claim that expulsion under the Title 42 Process exceeds the authority granted by Sec-tion 265 is likely to succeed, this is a clear harm that each member of the putative class has suffered or will suffer. Therefore, the undersigned finds that Plaintiff has adequately established a likeli-hood of irreparable injury should a preliminary injunction not issue.

### 3.   Balance of the Equities and Public Interest

Beyond the irreparable harm that Plaintiff and members of the putative class will suffer without an injunction, the balance of the equities also favors Plaintiff. *See Costa v. Bazron*, No. 19-3185 (RDM), 2020 WL 2025701, at *8 (D.D.C. Apr. 25, 2020) ("[W]here the government is a party to the suit, the harm to defendants and the public interest merge and 'are one and the same, because the government's interest *is* the public interest." (quoting *Pursuing America's Greatness v. FEC*, 831 F.3d 500, 511 (D.C. Cir. 2016))). Public interest in enjoining unlawful government action, protecting non-citizen children from being wrongfully removed, and preventing risks to

public health caused by the Title 42 Process weigh in Plaintiff's favor; while a preliminary injunc-
tion will impose some hardships on Defendants, the public interest and immitigable hardships to
Plaintiff outweigh the mitigable hardships to Defendants.

　　As discussed above, Defendants' actions are likely to be found unlawful, and "[t]here is
generally no public interest in the perpetuation of an unlawful agency action." *League of Women
Voters*, 838 F.3d at 12; *see also Banks v. Booth*, No. 20-849 (CKK), 2020 WL 1914896, at *12
(D.D.C. Apr. 19, 2020) (Kollar-Kotelly, J.) ("There is no harm to the [g]overnment when a court
prevents unlawful practices."). Rather, "the public interest is harmed when the [g]overnment ham-
handedly exercises its responsibilities." *Minney v. U.S. Off. of Pers. Mgmt.*, 130 F. Supp. 3d 225,
236 (D.D.C. 2015) (Leon, J.). Conversely, "there is a substantial public interest 'in having gov-
ernmental agencies abide by the federal laws that govern their existence and operations.'" *League
of Women Voters*, 838 F.3d at 12 (quoting *Washington v. Reno*, 35 F.3d 1093, 1103 (6th Cir. 1994);
*see also Jacksonville Port Auth. v. Adams*, 556 F.2d 52, 59 (D.C. Cir. 1977) ("[T]here is an over-
riding public interest . . . in the general importance of an agency's faithful adherence to its statu-
tory mandate."); *Louis v. Meissner*, 530 F. Supp. 924, 929 (S.D. Fla. 1981) ("The public's interest
is not served by continued acts violative of the law.").

　　Plaintiff's position is supported not only by the somewhat abstract public interest in faithful
execution of federal law but also by more concrete public interests in preventing aliens from
wrongful removal from the United States to countries where they are likely to be persecuted.
"[T]he public has an interest in 'ensuring that we do not deliver aliens into the hands of their
persecutors' and 'preventing aliens from being wrongfully removed, particularly to countries
where they are likely to face substantial harm.'" *E. Bay Sanctuary Covenant v. Trump*, 950 F.3d
1242, 1281 (9th Cir. 2020) (citations omitted) (first quoting *Leiva-Perez v. Holder*, 640 F.3d 962,

971 (9th Cir. 2011), then quoting *Nken*, 556 U.S. at 436); *see also, e.g.*, *AB-B v. Morgan*, No. 20-cv-846 (RJL), 2020 WL 5107548, at *9 (D.D.C. Aug. 31, 2020) ("[P]roceeding to the merits of this litigation without preliminary injunctive relief risks plaintiffs being returned to home countries where they face significant risk of physical harm.  These life-or-death consequences weigh heavily in favor of preliminary injunctive relief."); *Chaudhry v. Barr*, No. 2:19-cv-00682-TLN-DMC, 2019 WL 2009307, at *4 (E.D. Cal. May 7, 2019) ("[T]here is [ ] 'a public interest in preventing aliens from being wrongfully removed, particularly to countries where they are likely to face substantial harm.'" (quoting *Sied v. Nielsen*, No. 17-cv-06785-LB, 2018 WL 1142202, at *27 (N.D. Cal. Mar. 2, 2018))).  It is also, of course, in "the interests of society to protect the welfare of children."  *Prince v. Massachusetts*, 321 U.S. 158, 165 (1944).

Additionally, the government has failed to take into account the harm to the public interest in continuing its current practice of housing unaccompanied non-citizen minors in hotels while they await expulsion from the United States under the Title 42 Process—a practice that would end if an injunction issued requiring Plaintiff and the putative class to be excepted from expulsion from the United States under the Title 42 Process.  In a case in the U.S. District Court for the Central District of California concerning the government's practice of placing such children in hotels rather than transferring them to the custody of the Office of Refugee Resettlement, *see Flores v. Barr*, __ F. Supp. 3d __, __, 2020 WL 5491445, at *1, 3 (C.D. Cal. 2020) (noting that the question before that court is the practice of holding minors detained pursuant to the Title 42 Process in hotels prior to expulsion and "*not* . . . the validity of Title 42 expulsions"), *appeal docketed*, No. 20-55951 (9th Cir. Sept. 10, 2020), the court found that the government had "failed to demonstrate how hotels, which are otherwise open to the public and have unlicensed staff coming in and out, located in areas with high incidence of COVID-19, are any better for protecting public health than

licensed facilities would be" and that "[e]ven if the infection control protocols at [the Office of Refugee Resettlement] come under some stress, or are forced to make some adjustments," the program's facilities are likely to "remain far safer than unregulated hotel stays for both detained minors and the general public," In Chambers Order at 4, *Flores*, No. CV 85-4544 DMG (AGRx) (C.D. Cal Sept. 21, 2020), ECF No. 990 (quoting *Flores*, __ F. Supp. 3d at __, 2020 WL 5491445, at *6).

Against these arguments, Defendants first assert that an injunction against the Title 42 Process would make officers at the border less safe, noting that many such officers have contracted COVID-19 and several have died.  To be sure, "[i]t goes almost without saying . . . that promoting public health—especially during a pandemic—is in the public interest," and the premature loss of any life is tragic.  *Nat'l Immigr. Project of Nat'l Lawyers Guild v. Exec. Off. of Immigr. Rev.*, No. 1:20-cv-00852 (CJN), __ F. Supp. 3d __, __, 2020 WL 2026971, at *12 (D.D.C. 2020).  But the government's proof that the preliminary injunction Plaintiff seeks would endanger Customs and Border Patrol officers more than the Title 42 Process is, ultimately, unavailing.  The measure of the public interest and hardship to the government depends on the injunction proposed.  Here, denying the government the power to expel unaccompanied minors does not leave the government powerless to address the pandemic.  As discussed above in Section II.B.1, the government has many options available to it.  It has tools at its disposal to limit entry into the country and can apprehend, examine, quarantine, or conditionally release unaccompanied minors.  The real issues are potential exposure to the virus at congregation points and operational costs—as the government admits—of mitigating that risk through effective quarantine and/or conditional release and monitoring of putative class members who enter the country unlawfully.  *See, e.g.*, ECF No. 44-2 at 24, 57; March 20 Order, 85 Fed. Reg. at 17,066–17,067; May 20 Order, 85 Fed. Reg. at 31,508, n.32.

But the government's argument is suspect given that the alternative to quarantine that they propose—expulsion pursuant to the Title 42 Process—results in unaccompanied minors often being detained longer while awaiting expulsion than they would otherwise be, and the concomitant lengthened exposure of class members to other non-citizens, Customs and Border Patrol officers, and local medical personnel.  Plaintiff has provided a report from an independent monitor filed in the *Flores* litigation that found expelling children from the United States under the Title 42 Process takes an average of five days, "with a substantial number of children experiencing extended stays of more than 10 days,"  (ECF No. 52-3 at 30), as opposed to the 72 hours mandated under the TVPRA for transfer to the Office of Refugee Resettlement, *see* 8 U.S.C. § 1232(b)(3) (under normal process, Homeland Security must transfer children within 72 hours to the custody of the Office of Refugee Resettlement).  This longer period would appear to subject Customs and Border Patrol officers to greater risk from unaccompanied non-citizen children—and, indeed, vice-versa—than the prior process.

Next, Defendants rely on a declaration from Jallyn Sualog, the Deputy Director of the Office of Refugee Resettlement, submitted with the government's opposition to the current motions.  Ms. Sualog attests to particular concern about the number of unaccompanied non-citizen children that the Office of Refugee Resettlement "can safely absorb into the system at one time," asserting that the program "would likely come under significant stress if [it] were to begin to receive on a regular basis approximately 75 to 100 referrals of [unaccompanied minor children] per week, with approximately 30% of [them] having tested positive or been exposed to COVID-19."  ECF No. 42-5 at 4; ECF No. 44-2 at 56.  In *Flores*, Judge Gee recently addressed whether the very same assertions by the very same declarant made out a likelihood of harm to the government and found

them wanting. She found that the underlying factual contentions—that there would be an addi-
tional 75 to 100 referrals per week, of whom 30 percent would need to be isolated or quarantined—
were "highly speculative," noting that the government failed to support its assumptions with a
declaration from a public health official providing "scientific or empirical analysis" to support the
statements. In Chambers Order at 3, *Flores*, No. CV 85-4544 DMG (AGRx) (C.D. Cal Sept. 21,
2020), ECF No. 990. In a supplemental declaration, Ms. Sualog asserts that between September
1, 2020, and September 16, 2020, the Office of Refugee Resettlement received 568 referrals of
unaccompanied non-citizen children, 2 of whom were COVID-19 positive and 170 of whom were
COVID-19 exposed, which works out to 30 percent.[17] ECF No. 58-1 at 6. It is not disputed,
however, that, at the present time, the Office of Refugee Resettlement's care-provider facilities are
operating at well below capacity and they have thousands of beds available. ECF No. 42-5, ¶ 31–
32. Judge Gee specifically found that "there are sufficient numbers of currently under-utilized
[Office of Refugee Resettlement] facilities such that transfers can be allocated among facilities to
avoid over-concentration or bottlenecking." In Chambers Order at 4, *Flores*, No. CV 85-4544
DMG (AGRx) (C.D. Cal Sept. 21, 2020), ECF No. 990.

The undersigned appreciates that, in light of the pandemic, a preliminary injunction will
impose hardships on the government and may force it, as it has all Americans, to make difficult
decisions about allocation of resources to mitigate the risks caused by COVID-19. Federal courts
are not empowered to reorganize agencies' priorities when those agencies are acting within the
bounds prescribed by Congress. Here, however, the public's interest in ensuring that those bounds
are honored—the "overriding public interest" in the "importance of an agency's faithful adherence
to its statutory mandate," *Jacksonville Port Auth.*, 556 F.2d at 59—coupled with its interest in

---

[17] Ms. Sualog indicates that the government measures "exposure" based on the unaccompanied minors' self-report
concerning their travel history. ECF No. 42-5, ¶ 20; ECF No. 58-1 at 21.

protecting children from being "deliver[ed] [ ] into the hands of their persecutors," *E. Bay Sanctu-ary Covenant*, 950 F.3d at 1281, weigh in favor of issuing a preliminary injunction in this case.

4.      Breadth of Injunction and Bond

The undersigned has found that all four factors to be considered when deciding a motion for a preliminary injunction weigh in favor of granting the motion.  The question then becomes the breadth of that preliminary injunction.  In his Reply, Plaintiff notes that the Interim Final Rule, under which the CDC Orders here were issued, will be superseded by the Final Rule on the earlier of two dates: October 11, 2013, or the date that the Interim Final Rule "ceases to be in effect," because it has been "vacated or enjoined by a court."  ECF No. 51-1 at 32 (citing 85 Fed. Reg. at 56,424).  He therefore asks that, if the Court issues a preliminary injunction, it "specify that [the injunction] encompass the Final Rule and any substantially similar CDC Order granted under its terms."  ECF No. 51-1 at 32.

As should be clear from the discussion above, there is no relevant material difference be-tween the CDC Director's authority under the Final Rule and the authority that the government has here argued he enjoys under the Interim Final Rule.  The Final Rule interprets "'[p]rohibit, in whole or in part, the introduction into the United States of persons' to mean 'to prevent the intro-duction of persons into the United States by suspending any right to introduce into the United States, physically stopping or restricting movement into the United States, *or physically expelling* from the United States some or all of the persons.'"  85 Fed. Reg. at 56,425 (alteration in original) (emphasis added).  That is precisely the interpretation the government urged here in connection with the Interim Final Rule and the CDC Orders.  ECF No. 44-2 at 14–15 ("The statute grants the Executive Branch 'the power to prohibit, in whole or in part, the introduction of persons' into the United States during an outbreak of a communicable disease in order to avert the danger of the

disease spreading into the United States.  By granting that broad power, Congress necessarily gave the Executive Branch the authority to take actions needed to exercise that power.  That includes . . . the power *to promptly expel* persons who managed to surreptitiously cross over the U.S. border from a designated foreign country in violation of a Section 265 order and then are halted while in the process of moving into the interior."  (internal citation omitted) (quoting 42 U.S.C. § 265) (emphasis added).  The undersigned agrees with Plaintiff that the preliminary injunction should be crafted to make clear that it prohibits expulsion from the United States under the Title 42 Process whether that conduct has been permitted in orders issued by the CDC Director pursuant to the authority of the Interim Final Rule or the Final Rule.

Plaintiff also asks the Court not to require him to post a bond pursuant to Rule 65(c) of the Federal Rules of Civil Procedure.  That rule states that "[t]he court may issue a preliminary injunction . . . only if the movant gives security in an amount that the court considers proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined."  Fed. R. Civ. P. 65(c).  "Courts in this Circuit have found the Rule 'vest[s] broad discretion in the district court to determine the appropriate amount of an injunction bond,' including the discretion to require no bond at all."  *Simms v. District of Columbia*, 872 F. Supp. 2d 90, 107 (D.D.C. 2012) (Sullivan, J.) (internal citation omitted) (quoting *DSE, Inc. v. United States,* 169 F.3d 21, 33 (D.C. Cir. 1999)); *see also Council on Am.-Islamic Relations v. Gaubatz*, 667 F. Supp. 2d 67, 81 (D.D.C. 2009) (same).  In determining the appropriateness or amount of a bond, courts take into account the financial wherewithal of the party seeking the preliminary injunction and whether the action seeks to enforce important federal rights or public interests.  *See, e.g.*, *Carranza v. Reams*, No. 20-CV-00977, 2020 WL 2320174, at *14 (D. Colo. May 11, 2020); *Booth v. Galveston Cty.*, No. 3:18-CV-00104, 2019 WL 4305457, at *2 (S.D. Tex. Sept. 11, 2019); *Flack v. Wis. Dep't of Health*

*Servs.*, 328 F. Supp. 3d 931, 955 (W.D. Wis. 2018); *Simms*, 872 F. Supp. 2d at 107.  Here, Plaintiff, a 15-year-old boy from Guatemala allegedly fleeing persecution in his home country and seeking to represent a class including similarly-situated children, does not have the ability to post a bond. Additionally, this action seeks to vindicate important rights granted under immigration laws. The undersigned therefore recommends that the Court waive the requirement for an injunction bond or require a nominal amount.  *See, e.g.*, *Page Commc'ns Eng'rs, Inc. v. Froehlke*, 475 F.2d 994, 997 (D.C. Cir. 1973) (recognizing the court's "discretion to fix bond in a nominal amount"); *cf. Laster v. District of Columbia*, 439 F. Supp. 2d 93, 99 (D.D.C. 2006) (suggesting that where, as here, the defendant did not request a bond, none is required).

### III.    CONCLUSION

For the foregoing reasons, the undersigned **RECOMMENDS** that Plaintiff's Motion for Class Certification (ECF No. 2) be **PROVISIONALLY GRANTED** and the Court provisionally certify a class pursuant to Rules 23(a) and 23(b)(2) of the Federal Rules of Civil Procedure consisting of all unaccompanied noncitizen children who (1) are or will be detained in U.S. government custody in the United States, and (2) are or will be subjected to expulsion from the United States under the Title 42 Process, whether pursuant to an Order issued by the Director of the Centers for Disease Control and Prevention under the authority granted by the Interim Final Rule, 85 Fed. Reg. 16559-01, or the Final Rule, 85 Fed. Reg. 56,424-01.  The undersigned **FURTHER RECOMMENDS** that Plaintiff be appointed as Class Representative and that Plaintiff's counsel from the ACLU Immigrants' Rights Project be appointed as Lead Class Counsel and his other counsel be appointed as Class Counsel.

The undersigned **FURTHER RECOMMENDS** that Plaintiff's motion for a preliminary injunction (ECF No. 15-2) be **GRANTED** and that the Court order that Defendants, their agents,

and any person acting in concert with them are enjoined from expelling the Class Members from the United States under the Title 42 Process, whether pursuant to an Order issued by the Director of the Centers for Disease Control and Prevention under the authority granted by the Interim Final Rule, 85 Fed. Reg. 16559-01, or the Final Rule, 85 Fed. Reg. 56,424-01.

*       *       *       *       *

The parties are hereby advised that under the provisions of Local Rule 72.3(b) of the United States District Court for the District of Columbia and the Minute Order of Judge Sullivan entered in this case on September 6, 2020, any party who objects to the Report and Recommendation must file a written objection thereto with the Clerk of this Court within 7 days of the party's receipt of this Report and Recommendation.  The written objections must specifically identify the portion of the report and/or recommendation to which objection is made, and the basis for such objections. Any oppositions shall be due no later than 7 days after being served with a copy of the objections; and replies shall be due no later than 5 days after being served with a copy of the opposition.  The parties are further advised that failure to file timely objections to the findings and recommenda-tions set forth in this report may waive their right of appeal from an order of the District Court that adopts such findings and recommendation.  *See Thomas v. Arn*, 474 U.S. 140 (1985).

Date:  September 25, 2020

_____
G. MICHAEL HARVEY
UNITED STATES MAGISTRATE JUDGE

50