**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

P.J.E.S., A MINOR CHILD, by and through
his father and NEXT FRIEND, Mario Escobar
Francisco, on behalf of himself and others
similarly situated,

          Plaintiff,

   v.

CHAD WOLF, Acting Secretary of Homeland
Security, et al.,

          Defendants.

Civil Docket No. 1:20-cv-02245-EGS-GMH

# EXHIBIT A

# UNITED STATES DISTRICT COURT
## FOR THE CENTAL DISTRICT OF CALIFORNIA

JENNY LISETTE FLORES; *et al.*,

      Plaintiffs,

  v.

WILLIAM P. BARR, Attorney General of the United States, *et al.*,

      Defendants.

Case No. CV 85-4544-DMG

## SUPPLEMENTARY DECLARATION OF JALLYN SUALOG, DEPUTY DIRECTOR, OFFICE OF REFUGEE RESETTLEMENT

I, Jallyn Sualog, declare under penalty of perjury, pursuant to 28 U.S.C. § 1746, that my testimony below is true and correct:

1.    I am the Deputy Director of the Office of Refugee Resettlement ("ORR"), an Office within the Administration for Children and Families ("ACF"), U.S. Department of Health and Human Services ("HHS").

2.    My qualifications, professional experience, and basis for my personal knowledge are detailed in the September 11, 2020 declaration I previously submitted in support of the Government's request for an administrative stay of the district court's September 4, 2020 Order, No. 20-55951, Dkt. No. 2-5 (9th Cir., Sept. 11, 2020), attached hereto as "Exhibit 1," which I incorporate by reference.

3.    I submit this supplementary declaration to: (a) clarify my testimony regarding ORR's functional intake capacity, Exhibit 1, ¶¶ 43-44, in light of my prior testimony in support of the Government's opposition to the request for a temporary restraining order in *Lucas R.*, No. 2:18-cv-05741, Dkt. No. 230-1, ¶¶ 13-14 (C.D. Cal. Mar. 27, 2020), attached hereto as "Exhibit 2"; (b)

address the impracticalities of Plaintiffs' proposal to use temporary foster care to house Title 42 minors; and (c) provide an update to ORR intake and referral figures presented in my September 11, 2020 declaration.

*Prior Declaration Testimony*

4.      In my March 27, 2020 declaration, I stated that, based on February 2020 data, ORR was at "28% occupancy rate", and based on that historically low capacity, concluded that "for the near-term, ORR is likely to have sufficient capacity to continue to implement necessary social distancing and/or isolation." Exhibit 2, at ¶¶ 13-14.

5.      This statement was made in opposition to the *Lucas R.* plaintiffs' request for the expedited release of UAC in ORR custody based on the allegedly heightened risk of COVID-19 infection within the ORR network, and was intended to demonstrate ORR's ability to safely implement COVID-19 protocols with respect to the then-current population of UAC already in ORR's care and custody.

6.      At the time the March 27, 2020 declaration was written, the CDC Order had only just become effective and referrals had dropped precipitously such that the ORR population was practically static. At the time, there were serious outbreaks emerging in New York, California, and Washington (states with a significant number of ORR shelters), and large portions of the country were entering strict "lock downs" pursuant to various state and local health directives. ORR was assuming a similarly cautious posture, and its primary focus was on ensuring that the UAC already in its care and custody could be adequately protected from COVID-19. At the time, 30% capacity was deemed adequate to implement protocols sufficient to protect the current population of UAC from COVID-19.

7.    I understand that this statement has been interpreted by some as meaning that ORR can safely ingest *any* number of UAC until the ORR network reaches approximately 30% capacity. However, this statement was made before all of ORR's current COVID-19 protocols were in place, and thus did not account for the capacity that ORR must hold in reserve in order to properly stage incoming UAC. This statement also did not address what impact an increase in the rate of referrals or an increase in the percentage of infected referrals would have on ORR's ability to implement effective COVID-19 containment protocols with respect to incoming UAC.

8.    ORR's current intake capacity must be understood in light of the current COVID-19 protocols described in my September 11, 2020 declaration, which includes staging incoming UAC in facilities along the Southwest border. This process, which was designed to frontload protections on incoming UAC, in order to protect the entirety of the ORR network, has the potential to create a bottleneck if a sufficient number of incoming UAC need to be placed in quarantine/isolation.

9.    The determination in my September 11, 2020 declaration remains correct: the ORR system would likely come under significant stress if ORR were to begin to receive on a regular basis approximately 75 to 100 referrals of UAC per week, with approximately 30% of the UAC having tested positive or been exposed to COVID-19. The compounding of that stress by other factors outside of ORR's control—such as a material shift in the demographics of UAC referrals towards younger children, which would limit the number of licensed facilities capable of caring for such children—would likely worsen the situation and jeopardize ORR's ability to maintain effective infection control measures. If the September 4 Order becomes effective, and the volume of referrals to ORR increases in kind, then the risk of such a scenario and the attendant consequences would increase dramatically.

10.     This is partly because under the current infection control measures, there are limits to the number of UAC that ORR can safely absorb into the system at any one time.  A breakdown in the operationalization of the infection control measures—triggered by a large volume of referrals or shift in the clinical presentations of UACs—would increase the danger of COVID-19 for newly-referred UACs and those presently in the system.

11.     Beyond this point, capacity in those facilities designated for the staging of incoming UAC will quickly be depleted, and ORR will be forced to move increasing numbers of UAC into the interior of the United States.  Depending on the percentage of infected incoming UAC, ORR may also need to conduct medical staging operations further inland.

12.     ORR's capacity is also affected by conditions in communities where shelters are located.  Already states such as California, Washington, and Texas have been impacted by natural disasters like wild fires and hurricanes.  ORR must also consider the possibility that future outbreaks of COVID-19 in communities where shelters are located could temporarily eliminate those locations as potential placements, and further limit ORR's capacity.

*Foster Care*

13.     I understand that Plaintiffs have suggested that ORR could simply transfer an excess UAC to foster care.

14.     While ORR may have approximately 1900 TFC beds as of September 16, 2020, this does not translate to an ability to accommodate that many children into TFC programs. Transitional foster care (TFC) is reserved for children under the age of 12, pregnant and parenting teens, children with disabilities and/or sibling groups.[1]

---

[1] *See* Children Entering the United States Unaccompanied: Guide to Terms, https://www.acf.hhs.gov/orr/resource/children-entering-the-united-states-unaccompanied-guide-

15.    The majority of UAC DHS refers to ORR are teenagers who are often not suitable for TFC due to their age.

16.    Additionally, foster parents are licensed for specific ages, genders, and capacities within their own private homes, and only children meeting these specific demographics can be referred for placement with these families. Even outside of a worldwide pandemic it can be time consuming to identify a suitable foster family given the demographics of a referred child and their individual needs. Foster parents retain the right to deny placement at any time.

17.    In addition, many foster families already have their own children, family members, and other foster children in their homes. The potential for exposure to COVID-19 by taking in referrals from the border could prove too risky for foster parents to accept. In fact, ORR programs have noted a drop in available foster families in recent months, due in part to these concerns.

*Updated Figures*

18.    From September 1, 2020 to September 16, 2020, ORR has received 568 referrals, of which 30% were COVID-19 positive or exposed; specifically, 2 were COVID-19 positive (requiring isolation) and 170 were COVID-19 exposed (requiring quarantine). In addition, since September 11, 2020, there have been an additional 46 COVID-19 cases among the UAC already in ORR care.

Executed on September 17, 2020.

_____

Jallyn Sualog

---

to-terms (defining "Transitional Foster Care"); ORR Policy Guide § 1.2.2,
https://www.acf.hhs.gov/orr/resource/children-entering-the-united-states-unaccompanied-section-1#1.2.

Attachment A

No. _____
_____

IN THE UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT
_____
JENNY LISETTE FLORES, et al.
Plaintiffs-Appellees,

v.

WILLIAM P. BARR,
Attorney General of the United States, et al.
Defendants-Appellants.
_____
ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE CENTRAL DISTRICT OF CALIFORNIA
_____

## DECLARATION OF JALLYN SUALOG,
## DEPUTY DIRECTOR, OFFICE OF REFUGEE RESETTLEMENT

I, Jallyn Sualog, declare under penalty of perjury, pursuant to 28 U.S.C. § 1746, that my testimony below is true and correct:

1.     I am the Deputy Director of the Office of Refugee Resettlement ("ORR"), an Office within the Administration for Children and Families ("ACF"), U.S. Department of Health and Human Services ("HHS").

2.     I have held the position of Deputy Director since June 2018.  I was previously the Director of Children's Services from September 2013 through June 2018.  I have worked at ORR since February 2007.  I have a Master's of Arts in Clinical Psychology.  Before joining ORR, I worked as a mental health professional

and managed the child welfare and social services programs for Hawaii's largest non-profit organization.

3.    As the Deputy Director of ORR, I have responsibility for the oversight of the Unaccompanied Alien Children ("UAC") program, including all aspects of operations, planning and logistics, medical services, and monitoring. My job duties include the formulation and implementation of ORR's response to coronavirus disease 2019 (COVID-19) across its network of grantee care-provider facilities. In the course of performing my duties, I have gained personal knowledge of the factors that impact ORR operations, and the challenges associated with implementing ORR's COVID-19 infection control protocols.

4.    My testimony in this declaration is based upon this personal knowledge, and information obtained from records and systems maintained by ORR in the regular course of performing my job duties.

5.    I am testifying in this declaration to the best of my knowledge, and understand that this declaration is for use in the Government's appeal of the district court's September 4, 2020 order in *Flores v. Barr*, No. 2:85-cv-04544-DMG-AGR (C.D. Cal.), Dkt. No. 976 ("September 4 Order").

### ***The district court's order will significantly disrupt ORR operations and endanger UAC and ORR personnel***

6.    I have been asked by ORR leadership to assess the potential impact that material changes in the current ORR operating environment would have on ORR program operations, including the impact of the September 4 Order.

7.    It is my understanding that the September 4 Order directs the Government to cease temporarily housing alien minors in hotels pending their expulsion pursuant to the CDC Order prohibiting the introduction of certain "covered aliens" into the United States.

8.    I understand that in the September 4 Order, the district court determined that minors held pursuant to the CDC Order are also members of the *Flores* settlement class, and therefore must be transferred "as expeditiously as possible" to a licensed ORR grantee care provider facility if "a bed in a licensed facility is immediately available." Dkt. No. 976, 17, para.1. I also understand that the September 4 Order directs that, once in ORR care, any minors subject to the CDC Order must be treated identically to the population of UAC that it is ORR's statutory mission to care for. *See id.*

9.    It is my understanding the district court stayed the September 4 Order until midnight on September 8, after which, the U.S. Department of Homeland Security (DHS) must cease placing minors in hotels by September 15. *Id.* at 17, para.2. Absent an emergency stay, I anticipate that on or about September 15, ORR

will begin receiving referrals from DHS of alien minors who would otherwise have been cared for in hotels and then expelled under the CDC Order.

10.     As described below, ORR has implemented robust COVID-19 infection control protocols, which I believe have helped to protect both UAC and ORR and grantee personnel from COVID-19 thus far.  ORR's infection control protocols were developed in consultation with CDC, and take into account the relatively low and stable ORR census during the COVID-19 pandemic.  Although the ORR network is comprised of many facilities that house and care for UAC in congregate settings, the relatively low and stable ORR census has allowed ORR to implement infection control measures across the ORR network that would be unworkable if the number of UAC referred to ORR were to increase materially above current levels.

11.     I anticipate that the September 4 Order will lead to an increase in the number of referrals to ORR.  If the number of referrals increases materially, ORR will not be able to safely absorb incoming UAC according to its existing COVID-19 infection control measures, which will increase the risk of introducing COVID-19 into the ORR network, which I understand to be the type of situation the CDC Order was intended to avoid.

12.     Indeed, it is my understanding that hotels are used to house Title 42 minors pending their expulsion precisely because hotels furnish accommodations

conducive to an effective quarantine. Specifically, it is my understanding that hotels enable Title 42 minors to be confirmed to individual rooms with closed doors, where each minor has their own sleeping, eating, and bathing facilities. According to CDC guidance, it is ideal to quarantine individuals in private quarters because it eliminates the opportunity for others to come into contact with surfaces that may have been contaminated with respiratory droplets produced the quarantined individual, such as doorknobs, faucet handles, and other high-touch surfaces.[1]

13. Under the September 4 Order, hotels are no longer an option for temporarily housing Title 42 minors pending their expulsion. As a result, Title 42 minors who would have been housed in hotels Order will now be referred to ORR.

14. As the number of UAC in the ORR network increases, ORR will gradually lose the extra space that must be held in reserve to quarantine or isolate UAC as needed, and ORR will be forced to house UAC in denser conditions, which will further increase the risk of transmission of COVID-19.

---

[1] *See* CDC, Interim Guidance on Management of Coronavirus Disease 2019 (COVID-19) in Correctional and Detention Facilities (updated July 22, 2020), https://www.cdc.gov/coronavirus/2019-ncov/community/correction-detention/guidance-correctional-detention.html ("In order of preference, multiple quarantined individuals should be housed: IDEAL: Separately, in single cells with solid walls (i.e., not bars) and solid doors that close fully."); *see also* CDC, Guidance for Shared or Congregate Housing, https://www.cdc.gov/coronavirus/2019-ncov/community/shared-congregate-house/guidance-shared-congregate-housing.html (last updated Aug. 3, 2020) ("If possible, designate a separate bathroom for residents with COVID-19 symptoms.").

15.     Furthermore, immediate implementation of the September 4 Order will require ORR to abruptly transfer hundreds of UAC currently housed in shelters along the Southwest border further inland, in order to make room to medically stage additional incoming UAC in facilities along the Southwest border.  This will require UAC and ORR personnel to travel long distances on common carriers, such as airplanes, creating additional risk of infection.  The movement of so many UAC across the ORR network also increases the risk of introducing COVID-19 into the shelters that receive transferred UAC, and the communities where those shelters are located.

16.     I am concerned that once implementation of the September 4 Order begins, the operational complexity of the implementation will have the unintended consequence of increasing the danger of COVID-19 within the ORR network.

### *Material changes in the ORR operating environment will negatively impact the program*

17.     At this point in time, ORR is implementing infection control measures across its system in response to the COVID-19 pandemic, and the system-wide census (that is, the number of UAC in the system) is low relative to the maximum capacity of the system when there is no pandemic.  It is also low relative to the historical highs in the census when there is no pandemic.  The relatively low census

has remained relatively stable for months. ORR attributes the current operating environment to the CDC Order.

18.     My experience is that a host of factors can impact ORR operations. Some of those factors are within ORR's control. Others are not. ORR does not, for example, control the number of referrals of UAC that it receives from DHS; the home countries, demographics, or clinical presentations of the UAC referred by DHS; the numbers or locations of potential sponsors for the UAC; the public health situation domestically or internationally; the public health measures implemented by individual U.S. states or transportation companies (e.g., commercial airlines) in response to the COVID-19 pandemic; and natural disasters that take ORR shelters offline (e.g., recent hurricanes in Texas and Louisiana). ORR can control the public health measures that it implements within its system—as well its decisions concerning the placement and release of UACs—within the operating environment that is presented to ORR and is outside of ORR's control.

19.     My best programmatic judgment is that the relatively low and stable census in recent months has given ORR needed operational flexibility to effectively implement infection control measures—and make prompt and safe placement and release decisions—across the system. ORR has, for example, been able to isolate or quarantine confirmed or suspected cases of COVID-19, respectively, among the UAC population as they arise. These measures have protected the health and safety

of UAC in ORR's care and custody and prevented the development of more serious public health concerns in ORR shelters.

20.     It would increase the risks to the federal and grantee staff who care for the UAC if there were a material increase in UAC referrals or the percentage of UACs who have tested positive for COVID-19 or been exposed to the disease; the complexity of ORR operations would increase as well and have a potentially negative impact on the effectiveness of the infection control measures in ORR shelters.  Indeed, under the current infection control measures, there are limits to the number of UAC that ORR can safely absorb into the system at any one time.  A breakdown in the operationalization of the infection control measures—triggered by a large volume of referrals or shift in the clinical presentations of UACs—would increase the danger of COVID-19 for newly-referred UACs and those presently in the system.

21.     The health and safety of federal and grantee staff is critical because the loss of staff to sickness or self-quarantine diminishes the capacity of ORR to care for UAC.  ORR already loses dozens of staff each week to self-quarantine for COVID-19 because of state and local rules that mandate self-quarantine when traveling between U.S. jurisdictions with high rates of community transmission. When members of the staff transport UAC to sponsors as part of the release process, many become temporarily unavailable regardless of whether they have actually

become infected with or exposed to COVID-19.  Any outbreaks in ORR shelters that might result from increases in the census or breakdowns in infection control measures would put additional stress on program operations.  Sadly, there have also been several staff deaths associated with COVID-19 during the pandemic; rigorous adherence to infection control measures is important to maintaining morale and the ability to recruit and retain new staff during this challenging time.

22.     My best programmatic judgment is that the ORR system would likely come under significant stress if ORR were to begin to receive on a regular basis approximately 75 to 100 referrals of UAC per week, with approximately 30% of the UAC having tested positive or been exposed to COVID-19.  The compounding of that stress by other factors outside of ORR's control—such as a material shift in the demographics of UAC referrals towards younger children, which would limit the number of licensed facilities capable of caring for such children—would likely worsen the situation and jeopardize ORR's ability to maintain effective infection control measures.  If the September 4 Order becomes effective, and the volume of referrals to ORR increases in kind, then the risk of such a scenario and the attendant consequences would increase dramatically.

### *The COVID-19 pandemic presents unprecedented operational challenges for ORR*

23.     ORR is the agency charged with the care and custody of UAC pursuant to 8 U.S.C. § 1232(c) and other provisions.  As such, ORR is committed to providing for the safety and well-being of all UAC in its care, as well as protecting the health and safety of the communities in which these children live—including from the risk of COVID-19.

24.     To carry out its mission, ORR relies on a network of grantee care-provider facilities located across the country. There are a total of 107 facilities in the ORR grantee care-provider network that house UAC in a congregate setting.

25.     ORR has experience with the identification, mitigation, and treatment of communicable diseases affecting UAC, including seasonal influenza (flu), mumps (parotitis), chicken pox (varicella), and tuberculosis.  ORR has policies pertaining to communicable disease control that predate the COVID-19 pandemic. ORR's general, long-standing policies concerning the management of communicable disease require the routine assessment of travel history when a child arrives at a care-provider program; medical screenings and vaccinations within 48 hours of arriving at ORR shelters; ability to isolate or quarantine individuals for the purpose of communicable disease control; hand hygiene and respiratory etiquette education efforts; and established communicable disease reporting to the local health authority.

26.     The operational challenges presented by the COVID-19 pandemic far
exceed those presented by other communicable diseases in the past.  Previously,
when ORR needed to address infection prevention and control, it was in response
to isolated cases or outbreaks in individual facilities, where the cause typically was
an already-infected UAC.    Other  instances  involved  localized  outbreaks  in
communities where ORR facilities are located.  ORR and its care providers have
never before confronted a situation where all incoming UAC increased the danger
of the introduction of a quarantinable communicable disease into the United States,
[2] or where the same quarantinable communicable disease posed a risk to the current
UAC  population  and  ORR  and  grantee  personnel  based  on  the  community
transmission  of  that  disease  in  locations  where  ORR  facilities  are  located.
Likewise, ORR and its care providers did not originally structure the physical plants
or ordinary operations of their facilities to address the challenges presented by the
COVID-19 pandemic; the pandemic has required substantial and novel adjustments
in the use, operations, and capacity of facilities by ORR and its care providers.  In
these respects, the COVID-19 pandemic has been unprecedented in the history of
the program.

---

[2] *See* Notice of Order Under Sections 362 and 365 of the Public Health
Service Act Suspending Introduction of Certain Persons From Countries Where a
Communicable Disease Exists, 85 Fed. Reg. 17060 (Mar. 26, 2020) (effective Mar.
20, 2020) (determining that "covered aliens" who have traveled through Mexico
pose a risk of introducing COVID-19 into the United States due to the prevalence
of COVID-19 in Mexico).

### *ORR's infection control measures are workable and safe with a stable and low census*

27.     Since the first reports of COVID-19 in the U.S., ORR has monitored the public health reporting on COVID-19 in the jurisdictions in which grantee care-provider facilities operate.  ORR has provided regular updates to grantee care-provider facilities on infection prevention and control, and issued guidance regarding the screening and management of UAC, facility personnel, and visitors who have potentially been exposed to COVID-19.  All of these measures are rooted in guidance from CDC.

28.     Personnel from ORR's Division of Heath for Unaccompanied Children (DHUC) began consulting with CDC to develop COVID-19 infection control measures that could be implemented across the ORR network, notwithstanding the variation in physical structures, staffing, and operations across ORR care provider facilities.  Specifically, DHUC, including DHUC Director Dr. Michael Bartholomew, consulted with relevant subject matter experts from CDC, including Dr. Amanda Cohn, who reviewed ORR's guidance to care provider facilities on COVID-19 to confirm that it aligned with CDC's guidelines and recommendations, and the best practices for preventing and controlling the spread of COVID-19 within residential facilities.  This includes guidance related to symptom and temperature monitoring of staff and children, cleaning and hygiene guidance, and ensuring the ability to isolate ill UAC and quarantine potentially

exposed UAC. *See* Decl. of A. Cohn, *Lucas R. v. Azar*, No. 2:18-cv-5741 DMG (PLAx), Dkt. No. 230-11 (Mar. 27, 2020) (describing CDC's consultation with ORR).

29.     To prevent those who may have been exposed to or infected with COVID-19 from entering ORR facilities, ORR has mandated that all visitors and staff seeking to enter any grantee care-provider facility answer COVID-19 screening questions and submit to a mandatory temperature check. With the exception of UAC who are being processed for admission, grantee care-provider facilities are required to deny access to anyone with a fever of 100°F or above; or who exhibits signs of symptoms of an acute respiratory infection, such as a cough or shortness of breath; or who has had contact with someone with a confirmed diagnosis of COVID-19 in the previous 14 days; or who has been tested for COVID-19 and is awaiting test results; or who, in the previous 14 days, has traveled to a country identified by CDC as having widespread, sustained community transmission of COVID-19.

30.     In addition, UAC entering ORR care are screened for COVID-19 exposure or symptoms during their initial medical examination ("IME"), which has been expanded to include a COVID-19 health screening protocol consistent with CDC COVID-19 guidelines.

31.     UAC at risk of COVID-19 exposure based on reported travel history, but without symptoms, are quarantined and monitored for 14 days.  UAC who exhibit COVID-19 symptoms during their IME are isolated and tested in consultation with the local health authority.

32.     ORR has also instituted a symptom-monitoring regime to ensure that any UAC in any facility who begins exhibiting potential symptoms of COVID-19 after their IME is immediately identified and appropriately isolated in consultation with the local health authority.

33.     Since March 19, 2020, ORR has required each grantee care-provider facility to monitor the temperature of every UAC in care. UACs' temperatures are taken twice daily, once in the morning and again in the evening, and are recorded in a master census temperature report that each facility is required to maintain.  If any UAC is found to have a temperature above 100°F, the grantee care-provider is required to immediately alert ORR. The grantee care-provider is required to alert ORR each day that any child has a temperature over 100°F.  So for example, if a UAC has a 101°F fever for three days, ORR will be alerted of this fact every day for the duration of the child's fever.  Early identification of potential COVID-19 cases allows for early introduction of appropriate public health measures.

34.     Any UAC exhibiting symptoms consistent with COVID-19, such as coughing, fever, or difficulty breathing, at any point during their time in ORR care

are to be immediately isolated and referred for evaluation by a licensed medical provider, in consultation with the local health authority. If a UAC is recommended for testing by the healthcare provider or public health department, the UAC is tested.

35.     The same isolation procedures are used for any UAC determined to be at risk for COVID- 19 exposure or infection, whether based on information collected during the IME, or through subsequent monitoring. The affected UAC will be provided with a private room, with a closed door and bathroom access, preferably a private bathroom that is not used by other staff or UAC. State and local health departments, along with DHUC are immediately notified and consulted for additional guidance on risk assessment, symptom monitoring, and isolation or quarantine.

36.     Facility personnel who enter an occupied isolation room are required to wear personal protective equipment, including an N95 respirator and goggles or a face shield, per CDC guidelines. If a UAC in isolation needs to leave the isolation room for any reason (e.g., to attend a medical appointment, etc.), the UAC must wear a surgical mask for the duration of their time outside the isolation room.

37.     If a UAC must be transported to a health clinic or other off-site location, the facility must notify the local health department for guidance on proper precautions during transport. The facility is also required to alert the intended

destination so that proper infection control measures may be implemented prior to the UAC's arrival.

38.    UAC are required to remain in isolation until cleared by the local health department or DHUC.  During this time in isolation, UAC receive the same services as their non-isolated peers in the same facility, although services—particularly education services—may be adjusted to accommodate proper infection-control procedures.

39.    Program staff will provide an affected UAC with notice of the isolation requirement and address questions or concerns the child may have about medical isolation, as well as potential delays to anticipated transfers or discharge plans.  In order to protect the health of UAC and the local community, UAC cannot be transferred either to another facility or released to a sponsor until cleared by local health authorities and DHUC.

40.    In my judgment, these infection control measures have protected the health and safety of UAC and federal and grantee staff alike.  As I discuss more fully below, the ORR system has had to manage UAC and staff who have tested positive for COVID-19 or been exposed to the disease.  The management of those situations pursuant to ORR's infection control measures has succeeded in preventing more serious public health concerns from developing in ORR facilities.

41.     In my judgment, ORR has been able to implement the infection control measures effectively due in part to its system-wide census during the COVID-19 pandemic.  The system-wide census during the pandemic has been far less than either ORR's maximum capacity or historical highs.

42.     As of September 8, 2020, there are a total of 1,097 UAC in ORR care. This includes 409 UAC in long-term foster care and 139 UAC in transitional foster care, which are not congregate settings.  For congregate settings only, there are 515 UAC in shelter facilities.

43.     Currently, ORR's care-provider facilities are operating below their maximum capacity and historical highs. For example, at this time last year (August/September of 2019), ORR was receiving approximately 2,779 monthly referrals and had almost 5,039 minors in care with a 41% occupancy rate (including influx and variance beds).  In contrast, August 2020 referrals were approximately 423 with approximately 972 minors in care, and an 8% occupancy rate (including influx and variance beds).

44.     Critically, based on the August 2020 referrals, ORR is already receiving approximately 105 referrals a week, which is the upper limit of referrals ORR can safely absorb while maintaining COVID-19 infection prevention protocols.  Thus, ORR is already at its functional intake capacity.  It is my understanding that DHS anticipates that it may need to refer approximately 60-140

additional minors to ORR per week after the September 4 Order takes effect and DHS can no longer house minors in hotels.

45. Thus, I anticipate that ORR will immediately begin receiving approximately 165 to 245 referrals a week from DHS once the September 4 Order becomes effective, which exceeds the threshold of 75 to 100 referrals a week that ORR can safely absorb according to its COVID-19 infection prevention protocols.

46. Although ORR has a large number of available beds on paper, the majority of these beds are located in congregate facilities, where UAC live in dormitory-like conditions, with shared sleeping, eating, and bathing facilities. ORR cannot use its full capacity to shelter UAC without jeopardizing its ability to maintain its current infection control measures. Moreover, many of the available beds are in shelters located in the interior of the United States, and ORR could not utilize them without transporting UAC from the U.S.-Mexico border region, through multiple states, to the shelters. This would increase the risk of COVID-19 exposure for UAC and federal and grantee staff alike, in addition to leading to reductions in ORR operational capacity due to subsequent self-quarantines of returning staff. The relatively stable, historically low system-wide census within ORR facilities during the COVID-19 pandemic has allowed ORR the operational flexibility that it needs to implement infection control measures effectively.

### *Careful placement and release decisions are another key part of the COVID-19 response*

47.    ORR is continually monitoring the jurisdictions in which its grantee care-provider facilities operate to determine whether the conditions in the community surrounding the facility warrant the suspension of placements due to concerns related to COVID-19.  For example, beginning on March 9, 2020, ORR stopped placements of UAC on a rolling basis in the states of California, New York, and Washington due to the ongoing outbreaks of COVID-19 among the general public in those states.

48.    In addition, ORR is prioritizing local placements for all new referrals from DHS in order to limit the need for UAC to travel on commercial airliners, which poses a risk of exposing passengers (including UAC) to COVID-19.  Care providers may still use air travel to reunify a UAC with their sponsor if it is safe to do so.  But care providers are required to assess the safety of the UAC's ultimate destination, in order to anticipate logistical issues associated with the COVID-19 pandemic.  Care-provider facilities are required to consult with their Federal Field Specialist ("FFS"), or delegate, if a UAC will be traveling to a jurisdiction with widespread community transmission of COVID-19 or that is subject to a community-wide "lock down."  In such cases, release should be postponed until it is deemed safe, which may be an undetermined and lengthy period, further burdening ORR capacity.  This safety assessment includes consideration of the

particular UAC's unique medical needs and vulnerabilities, and the UAC's respective medical specialists are consulted in the safety planning process.

49.    The increased operational complexity associated with placement and release decisions during the COVID-19 pandemic is yet another reason why a stable and low census is important to the effective implementation of infection control measures within the ORR system.  ORR cannot utilize its full capacity during the COVID-19 pandemic without jeopardizing its ability to maintain effective infection control measures.  At the same time, ORR must account for an array of public health concerns whenever it moves UAC into and out of ORR facilities.  A stable and low census gives ORR the operational flexibility that it needs to make placement and release decisions that are not only prompt but also safe for UAC and the public.

### *COVID-19  has already impacted ORR care-provider facilities*

50.    Despite the robust measures described above, COVID-19 has still impacted ORR.  As of September 8, 2020, there have been a total of 204 confirmed COVID-19 cases among UAC across all ORR care-provider facilities since March 24, 2020, when the first infection of a UAC was reported in a facility in New York.  Currently, there are 65 active cases.  Active cases are primarily in Texas, where ORR within the last two weeks received over 100 referrals of UAC infected with or exposed to COVID-19.  These UAC are currently in isolation, per ORR and CDC guidelines, and are receiving appropriate monitoring and medical care.  Even if

some eventually test negative, they must be presumed positive and cared for as such until results are available.

51.     In addition, a total of 745 program staff and contractors have self-reported testing positive for COVID-19 since March 18, 2020. The majority of infected staff are in Texas, Arizona and New York.  ORR has received reports that four (4) facility staff members and one (1) foster parent have died as a result of COVID-19.  ORR's medical team and the affected programs have worked in close coordination with the local public health departments on appropriate public health measures for staff members, which typically involve self-quarantine at home, and the tracking and monitoring of the affected staff members' contacts within the care-provider facility, per CDC guidance.

52.     In addition to the COVID-19 protocols described above, care-provider facilities are directed to follow any local requirements issued by the state licensing agency or other local public health authority related to the identification, reporting, and control of communicable diseases that are more stringent than ORR's protocols.

Executed on September 11, 2020.

_____
Jallyn Sualog
Deputy Director
Office of Refugee Resettlement

# Attachment B

Case 2:85-cv-04544-DMG-AGR   Document 685-15   Filed 05/25/20   Page 14 of 15   Page ID
#:3488

# Exhibit Q

Sualog Declaration

UNITED STATES DISTRICT COURT
FOR THE CENTRAL DISTRICT OF CALIFORNIA

LUCAS R., *et al.*,

        Plaintiffs,

    v.

ALEX AZAR, Secretary of U.S. Dep't of Health
and Human Services, *et al.*,

        Defendants.

Case No.:  2:18-CV-5741 DMG (PLAx)

District Judge Dolly M. Gee

## DECLARATION OF JALLYN SUALOG, DEPUTY DIRECTOR, OFFICE OF REFUGEE RESETTLEMENT

    I, Jallyn Sualog, declare under penalty of perjury, pursuant to 28 U.S.C. § 1746, that my testimony below is true and correct:

    1.    I am the Deputy Director of the Office of Refugee Resettlement ("ORR"), an Office within the Administration for Children and Families ("ACF"), U.S. Department of Health and Human Services ("HHS").

    2.    I have held the position of Deputy Director since June 2018.  I was previously the Director of Children's Services from September 2013 through June 2018.  I have worked at ORR since February 2007.  I have a Master's of Arts in Clinical Psychology.  Before joining ORR, I worked as a mental health professional and managed the child welfare and social services programs for Hawaii's largest non-profit organization.

    3.    As the Deputy Director of ORR, I have responsibility for the oversight of the Unaccompanied Alien Children ("UAC") program, including all aspects of operations, planning and logistics, medical services, and monitoring.  My job duties include the formulation and implementation of ORR's response to COVID-19 across its network of grantee care-provider facilities.

    4.    My testimony in this declaration is based upon my personal knowledge of ORR's response to COVID-19, information obtained from records and systems maintained by ORR in the regular course of performing my job duties, and CDC guidance documents regarding COVID-19, which I obtained from the CDC's official website and reviewed in connection with the performance of my duties.

    5.    I am testifying in this declaration to the best of my knowledge, and understand that this declaration is for use in the *Lucas R.* case.

*Background*

6.     ORR is the agency charged with the care and custody of UAC pursuant to 8 U.S.C. § 1232(c) and other provisions.  As such, ORR is committed to providing for the safety and well-being of all UAC in its care, as well as protecting the health and safety of the communities in which these children live—including from the risk of COVID-19.

7.     To carry out its mission, ORR relies on a network of grantee care-provider facilities located across the country.  There are a total of 107 facilities in the ORR grantee care-provider network that house UAC in a congregate setting: 98 shelters, 6 staff secure facilities, 1 secure facility, and 2 residential treatment centers ("RTCs").

8.     Although each care-provider facility is unique in terms of its physical layout and capabilities, the ORR Guide generally defines a shelter as "a residential care provider facility in which all of the programmatic components are administered on-site, in the least restrictive environment."[1]

9.      A staff secure facility is generally defined as "a facility that maintains stricter security measures, such as higher staff to unaccompanied alien children ratio for supervision, than a shelter in order to control disruptive behavior and to prevent escape.  A staff secure facility is for unaccompanied alien children who may require close supervision but do not need placement in a secure facility.  Service provision is tailored to address an unaccompanied alien child's individual needs and to manage the behaviors that necessitated the child's placement into this more restrictive setting.  The staff secure atmosphere reflects a more shelter, home-like setting rather than secure detention.  Unlike many secure care providers, a staff secure care provider is not equipped internally with multiple locked pods or cell units."[2]

10.     A secure facility is generally defined as "a facility with a physically secure structure and staff able to control violent behavior.  ORR uses a secure facility as the most restrictive placement option for an unaccompanied alien child who poses a danger to self or others or has been charged with having committed a criminal offense.  A secure facility may be a licensed detention center or a highly structured therapeutic facility."[3]

11.     An RTC is generally defined as "a sub-acute, time limited, interdisciplinary, psycho-educational, and therapeutic 24-hour-a-day structured program with community linkages, provided through

---

[1] ORR, Children Entering the United States Unaccompanied:  Guide to Terms (Mar. 21, 2016), "Shelter care," available at https://www.acf.hhs.gov/orr/resource/children-entering-the-united-states-unaccompanied-guide-to-terms#Shelter Care.

[2] *Id.*, "Staff secure care," available at https://www.acf.hhs.gov/orr/resource/children-entering-the-united-states-unaccompanied-guide-to-terms#Staff Secure Care.

[3] *Id.*, "Secure care," available at https://www.acf.hhs.gov/orr/resource/children-entering-the-united-states-unaccompanied-guide-to-terms#Secure Care.

2

non-coercive, coordinated, individualized care, specialized services and interventions. Residential treatment centers provide highly customized care and services to individuals following either a community based placement or more intensive intervention, with the aim of moving individuals toward a stable, less intensive level of care or independence. ORR uses a RTC at the recommendation of a psychiatrist or psychologist or with ORR Treatment Authorization Request (TAR) approval for an unaccompanied alien child who poses a danger to self or others and does not require inpatient hospitalization."[4]

12.     As of March 25, 2020, there are a total of 3,374 UAC in ORR care. This includes 439 UAC in long-term foster care and 374 UAC in transitional foster care, which are not congregate settings. For congregate settings only, there are 2,505 UAC in shelter facilities, 28 in staff secure facilities, 12 in secure facilities, and 16 in RTCs.

13.     Currently, ORR's care-provider facilities are operating significantly below their maximum capacity and historical highs. For example, at this time last year (March of 2019), ORR was receiving approximately 8,000 monthly referrals and had almost 12,000 minors in care with an 87% occupancy rate (including influx and variance beds). In contrast, February referrals from 2020 were approximately 2,000 per month with approximately 3,600 minors in care, and a 28% occupancy rate (including influx and variance beds). As a result, ORR currently has additional capacity and more opportunity to ensure social distancing and isolation within the care provider network.

14.     In addition, CDC recently issued an order under Public Health authorities suspending introduction of certain persons into the United States.[5] As a result, for the near-term, ORR is likely to have sufficient capacity to continue to implement necessary social distancing and/or isolation.

*ORR Infection Control Measures in Care Provider Facilities*

15.     ORR has significant historical experience with the identification, mitigation, and treatment of contagious diseases affecting UAC, including seasonal influenza (flu), mumps (parotitis), chicken pox (varicella), and tuberculosis. Accordingly, ORR has policies pertaining to infectious disease control that predate the COVID-19 pandemic.

16.     ORR's general, long-standing policies concerning the management of communicable disease require the routine assessment of travel history when a child arrives at a care-provider program; medical screenings and vaccinations within 48 hours of arriving at ORR shelters; ability to isolate or

---

[4] *Id.*, "Residential Treatment Center (RTC)," available at https://www.acf.hhs.gov/orr/resource/children-entering-the-united-states-unaccompanied-guide-to-terms#Residential Treatment Center.

[5] CDC Order Under Sections 362 and 365 of the Public Health Service Act (42 U.S.C. §§ 265, 268), available at https://www.cdc.gov/quarantine/order-suspending-introduction-certain-persons.html.

3

quarantine individuals for the purpose of infectious disease control; hand hygiene and respiratory etiquette education efforts; and established communicable disease reporting to the local health authority.[6]

17.    Since the first reports of COVID-19 in the U.S., ORR has monitored the public health reporting on COVID-19 in the jurisdictions in which grantee care-provider facilities operate.  ORR has provided regular updates to grantee care-provider facilities on infection prevention and control, and issued guidance regarding the screening and management of UAC, facility personnel, and visitors who have potentially been exposed to COVID-19.  All of these measures are rooted in CDC guidance.[7]

18.    To prevent those who may have been exposed to, or who may be infected with COVID-19 from entering ORR facilities, ORR has mandated that all visitors and staff seeking to enter any grantee care-provider facility answer COVID-19 screening questions and submit to a mandatory temperature check.  With the exception of UAC who are being processed for admission, grantee care-provider facilities are required to deny access to anyone with a fever of 100°F or above; or who exhibits signs of symptoms of an acute respiratory infection, such as a cough or shortness of breath; or who has had contact with someone with a confirmed diagnosis of COVID-19 in the previous 14 days; or who has been tested for COVID-19 and is awaiting test results; or who, in the previous 14 days, has traveled to a country identified by the CDC as having widespread, sustained community transmission of COVID-19.

19.    In addition, UAC entering ORR care are screened for COVID-19 exposure or symptoms during their initial medical examination ("IME"), which has been expanded to include a COVID-19 health screening protocol consistent with CDC COVID-19 guidelines.

20.    UAC at risk of COVID-19 exposure based on reported travel history, but without symptoms, are quarantined and monitored for 14 days.  UAC who exhibit COVID-19 symptoms during their IME are isolated and tested in consultation with the local health authority.

21.    ORR has also instituted a rigorous symptom-monitoring regime to ensure that any UAC in any facility who begins exhibiting potential symptoms of COVID-19 after their IME is immediately identified and appropriately isolated in consultation with the local health authority.

22.    Since March 19, 2020, ORR has required each grantee care-provider facility to monitor the temperature of every UAC in care.  UACs' temperatures are taken twice daily, once in the morning and again in the evening, and are recorded in a master census temperature report that each facility is required to maintain.  If any UAC is found to have a temperature above 100°F, the grantee care-provider is required

---

[6] *See* ORR Policy Guide § 3.4.6 Management of Communicable Diseases, § 3.4.7 Maintaining Health Care Records and Confidentiality, https://www.acf.hhs.gov/orr/resource/children-entering-the-united-states-unaccompanied-section-3.

[7] CDC, Interim US Guidance for Risk Assessment and Public Health Management of Persons with Potential Coronavirus Disease 2019 (COVID-19) Exposures: Geographic Risk and Contacts of Laboratory-confirmed Cases, https://www.cdc.gov/coronavirus/2019-ncov/php/risk-assessment.html.

to immediately alert ORR. The grantee care-provider is required to alert ORR each day that any child has a temperature over 100°F. So for example, if a UAC has a 101°F fever for three days, ORR will be alerted of this fact every day for the duration of the child's fever. Early identification of potential COVID-19 cases allows for early introduction of appropriate public health measures.

23. Any UAC exhibiting symptoms consistent with COVID-19, such as coughing, fever, or difficulty breathing, at any point during their time in ORR care are to be immediately isolated and referred for evaluation by a licensed medical provider, in consultation with the local health authority. If a UAC is recommended for testing by the healthcare provider or public health department, the UAC will receive testing.

24. The same isolation procedures are used for any UAC determined to be at risk for COVID-19 exposure or infection, whether based on information collected during the IME, or through subsequent monitoring. The affected UAC will be provided with a private room, with a closed door and bathroom access, preferably a private bathroom that is not used by other staff or UAC. State and local health departments, along with ORR's Division of Health for Unaccompanied Children ("DHUC") are immediately notified and consulted for additional guidance on risk assessment, symptom monitoring, and isolation or quarantine.

25. Facility personnel who enter an occupied isolation room are required to wear personal protective equipment, including an N95 respirator and goggles or a face shield, per CDC guidelines.

26. If a UAC in isolation needs to leave the isolation room for any reason (e.g., to attend a medical appointment, etc.), the UAC must wear a surgical mask for the duration of their time outside the isolation room.

27. If a UAC must be transported to a health clinic or other off-site location, the facility must notify the local health department for guidance on proper precautions during transport. The facility is also required to alert the intended destination so that proper infection control measures may be implemented prior to the UAC's arrival.

28. UAC are required to remain in isolation until cleared by the local health department or DHUC. During this time in isolation, UAC receive the same services as their non-isolated peers in the same facility, although services—particularly education services—may be adjusted to accommodate proper infection-control procedures.

29. Any room, object, or vehicle used by a UAC in isolation is thoroughly sanitized afterwards.[8]

---

[8] *See* CDC, Disinfecting Your Facility if Someone is Sick, https://www.cdc.gov/coronavirus/2019-ncov/prepare/disinfecting-building-facility.html.

5

30.     To assess whether each grantee care-provider facility has appropriate stores of personal protective equipment ("PPE") to safely respond in the event COVID-19 is detected within their facility, on March 13, 2020, ORR inventoried all care providers for their current levels of PPE (e.g., surgical masks and gowns, face shields, N95 respirators) and cleaning/disinfecting supplies, as well as the number of staff who are involved in cleaning and maintenance activities.  Any facility that encounters difficulty maintaining adequate levels of COVID-19 related supplies may request additional stores from FEMA, and ORR may assist in facilitating any such requests.

31.     Program staff will provide an affected UAC with notice of the isolation requirement and address questions or concerns the child may have about medical isolation, as well as potential delays to anticipated transfers or discharge plans.  In order to protect the health of UAC and the local community, *UAC cannot be transferred either to another facility or released to a sponsor until cleared by local health authorities and DHUC*.

*ORR Suspensions of Placements and Releases*

32.     Beginning on March 9, 2020, ORR stopped placements of UAC on a rolling basis in the states of California, New York, and Washington due to the ongoing outbreaks of COVID-19 among the general public in those states.  ORR is continually monitoring the jurisdictions in which its grantee care-provider facilities operate to determine whether the conditions in the community surrounding the facility warrant the suspension of placements due to concerns related to COVID-19.

33.     In addition, ORR is prioritizing local placements for all new referrals from DHS in order to limit the need for UAC to travel on commercial airliners, which poses a risk of exposing passengers (including UAC) to COVID-19.  Care providers may still use air travel to reunify a UAC with their sponsor if it is safe to do so.  However, care providers are required to assess the safety of the UAC's ultimate destination, in order to anticipate logistical issues associated with COVID-19 disruptions.  Care-provider facilities are required to consult with their Federal Field Specialist ("FFS"), or delegee, if a UAC will be traveling to a jurisdiction with widespread community transmission of COVID-19 or that is subject to a community-wide "lock down," such as California.  In such cases, release should be postponed until it is determined to be safe for the UAC to travel to their destination.  This safety assessment includes consideration of the particular UAC's unique medical needs and vulnerabilities, and the UAC's respective medical specialists are consulted in the safety planning process.

34.     Prior to the COVID-19 pandemic, ORR was working on a telehealth initiative to increase UAC's access to healthcare resources that may not be physically present in their locality.  In light of the state orders restricting the movement of people generally in California, New York, and elsewhere, ORR has rolled out its telehealth capabilities ahead of schedule in numerous jurisdictions in order to ensure care-

6

provider facilities are able to provide UAC with access to medical care without having to leave their facilities. Those jurisdictions are: California, New York, Connecticut, Maryland, Massachusetts, New Jersey, Pennsylvania, Texas, and Virginia. Further, ORR is awaiting final approval from telehealth providers in Arizona, Florida, Illinois, Michigan, Washington, and Oregon, and anticipates the service will be available in these locations in the near future.

*COVID-19 Cases in ORR Grantee Care Provider Facilities*

35.     As of March 26, 2020, there have been four confirmed COVID-19 cases among UAC across all ORR care-provider facilities. All four cases were in a single facility in New York state, and the affected UAC are currently in isolation, per ORR and CDC guidelines, and are receiving appropriate monitoring and medical care.

36.     Currently, 18 UAC in the care-provider network have been tested. As noted, four tested positive for COVID-19, 11 tested negative for COVID-19, and three have test results pending.

37.     Pursuant to CDC Guidance, any UAC who has undergone COVID-19 testing is considered presumptively positive until results are available (typically within 3-4 after testing) and are placed in isolation as a precautionary measure.

38.     In addition, a total of eight program staff, contractors or foster parents at five care-provider programs across New York, Washington, and Texas have self-reported testing positive for COVID-19. ORR's medical team and the affected programs have worked in close coordination with the local public health departments on appropriate public health measures, which typically involve self-quarantine at home, and the tracking and monitoring of the affected staff members' contacts within the care-provider facility, per CDC guidance.[9]

39.     In addition to the COVID-19 protocols described above, care-provider facilities are directed to follow any local requirements issued by the state licensing agency or other local public health authority related to the identification, reporting, and control of communicable diseases that are more stringent than ORR's protocols.

*Assessment of Plaintiffs' Assertions*

40.     In their March 22, 2020 correspondence, Plaintiffs stated that they "are advised that *congregate care is inherently incongruent with the recommendations of the Centers for Disease Control and Prevention*, state health authorities, and epidemiologists, all of whom recommend (if not mandate) social distancing and related safety precautions that are difficult, if not impossible, to observe in facilities

---

[9] CDC, Interim US Guidance for Risk Assessment and Public Health Management of Persons with Potential Coronavirus Disease 2019 (COVID-19) Exposures: Geographic Risk and Contacts of Laboratory-confirmed Cases, https://www.cdc.gov/coronavirus/2019-ncov/php/risk-assessment.html.

Defendants' Opposition to TRO - Exhibits                    008

housing more than ten Class Members." *See* Ltr. from C. Holguin (Ctr. for Human Rights & Const. Law), to D. Shieh (DOJ), dated Mar. 22, 2020, at 2 (emphasis added), attached hereto as "Exhibit A."

41.    CDC, however, has issued guidance on COVID-19 containment in various congregate settings, including colleges,[10] nursing homes,[11] prisons,[12] and homeless shelters.[13]  ORR has implemented such guidance to the extent that it can be applied to its grantee care-provider facilities.  Further, ORR has consulted with CDC regarding ORR's COVID-19 containment and mitigation strategies and has been told by CDC that they are consistent with CDC's recommendations.

42.    I have serious concerns about the proposals in Plaintiffs' March 22 correspondence that call for the expedited release of UAC to potential sponsors.  In particular, the immediate, blanket release of UAC to sponsors located in jurisdictions with widespread community transmission of COVID-19 would pose a risk to the health and welfare of the UAC.  UAC are currently housed in settings where infection control protocols are rigorously enforced.  In contrast, upon release, UAC may be exposed to COVID-19 in airports or transit systems, or through sponsors who have been exposed to COVID-19, or through circulation in communities with widespread community transmission of COVID-19.

43.    Many sponsors are also located in states that are currently under "lock down" in which residents' freedom of movement has been significantly curtailed in an effort to control the spread of COVID-19, such as California, Washington, and New York.  If anything, the current ORR approach is consistent with those "lock down" orders in that UAC are shielded from UAC community transmission.

44.    ORR's efforts to safely release UAC to safe, approved sponsors remain ongoing.  But Plaintiffs' proposal to release UAC to sponsors who are still undergoing vetting would materially increase the risk of release to a sponsor who potentially cannot or will not shelter in place with the UAC, or who may not adhere to appropriate infection control practices (e.g., social distancing), or who may circulate with the UAC in areas with widespread community transmission of COVID-19, all of which increase the health risks to the UAC.  Plaintiffs' proposal would also increase the risk of release to a sponsor who, because vetting has not yet completed, is, or will become unable to financially support the UAC due to COVID-19-related business closures, layoffs, or furloughs.

---

[10] CDC, Interim Guidance for Administrators of U.S. Higher Education, https://www.cdc.gov/coronavirus/2019-ncov/community/guidance-ihe-response.html.

[11] CDC, Preventing the Spread of COVID-19 in Retirement Communities and Independent Living Facilities (Interim Guidance), https://www.cdc.gov/coronavirus/2019-ncov/community/retirement/guidance-retirement-response.html.

[12] CDC, Interim Guidance on Management of Coronavirus Disease 2019 (COVID-19) in Correctional and Detention Facilities, https://www.cdc.gov/coronavirus/2019-ncov/community/correction-detention/guidance-correctional-detention.html.

[13] CDC, Interim Guidance for Homeless Service Providers to Plan and Response to Coronavirus Disease 2019 (COVID-19), https://www.cdc.gov/coronavirus/2019-ncov/community/homeless-shelters/plan-prepare-respond.html.

45.     The immediate, blanket release of UAC to sponsors who are still undergoing vetting would also deprive these UAC of access to the significant medical resources of ORR (including testing for COVID-19).  Once they leave ORR's care they are limited by the resources of their sponsor's household and local community, at a time when important medical resources may be in short supply.[14]

46.     Plaintiffs propose that ORR can expedite the release of UAC to potential sponsors on Plaintiffs' terms while adequately vetting the sponsors for the new child welfare and public health concerns that have arisen in recent months and are continuing to evolve.  Plaintiffs, however, do not identify the safeguards that ORR can jettison from the sponsor vetting process without putting UAC at risk.

47.     Plaintiffs also overlook the fact that fingerprinting remains a key component for many sponsors in the sponsor vetting process, particularly sponsors who are not parents or close relatives. Such fingerprinting has been affected by the recent closures of some digital fingerprinting sites due to COVID-19.

48.     Thirty-nine digital fingerprinting sites in 21 states[15] have, as of March 24, 2020, either closed, curtailed their hours of operation, or switched to an "appointment only" system in response the public health threat posed by COVID-19.  Fingerprinting is a key component of the background check process that is needed to fulfill the requirements of the TVPRA and ensure UAC are not released into the custody of sponsors with disqualifying criminal histories, such as convicted human traffickers and pedophiles.  Potential sponsors for whom ORR requires fingerprints (including those who are not Category 1 or 2A sponsors)[16] must be able to undergo fingerprinting in order for background checks to be performed.

49.     To compensate for the reduced availability of digital fingerprinting, ORR's has directed care providers to automatically mail fingerprint cards to all individuals identified in family reunification applications, so that given limited hours at digital fingerprint locations, potential sponsors are aware of the ability to have fingerprints taken on fingerprint cards, including at a local law enforcement agency.  While fingerprint cards are often used, this alternative to digital fingerprinting could take longer for potential sponsors to execute given the additional steps involved, and the reliance on the mail system to transmit the cards.

---

[14] ORR is aware of one instance in which 3 UAC who were recommended for COVID-19 testing were unable to immediately obtain a COVID-19 test due to the particular community's system for allocating tests among primary care providers.  DHUC is monitoring this situation and will intervene as necessary to assure the UAC have prompt access to COVID-19 testing.

[15] Alabama, Arizona, California, Colorado, Florida, Georgia, Illinois, Louisiana, Massachusetts, Maryland, Missouri, North Carolina, Nebraska, New Jersey, New York, Oregon, Pennsylvania, Tennessee, Texas, Virginia, and Washington.

[16] ORR Policy Guide § 2.2.1, https://www.acf.hhs.gov/orr/resource/children-entering-the-united-states-unaccompanied-section-2#2.2.1 (defining Category 2A sponsors; Category 1 sponsors are parents or legal guardians; Category 1 and 2A sponsors generally do not require fingerprinting, unless there is a special concern).

9

50.     My opinion is that ORR cannot safely release UAC to sponsors absent vetting that includes the completion of fingerprint-based background checks where required, or other protective measures, such as home studies, which are required in certain instances by the TVPRA.  This is especially true during the current public health emergency. The jettisoning of core safeguards in the sponsor vetting process in order to effectuate the immediate release of UAC would expose UAC to not only public health dangers but also material child welfare and safety risks.

51.     Plaintiffs also request a full adversarial hearing in order for UAC to challenge failures to (yet) release to individuals applying to be sponsors (including individuals still undergoing vetting).  In my opinion, the creation and operation of such an adversarial hearing process during the current public health emergency would require ORR to redeploy federal and grantee staff from program operations, and materially degrade the ability of ORR to conduct sponsor vetting and work with grantee care-provider facilities to maintain appropriate infection control measures and protect the health and safety of UAC at the facilities.  My opinion is that to maximize child welfare during the current public health emergency, the federal and grantee staff need to focus on program operations with the goal of releasing UAC to sponsors only when it is safe to do so.

Executed on March 27, 2020.

_____

Jallyn Sualog

10