**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

<table>
<tr>
<td>

P.J.E.S., A MINOR CHILD, by and through his father and NEXT FRIEND, Mario Escobar Francisco, on behalf of himself and others similarly situated,

        Plaintiff,

    v.

CHAD WOLF, Acting Secretary of Homeland Security, et al.,

        Defendants.

</td>
<td>

Civil Docket No. 1:20-cv-02245-EGS-GMH

</td>
</tr>
</table>

**DEFENDANTS' OBJECTIONS TO THE
<u>MAGISTRATE JUDGE'S REPORT AND RECOMMENDATION</u>**

**TABLE OF CONTENTS**

INTRODUCTION ................................................................................................ 1

BACKGROUND ................................................................................................. 3

I.      Statutory and Regulatory Background ...................................................... 3

II.     Procedural History .................................................................................... 7

LEGAL STANDARD ......................................................................................... 8

ARGUMENT ...................................................................................................... 9

I.      The Magistrate Judge's Finding that Plaintiff is Likely to Succeed on the
        Merits Relies on a Misinterpretation of Section 265 and Is Contrary to Law ................... 9

        A.      The Magistrate Judge Impermissibly Narrowed Section 265's Broad
                Grant of Authority to Prohibit the Introduction of Persons ................................. 10

        B.      The Magistrate Judge Erred in Finding that the Statutory Context
                of Section 265 Indicates that Section 265 Does Not Authorize Expulsion .......... 13

        C.      Section 265's Broad Provision of Authority Need Not Specifically
                Reference Returning or Removing Aliens, and the Magistrate Judge's
                Finding to the Contrary Is in Error ....................................................... 16

        D.      The Magistrate Judge Erred in Attempting to Harmonize Section 265
                with Other Statutes ................................................................. 18

        E.      To the Extent Section 265 is Ambiguous, the Magistrate Judge Erred in
                Finding *Chevron* Deference Inapplicable .......................................... 24

II.     The Magistrate Judge Erred in Finding the Other Preliminary Injunction
        Factors Weigh in Favor of Issuing A Preliminary Injunction ............................ 26

III.    The Certification of a Provisional Class Here Is Inconsistent with Article III
        and Federal Rule 23 Principles ............................................................ 31

IV.     This Court Should Stay Any Order Enjoining Title 42 to Allow Defendants to
        Consider Their Appellate Options ......................................................... 32

CONCLUSION ................................................................................................. 33

# TABLE OF AUTHORITES

**Cases**

*Am. Ass'n for Homecare v. Leavitt*,
No. CIV A 08-0992 (RMU), 2008 WL 2580217 (D.D.C. June 30, 2008) .............................. 26

*Am. Ctr. for Civil Justice v. Ambush*,
794 F. Supp. 2d 123 (D.D.C. 2011) ...................................................................................... 8, 9

*Am. Soc'y for Prevention of Cruelty to Animals v. Feld Entm't*,
659 F.3d 13 (D.C. Cir. 2011) ...................................................................................................... 9

*Banks v. Office of the Senate Segeant-at-Arms & Doorkeeper*,
226 F.R.D. 113 (D.D.C. 2005) .................................................................................................. 8

*Boca Investerings P'ship v. United States*,
31 F. Supp. 2d 9 (D.D.C. 1998) ................................................................................................ 8

*Breen v. Mineta*,
No. CIV.A. 05-654 RWR, 2005 WL 3276163 (D.D.C. Sept. 30, 2005) ................................ 26

*Castro v. U.S. Dep't of Homeland Sec.*,
835 F.3d 422 (3d Cir. 2016) .................................................................................................... 12

*Chevron, USA, Inc. v. Nat. Res. Def. Council, Inc.*,
467 U.S. 837 (1984) ................................................................................................................ 24

*Cisneros v. Alpine Ridge Grp.*,
508 U.S. 10 (1993) .................................................................................................................. 19

*City of Arlington v. FCC*,
569 U.S. 290 (2013) ................................................................................................................ 24

*Clapper v. Amnesty Int'l USA*,
568 U.S. 398 (2013) ................................................................................................................ 32

*Clark v. Rameker*,
573 U.S. 122 (2014) ................................................................................................................ 13

*Cruz v. Dep't of Homeland Sec.*,
No. 19-CV-2727, 2019 WL 8139805 (D.D.C. Nov. 21, 2019) ................................................ 12

*Dep't of Homeland Sec. v. Thuraissigiam*,
140 S. Ct. 1959 (2020) ............................................................................................................ 12

*Epic Sys. Corp. v. Lewis*,
    138 S. Ct. 1612 (2018)......................................................................... 19, 20

*Garcia v. San Antonio Metro. Transit Auth.*,
    469 U.S. 528 (1985)................................................................................... 2

*Hilton v. Braunskill*,
    481 U.S. 770 (1987)................................................................................. 32

*Hohn v. United States*,
    524 U.S. 236 (1998)................................................................................. 13

*Jacobson v. Massachusetts*,
    197 U.S. 11 (1905).............................................................................. 2, 31

*JD v. Azar*,
    925 F.3d 1291 (D.C. Cir. 2019)............................................................ 32

*Landon v. Plasencia*,
    459 U.S. 21, (1982)................................................................................. 12

*Luis v. United States*,
    136 S. Ct. 1083 (2016)........................................................................... 25

*Marshall v. United States*,
    414 U.S. 417 (1974)................................................................................... 2

*Nat'l Ass'n of Farmworkers Orgs. v. Marshall*,
    628 F.2d 604 (D.C. Cir. 1980)............................................................... 32

*Nat'l Immigr. Project of Nat'l Lawyers Guild v. Exec. Off. Of Immigr. Rev.*,
    --- F. Supp. 3d ---, 2020 WL 2026971 (D.D.C. Apr. 28, 2020)............... 31

*Nken v. Holder*,
    556 U.S. 418 (2009)................................................................................. 26

*Poett v. U.S. Dep't of Justice*,
    846 F. Supp. 2d 96 (D.D.C. 2012) .......................................................... 9

*\*Russello v. United States*,
    464 U.S. 16 (1983)............................................................................ 16, 17

*\*S. Bay United Pentecostal Church v. Newsom*,
    140 S. Ct. 1613 (2020)........................................................................ 2, 31

*Sherley v. Sebelius,*
    644 F.3d 388 (D.C. Cir. 2011) ........................................................................ 26

*Trump v. Hawaii,*
    138 S. Ct. 2392 (2018) .................................................................................... 12

*United States v. All Assets Held at Bank Julius, Baer & Co., Ltd.,*
    233 F. Supp. 3d 143 (D.D.C. 2017) .................................................................. 9

*United States v. Fausto,*
    484 U.S. 439 (1988) ........................................................................................ 20

*United States v. Steinfels,*
    753 F.2d 373 (5th Cir. 1985) .......................................................................... 10

*Utility Air Regulatory Group v. EPA,*
    573 U.S. 302 (2014) ........................................................................................ 15

*Virginia Petroleum Jobbers Ass'n v. Fed. Power Comm'n,*
    259 F.2d 921 (D.C. Cir. 1958) ........................................................................ 32

*Winter v. Nat. Res. Def. Council, Inc.,*
    555 U.S. 7 (2008) ............................................................................................ 25

**Statutes**

5 U.S.C. § 553 ............................................................................................................ 4

8 U.S.C. § 1182 ............................................................................................ 12, 21, 22

8 U.S.C. § 1231 .......................................................................................................... 19

8 U.S.C. § 1232 .................................................................................................... 12, 27

10 U.S.C. § 123 .......................................................................................................... 20

42 U.S.C. § 264 .................................................................................................... 13, 14

*42 U.S.C. § 265 ................................................................................................ *passim*

42 U.S.C. § 268 ........................................................................................................... 4

Immigration Act of 1891, ch. 551, section 1, 26 Stat. 1084 .................................... 22

Immigration and Nationality Act of 1952, Pub. L. 104-208, Div. C, Title III,
    §§ 305(a)(3), 306(a)(1), 328(a)(1), 110 Stat. 3009-598, 3009-607, 3009-630 ........ 19

**Rules**

Fed. R. Civ. P. 62(d) ..................................................................................... 32

Fed. R. Civ. P. 72(a) ...................................................................................... 8

Fed. R. Civ. P. 72(b)(3)................................................................................. 8

**Regulations**

42 C.F.R. § 71.51 ......................................................................................... 25

85 Fed. Reg. 16,559-01 (Mar. 24, 2020) ........................................... 4, 15, 17

85 Fed. Reg. 17,060-02 (Mar. 26, 2020) .............................................. *passim*

85 Fed. Reg. 22,424 (Apr. 22, 2020) ............................................................ 6

85 Fed. Reg. 31,503-02 (May 26, 2020)..................................................... 5, 6

85 Fed. Reg. 56,424 (Sept. 11, 2020) .................................................. *passim*

**Other Authorities**

24 Cong. Rec. 370-71 (Jan. 6, 1893) .......................................................... 16

24 Cong. Rec. 393-94 (Jan. 10, 1893) ........................................................ 21

24 Cong. Rec. 470 (Jan. 10, 1893)........................................................ 16, 21

*Nationwide Enforcement Encounters: Title 8 Enforcement Actions and Title 42 Expulsions*,
https://www.cbp.gov/newsroom/stats/cbp-enforcement-statistics/title-8-and-title-42-statistics .... 7

Prohibit, *Oxford English Dictionary* 1441 (1933) ....................................... 11

Testimony of Mark A. Morgan Before U.S. Senate Committee on Homeland Security
and Governmental Affairs, June 25, 2020, https://www.hsgac.senate.gov/imo/
media/doc/Testimony-Morgan-2020-06-25-REVISED.pdf ..................................... 7

Thomas Cooley, *Constitutional Limitations* (1868) .................................... 25

*Universal English Dictionary* 458 (John Craig ed. 1869) ........................... 10

**INTRODUCTION**

The Magistrate Judge's Report and Recommendation contains critical errors that, if adopted, would undermine the authority of the United States to prevent the introduction of persons into the country during a global pandemic, straining the Government's ability to contain the risk of transmission of the Coronavirus Disease 2019 ("COVID-19") across its borders.   The Magistrate Judge also improperly weighed the equities here, discounting the Government's compelling interest in protecting public health and safety.  Defendants thus file these objections to the Report and Recommendation.

Facing a historic, unprecedented outbreak of COVID-19, the Director of the U.S. Centers for Disease Control & Prevention ("CDC") exercised his long-standing statutory authority under Section 362 of the Public Health Service Act, 42 U.S.C. § 265 [hereinafter Section 265] and applied the CDC's scientific and technical expertise to temporarily prohibit the introduction of certain aliens traveling from Mexico and Canada who would otherwise be introduced into a congregate setting in a land or coastal port of entry or Border Patrol station at or near the United States borders with Canada and Mexico.  The CDC Director invoked this authority to protect the health and safety of the United States population, aliens in U.S. Customs and Border Protection ("CBP") facilities, and CBP personnel.

Based on his expert judgment, the Director found that a suspension of the right to introduce such aliens is necessary because aliens covered by the Order are potential carriers of COVID-19 and are typically held for hours or days in congregate settings at border facilities for immigration processing, when such facilities were not designed, and are not equipped, to quarantine, isolate, or enable social distancing of aliens in accordance with public health measures.  Given such public health risks, the Director determined that it is imperative to expel covered aliens as quickly as possible.  Plaintiff seeks to preliminarily enjoin the application of the CDC Order—or what Plaintiff calls the Title 42 process—to a putative class of "unaccompanied noncitizen children" who are or will be in the custody of the U.S. Government.

1

In recommending that the Court grant Plaintiff's motion for a preliminary injunction, the Magistrate Judge makes two key errors.  *First*, the Magistrate Judge misinterpreted Section 265 to find that the statute does not authorize the expulsions of putative class members whose introductions into the United States are halted while in process.  In doing so, the Magistrate Judge wholly disregarded Section 265's broad grant of authority as reflected in the statute's plain language, context, and legislative history.   Moreover, the Magistrate Judge's finding that expulsions are not within the scope of Section 265 rests on an unworkable logic—under the Magistrate Judge's reasoning, the Government would be able to exercise its Section 265 authority to prohibit the introduction of persons into the United States only *prior* to the arrival of covered aliens at the Nation's borders—namely in non-U.S. jurisdictions—rendering Section 265 without effect to prevent the introduction of a communicable disease transmitted through land border crossings.

*Second*, the Magistrate Judge committed clear error in disregarding and dismissing evidence that otherwise suggests that the balance of equities tips against the issuance of a preliminary injunction.  As Chief Justice Roberts recently observed, "[o]ur Constitution principally entrusts 'the safety and the health of the people' to the politically accountable officials of the [government] 'to guard and protect,'" and "[w]hen those officials 'undertake[ ] to act in areas fraught with medical and scientific uncertainties,' their latitude 'must be especially broad.'"  *S. Bay United Pentecostal Church v. Newsom*, 140 S. Ct. 1613, 1613 (2020) (Roberts, C.J., concurring in denial of application for injunctive relief) (first quoting *Jacobson v. Massachusetts*, 197 U.S. 11, 38 (1905), and then quoting *Marshall v. United States*, 414 U.S. 417, 427 (1974)).  "Where those broad limits are not exceeded, they should not be subject to second-guessing by an 'unelected federal judiciary,' which lacks the background, competence, and expertise to assess public health and is not accountable to the people."  *Id.* at 1613-14 (quoting *Garcia v. San Antonio Metro. Transit Auth.*, 469 U.S. 528, 545 (1985)).   "That is especially true where, as here, a party seeks emergency relief . . . while [] officials are actively shaping their response to changing facts on the ground."  *Id.* at 1614.

This Court should heed Chief Justice Roberts's teaching and decline to adopt the Magistrate Judge's Report and Recommendation, which effectively asks this Court to substitute its own policy judgment for that of the Nation's top public health official as to how best to address this unprecedented pandemic.

## BACKGROUND

### I.    Statutory and Regulatory Background

Defendants have explained in great detail the factual, statutory, and regulatory background of this case, which Defendants incorporate by reference herein.  *See* Defs.' Combined Opp'n to Pl.'s Motion for Class Certification and for Classwide Prelim. Inj., ECF No. 42 at 16-26, ECF No. 43 (unredacted) ("PI Opp'n").[1]  Defendants will provide only a brief summary here.

To help combat the serious danger of COVID-19 further spreading into the United States, the CDC exercised its statutory authority under 42 U.S.C. § 265 to temporarily prohibit the introduction of certain aliens traveling from Canada and Mexico into the United States who would otherwise be introduced into a congregate setting in a land or coastal port of entry or Border Patrol station at or near the United States borders with Mexico and Canada.  Section 265 provides:

> Whenever [the Secretary] determines that by reason of the existence of any communicable disease in a foreign country there is serious danger of the introduction of such disease into the United States, and that this danger is so increased by the introduction of persons or property from such country that a suspension of the right to introduce such persons and property is required in the interest of the public health, the [Secretary], in accordance with regulations approved by the President, shall have the power to prohibit, in whole or in part, the introduction of persons and property from such countries or places as he shall designate in order to avert such danger, and for such period of time as he may deem necessary for such purpose.

42 U.S.C. § 265.

On March 20, 2020, the Department of Health and Human Services ("HHS") issued an Interim Final Rule to allow the CDC Director to invoke the authority in Section 265.  Interim Final

---

[1]    Because the Magistrate Judge cited to page numbers assigned by the Court's CM/ECF system, *see* Report & Recommendation ("R&R"), ECF No. 65, at 2 n.1, Defendants similarly cite to the page numbers assigned by the Court's CM/ECF system.

Rule, Control of Communicable Diseases; Foreign Quarantine: Suspension of Introduction of Persons Into The United States From Designated Foreign Countries of Places for Public Health Purposes, 85 Fed. Reg. 16,559-01 (Mar. 24, 2020) ["IFR"], ECF No. 42-2.  The rule, which took effect immediately due to the national emergency, *see* 5 U.S.C. § 553(b)(B) and (d), defines "introduction into the United States of persons from a foreign country" or place to mean "the movement of a person from a foreign country" or place into the United States (1) "so as to bring the person into contact with persons" in the United States or (2) to cause the contamination of property in the United States "in a manner that the Director determines to present a risk of transmission of a communicable disease to persons or property, even if the communicable disease has already been introduced, transmitted, or is spreading within the United States." IFR at 28.  The CDC explained that "introduction" can encompass those who have physically crossed the U.S. border and are in the process of moving into the interior of the United States in a manner the Director determines to present a risk of transmission of a communicable disease.  Halting the travel of such persons and rapidly moving them outside the United States constitutes preventing their "introduction" into the United States.  *Id.* at 17.  HHS has since published a Final Rule, which will become effective October 13, 2020, unless the IFR ceases to be in effect before that time, in which case the Final Rule will become effective immediately.  Final Rule, 85 Fed. Reg. 56,424, 56,465 (Sept. 11, 2020).

The same day the Interim Final Rule took effect, the CDC Director issued the challenged Order temporarily prohibiting the introduction of certain aliens traveling from Canada and Mexico into the United States because of the serious danger of their introduction of COVID-19 into border facilities, as well as the interior of the country.  Notice of Order Under Sections 362 & 365 of the Public Health Service Act Suspending Introduction of Certain Persons From Countries Where A Communicable Disease Exists, 85 Fed. Reg. 17,060-02 (Mar. 26, 2020) ["Order"] at 16-17, ECF No. 42-1.  Consistent with 42 U.S.C. § 268(b), the CDC requested the assistance of the Department of Homeland Security ("DHS") in implementing the Order because the CDC lacks the capability and resources to do so.  *Id.* at 17.

4

Based on information provided by DHS and a U.S. Public Health Service Scientist Officer's visit to the El Paso Port of Entry, Paso del Norte Border Crossing, *see* Order at 14; Ex. 1 to Order, the CDC Director determined that ports of entry and Border Patrol stations at or near the northern and southern borders are not structured or equipped to effectively mitigate the risks presented by COVID-19—*i.e.*, to implement quarantine, isolation, or social distancing protocols— for even small numbers of aliens.  Order at 15.  Rather, these facilities were designed for short-term holding in a congregate setting where aliens (typically those who lack valid travel documents and would therefore be found inadmissible) are held in common areas in close proximity to one another for hours or days as they undergo immigration processing.  *Id.* at 2, 15.  The CDC Director also found CBP's then-existing screening protocol for COVID-19 to be unworkable for large numbers of individuals and risked aliens with COVID-19 infecting other aliens and CBP personnel.  *See id.* at 13.

In addition, the Director found that, for those aliens who tested positive for COVID-19, ports of entry and Border Patrol stations largely lacked the capacity to provide medical services, and even when they did, such services were relatively limited.  Final Rule, 85 Fed. Reg. at 56,433. DHS must rely on local and regional hospitals (which sometimes can be far away) and emergency medical resources.  Order at 16.  But States along the southern border have some of the lowest numbers of hospital beds per 1,000 inhabitants in the United States.  *Id.*  Experience has also proven that a surge in the number of COVID-19 cases could overtax these border states' healthcare systems.  *See* Final Rule, 85 Fed. Reg. at 56,439-40 (discussing Arizona's experience).

Finally, the Director found that conditional release is not a viable option because there is significant uncertainty that covered aliens could effectively self-quarantine, self-isolate, or otherwise comply with existing social distancing guidelines, not to mention that the CDC lacks the resources and personnel necessary to effectively monitor a large number of people so released. Order at 16; Amendment and Extension of Order Suspending Introduction of Certain Persons from Countries Where a Communicable Disease Exists, 85 Fed. Reg. 31503-02 (May 26, 2020) ["May

Order"] at 12, ECF No. 42-3; *see also* Final Rule, 85 Fed. Reg. at 56,426-27, 56,449, 56,452-53, 56, 455.

Based on these findings, the CDC Order thus requires that all "covered aliens" be returned as rapidly as possible, and with as little time spent in congregate settings as is feasible, to the country from which they entered the United States, their country of origin, or to another location, as practicable and appropriate.  Order at 17.  "Covered aliens" are those persons traveling from Canada or Mexico (regardless of their country of origin) who would otherwise be introduced into a congregate setting in a land (and, as amended, coastal) port of entry or Border Patrol station at or near the U.S. borders with Canada and Mexico, and excludes, among others, U.S. citizens, Lawful Permanent Residents, and those who arrive at a port of entry with valid travel documents. *Id.* at 3; May Order at 8.  In addition, customs officers may, with supervisory approval, except otherwise covered aliens from the Order based on the totality of the circumstances, including considerations of significant law enforcement, officer and public safety, humanitarian, and public health interests.  Order at 3.

The CDC Order has since been extended multiple times.  *See, e.g.*, Extension of Order Suspending Introduction of Certain Persons From Countries Where A Communicable Disease Exists, 85 Fed. Reg. 22,424 (Apr. 22, 2020) ["April Order"], ECF No. 42-4 at 3; May Order at 1; Decision Memos, ECF No. 44-3.  The CDC Director has found that the Order has reduced the number of covered aliens in congregate settings in border facilities, thereby reducing the danger of COVID-19 transmission into the United States.  May Order at 4 (finding that the Order has mitigated public health risk by reducing covered alien population at border facilities by 88 percent); Final Rule, 85 Fed.  Reg. at 56,433.  The Director has also found that the Order has reduced the utilization of local health care systems by covered aliens: in the 50 days preceding the Order, for instance, CBP officers made over 1,600 trips to community hospitals to facilitate advanced medical care for aliens in CBP custody, but in the first 80 days after the Order's implementation, CBP officers made only 400 trips for aliens in CBP custody to receive medical care from community hospitals, thereby preserving vital resources for the domestic population

during the COVID-19 pandemic.  Final Rule, 85 Fed. Reg. at 56,434.  As for the implementation of the Order, DHS makes every effort to immediately expel covered aliens to their country of last transit or to return them to their country of origin as expeditiously as possible.[2]

## II.    Procedural History

Plaintiff is a 15-year-old from Guatemala, who was apprehended on August 11, 2020 after illegally crossing the U.S.-Mexico border into the United States.  Compl., ECF No. 1; ECF No. 62 ¶ 3.  DHS determined that he was a "covered alien" subject to expulsion under the CDC Order. *Id.*  On August 14, 2020, he brought this suit on behalf of a putative class that he defined as: "All unaccompanied noncitizen children who (1) are or will be detained in U.S. government custody in the United States, and (2) are or will be subjected to the Title 42 Process."  *Id.* ¶ 101; *see also* Pl.'s Mem. in Supp. of Class Certification, ECF No. 2-1 at 7.  Plaintiff seeks an order to stay their expulsion, to remove them from "the Title 42 Process," and to require Defendants to process them under the immigration procedures that otherwise would apply absent the CDC Order.  Compl. at 28.  Following the filing of the complaint, but prior to his filing of a motion for classwide preliminary injunctive relief, Plaintiff was excepted from the CDC Order and processed pursuant

---

[2]      *See* Testimony of Mark A. Morgan, CBP, Before the U.S. Senate Committee on Homeland Security and Governmental Affairs, June 25, 2020, at 3, *available at* https://www.hsgac.senate.gov/imo/media/doc/Testimony-Morgan-2020-06-25-REVISED.pdf; *Nationwide Enforcement Encounters: Title 8 Enforcement Actions and Title 42 Expulsions*, https://www.cbp.gov/newsroom/stats/cbp-enforcement-statistics/title-8-and-title-42-statistics.

Minors slated for expulsion who cannot be immediately expelled have been housed in hotels.  On September 4, 2020, in an order granting a motion to enforce a settlement agreement, the U.S. District Court for the Central District of California ordered DHS to "cease placing minors at hotels" and to transfer them to licensed facilities as expeditiously as possible.  *See Flores v. Barr*, No. CV 85-4544-DMG (C.D. Cal.), Order Re Plaintiffs' Motion to Enforce Settlement as to "Title 42" Class Members, ECF No. 976 at 4-5, 17; *see also* Order Re Defendants' *Ex Parte* Application to Stay, ECF No. 990 at 5, 17 (requiring DHS compliance by September 28, 2020).  The Government has appealed that decision and moved for a stay pending appeal.  The U.S. Court of Appeals for the Ninth Circuit has now granted an administrative stay through October 5, 2020. *See Flores v. Barr*, No. 20-55951 (9th Cir.), Order, Dkt. No. 22.  In any event, the *Flores* Court acknowledged that it was not evaluating the validity of the Government's "Title 42 policy."

to the requested immigration procedures.  *See* Pl.'s PI Motion & Br. in Supp. ["Pl.'s Mot."], ECF No. 15-1 at 20.

On September 6, 2020, this Court referred this case to Magistrate Judge G. Michael Harvey for full case management, including the preparation of a report and recommendation on Plaintiff's motions to certify a class and for a classwide preliminary injunction.  On September 25, 2020, Magistrate Judge Harvey issued his report, recommending that the Court provisionally grant Plaintiff's motion for class certification.  *See* Report & Recommendation at 49, ECF No. 65 ("R&R").  He further recommends that Plaintiff's motion for a preliminary injunction be granted and that the Court order that "Defendants, their agents, and any person acting in concert with them are enjoined from expelling the Class Members from the United States under the Title 42 Process, whether pursuant to an Order issued by the [CDC Director] under the authority granted by the Interim Final Rule . . . or the Final Rule."  *Id.* at 49-50.

Defendants respectfully request a hearing to aid the Court's consideration of whether to adopt the Magistrate Judge's Report and Recommendation.  The proposed injunction will significantly hamper the Government's ability to address a public health crisis in the midst of a pandemic.  Given its significance and the potential implication on the Government's compelling interest, a hearing is appropriate.

## LEGAL STANDARD

Federal Rule of Civil Procedure 72(a) gives parties an "unquestioned right" to object to any "unfavorable decision by a magistrate judge."  *Banks v. Office of the Senate Sergeant-at-Arms & Doorkeeper*, 226 F.R.D. 113, 118 (D.D.C. 2005).  Upon consideration of timely objections, the district court "must determine de novo any part of the magistrate judge's disposition that has been properly objected to," Fed. R. Civ. P. 72(b)(3), and "must . . . modify or set aside any part of the order that is clearly erroneous or contrary to law."  Fed. R. Civ. P. 72(a); *see also Boca Investerings P'ship v. United States*, 31 F. Supp. 2d 9, 11 (D.D.C. 1998).

"The 'clearly erroneous' standard 'applies to factual findings and discretionary decisions[.]'"  *Am. Ctr. for Civil Justice v. Ambush*, 794 F. Supp. 2d 123, 129 (D.D.C. 2011)

(internal citation omitted).  "A court should make such a finding when the court 'is left with the definite and firm conviction that a mistake has been committed.'"  *Poett v. U.S. Dep't of Justice*, 846 F. Supp. 2d 96, 98 (D.D.C. 2012) (quoting *Am. Soc'y for Prevention of Cruelty to Animals v. Feld Entm't*, 659 F.3d 13, 21 (D.C. Cir. 2011)).  Meanwhile, the "contrary to law" standard "permits de novo review of a magistrate judge's legal conclusions," *Ambush*, 794 F. Supp. 2d at 129, "including any asserted misapplication of the relevant statutes, case law, and rules of procedure[]," *United States v. All Assets Held at Bank Julius, Baer & Co., Ltd.*, 233 F. Supp. 3d 143, 148 (D.D.C. 2017).

## ARGUMENT

### I.    The Magistrate Judge's Finding that Plaintiff is Likely to Succeed on the Merits Relies on a Misinterpretation of Section 265 and Is Contrary to Law

The Magistrate Judge incorrectly found that Plaintiff was likely to succeed on the merits of his claim that Section 265 does not authorize the Government to expel putative class members from the United States and that the Government must instead use the procedures provided by immigration laws in Title 8 of the U.S. Code.  *See* R&R at 23-38.

*First*, the Magistrate Judge's reading of Section 265 was contrary to law because it impermissibly narrowed the statute's broad grant of authority to "prohibit" the "introduction" of persons into the United States.  *Second*, the Magistrate Judge's interpretation of Section 265 is divorced from its proper context.  *Third*, the Magistrate Judge erroneously looked to immigration laws that have an entirely different aim to narrowly construe Section 265.  *Fourth*, the Magistrate Judge misapplied various canons of statutory interpretation as well as the constitutional avoidance doctrine.  *Fifth*, the Magistrate Judge erroneously attempted to harmonize Section 265 with other statutes in a manner that effectively nullified Section 265, when the statutes are already in harmony—the immigration statutes are of general applicability, and their effects are suspended temporarily by Section 265 only when there is a serious danger of the introduction of a communicable disease into the United States during an outbreak.  And *sixth*, although the statute

plainly allows for the expulsion of covered aliens, it is at least ambiguous, and the Magistrate Judge failed to apply *Chevron* deference to the Secretary's interpretation of any ambiguity.

At bottom, the Magistrate Judge's misinterpretation of Section 265 relies on reasoning that leads to an absurd and unworkable result: the Government may only exercise its Section 265 authority *before* a potentially contagious person arrives at a land port of entry or crosses the border between ports of entry. In other words, under the Magistrate Judge's reasoning, any prohibition of introduction of persons must occur while individuals are outside the jurisdiction of the United States. That reasoning is plainly wrong.[3]

### A. The Magistrate Judge Impermissibly Narrowed Section 265's Broad Grant of Authority to Prohibit the Introduction of Persons

In concluding that Section 265 does not allow the Government to expel aliens whose introduction into the United States is halted, the Magistrate Judge misinterpreted and impermissibly narrowed the language of Section 265, which grants the CDC authority to "prohibit, in whole or in part, the introduction of persons" from "a foreign country." 42 U.S.C. § 265. As the Government previously explained, "introduction" signals a continuing process, and thus does not stop at the border, *see* PI Opp'n at 29, a point that the Magistrate Judge does not dispute, *see* R&R at 24-25. *Cf. United States v. Steinfels*, 753 F.2d 373, 377 (5th Cir. 1985) (finding that "introduction into commerce commences upon the arrival of imported goods upon United States soil, but introduction does not necessarily end there"). And to "prohibit . . . the introduction" means to intercept or prevent such process, *see Universal English Dictionary* 458 (John Craig ed. 1869) (to "prohibit" meant "to forbid; to interdict by authority; to hinder; to debar; to prevent; [or]

---

[3]     Defendants understand the Magistrate Judge to have wholly adopted Plaintiff's theory of the case, which is that "Section 265 does not authorize expulsions *at all* once a person is on U.S. soil, whether the person seeks entry at or between ports [of entry]." Pl.'s Combined Reply Mem. in Supp. of Mots. for Classwide Prelim. Inj. and Class Certification at 10 n.1, ECF No. 52. This is evident from the measures that the Magistrate Judge suggests the Government still has at its disposal: regulation of vessels or airplanes, imprisonment or fines, and apprehension, examination, quarantine, and conditional release of persons traveling into the United States. R&R at 28, 36-37.

to preclude"); Prohibit, *Oxford English Dictionary* 1441 (1933) ("to forbid (an action or thing) by or as by a command or statute; to interdict");[4] *see also* PI Opp'n at 29-30.  Section 265 thus clearly includes the authority to intercept persons who have already crossed the border and are in the process of being introduced into the United States.  This is particularly true at the southern and northern borders, given that U.S. officials generally lack authority to operate on foreign soil.

The Magistrate Judge charges the Government with making an "unsupported (and unwarranted) logical leap" that Section 265 authorizes expulsion.  According to the Magistrate Judge, the Government's interpretation is wrong because the definition of "prohibit" "connote[s] stopping something before it begins, rather than remedying it afterwards."  R&R at 25-26.  And to intercept a person who is in the process of being introduced purportedly is a remedy after the fact. That reasoning, however, makes no sense, particularly given the Magistrate Judge's willingness to "[a]ssum[e]" that "introduction" "suggest[s] a continuing process that is most naturally read to extend beyond a person's immediate physical crossing of the border."  R&R at 24-25 (internal quotation marks and citations omitted).  Given that assumption, the Government prohibits or intercepts through expulsion a process (the "introduction") that is underway but not yet complete. The Magistrate Judge thus erred in suggesting that expelling covered aliens who unlawfully cross the border remedies the matter "afterwards."  *See* R&R at 25-26.  Again, the CDC Order addresses only those covered aliens who are in the process of being introduced into the United States (and would be held at congregate facilities which are essential to immigration enforcement at the border), not those who are already introduced into the United States.  The Magistrate Judge's misunderstanding of this fundamental feature of the CDC Order infects the rest of the Report and Recommendation.

The Magistrate Judge also erred in determining that the title of Section 265, which speaks of the "'[s]uspenion of *entries*,'" R&R at 26 (quoting 42 U.S.C. § 265 (emphasis added by Magistrate Judge))—supports his conclusion that expulsion is not contemplated by the statute.  It

---

[4]     Defendants cite to these dictionary definitions because they date to the approximate period when Congress enacted either Section 265 in 1944 and or its predecessor statute in 1893.

is unclear how that can be so.  Even in the immigration context, an alien is not necessarily considered to have "effected an entry" simply by crossing the border.  *See Trump v. Hawaii*, 138 S. Ct. 2392, 2414 (2018) (differentiating between "entry" and "arrival" in challenge to immigrant travel restrictions; observing that "a visa [issued by a consular officer] does not entitle an alien to enter the United States 'if, upon arrival,' an immigration officer determines that the applicant is 'inadmissible under this chapter, or any other provision of law'—including [8 U.S.C.] § 1182(f)") (citation omitted); *Castro v. U.S. Dep't of Homeland Sec.*, 835 F.3d 422, 445 (3d Cir. 2016) (observing that aliens who are "apprehended within hours of surreptitiously entering the United States" are still treated as "'alien[s] seeking initial admission to the United States'") (quoting *Landon v. Plasencia*, 459 U.S. 21, 32, (1982)); *Cruz v. Dep't of Homeland Sec.*, No. 19-CV-2727, 2019 WL 8139805, at *5 (D.D.C. Nov. 21, 2019) (fact that plaintiff was apprehended within the territorial bounds of the United States after crossing the U.S.-Mexico border does not overcome the fact that he has not "effected entry into this country"); *cf. Dep't of Homeland Sec. v. Thuraissigiam*, 140 S. Ct. 1959, 1982 (2020) ("an alien who is detained shortly after unlawful entry cannot be said to have 'effected an entry'").

Further, the Magistrate Judge's interpretation of Section 265 frustrates the statute's purpose and leads to an absurd, unworkable result.  Under the Magistrate's reading, the Government could not apply Section 265 to any covered aliens, regardless of whether they are intercepted after unlawfully crossing the border or are found inadmissible after arrival at ports of entry along the border.  This is directly contrary to the CDC Director's expert judgment that Section 265 extends to all such aliens who would otherwise be held in congregate settings for hours or days at border facilities that are not designed or equipped to quarantine, isolate, or enable social distancing of detainees.  CDC Order at 12-14; *see* 8 U.S.C. § 1232(b)(3) (unaccompanied alien children may be held in border facilities for up to 72 hours, and then are transferred to further congregate care administered by HHS).  Again, the Magistrate Judge's reasoning essentially suggests that the Government cannot prohibit the introduction into the United States of persons like Plaintiff who

12

crossed the border between ports of entry or even those who arrive at ports of entry. Such a result is absurd because it would render Section 265 without effect at land borders.

### B. The Magistrate Judge Erred in Finding that the Statutory Context of Section 265 Indicates that Section 265 Does Not Authorize Expulsion

The Magistrate Judge erroneously found that the statutory context indicates that Section 265 does not authorize expulsion. R&R at 27. The Magistrate Judge first examined the adjacent provision, Section 264 ("Regulations to control communicable diseases"), to find that "Section 264 does not contemplate regulations that authorize expulsion from the United States" but authorizes only "apprehension, detention, examination, or conditional release of individuals." *Id.* (quoting 42 U.S.C. § 264(c)). Because Section 264 does not identify expulsion as one of the tools available to the Secretary, the Magistrate Judge concluded that Section 265 does not authorize expulsion either. That reasoning is flawed because, if Section 264 authorizes expulsion, then Section 265 would be superfluous. But "a statute should be construed so that effect is given to all its provisions, so that no part will be inoperative or superfluous." *Clark v. Rameker*, 573 U.S. 122, 131 (2014) (citation omitted); *see also Hohn v. United States*, 524 U.S. 236, 249 (1998) ("We are reluctant to adopt a construction making another statutory provision superfluous."). This rule of construction necessarily indicates that Section 265 authorizes the Secretary to adopt public health measures that are not already authorized by Section 264. For similar reasons, the fact that other provisions of Title 42 identified by the Magistrate Judge do not mention expulsion, *see* R&R at 28, by no means suggests that Section 265 itself does not authorize expulsion.

To the contrary, Section 265 plainly authorizes the Secretary to issue regulations governing the prohibition of the introduction of persons from designated countries to avert the danger of transmission of a communicable disease from those countries. *See* 42 U.S.C. § 265 ("in accordance with regulations approved by the President, [the Secretary] shall have the power to prohibit, in whole or in part, the introduction of persons . . . ."). The CDC Director properly did so by authorizing the expulsion of those whose introduction into the United States—in violation of the CDC Order—is halted.

Rather than indicating a limitation on the Secretary's authority as the Magistrate Judge found, *see* R&R at 27-28, Section 264 actually reflects Congress's broad grant of powers in the context of the federal quarantine laws, which generally defer to the judgment of the public health officials to determine how best to protect the country from the dangers of a communicable disease. As Defendants explained in their opposition to the preliminary injunction motion, PI Opp'n at 33-34, the plain language of both Sections 264 and 265 reflects Congress's intent to defer to the Secretary's judgment in this area. *See, e.g.*, 42 U.S.C. § 264(a) (empowering the Secretary to "make and enforce such regulations as *in his judgment are necessary* to prevent the introduction, transmission, or spread of communicable diseases from foreign countries into the States") (emphasis added)). Subsections 264(b) through (d) further indicate that the Secretary's powers in this area are especially broad with respect to foreign travelers, authorizing the Secretary to use various public health measures—apprehension, detention, conditional release, and examination— to prevent the introduction, transmission, or spread of communicable diseases. Read together, sections 264 and 265 show that, through the federal quarantine laws, Congress gave the Secretary a robust set of public health mitigation tools, including the power of expulsion (in Section 265), and that the Secretary may expel an individual if the agency determines that other containment measures are insufficient to offset the danger posed by the individual's introduction to the United States.

The above discussion also illustrates that the Magistrate Judge erred in concluding that Congress did not grant the Secretary expulsion authority. The Magistrate Judge found that Congress could not have delegated the authority through silence. *See* R&R at 29. But Congress was not silent; it expressly delegated to the Secretary the power to issue regulations that would accomplish the purpose of Section 265. And the fact that the Government has not claimed the authority in the more than 75 years since Section 265 was enacted through the Public Health Service Act, *see* R&R at 29, by no means suggests that no such authority exists.

It is beyond dispute that the current pandemic is historic and unprecedented. The CDC found that "[i]nternational travel and migration play a significant role in the global transmission"

14

of COVID-19, IFR at 6, and the risk of transmission increases when travelers are in congregate settings, *id*. at 7.  Countries across the world have implemented emergency measures to help curb the spread of COVID-19, including closing their borders and imposing severe travel restrictions. Domestically, the Federal, State, and local governments all have adopted extraordinary measures to contain the spread of the disease.  Never before has the country seen the type of containment measures that are being deployed now.  Accordingly, the fact that this is the first time since the enactment of the Public Health Service Act of 1944 that the Government has invoked Section 265 to prohibit the introduction of persons is only descriptive of the fact that this extraordinary authority is sparingly used and only applies in narrow circumstances—when "there is serious danger of the introduction of such disease into the United States, and that this danger is so increased by the introduction of persons or property from such country that a suspension of the right to introduce such persons and property is required in the interest of the public health."  It does not suggest the absence of authority.

The Government's invocation of Section 265 to expel those who are halted while in the process of being introduced into the United States—or to turn away those who present themselves at ports of entry (which under the Magistrate Judge's erroneous interpretation is similarly impermissible)—is therefore nothing like the invocation of authority in *Utility Air Regulatory Group v. EPA*, 573 U.S. 302, 324 (2014), which the Magistrate Judge cited, R&R at 29.  There, the Supreme Court found the EPA's interpretation unreasonable "because it would bring about an enormous and transformative expansion in EPA's regulatory authority without clear congressional authorization."  *Util. Air Regulatory Grp*., 573 U.S. at 324.  That was particularly so, the Court found, because it was "confront[ing] a singular situation: an agency laying claim to extravagant statutory power over the national economy while at the same time strenuously asserting that the authority claimed would render the statute 'unrecognizable to the Congress that designed' it."  *Id.* As the Court noted, "it would be patently unreasonable—not to say outrageous—for EPA to insist on seizing expansive power that it admits the statute is not designed to grant."  *Id.*

15

Here, in contrast, Congress intended Section 265 to grant the Executive extraordinary authority in times of a public health crisis, as is evidenced by the statute's text, structure, and legislative history. *See* PI Opp'n at 41-42 (discussing that the legislative history indicates a consistent theme that the Executive is granted "extraordinary power" through Section 265 to suspend immigration); *see, e.g.*, 24 Cong. Rec. 470 (Jan. 10, 1893) (statement of Senator George Gray explaining that the exigency posed by "invasion of contagious disease, is sufficient . . . to justify this *extraordinary power* of the entire suspension of immigration") (emphasis added); 24 Cong. Rec. 370-71 (Jan. 6, 1893) (Senator Roger Mills: "I shall vote very cheerfully against placing in the hands of the President of the United States, whether he be a Republican or a Democrat, any such *extraordinary power* as that, to suspend immigration to this country at his pleasure.") (emphasis added). Thus, that the Section 265 authority is sparingly used only tracks the extraordinary nature of the authority and the fact that it is very rarely needed. It simply cannot be equated with the type of expansion of regulatory power—newly discovered by the EPA—at issue in *Utility Air Regulatory Group*.

### C. Section 265's Broad Provision of Authority Need Not Specifically Reference Returning or Removing Aliens, and the Magistrate Judge's Finding to the Contrary Is in Error

The Magistrate Judge similarly erred in concluding that because immigration statutes contain terms that expressly mention the return or removal of aliens, the absence of such terms in Section 265 indicates that Section 265 does not grant expulsion authority. *See* R&R 29-31. Plaintiff had cited immigration statutes (containing those terms) that were in effect when Congress enacted Section 265's predecessor statute, Section 7 of the Act of 1893. Pl.'s PI Mot. at 23-24, 27. As Defendants explained in detail in their opposition to the motion for preliminary injunction, PI Opp'n at 34-36, "[l]anguage in one statute usually sheds little light upon the meaning of different language in another statute, even when the two are enacted at or about the same time." *Russello v. United States*, 464 U.S. 16, 25 (1983). As the Supreme Court found in *Russello*, this is particularly the case when the statutes have different aims, *see id.*, as is the case here:  Section

265 is designed to prohibit the introduction of persons into the United States to avoid the spread of a communicable disease into the country, whereas the immigration statutes identified by Plaintiff are designed to confer immigration benefits based on an alien's individual circumstances. That is, it is hardly surprising that Congress used specific terms such as "return," "remove," or "send back" in immigration statutes because the purpose of those statutes was to regulate, among other things, the disposition of unauthorized aliens. Accordingly, there is no basis to construe "prohibit . . . the introduction" by relying on words used in immigration statutes.

The Magistrate Judge found that the Supreme Court's teaching in *Russello* is mere dicta and does not change the fact that Congress knows how to authorize the return or removal of aliens, as reflected in the immigration statutes. R&R at 30, n.11. The Magistrate Judge is incorrect.

The interpretative approach articulated by *Russello*—which is that a court should not use language in one statute to interpret different language in a different statute when the statutes have different aims—was not dicta. Specifically, the Court held in *Russello* that the language used in the Controlled Substances Act ("CSA")—passed by the same Congress that enacted the Racketeer Influenced and Corrupt Organizations ("RICO") statute—should not be used to constrain the language used in RICO because RICO and CSA have different purposes, and the different language naturally was tailored to achieve the distinct statutory aims. 464 U.S. at 24-25. Moreover, the Court held that to narrowly construe the language in RICO by reference to the language in CSA "[w]ould blunt the effectiveness of the provision in combatting illegitimate enterprises, and would mean that 'whole areas of organized criminal activity would be placed beyond' the reach of the statute." *Id.* at 24 (citation omitted). The same rationales apply here.

Citing the constitutional avoidance doctrine, the Magistrate Judge also devoted significant attention to the issue of Section 265's potential applicability to U.S. citizens in determining whether Section 265 authorizes expulsion. R&R at 31-32. As an initial matter, neither the Interim Final Rule (nor the Final Rule) includes U.S. citizens within the scope of any Section 265 order. *See* IFR at 19-20; Final Rule, 85 Fed. Reg. at 56,448 (noting that "[g]iven the complex and important legal and policy questions presented by the potential application of section 362 to U.S.

citizens, U.S. nationals, and LPRs [lawful permanent residents], HHS/CDC has determined that it would be in the public interest to provide notice of, and accept comments on, any regulatory text that HHS/CDC would propose to apply to U.S. citizens, U.S. nationals, and LPRs").  It is an academic question whether Section 265 could constitutionally be applied to U.S. citizens to halt their introduction into the United States and expel them under a future Section 265 Order.  The putative class does not include U.S. citizens.  That makes sense because U.S. citizens entering the United States are not similarly situated to persons within the scope of the CDC Order because they would not typically be held in congregate settings at ports of entry or Border Patrol stations.

More importantly, the fact that U.S. Citizens cannot be expelled without procedural protections does not mean Section 265 does not give the CDC Director the power to expel.  The case the Magistrate cites, *Doe v. Mattis*, 928 F.3d 1, 8 (D.C. Cir. 2019), simply stands for the unremarkable proposition that U.S. citizens are entitled to certain procedural protections before the government may deprive them of their liberty interests, not that U.S. citizens are immune from any such deprivation.  *Cf.* Pl.'s PI Mot. at 23 (citing *Valentine v. United States ex rel. Neidecker*, 299 U.S. 5, 6 (1936) (extradition of native-born U.S. citizens charged with the commission of crimes in France)).  But the fact that U.S. citizens are entitled to such protections by no means suggests that Section 265 therefore must not include expulsion authority.  In short, the Magistrate Judge's reliance on the constitutional avoidance doctrine is misplaced.

In sum, this Court should reject the Magistrate Judge's reasoning and conclusion that Section 265 does not authorize expulsion.

### D.  The Magistrate Judge Erred in Attempting to Harmonize Section 265 with Other Statutes

The Magistrate Judge erred in trying to harmonize Section 265 with immigration provisions under Title 8 that otherwise would allow unaccompanied alien children to be introduced into the United States.  R&R at 32.  Although the Magistrate Judge correctly notes that courts generally should try to harmonize conflicting statutes when possible, *id*. at 32, 34 (citing cases), he erred in failing to recognize that the statutes are already in harmony—the immigration

provisions are of general applicability, and Section 265 temporarily suspends their effects in limited circumstances like those present here.  And the "'clearly expressed congressional intention' that such a result should follow," R&R at 34 (quoting *Epic Sys. Corp. v. Lewis*, 138 S. Ct. 1612, 1624 (2018)), is found in Section 265's authorization to suspend other laws that otherwise confer the right to introduce persons into the United States.  The Magistrate Judge's contrary conclusion rests on multiple errors.

*First*, the Magistrate Judge erred in adopting Plaintiff's argument that the absence of the phrase "[n]otwithstanding any other provision of law" in Section 265 indicates that Section 265 was not meant to temporarily suspend the effect of Title 8 provisions that otherwise allow introduction.  R&R at 34.  To be sure, the phrase is often used "to signal that one statutory provision is intended to override conflicting provisions."  R&R at 34 (quoting *Cisneros v. Alpine Ridge Grp.*, 508 U.S. 10, 18 (1993)).  But the logical place this phrase appears is in the *subsequently* enacted legislation to reflect Congress's intention that the later-enacted provision supersedes in effect a *previously* enacted provision, as is the case in *Epic Systems*, which the Magistrate Judge cited, R&R at 34.  *See Epic Sys.*, 138 S. Ct. at 1626 (observing that Congress has "shown that it knows how to override the Arbitration Act [enacted in 1925] when it wishes" through this phrase but chose not to do so in the National Labor Relations Act [enacted in 1935]).  The Title 8 provisions that Plaintiff contends create a conflict were enacted after Section 265.  For example, Title 8's removal provisions, R&R at 32-33 (describing statutory provisions that Plaintiff alleges conflict with Section 265), were enacted in 1952 and subsequent years.  *See, e.g.*, Immigration and Nationality Act of 1952, 8 U.S.C. § 1231 (originally enacted as of June 27, 1952, ch. 4, § 241, as added and amended, 110 Stat. 3009-598, 3009-607, 3009-630).

It is therefore *those* subsequently enacted provisions—not Section 265—that should contain the phrase "notwithstanding any other provision of law" to indicate that Congress intended for those provisions to supersede the effect of the earlier enacted Section 265.  This is particularly the case given Section 265's express language that the Secretary may determine "a suspension of the right to introduce such persons and property is required in the interest of public health."  42

U.S.C. § 265.  The absence of the phrase "notwithstanding any provision of law" in the Title 8 provisions at issue here, therefore, actually underscores that Section 265 takes precedence over those provisions.  The Magistrate Judge's contrary ruling effectively repeals Section 265.  But the Supreme Court has observed that, "in approaching a claimed conflict, we come armed with the 'stron[g] presum[ption]' that repeals by implication are 'disfavored' and that 'Congress will specifically address' *preexisting law when it wishes to suspend its normal operations in a later statute*."  *Epic Sys.*, 138 S. Ct. at 1624 (emphasis added) (quoting *United States v. Fausto*, 484 U.S. 439, 452, 453 (1988)).

*Second*, the Magistrate Judge erred in concluding that Section 265's reference to a "suspension of the right to introduce such persons and property" contains "no reference to the suspension of laws or specific rights," R&R at 34-35, and thus is not a "clearly expressed congressional intention," *Epic Sys.*, 138 S. Ct. at 1624, to override conflicting provisions.  The Magistrate Judge provides no sound reason why that is so.  As Defendants discussed previously, the meaning of the term "suspend" has been well understood since the Founding and means temporarily ceasing the operation or effect of laws.  PI Opp'n at 40-41 (citing examples).  The phrase "suspension of the right to introduce" thus naturally means the temporary cessation of the effect of any laws pursuant to which a person might otherwise claim the right to be introduced into the United States, including the immigration laws that Plaintiff identifies.

Finding otherwise, the Magistrate Judge erroneously concluded that Section 265 is not analogous to the usage of the term "suspend" in the wartime powers act, 10 U.S.C. § 123(a), and the Suspension Clause of the Constitution.  R&R at 35.  But the language of Section 265 mimics both examples in specifying the right suspended, reflecting that the provision was intended to give the Executive the expansive authority to suspend any right to introduce persons into the United States, including under the immigration laws.  Again, the relevant phrase refers to the suspension of "the right" to introduce.

Moreover, the Magistrate Judge's conclusion that the plain language of Section 265— "suspension of the right to introduce"—does not in fact mean a suspension of other laws allowing

introduction conflicts with the legislative history of the predecessor statute to Section 265, which is section 7 of the 1893 Act.  PI Opp'n at 41-42 (citing legislative history of section 7).  Congressional debates surrounding the passage of section 7 of the 1893 Act showed a clear and consistent theme that the provision was intended to give the Executive the authority to suspend any right to introduce persons into the United States, including under the immigration laws.  PI Opp'n at 41-42 (citing, among other examples, 24 Cong. Rec. 470 (Jan. 10, 1893) (statement of Senator George Gray explaining that the exigency posed by "invasion of contagious disease, is sufficient . . . to justify this extraordinary power of the entire suspension of immigration"); *id.* at 393 (statement of Senator George Hoar indicating that section 7 would grant the "power to suspend immigration altogether, either temporarily or permanently as a health device"; "this section should be added, declaring in terms whenever the health or protection of the country from infection requires the total suspension of immigration"); *id.* at 393-94 (statement of Senator Chandler recognizing that section 7 would give the President the power to suspend immigration in his discretion, whenever there is danger of infection)).

The enactment of section 7 against the backdrop of the predecessor to the health-related grounds of inadmissibility, 8 U.S.C. § 1182(a)(1)(A)(i), further confirms that Congress intended Section 265 to suspend temporarily the effect of immigration laws that otherwise would allow the introduction of persons into the United States.  The Magistrate Judge observed that Congress "made clear when public health concerns merit disallowing a non-citizen to remain in the United States," and according to the Magistrate Judge, Congress did so through the Title 8 provision that denies admission of "[a]ny alien . . . who is determined (in accordance with regulations prescribed by the Secretary of Health and Human Services) to have a communicable disease of public health significance,'" R&R at 30 (quoting 8 U.S.C. § 1182(a)(1)(A)(i)).  Because "Section 265 contains no such clear language," the Magistrate reasoned, it "indicates that Congress did not intend to grant that power."  *Id.*  But the context of Congress's enactment of section 7 makes clear that Congress intended Section 265 to convey a broad grant of public health authority.  Congress enacted the provision against the backdrop of a cholera epidemic in Europe, just two years after enacting the

21

predecessor of 8 U.S.C. § 1182(a)(1)(A)(i), which is the Immigration Act of 1891.   The Immigration Act authorized the exclusion from admission into the United States aliens "suffering from a loathsome or a dangerous contagious disease."  Ch. 551, section 1, 26 Stat. 1084.  Despite the existence of that Act that applied to preclude the admission of individual aliens suffering from a communicable disease, Congress enacted Section 7 in response to the cholera outbreak, making it clear that it deemed Section 7 a necessary public health tool to combat larger threats to public health such as the current pandemic.  PI Opp'n at 41.

Further confusing the interplay between Section 265 and the immigration statutes, the Magistrate Judge improperly found that the canon of "the specific governs the general" indicates that the immigration laws at issue must take precedence over Section 265.  R&R at 35-36.  According to the Magistrate Judge, "[i]t is not clear how Section 265 . . . could be considered more specifically targeted to matters of immigration or as providing more specific solutions."  R&R at 36.  But that characterization reflects the fundamental flaw of the Magistrate Judge's reasoning— Section 265 is not designed to target immigration at all, much less to provide a solution to any immigration problems.  Rather, it is a public health provision designed only to address the specific and rare instance of a public health crisis presented by an outbreak of a communicable disease.  In that respect, it is certainly more specific than the immigration laws because while the latter is generally applicable, Section 265 applies only if the very narrow and specific criteria set forth in the statute itself are met.  Again, the fact that Section 265 has been rarely invoked underscores the specific and targeted nature of Section 265.  *See* PI Opp'n 33-34.

Finally, the Magistrate Judge erred in discounting Defendants' argument that Section 265 would be rendered a nullity if it must be applied in conjunction with the immigration provisions.  According to the Magistrate Judge, such an interpretation nonetheless served Section 265's purpose because the CDC Director could "bar entry into the country, at least through the regulation of vessels (including airplanes)," and that "those violating a barring order may be prosecuted and face up to one year of imprisonment."  R&R at 36-37.  But the statute is drafted broadly to empower the Secretary to prohibit the introduction of persons in whole or in part without regard to *how* such

22

persons travel to the United States, *see* PI Opp'n at 26-29 (explaining why Plaintiff is incorrect to state that Section 265 regulates only vessels), and stopping vessels or imposing fines or imprisonment does not address the public health crisis that Section 265 is specifically designed to address.  Indeed, regulating vessels and airplanes has no relevance to land border crossings, and the imposition of criminal punishments on those who violate a CDC order—presumably under a separate statutory provision, section 271 ("Penalties for violations of quarantine laws")—would not serve Section 265's very aim to prohibit the introduction of persons, and a highly contagious and deadly communicable disease such as COVID-19, into the United States.

The Magistrate Judge also noted that the Government may apprehend, examine, quarantine, and conditionally release persons traveling to the United States.  R&R at 37.  In other words, the Magistrate Judge suggests that the CDC could adopt public health measures authorized by a different provision, section 264, that the CDC Director has already determined to be impossible or impractical to implement at the land border given the number of covered aliens, the limited capacity of the border facilities, covered aliens' lack of residences in the United States, and the CDC's limited capacity to monitor any conditional releases.

This reading by the Magistrate Judge again ignores what is plainly authorized by Section 265—the Secretary may prohibit the introduction of persons from Mexico and Canada when a communicable disease is determined to exist in those countries and other statutory requirements are met.  Yet, as discussed above, under the Magistrate Judge's reading, the Government has no ability to prohibit such introduction at all because aliens who arrive at ports of entry along the U.S.-Mexico or U.S.-Canada borders may not be returned, either.  The government's only recourse, under the Magistrate Judge's reading, is apparently to punish third-party drivers who transport covered aliens to ports of entry or who transport aliens illegally across the border between ports of entry.  Such implications reflect the very definition of interpreting a statute to render it a nullity.

**E.  To the Extent Section 265 is Ambiguous, the Magistrate Judge Erred in Finding *Chevron* Deference Inapplicable**

Section 265 clearly permits its authority to be exercised at or near the border to prevent the introduction of persons into the United States.  Even if it were viewed as not clearly addressing the issue, it is at most ambiguous, and accordingly, the Secretary's permissible interpretation of that term must be accorded *Chevron* deference.  *See Chevron, USA, Inc. v. Nat. Res. Def. Council, Inc.*, 467 U.S. 837, 842-43 (1984).  The Magistrate Judge erred in holding that *Chevron* does not apply because "[t]he question for this claim is purely legal:  does Section 265 authorize expulsions from the United States, or does it not?"  R&R at 38 n.15.  The Magistrate Judge's question reflects his misunderstanding of the *Chevron* framework—simply because a question is purely legal says nothing about whether the Court should defer to an agency's reasonable interpretation of the statute it administers.  *See Chevron*, 467 U.S. at 843 ("[I]f the statute is silent or ambiguous with respect to the specific issue, the question for the court is whether the agency's answer is based on a permissible construction of the statute.").

As discussed above, the Magistrate Judge's interpretation of the term "introduction" suggests that there may be an ambiguity in whether "prohibit[ing]" "the introduction of persons" from "a foreign country" can include expulsion authority.  42 U.S.C. § 265.  In the case of ambiguity, the interpretation of "introduction" lies squarely within the Secretary's delegated authority and expertise.  PI Opp'n at 32 & n.14; *City of Arlington v. FCC*, 569 U.S. 290, 296 (2013) ("Congress knows to speak . . . in capacious terms when," as here, "it wishes to enlarge[] agency discretion").  Moreover, here, the agency is not attempting to reconcile statutes that are in conflict.  *See* R&R at 38 n.15.  As discussed above, Section 265 expressly suspends provisions of Title 8 that otherwise allow introduction, and in such a situation, the agency's reasonable interpretation of Section 265 is entitled to deference.

The agency's interpretation is permissible.  To begin, the interpretation of "introduction" is within the Secretary's delegated authority—and clearly within the Secretary's expertise.  Congress charged the Secretary with a capacious grant of authority in implementing the statute

during the limited circumstance in which there is a serious danger of the introduction of a communicable disease into the United States such that a suspension of the right to introduce persons or property is required in the interest of the public health. *See* 42 U.S.C. § 265 ("the [Secretary], *in accordance with regulations* approved by the President, shall have the power to prohibit, in whole or in part, the introduction of persons . . . in order to avert such danger" (emphasis added)).  In interpreting "introduction," the agency utilized scientific and technical knowledge and experience regarding communicable diseases generally and applied it to the specific threat to public health here. *See* PI Opp'n at 32 n.14 (collecting authority recognizing CDC's public health expertise).

Communicable disease does not respect national borders, and aliens without valid travel documents often try to enter the country either unlawfully without detection or by arriving at ports of entry.  When they do, the public health concerns that Section 265 is designed to address do not evaporate.  In such scenarios, the Secretary must have the authority to stop the further movement of persons who manage to cross the border in violation of the CDC Order, and this interpretation is reasonable in light of the plain language and legislative history of the statute. *See Luis v. United States*, 136 S. Ct. 1083, 1097 (2016) (Thomas, J., concurring) ("where a general power is conferred or duty enjoined, every particular power necessary for the exercise of the one, or the performance of the other, is also conferred.") (quoting Thomas Cooley, *Constitutional Limitations* 63 (1868)). Indeed, Section 265 extends not only to persons but also to property. *See* 42 C.F.R. § 71.51(g) (allowing the CDC to export a dog or cat that has been excluded from the United States under public health regulations).  Under the Magistrate Judge's reading, for instance, the Government would not be able to send back or otherwise remove property (*e.g.*, diseased animals) as long as that property has entered the territorial boundaries of the United States.  That is clearly wrong.

***

In sum, the Magistrate Judge's interpretation of Section 265 is contrary to law.  The Court should sustain Defendants' objections and, because Plaintiff cannot show a likelihood of success on the merits, deny his request for injunctive relief. *See Winter v. Nat. Res. Def. Council, Inc.*, 555

25

U.S. 7, 20 (2008); *Sherley v. Sebelius*, 644 F.3d 388, 393 (D.C. Cir. 2011) ("we read *Winter* at least to suggest if not to hold that a likelihood of success is an independent, free-standing requirement for a preliminary injunction" (internal quotation marks and citation omitted)).

## II.   The Magistrate Judge Erred in Finding the Other Preliminary Injunction Factors Weigh in Favor of Issuing A Preliminary Injunction

Even if this Court considered the remaining factors for injunctive relief—irreparable injury, the balance of equities, and the public interest[5]—those factors all support the denial of Plaintiff's request for emergency relief.

The Magistrate Judge erred in concluding that because he found Plaintiff likely to succeed on the merits of his claim, "this is a clear harm that each member of the putative class has suffered or will suffer." R&R at 41. That analysis improperly collapses independent requirements such that Plaintiff's purported likelihood of success on the merits apparently establishes irreparable harm. *See Breen v. Mineta*, No. CIV.A. 05-654 RWR, 2005 WL 3276163, at *2 (D.D.C. Sept. 30, 2005) ("Irreparable harm requires something more than having to comply with or abide by an illegal agency decision pending the outcome of litigation over that decision."); *Am. Ass'n for Homecare v. Leavitt*, No. CIV A 08-0992 (RMU), 2008 WL 2580217, at *5 (D.D.C. June 30, 2008) ("For the purposes of a preliminary injunction, courts will not base a finding of 'irreparable injury' on a procedural violation standing alone.").

Further, the Magistrate Judge erroneously concluded that the Government failed to consider the harm to public interest "in continuing its current practice of housing unaccompanied non-citizen minors in hotels" prior to those minors' expulsion under Title 42. The Magistrate Judge's conclusion is based on a finding by the court in *Flores v. Barr*, No. CV 85-4544 DMG (AGRx) (C.D. Cal. Sept. 21, 2020), ECF No. 990, in the context of enforcement of a settlement agreement. R&R at 43. The Government is appealing the *Flores* order and has moved for a stay

---

[5]     The balance of harms and the public interest "merge when the Government is the opposing party." *Nken v. Holder*, 556 U.S. 418, 435 (2009).

pending appeal of that order.[6]  In any event, the Magistrate Judge's conclusion is flawed in two respects.

*First*, as Defendants have previously explained, the Magistrate Judge failed to consider that the putative class members would first be held in congregate settings in border facilities if the CDC Order were enjoined.  PI Opp'n at 55; *see* 8 U.S.C. § 1232(b)(3) (unaccompanied alien children may be held in border facilities for up to 72 hours, and then are transferred to further congregate care administered by HHS).  As the CDC Director found, such facilities "are not structured or equipped for quarantine or isolation for COVID-19," and "[t]he numbers of aliens and the size and capacity of the congregate holding areas are not at all conducive to effective social distancing . . ." Order at 15.  Moreover, they are not equipped to provide on-site care to infected persons.  Final Rule, 85 Fed. Reg. at 56,433; *see also id.* (discussing infectious control challenges at border facilities, and noting that in the 75-day period before the issuance of the CDC Order on March 20, 2020, an average of 3,292 individuals who would be covered aliens under the CDC Order were in custody at ports of entry and Border Patrol stations each day).  Holding these minors in congregate settings in border facilities ill-equipped to address the public health exigencies during this unprecedented pandemic increases the risk of infection and transmission of COVID-19 for those minors, other aliens, DHS personnel, and the U.S. domestic population.  The Magistrate Judge clearly erred in failing to consider this period of holding putative class members in border facilities when evaluating harm to public interest.

---

[6]     As the Government explained in its emergency stay motion in the U.S. Court of Appeals for the Ninth Circuit, the *Flores* court's requirement that minors subject to the CDC Order at issue in this case be transferred to licensed programs such as ORR facilities causes irreparable harm and undermines the public interest.  Renewed Emergency Mot. Under Cir. Rule 27-3 for Admin. Stay and Stay Pending Appeal, *Flores v. Barr*, No. 20-55951, at 16-18 (9th Cir. Sept. 24, 2020), ECF No. 12-1.  It is the Government's position that the *Flores* Court improperly substituted its own judgment for that of the Nation's top public health official by imposing requirements that frustrate the CDC Order's aim to prevent the introduction of COVID-19 into the United States.  In allowing the movement of minors who have traveled to the United States through and from countries that are experiencing widespread community transmission into congregate-care facilities, the *Flores* decision increases the risk of transmission to those minors, those who care for them, other minors in care, and the public at large.  *Id*. at 18.

*Second*, the Magistrate Judge failed to consider the attestations of Deputy Director Jallyn Sualog—a career civil servant with years of experience managing the ORR program, including during the current pandemic—as to the attributes of the hotels at issue that justify their use.  Decl. of ORR Deputy Director Jallyn Sualog, ECF No. 58-1, Attach. A ¶ 12 (dated Sept. 11, 2020) (attesting that "hotels furnish accommodations conducive to an effective quarantine" because they allow for the placement of minors in "individual rooms with closed doors, where each minor has their own sleeping, eating, and bathing facilities").

Moreover, the Government's asserted interest in applying Section 265 authority is *not*, as the Magistrate Judge noted, limited to DHS personnel at the border.  R&R at 44.  To be sure, DHS personnel will be at serious, unnecessary risk if the Court issues the requested injunction here.  PI Opp'n at 55.  But the CDC Director found that the CDC Order has clearly reduced the danger of COVID-19 transmission into the United States by reducing the number of covered aliens in congregate settings in border facilities.  *Id.* at 24.  The CDC Director also found that the Order has preserved vital resources for the domestic population during the COVD-19 pandemic by reducing the utilization of local health care systems by covered aliens.  *Id.*  The Magistrate Judge erred in disregarding the ways in which the CDC Order and its enforcement here have protected the public health of aliens, DHS personnel, and the American public, as well as the vital healthcare resources of this Nation.

Further, citing options such as apprehension, examination, quarantine, and conditional release, the Magistrate Judge erred in concluding that issuance of the requested injunction here "does not leave the government powerless to address the pandemic."  R&R at 44.  As already discussed, *see* PI Opp'n at 22-23, 50-51, the CDC Director has already found that none of those mitigation measures is viable to address the pandemic, in light of the significant practical and operational constraints on DHS's ability to implement effective infection control measures in congregate settings in border facilities.  For example, the Magistrate Judge failed to consider the CDC Director's conclusion that conditional release is not a viable option here due to significant uncertainty that covered aliens could effectively self-quarantine, self-isolate, or otherwise comply

with social distancing guidelines, particularly in light of the CDC's inability to effectively monitor such a large number of people so released.  PI Opp'n at 23, 50-51.

The Magistrate Judge's conclusion regarding the public health implications of transferring putative class members to the Office of Refugee Resettlement ("ORR") is also fraught with errors.

*First*, the Magistrate Judge erred in entirely discounting Deputy Director Sualog's judgment that ORR cannot safely intake members of the putative class in the event the Court issues the requested injunction.  R&R at 45-46.  The Magistrate Judge erroneously focused on the number of open beds in ORR facilities.  R&R at 46.  Deputy Director Sualog's declaration makes clear, however, that the determinative issue in assessing ORR capabilities in this situation is not the number of open beds, but rather whether the increased rate of referrals to ORR of minors with higher rates of exposure would create operational difficulties and make it more difficult to implement sufficient containment protocols—and Deputy Director Sualog determined that it would.  Declaration of Deputy Director Jallyn Sualog, ORR, ECF No. 58-1, ¶¶ 6-7, 10 (dated Sept. 17, 2020); Sept. 11 Sualog Decl. ¶¶ 11, 14, 15, 20-22, 46, 49.

Indeed, ORR's current success in preventing COVID-19 outbreaks at its facilities is due to its ability to maintain low numbers at those facilities.  Sept. 17 Sualog Decl. ¶¶ 6-7.  This is consistent with a core purpose of the Title 42 order: to prevent the "danger to the public health that results from the introduction of [covered] persons into congregate settings at or near the borders." 85 Fed. Reg. at 17,061.  Given the need to limit capacity to address COVID-19, the total number of available beds in ORR facilities is far from dispositive.  Sept. 17 Sualog Decl. ¶¶ 9-11; 13-17. Increased referrals will quickly overwhelm ORR and escalate the risk of transmission of COVID-19 to minors in ORR custody and local communities.  *Id*. ¶¶ 10-12.  It will also increase the need to transfer minors, including potentially infected ones, between facilities, thereby increasing the risk that COVID-19 will spread within the ORR network and to local communities.  Sept. 11 Sualog Decl. ¶¶ 11, 14-15, 20-22, 44-46, 47-49.

*Second*, the Magistrate Judge failed to take into account the judgment of Deputy Director Sualog that ORR had already reached the threshold that puts ORR in significant stress.  Deputy

29

Director Sualog explained that from September 1, 2020 through September 16, 2020, ORR received 568 referrals, of which 30% were COVID-19 positive or exposed; specifically, two were COVID-19 positive (requiring isolation) and 170 were COVID-19 exposed (requiring quarantine). Sept. 17 Sualog Decl. ¶ 18.  This development unfortunately met her programmatic judgment that "the ORR system would likely come under significant stress if ORR were to begin to receive on a regular basis approximately 75 to 100 referrals of UAC [unaccompanied alien children] per week, with approximately 30% of the UAC having tested positive or been exposed to COVID-19." Declaration of Jallyn Sualog, ORR, ECF No. 42-5, ¶ 11 (dated Sept. 8, 2020).

*Third*, the Magistrate Judge erroneously gave weight to the *Flores* Court's dismissal of Deputy Director Sualog's declaration for lack of support from a "public health official."  R&R at 46.  Deputy Director Sualog in fact attested that ORR consulted with CDC in developing and implementing COVID-19 infection control measures across the ORR network.  Sept. 8 Sualog Decl. ¶ 17.  Additionally, Deputy Director Sualog, who has ongoing oversight of ORR's day-to-day operations, including the implementation of COVID-19 infection control protocols, is uniquely qualified to opine on the myriad operational considerations that bear on ORR's ability to safely intake incoming unaccompanied alien children.  The Magistrate Judge erred in giving no weight to Deputy Director Sualog's opinion with respect to the operation of the agency she oversees.  And while the Magistrate Judge correctly notes that ORR's "care-provider facilities are operating at well below capacity," R&R at 46, Deputy Director Sualog makes clear that the "relatively stable, historically low system-wide census within ORR facilities during the COVID-19 pandemic has allowed ORR the operational flexibility that it needs to implement infection control measures effectively." Sept. 11 Sualog Decl. ¶ 46.  If the Court were to enjoin enforcement of the CDC Order, ORR would no longer be able to maintain the very operational flexibility needed to protect minors in its care.

At bottom, the Magistrate Judge erroneously minimized the public health exigency posed by the pandemic, which requires the Government to utilize its broad powers under Section 265 to effectively address the public health dangers to aliens, DHS personnel, and the American public.

Plaintiff and the Magistrate Judge would structure the Nation's response to this public health crisis differently, but that is not a sufficient reason for this Court to substitute its judgment for that of Government officials tasked with ensuring the public health and safety of our Nation.  *See, e.g.*, *Jacobson*, 197 U.S. at 30 (explaining that "[i]t is no part of the function of a court or a jury to determine" how best to protect the public from a disease); *S. Bay United Pentecostal Church*, 140 S. Ct. at 1613  (Roberts, C.J., concurring) (explaining that the latitude "to guard and protect" "[t]he safety and the health of the people" "must be especially broad" when acting "in areas fraught with medical and scientific uncertainties"); *Nat'l Immigr. Project of Nat'l Lawyers Guild v. Exec. Off. Of Immigr. Rev.*, --- F. Supp. 3d ---, 2020 WL 2026971, at *12 (D.D.C. Apr. 28, 2020) ("where[, as here,] the Court is . . . certainly not well-positioned to second-guess" the CDC Director's health and safety determinations, "the public interest does not point in favor of granting injunctive relief").

***

The Magistrate Judge compounded the above identified errors by recommending that the Court enjoin an agency action not even before the Court:  a future CDC Order issued under the Final Rule.  But Plaintiff's Complaint makes no mention of any such order, and for good reason— the CDC has not issued one.  The Court therefore is in no position to determine whether a future CDC Order under a different regulatory authority—*i.e*., the Final Rule rather than the Interim Final Rule—would raise the same concerns as those addressed in the Magistrate Judge's Report and Recommendation.  The Magistrate Judge's proposed relief is overbroad and contrary to law, and it should be rejected.

### III.     The Certification of a Provisional Class Here Is Inconsistent with Article III and Federal Rule 23 Principles

The Magistrate Judge has recommended that the Court certify a provisional class when issuing the requested preliminary injunction, even though Plaintiff's claims in this case are moot. Although Defendants recognize that the D.C. Circuit has held that the fact that a putative class

representative's case is moot at the time of certification does not alone moot the case or otherwise render the putative class representative inadequate, *see JD v. Azar*, 925 F.3d 1291, 1307-12 (D.C. Cir. 2019) (per curiam), the Magistrate Judge fails to consider that this holding is an improper relaxation of Article III's strict requirement of a case or controversy, *see Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 408 (2013), and does not comport with long-standing principles underlying the Rule 23 class action vehicle. *See* ECF No. 42, at 28. The Magistrate Judge's recommendation is therefore contrary to law and should not be adopted.

### IV.   This Court Should Stay Any Order Enjoining Title 42 to Allow Defendants to Consider Their Appellate Options

To the extent that this Court adopts the Magistrate Judge's recommendations, and enjoins application of CDC Order to the putative class members, Defendants respectfully request that this Court stay its order for 14 days to give Defendants sufficient time to explore their appellate options. And, should Defendants seek further review, Defendants respectfully ask that this Court continue the stay pending appeal.

Federal Rule of Civil Procedure 62(d) provides in relevant part: "While an appeal is pending from an interlocutory order or final judgment that grants . . . an injunction, the court may suspend . . . an injunction" during the pendency of the appeal. Courts in this Circuit weigh the same factors "before granting a stay or a preliminary injunction." *Nat'l Ass'n of Farmworkers Orgs. v. Marshall*, 628 F.2d 604, 613 (D.C. Cir. 1980) (quoting *Virginia Petroleum Jobbers Ass'n v. Fed. Power Comm'n*, 259 F.2d 921, 925 (D.C. Cir. 1958); *see also Hilton v. Braunskill*, 481 U.S. 770, 776 (1987). As shown above, Defendants have demonstrated a likelihood of success on the merits. Further, the equities weigh in favor of a stay. As the Court is aware, COVID-19 is a communicable disease that spreads easily and quickly across national borders and for which there are no widely available therapeutics or vaccines. Countries across the world have implemented emergency measures to help curb its spread, including closing their borders and imposing severe travel restrictions. The Title 42 process that Plaintiff challenges averts the serious danger of COVID-19 further spreading into the United States, and has been found by the CDC Director to

be effective.  An injunction prohibiting the application of that process to putative class members would permit them to be held in congregate settings for hours or days during immigration processing, and thus allow the disease to spread, frustrating the very purpose of the Section 265 Order to curb the potentially irreversible and devastating spread of COVID-19 into the United States.

For these reasons, Defendants respectfully request that, if this Court is inclined to enjoin the Title 42 process from being applied to putative class members, the Court stay such an order for 14 days to give Defendants sufficient time to explore their appellate options.

## CONCLUSION

For all the foregoing reasons, Defendants respectfully request that the Court reject the Magistrate Judge's Report and Recommendation, sustain Defendants' objections, and deny Plaintiff's motions for class certification and for classwide preliminary injunction.

Dated:  October 2, 2020

Respectfully submitted,

JEFFREY BOSSERT CLARK
Acting Assistant Attorney General

JOHN V. COGHLAN
Deputy Assistant Attorney General

/s/ *Jean Lin*
JEAN LIN (NY Bar 4074530)
Special Litigation Counsel
KEVIN SNELL
BRADLEY CRAIGMYLE
TANYA SENANAYAKE (D.C. Bar 1006218)
Trial Attorneys
Federal Programs Branch
Civil Division, Department of Justice
1100 L Street, N.W.
Washington, D.C. 20005
(202) 514-3716
Jean.Lin@usdoj.gov
*Attorneys for Defendants*

33