**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| P.J.E.S., A MINOR CHILD, by and through his father and Next Friend, Mario Escobar Francisco, on behalf of himself and others similarly situated, <br><br> *Plaintiff,* <br><br> v. <br><br> CHAD F. WOLF, ACTING SECRETARY OF HOMELAND SECURITY, in his official capacity, et al., <br><br> *Defendants.* | ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> )   No. 20-cv-02245-EGS-GMH <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) |

## PLAINTIFF'S OPPOSITION TO DEFENDANTS' OBJECTIONS TO THE MAGISTRATE JUDGE'S REPORT AND RECOMMENDATION

## TABLE OF CONTENTS

INTRODUCTION ................................................................................................................ 1

BACKGROUND ................................................................................................................ 3

ARGUMENT ..................................................................................................................... 4

I. THE MAGISTRATE JUDGE PROPERLY CONCLUDED THAT PLAINTIFF
   IS LIKELY TO SUCCEED ON THE MERITS OF HIS STATUTORY CLAIMS.............. 4

A. The Magistrate Judge Correctly Concluded that § 265 Does Not
   Authorize Expulsions ............................................................................................. 4

B. Section 265 Does Not Override the Immigration Laws' Requirements ........................... 12

C. The Magistrate Judge Properly Concluded that Defendants' Interpretation of § 265
   Is Not Entitled to *Chevron* Deference .............................................................. 16

D. The Injunction Should Apply To The Final Rule As Well.............................................. 18

II. THE MAGISTRATE JUDGE PROPERLY FOUND THAT THE REMAINING
    PRELIMINARY INJUNCTION FACTORS FAVOR PLAINTIFF ................................. 19

III. THE MAGISTRATE JUDGE PROPERLY FOUND THAT THE PROPOSED CLASS
     SHOULD BE CERTIFIED ........................................................................................... 22

IV. THE COURT SHOULD DENY DEFENDANTS' REQUEST FOR A STAY OF ANY
    PRELIMINARY INJUNCTION....................................................................................... 233

CONCLUSION.................................................................................................................... 24

# TABLE OF AUTHORITIES

**Cases**

*Alexander v. Sandoval*,
  532 U.S. 275 (2001) ....................................................................................................... 7

*Am. Ass'n for Homecare v. Leavitt*,
  No. 08-cv-0992-RMU, 2008 WL 2580217 (D.D.C. June 30, 2008) ......................................... 19

*Am. Freedom Def. Initiative v. Wash. Metro. Area Transit Auth.*,
  901 F.3d 356 (D.C. Cir. 2018) ......................................................................................... 18

*Breen v. Mineta*,
  No. 05-cv-654-RWR, 2005 WL 3276163 (D.D.C. Sept. 30, 2005).......................................... 19

*Brotherhood of Railway and Steamship Clerks v. Nat'l Mediation Board*,
  374 F.2d 269 (D.C. Cir. 1966) ......................................................................................... 23

*Chamber of Commerce of U.S. v. Fed. Election Comm'n*,
  69 F.3d 600 (D.C. Cir. 1995) .......................................................................................... 17

*Chevron, U.S.A., Inc. v. NRDC*,
  467 U.S. 837 (1984) ............................................................................................... 16, 17

*Chicago & N.W. Ry. Co. v. United Transp. Union*,
  402 U.S. 570 (1971) ...................................................................................................... 14

*Clark v. Martinez*,
  543 U.S. 371  (2005) ....................................................................................................... 5

*Dep't of Homeland Sec. v. Thuraissigiam*,
  140 S. Ct. 1959 (2020)..................................................................................................... 7

*Dessouki v. Att'y Gen. of U.S.*,
  915 F.3d 964 (3d Cir. 2019) ............................................................................................. 6

*District of Columbia v. Dep't of Labor*,
  819 F.3d 444 (D.C. Cir. 2016) ............................................................................... 9, 12, 23

*Doe v. Mattis*,
  928 F.3d 1 (D.C. Cir. 2019) .............................................................................................. 6

*Dole Food Co. v. Patrickson*,
  538 U.S. 468 (2003) ........................................................................................................ 8

*E. Bay Sanctuary Covenant v. Trump*,
  950 F.3d 1242 (9th Cir. 2020)......................................................................................... 22

Epic Systems Corp. v. Lewis
  138 S. Ct. 1612 (2018) ........................................................................................... passim

*Flores v. Barr,*
   __ F.3d __, 2020 WL 5951115 (9th Cir. Oct. 4, 2020)................................................... 2, 20, 21

*Flores v. Barr,*
   2020 WL 5491445 (C.D. Cal. Sept. 4, 2020)............................................................... 21

*Flores v. Barr,*
   85-cv-04544 (C.D. Cal. Mar. 28, 2020) .................................................................... 22

*Flores v. Barr,*
   No. CV 85-4544 DMG (AGRx), 2020 WL 5666550 (C.D. Cal. Sept. 21, 2020).............. 20, 21

*J.B.B.C. v. Wolf,*
   No. 20-cv-1509, (D.D.C. June 24, 2020) ...................................................... 1, 13, 17

*J.D. v. Azar,*
   925 F.3d 1291 (D.C. Cir. 2019) .......................................................................... 22

*J.L. v. Cissna,*
   341 F. Supp. 3d 1048 (N.D. Cal. 2018) ................................................................ 19

*Kingdomware Techs., Inc. v. United States,*
   136 S. Ct. 1969 (2016) ...................................................................................... 15

*Kisor v. Wilkie,*
   139 S. Ct. 2400 (2019) ................................................................................. 16, 17

*Loving v. IRS,*
   742 F.3d 1013 (D.C. Cir. 2014) ........................................................................... 17

*Merck & Co. v. U.S. Dep't of Health & Human Servs.,*
   962 F.3d 531, 541 (D.C. Cir. 2020) ............................................................ 5, 7, 9, 12

*Ne. Fla. Chapter of Associated Gen. Contractors of Am. v. City of Jacksonville,*
   508 U.S. 656 (1993)......................................................................................... 18

*Nken v. Holder,*
   556 U.S. 418 (2009) ......................................................................................... 23

*NRDC v. Daley,*
   209 F.3d 747 (D.C. Cir. 2000) ............................................................................ 16

*Nunnally v. District of Columbia,*
   243 F. Supp. 3d 55 (D.D.C. 2017) ........................................................................ 4

*Pereira v. Sessions,*
   138 S. Ct. 2105 (2018) ...................................................................................... 16

*RadLAX Gateway Hotel, LLC v. Amalgamated Bank,*
   566 U.S. 639 (2012) ......................................................................................... 15

*Russello v. United States*,
 464 U.S. 16 (1983) ......................................................................................... 8

*Tefel v. Reno*,
 972 F. Supp. 608  (S.D. Fla. 1997).............................................................. 19

*United States v. Juvenile Male*,
 670 F.3d 999 (9th Cir. 2012)......................................................................... 14

*United States v. Philip Morris USA, Inc.*,
 449 F. Supp. 2d 988 (D.D.C. 2006) ............................................................. 23

*United States v. Puentes*,
 803 F.3d 597 (11th Cir. 2015)....................................................................... 14

*Util. Air Regulatory Grp. v. EPA*,
 573 U.S. 302 (2014) ................................................................................. 9, 16

*Valentine v. United States ex rel. Neidecker*,
 299 U.S. 5 (1936)............................................................................................ 6

*Wisc. Cent. Ltd. v. United States*,
 138 S. Ct. 2067 (2018) ......................................................................... 10, 11

**Statutes and Legislative History**

5 U.S.C. § 8477(a)(4)(G)(iii) ................................................................................ 8

8 U.S.C. § 1182(a)(1)(A)(i) ................................................................................. 14

8 U.S.C. § 1232(b)(3) .......................................................................................... 20

10 U.S.C. § 123(a) .............................................................................................. 14

12 U.S.C. § 84(c)(5) .............................................................................................. 8

15 U.S.C. § 1802(3) .............................................................................................. 8

42 U.S.C. § 264 ................................................................................................ 9, 10

42 U.S.C. § 264(b) .............................................................................................. 10

42 U.S.C. § 264(c) .............................................................................................. 10

42 U.S.C. § 264(d) .............................................................................................. 10

42 U.S.C. § 265 ............................................................................................. passim

Foreign Affairs Reform and Restructuring Act of 1998 ............................... 15, 16

U.S. Const. art I, § 9, cl. 2.................................................................................. 14

**Other Authorities**

Convention Against Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment
art. 3, Dec. 10, 1984, S. Treaty Doc. No. 100-20 (1988) .................................................... 15, 16

COVID-19 Platform: Temporary Measures and Impact on Protection, U.N. High Commissioner
for Refugees, available at https://im.unhcr.org/covid19_platform ........................................... 23

Jason Dearen & Garance Burke, *Pence Ordered Borders Closed After CDC Experts Refused*, AP
News (Oct. 3, 2020), available at https://apnews.com/article/virus-outbreak-pandemics-public-
health-new-york-health-4ef0c6c5263815a26f8aa17f6ea490ae ........................................... 2, 17

Michelle Hackman, et al., *CDC Officials Objected to Order Turning Away Migrants at Border*,
The Wall Street Journal (Oct. 3, 2020), available at https://www.wsj.com/articles/cdc-officials-
objected-to-order-turning-away-migrants-at-border-11601733601 ..................................... 2, 17

Order in Council, Minimizing the Risk of Exposure to COVID-19 in Canada Order (Prohibition
of Entry into Canada from the United States), P.C. 2020-0161, § 4(2)(d) (Mar. 20, 2020),
available at https://tinyurl.com/y888f7yh ................................................................................ 23

**Rules**

Fed. R. Civ. P. 23 ................................................................................................................................ 22

Fed. R. Civ. P. 23(a) ..................................................................................................................... 3, 22

Fed. R. Civ. P. 23(b)(2) ................................................................................................................. 3, 22

Fed. R. Civ. P. 62(d) ......................................................................................................................... 23

**Regulations**

85 Fed. Reg. 56,424 (Sept. 11, 2020) ................................................................................................ 5

## INTRODUCTION

The Report and Recommendation, ECF No. 65 ("R&R"), was correct in recommending provisional class certification and a classwide preliminary injunction.  Defendants' arguments are recycled versions of those the Magistrate Judge considered and rejected, and Defendants have presented no new facts.  The Court should adopt the R&R in full and issue the classwide preliminary injunction so that thousands more young children are not summarily expelled without even a chance to show that they warrant asylum or other humanitarian protection in the United States.

Two judges have now looked at Defendants' contention that, for the first time in the country's history, they may use the public health laws to completely bypass the safeguards created by Congress for unaccompanied children.  Both Judge Nichols in *J.B.B.C.* and Magistrate Judge Harvey in this case correctly reached the same two statutory conclusions: (1) The public health laws do not authorize expulsions, and (2) even if the public health laws did authorize expulsions of some individuals, they do not authorize the expulsion of unaccompanied minors, because Congress enacted specific and mandatory laws to protect unaccompanied minors from summary expulsions, and these later-enacted laws must be harmonized with the public health laws.

Defendants' arguments were all properly rejected by Judge Nichols and Magistrate Judge Harvey.  Most fundamentally, Defendants fail to overcome what Magistrate Judge Harvey viewed as the central flaw in Defendants' argument: that notwithstanding the lack of any reference to expulsion in the text of the public health laws, Defendants ask this Court to find an *implied* authorization for the breathtaking power of summary expulsions, even of children to whom Congress granted special protections.  Where Congress wishes to authorize removal as a government power, it does so explicitly, as it has in the immigration laws.  Moreover, as the R&R importantly noted, Congress has not only expressly authorized removals in the immigration laws, but it has also specifically addressed communicable diseases in the immigration laws.  Those laws allow the government to deport some individuals with communicable diseases, but it is well established that unaccompanied children and those seeking protection must be provided

the protections to which they are entitled, and may not be automatically expelled even if they actually have a communicable disease.

The R&R also correctly concluded that the other preliminary injunction factors weigh decidedly in Plaintiff's favor.  Defendants contend that even if Congress has prohibited summary expulsions of unaccompanied children, and even if these children will be sent back to extreme danger, the Court should nonetheless refuse to enjoin the Title 42 expulsion policy because allowing 75-100 children per week to be treated as the immigration laws require would put "stress" on the system.  But as both Magistrate Judge Harvey and the Ninth Circuit in *Flores* correctly observed about Defendants' conclusory assertions, there are thousands of open beds for children in the system.  Thus, there is little doubt that the government is easily capable of quarantining any child for whom that is necessary.

Additionally, although it is not necessary at this juncture for the Court to determine the role CDC actually played in the creation of the Title 42 Process, Plaintiff notes that there are recent reports that the White House may have overridden the CDC's independent judgment about the lack of any public health need for this Title 42 expulsion policy.  *See* Jason Dearen & Garance Burke, *Pence Ordered Borders Closed After CDC Experts Refused*, AP News (Oct. 3, 2020), https://apnews.com/article/virus-outbreak-pandemics-public-health-new-york-health-4ef0c6c5263815a26f8aa17f6ea490ae (reporting that White House "directed the [CDC] to use its emergency powers to effectively seal the U.S. borders, overruling the agency's scientists who said there was no evidence the action would slow the coronavirus"); Michelle Hackman, et al., *CDC Officials Objected to Order Turning Away Migrants at Border*, The Wall Street Journal (Oct. 3, 2020), https://www.wsj.com/articles/cdc-officials-objected-to-order-turning-away-migrants-at-border-11601733601 (explaining that "the policy was driven by immigration officials in the administration over the objections of senior officials at the CDC").

In short, the Administration has circumvented the process created by Congress to deal with unaccompanied minors.  And, because of the Executive's unlawful actions, unaccompanied children are suffering and will continue to suffer irreparable harm absent a preliminary injunction.

**BACKGROUND**

Magistrate Judge Harvey explained the statutory and regulatory background of the Title 42 Process, and the factual background of Plaintiff P.J.E.S. and the numerous other unaccompanied children who have been subjected to expulsion pursuant to Defendants' new regulations and policies.  R&R 3-15.  Plaintiff's Motions for Preliminary Injunction and Class Certification also provide extensive background on the Title 42 Process, as well as the critical statutory rights of unaccompanied children in the immigration system.  *See* Memorandum in Support of Motion for Classwide Preliminary Injunction, ECF No. 15-1 ("PI Mot."), at 3-11; Memorandum in Support of Motion for Class Certification, ECF No. 2-1 ("Class Mot."), at 2-6.

The Magistrate Judge reviewed extensive briefing and evidence from the parties, including a supplemental declaration filed by Defendants after the close of briefing.  *See* Class Mot.; PI Mot.; Defendants' Combined Opposition to Motions for Class Certification and Preliminary Injunction, ECF No. 43 ("PI Opp."); Plaintiff's Combined Reply Memorandum in Support of Motions for Classwide Preliminary Injunction and Class Certification, ECF No. 52 ("PI Reply"); Defendants' Motion to Strike, ECF No. 58; Plaintiff's Opposition to Motion to Strike, ECF No. 61; Defendants' Reply in Support of Motion to Strike, ECF No. 63; Supplementary Declaration of Jallyn Sualog, ECF No. 68.  The Magistrate Judge also received amicus briefs supporting Plaintiff and Defendants.  *See* ECF Nos. 36, 37, 57.

On September 25, 2020, the Magistrate Judge issued a thoroughly reasoned, 50-page R&R that extensively addressed the parties' arguments.  Regarding Plaintiff's Motion for Class Certification, he found that Plaintiff had satisfied the requirements for class certification under Rules 23(a) and (b)(2).  R&R 15-22.  Regarding Plaintiff's Motion for Preliminary Injunction, he found that Plaintiff (1) had shown a likelihood of success on the merits of his claims that 42 U.S.C. § 265 did not authorize the government to expel noncitizens from the United States, R&R 23-32, and that even if it did, it conflicted with "various rights granted in the TVPRA and the INA," *id.* 32-38; (2) had shown that the proposed Class would suffer irreparable injury in the absence of a preliminary injunction, *id.* 38-41; and (3) that the balance of harms and the public interest favored classwide preliminary relief, *id.* 41-47.  The Magistrate Judge further concluded

that any preliminary injunction should apply to the Final Rule, and that Plaintiff should not be required to post a bond.

## ARGUMENT

## I.   THE MAGISTRATE JUDGE PROPERLY CONCLUDED THAT PLAINTIFF IS LIKELY TO SUCCEED ON THE MERITS OF HIS STATUTORY CLAIMS.

The R&R correctly reached two conclusions: that § 265 of the public health laws does not authorize expulsions from the United States of anyone, but even if it did, the later-enacted protections afforded unaccompanied children and asylum seekers prohibit summary expulsions of the proposed class of unaccompanied children.  Defendants' objections to those conclusions rehash meritless arguments the Magistrate Judge considered and correctly rejected.  Defendants' objections should be overruled in their entirety.  *See Nunnally v. District of Columbia*, 243 F. Supp. 3d 55, 69 n.6 (D.D.C. 2017) (explaining that district court may accept the Magistrate Judge's recommendation "on any ground supported by the record").

### A.   The Magistrate Judge Correctly Concluded that § 265 Does Not Authorize Expulsions.

1. Section 265 does not vest Defendants with any expulsion authority.  Most importantly, the Magistrate Judge correctly observed that "expulsion from the United States is nowhere mentioned in" § 265; indeed, "it contains not a word about the power of the Surgeon General to expel anyone who has come into the country."  R&R 28.  Nevertheless, Defendants claim to have discovered, for the first time, an *implied* expulsion power in this century-old statute.  As the Magistrate Judge thoroughly explained, however, all the "traditional tools of statutory interpretation" demonstrate that expulsions are not authorized.  R&R 24.

2. The Magistrate Judge correctly emphasized that "the power the government claims under Section 265 is breathtakingly broad."  R&R 31.  If expulsion could be implied as a power to effectuate § 265, that would be true for all "persons" covered by the statute—including citizens.  *Id.*; *see* PI Mot. 15; PI Reply 3.  Indeed, the Magistrate Judge observed, Defendants have "admitted" that, on their interpretation, "the section authorizes the government to expel even U.S. citizens."  R&R 31; *see also* Declaration of Stephen B. Kang, ECF No. 2-2, Ex. D ("*J.B.B.C.* Oral Ruling") at 26-27 (concession).  Defendants' position that Congress silently

4

authorized the expulsion of citizens is astonishing and "would raise serious constitutional issues."  R&R 31.  The Magistrate Judge correctly relied on these implications as strong reasons to conclude that Defendants' interpretation is incorrect.

Defendants object, first, that because the Title 42 Process applies only to noncitizens, the constitutional questions raised by their claimed authority to expel U.S. citizens is "academic." Defendants' Objections ("Obj.") at 18, ECF No. 69.  But the fact that this particular invocation of § 265 is not being applied to citizens is irrelevant.  "[T]he breadth of the [agency's] asserted authority is measured not only by the specific application at issue, but also by the implications of the authority claimed."  *Merck & Co. v. U.S. Dep't of Health & Human Servs.*, 962 F.3d 531, 541 (D.C. Cir. 2020).  And the Magistrate Judge explained why the constitutional avoidance canon plainly applies here:  "As the Supreme Court has instructed, '[i]f one [proposed statutory construction] would raise a multitude of constitutional problems, the other should prevail— whether or not those constitutional problems pertain to the particular litigant before the Court.'" R&R 32 (quoting *Clark v. Martinez*, 543 U.S. 371, 380-81 (2005)).  Here, the claimed power to expel would apply to citizens and noncitizens alike; the grave constitutional questions raised as to the former thus guide the construction of the statute for everyone.  *See Clark*, 543 U.S. at 386 (rejecting "the dangerous principle that judges can give the same statutory text different meanings in different cases" even if only some applications raise constitutional concerns). Defendants offer no response to the Magistrate Judge's analysis or the *Clark* principle.[1]

Defendants next suggest that their asserted power to expel U.S. citizens does not raise serious constitutional questions after all.  Obj. 18.  But, as the Magistrate Judge observed, the Defendants' own Final Rule cites the "complex and important legal . . . questions presented by the potential application of [Section 265] to U.S. citizens."  R&R 32 (quoting Final Rule, 85 Fed. Reg. 56,424-01, 56,448) (second alteration in original).  Moreover, it is simply not credible that removal of citizens from the country in the name of public health raises no grave constitutional

---

[1] Defendants state that the reason that citizens are exempt from the Title 42 policy is because they need not be held in congregate settings.  Obj. 18.  But, even were that statement true, that has nothing whatsoever to do with the question here: whether the *statute* can be read to authorize expulsions given that it indisputably applies to both citizens and noncitizens.

concerns.  Indeed, the Magistrate Judge cited authority—which Defendants ignore—construing a statute to avoid the grave constitutional questions presented by the potential deportation of U.S. citizens.  R&R 31 (citing *Dessouki v. Att'y Gen. of U.S.*, 915 F.3d 964, 967 (3d Cir. 2019) ("The Executive cannot deport a citizen.")).

Defendants assert that as long as "certain procedural protections" are in place, expulsion of citizens is constitutionally unobjectionable.  Obj. 18.  But that is wrong and misses the Magistrate Judge's point.  Regardless of the procedures provided, physically expelling a citizen from the country is an extraordinary step that strikes at the heart of citizenship itself.  R&R 31 ("A fundamental attribute of United States citizenship is a right to remain in this country.") (quoting *Doe v. Mattis*, 928 F.3d 1, 8 (D.C. Cir. 2019)) (internal quotation marks and alterations omitted).  Accordingly, "the Supreme Court has stated that the power to remove a citizen from the country 'must be affirmatively granted' in order to exist."  *Id.* (quoting *Valentine v. United States ex rel. Neidecker*, 299 U.S. 5, 12 (1936)).  Defendants offer no response to the *Valentine* clear statement requirement, instead suggesting *Valentine* helps their case because citizens can be extradited.  But *Valentine*'s holding is that Congress must *explicitly* authorize such removal from the country, and it rejected the government's suggestion to imply such a power where it is not expressly conferred.  PI Reply 4.  Here, Defendants are claiming an implied power to expel citizens, read into a statute that says no such thing.  Both the canon of constitutional avoidance and *Valentine*'s clear statement rule foreclose that position, as the Magistrate Judge correctly concluded.

3.  Defendants contend that, although the statute is in fact silent as to expulsion, Congress "expressly delegated to the Secretary the power to issue regulations that would accomplish the purpose of Section 265."  Obj. 14.  The Magistrate Judge was rightly unmoved by Defendants' prior similar reliance on the "regulations" language in § 265.  *See* PI Opp. 20; PI Reply 6.  Section 265 requires that any order to "prohibit . . . the introduction of persons and property" be issued "in accordance with regulations."  42 U.S.C. § 265.  If the power to prohibit introduction does not include the power to expel, as the Magistrate Judge concluded, the requirement to promulgate regulations *about such introduction* adds nothing to the government's powers.  Nor

does § 265 anywhere say that the government can promulgate whatever regulations and assume whatever powers it deems warranted to "accomplish the purpose of Section 265." Obj. 14. As the Magistrate Judge explained: "Agencies are bound, not only by the ultimate purposes Congress has selected, but by the means it has deemed appropriate, and prescribed, for the pursuit of those purposes." R&R 37-38 (quoting *Merck*, 962 F.3d at 536) (internal quotation marks and alteration omitted). Permitting Defendants to use regulatory authority to conjure up powers not contained within the statute would violate the Supreme Court's admonition that "[a]gencies may play the sorcerer's apprentice but not the sorcerer himself." *Alexander v. Sandoval*, 532 U.S. 275, 291 (2001).

Next, Defendants contest the Magistrate Judge's conclusion that their interpretation of § 265 represents "an unsupported (and unwarranted) logical leap." R&R 25. As the Magistrate Judge explained: "Put simply, accepting that 'to prohibit . . . the introduction' means 'to intercept or prevent such a process' does not lead to the conclusion that 'prohibition,' 'interception,' or 'prevention' includes 'expulsion.'" *Id.* (some internal quotation marks omitted). In response, Defendants focus extensively on whether the process of "introduction" ends at the border or continues after. Obj. 11. But as the Magistrate Judge explained, and as a matter of ordinary language, expelling someone from the country is wholly different than stopping them from coming into (or further into) the country.[2] Indeed, Defendants' own briefing reflects that basic distinction. *See, e.g.*, Obj. 13 (asserting that § 265 authorizes "the *expulsion* of those whose

---

[2] The same point rebuts Defendants' argument that the title of § 265—which refers to "[s]uspension of entries"—supports their view because under the immigration laws "an alien is not necessarily considered to have 'effected an entry' simply by crossing the border." Obj. 11-12. The Magistrate Judge did not conclude that as a matter of immigration law an "entry" is complete when one crosses the border; he concluded that § 265 says nothing about *expulsion*. In contrast, the immigration statutes explicitly provide for removal of noncitizens on U.S. soil, R&R 29-30, *regardless* of whether they have made an "entry" for purposes of immigration law—as Defendants' own cases illustrate. *See, e.g.*, *Dep't of Homeland Sec. v. Thuraissigiam*, 140 S. Ct. 1959 (2020) (rejecting challenge to removal of noncitizen the Court determined had not effected an "entry"). The immigration meaning of the term "entry" and the various cases Defendants cite addressing entry or admission under the immigration laws are thus inapposite.

introduction into the United States—in violation of the CDC Order—is *halted*") (emphasis added).

Defendants also recycle their response to the extensive evidence from other statutes, both current and historical, that "when Congress wants to grant the power to expel individuals out of the United States," it knows how to do so and "does so plainly."  R&R 29; *see id*. at 29-30 (collecting examples).  Defendants contend that § 265—and in particular its lack of any language expressly authorizing expulsion—must instead be viewed in isolation from other federal statutes.  Obj. 16-17; *see* PI Opp. 23.  The Magistrate Judge correctly rejected that blinkered approach to statutory interpretation, explaining that "the Supreme Court regularly" "looks to the language used in one statute to interpret the meaning of another."  R&R 30 n.11.  Indeed, the Magistrate Judge quoted several examples of the Supreme Court relying on Congress's use of particular language in other statutes as evidence that it knows how to, but chose not to, legislate in a particular way.  *Id*.  Defendants do not respond to those cases.[3]

4. Defendants' efforts to respond to the Magistrate Judge's other statutory interpretation conclusions also lack merit.

---

[3] Instead, as they did before the Magistrate Judge, Defendants rely on language in a single decision to argue that other statutes are off limits.  Obj. 16-17 (discussing *Russello v. United States*, 464 U.S. 16 (1983)); *see* PI Opp. 23-25 (same).  But as the Magistrate Judge concluded, R&R 30 n.11, the vague, general statement in *Russello* that "[l]anguage in one statute usually sheds little light upon the meaning of different language in another statute," 464 U.S. at 25, is dicta.  As Plaintiff previously explained, *Russello*'s narrow holding, specific to the terms used in the statute at issue there, has no bearing on this case.  PI Reply 7.  Defendants' arguments to the contrary, and particularly their suggestion that *Russello* means other statutes are off limits when they have "different purposes," Obj. 17, find no footing in the actual analysis of *Russello* and are contradicted by decades of subsequent Supreme Court decisions.  In *Epic Systems Corp. v. Lewis*, for example, on which the Magistrate Judge relied, the Court cited language mandating "particular dispute resolution procedures" in various statutes, including one governing age discrimination claims, to conclude Congress had not done so in the National Labor Relations Act (which had a very different purpose).  138 S. Ct. 1612, 1626 (2018); *see also, e.g.*, *Dole Food Co. v. Patrickson*, 538 U.S. 468, 476 (2003) (interpreting a section of Foreign Sovereign Immunities Act by noting that Congress "knows how" to "refer to ownership in other than the formal sense," relying on statutes about retirement plans for federal employees (5 U.S.C. § 8477(a)(4)(G)(iii)), federal loan lending limits (12 U.S.C. § 84(c)(5)), and newspaper ownership (15 U.S.C. § 1802(3))).

As the Magistrate Judge explained, the history of § 265, in conjunction with the extraordinary authority Defendants claim, seriously undermines their new interpretation.  The government has never used § 265 or its 1893 predecessor to expel people as it now claims to be able to do.  R&R 29.  "'When an agency claims to discover in a long-extant statute an unheralded power,' courts should 'greet its announcement with a measure of skepticism.'"  *Id.* (quoting *Util. Air Regulatory Grp. v. EPA*, 573 U.S. 302, 324 (2014)).  Defendants contend that *Utility Air Regulatory Group*'s skepticism applies only where the agency "admits the statute is not designed to grant" the claimed power.  Obj. 15 (quoting *Util. Air Regulatory Grp.*, 573 U.S. at 324).  But *Utility Air Regulatory Group* and the cases on which it relies have never been read so narrowly.  *See, e.g.*, *Merck*, 962 F.3d at 540 (applying *Utility Air Regulatory Group* where agency had made no such admission); *see also District of Columbia v. Dep't of Labor*, 819 F.3d 444, 454 (D.C. Cir. 2016) (rejecting "novel reading" that would "significantly enlarge" longstanding statute's effect).

Defendants also assert that *Utility Air Regulatory Group* has no bearing because the current situation is extraordinary.  But while this is "the first time *since the enactment of the Public Health Service Act* of 1944 that the Government has invoked Section 265" to prohibit the introduction of persons, Obj. 15 (emphasis added), this is not the first invocation of the underlying statutory power.  *See* R&R 25 n.8, 36.  Rather, in 1929, when the statutory predecessor to § 265 (enacted in 1893) was invoked to prohibit the introduction of persons during a meningitis outbreak, the Executive Order and detailed associated regulations issued at that time did not claim any expulsion power.  PI Mot. 19-20; PI Reply 8-9; ECF No. 15-5, Exs. B, C.  Thus, prior practice undermines Defendants' new claim.

Defendants also take issue with the Magistrate Judge's discussion of a neighboring provision, 42 U.S.C. § 264, repeating their previous arguments that § 264 reflects deference and a "broad grant of powers in the context of the federal quarantine laws."  Obj. 13-14; PI Opp. 22-23.  But, notably, in creating the Title 42 Process, Defendants merely noted § 264 in passing as "relevant."  R&R 27.  They do not claim it authorizes expulsions.  The Magistrate Judge rightly

rejected Defendants' arguments, as nothing in § 264 remotely indicates, as Defendants claim, that in § 265 "Congress gave" the agencies "the power of expulsion."  Obj. 14.

To the contrary, as the Magistrate Judge concluded, insofar it has any relevance, § 264 supports *Plaintiff*'s position.  "Tellingly, Section 264 does not contemplate regulations that authorize expulsion from the United States."  R&R 27.  That lack of authority is an additional contextual indication that Congress contemplated no expulsion power, because in § 264 Congress specifically identified (and subjected to various limits) the public health powers it viewed as extreme but potentially necessary for public health at the border: "apprehension, detention, [and] conditional release of individuals."  42 U.S.C. § 264(b)-(d); *see* PI Reply 7-8. "That is, in a section where one would expect the term to appear—where Congress has delineated the government's power to prevent the spread of contagious disease from individuals coming into the United States from a foreign country—it does not."  R&R 28.  Defendants, resisting that conclusion, urge that § 265 must be read to do something different than § 264 to avoid superfluity.  Obj. 13-14.  But the Magistrate Judge explained that there is no dispute that § 265 vests the government with *at least* the significant authority to bar transportation companies from bringing cargo and passengers into the United States (just as it was used in 1929).  R&R 36; *see* PI Mot. 21-22; PI Reply 15.  So even if § 265 were interpreted to vest the government no additional authority over individuals at the border than § 264, it would be far from superfluous.

The Magistrate Judge's interpretation therefore plainly does not render § 265 a nullity. R&R 36 ("That point requires little discussion.").  Again, Plaintiff has throughout this litigation conceded that § 265 represents a significant grant of authority to bar the introduction of individuals into the country "through the regulation of vessels (including airplanes) arriving in the United States."  *Id*.  And that power includes introduction at land borders, for example by train.  *Contra* Obj. 12 (asserting otherwise).  The nullity canon does not apply because on *any* interpretation, § 265 would do *at least* that significant work.  *See Wisc. Cent. Ltd. v. United*

*States*, 138 S. Ct. 2067, 2073 (2018) (provision not rendered superfluous even if it only does "modest work" compared to government's interpretation).[4]

5.   Defendants invoke legislative history, arguing that Congress sought "to grant the Executive extraordinary authority."  Obj. 16.  The Magistrate Judge did not rely on legislative history, and this Court need not wade into it to overrule Defendants' objections because, even taken at face value, their legislative history citations do not help their case.  The undisputed authority granted by § 265—to halt, for instance, all flights from China for foreign nationals and U.S. citizens alike—*is* far reaching.  *See* R&R 36; *see also* PI Mot. 19; PI Reply 8, 14 n.10 (addressing legislative history referring to suspending immigration).  But that Congress understood the predecessor to § 265 was a powerful provision does nothing to establish that the statute authorizes the particular power of *expulsion*, despite the lack of any language in the statute saying so.  And it is notable that Defendants point to no indications in the legislative history indicating that § 265 includes such an expulsion power—and certainly nothing in the legislative history to overcome the lack of an express authorization of expulsions in the *text* of the statute.

6.   Perhaps recognizing the futility of arguing otherwise, Defendants have now altered their framing.  They claim that the Magistrate Judge's interpretation "leads to an absurd, unworkable result."  Obj. 12.  But their ultimate point is the same: that they need the power to expel noncitizens, including children like Plaintiff, without regard for the ordinary immigration system.  And they therefore deem it "absurd and unworkable" that § 265 would not grant that

---

[4] As the Magistrate Judge noted, Plaintiff maintains that § 265 does not authorize the regulation of *individuals* coming into the country, but rather addresses only the regulation of the *transportation companies* that "introduce" such individuals into the country.  R&R 25 n.8; *see* PI Mot. 16-22 (setting forth statutory construction and legislative history arguments in support of this interpretation).  The Magistrate Judge did not rely on this ground in his Report and Recommendation, and the Court need not decide that issue here for the reasons noted in the R&R.  But Plaintiff respectfully preserves that argument for any appeal.

power.  *Id.* at 10.  But there is nothing absurd about interpreting a statute according to its terms and abiding by the limits on the Executive's authority established by Congress.[5]

Likewise, Defendants' claim that abiding by those limits "frustrates the statute's purpose," Obj. 12, is wrong.  "[A]gencies are bound, not only by the ultimate purposes Congress has selected, but by the means it has deemed appropriate, and prescribed, for the pursuit of those purposes."  R&R 37-38 (quoting *Merck*, 962 F.3d at 536) (internal quotation marks omitted).

As the Magistrate Judge explained, the government has various powers it can bring to bear to address public health at the border.  R&R 37; *see also* PI Reply 24-25.  Among those powers is the authority to prohibit transportation from an affected country, as the government did in 1929 under the predecessor to § 265.  But neither § 265 nor any other statute authorizes the government to summarily expel noncitizens in the name of public health.  "The fact that the [executive branch] may believe that, without the power to summarily expel unaccompanied non-citizen children, Section 265 is not up to the task of preventing the introduction or spread of a communicable disease in the United States does not change the legal question of what the statute allows."  R&R 37.  The Magistrate Judge correctly referred Defendants' thinly veiled policy arguments to the only Branch of Government vested with the authority to amend the statute: Congress.  *Id.* at 38 ("[T]he proper approach under our system of separation of powers is for Congress to amend the statute, not for the Executive Branch and the courts to rewrite the statute beyond what the statute's terms can reasonably bear.") (quoting *District of Columbia*, 819 F.3d at 450) (internal quotation marks omitted).

**B.  Section 265 Does Not Override the Immigration Laws' Requirements.**

Magistrate Judge Harvey stated: "[A]s Judge Nichols also found, Section 265 must be read in conjunction with statutes governing immigration under Title 8 of the U.S. Code."  R&R

---

[5] Defendants suggest that the idea of § 265 operating "outside the jurisdiction of the United States" is also "absurd and unworkable."  Obj. 10.  But, again, that is precisely how it operated the one time it was previously used to bar the introduction of persons, in 1929.  At that time the government prohibited transportation entities from bringing people to the United States except as permitted subject to regulations about safety measures those entities would need to take while still abroad.  ECF No. 15-5, Ex. C.

32 (citing *J.B.B.C.* Oral Ruling at 50).  The Magistrate Judge properly placed on Defendants—as the party asserting "that one [statute] displaces another"—"the heavy burden of showing a clear expressed congressional intention that such a result should follow."  R&R 34 (internal quotation marks omitted) (quoting *Epic Sys.*, 138 S. Ct. at 1624).  The Magistrate Judge also correctly determined that they have failed to meet their burden.  R&R 35-38.  Thus, even if § 265 authorized expulsions for some individuals, unaccompanied minors could not be expelled without the protections afforded them under the immigration laws.

1.  The Magistrate Judge, like Judge Nichols, recognized that laws should be harmonized when possible, and concluded that these statutes can and therefore must be harmonized by reading § 265 to *not* authorize the expulsion of unaccompanied children.  R&R 32.  The Magistrate Judge further observed that, while Defendants claim that Congress intended for § 265 to prevail over the immigration laws, that intention is not found in the text of § 265.  "The conventional way to signal that one statutory provision is intended to override conflicting provisions," is with the use of phrases like "notwithstanding any other provision of law" or some other "sufficiently clear" expression of Congress's intent to displace other laws.  *Id.* at 34-35.  Section 265 contains no such language.

Defendants argue, however, that such a clear statement in § 265 would not have been possible here, because the TVPRA and asylum laws were enacted after § 265.  Defendants contend that it is thus the "subsequently enacted [immigration] provisions—not Section 265— that should contain the phrase 'notwithstanding any other provision of law'" if they are to "supersede" the public health laws.  Obj. 19.  Even assuming, contrary to the Magistrate Judge's conclusion, that the statutes cannot be reconciled, Defendants' arguments about the absence of a clear statement of intent to displace other statutes in § 265 lack merit.

First, as Defendants acknowledge, immigration laws, including laws addressing communicable diseases, were already in place when § 265's predecessor was enacted in 1893.  Obj. 21-22.  Thus, on Defendants' view, the public health laws were already the "subsequently enacted legislation" on the issue.  Second, "the phrase '[n]otwithstanding *any other* provision of law'" is not used to supersede only earlier laws but instead reflects "Congress's indication that

the statute containing that language is intended to take precedence over any preexisting *or subsequently-enacted* legislation on the same subject."  *United States v. Puentes*, 803 F.3d 597, 606 (11th Cir. 2015) (emphasis added).  Thus, even if the 1893 provision were the earlier-enacted law, it could have contained the "notwithstanding" phrase.  And third, if Congress wanted the public health laws to supersede the immigration laws, it easily could have included a broad public health exception in the subsequent immigration laws but did not—even as it adopted various other exceptions (immaterial here) to immigration protections and continued to specifically address communicable diseases in the immigration laws themselves.  *See* R&R 30 (discussing 8 U.S.C. § 1182(a)(1)(A)(i)), 33; PI Mot. 4-5.  Finally, in the absence of clear language resolving a conflict between two laws, the "the subsequent, more specific provisions . . . would prevail" if the laws could not be harmonized.  *Chicago & N.W. Ry. Co. v. United Transp. Union*, 402 U.S. 570, 582 n.18 (1971); *accord, e.g.*, *United States v. Juvenile Male*, 670 F.3d 999, 1008 (9th Cir. 2012) ("Where two statutes conflict, the later-enacted, more specific provision generally governs.").

2.  Next, Defendants argue that the Magistrate Judge erred in rejecting their argument that § 265 authorizes "a *suspension of the right* to introduce such persons and property."  Obj. 19 (emphasis added) (quoting 42 U.S.C. § 265).  Defendants claim this is "express language" authorizing "the temporary cessation of the effect of any *laws* pursuant to which a person might otherwise claim the right *to be introduced*."  Obj. 19-20 (emphasis added); *accord* PI Opp. 29-30.  But as the Magistrate Judge noted, the statute "contains no reference to the suspension of *laws*" or to the suspension of any "specific right[]" *to be introduced* (rather than "to introduce").  R&R 35 (emphasis added).  Section 265 therefore is not analogous to either provision Defendants invoke as comparable.  Obj. 20.  10 U.S.C. § 123(a) "explicitly suspends the operation of *any provision of law*," and the Suspension Clause, U.S. Const. art I, § 9, cl. 2, "specifically identifies the right suspended."  R&R 35 (emphasis added).  The Magistrate Judge

rightly concluded that § 265's "vague language" concerning suspension of the right to introduce persons cannot bear Defendants' heavy burden.  R&R 35.[6]

3.  Unable to identify any clear textual indication that Congress intended § 265 to displace other laws, Defendants again resort to legislative history.  Obj. 20-21.  But their attempts "to divine messages from congressional commentary" cannot make up for Congress's refusal "in the [statute]" itself to "manifest[] a clear intention to displace [other laws]."  *Epic Sys.*, 138 S. Ct. at 1631-32.  In any event, Defendants misread the legislative history, which does not indicate that § 265's predecessor provision authorized the Executive to override other statutes.  PI Reply 14 n.10.

4.  Defendants further assert that the Magistrate Judge erred in rejecting their argument that the specific-over-general canon favors their broad interpretation of § 265.  Obj. 22.  But they do not dispute that this "canon is most often applied when the two provisions 'are interrelated and closely positioned, both in fact being parts of [the same statutory scheme],'" which "is not the case here."  R&R 36 (alteration in original) (quoting *RadLAX Gateway Hotel, LLC v. Amalgamated Bank*, 566 U.S. 639, 645 (2012)).  Nor can they dispute that "the immigration laws [Plaintiff] cite[s] are clearly part of a 'comprehensive scheme [that] has deliberately targeted specific problems with specific solutions.'"  *Id.* (quoting *RadLAX*, 566 U.S. at 645).[7]  Moreover,

---

[6] Two additional points bolster the Magistrate Judge's persuasive rejection of Defendants' reliance on § 265's "suspension" language.  First, inferring the grant of such sweeping Executive authority to override other legislation in a dependent clause describing a predicate finding that the agency must make before exercising its power—rather than describing the power being granted itself—"runs afoul of the usual rule that Congress does not . . . hide elephants in mouseholes."  *Epic Sys.*, 138 S. Ct. at 1626-27;  *Kingdomware Techs., Inc. v. United States*, 136 S. Ct. 1969, 1977-78 (2016) (explaining that a "prefatory clause" in a statute "does not change the plain meaning of the operative clause").  Second, "the right to introduce persons and property" most naturally refers to transportation companies' *licenses* conferring "the right to introduce" passengers and goods from abroad.  PI Reply 13-14.  This language thus in fact reinforces Plaintiff's argument that § 265 is directed to such companies rather than individuals.  *See supra* Part I.A.4 n.4; PI Mot. 16-22; PI Reply 5-6, 8-9.

[7] Plaintiff contends that the Title 42 Process violates the TVPRA as well as the INA's provisions addressing asylum, withholding of removal, and protection under the Convention Against Torture ("CAT")—the last of which was added by the Foreign Affairs Reform and Restructuring Act of 1998 ("FARRA").  *See* PI Mot. 6, 24-25.  With respect to CAT protection, Plaintiff specifically contends that the Title 42 Process's purported CAT screening "is totally inadequate,"

Defendants concede that "Section 265 is not designed to target immigration at all, much less to provide a solution to any immigration problems."  Obj. 22.  It thus cannot possibly be "the more on-point" statute "that speaks directly" to "the question before [the Court]"—whether unaccompanied children may be summarily expelled without a hearing—an issue § 265 "doesn't mention . . . at all."  PI Reply 14 (quoting *Epic Sys.*, 138 S. Ct. at 1631-32).[8]

### C. The Magistrate Judge Properly Concluded that Defendants' Interpretation of § 265 Is Not Entitled to *Chevron* Deference.

The Court should likewise reject Defendants' arguments regarding the Magistrate Judge's refusal to accord deference to their sweeping interpretation of § 265 under *Chevron, U.S.A., Inc. v. NRDC*, 467 U.S. 837 (1984).  *See* Obj. 24-25.  *Chevron* is not a "rubber stamp," *NRDC v. Daley*, 209 F.3d 747, 755 (D.C. Cir. 2000), and courts must not afford "reflexive" deference to agency interpretations, *Kisor v. Wilkie*, 139 S. Ct. 2400, 2415 (2019) (quoting *Pereira v. Sessions*, 138 S. Ct. 2105, 2120 (2018) (Kennedy, J., concurring)).

Defendants assert that "to the extent Section 265 is ambiguous," the CDC's interpretation is entitled to deference.  Obj. 24.  But for all the reasons set forth above and in the Magistrate Judge's statutory analysis, "the traditional tools of statutory construction"—including the plain text, the context and history, and the relevant canons and clear statement rules—lead to the conclusion "that the statute is not ambiguous" and "'that is the end of the matter.'"  R&R 38 n.15 (quoting *Chevron*, 467 U.S. at 842-43 & n.9); *see* PI Reply 9-10, 16.  For similar reasons, should

---

*id.* at 24 n.12, not least because "children are entitled to have their CAT claims decided in full removal proceedings," PI Reply 17.  However, Plaintiff agrees with the Magistrate Judge that "the question of whether the Title 42 Process likely violates FARRA is unnecessary to the determination here," in light of the Process's other fatal flaws.  *See* R&R 33 n.12.

[8] Defendants' only other argument—for which they have no support—is that § 265 is the more "specific and targeted" statute because it "has been rarely invoked."  Obj. 22 (citing PI Opp. 33-34); *see* PI Opp. 33-34 (citing nothing for same point).  Defendants do not explain why they think infrequency of invocation has any logical relationship to specificity.  Extremely specific provisions of the tax code, for example, may be invoked on a daily basis.  In any event, the rare usage of § 265 and its predecessor undercuts rather than aids Defendants' argument.  *See* R&R 29 ("'When an agency claims to discover in a long-extant statute an unheralded power,' courts should 'greet its announcement with a measure of skepticism.'") (quoting *Util. Air Reg. Grp.*, 573 U.S. at 324); *supra* Part I.A.4.

the Court reach *Chevron*'s second step, Defendants' interpretation warrants no deference "because it is unreasonable in light of the statute's text, history, structure, and context." *Loving v. IRS*, 742 F.3d 1013, 1022 (D.C. Cir. 2014); *see also* PI Reply 10-11, 16.

The Magistrate Judge also concluded, "as did Judge Nichols," that "even if there were ambiguity, . . . deference to the government's interpretation of the statute would not be justified." R&R 38 n.15 (citing *J.B.B.C.* Oral Ruling at 50-51). Defendants claim that this conclusion reflects a "misunderstanding of the *Chevron* framework." Obj. 24. Not so. The Magistrate Judge correctly followed the Supreme Court's recent admonition that, "When the agency has no comparative expertise in resolving a regulatory ambiguity, Congress presumably would not grant it that authority." R&R 38 n.15 (quoting *Kisor*, 139 S. Ct. at 2417). "Some interpretive issues . . . fall more naturally into a judge's bailiwick." *Kisor*, 139 S. Ct. at 2417. For one thing, the extraordinary implications of Defendants' reading and the grave constitutional questions raised by their assertion of an *implicit* power to expel U.S. citizens in the name of public health decisively undercut any claim to deference. *See Chamber of Commerce of U.S. v. FEC*, 69 F.3d 600, 605 (D.C. Cir. 1995) (constitutional avoidance warrants rejection of *Chevron* deference); PI Reply 10. And, as the Magistrate Judge explained, the Supreme Court has held that "'[t]he reconciliation of distinct statutory regimes is a matter for the courts, not agencies'"— precisely the task before the Court in this case. R&R 38 n.15 (quoting *Epic Sys.*, 138 S. Ct. at 1629) (some internal quotation marks omitted).[9] Defendants have no response, and instead revert back to the raw policy plea that, whatever the laws say, "the [CDC] *must* have the authority to stop the further movement of persons who manage to cross the border in violation of

---

[9] While unnecessary to resolve now, Defendants' suggestion that CDC expertise supports their interpretation warrants ever-greater skepticism. *See* Jason Dearen & Garance Burke, *Pence Ordered Borders Closed After CDC Experts Refused*, AP News (Oct. 3, 2020), https://apnews.com/article/virus-outbreak-pandemics-public-health-new-york-health-4ef0c6c5263815a26f8aa17f6ea490ae; Michelle Hackman, et al., *CDC Officials Objected to Order Turning Away Migrants at Border*, The Wall Street Journal (Oct. 3, 2020), https://www.wsj.com/articles/cdc-officials-objected-to-order-turning-away-migrants-at-border-11601733601; *see also* PI Reply 10 n.8 (citing earlier news reports containing "many troubling indications that political goals have compromised or overridden CDC's public health judgments").

the CDC Order."  Obj. 25 (emphasis added).  But again, that policy request must be directed to Congress.[10]

### D.  The Injunction Should Apply To The Final Rule As Well.

Finally, the Magistrate Judge correctly concluded "that the preliminary injunction should be crafted to make clear that it prohibits expulsion from the United States under the Title 42 Process whether . . . pursuant to the authority of the Interim Final Rule or the Final Rule."  R&R 48.  Defendants vaguely object that this Court "is in no position to determine" whether the anticipated CDC Order under the Final Rule "would raise the same concerns," Obj. 31, but the Magistrate Judge correctly determined that "there is no relevant material difference between the CDC Director's authority under the Final Rule and the authority that the government has here argued he enjoys under the Interim Final Rule."  R&R 47.  Defendants have failed to identify any meaningful way in which the Final Rule differs from the Interim Final Rule, and both Rules suffer from the same legal defects.

Accordingly, this Court's preliminary injunction should apply to both.  *See Ne. Fla. Chapter of Associated Gen. Contractors of Am. v. City of Jacksonville*, 508 U.S. 656, 662 (1993) (explaining that, although a new ordinance issued mid-litigation "differs in certain respects" from the old ordinance, plaintiff's legal challenges applied equally to the new ordinance because it "disadvantages [plaintiffs] in the same fundamental way"); *Am. Freedom Def. Initiative v. Wash. Metro. Area Transit Auth.*, 901 F.3d 356, 362-63 (D.C. Cir. 2018) (reviewing new policy enacted mid-litigation because it was "fundamentally similar" to the old policy).  If Defendants believe that the new rules that are ultimately established materially differ on the statutory questions, which would be highly unlikely, they can move the Court for modification at that point.  But in the interim children should not be summarily expelled.

---

[10] Defendants also assert that "[u]nder the Magistrate Judge's reading, . . . the Government would not be able to send back or otherwise remove property" from the United States.  Obj. 25.  Plaintiff does not doubt that Defendants' public health powers allow them to dispose of potentially infectious property.  But redirecting goods is a very different matter from expelling persons.

## II.   THE MAGISTRATE JUDGE PROPERLY FOUND THAT THE REMAINING PRELIMINARY INJUNCTION FACTORS FAVOR PLAINTIFF.

1.   Defendants say almost nothing concerning the Magistrate Judge's findings that Plaintiff has shown irreparable harm to the Proposed Class, which includes the threat of deportation, "prior to receiving any of the protections the immigration laws provide," to "dangerous countries in which children are often targeted for sexual and other violence and face the possibility of torture and death."  R&R 39; *see also id.* at 40 (explaining that "putative class members are being returned without any opportunity to apply for asylum or withholding of removal").  Defendants' sole argument on irreparable injury is that the Magistrate Judge "improperly collapses independent requirements" for preliminary relief by double-counting Plaintiff's showing on the merits.  Obj. 26.  But Defendants are mischaracterizing the Magistrate Judge's decision—he merely concluded that all proposed class members would incur the same unlawful deprivation of critical humanitarian relief, and that multiple harms would flow from that deprivation.  R&R 41 (citing, inter alia, *J.L. v. Cissna*, 341 F. Supp. 3d 1048, 1068 (N.D. Cal. 2018), and *Tefel v. Reno*, 972 F. Supp. 608, 619–20 (S.D. Fla. 1997)).[11]

2.   On the other side of the balance, Defendants claim that "the Magistrate Judge failed to consider that the putative class members would first be held in congregate settings in border facilities if the CDC Order were enjoined."  Obj. 27.  To the contrary, the Magistrate Judge expressly addressed that contention, recognizing that Defendants have "tools at [their] disposal" to mitigate that concern, "and can apprehend, examine, quarantine, or conditionally release unaccompanied minors."  R&R 44-45.  The Magistrate Judge further recognized that Defendants' expulsion policy "results in unaccompanied minors often being detained longer while awaiting expulsion than they otherwise would be," citing evidence compiled by an

---

[11] Defendants' cited cases stand for the unremarkable proposition that a statutory violation, by itself, is not per se irreparable.  Obj. 26.  But in both cases, unlike here, the harms arising from those statutory violations could be fully remedied at a later date.  *See Breen v. Mineta*, No. 05-cv-654-RWR, 2005 WL 3276163, at *9 (D.D.C. Sept. 30, 2005) (explaining that alleged harms, including "lost retirement contributions," can be "compensable by monetary damages"); *Am. Ass'n for Homecare v. Leavitt*, No. 08-cv-0992-RMU, 2008 WL 2580217, at *5 (D.D.C. June 30, 2008) (similar).

independent monitor finding that children in the Title 42 Process stay in hotels "an average of five days," and a substantial number were detained in hotels for "more than 10 days," R&R 45 (quoting ECF No. 52-3 at 30).  In contrast, under the TVPRA unaccompanied minors like Plaintiff must be transferred within 72 hours to an Office of Refugee Resettlement ("ORR") facility, 8 U.S.C. § 1232(b)(3).  As the Magistrate Judge found, "[t]his longer period would appear to subject [DHS] officers to greater risk from unaccompanied non-citizen children—and indeed, vice versa—than the prior process."  R&R 45.  The Magistrate Judge thus properly found that Defendants' policies actually *increase* the possibility of "exposure . . . to other non-citizens, [CBP] officers, and local medical personnel."  *Id.*  Notably, moreover, the Title 42 Process itself involves some period of CBP custody while CBP processes the children for expulsion.  *See* ECF 15-10, ¶¶ 8, 13 (discussing children held in CBP custody during Title 42 Process); ECF No. 15-5, Ex. H at 4, 8, 12 (*Flores* monitor discussing CBP operation of Title 42 Process and movement of children from CBP to hotels).

Relying principally on a declaration from Jallyn Sualog of ORR, Defendants additionally claim that the Magistrate Judge's reasoning regarding the "implications of transferring putative class members to [ORR] is fraught with errors."  Obj. 29.  The Magistrate Judge addressed Ms. Sualog's testimony at length, recognizing—as did Judge Gee in the *Flores* litigation—the many ways her analysis was "wanting," "'highly speculative,'" and lacking "'scientific or empirical analysis' to support [her] statements."  R&R 46 (quoting *Flores v. Barr*, No. CV 85-4544 DMG (AGR), 2020 WL 5666550, at *2 (C.D. Cal. Sept. 21, 2020).  Subsequent to Judge Gee's Order, the Ninth Circuit denied the government a stay, examining Ms. Sualog's testimony and likewise determining that "the government has not established that the additional referrals would actually overwhelm the ORR system."  *Flores v. Barr*, __ F.3d __, 2020 WL 5951115, at *6 (9th Cir. Oct. 4, 2020).[12]

---

[12] Defendants also argue that the use of hotels is necessary to meet their public health concerns. Obj. 26-27.  The circumstances under which children are *detained* pursuant to the Title 42 Process is currently being litigated in proceedings to enforce the consent decree in *Flores v. Barr*, where a federal district court placed certain restrictions on housing children in hotels as part of the Title 42 Process—which the Ninth Circuit declined to stay.  *See Flores*, 2020 WL

The Magistrate Judge's conclusions were well-founded, given that Ms. Sualog simply stated her central conclusion—that the ORR system would incur "significant stress" if it began receiving 75-100 children per week, and 30% were positive or exposed to COVID-19—without providing any reasoning.  *See* ECF No. 42-5, ¶ 11.  As the Magistrate Judge explained, "[i]t is not disputed . . . that, at the present time, [ORR's] care-provider facilities are operating at well below capacity and they have thousands of beds available."  *Id.* (citing ECF No. 42-5, ¶¶ 31-32). Even assuming that 30 percent of incoming unaccompanied children require quarantine or isolation, and 100 children come in per week, Ms. Sualog offers no explanation as to why ORR cannot use or reconfigure its *over 12,000 empty beds* to keep 30 children per week quarantined. *See Flores*, 2020 WL 5951115, at *6.  This is particularly so given that thousands of ORR's beds are already located along the Southwest border, meaning that children do not require long transport to safely reach facilities where they can isolate.  *See* ECF No. 51 at 6 n.4 (discussing numbers of ORR shelter beds in Arizona, California, and Texas).  Defendants also ignore that children can be swiftly discharged from ORR custody to parents, family members or sponsors, which would free up additional space in the shelter network for new children.  *See* Declaration of Mark Greenberg, ECF No. 52-4, ¶¶ 19-20.[13]

Notably, Ms. Sualog herself previously testified in the *Flores* litigation that in March 2020 that "ORR currently has additional capacity and more opportunity to ensure social distancing and isolation within the care provider network."  ECF No. 52-2, Ex. D ("March 27 Sualog Decl."), ¶ 13.  Critically, at that time the ORR population was about *three times higher*

---

5951115; *Flores v. Barr*, 2020 WL 5666550 (C.D. Cal. Sept. 21, 2020); *Flores v. Barr*, 2020 WL 5491445 (C.D. Cal. Sept. 4, 2020).  And as the Ninth Circuit pointed out, "[t]he district court's orders in fact are not strict" and permit detention in hotels for up to 72 hours.  *Flores*, 2020 WL 5951115, at *5.  They also "provide[] the government with flexibility to address 'exigent circumstances that necessitate future hotel placements.'"  *Id.* (quoting *Flores*, 2020 WL 5491445, at *10).  In that case the plaintiffs are not challenging the Title 42 *expulsion* policy.

[13] That unaccompanied children are not released from ORR custody on their own recognizance, but rather to sponsors—e.g. parents or close relatives—also undermines Defendants' claim that children may not "effectively self-quarantine, self-isolate, or otherwise comply with social distancing guidelines."  Obj. 28-29.  The children's sponsors would be responsible for caring for the children's safety and well-being.  *See* PI Mot. 32; ECF No. 1, ¶¶ 4, 32.

than it was in early September 2020.  *Id.*, ¶ 12 (over 3,300 children in care in late March 2020).

Yet Defendants' ORR declarant and a CDC officer testified that "ORR has adequate space

within its facilities to isolate any UAC suspected of or confirmed to be infected with COVID-

19," and "the overall risk to UAC is lower in the facilities than traveling and placing children in

home environments in some locations in the U.S."  *See* ECF No. 52-2, Ex. E (March 27, 2020,

Declaration of Dr. Amanda Cohn of CDC), ¶ 23; *see also* March 27 Sualog Decl., ¶¶ 13-14.

Judge Gee relied on this evidence to conclude that ORR was "provid[ing] adequate routine

medical care and adequate living accommodations."  Order at 15, *Flores v. Barr*, 85-cv-04544

(C.D. Cal. Mar. 28, 2020), ECF No. 740.

Finally, the Magistrate Judge clearly recognized that a preliminary injunction may

"impose hardships on the government and may force it . . . to make difficult decisions about

allocation of resources to mitigate the risks caused by COVID-19."  R&R 46.  The Magistrate

Judge properly found, however, that any such interests are outweighed here by other powerful

concerns, including the public interest in ensuring that "agencies are acting within the bounds

prescribed by Congress" and in "protecting children from being delivered into the hands of their

persecutors."  *Id.* (quoting *E. Bay Sanctuary Covenant v. Trump*, 950 F.3d 1242, 1281 (9th Cir.

2020)) (alterations omitted).

## III.   THE MAGISTRATE JUDGE PROPERLY FOUND THAT THE PROPOSED CLASS SHOULD BE CERTIFIED.

The Magistrate Judge reviewed all the relevant Rule 23 factors and concluded that

Plaintiff had made each showing required to certify his proposed Class under Rules 23(a) and

(b)(2).  R&R 15-22.  Defendants' only argument against class certification is that they think the

binding precedent on which the Magistrate Judge relied, *J.D. v. Azar*, 925 F.3d 1291 (D.C. Cir.

2019) (per curiam), is wrong.  Obj. 32.  Defendants make no effort to distinguish *J.D.*, and their

objections to class certification should therefore be rejected under controlling circuit precedent.[14]

---

[14] Defendants have now waived their argument that Plaintiff is not an adequate class
representative, *see* Obj. 31–32, after the Magistrate Judge rejected such "speculation" and
credited Plaintiff's willingness to vigorously pursue litigation on behalf of the class, R&R 20.

## IV.  THE COURT SHOULD DENY DEFENDANTS' REQUEST FOR A STAY OF ANY PRELIMINARY INJUNCTION.

Should the Court grant Plaintiff's motion for a classwide preliminary injunction, this Court should deny Defendants' request for a 14-day stay "to explore their appellate options" and a further stay on any appeal.  Obj. 32 (citing Fed. R. Civ. P. 62(d)).  "[A] stay pending appeal is 'always an extraordinary remedy.'"  *United States v. Philip Morris USA, Inc.*, 449 F. Supp. 2d 988, 990 (D.D.C. 2006) (quoting *Brotherhood of Railway and Steamship Clerks v. Nat'l Mediation Board*, 374 F.2d 269, 275 (D.C. Cir. 1966)).  When considering whether to grant a stay, courts apply the same four-factor test for injunctive relief.  *Nken v. Holder*, 556 U.S. 418, 434 (2009).  Here, Defendants recycle a few of the same arguments they made against Plaintiff's preliminary injunction motion.  As explained above, the Magistrate Judge properly rejected these arguments and concluded that all four factors weigh against Defendants.  *See* R&R 28-50.

Moreover, Defendants continue to ignore that § 265 is not their only tool to prohibit individuals from entering the country.[15]  As the Magistrate Judge and Plaintiff have explained, the government has other effective measures at its disposal.  *See* R&R 37 & n.13; PI Reply 24-25 (listing statutory provisions).  Again, if Defendants believe these powers are insufficient, "the proper approach under our system of separation of powers is for Congress to amend the statute, not for the Executive Branch and the courts to rewrite the statute beyond what the statute's terms can reasonably bear."  R&R 37 (quoting *District of Columbia*, 819 F.3d at 450) (internal quotation marks omitted).

In sum, the Title 42 Process is beyond Defendants' statutory authority and should be enjoined by the Court.  Since Judge Nichols' ruling in June, Defendants have avoided judicial

---

[15] Defendants assert that "[c]ountries across the world" have imposed travel restrictions in response to COVID-19, Obj. 32, but omit that many countries, especially in Western Europe, have kept their doors open to asylum seekers.  *See* COVID-19 Platform: Temporary Measures and Impact on Protection, U.N. High Commissioner for Refugees, https://im.unhcr.org/covid19_platform (identifying countries that exempt persons seeking protection, including France, Italy, the Netherlands, and Spain).  And Canada even has an *express exemption for unaccompanied children*.  *See* Order in Council, Minimizing the Risk of Exposure to COVID-19 in Canada Order (Prohibition of Entry into Canada from the United States), P.C. 2020-0161, § 4(2)(d) (Mar. 20, 2020), https://tinyurl.com/y888f7yh.

scrutiny for months through their tactic of attempting to moot every individual case, including the original plaintiff before Judge Nichols, J.B.B.C.  Every time Plaintiff's counsel has contacted Defendants about a child who has not yet been removed, Defendants have taken them out of the Title 42 Process.  *See* Class Mot. 5-6, 10; 2d Kang Decl., ¶¶ 1-4, ECF No. 52-2; PI Reply 18.  As of September 15, 2020, Defendants had voluntarily taken at least 97 unaccompanied children out of the Process in this way.  2d Kang Decl., ¶ 3.  But in the meantime, thousands of unaccompanied children who could not contact a lawyer in time have been expelled, and an untold number of children are expelled to grave danger every day.  A classwide injunction is needed, and no further delay should be accepted.

## CONCLUSION

The Court should adopt in full the Report and Recommendation, grant Plaintiff's Motions for Classwide Preliminary Injunction and Class Certification, excuse Plaintiff from posting a bond, confirm that the injunction applies to the Final Rule, and deny Defendants' stay request.

Dated: October 9, 2020

Respectfully submitted,

/s/ *Lee Gelernt*

Stephen B. Kang*
Cody Wofsy*
Morgan Russell*
Adrienne Harrold*
Ming Cheung*
American Civil Liberties Union Foundation,
Immigrants' Rights Project
39 Drumm Street
San Francisco, CA 94111
Tel: (415) 343-0770

Andre Segura
Kathryn Huddleston
Rochelle Garza
Brantley Shaw Drake
American Civil Liberties Union Foundation
of Texas, Inc.
5225 Katy Freeway, Suite 350
Houston, Texas 77007

Lee Gelernt*
Daniel A. Galindo*
Celso J. Perez (D.C. Bar No. 1034959)
Omar Jadwat*
American Civil Liberties Union Foundation,
Immigrants' Rights Project
125 Broad Street, 18th Floor
New York, NY 10004
Tel: (212) 549-2600

Robert Silverman***
Oxfam America
Boston, MA 02115, Suite 500
Tel: (617) 482-1211

Scott Michelman (D.C. Bar No. 1006945)
Arthur B. Spitzer (D.C. Bar No. 235960)

Tel. (713) 942-8146

Karla M. Vargas*
Efren C. Olivares*
Texas Civil Rights Project
1017 W. Hackberry Ave.
Alamo, Texas 78516
Tel: (956) 787-8171

American Civil Liberties Union Foundation of
the District of Columbia
915 15th Street NW, Second Floor
Washington, D.C. 20005
Tel: (202) 457-0800

Jamie Crook (D.C. Bar No. 1002504)
Blaine Bookey
Karen Musalo
Center for Gender & Refugee Studies
200 McAllister St.
San Francisco, CA 94102
Tel: (415) 565-4877

*Attorneys for Plaintiff*

*Admitted pro hac vice*
***Pro hac vice application forthcoming*