# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

|  |  |
|---|---|
| P.J.E.S., A MINOR CHILD, by and through his father and NEXT FRIEND, Mario Escobar Francisco, on behalf of himself and others similarly situated,<br><br>    Plaintiff,<br><br>  v.<br><br>CHAD WOLF, Acting Secretary of Homeland Security, *et al.*,<br><br>    Defendants. | Civil Docket No. 1:20-cv-02245-EGS-GMH |

## DEFENDANTS' REPLY IN SUPPORT OF THEIR OBJECTIONS TO THE MAGISTRATE JUDGE'S REPORT AND RECOMMENDATION

## TABLE OF CONTENTS

INTRODUCTION ........................................................................................................................ 1

ARGUMENT ............................................................................................................................... 2

I.     The Magistrate Judge's Interpretation of Section 265 Is Contrary to Law ........................ 2

     A.     The Magistrate Judge Improperly Narrowed Section 265's Broad
Grant of Authority to Prohibit the Introduction of Persons ................................... 3

     B.     The Magistrate Judge Erred in Finding that the Statutory Context of
Section 265 Indicates that Section 265 Does Not Authorize Expulsion ................ 6

     C.     The Absence of  References to Returning or Removing Aliens in
Section 265 Does Not Narrow the Statute's Broad Grant of Authority .............. 10

     D.     The Magistrate Judge Erred in Applying the Constitutional
Avoidance Doctrine ............................................................................................. 14

     E.     The Magistrate Judge Erred in Attempting to Subordinate Section 265
to the Separate and Distinct Immigration Statutes .............................................. 17

     F.     The Magistrate Judge Erred in His Analysis Regarding *Chevron* Deference ...... 21

II.     The Magistrate Judge Erred in Finding the Other Preliminary Injunction Factors
Weigh in Favor of Issuing a Preliminary Injunction ....................................................... 23

III.     This Court Should Stay Any Order Enjoining Title 42 .................................................... 24

CONCLUSION .......................................................................................................................... 25

## TABLE OF AUTHORITIES

**Cases**

*Bartlett v. Strickland*,
556 U.S. 1 (2009)...................................................................................................... 15

*Bostock v. Clayton Cnty.*,
140 S. Ct. 1731 (2020) ................................................................................................ 5

*Chevron, USA, Inc. v. Nat. Res. Def. Council, Inc.*,
467 U.S. 837 (1984).................................................................................................. 21

*Clark v. Martinez*,
543 U.S. 371 (2005)............................................................................................ 14, 15

*Comcast Corp. v. FCC*,
526 F.3d 763 (D.C. Cir. 2008) ................................................................................. 22

*Cubaexport v. Dep't of Treasury*,
638 F.3d 794 (D.C. Cir. 2011) ................................................................................. 17

*Dessouki v. Attorney General*,
915 F.3d 964 (3d Cir. 2019)..................................................................................... 17

*Dir., Office of Workers' Comp. Programs, Dep't of Labor v. Newport News*
*Shipbuilding & Dry Dock Co.*, 514 U.S. 122 (1995) ................................................. 5

*Dole Food Co. v. Patrickson*,
538 U.S. 468 (2003) ................................................................................................. 13

*Epic Sys. Corp. v. Lewis*,
138 S. Ct. 1612 (2018) .............................................................................................. 12

*FCC v. Fox Television Stations, Inc.*,
556 U.S. 502 (2009) ................................................................................................. 15

*Jennings v. Rodriguez*,
138 S. Ct. 830 (2018)........................................................................................... 15, 16

*McFadden v. United States*,
576 U.S. 186 (2015) ................................................................................................. 15

*McGirt v. Oklahoma*,
140 S. Ct. 2452 (2020) .............................................................................................. 12

*Merck & Co. v. Dep't of Health & Human Servs.*,
962 F.3d 531 (D.C. Cir. 2020) ................................................................................. 10

*Merck & Co. v. HHS*,
385 F. Supp. 3d 81 (D.D.C. 2019) ........................................................................... 10

*Ng Fung Ho v. White*,
259 U.S. 276 (1922).................................................................................................. 17

*Nielsen v. Preap*,
    139 S. Ct. 954 (2019)................................................................................................. 15

*Nken v. Holder*,
    556 U.S. 418 (2009)................................................................................................. 23

*Pub. Citizen v. U.S. Dep't of Justice*,
    491 U.S. 440 (1989)................................................................................................. 16

*Republican Nat'l Comm. v. FEC*,
    76 F.3d 400 (D.C. Cir. 1996)................................................................................... 17

*Rotkiske v. Klemm*,
    140 S. Ct 355 (2019)........................................................................................ 13, 20

*Russello v. United States*,
    464 U.S. 16 (1983)................................................................................................... 11

*Rust v. Sullivan*,
    500 U.S. 173 (1991)................................................................................................. 17

*Sierra Club v. EPA*,
    322 F.3d 718 (D.C. Cir. 2003)................................................................................. 11

*Spector v. Norwegian Cruise Line Ltd.*,
    545 U.S. 119 (2005)........................................................................................... 14, 15

*Sussman v. U.S. Marshals Serv.*,
    494 F.3d 1106 (D.C. Cir. 2007)............................................................................... 22

*United States v. Puentes*,
    803 F.3d 597 (11th Cir. 2015)............................................................................ 18, 19

*Util. Air Regulatory Grp. v. EPA*,
    573 U.S. 302 (2014)......................................................................................... 4, 9, 10

*Whitaker v. Thompson*,
    353 F.3d 947 (D.C. Cir. 2004)................................................................................. 17

*Zadvydas v. Davis*,
    533 U.S. 678 (2001)........................................................................................... 14, 15

**Statutes**

5 U.S.C. § 706(2)(A)....................................................................................................... 15

8 U.S.C. § 1182(a)(1)(A)(i)............................................................................................. 18

8 U.S.C. § 1225(a)(1).................................................................................................... 3, 8

8 U.S.C. § 1225(b)(2)(A).................................................................................................. 8

8 U.S.C. § 1229a.............................................................................................................. 3

8 U.S.C. § 1232(b)(3) ............................................................................................. 23

15 U.S.C. § 1692k(d) ............................................................................................. 13

42 U.S.C. § 265............................................................................................... *passim*

Pub. L. No. 110-457, 122 Stat. 5044 .................................................................... 18

## Regulations

42 C.F.R. § 71.51(g) ............................................................................................. 22

85 Fed. Reg. 17,060-02 (Mar. 26, 2020) ............................................................. 22

85 Fed. Reg. 56,424 (Sept. 11, 2020) ........................................................ 4, 5, 16, 22

## Other Authorities

CDC, U.S. Dep't of Health and Human Servs., https://www.cdc.gov/coronavirus/
    2019-ncov/order-suspending-introduction-certain-persons.html................................................. 4

**INTRODUCTION**

In their objections to the Magistrate Judge's Report and Recommendation, Defendants demonstrated that the Magistrate Judge erred in numerous respects that all but strip the Government's authority to contain the risk of transmission of the Coronavirus Disease 2019 ("COVID-19") into the United States across the U.S.-Mexico and U.S.-Canada borders.  Although the Magistrate Judge stated that he "does not pass on the soundness of [Plaintiff's] argument" that Section 265 merely regulates transportation companies that bring people to the United States, R&R, at 25 n.8,[1] the Magistrate Judge essentially adopted Plaintiff's theory of the case—that Section 265 does not authorize expulsions "whether the person seeks entry at or between ports [of entry]," Pl.'s Combined PI and Class Cert. Reply, ECF No. 52, at 10 n.1.  The Magistrate Judge concluded that the Government may utilize its authority under Section 362 of the Public Health Service Act, 42 U.S.C. § 265 [hereinafter Section 265] only to regulate vessels or airplanes, but not to prohibit individuals from crossing the nearly 6,000 miles of U.S. land borders.  According to the Magistrate Judge, this extremely narrow interpretation of Section 265 is sound because the Government has *other* statutory authorities to apprehend, examine, quarantine, and conditionally release persons traveling into the United States, and to impose fines and criminal penalties.

But this cramped view of the Government's public health authority fails to recognize Congress's broad grant of power in Section 265—which, by its plain terms, is not tied to *how* individuals are introduced into the United States.  It also frustrates the purpose of this important public health statute.  After all, the regulation of vessels and airplanes has no relevance to land border crossings.  And even if the Government were to invoke its statutory authority to impose criminal punishments on those who violate an order of the U.S. Centers for Disease Control & Prevention ("CDC") issued under Section 265, that would not serve Section 265's express aim of prohibiting the introduction of persons capable of spreading a highly contagious and deadly

---

[1] Because the Magistrate Judge cited to page numbers generated by the Court's CM/ECF system, *see* Report & Recommendation ["R&R"], ECF No. 65, at 2 n.1, Defendants will use the CM/ECF page numbers for all citations to the parties' briefs.

communicable disease such as COVID-19 into the United States.  Indeed, reliance on criminal prosecution of individuals already within the United States in violation of a Section 265 order could potentially exacerbate the harm from permitting the entry of aliens at risk of carrying a communicable disease.  Moreover, based on information provided by the Department of Homeland Security ("DHS") and an observational visit by a U.S. Public Health Service Scientist officer to a representative border facility, the CDC Director has determined that border facilities at or near the northern and southern borders were not designed and are not equipped to effectively mitigate the serious risks presented by COVID-19 through social distancing and infection control protocols (e.g., quarantine and isolation) for even small numbers of covered aliens.

The Magistrate Judge's atextual reasoning leads to an absurd result:  The Government could not apply Section 265 to any covered aliens, regardless of whether they are at ports of entry or are intercepted at the border (or after unlawfully crossing the border) between ports of entry. That is, the Government would not be able to exercise its Section 265 authority to prohibit the introduction of persons into the United States along the land borders at all, leaving the prohibition of the introduction of persons valid only while individuals are outside the jurisdiction of the United States.  This interpretation cannot be right because it renders Section 265 ineffective to prevent the introduction of a communicable disease transmitted through land border crossings.

Plaintiff's opposition brief does nothing to cure the numerous defects Defendants identified.  Defendants hereby incorporate their prior objections, Defs.' Objs. to R&R ["Objs."], ECF No. 69, and address below the specific points Plaintiff highlighted in his opposition.

## ARGUMENT

## I.      The Magistrate Judge's Interpretation of Section 265 Is Contrary to Law

The Magistrate Judge incorrectly found that Plaintiff was likely to succeed on the merits of his claim that Section 265 does not authorize the Government to expel putative class members from the United States and that the Government must instead allow them to remain in the United States to pursue claims for immigration benefits under Title 8 of the U.S. Code.  *See* R&R at 38.

As discussed below, Plaintiff's response simply repeats the Magistrate Judge's errors.  *See* Pl.'s Opp'n to Defs.' Objs. to R&R  ["Opp'n"], ECF No. 72.

## A. The Magistrate Judge Improperly Narrowed Section 265's Broad Grant of Authority to Prohibit the Introduction of Persons

As Defendants explained in their objections, in interpreting Section 265's grant of authority to the CDC to "prohibit, in whole or in part, the introduction of persons" from "a foreign country," 42 U.S.C. § 265, the Magistrate Judge erred in concluding that the provision does not allow the Government to expel aliens whose introduction into the United States has not been completed.  *See* Objs. at 16-19.  Trying to defend the Magistrate Judge's determination, Plaintiff argues that "expelling someone from the country is wholly different than stopping them from coming into (or further into) the country," and that Defendants' "own briefing reflects that basic distinction." Opp'n at 13.  But that ignores the logical flaws in the Magistrate Judge's reasoning.

To begin, Plaintiff does not explain how the Government is to stop covered aliens from coming into the United States through the land borders.  Indeed, his theory of the case, adopted by the Magistrate Judge, is that the Government cannot do so.  Under the immigration laws, an "applicant for admission" is defined as "[a]n alien present in the United States who has not been admitted or who arrives in the United States (whether or not at a designated port of arrival . . .)." *See* 8 U.S.C. § 1225(a)(1).  An applicant for admission therefore would be processed for a removal proceeding under 8 U.S.C. § 1229a or for expedited removal under 8 U.S.C. § 1225(b)(1), if an immigration officer determined that the alien "is not clearly and beyond a doubt entitled to be admitted," *id.* § 1225(b)(2).  That is, the alien potentially would be able to remain in the United States to seek asylum and other protections from removal.  To accord "applicant[s] for admission" the procedures under the immigration laws would mean that the Government cannot stop them from being introduced into the United States.  The distinction Plaintiff posits is thus meaningless.

Moreover, the Magistrate Judge "[a]ssum[ed]" that Defendants correctly interpreted "introduction" to "suggest[] a continuing process that is most naturally read to extend beyond a person's immediate physical crossing of the border," R&R at 24-25 (internal quotation marks and

citations omitted).  *Id.* at 25-26.  The Magistrate Judge also reasoned that "prohibit" "connote[s] stopping something before it begins, rather than remedying it afterwards."  *Id.*  With these understandings, there is no basis to reject the Government's interpretation that, through expulsion, the Government prohibits or intercepts a process (the "introduction") that is underway but not yet complete.  As Defendants explained, Congress provided such broad authority for good reason, given the reality that a communicable disease does not respect national borders.  Objs. at 31.

Importantly, rather than specifying that the power to prohibit the introduction of persons is limited to the Nation's borders, Congress specifically granted the Secretary of Health and Human Services with broad discretion to implement Section 265's capacious grant of authority in seeking to achieve the statutory purpose.  *See* 42 U.S.C. § 265 ("the [Secretary], *in accordance with regulations* approved by the President, shall have the power to prohibit, in whole or in part, the introduction of persons . . . in order to avert such danger" (emphasis added)).  Such a broad grant of implementing authority is necessary to allow public health experts to flexibly respond to the exigency posed by the spread of communicable diseases.  *Cf. Util. Air Regulatory Grp. v. EPA*, 573 U.S. 302, 327 (2014) ("The power of executing the laws necessarily includes both authority and responsibility to resolve some questions left open by Congress that arise during the law's administration.").

Trying to discount this broad grant of authority, Plaintiff claims that the express reference to the Secretary's promulgation of regulations "adds nothing to the government's powers" "[i]f the power to prohibit introduction does not include the power to expel, as the Magistrate Judge concluded[.]"  Opp'n at 12.  But Section 265 does provide that power, Defs.' PI Opp'n at 29-34, ECF No. 42; Objs. at 16-25, and the CDC Order[2] fully accords with the means Section 265 provides to achieve its purpose—*i.e.*, by suspending the right to introduce persons who would otherwise increase the serious danger of spreading a communicable disease into the United States.

_____

[2] The Final Rule became effective on October 13, 2020.  Final Rule, 85 Fed. Reg. 56,424, 56,424 (Sept. 11, 2020).  The CDC Director issued an Order on the same day.  *See* CDC, U.S. Dep't of Health and Human Servs., https://www.cdc.gov/coronavirus/2019-ncov/order-suspending-introduction-certain-persons.html.

*See Dir., Office of Workers' Comp. Programs, Dep't of Labor v. Newport News Shipbuilding & Dry Dock Co.*, 514 U.S. 122, 136 (1995) ("Every statute proposes, not only to achieve certain ends, but also to achieve them by particular means.").

Section 265's legislative history further illustrates the extraordinary authority that Congress intended to grant the Executive in times of a public health crisis. *See* Defs.' PI Opp'n at 41-42 (discussing that the legislative history indicates a consistent theme that the Executive is granted "extraordinary power" through Section 265 to suspend immigration); *see, e.g.*, 24 Cong. Rec. 470 (Jan. 10, 1893) (statement of Senator George Gray explaining that the exigency posed by "invasion of contagious disease, is sufficient . . . to justify this *extraordinary power* of the entire suspension of immigration") (emphasis added).

Plaintiff again argues that Congress had only focused on "the regulation of vessels." Opp'n at 16 (quoting R&R at 36). That is not so. *See* Defs.' PI Opp'n at 37-40, Objs. at 28-29; *see also* Final Rule, 85 Fed. Reg. at 56,441 n.153. Even if Congress had only contemplated vessels, "the limits of the drafters' imagination supply no reason to ignore the law's demands." *Bostock v. Clayton Cnty.*, 140 S. Ct. 1731, 1737 (2020). Crucially, Section 265's plain language does not contain the limitation Plaintiff posits. It is also unreasonable to assume that Congress intended to leave a massive hole in the authority it provided by leaving the Executive no power over aliens who arrive at, or illegally and surreptitiously cross, land borders in the midst of an outbreak of a communicable disease. The broad statutory text allows for expulsion of those covered aliens who are in the process of being introduced into the United States, and a contrary conclusion leads to an absurd result where Section 265 could not be applied to any covered aliens, regardless of whether they are at ports of entry or are intercepted at the border (or after unlawfully crossing the border) between ports of entry. *See* Objs. at 18-19.

The Magistrate Judge compounded his error when he found that his interpretation was "reinforced by the title of" Section 265, which says "[s]uspension of *entries*," R&R at 26 (quoting 42 U.S.C. § 265 (emphasis added by Magistrate Judge)). As Defendants explained, an alien is not necessarily considered to have "effected an entry" simply by surreptitiously crossing the border.

*See* Objs. at 11-12.  Even Plaintiff retreats from the Magistrate Judge's logic, claiming that "[t]he Magistrate Judge did not conclude that as a matter of immigration law an 'entry' is complete when one crosses the border; he concluded that § 265 says nothing about *expulsion*."  Opp'n at 13 n.2. That misses the point:  in reaching the conclusion that the statute does not include expulsion, the Magistrate Judge relied on a misunderstanding of "entry" to "reinforce[]" his flawed interpretation.

### B.  The Magistrate Judge Erred in Finding that the Statutory Context of Section 265 Indicates that Section 265 Does Not Authorize Expulsion

Defendants have explained that the statutory context reinforces their interpretation that Section 265 authorizes expulsion.  Specifically, Section 265 and its adjacent provision, Section 264, reflect Congress's broad grant of powers in the context of the federal quarantine laws and a congressional intent to defer to the scientific judgment of the public health officials to determine how best to protect the country from the dangers of a communicable disease.  Objs. at 20.  The Magistrate Judge, however, incorrectly interpreted Section 265 to be limited by Section 264, finding that, in exercising its power under Section 265, the Government may use only the public health measures identified in Section 264—namely, the apprehension, detention, examination, or conditional release of individuals—or impose fines and imprisonment under Section 271.  R&R at 37.  According to the Magistrate Judge, Section 264 is "where one would expect the term [expulsion] to appear," and because Section 264 does not authorize expulsion as one of the tools available to the Secretary, Section 265 must not, either. *Id.*  Plaintiff sought to defend this conclusory statement by emphasizing that Defendants "do not claim [Section 264] authorizes expulsions."  Opp'n at 15.  Both Plaintiff and the Magistrate Judge are incorrect.

The Magistrate Judge's reasoning is flawed because Sections 264 and 265 are independent provisions designed to protect the public health through different means.  Section 264 had its origin in Section 3 of the Act of February 15, 1893, which enabled the Secretary of Treasury to assist "State and municipal authorities" in enforcing their quarantine rules and regulations, and to supplement such rules and regulations, if necessary, to be enforced by State and municipal health authorities.  Act of Feb. 15, 1893, ch. 114, § 3, 27 Stat. 449, 450-51.  Given the domestic and local

nature of Section 3, it was in Section 7 of the 1893 Act—the predecessor statute of Section 265—that Congress addressed the prohibition of introduction of persons (and property) into the United States and vested in the President authority that was consistently characterized in the legislative history as "extraordinary." *See* Objs. at 22; *see, e.g.*, 24 Cong. Rec. 370-71 (Jan. 6, 1893) (Senator Roger Mills: "I shall vote very cheerfully against placing in the hands of the President of the United States . . . any such extraordinary power as that, to suspend immigration to this country at his pleasure."). Although the Public Health Service Act of 1944 later placed the authority of both provisions in the same officer, nothing indicates that Congress also intended to subject the substantive regulatory authority available under Section 265 to the limitations of Section 264 or vice versa. *See* H.R. Rep. No. 78-1364, at 25 (explaining that Section 265 was intended to "reenact" existing law and that it reassigned the President's authority to the Surgeon General for "consisten[cy] with the general administrative pattern in the bill").

Plaintiff disagrees with Defendants' argument that the Magistrate Judge's interpretation of Sections 264 and 265 would render Section 265 a nullity. Opp'n at 16. Plaintiff does not appear to dispute the CDC Director's finding that the Government cannot implement the various public health measures authorized by Section 264 (*i.e.*, apprehension, examination, quarantine, and conditional release) at the land border, given the limitations of border facilities—a point with which the Magistrate Judge inexplicably disagreed, R&R at 37. Plaintiff does argue, as the Magistrate Judge found, R&R at 36, that the Government could still prohibit vessels or airplanes from arriving in the United Sates, Opp'n at 16, or, as Plaintiff would have it, regulate "the transportation companies' *licenses* conferring the 'right to introduce' passengers and goods from abroad," *id.* at 21 n.6. Indeed, recognizing the flaw in the argument as to land borders, Plaintiff adds that the Government could regulate trains as well. *Id.*

In light of the text, nature, and purpose of Section 265, it is inconceivable that Congress intended to leave open nearly 6,000 miles of land borders with Mexico and Canada to the possible transmission of communicable diseases. Under the Magistrate Judge's theory, even those who arrive at ports of entry, or are intercepted at the border between ports of entry, may not be expelled

under the CDC Order.  As discussed above, an applicant for admission under the immigration laws is "[a]n alien present in the United States who has not been admitted or who arrives in the United States (whether or not at a designated port of arrival . . ." *See* 8 U.S.C. § 1225(a)(1).  Such an applicant potentially would be able to remain in the United States to seek asylum and other protections from removal.  And before that, the alien would be held at border facilities for immigration processing for hours or days, triggering the very public health concern that the CDC Order is designed to avoid.  That is, the Magistrate Judge's atextual conclusion would render Section 265 without effect.

Plaintiff continues to insist that past practice limited Section 265 to the prohibition of vessels from arriving in the United States.  Opp'n at 16.  Because of a meningitis outbreak in China and the Philippine Islands, President Herbert Hoover had invoked Section 7 of the 1893 Act to prohibit any person from being "introduced directly or indirectly by transshipment or otherwise into the United States . . . from any port in China (including Hong Kong) or the Philippine Islands for such period of time as may be deemed necessary."  Executive Order 5143, ECF 15-5, Ex. B.  As Defendants explained in their PI opposition, however, the mitigation measure there merely tracked the problem—a communicable disease was being transmitted into the United States by people who arrived by ship.  Defs.' PI Opp'n at 38.  Neither President Hoover's Executive Order nor the accompanying Treasury Department regulations, *see* ECF 15-5, Ex. C, purported to set forth a final interpretation or framework for implementing Section 7.

Plaintiff also defends the Magistrate Judge's reliance on *Utility Air Regulatory Group v. EPA*, in which the Supreme Court observed that "'[w]hen an agency claims to discover in a long-extant statute an unheralded power,' courts should 'greet its announcement with a measure of skepticism.'"  R&R at 29 (quoting *Utility Air Regulatory Group*, 573 U.S. at 324); *see* Opp'n at 15.  As Defendants explained, Objs. at 21-22, *Utility Air Regulatory Group* is inapposite because in that case, the Court was "confront[ing] a singular situation: an agency laying claim to extravagant statutory power over the national economy while at the same time strenuously asserting that the authority claimed would render the statute 'unrecognizable to the Congress that

designed' it." *Id.* at 21.  The Court found that "it would be patently unreasonable—not to say outrageous—for [the agency] to insist on seizing expansive power that it admits the statute is not designed to grant." *Id.*

Plaintiff insists that *Utility Air Regulatory Group* has not been read to narrowly apply only to agency admissions of the type in that case.  *See* Opp'n at 15.  But Plaintiff fails to acknowledge that even a broad application of that case would not impact the proper interpretation of Section 265 authority here.  The case related to an agency's entirely new claim of power based on statutes it administered regularly, beyond the scope of—and indeed in conflict with—any reasonable reading of the relevant statutory text and context, which is entirely distinguishable from the situation here.  At issue was whether the Environmental Protection Agency ("EPA") permissibly extended statutory permitting requirements, designed by Congress for large stationary sources that emit greenhouse gases, to new motor vehicles.  573 U.S. at 314.  The Court found that the agency could not, because (1) the agency "has repeatedly acknowledged" that the extension "would be inconsistent with—in fact, would overthrow—the [Clean Air] Act's structure and design," *id.* at 321; (2) the statute indicated that the permitting requirements were "designed to apply to, and [could not] rationally be extended beyond, a relative handful of large sources capable of shouldering heavy substantive and procedural burdens," *id.* at 322; and (3) EPA's interpretation "would bring about an enormous and transformative expansion in EPA's regulatory authority without clear congressional authorization," *id.* at 324.

The CDC's exercise of Section 265 authority is unlike the improper expansion of authority that EPA claimed in *Utility Air Regulatory Group*.  The CDC seeks to exercise authority under a longstanding statute that has been rarely invoked by virtue of the fact that it is designed to address extraordinary public health crises.  *See* Objs. at 20-21.  And the CDC's interpretation of the statute to authorize the expulsion of those whose introduction is halted in the process is squarely within the agency's province as contemplated by Congress.  As the Supreme Court recognized, "[t]he power of executing the laws necessarily includes both authority and responsibility to resolve some questions left open by Congress that arise during the law's administration."  *Utility Air Regulatory*

9

*Group*, 573 U.S. at 327.  This recognition has particular force when the Government must address a public health crisis such as the one the Nation currently faces.

Finally, *Merck & Co. v. Department of Health & Human Services*, 962 F.3d 531 (D.C. Cir. 2020), cited by Plaintiff, Opp'n at 13, 15, does not bolster the Magistrate Judge's ruling.  In that case, the Centers for Medicare and Medicaid Services invoked the Social Security Act to promulgate a rule requiring drug manufacturers to disclose in their television advertisements the wholesale acquisition cost of many prescription drugs for which payment is available under Medicare or Medicaid.  *Merck & Co.*, 962 F.3d at 533.  Not only did the price that the manufacturers were compelled to disclose "bear[] little resemblance to the price beneficiaries actually pay under the Medicare and Medicaid programs," *id.*, but the agency also had never before attempted to use the Social Security Act to directly regulate the marketing of pharmaceuticals.  *See Merck & Co. v. HHS*, 385 F. Supp. 3d 81, 97 (D.D.C. 2019) (noting that such prior measures were taken pursuant to the Federal Food, Drug, and Cosmetics Act).  The D.C. Circuit held that there was no statutory basis for the rule's "far-flung reach," 962 F.3d at 533, in part because the rule bore little relationship to the Medicare and Medicaid programs.  *Id.* at 541.

*Merck* is distinguishable from the CDC rule at issue here because the agency in *Merck* was attempting to extend an existing statutory authority (the Social Security Act) to a new area (pharmaceuticals marketing).  The CDC is doing no such thing.  Moreover, whereas the D.C. Circuit found that the challenged rule in *Merck* was "untethered to the actual administration of the Medicare or Medicaid programs," *id.* at 533, there is no such misalignment here, either.  The Interim Final Rule directly achieves the purpose of the statute.  As the CDC Director found, the CDC Order already has reduced the transmission of COVID-19 into the United States and has conserved the limited healthcare resources in the border states.  *See* Defs.' PI Opp'n at 24-25.

### C. The Absence of  References to Returning or Removing Aliens in Section 265 Does Not Narrow the Statute's Broad Grant of Authority

Plaintiff also defends the Magistrate Judge's reliance on immigration statutes containing terms that expressly mention the return or removal of aliens as indicating that Section 265 does

not grant such authority.  Opp'n at 14.  But "[l]anguage in one statute usually sheds little light upon the meaning of different language in another statute, even when the two are enacted at or about the same time."  *Russello v. United States*, 464 U.S. 16, 25 (1983).  That is particularly the case here.  Section 265 is a public health statute that need not contain specific references to the appropriate disposition of aliens determined to have no lawful status in the United States, as would immigration statutes regulating such dispositions.  *See* Objs. at 22-23; Defs.' PI Opp'n at 34-36. Repeating the Magistrate Judge, Plaintiff incorrectly labels *Russello*'s instruction as "dicta." Opp'n at 14 n.3; R&R at 30 n.11.  But the statutory interpretation issue was squarely before the *Russello* Court, which held that the language used in the Controlled Substances Act should not constrain an interpretation of the Racketeer Influenced and Corrupt Organizations statute—even though they were passed by the same Congress—because they have different purposes, and the different language naturally was tailored to achieve distinct statutory aims.  464 U.S. at 24-25. The same rationale applies here.  In any event, the Magistrate Judge and Plaintiff's "argument carries no weight since carefully considered language of the Supreme Court, even if technically dictum, generally must be treated as authoritative."  *Sierra Club v. EPA*, 322 F.3d 718, 724 (D.C. Cir. 2003) (internal quotation marks and citation omitted).

Plaintiff and the Magistrate Judge claim that "'the Supreme Court regularly' 'looks to language used in one statute to interpret the meaning of another.'"  Opp'n at 14 & n.3 (quoting R&R at 30 n.11).  In particular, Plaintiff argues that courts look to other statutes, even those with different purposes, to find that "Congress's use of particular language in other statutes" constitutes "evidence that it knows how to, but chose not to, legislate in a particular way."  Opp'n at 14 (citing cases).  But the cases on which the Magistrate Judge and Plaintiff rely fail to support the proposition that this interpretive principle applies here.

The Magistrate Judge and Plaintiff principally rely on *Epic Systems Corp. v. Lewis*, 138 S. Ct. 1612, 1619 (2018), but take it too far.  In that case, plaintiff employees sought to litigate Fair Labor Standards Act claims through class or collective actions, even though their contracts with employer defendants permitted only individual arbitration proceedings for such disputes.  The

employees argued that the National Labor Relations Act ("NLRA"), which Congress enacted in 1935, contained a congressional command to displace the earlier-enacted Federal Arbitration Act ("FAA"), which requires courts "to enforce arbitration agreements according to their terms— including terms providing for individualized proceedings." *Id*. According to the employees, the FAA and NLRA presented an irreconcilable statutory conflict and, accordingly, the NLRA controlled to confer a right to bring a class or collective action. *Id*. at 1624-25. But the Court found "no conflict at all" between the two statutes because, in part, the NLRA did not contain dispute resolution procedures that indicated that Congress intended to override the earlier-enacted FAA. *Id*. at 1625-26. To be sure, the Court found probative the lack of specified dispute resolution procedures in the NLRA, noting that Congress "knew" how to mandate such procedures in other statutes. *Id*. at 1626. But the statutes to which the Court compared the NLRA—the Fair Labor Standards Act and employment discrimination statutes—all regulated workplace rights, and were not so far afield from the purpose of the NLRA as Plaintiff suggests.

Similarly, in *McGirt v. Oklahoma*, a case involving whether certain land constituted an "Indian country" for purposes of a federal criminal statute, the Court looked to language in other statutes that involved tribal lands and reservations. 140 S. Ct. 2452, 2462-63 (2020). Based on those statutes, the Court observed that "[h]istory shows that Congress knows how to withdraw a reservation" through "[e]xplicit reference to cession" or measures to "compensate the Indian tribe for its opened land." *Id.* Again, the Court's reference to statutes governing similar subjects in discerning congressional intent is unremarkable.

The other cases to which the Magistrate Judge and Plaintiff cite, R&R at 30 n.11; Opp'n at 14, also fail to support the application of this interpretive tool here. In *Dole Food Co. v. Patrickson*, for example, the Court looked to the specific corporate ownership definitions of various statutes to determine whether Congress intended to depart from "settled principles of corporate law" in defining the term "agency or instrumentality of a foreign state." 538 U.S. 468, 473, 474, 476 (2003). After finding that the text of the statute "gives no indication that Congress intended [the Court] to depart from the general rules regarding corporate formalities," the Court

12

only then referred to specific corporate ownership definitions in other statutes to find that "Congress did not intend to disregard" these "well-settled" principles of corporate law. *Id*. at 476.

Here, the fact that some immigration statutory provisions contemporaneous with the Act of 1893 used terms such as "return," "remove," or "send back" suggests no more than that, in the immigration context, Congress knew how to describe the disposition of aliens. Accordingly, a departure from such language may shed light on the interpretation of immigration statutes. But that says nothing about how to interpret a public health statute designed to address the entirely different scenario of an outbreak of a communicable disease and the transmission of such disease into the United States. As Defendants have explained, Objs. at 27-28, this is particularly the case where Congress enacted the predecessor of Section 265 against the backdrop of a cholera epidemic in Europe, just two years after enacting the predecessor immigration provisions authorizing the exclusion from admission into the United States of aliens "suffering from a loathsome or a dangerous contagious disease." Ch. 551, section 1, 26 Stat. 1084. Congress clearly deemed Section 265 a necessary public health tool to combat larger threats to public health, such as the current pandemic. Objs. at 27-28; Defs.' PI Opp'n at 41.

Similarly, *Rotkiske v. Klemm* is readily distinguishable. 140 S. Ct. 355, 360 (2019); *see* R&R at 30 n.11. In *Rotkiske*, the plaintiff argued that the Court should read an exception into the one-year limitations period for bringing a suit under the Fair Debt Collection Practices Act. 140 S. Ct. at 360 (quoting 15 U.S.C. § 1692k(d)). The plaintiff argued that a "discovery rule" should be read into the statute to allow the plaintiff to bring an action within one year of the discovery of an alleged statutory violation. *Id*. After examining statutes that contain a discovery rule in limitations periods, the Court declined to engage in "atextual judicial supplementation"— to insert into the statute a term in derogation of the undisputed plain meaning of the provision. *Id*. at 361. But this is not the situation here. The phrase "prohibit . . . the introduction" in Section 265 fairly can be construed to encompass the expulsion of persons who are intercepted while in the process of moving into the United States. Defs.' PI Opp'n, at 29-32. And to the extent the phrase is deemed ambiguous, the agency's interpretation is reasonable and entitled to *Chevron* deference.

13

*Id*. at 32.  In either case, Defendants are not requesting a "judicial supplementation" to the plain text of Section 265, and thus *Rotkiske* is inapposite.

### D.  The Magistrate Judge Erred in Applying the Constitutional Avoidance Doctrine

In Defendants' objections to the Report and Recommendation, Defendants further demonstrated that the Magistrate Judge erred in applying the constitutional avoidance doctrine to conclude that Section 265 does not authorize expulsion.  Objs. 23-24.  The Magistrate Judge reasoned that, if the statute is interpreted to authorize expulsion, it would raise "serious constitutional issues" because the Government cannot constitutionally apply Section 265 to U.S. citizens.  R&R at 31-32.  Plaintiff's opposition brief repeats the same reasoning.  But both misapplied the constitutional avoidance doctrine.  Opp'n at 10-11.

To begin, neither the Interim Final Rule nor the Final Rule includes U.S. citizens within its scope.  Although both Plaintiff and the Magistrate Judge cite *Clark v. Martinez*, 543 U.S. 371, 380-81 (2005), for the proposition that the constitutional problem sought to be avoided need not pertain to the particular litigant before the Court, R&R at 32; Opp'n at 11, *Clark* does not suggest that a hypothetical constitutional issue could constitute a proper basis for invoking the avoidance doctrine.  To the contrary, *Clark* stands for the proposition that "statutory language given a limiting construction in one context must be interpreted consistently in other contexts."  *Spector v. Norwegian Cruise Line Ltd*., 545 U.S. 119, 140 (2005).

Specifically, *Clark* involved the interpretation of a statute that authorized the detention of aliens pending their removal.  In a prior case, *Zadvydas v. Davis*, 533 U.S. 678, 696–699 (2001), the Supreme Court had already interpreted that statute to impose time limits on detention of lawfully admitted aliens held after a final order of removal has been entered, because the alternative—allowing indefinite detention of such aliens—would raise grave constitutional doubts. Given the determination in *Zadvydas*, the *Clark* Court was obliged to follow the same interpretation, even though the case, involving inadmissible aliens, did not present the same constitutional concern as *Zadvydas*.  *Clark*, 543 U.S. at 377-81.  *Clark*, therefore, does not support the Magistrate Judge's reliance on hypothetical constitutional issues in invoking the avoidance

doctrine.  *Cf. Bartlett v. Strickland*, 556 U.S. 1, 23 (2009) (doctrine inapplicable because it "invites the divisive constitutional questions that are both unnecessary and contrary to the purposes of our precedents under the [relevant statute]").  The Magistrate Judge's error is particularly apparent in the context of judicial review of agency action under the Administrative Procedure Act.  As the Supreme Court explained in *FCC v. Fox Television Stations, Inc.*:

> We know of no precedent for applying [the constitutional avoidance doctrine] to limit the scope of authorized executive action. In the same section authorizing courts to set aside "arbitrary [or] capricious" agency action, the Administrative Procedure Act separately provides for setting aside agency action that is "unlawful," 5 U.S.C. § 706(2)(A), which of course includes unconstitutional action. We think that is the only context in which constitutionality bears upon judicial review of authorized agency action.

556 U.S. 502, 516 (2009).  Here, the agency has taken no action that conceivably raises any constitutional issues.  The invocation of the doctrine to limit the agency authority, as proposed by the Magistrate Judge, is therefore improper.

The doctrine is inapplicable for other reasons as well.  The doctrine "'comes into play only when, after the application of ordinary textual analysis, the statute is found to be susceptible of more than one construction.'"  *Nielsen v. Preap*, 139 S. Ct. 954, 972 (2019) (quoting *Jennings v. Rodriguez*, 138 S. Ct. 830, 842 (2018)).  The doctrine has "no application in the interpretation of an unambiguous statute."  *McFadden v. United States*, 576 U.S. 186, 197 (2015).  That is, if Congress has made its intent clear, the intent must be given effect.  *See Zadvydas*, 533 U.S. at 696 ("Despite this constitutional problem, if Congress has made its intent in the statute clear, we must give effect to that intent" (internal quotation marks omitted)); *Pub. Citizen v. U.S. Dep't of Justice*, 491 U.S. 440, 466 (1989) ("[W]here an otherwise acceptable construction of a statute would raise serious constitutional problems, the Court will construe the statute to avoid such problems unless such construction is plainly contrary to the intent of Congress." (citation omitted)).

As Defendants have already demonstrated, the text of the statute, the statutory context, and the legislative history all point to an unambiguous congressional intent to expel those aliens who are halted in the process of being introduced into the United States in violation of a Section 265

order.  Moreover, whereas the canon "informs the choice among plausible readings," *Spector*, 545 U.S. at 140, the Magistrate Judge's interpretation to avoid the purported constitutional issue is implausible—he suggests that Section 265 prohibits only ships and airplanes (or as added by Plaintiff, trains) from arriving in the United States, when Section 265, by its plain terms, is not tied to *how* individuals are introduced into the United States.  *See Jennings*, 138 S. Ct. at 836 ("a court relying on [the avoidance] canon still must *interpret* the statute, not rewrite it").  Most telling is the Magistrate Judge's conclusion that even aliens who arrive at a port of entry may not be expelled under the CDC Order—which is fundamentally at odds with the text and purpose of Section 265 to avert the serious danger of spreading a communicable disease into the United States.

Finally, although both the Magistrate Judge and Plaintiff recognize that one of the plausible readings must raise "serious constitutional issues" for the constitutional avoidance doctrine to apply, R&R at 31; Opp'n at 11, Defendants' interpretation raises no constitutional issues at all.  This is true even if the Court were to consider the hypothetical application of Section 265 to U.S. citizens—which, as discussed before, is improper.  The Magistrate Judge cites the agency's acknowledgement that there are "complex and important legal and policy questions presented by the potential application of section [265] to U.S. citizens, U.S. nationals, and [lawful permanent residents]."  R&R at 32 (quoting Final Rule, 85 Fed. Reg. at 56,448).  But that does not suggest that a hypothetical, future application of Section 265 to U.S. citizens would raise a serious constitutional question, as the Magistrate Judge found.  *Id.*; *see also* Opp'n at 11.  While U.S. citizens undoubtedly are entitled to certain procedural protections before the Government may deprive them of their liberty interests, this only means that any possible future application of Section 265 to U.S. citizens must comply with applicable constitutional requirements based on future facts and circumstances.

*Dessouki v. Attorney General*, 915 F.3d 964, 967 (3d Cir. 2019), cited by the Magistrate Judge and highlighted by Plaintiff, is not to the contrary.  Opp. at 12 (citing R&R at 31).  The plaintiff in that case claimed that he was a U.S. citizen as a defense to immigration removal proceedings.  In concluding that the court had jurisdiction to decide the citizenship claim, the court

16

noted that a different interpretation would raise a serious constitutional question—the potential deprivation of a liberty interest without process.  915 F.3d at 967.  As made clear by the Supreme Court's precedent it cited, *Ng Fung Ho v. White*, 259 U.S. 276, 284 (1922), "[t]o deport [a resident,] who so claims to be a citizen [of the United States,] obviously deprives him of liberty" and "may result also in loss of both property and life," such that the Fifth Amendment protects such person against deportation without a judicial hearing on his claim of citizenship.

In sum, there is no "serious constitutional issue" of the type justifying invocation of the canon.  *See Whitaker v. Thompson*, 353 F.3d 947, 952 (D.C. Cir. 2004) ("the canon's application requires a comparatively high likelihood of unconstitutionality, or at least some exceptional intricacy of constitutional doctrine"); *Cubaexport v. Dep't of Treasury*, 638 F.3d 794, 801 (D.C. Cir. 2011) ("A clear statute and a weak constitutional claim are not a recipe for successful invocation of the constitutional avoidance canon."); *see, e.g.*, *Rust v. Sullivan*, 500 U.S. 173, 191 (1991) (finding the constitutional question not so "grave and doubtful" as to justify avoidance doctrine (citation omitted)); *Republican Nat'l Comm. v. FEC*, 76 F.3d 400, 409 (D.C. Cir. 1996) (same).  The Magistrate Judge therefore erred in invoking the canon, and his resulting interpretation—that Section 265 does not authorize expulsion—is also erroneous.

### E. The Magistrate Judge Erred in Attempting to Subordinate Section 265 to the Separate and Distinct Immigration Statutes

In their opening brief, Defendants showed that the Magistrate Judge erred in trying to harmonize Section 265 with immigration provisions under Title 8 that otherwise would allow unaccompanied alien children to be introduced into the United States.  Objs. at 24-31 (citing R&R at 32).  Although the Magistrate Judge correctly notes that courts generally should try to harmonize conflicting statutes when possible, R&R at 32, 34, he erred in failing to recognize that the statutes are already in harmony—the immigration provisions are of general applicability, and Section 265 temporarily suspends their effects in rare and limited circumstances like those present here.  Plaintiff perpetuates this error, insisting that the immigration provisions must apply in conjunction

with Section 265, *see* Opp'n at 19, which essentially erases the phrase "suspension of the right to introduce" from Section 265.  Plaintiff's several arguments on this score have no merit.

*First*, Plaintiff is unsuccessful in his defense of the Magistrate Judge's reliance on the absence of the phrase "notwithstanding any other provision of law" in Section 265 to find that Section 265 does not temporarily supersede the immigration provisions.  Defendants previously demonstrated that, because Section 265 is the earlier enacted statute, it is the subsequently enacted immigration statutes that must contain the phrase.  Objs. at 25-26.  In response, Plaintiff argues that the predecessor statute of the health-related grounds of inadmissibility, 8 U.S.C. § 1182(a)(1)(A)(i)—namely the Immigration Act of 1891, ch. 551, section 1, 26 Stat. 1084—was enacted two years before Section 265's predecessor statute.  Opp'n at 19.  The argument makes no sense because the statutory provisions Plaintiff seeks to invoke to allow putative class members to seek protections from removal from the United States, including the William Wilberforce Trafficking Victims Protection Reauthorization Act of 2008 ["TVPRA"], Pub. L. No. 110-457, 122 Stat. 5044, were enacted *after* Section 265.  It is those statutory provisions that the Magistrate Judge seeks to harmonize with Section 265, and, thus, if the phrase "notwithstanding any other provision of law" should appear anywhere, it would be in the later enacted immigration provisions. The absence of such a phrase in Section 265 in no way means that the immigration provisions should override Section 265, as the Magistrate Judge erroneously concluded.  Objs. at 25.

*Second*, Plaintiff cites *United States v. Puentes*, 803 F.3d 597 (11th Cir. 2015), for the notion that Congress uses the phrase "[n]otwithstanding any other provision of law" to supersede both earlier and subsequently enacted laws.  Opp'n at 19-20.  But *Puentes* does not help Plaintiff because, in that case, the Eleventh Circuit found that the phrase "[n]otwithstanding any other provision of law" indicates Congress's intent for that provision "to take precedence over any preexisting or subsequently-enacted legislation *on the same subject*."  Opp'n at 20 (quoting *Puentes*, 803 F.3d at 606) (emphasis added).  As Defendants have repeatedly demonstrated, Section 265 and the immigration provisions otherwise allowing the introduction of persons into the United States are not "on the same subject."

So Plaintiff now pivots, suggesting that, "if Congress wanted the public health laws to supersede the immigration laws, it easily could have included a broad public health exception in the subsequent immigration laws but did not . . . ." Opp'n at 20.  But again, this does not refute Defendants' point that the logical place for the phrase "[n]otwithstanding any other provision of law" is in subsequently enacted legislation, and, accordingly, the Magistrate Judge erred in finding that the absence of this phrase in Section 265 meant that Section 265 does not temporarily suspend the effect of the immigration provisions that otherwise allow introduction.  Objs. at 25.  Indeed, the absence of the phrase in the immigration provisions confirms that a Section 265 order may temporarily suspend their effect to avoid the serious danger of the introduction of a communicable disease into the United States.

*Third*, Plaintiff provides no basis for refuting Defendants' objection to the Magistrate Judge's conclusion that Section 265's reference to "a suspension of the right to introduce such persons and property" contains "no reference to the suspension of laws or specific rights," R&R 34-35, and thus does not override immigration provisions allowing the introduction of persons into the United States.  Objs. at 26.[3]  As Defendants explained, the meaning of the term "suspend" has been well understood since the Founding; the term means the temporary cessation of the operation or effect of laws, so that the phrase "suspension of the right to introduce" means the temporary cessation of the effect of any laws under which a person may otherwise claim a right to be introduced into the United States.  *Id*.  Plaintiff criticizes Section 265's usage of the term as being "vague," Opp'n at 21 (quoting R&R at 35), but provides no legitimate reason why that is so.  Objs. at 27-28.  In fact, Plaintiff cannot do so because Defendants' reading is consistent with the plain language of the statute (*i.e.*, "suspension of the right to introduce"), the statutory context of the

_____

[3] Plaintiff attempts to insert a finding that the Magistrate Judge never made—that the statute does not authorize the suspension of the right *to be introduced* (rather than "to introduce").  Opp'n at 20.  Plaintiff contorts the Magistrate Judge's finding to fit Plaintiff's theory that the statute prohibits only *third parties* (*i.e.*, transportation companies) from introducing persons into the United States.  *See* Defs.' PI Opp'n at 37-38.  But the Magistrate Judge did not limit the phrase "suspension of the right to introduce" to only introduction by third parties.

federal quarantine laws, and the legislative history, which evinces Congress's intent to give the Executive the authority to suspend any right to introduce persons into the United States, including any such right under the immigration laws. Objs. at 26-27 (describing legislative history). And while Plaintiff states only that "Defendants misread the legislative history," Opp'n at 21, Plaintiff does not explain how this is so.

In defending the Magistrate Judge's dismissal of Defendants' interpretation of Section 265, Plaintiff argues that Congress would not have granted "sweeping Executive authority to override other legislation in a dependent clause." Opp'n at 21 n.6. But this characterization misconstrues the relevant language. Section 265 requires the Secretary to determine that "there is serious danger of the introduction of such disease into the United States, and that this danger is so increased by the introduction of persons or property from such country that a suspension of the right to introduce such persons and property is required in the interest of public health." This language indicates that the suspension of such a right is contemplated by Section 265. In other words, the scope of the required finding naturally must mirror the scope of the authority, or the statute would be internally incoherent. Plaintiff also reiterates the meritless argument that the phrase "the right to introduce persons and property" in Section 265 refers only to transportation companies' *licenses*—a reading that finds no support in the plain language or legislative history of Section 265. *See* Opp'n at 21 n.6. In urging this extremely narrow interpretation of Section 265 that even the Magistrate Judge did not adopt, Plaintiff is in fact urging the Court to engage in the "atextual judicial supplementation" that courts may not do. *See Rotkiske*, 140 S. Ct. at 361.

*Fourth*, Plaintiff misunderstands Defendants' objection to the Magistrate Judge's finding that the canon of "the specific governs the general" indicates that the immigration laws at issue must take precedence over Section 265. As Defendants explained, the Magistrate Judge employed a circular reasoning—because Section 265 is not more specifically targeted to matters of immigration or as providing more specific solutions to immigration problems, Section 265 must give way to the immigration provisions. Objs. at 28. But the problem at hand is an ongoing global pandemic that continues to threaten the public health. The principal statutory solution that

20

Congress has provided for this problem is Section 265.  The CDC must be able to deploy this congressionally authorized tool to combat the problem.  Plaintiff also takes issue with Defendants' argument that the specific and targeted nature of Section 265 is underscored by the fact that the statute has been rarely invoked.  Opp'n at 16 n.8.  Plaintiff argues that many frequently invoked statutes can be specific as well.  *Id.*  The argument misses the mark.  The indisputable point is that Section 265 is specifically designed to address the rare instances of an outbreak of a communicable disease that threatens to spread into the United States.  That alone is dispositive of its primacy in the circumstances here.

### F.  The Magistrate Judge Erred in His Analysis Regarding *Chevron* Deference

As Defendants explained in their objections, to the extent Section 265 does not clearly address whether it includes expulsion authority, the Secretary's permissible interpretation must be accorded deference under *Chevron, U.S.A., Inc. v. Nat. Res. Def. Council, Inc.*, 467 U.S. 837, 842-43 (1984).  *See* Objs. at 30-31.[4]  Plaintiff joins the Magistrate Judge in wrongly asserting that *Chevron* does not apply because "[t]he reconciliation of distinct statutory regimes is a matter for the courts, not agencies."  Opp'n at 23 (quoting R&R at 38 n.15).  But here, the CDC's interpretative task is not to reconcile statutes perceived to be in conflict, several of which CDC does not administer.  Rather, Section 265 provides for the "suspension of the right to introduce . . . persons" if the CDC Director determines such suspension "is required in the interest of the public health," among other requisite determinations.  Thus, Section 265 expressly suspends provisions of Title 8 that otherwise allow introduction.  And in the case of ambiguity, the interpretation of "introduction" lies squarely within the agency's delegated authority and expertise.  In interpreting "introduction," the agency relies on its scientific and technical knowledge and experience regarding communicable diseases generally and the threat that such diseases can pose to public

---

[4] Although Plaintiff states it is "unnecessary to resolve now," he questions the CDC Director's independence by pointing to news articles that are critical of the Title 42 process.  Opp'n at 8, 23 n.9.  Government officials, however, are presumed to properly discharge their official duties in good faith.  *Comcast Corp. v. FCC*, 526 F.3d 763, 769 n.2 (D.C. Cir. 2008); *Sussman v. U.S. Marshals Serv.*, 494 F.3d 1106, 1117 (D.C. Cir. 2007).

health.  The agency's reasonable interpretation of Section 265 is entitled to deference.  *See* Defs.'
PI Opp'n at 32-34 & 32 n.14; Objs. at 30-31.

Indeed, Section 265 extends not only to persons but also to property, *see* 42 C.F.R.
§ 71.51(g), yet under the Magistrate Judge's reading, the Government would not be able to send
back or otherwise remove property (*e.g.*, diseased animals) that has entered the territorial
boundaries of the United States.  "Plaintiff does not doubt" that the Government can "dispose of
potentially infectious property," but states that "redirecting goods is a very different matter from
expelling persons."  Opp'n at 24 n.10.  The Government of course does not consider alike diseased
infectious property and persons, but as Plaintiff and the Magistrate Judge observed, the same
statutory text should not have different meanings in different cases.  *See* Opp'n at 11.  Were it
otherwise, the Government would be rendered powerless to remove diseased property.  Such an
absurd result underscores that the Magistrate Judge and Plaintiff's interpretation is incorrect.

Here, the CDC Director issued a formal order in the midst of a historic pandemic. The
order relied on the irrefutable facts that ports of entry and Border Patrol stations were not designed
and are not structured or equipped to effectively mitigate the risks presented by COVID-19, *see*
CDC Order, 85 Fed. Reg. 17,060-02 (Mar. 26, 2020) at 15, ECF No. 42-1, and that border facilities
largely lack the capacity to provide appropriate medical services, *id*. at 16; *see also* Final Rule,
85 Fed. Reg. at 56,433.  And the Director has since explained the effectiveness of his Order,
including that it has reduced the utilization of local health care systems by covered aliens, thereby
preserving vital resources for the domestic population.  Final Rule, 85 Fed. Reg. at 56,434; *see
also* Objs. at 11-13.  The CDC Director properly exercised his expertise, and to the extent Section
265 is ambiguous, the Secretary's interpretation is entitled to *Chevron* deference.

In sum, Plaintiffs fail to meaningfully counter Defendants' showing that the Magistrate
Judge's interpretation of Section 265 is contrary to law.  Because Plaintiff cannot show a likelihood
of success on the merits, the Court should deny his request for injunctive relief.

## II.    The Magistrate Judge Erred in Finding the Other Preliminary Injunction Factors Weigh in Favor of Issuing a Preliminary Injunction

As Defendants showed in their opening brief, the remaining factors for injunctive relief—irreparable injury, the balance of equities, and the public interest—support the denial of Plaintiff's request for emergency relief.  Objs. at 32-37.  Plaintiff's arguments to the contrary are unavailing.

In finding Plaintiff has established irreparable harm, the Magistrate Judge improperly collapsed independent requirements for preliminary relief by concluding that his finding of a likelihood of success on the merits showed "a clear harm that each member of the putative class has suffered or will suffer."  R&R at 41.  While Plaintiff accuses Defendants of "mischaracterizing the Magistrate Judge's decision," Opp'n at 25, the Magistrate Judge plainly addressed purported "statutory rights" that were allegedly violated.  R&R at 41 (internal quotation marks and citation omitted).  And just as removal "is not categorically irreparable" in the immigration context, *Nken v. Holder*, 556 U.S. 418, 435 (2009), expulsion under the CDC Order alone should not be either.

Moreover, as Defendants have explained, the Magistrate Judge failed to consider that, if the CDC Order were enjoined, putative class members would first be held in congregate settings in border facilities that are ill-equipped to address the public health exigencies during this unprecedented pandemic.   Objs. at 33; Defs.' PI Opp'n at 55; *see* 8 U.S.C. § 1232(b)(3) (unaccompanied alien children may be held in border facilities for up to 72 hours, and then are transferred to further congregate care administered by HHS).  Because holding putative class members in congregate settings in border facilities increases the risk of infection and transmission of COVID-19 for those minors, other aliens, DHS personnel, and the U.S. population, the Magistrate Judge clearly erred in failing to consider this period of holding putative class members when evaluating harm to public interest.

Plaintiff's arguments to the contrary miss the point.  First, Plaintiff suggests that the Government may "apprehend, examine, quarantine, or conditionally release unaccompanied minors."  Opp'n at 25 (quoting R&R at 44-45).  But those mitigation measures do not counter the fact that unaccompanied minors initially must be held at border facilities.  Moreover, the argument

ignores the CDC Director's determination that such measures are not even possible or practicable at such facilities.  *See* Defs.' PI Opp'n at 22-23, 50-51.

Additionally, as Defendants explained, the Magistrate Judge erred in entirely discounting Deputy Director Sualog's judgment that the Office of Refugee Resettlement ("ORR") might not be able to safely intake members of the putative class in the event the Court issues the requested injunction.  Objs. at 35-36.  Plaintiff principally relies on findings by the *Flores* Court, Opp'n at 26, with which Defendants respectfully disagree.  Plaintiff also repeats the Magistrate Judge's misplaced focus on the number of open beds in ORR facilities.  *Id*. at 27.  As Defendants demonstrated, the key issue in assessing ORR capabilities in this situation is not the number of open beds, but rather whether the increased rate of referrals to ORR of minors with higher rates of exposure would create operational difficulties and make it more difficult to implement appropriate infection control protocols.  Objs. at 35.  Plaintiff's recitation of Deputy Director Sualog's attestations regarding ORR capabilities from March 2020, *see* Opp'n at 27-28, do little to rebut her attestations about these limitations in September 2020.  Objs. at 35-36.

### III.    This Court Should Stay Any Order Enjoining Title 42

As discussed in Defendants' initial brief, in the event that this Court adopts the Magistrate Judge's recommendations and enjoins application of the CDC Order to the putative class members, Defendants respectfully request that this Court stay its order for 14 days to give Defendants sufficient time to explore their appellate options.  Objs. at 38-39.  And, should Defendants seek further review, the Court should continue the stay pending appeal.  *Id*.

Plaintiff disputes that a stay is warranted because Section 265 "is not [Defendants'] only tool to prohibit individuals from entering the country."  Opp'n at 29.  But as discussed, the "other [purportedly] effective measures" that Plaintiff references, *id*., do not curtail the Government's authority under Section 265, and are demonstrably not substitutes for the Section 265 authority to prohibit the introduction of persons to address the current public health exigency.  As Defendants explained, the imposition of criminal punishments on those who violate a CDC Order would not further the goal of Section 265 to reduce the danger of COVID-19 transmission into the United

States by prohibiting the introduction of persons.  Objs. at 29.  And that certain statutes already permit the Government to apprehend, examine, quarantine, or conditionally release persons traveling into the United States fails to recognize the unique situation at the Nation's borders that the CDC Order was designed to address.  The CDC Director determined that the border facilities are not equipped to effectively mitigate the risks presented by COVID-19, an unprecedented situation that the cited statutes, R&R at 37 n.13, do not adequately address.  Objs. at 11-12.

In opposing Defendants' request for a stay of any order that enjoins the Government from applying the Title 42 process to putative class members, Plaintiff focuses mainly on the potential danger involved with the expulsions of minors.  Opp'n at 29.  But an injunction implicates countervailing dangers.  Plaintiff does not dispute that COVID-19 is a communicable disease that spreads easily and quickly across national borders and for which there are no widely available therapeutics or vaccines.  An injunction prohibiting the application of the Title 42 process to putative class members effectively would result in their being held in congregate settings for hours or days during immigration processing, and thus allow for the potentially irreversible and devastating spread of COVID-19 to those minors, DHS personnel, and the population within the United States.  Defendants thus request a stay of an injunction to prevent such irreversible harm that would follow the introduction of covered aliens into the congregate settings at border facilities.

For these reasons, Defendants respectfully request that, if this Court is inclined to enjoin the CDC Order from being applied to putative class members, the Court stay such an order for 14 days to give Defendants sufficient time to explore their appellate options.

## CONCLUSION

For all of the foregoing reasons, Defendants respectfully request that the Court reject the Magistrate Judge's Report and Recommendation, sustain Defendants' objections, and deny Plaintiff's motions for class certification and for classwide preliminary injunction.

Dated:  October 14, 2020

Respectfully submitted,
JEFFREY BOSSERT CLARK
Acting Assistant Attorney General

JOHN V. COGHLAN
Deputy Assistant Attorney General

/s/ *Jean Lin*
JEAN LIN (NY Bar 4074530)
Special Litigation Counsel
KEVIN SNELL
TANYA SENANAYAKE (D.C. Bar 1006218)
Trial Attorneys
Federal Programs Branch
Civil Division, Department of Justice
1100 L Street, N.W.
Washington, D.C. 20005
(202) 514-3716
Jean.Lin@usdoj.gov
*Attorneys for Defendants*