**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| P.J.E.S.,<br>a minor child, by and through<br>his father and next friend,<br>Mario Escobar Francisco,<br>on behalf of himself and<br>others similarly situated,<br><br>          Plaintiffs,<br><br>     v.<br><br>CHAD F. WOLF,<br>Acting Secretary of<br>Homeland Security, *et al.*,<br><br>          Defendant. | <br><br><br><br><br><br><br><br>Civ. Action No. 20-2245 (EGS) |

<u>**MEMORANDUM OPINION**</u>

Plaintiff P.J.E.S., a 15-year-old minor from Guatemala who entered the United States as an unaccompanied minor in August 2020, brings this action against Chad F. Wolf in his official capacity as Acting Secretary of Homeland Security and various other federal government officials ("Defendants" or the "Government") for violations of the Administrative Procedure Act ("APA"), 5 U.S.C. § 701 *et seq.*; the Trafficking Victims Protection Reauthorization Act ("TVPRA"), 8 U.S.C. § 1232; the Immigration and Nationality Act ("INA"), 8 U.S.C. § 1101 *et seq.*; and the Foreign Affairs Reform and Restructuring Act of 1998 ("FARRA"), 8 U.S.C. § 1231 NOTE.

Pending before the Court are Plaintiff's motion for class

certification ("Pl.'s Cert. Mot."), ECF No. 2[1], and motion for a classwide preliminary injunction ("Pl.'s Prelim. Inj. Mot."), ECF No. 15. Magistrate Judge Harvey's Report and Recommendation ("R. & R.") recommends that this Court provisionally grant the motion for class certification and grant the motion for preliminary injunction and . *See* R. & R., ECF No. 65 at 2.

The Government has objected to several of Magistrate Judge Harvey's recommendations. *See* Gov't's Objs., ECF No. 69. Raising no objections to the R. & R., Plaintiff asks this Court to adopt Magistrate Judge Harvey's recommendations to grant both motions. *See* Pl.'s Resp. to Pl.'s Objs. ("Pl.'s Resp."), ECF No. 72 at 7. Upon careful consideration of the R. & R., the Government's objections, Plaintiff's response, and the relevant law, the Court hereby **ADOPTS** the R. & R., ECF No. 65, **PROVISIONALLY GRANTS** Plaintiff's (1) Motion to Certify Class, ECF No. 2, and **GRANTS** Plaintiff's (2) Motion for Preliminary Injunction, ECF No. 15.

## I.  Background

The factual background and procedural history in this case are set forth in the R. & R. *See* R. & R., ECF No. 65 at 3-15.[2]

---

[1] When citing electronic filings throughout this Opinion, the Court cites to the ECF header page number, not the page number of the filed document.

[2] The Court accepts as true the allegations in the operative complaint for purposes of deciding this motion, and construes them in Plaintiff's favor. *See Baird v. Gotbaum*, 792 F.3d 166,

## A. Factual Background

### 1. Pre-COVID-19 Pandemic

Prior to the current COVID-19 pandemic and pursuant to the TVPRA, unaccompanied children who entered the United States and were nationals of countries that do not share a border with the United States were required to be transferred to the care and custody of the Department of Health and Human Services' ("DHH") Office of Refugee Resettlement ("ORR"), within 72 hours of their detainment, for placement in the "least restrictive setting that is in the best interest of the child." 8 U.S.C. § 1232(b). Unaccompanied children from countries that share borders with the United States were initially screened to determine that the unaccompanied child: (1) was not a victim of trafficking; (2) did not have "a credible fear of persecution"; and (3) was "able to make an independent decision" about their admission into the United States. *Id.* § 1232(a)(2)(A). Absent these determinations, the unaccompanied child was also transferred to the care and custody of ORR. *Id.* § 1232(a)(3). These unaccompanied children also had access to "counsel to represent them in legal proceedings or matters and protect them from mistreatment, exploitation, and trafficking," *id.* § 1232(c)(5); and some were

---

169 n.2 (D.C. Cir. 2015). The Government does not object to Magistrate Judge Harvey's recitation of the alleged facts. *See generally*, Gov't's Objs., ECF No. 69.

provided "independent child advocates . . . to effectively advocate for the[ir] best interest." *Id*. § 1232(c)(6).

In addition, all unaccompanied children retained their rights under the INA to (1) apply for asylum, *id.* § 1158(a)(1); contest their removal to a country where their "life or freedom would be threatened . . . because of [their] race, religion, nationality, membership in a particular social group, or political opinion," *id.* § 1231(b)(3) ("withholding of removal"); or, pursuant to FARRA, (3) make a case that "he or she would be tortured if removed to the proposed country of removal." *Id*. § 1231 Note.

### 2. COVID-19 Pandemic and CDC Orders

Since 1893, federal law has provided federal officials with the authority to stem the spread of contagious diseases from foreign countries by prohibiting, "in whole or in part, the introduction of persons and property from such countries." Act of February 15, 1893, ch. 114, § 7, 27 Stat. 449, 452, ECF No. 15-5 at 5 ("1893 Act"). Under current law,

> Whenever the Surgeon General determines that by reason of the existence of any communicable disease in a foreign country there is serious danger of the introduction of such disease into the United States, and that this danger is so increased by the introduction of persons or property from such country that a suspension of the right to introduce such persons and property is required in the interest of the public health, the Surgeon General, in accordance with regulations

> approved by the President, shall have the
> power to prohibit, in whole or in part, the
> introduction of persons and property from such
> countries or places as he shall designate in
> order to avert such danger, and for such
> period of time as he may deem necessary for
> such purpose.

42 U.S.C. § 265 ("Section 265"). In 1966, "the Surgeon General's
§ 265 authority was transferred" to HHS, which in turn
"delegated this authority to the [Centers for Disease Control
("CDC")] in 2001 and [t]he President's functions under § 265
were assigned to the Secretary of HHS in a 2003 executive
order." Compl., ECF No. 1 at 13 n.2.

On March 24, 2020, as the COVID-19 virus spread throughout
the country, the CDC issued a new regulation, pursuant to
Section 265, aiming to "provide[] a procedure for CDC to suspend
the introduction of persons from designated countries or places,
if required, in the interest of public health." Control of
Communicable Diseases; Foreign Quarantine: Suspension of
Introduction of Persons Into United States From Designated
Foreign Countries or Places for Public Health Purposes, 85 Fed.
Reg. 16559-01, 2020 WL 1330968, (March 24, 2020) ("Interim
Rule"). The Interim Rule created Section 71.40 to "enable the
CDC Director to suspend the introduction of persons into the
United States" and stated, in relevant part,

> (b) For purposes of this section:
>
> (1) Introduction into the United States

of persons from a foreign country (or one or more political subdivisions or regions thereof) or place means the movement of a person from a foreign country (or one or more political subdivisions or regions thereof) or place, or series of foreign countries or places, into the United States so as to bring the person into contact with persons in the United States, or so as to cause the contamination of property in the United States, in a manner that the Director determines to present a risk of transmission of a communicable disease to persons or property, even if the communicable disease has already been introduced, transmitted, or is spreading within the United States;

(2) Serious danger of the introduction of such communicable disease into the United States means the potential for introduction of vectors of the communicable disease into the United States, even if persons or property in the United States are already infected or contaminated with the communicable disease; and

(3) The term "Place" includes any location specified by the Director, including any carrier, as that term is defined in 42 CFR 71.1, whatever the carrier's nationality.

*Id.* at 16566-67. The CDC's Interim Rule was made effective immediately, "without advance notice and comment," Compl., ECF No. 1 at 13 ¶ 50; though the CDC explained that "[p]ursuant to 5 U.S.C. 553(b)(3)(B)," of the APA, HHS "conclude[d] that there [was] good cause to dispense with prior public notice and the opportunity to comment on this rule before finalizing this

rule." Interim Rule at 16564. Specifically, the CDC stated that
"[g]iven the national emergency caused by COVID-19, it would be
impracticable and contrary to the public health—and, by
extension, the public interest—to delay these implementing
regulations until a full public notice-and-comment process is
completed." *Id.* at 16565. Finally, noting that Section 265
applied to "persons" in general, the CDC declared that the
"interim final rule [would] not apply to U.S. citizens or lawful
permanent residents . . . [because the] CDC believes that, at
present, quarantine, isolation, and conditional release, in
combination with other authorities, while not perfect solutions,
can mitigate any transmission or spread of COVID-19 caused by
the introduction of U.S. citizens or lawful permanent residents
into the United States." *Id.* at 16564.

Pursuant to the Interim Rule, the CDC Director issued an
order suspending the introduction of "covered aliens" which he
defined as "persons traveling from Canada or Mexico (regardless
of their country of origin) who would otherwise be introduced
into a congregate setting in a land Port of Entry [("POE")] or
Border Patrol station at or near the United States borders with
Canada and Mexico" for a period of 30 days. Notice of Order
Under Sections 362 and 365 of the Public Health Service Act
Suspending Introduction of Certain Persons From Countries Where
a Communicable Disease Exists, 85 Fed. Reg. 17060-02, 2020 WL

1445906 (March 26, 2020) ("March Order"). The CDC Director found

the March Order necessary because the public health risks

> include[d] transmission and spread of COVID-
> 19 to [U.S. Customs and Border Protection
> ("CBP")] personnel, U.S. citizens, lawful
> permanent residents, and other persons in the
> POEs and Border Patrol stations; further
> transmission and spread of COVID-19 in the
> interior; and the increased strain that
> further transmission and spread of COVID-19
> would put on the United States healthcare
> system and supply chain during the current
> public health emergency.

*Id.* at 17061. In a section titled "Determination and

Implementation," the March Order declared that "[i]t is

necessary for the public health to immediately suspend the

introduction of covered aliens" and "require[d] the movement of

all such aliens to the country from which they entered the

United States, or their country of origin, or another location

as practicable, as rapidly as possible." *Id.* at 17067. The CDC

Director then "requested that DHS implement th[e] [March Order]

because CDC does not have the capability, resources, or

personnel needed to do so" and then notes that "CBP [had

already] developed an operational plan for implementing the

order." *Id.* In April, the March Order was extended another 30

days. *See* Extension of Order Under Sections 362 and 365 of the

Public Health Service Act; Order Suspending Introduction of

Certain Persons From Countries Where a Communicable Disease

Exists, 85 Fed. Reg. 22424-01, 2020 WL 1923282 (April 22, 2020)

("April Order"). The March Order was extended again on May 20, 2020 and amended to "clarify that it applies to all land and coastal [POEs] and Border Patrol stations at or near the United States' border with Canada or Mexico that would otherwise hold covered aliens in a congregate setting." Amendment and Extension of Order Under Sections 362 and 365 of the Public Health Service Act; Order Suspending Introduction of Certain Persons From Countries Where a Communicable Disease Exists, 85 Fed. Reg. 31503-02, 31504, 2020 WL 2619696 (May 26, 2020) ("May Order"). The May Order also extended the duration of the order until the CDC Director "determine[s] that the danger of further introduction of COVID-19 into the United States has ceased to be a serious danger to the public health," though the CDC would still conduct a recurring 30-day review. *Id.* Finding that: (1) the CDC Order had "significantly mitigated the specific public health risk identified in the initial Order by significantly reducing the population of covered aliens held in congregate settings in POEs and Border Patrol stations," *id.* at 31505; and (2) "due to their lack of legal immigration status, there is significant uncertainty that covered aliens would be able to effectively self-quarantine, self-isolate, or otherwise comply with existing social distancing guidelines, if they were conditionally released," *id.* at 31508; the CDC Director requested that DHS "continue to implement the operational plan

developed to carry out the" March and April Orders, *id*. The Court will refer to the process developed by the CDC and implemented by the March, April, and May Orders as the "CDC Orders."[3]

As noted above, the CBP had already developed its plan to implement the March Order and issued a memorandum on April 2, 2020 establishing its procedures for implementing the order. *See* Compl., ECF No. 1 at 17 ¶ 65; *see also* COVID-I9 CAPIO, ECF No. 15-5 at 15 ("CAPIO Memo"). Specifically, the CAPIO Memo instructed that when implementing the CDC Orders, agents may determine whether individuals are subject to the CDC Orders "Based on training, experience, physical observation, technology, questioning and other considerations." CAPIO Memo, ECF No. 15-5 at 15. If an individual was determined to be subject to the CDC Orders, they were to be "transported to the nearest POE and immediately returned to Mexico or Canada depending on their point of transit." *Id*. at 17. The CAPIO Memo, "provide[d] no instructions on medical screenings or other procedures for determining whether a covered noncitizen may have COVID-19," Compl., ECF No. 1 at 17 ¶ 68; and did "not exempt minors from forcible expulsion," *id*. at 18 ¶ 69.

---

[3] Plaintiff refers to the process under 42 U.S.C. § 265 as the "Title 42 Process," *see* Pl.'s Prelim. Inj. Mot., ECF No. 15; while the Government refers to it as the "CDC Order." *See* Gov't's Combined Opp'n, ECF No. 42 at 12.

On September 11, 2020, the CDC published its final rule.
*See* Control of Communicable Diseases; Foreign Quarantine:
Suspension of the Right To Introduce and Prohibition of
Introduction of Persons Into United States From Designated
Foreign Countries or Places for Public Health Purposes, 85 Fed.
Reg. 56424-01, 2020 WL 5439721, (Sept. 11, 2020) (Effective
October 13, 2020) ("Final Rule"). The Final Rule, which
references this case but makes no changes to its determinations
and findings as relevant for this action, *see id.* at 56437,
states "[i]t has long been recognized that 'where a general
power is conferred or duty enjoined, every particular power
necessary for the exercise of the one, or the performance of the
other, is also conferred.'" *Id.* at 56445. It further states that
"HHS/CDC identifies particular powers that it may exercise under
[Section 265] by defining the phrase to '[p]rohibit, in whole or
in part, the introduction into the United States of persons' to
mean 'to prevent the introduction of persons into the United
States by suspending any right to introduce into the United
States, physically stopping or restricting movement into the
United States, or physically expelling from the United States
some or all of the persons.'" *Id.*

### 3. CDC Orders' Effect on Plaintiff

Plaintiff is a 16-year-old boy from Guatemala, who entered
the United States in August 2020, was apprehended by CBP and

initially held in CBP custody in McAllen, Texas, before he was
made subject to expulsion pursuant to the CDC Orders and CAPIO
Memo. *See id.* at 19 ¶¶ 77, 81. His father lives in the United
States and has a pending immigration case. *See id.* ¶ 78.
Plaintiff is from "an indigenous Mayan family" and alleges to
have (1) "experienced severe persecution in Guatemala" due to
his father's political opinions; and (2) had his life threatened
due to his refusal to join a gang. *Id.* ¶ 79. He states that, if
he is "allowed to remain in the United States, he could live
with his father . . . or another suitable sponsor." *Id.* ¶ 84.
Further, Plaintiff asserts that, "even if [he is] required to
first reside for a short time in a[n] ORR children['s] shelter,
he could do so safely . . . [because] ORR facilities [] have
experience with communicable diseases . . . [and] are currently
well under capacity, [which would allow for] social distancing
and quarantine[ing]." *Id.* at 20 ¶ 85. Plaintiff alleges that,
instead of remaining in CBP custody, he "could have been
transferred directly to his father or another sponsor or to an
ORR shelter, [and] he would [have] pose[d] minimal, if any,
additional risk to border agents." *Id.* ¶ 88. On August 14, 2020,
after Plaintiff filed this action and a motion for class
certification, the Government exempted him from the CDC Orders.
*See* Escobar Francisco Decl., ECF No. 14-1 at 2 ¶ 11.

#### 4. CDC Orders' General Effect on Unaccompanied Children

Plaintiff alleges that unaccompanied children have "been required to remain in DHS custody longer than the time it would have taken to transfer them to their family members or to an ORR facility," Compl., ECF No. 1 at 20 ¶ 89; and that "arranging for air transport to deport individuals will generally take longer than time in which DHS must transfer children to ORR or family members." *Id*. at 21 ¶ 90. He further alleges that some unaccompanied "children are held for days or weeks in hotels [as] they await flights back to their home countries, [while] [o]thers are detained in CBP facilities near the border, reportedly held in cage-like settings with other children." *Id*. ¶ 91. Finally, Plaintiff states,

> Unaccompanied children subject to the [CDC Orders] face numerous problems accessing legal representation. Because children can be expelled under Title 42 in a matter of days, the child or any family member who obtains information about the child has only a limited amount of time in which to advocate for the child. And because the [] Process [pursuant to the CDC Orders] has operated largely in secret, its rules and procedures have remained opaque to children, their parents, and any lawyers and advocates who seek to help them. Unaccompanied children are also unable, by reason of their youth, to advocate effectively for themselves, especially when detained in custodial settings by government officers. Many do not speak English, and lack even a basic comprehension of the U.S. legal system. Their relatives are similarly not well-situated to help navigate this process, especially given the time constraints; many

> children are from families in which few
> members have had significant formal schooling,
> much less any fluency in English.

*Id.* at 21-22 ¶ 93. At the time he filed his motion for preliminary injunction, Plaintiff alleged that the DHS had "already expelled at least 2,000 unaccompanied children pursuant to the CDC Order[s]," Pl.'s Prelim. Inj. Mem., ECF No. 15-1 at 10; but Plaintiff now alleges that the number of expelled unaccompanied children had "exceeded 13,000 by the end of October." Pl.'s Notice of November 17, 2020, ECF No. 78.[4]

### B. Procedural Background

Plaintiff filed this action on August 14, 2020, *see* Compl., ECF No. 1; and a motion for class certification, *see* Pl.'s Cert. Mot., ECF No. 2, that same day. On August 20, 2020, Plaintiff filed a motion for a classwide preliminary injunction. *See* Pl.'s Prelim. Inj. Mot., ECF No. 15. The Government filed its Combined Opposition to Plaintiff's Motions for Class Certification and for Classwide Preliminary Injunction ("Gov't's Combined Opp'n") on September 8, 2020, *see* Gov't's Combined Opp'n, ECF No. 42; and Plaintiff filed his Combined Reply Memorandum in Support of Motions for Classwide Preliminary Injunction and Class

---

[4] Citing to Hamed Aleaziz, *Border Officials Turned Away Unaccompanied Immigrant Children More Than 13,000 Times Under Trump's Pandemic Policy*, BuzzFeed News (Oct. 28, 2020), https://www.buzzfeednews.com/article/hamedaleaziz/border-officials-turned-away-unaccompanied-immigrants.

Certification ("Pl.'s Combined Reply") on September 15, 2020.
Pl.'s Combined Reply, ECF No. 52.

Magistrate Judge Harvey, having been referred Plaintiff's
motions and this case for full case management, issued his R. &
R. on September 25, 2020. *See* R. & R., ECF No. 65; *see also*
Sept. 6, 2020 Min. Order. The Government submitted objections to
the R. & R. on October 2, 2020, *see* Gov't's Objs., ECF No. 69;
Plaintiff filed his Response to the Government's Objections on
October 9, 2020, *see* Pl.'s Resp., ECF No. 72; and the Government
filed its Reply to Plaintiff's Response to the Government's
Objections ("Gov't's Objs. Reply") on October 14, 2020, *see*
Gov't's Objs. Reply, ECF No. 75. The objections are ripe and
ready for the Court's adjudication.

## II.  Legal Standards

### A. Objections to a Magistrate Judge's Report and Recommendation

Pursuant to Federal Rule of Civil Procedure 72(b), a party
may file specific written objections once a magistrate judge has
entered a recommended disposition. Fed. R. Civ. P. 72(b)(1)-(2).
A district court "may accept, reject or modify the recommended
disposition." Fed. R. Civ. P. 72(b)(3); *see also* 28 U.S.C. §
636(b)(1) ("A judge of the court may accept, reject, or modify,
in whole or in part, the findings or recommendations made by the
magistrate judge."). A district court "must determine de novo

any part of the magistrate judge's disposition that has been
properly objected to." Fed. R. Civ. P. 72(b)(3)."If, however,
the party makes only conclusory or general objections, or simply
reiterates his original arguments, the Court reviews the [R. &
R.] only for clear error." *Houlahan v. Brown*, 979 F. Supp. 2d
86, 88 (D.D.C. 2013) (citation omitted). "Under the clearly
erroneous standard, the magistrate judge's decision is entitled
to great deference" and "is clearly erroneous only if on the
entire evidence the court is left with the definite and firm
conviction that a mistake has been committed." *Buie v. D.C.*, No.
CV 16-1920 (CKK), 2019 WL 4345712, at *3 (D.D.C. Sept. 12, 2019)
(citing *Graham v. Mukasey*, 608 F. Supp. 2d 50, 52 (D.D.C. 2009))
(internal quotation marks omitted).

Objections must "specifically identify the portions
of the proposed findings and recommendations to which objection
is made and the basis for objection." LCvR 72.3(b)."[O]bjections
which merely rehash an argument presented to and considered by
the magistrate judge are not 'properly objected to' and are
therefore not entitled to de novo review." *Shurtleff v. EPA*, 991
F. Supp. 2d 1, 8 (D.D.C. 2013) (quoting *Morgan v. Astrue*, No.
08-2133, 2009 WL 3541001, at *3 (E.D. Pa. Oct. 30,2009)).

**B. Preliminary Injunction**

"A plaintiff seeking a preliminary injunction must
establish [1] that he is likely to succeed on the merits, [2]

that he is likely to suffer irreparable harm in the absence of preliminary relief, [3] that the balance of equities tips in his favor, and [4] that an injunction is in the public interest." *Aamer v. Obama*, 742 F.3d 1023, 1038 (D.C. Cir. 2014) (alteration in original) (quoting *Sherley v. Sebelius*, 644 F.3d 388, 392 (D.C. Cir. 2011)). Where the federal government is the opposing party, the balance of equities and public interest factors merge. *See Nken v. Holder*, 556 U.S. 418, 435 (2009). A preliminary injunction is an "extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled to such relief." *Winter v. Nat. Res. Def. Council*, Inc., 555 U.S. 7, 22 (2008) (citation omitted). "The purpose of a preliminary injunction is merely to preserve the relative positions of the parties until a trial on the merits can be held." *Univ. of Tex. v. Camenisch*, 451 U.S. 390, 395 (1981). In this Circuit, the four factors have typically been evaluated on a "sliding scale," such that if "the movant makes an unusually strong showing on one of the factors, then it does not necessarily have to make as strong a showing on another factor." *Davis v. Pension Benefit Guar. Corp.*, 571 F.3d 1288, 1291-92 (D.C. Cir. 2009).

In the wake of the Supreme Court's decision in *Winter v. Natural Resources Defense Council*, 555 U.S. 7 (2008), "the D.C. Circuit has suggested that a positive showing on all four

preliminary injunction factors may be required." *Holmes v. FEC*, 71 F. Supp. 3d 178, 183 n.4 (D.D.C. 2014); *see also Sherley*, 644 F.3d at 393 ("[W]e read Winter at least to suggest if not to hold that a likelihood of success is an independent, freestanding requirement for a preliminary injunction.") (citation and quotation marks omitted)). Nonetheless, "the Circuit has had no occasion to decide this question because it has not yet encountered a post-Winter case where a preliminary injunction motion survived the less rigorous sliding-scale analysis." *ConverDyn v. Moniz*, 68 F. Supp. 3d 34, 46 n.2 (D.D.C. 2014).

### III.   Analysis

Before proceeding to its analysis, the Court observes that another court in this District recently examined CBP's new process pursuant to the CDC Orders, in a case with facts similar to those before this Court. In *J. B. B. C. v. WOLF, et al.*, Docket No. 20-cv-1509 (D.D.C. filed June 9, 2020), the plaintiff, a 16-year-old boy from Honduras, whose father also lives in the United States and had a pending asylum case, was apprehended by CBP when he entered the country near El Paso, Texas and made subject to expulsion pursuant to the CDC Orders and CAPIO Memo. *J. B. B. C.* Compl., Dkt No. 20-cv-1509, ECF No. 1 at 19-20 ¶¶ 76-80. At the time he filed his complaint, the plaintiff in *J. B. B. C.*, had been in a hotel for five days as

CBP moved under the new process to place him on a flight to Honduras. *Id.* ¶¶ 83-84. Since his expulsion was imminent, he filed a motion for temporary restraining order ("T.R.O.") that same day, presenting many of the same arguments as presented in this case. *See generally*, *J. B. B. C.* Emergency Mot. for T.R.O., ECF No. 2. At a June 24, 2020 hearing, Judge Nichols granted the TRO, finding that the *J. B. B. C.* plaintiff was likely to succeed on the merits. *J. B. B. C.* Hr'g Tr., Dkt No. 20-cv-1509, ECF No. 39 at 49-50.

Specifically, Judge Nichols found that: (1) Section 265 does not grant the CDC Director the power to return or remove, in light of the fact that immigration statutes directly "reference the power to return or to remove," *id.* at 50; (2) Section 265 "should be harmonized, to the maximum extent possible, with immigration statutes," *id.*; and (3) the CDC Director is not entitled to deference under *Chevron, USA, Inc. v. Nat. Res. Def. Council, Inc.*, 467 U.S. 837, 842-43 (1984), because Section 265 must be "read in light of statutes that the CDC Director quite plainly has no special expertise regarding and . . . the order does very little by way of an analysis of what exactly the power to prohibit the introduction of persons and property means," *id.* at 51-50. Notably, after Judge Nichols's ruling, the Government transferred the J. B. B. C. plaintiff to ORR, noting that he would "no longer be subject to the challenged CDC Order" and

claimed that the case was moot. *J. B. B. C.* Notice to Ct., Dkt
No. 20-cv-1509, ECF No. 41 at 1. When the *J. B. B. C.* plaintiff
filed an amended complaint, adding another plaintiff, E.Y.E., a
15-year-old boy from Guatemala, who claimed to be escaping an
abusive grandfather and aunt, and who had siblings in the United
States who had been granted asylum the previous year based on
similar claims, the Government excepted him from the CDC Orders
as well. *See J. B. B. C.* Mot. to Dismiss, Dkt No. 20-cv-1509,
ECF No. 47 at 9. The *J. B. B. C.* plaintiffs then voluntarily
dismissed the case. *See J. B. B. C.* Notice of Voluntary
Dismissal, Dkt No. 20-cv-1509, ECF No. 48.

### A. Plaintiff's Motion for Class Certification

Pursuant to Federal Rules of Civil Procedure 23(a) and
23(b)(2), Plaintiff has sought certification of the following
class: All unaccompanied noncitizen children who (1) are or will
be detained in U.S. government custody in the United States, and
(2) are or will be subjected to the Title 42 Process ("Subject
Class"). Pl.'s Cert. Mot., ECF No. 2 at 1.

Magistrate Judge Harvey found that Plaintiff's motion for
class certification should be provisionally granted because
Plaintiff met the: (1) numerosity requirement by providing
evidence that almost 6,000 unaccompanied non-citizen children
were apprehended at the southwest border between April and July
2020, [and] more than 2,000 unaccompanied non-citizen children

had been expelled, R. & R., ECF No. 65 at 17; (2) commonality requirement because the challenged CDC Orders are a "a uniform policy or practice that affects all class members," *id.* at 18; (3) typicality requirement since Plaintiff's claims and the claims of the putative class "stem from a unitary course of conduct—expulsion of unaccompanied non-citizen children" under the CDC Orders and "are based on the same legal theories," *id.* at 19; (4) adequacy requirement because, citing to *JD v. Azar*, 925 F.3d 1291, 1322 (D.C. Cir. 2019) (per curiam), the "Plaintiff is an adequate class representative who, with his counsel, will vigorously pursue the claims of the putative class," *id.* at 21; and the cohesiveness requirement because the Government allegedly applied the same illegal CDC Orders to the Plaintiff and Subject Class, and the Plaintiff and Subject Class seek the same relief, *see id.* at 22.

The Government's only objection to Magistrate Judge Harvey's recommendation is that the case upon which he relied—*J.D. v. Azar*-was wrongly decided because allowing a Plaintiff whose claims are moot to serve as a class representative "is an improper relaxation of Article III's strict requirement of a case or controversy." Gov't's Objs., ECF No. 69 at 38.

However, *J.D. v. Azar* is binding precedent on this Court. *See Hopkins v. Price Waterhouse*, 920 F.2d 967, 975 (D.C. Cir. 1990)("[T]he trial court . . . [is] nonetheless bound by the law

of the circuit."). Furthermore, the actions the Government has taken to avoid judicial scrutiny by mooting the claims of the unaccompanied children, Plaintiff's counsel bring to their attention, arguably reveals an intent to make Plaintiff's claim "so inherently transitory that the [Court] will not have [] enough time to rule on [the] motion for class certification before the proposed representative's individual interest expires." *J.D.*, 925 F.3d at 1309. However, the "relation back" doctrine, which allows a "motion for certification [to] 'relate back' to the filing of the complaint," *id.* at 1308; was created so that a class would not be deprived of its day in court by a defendant simply exempting the class representatives in order to moot the class' claims, *see Cty. of Riverside v. McLaughlin*, 500 U.S. 44, 51 (1991); *see also Swisher v. Brady*, 438 U.S. 204, 213 n.11 (1978) (holding that the State's action of excepting some of the named plaintiffs "did not deprive the District Court of the power to certify the class action"). Having addressed the Government's sole objection to this recommendation, and finding no clear error in this portion of the R. & R., the Court **ADOPTS** Magistrate Judge Harvey's recommendation, and **PROVISIONALLY GRANTS** Plaintiff's motion for class certification. Pl.'s Cert. Mot., ECF No. 2.

**B. Plaintiff's Motion for Preliminary Injunction**

**1. Plaintiff is likely to Succeed on the Merits**

Pursuant to Federal Rule of Civil Procedure 65 and Local Civil Rule 65.1, Plaintiff seeks a "classwide preliminary injunction enjoining the application of the [CDC Orders] to Plaintiff and Class Members." Pl.'s Prelim. Inj. Mot., ECF No. 15 at 1. Specifically, Plaintiff argues that he is likely to succeed on the merits because (1) Section 265 "does not authorize deportation"; (2) "unaccompanied children are entitled to explicit statutory procedures and protections [and those] later-enacted statutes control over whatever [Section] 265 may authorize in general"; and (3) "subjecting Class Members to the CDC Orders is arbitrary and capricious in violation of the" APA. Pl.'s Prelim. Inj. Mem., ECF No. 15-1 at 21.

Magistrate Judge Harvey found "that Plaintiff is likely to prevail in his argument that the CDC Orders instituting the Title 42 Process exceed the authority granted by Congress pursuant to Section 265," R. & R., ECF No. 65 at 24; noting that the Government's "parsing of the plain text of the statute makes an unsupported (and unwarranted) logical leap . . . by asserting that '[t]he statute's reference to prohibiting the introduction 'in whole or in part' supports the interpretation that a person may be intercepted and then quarantined in the United States or intercepted and *then expelled*,'" *id*. at 25 (emphasis in

23

original); *see also* Final Rule at 56425–26. The Government makes a number of objections, which the Court addresses below.

*Chevron* provides the framework for reviewing an agency's interpretation of a statute that the agency is charged with administering. *See* 467 U.S. at 837. The first step in this review process is for the court to determine "whether Congress has directly spoken to the precise question at issue." *Id.* at 842. "If the intent of Congress is clear, that is the end of the matter; for the court, as well as the agency, must give effect to the unambiguously expressed intent of Congress." *Id.* at 842–43. In determining whether the statute unambiguously expresses the intent of Congress, the court should use all the "traditional tools of statutory construction," including looking to the text and structure of the statute, as well as its legislative history, if appropriate. *See id.* at 843 n.9; *see also Bell Atlantic Tel. Co. v. FCC,* 131 F.3d 1044, 1047 (D.C. Cir. 1997). If the court concludes that the statute is either silent or ambiguous with respect to the precise question at issue, the second step of the court's review process is to determine whether the interpretation proffered by the agency is "based on a permissible construction of the statute." *Chevron,* 467 U.S. at 843. The court must defer to agency interpretations that are not "arbitrary, capricious, or manifestly contrary to the statute." *Id.* at 844.

### a. Section 265 Likely Does Not Authorize Expulsions

The Court first reviews "the language of the statute itself." *United States Ass'n of Reptile Keepers, Inc. v. Zinke*, 852 F.3d 1131, 1135 (D.C. Cir. 2017). Both Plaintiff and the Government provide various definitions for the word "introduction" and the phrase "prohibit . . . the introduction of." *See* Pl.'s Prelim. Inj. Mem., ECF No. 15-1 at 25-26 (citing *Introduce*, *Universal English Dictionary 1067* (John Craig ed. 1861) (the "term—'introduction'—meant then, as now, 'the act of bringing into a country.'")); Gov't's Combined Opp'n, ECF No. 42 at 29-30 (citing *Universal English Dictionary* 458 (John Craig ed. 1869) ("to 'prohibit . . . the introduction' naturally means to intercept or prevent such a process.")). The Government further states the meaning of the word "prohibit" is "to forbid; to interdict by authority; to hinder; to debar; to prevent; [or] to preclude." Gov't's Combined Opp'n, ECF No. 42 at 30 (citing Prohibit, *Oxford English Dictionary* 1441 (1933)). Based on these definitions, the Government argues that Section 265 "clearly includes the authority to intercept persons who have already crossed the border and are in the process of being introduced into the United States." Gov't's Objs., ECF No. 69 at 16.

Magistrate Judge Harvey assumed without deciding that the Government's interpretation—intercepting or preventing a process

was legally sound, finding that even if the court "accept[s] that 'to 'prohibit . . . the introduction' means 'to intercept or prevent such a process', [it] does not lead to the conclusion that 'prohibition,' 'interception,' or 'prevention' includes 'expulsion.'" R. & R., ECF No. 65 at 25. Magistrate Judge Harvey reasoned that to "prohibit" "connotes stopping something before it begins, rather than remedying it afterwards." *Id*. at 25-26.

The Government argues that Magistrate Judge Harvey's reasoning—that "the Government's interpretation is wrong because the definition of 'prohibit' connote[s] stopping something before it begins, rather than remedying it afterwards," R. & R., ECF No. 65 at 25-26;—"makes no sense" because he "[a]ssumed without deciding that the government's interpretation of the 'introduction' and the phrase 'prohibit . . . the introduction' of are legally sound," *id*. at 25; and since the CDC Order only applies to persons who are in the process of being introduced rather than already introduced, expelling them does not remedy something afterwards because they have not been introduced, *see* Gov't's Objs., ECF No. 69 at 17. The Court disagrees. Even accepting that the phrase, "prohibit[ing] . . . the introduction of," means "intercepting" or "preventing"; the phrase does not encompass expulsion; but merely means that the process of introduction can be halted. Expelling persons, as a matter of ordinary language, is entirely different from interrupting,

intercepting, or halting the process of introduction.[5] Put another way, interrupting, intercepting, or halting the process of introduction does inexorably lead to expulsion.

Neither Section 265 nor any of the definitions provided by the Government contain the word "expel." They do not even contain synonyms of the word expel, such as "eject" or "evict." *See* Synonyms for Expel, *Merriam-Webster.com Dictionary*, Merriam-Webster, https://www.merriam-webster.com/dictionary/expel (last visited Oct. 27, 2020). The Court finds this to be significant, because even "broad rulemaking power must be exercised within the bounds set by Congress," *Merck & Co. v. United States Dep't of Health & Human Servs.*, 385 F. Supp. 3d 81, 92 (D.D.C. 2019), *aff'd*, 962 F.3d 531 (D.C. Cir. 2020); and the CDC "does not [have the] power to revise clear statutory terms," *Util. Air Reg. Grp.*, 573 U.S. at 327. To be sure, as Plaintiff and Magistrate Judge Harvey point out, "when Congress wants to grant the power to expel individuals out of the United States, it does so plainly." R. & R., ECF No. 65 at 29. For example, in the Chinese Exclusion Act of 1882, enacted only eleven years before the 1893 Act, Congress was very explicit in its deportation

---

[5] With regard to the Government's objection to Magistrate Judge Harvey finding support for this interpretation in the title of Section 265: "Suspension of entries and imports from designated places to prevent spread of communicable diseases," 42 U.S.C. § 265; his point was that Section 265 does not address expulsion, not the meaning of entry as a matter of immigration law.

requirements, declaring "it shall not be lawful for any Chinese laborer to *come*, or, having so come . . . ninety days [after the Act], to *remain* within the United States." Chinese Exclusion Act of May 6, 1882, ch. 126, § 1 (emphasis added).

Finally, the Government objects on the grounds that Magistrate Judge Harvey's interpretation leads to an absurd, unworkable result because it results in Section 265 being without effect at land borders. Gov't's Opp'n, ECF No. 69 at 18-19. However, Magistrate Judge Harvey persuasively explained why his interpretation does not result in Section 265 being without effect at land borders. R. & R., ECF No. 65 at 36-38.

### b. The Statutory Context Provides Support for Interpreting Section 265 to Likely Not Authorize Expulsions

Since "statutory language cannot be construed in a vacuum, . . . [i]t is a fundamental canon of statutory construction that the words of a statute must be read in their context and with a view to their place in the overall statutory scheme." *Davis v. Michigan Dep't of Treasury*, 489 U.S. 803, 809 (1989) (citing *United States v. Morton*, 467 U.S. 822, 828 (1984)); *see also K Mart Corp. v. Cartier, Inc.*, 486 U.S. 281, 291 (1988) ("In ascertaining the plain meaning of the statute, the court must look to the particular statutory language at issue, as well as the language and design of the statute as a whole."). Plaintiff argues that neither Section 265 nor "a neighboring provision

laying out the 'penalties' for violation of 'any regulation prescribed' under § 265 make any mention of such expulsion authority." Pl.'s Prelim. Inj. Mem., ECF No. 15-1 at 22 (citing 42 U.S.C. § 271). The Government contends that "the explicit language in Section 265 authorizing the prohibition of persons (or property) from 'a foreign country' to protect against 'the introduction of such disease into the United States'. . . [in] context . . . clearly includes expulsion." Gov't's Combined Opp'n, ECF No. 42 at 31. Citing the CDC's additional reliance on "42 U.S.C. § 264 ('Section 264'), entitled 'Regulations to control communicable diseases'" which authorizes the CDC "to make and enforce such regulations . . . to prevent the introduction, transmission, or spread of communicable diseases from foreign countries into the States or possessions," Magistrate Judge Harvey looked to that adjacent Section and found that it "does not contemplate regulations that authorize expulsion from the United States. . . . [but] only regulations that 'provide for the apprehension, detention, or conditional release of individuals.'" R. & R., ECF No. 65 at 27. Magistrate Judge Harvey observed that "in a section where one would expect the term to appear—where Congress has delineated the government's power to prevent the spread of contagious disease from individuals coming into the United States from a foreign country—it does not." *Id.* at 27-28.

The Government points to the rule of statutory construction that requires a statute to be construed in a manner such that particular construction does not render another provision superfluous to argue that Magistrate Judge Harvey's reasoning was flawed because if Section 264 authorized expulsion, Section 265 would be superfluous. Gov't's Opp'n, ECF No. 69 at 20. The Court disagrees. That "Section 264 does not contemplate regulations that authorize expulsion from the United States," R. & R., ECF No. 65 at 27; provides contextual support for interpreting Section 265 to not provide authority to expel persons. Plaintiffs have conceded that Section 265 vests the government with significant "authority to bar entry into the country, at least through the regulation of vessels (including airplanes) arriving in the United States." R. & R., ECF No. 65 at 36. Accordingly, interpreting Section 265 to not authorize expulsions does not render the provision superfluous.

In addition, the Government also argues that Magistrate Judge Harvey erred when he concluded that Congress could not have delegated the authority by silence by not expressly providing for expulsion authority in Section 265 because that section expressly delegated the power to issue regulations that accomplish its purpose. Gov't's Obj., ECF No. 69 at 20. The Government's argument is beside the point; if Section 265 does not provide the authority to expel persons; then it does not

delegate the authority to issue regulations to expel persons.

The Government further argues that just because this is the first time it has claimed that Section 265 provides it with the authority to expel persons since the provision was enacted 75 years ago does not mean that it does not have such authority. *Id.* The Government cites the historic and unprecedented nature of the pandemic and the legislative history of the Section 265 to argue that if "Section 265 authority is sparingly used only tracks the extraordinary nature of the authority and the fact that it is very rarely needed." *Id.* at 22. The Court agrees that the undisputed authority granted in Section 265 is extraordinary and that the COVID-19 pandemic is unprecedented. But that is entirely distinguishable from whether or not Section 265 authorizes the Government to expel persons. The Court also notes that the legislative history cited by the Government provides not support for its position that Section 265 authorizes it to expel persons.[6]

Beyond Section 264, Magistrate Judge Harvey noted that the "statute is shot through with references to quarantine . . . but

---

[6] The Government also argues that the situation here is distinguishable from the newly discovered power at issue in *Utility Air Regulatory Group v. EPA*, 573 U.S. 302 (2014). Gov't's Objs., ECF No. 69 at 21-22. Magistrate Judge Harvey's invocation of this authority, however, is only one of the multitude of reasons why plaintiff is likely to succeed on the merits of his claim.

it contains not a word about the power of the [CDC] to expel anyone who has come into the country." R. & R., ECF No. 65 28 (citing 42 U.S.C., Chap. 6A, Subchap. II, Part G (entitled "Quarantine and Inspection."); 42 U.S.C. § 267 (entitled "Quarantine stations, grounds, and anchorages"); 42 U.S.C. § 268 (entitled "Quarantine duties of consular and other officers"); 42 U.S.C. § 270 (entitled "Quarantine regulations governing civil air navigation and civil aircraft"); 42 U.S.C. § 271 (entitled "Penalties for violation of quarantine laws"); 42 U.S.C. § 272 (entitled "Administration of oaths by quarantine officers")). The statutory scheme reflects Congress's focus on the public's health, authorizing the CDC to create regulations that allow for the "apprehension, detention, examination, or conditional release of individuals" entering from foreign countries to stop the spread of communicable diseases from those countries, 42 U.S.C. § 264; and then in times of serious danger, to halt the "introduction of persons" from designated foreign countries. 42 U.S.C. § 265. Notably, Congress established specific penalties for violations of any of the CDC's regulations pursuant to Sections 264, 265, 266 (entitled "Special Quarantine Powers in Time of War"), and 269 (entitled "Bills of health"). 42 U.S.C. § 271. However, not only is expulsion not mentioned in the statute, but all of these sections, including Section 265, are referred to as "quarantine

laws," suggesting that the CDC's powers were limited to quarantine and containment. *Id.*

### c. Harmonizing Section 265 With Relevant Immigration Statutes Provides Support for Interpreting Section 265 to Likely Not Authorize Expulsions

In conducting his contextual analysis and in harmonizing Section 265 with immigration statutes, Magistrate Judge Harvey: (1) notes that several immigration statutes under Title 8 use words such as "remove" or "return," whereas none of these words are found in Section 265, *see* R. & R., ECF No. 65 at 30; and (2) finds the Government's reading of Section 265 to include the power to expel "unaccompanied minors like Plaintiff and the putative class members, . . . conflicts with various rights granted in the TVPRA and the INA," *id.* at 32. Citing to dicta *Russello v. United States*, 464 U.S. 16, 25 (1983), the Government objects to this by arguing that "'language in one statute usually sheds little light upon the meaning of different language in another statute.'" Gov't's Objs., ECF No. 69 at 22 (internal brackets omitted). In that vein, the Government argues that (1) statutes such as Section 265 which is "designed to prohibit the introduction of persons into the United States to avoid the spread of a communicable disease into the country" should not be compared to immigration statutes which are "designed to confer immigration benefits based on an alien's

individual circumstances" because the statutes have different aims, *id.* at 22-23; and (2) "statutes are already in harmony—the immigration provisions are of general applicability, and Section 265 temporarily suspends their effects in limited circumstances" such as a national emergency, *id.* at 24-25. The Government's arguments are unpersuasive.

"It is a fundamental principle of statutory interpretation that absent provision[s] cannot be supplied by the courts." *Rotkiske v. Klemm*, 140 S. Ct. 355, 360-61 (2019) (internal citations and quotation marks omitted). First, as Plaintiff points out and Magistrate Judge Harvey agrees, "the Supreme Court routinely points to other statutes as evidence that Congress knows how to legislate in particular ways." Pl.'s Combined Reply, ECF No. 52 at 15 (collecting cases); *see also* R. & R., ECF No. 65 at 30 n.11. In view of current immigration laws, which speak to deportation by using words such as "remove" and "return," *see* 8 U.S.C. § 1182(d)(3A) ("[t]he Attorney General shall prescribe conditions . . . to . . . *return* . . . inadmissible aliens"); § 1182(h)(2) ("No waiver shall be granted . . . for a period of not less than 7 years immediately preceding the date of initiation of proceedings to *remove* the alien from the United States.") (emphasis added); the Court recognizes, as did Judge Nichols, that "[t]here's a serious question about whether [Section 265's] power includes the power

. . . to remove or exclude persons who are already present in
the United States" and the "fact that Congress did not use
[words such as 'return' or 'remove'] . . . . suggests at a
minimum that the power to remove is not granted by [S]ection
265," *J. B. B. C.* Hr'g Tr., Dkt No. 20-cv-1509, ECF No. 39 at
50.

The Government contends that Section 265 contains a
"clearly expressed congressional intention" to suspend the
effect of Title 8 because Section 265 authorizes the suspension
of other laws that provide for the right to introduce persons
into the country. Gov't's Objs., ECF No. 69 at 25. The
Government argues that Magistrate Judge Harvey was wrong to rely
on the absence of the phrase "[n]otwithstanding any other
provision of law" in Section 265 for the proposition that it was
not meant to suspend the effect of relevant Title 8 provisions
because that phrase would logically appear in a subsequently
enacted statute, but the relevant Title 8 provisions were
enacted subsequent to Section 265. *Id.* However, the phrase
"[n]otwithstanding any other provision of law" is not used to
supersede only earlier-enacted statutes, but is properly read as
"Congress's indication that the statute containing that language
is intended to take precedence over any pre-existing or
subsequently-enacted legislation on the same subject." *U.S. v.
Puentes*, 803 F.3d 597, 606 (11th Cir. 2015)(internal citation

omitted). Further, the Government's contention that Section 265 and the relevant provisions of Title 8 are not on the "same subject" is unavailing since the Government intends to use Section 265 to expel persons from the United States just as Title 8 provides for the removal of persons.

The Government also argues that Magistrate Judge Harvey had no "sound reason" to conclude that the phrase "suspension of the right to introduce" in Section 265 is not a "clearly expressed congressional intention" to suspend the effect of Title 8 provisions. Gov't's Objs., ECF No. 69 at 26. Rather, according to the Government, the legislative history of the predecessor statute shows that Congress intended to authorize the temporary suspension of the immigration laws. *Id.* at 26-27. However, the language of Section 265 contains no "clear intention" to authorize the suspension of the relevant provisions of Title 8. *Epic Systems Corp. v. Lewis*, 138 S. Ct. 1612, 1632 (2018).

The Government further argues that Magistrate Judge Harvey improperly invoked the canon of "the specific governs the general" to find that the relevant provisions of Title 8 take precedence over Section 265 because his reasoning—that "[i]t is not clear how Section 265 . . . could be considered more specifically targeted to matters of immigration or as providing more specific solutions," R. & R., ECF No. 65 at 36;—is flawed because "Section 265 is not designed to target immigration at

all . . . it is a public health provision designed only to address the specific and rare instance of a public health crisis presented by the outbreak of a communicable disease." Gov't's Objs., ECF No. 69 at 28. Since the Government concedes that "Section 265 is not designed to target immigration at all" it clearly cannot be the more specific statute when it is being relied upon to expel unaccompanied children who are entitled to protections under the relevant provisions of Title 8. *Id.*

Finally, the Government argues that Magistrate Judge Harvey erred in dismissing its "argument that Section 265 would be rendered a nullity if it must be applied in conjunction with immigration provisions." Id. at 28-29. However, as explained supra, Magistrate Judge Harvey persuasively explained why his interpretation does not result in Section 265 rendered a nullity. R. & R., ECF No. 65 at 36-38.

### d. The Government's Interpretation of Section 265 is Likely Not Entitled to Chevron Deference

Magistrate Judge Harvey found that because the statute is not ambiguous using traditional tools of statutory interpretation, there was no need to reach step two of the *Chevron* analysis.[7] R. & R., ECF No. 65 at 38 n.15. He stated,

---

[7] Because he found the statute to be unambiguous, Magistrate Judge Harvey improperly invoked the constitutional avoidance doctrine. *See McFadden v. United States*, 576 U.S. 186, 197 (2015) (noting that the "canon of constitutional avoidance . . .

however, that even if there were ambiguity, he would find, as
did Judge Nichols, that deference would not be justified because
the question for the claim is purely legal and does not depend
upon the CDC's scientific and technical expertise. *See id.*

The Government argues that, pursuant to *Chevron*, "simply
because a question is purely legal says nothing about whether
the Court should defer to an agency's reasonable interpretation
of the statute it administers." Gov't's Objs., ECF No. 69 at 30.
The Government contends that it is within CDC's delegated
authority and expertise to interpret the word "introduction"
because in interpreting the word, the CDC "utilized [its]
scientific and technical knowledge and experience regarding
communicable diseases generally and applied it to the specific
public health threat here." *Id.* at 31. Assuming for the purpose
of responding to the Government's objections that the term is
ambiguous, the Court disagrees that the CDC's interpretation
implicates its scientific and technical expertise because the
Government has not explained how that scientific and technical
expertise lead it to interpreting "introduction" to encompass
"expulsion." *Cf. Kisor v. Wilkie*, 139 S. Ct. 2400, 2416 (2019)

---

has no application in the interpretation of an unambiguous
statute . . .") (internal quotation marks omitted). Magistrate
Judge Harvey's invocation of this canon, however, is only one of
the multitude of reasons why plaintiff is likely to succeed on
the merits of his claim.

(noting that "[a] court must make an independent inquiry into whether the character and context of the agency interpretation entitled it to controlling weight"). Accordingly, CDC is not entitled to deference with respect to its interpretation.

For the reasons above, the Court **ADOPTS** Magistrate Judge Harvey's finding that Plaintiff is likely to succeed on the merits of his claim.

### 2. Irreparable Injury

Plaintiff contends that, at the time he filed his complaint, he was likely to suffer an irreparable injury if he was expelled under Section 265 because he would have been "sent summarily back to Guatemala without any meaningful opportunity to assert his claims for relief, and where he would have faced grave harm from those he sought to escape." Pl.'s Prelim. Inj. Mem., ECF No. 15-1 at 39. Further, Plaintiff provided declarations demonstrating that returned children are "frequently trafficked from rural to urban areas and across borders or to border areas, where they are often sexually exploited or subject to exploitative labor." Lisa Frydman Decl., ECF No. 15-12 ¶ 6.

Magistrate Judge Harvey found that Plaintiff "adequately established a likelihood of irreparable injury should a preliminary injunction not issue," R. & R., ECF No. 65 at 41; because "Plaintiff has presented declarations from attorneys

representing numerous unaccompanied children who have crossed the border and have bona fide claims for humanitarian relief, including fear of persecution on the basis of protected characteristics, but have been subjected to the [CDC Orders] and threatened with deportation prior to receiving any of the protections the immigration laws provide," *id.* at 39.

The Government's sole objection is that Magistrate Judge Harvey "improperly collapse[d] independent requirements such that Plaintiff's purported likelihood of success on the merits apparently establishes irreparable harm." Gov't's Objs., ECF No. 69 at 32.

Magistrate Judge Harvey was persuaded that Plaintiff and members of the Provisional Class demonstrated that in the absence of injunctive relief they were likely to suffer irreparable harm because they could be subject to "sexual and other violence and face the possibility of torture and death." R. & R., ECF No. 65 at 39; *see also* Lisa Frydman Decl., ECF No. 15-12 ¶ 6. (averring that returned children are "frequently trafficked from rural to urban areas and across borders or to border areas, where they are often sexually exploited or subject to exploitative labor."). Furthermore, Magistrate Judge Harvey recognized that "the burden of removal alone cannot constitute the requisite irreparable injury." R. & R., ECF No. 65 at 40 (quoting *Nken v. Holder*, 556 U.S. 418, 435 (2009)). Magistrate

Judge Harvey appropriately distinguished the facts upon which that holding rested from this situation because here, "the putative class members are being returned without any opportunity to apply for asylum or withholding of removal. Once expelled from the United States and outside the jurisdiction of the Court, it is not clear that a remedy can be provided." R. & R., ECF No. 65 at 40. The Government's objections do not address Magistrate Judge Harvey's reasoning on this point. *See generally*, Gov't's Objs., ECF No. 69; Reply, ECF No. 75.

For the reasons above, the Court **ADOPTS** Magistrate Judge Harvey's finding that Plaintiff adequately established a likelihood of irreparable injury should a preliminary injunction not issue.

### 3. Balance of the Equities and Public Interest

Plaintiff contends that "[p]reventing [the Government] from removing unaccompanied children until final disposition of this case would not substantially injure the government" because: (1) "unaccompanied children referred to ORR care are typically released to sponsors under the TVPRA, which in most cases will be a parent or close relative who can ensure the child will self-quarantine," Pl.'s Prelim. Inj. Mem., ECF No. 15-1 at 41; (2) the CDC Orders do "not make DHS officers safer, and in fact, likely increases any potential exposure" because expelling unaccompanied children takes longer than transferring them to

the ORR, *id.* at 42; and (3) "public health officials have
overwhelmingly noted there are numerous safety measures that can
be taken to avoid the spread of COVID-19, including
quarantines," *id.*

Magistrate Judge Harvey found that the [p]ublic interest
in enjoining unlawful government action, protecting non-citizen
children from being wrongfully removed, and preventing risks to
"public health caused by the [CDC Orders] weighed in Plaintiff's
favor," R. & R., ECF No. 65 at 41-42; and while "a preliminary
injunction will impose some hardships on [the Government], the
public interest and immitigable hardships to Plaintiff outweigh
the mitigable hardships to [the Government]," *id.* at 42.

The Government objects on two grounds. First, that
Magistrate Judge Harvey erred in his evaluation of the public
interest because the children would be held in "congregate
settings in border settings ill-equipped" to deal with the
public health issues posed by the pandemic, resulting in an
increased risk of COVD-19 transmission and infection among the
children, others being held, DHS personnel, and the United
States population at large.[8] Gov't's Objs., ECF No. 69 at 33.

---

[8] The Government makes similar objections by arguing that
Magistrate Judge Harvey "erred in disregarding the ways in which
the CDC Order and its enforcement" protect persons other than
DHS personnel at the border; specifically "aliens, DHS personnel
and the American public, as well as the vital healthcare
resources of this Nation," Gov't's Objs., ECF No. 69 at 34; and

However, Magistrate Judge Harvey did consider but ultimately rejected the Government's position, noting that the Government's "argument is suspect given that the alternative to quarantine that they propose—expulsion pursuant to the [CDC Order]—results in unaccompanied minors often being detained longer while awaiting expulsion than they would otherwise be, and the concomitant lengthened exposure of class members to other non-citizens, Customs and Border Patrol officers, and local medical personnel." R. & R., ECF No. 65 at 45.

Second, the Government objects on the grounds that Magistrate Judge Harvey failed to consider Deputy Director Jallyn Sualog's declaration as to why the use of hotels are justified—specifically that the children can be placed in individual rooms with doors that close and private facilities for sleeping, eating and bathing. Gov't's Objs., ECF No. 69 at 34. Although Magistrate Judge Harvey did not specifically reference Ms. Sualog's declaration on this specific point, he rejected the justification she provided, relying on persuasive authority for the proposition that the Government "had failed to

––––––––––––––––––––

that he "failed to consider the CDC Director's conclusion that conditional release is not a viable option here due to significant uncertainty that covered aliens could effectively self-quarantine, self-isolate, or otherwise comply with social distancing guidelines, particularly in light of the CDC's inability to effectively monitor such a large number of people so released," *id.* at 34-35.

demonstrate how hotels, which are otherwise open to the public
and have unlicensed staff coming in and out, located in areas
with high incidence of CIVD-19, are any better for protecting
public health than licensed facilities would be" and that
"[e]ven if the infection control protocols at [the Office of
Refugee Resettlement] come under stress, or are forced to make
some adjustments," the program's facilities are likely to
"remain far safer than unregulated hotel stays for both detained
minors and the general public." R. & R., ECF No. 65 at 44
(quoting In Chambers Order at 4, *Flores v. Barr*, CV 85-4544
(DMG) (AGRx) (C.D. Cal. Sept. 21, 2020), ECF No. 990 ("In
Chambers *Flores* Order") (quoting *Flores*, 2020 WL 5491445, at
*6).

       Next, the Government argues that Magistrate Judge Harvey's
"conclusion regarding the public health implications of
transferring putative class members to the [ORR] is . . .
fraught with errors" for three reasons. Gov't's Objs., ECF No.
69 at 35. First, the Government argues that he erred by focusing
on the number of available beds rather than the rationale
articulated by Deputy Director Sualog—specifically that "the
increased rate of referrals to ORR of minors with higher rates
of exposure would create operational difficulties and make it
more difficult to implement sufficient containment protocols."
Gov't's Objs., ECF No 69 at 35. Second, he "failed to take into

account the judgment of Deputy Director Sualog that ORR had already reached the threshold that puts ORR in significant stress." *Id.* Third, he was wrong to give weight to the rationale articulated in *Flores*—specifically that Deputy Director Sualog's declaration lacked support from a "public health official" because she attested that the COVD-19 infection control measures were developed in consultation with the CDC. *Id.* at 36. Along these lines, the Government contends that it was error for Magistrate Judge Harvey to give no weight to Deputy Director Sualog's opinion given that she oversees the operations of the agency. *Id.*

The Court is not persuaded by the Government's objections. Magistrate Judge Harvey directly addressed Deputy Director Sualog's rationale, but rejected it on the same grounds as did the court in *Flores*—specifically noting that "there are sufficient numbers of currently under-utilized [ORR] facilities such that transfers can be allocated among facilities to avoid over-concentration or bottlenecking," R. & R., ECF No. 65 at 46 (citing In Chambers Order at 4, *Flores*, No. CV 85-4544 DMG, ECF No. 990, (AGRx) (C.D. Cal Sept. 21, 2020)). Magistrate Judge Harvey also correctly pointed out that there was good reason to not credit Deputy Director Sualog's assertions because they were "highly speculative" and not supported by "scientific or empirical analysis." R. & R., ECF No. 65at 46 (quoting In

Chambers *Flores* Order at 3). The Court also finds it persuasive that following the issuance of Magistrate Judge Harvey's R. & R., the United States Court of Appeals for the Ninth Circuit agreed with the court's relevant determination in *Flores*:

> [T]he government has not established that the additional referrals would actually overwhelm the ORR system. The same ORR official determined in March 2020, when the system was operating at 30 percent capacity overall, that the population of minors was sufficiently low to allow ORR to implement COVID-19 safety protocols effectively. She now urges us not to rely on that determination and points out that the population was "practically static" at that time, so the system's intake capacity was not burdened. Since March, however, the population of minors in ORR care has dropped tenfold; as of August 24, 2020, the system was operating at 3 percent capacity, with 10,000 vacant beds. *See* Sept. 4 Order, 2020 WL 5491445, at *8. The government has not satisfactorily explained why ORR's largely empty shelters are not capable of absorbing even as many as 140 additional minors a week for short-term stays before those minors are expelled under Title 42. Nor has the government offered testimony from any public health official explaining why holding minors in hotels, which are open to the public, presents less risk of COVID-19 exposure and spread, both to the minors and to the public, than holding them in licensed facilities.

*Flores v. Barr*, No. 20-55951, 2020 WL 5883905, *5-*6 (9th Cir. Oct. 4, 2020).

The Government concludes that Magistrate Judge Harvey "erroneously minimized the public health exigency posed by the pandemic, which requires the Government to utilize its broad

powers under Section 265 to effectively address the public health dangers to aliens, DHS personnel and the American public" noting that the Court should not "substitute its judgment for that of Government officials tasked with ensuring the public health and safety of our Nation." Gov't's Objs., ECF No. 69 at 36-37. Magistrate Judge Harvey recognized that "a preliminary injunction will impose hardships on the government and may force it . . . to make difficult decisions about allocation of resources to mitigate the risks caused by COVID-19." R. & R., ECF No. 65 at 46. Rather than this being a situation where the Court is substituting its judgment for that of government officials; however, here the government officials are not acting within the bounds set by Congress. Accordingly, the Court finds that Magistrate Judge Harvey correctly weighed the public interest in favor of "the general importance of [the CDC and DHS's] faithful adherence to its statutory mandate," which does not permit expulsion. *Jacksonville Port Auth. v. Adams*, 556 F.2d 52, 59 (D.C. Cir. 1977).

For the reasons above, the Court therefore **ADOPTS** Magistrate Judge Harvey's finding that Plaintiff adequately established that the public interest and immitigable hardships to Plaintiff outweigh the mitigable hardships to the Government.

Having found no clear error in this portion of the R. & R., the Court therefore **ADOPTS** Magistrate Judge Harvey's

recommendation, and **GRANTS** Plaintiff's motion for preliminary injunction. Mot., ECF No. 15.

### 4. The Injunction Applies to the Final Rule

Magistrate Judge Harvey recommends that "the preliminary injunction . . . be crafted to . . . prohibit[] expulsion from the United States under the Title 42 process whether that conduct has been permitted in orders issued by the CDC Director pursuant to the authority of the Interim Final Rule or the Final Rule" because "there is no relevant material difference between the CDC Director's authority under the Final Rule and the authority that the government here has argued he enjoys under the Interim Final Rule." R. & R., ECF No. 65 at 47–48. The Government objects to this relief but has not identified any meaningful way in which the Final Rule differs from the Interim Final Rule. *See* Gov't's Objs., ECF No. 69 at 37. Accordingly, the Court will enjoin expulsion from the United States under Title 42 for CDC Orders issued pursuant to the Interim Final Rule or the Final Rule. *See Ne. Fla. Chapter of Associated Gen. Contractors of Am. V. City of Jacksonville*, 508 U.S. 656, 662 (1993).

### 5. The Court Will Not Require Plaintiff to Post a Bond

Federal Rule of Civil Procedure 65(c) provides that "[t]he court may issue a preliminary injunction . . . only if the movant gives security in an amount that the court considers

proper to pay the costs and damages sustained by any party found to have been wrongly enjoined." Fed. R. Civ. P. 65(c). "Courts in this Circuit have found the Rule 'vest[s] broad discretion in the district court to determine the appropriate amount of an injunction bond,' including the discretion to require no bond at all." *Simms v. District of Columbia*, 872 F. Supp. 2d 90, 107 (D.D.C. 2012) (Sullivan, J.) (quoting *DSE, Inc. v. United States*, 169 F.3d 21, 33 (D.C. Cir. 1999) (internal citation omitted). Here, Plaintiff is a child allegedly fleeing prosecution in his home country and does not have the ability to post a bond. Additionally, he is seeking to vindicate important rights under the immigration laws. Accordingly, the Court will waive the requirement for an injunction bond. *See id*.

## IV. Conclusion

For the foregoing reasons the court **ADOPTS** the Report and Recommendation, ECF No. 65 and **PROVISIONALLY GRANTS** Plaintiff's Motion to Certify Class, ECF No. 2, and **GRANTS** Plaintiff's Motion for Preliminary Injunction, ECF No. 15. The Government's request to stay the Court's Order while it decides whether to appeal and/or pending appeal is **DENIED** for substantially the same reasons as those articulated in this Opinion. An appropriate Order accompanies this Memorandum Opinion.

        SO ORDERED.

Signed:     Emmet G. Sullivan
            United States District Judge
            November 18, 2020