IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

P.J.E.S., A MINOR CHILD, by and through his father and NEXT FRIEND, Mario Escobar Francisco, on behalf of himself and others similarly situated,

        Plaintiff,

  v.

CHAD WOLF, Acting Secretary of Homeland Security, et al.,

        Defendants.

Civil Docket No. 1:20-cv-02245-EGS

# EXHIBIT B

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

P.J.E.S. A MINOR CHILD, by and through his father and NEXT FRIEND, Mario Escobar Francisco, on behalf of himself and others similarly situated,

Plaintiff,

v.

CHAD WOLF, Acting Secretary of Department of Homeland Security, et al.,

Defendants.

Civil Docket No. 1:20-cv-02245-EGS

## DECLARATION OF MARK A. MORGAN

I, Mark A. Morgan, pursuant to 28 U.S.C. § 1746, and based upon my personal knowledge, and documents and information made known or available to me from official records and reasonably relied upon in the course of my employment, hereby declare as follows:

*Background*

1. I am the Chief Operating Officer and Senior Official Performing the Duties of the Commissioner of U.S. Customs and Border Protection (CBP), and have been in this role since July 7, 2019. Prior to this role, I served as Acting Director of U.S. Immigration and Customs Enforcement (ICE) from May 28, 2019, to July 5, 2019, and served as Chief of U.S. Border Patrol (USBP) from July 11, 2016, through January 26, 2017, following a 20-year career as a Special Agent in the Federal Bureau of Investigation.

2. The CBP mission is to protect the American people, safeguard our borders, and enhance the Nation's economic prosperity while maintaining the core values of vigilance, service,

and integrity. This includes the enforcement of the customs, immigration, and agriculture laws of the United States, as well as the enforcement of hundreds of other laws at the border on behalf of numerous federal agencies. In my capacity as the Senior Official Performing the Duties of the Commissioner, I oversee and direct five core missions -- counterterrorism, combating transnational crime, securing the border, facilitating lawful trade and protecting revenue, and facilitating lawful travel. I am responsible for overseeing over 63,000 employees, managing an annual budget of over $13 billion, and ensuring the effective operations of CBP's mission to protect national security while promoting economic prosperity. CBP annually facilitates $4 trillion in trade and processes over 410 million travelers through Ports of Entry (POEs). In addition, in FY2019, USBP apprehended 859,501 aliens not lawfully in the U.S.

3. I am familiar with the Centers for Disease Control and Prevention (CDC) *Order Suspending Introduction of Certain Persons from Countries Where a Communicable Disease Exists* (Mar. 20, 2020) (CDC Order) and subsequent extensions and amendments, as well as CBP's role in assisting with implementing this Order. Specifically, I am aware that CDC has determined that transmission of COVID-19 at CBP facilities could lead to the infection of aliens in CBP custody, infection of CBP officers, agents, and others who are exposed to such aliens in custody, as well as increasing exposure risk to already challenged local health systems and local communities. I am also aware that because of the continued prevalence of COVID-19 in both Mexico and Canada, the CDC has determined that the entry of aliens crossing the northern and southern borders into the United States (regardless of their country of

origin) continues to present a serious danger of introducing COVID-19 into POEs and USBP stations at or near the U.S-Mexico and U.S.-Canada borders.

4. I am familiar with the U.S. District Court for the District of Columbia's November 18, 2020 order (District Court Order) in *P.J.E.S. v. Wolf, et al.*, No. 1:20-cv-02245 (D.D.C. August 14, 2020), that, among other things, certified a class of certain noncitizen children who are not accompanied and would be expelled consistent with the CDC Order, generally discussed above. I also understand that the District Court Order enjoined CBP from "expelling the Class Members from the United States under the CDC Order Process, whether pursuant to an Order issued by the Director of the Centers for Disease Control and Prevention under the authority granted by the Interim Final Rule, 85 Fed. Reg. 16559-01, or the Final Rule, 85 Fed. Reg. 56,424-01." I further understand that the Order denied the government's request for a stay pending appeal. I submit this declaration in support of CBP's assertion of the harm that CBP anticipates would occur if the District Court Order is left in place. As set forth further below, it is my judgment that if the District Court Order is left in place, it could be expected to cause significant harm to national security and substantial negative impacts on lawful trade and travel throughout the country.

5. From March 1, 2020 to October 31, 2020, CBP apprehended 20,920 unaccompanied minors along the southwest border (including 137 unaccompanied minors along the northern border). CBP apprehended 741 unaccompanied minors in April 2020; 1,008 in May 2020; 1,691 in June 2020; 2,509 in July 2020; 3,103 in August 2020; 3,883 in September 2020; and 4,764 in October 2020. This represents a 543 percent increase from April to October 2020, levels not seen since the 2019 southwest border humanitarian

3

crisis.[1] During the 72 day period prior to September 8, 2020, CBP apprehended 6,000 unaccompanied minors along the southwest border. In the 72 day period immediately following September 8, 2020, CBP apprehended 9,941 unaccompanied minors along the southwest border. That represents a 66 percent increase in unaccompanied minor apprehensions along the southwest border from the prior 72 day period. During the same time period, Rio Grande Valley Sector experienced a 109 percent increase, apprehending 1,862 unaccompanied minors in the 72 day prior to September 8, 2020, and apprehending 3,894 unaccompanied minors in the 72 day period immediately after September 8, 2020. Tucson Sector experienced a 78 percent increase, apprehending 1,025 unaccompanied minors in the 72 days prior to September 8, 2020, and apprehending 1,824 unaccompanied minors in the 72 day period immediately after September 8, 2020.

6. On November 18, 2020, CBP apprehended 144 UACs, on November 19, 2020, CBP apprehended 175 UACs, on November 20, 2020, CBP apprehended 177 UACs, on November 21, 2020, CBP apprehended 153 UACs, on November 22, 2020, CBP apprehended 166 UACs, and on November 23, 2020, CBP apprehended 182 UACs. Based on CBP trend data and internal projections, CBP anticipates that the number of UACs apprehended by CBP will increase by 50 percent within 120 days of the District Court Order.

7. Based on my experience both as the Chief of the USBP and in my current role, I expect that the District Court Order will serve as a pull factor leading to additional numbers of

---

[1] Between October 2018 and September 2019, CBP law enforcement personnel apprehended or deemed inadmissible nearly a million aliens crossing the southwest border, the most in nearly 15 years. Davis, John *Border Crisis: CBP's Response,* Frontline, https://www.cbp.gov/frontline/border-crisis-cbp-s-response. Further, "[i]n Fiscal Year (FY) 2019, a total of 851,508 individuals were apprehended between ports of entry on our Southwest Border. In FY18, a total of 396,579 individuals were apprehended between ports of entry on our Southwest Border." *Southwest Border Migration FY 2019,* https://www.cbp.gov/newsroom/stats/sw-border-migration/fy-2019.

4

class members apprehended and referred to ORR. Also based on my experience, previous court orders that have similarly had an effect – or perceived effect – on USBP's processing or detention of minors have also served as a pull factor for minors entering the United States. For instance, it has been clearly shown that family units previously placed in the Migrant Protection Protocols (MPP), at times, voluntarily separate and send minors alone across the international boundary in order to avoid MPP. The minors, once encountered, are referred to ORR rather than returned to Mexico. Specifically, since the CDC Order went into effect on March 20, 2020, a total of 151 unaccompanied minors who were previously processed for MPP with their families have been apprehended. Similarly, as more unaccompanied minors are referred to ORR, increased numbers of minors will subsequently enter the United States alone, some of whom were previously expelled as members of family units or family groups. Moreover, where unaccompanied minors are not expeditiously expelled, more will seek to enter the United States.

8. Should the District Court Order stay in place, the time it takes to process class members will be significantly prolonged, increasing the risk of exposure to COVID-19 for CBP personnel and other aliens in CBP custody. Under Title 42, unaccompanied minors who can be expelled directly back to Mexico would generally be processed in the field in approximately two hours without being brought back to a USBP station. Pursuant to the District Court Order, CBP will now have to process class members who would otherwise be subject to the CDC Order under Title 8, which will generally require transporting the minor to a USBP station/processing center, processing the minor for a Title 8 removal pathway, and holding the minor until the appropriate partner agency can take custody (whether it be ICE or ORR). Since the inception of Title 42, approximately 69 percent of

unaccompanied minors expelled under Title 42 have been immediately expelled without entering a USBP facility, meaning only approximately 31 percent of minors expelled under Title 42 ever reach a CBP facility while awaiting a delayed expulsion. Currently, 66 percent of the unaccompanied minors being processed under Title 42 are Mexican. For Mexican unaccompanied minors in particular, under Title 42, CBP may quickly process them in the field and expel them back to Mexico immediately, usually within approximately 2 hours of encounter. Under Title 8, minors are generally taken back to a USBP facility for a more time intensive processing. Once that is complete, the minor may be returned back to Mexico or may be processed under a different Title 8 removal pathway, such as being placed in 8 U.S.C. § 1229a proceedings. Thus, the District Court Order will substantially increase the amount of time it takes to process class members, and the number of class members entering CBP facilities will increase dramatically, likely putting CBP personnel and other aliens in CBP custody at a greater risk of contracting COVID-19.

***Risks in Overflowing Border Facilities***

9. I would emphasize that generally, if a particular USBP station or POE, or even a particular USBP Sector or Office of Field Operations Field Office, is facing a significant influx of individuals apprehended or encountered, agents and officers in those locations must devote a significant portion of their time to processing those individuals, ensuring that those individuals receive appropriate treatment, and transporting those individuals to and out of CBP facilities. CBP has a finite number of employees. Thus, with more agents and officers focused on the individuals already in custody, this leaves fewer agents and officers available to actually patrol and secure the border, particularly in remote areas

of the southwest border. Further, as the number of minors in USBP custody increases, the risk of the spread of COVID-19 in USBP facilities increases. This is because USBP facilities are congregate facilities that are not well equipped for social distancing, isolation, or quarantine. USBP facilities are designed for short-term holding, and have limited capacity. They are not designed to hold individuals for more than a few days, generally for the purpose of transferring custody to another agency such as ICE or ORR. Further, I would emphasize that USBP personnel have experienced difficulties with class members utilizing personal protective equipment, such as masks, and adhering to social distancing guidelines. CBP personnel routinely have to ask minors to wear their masks and wear them properly in order to protect themselves and others from COVID-19. Additionally, CBP personnel have to routinely ask minors to sit apart from one another or keep their distance in order to comply with COVID-19 social distancing guidelines.

10. I am aware that under normal operating conditions, CBP officers and agents come into regular, sustained contact with aliens seeking to enter the United States at POEs, or between POEs. I am also aware that CBP must normally hold aliens longer for immigration processing if they arrive without valid travel documents, and that such aliens may be in CBP custody, near CBP personnel and other travelers for hours or days. In light of the current elevated COVID-19 risk, these circumstances create increased risk for CBP personnel, aliens in CBP custody, local health systems, and local communities.

11. The CDC Order has greatly reduced the number of persons CBP has in its custody. In the 75 day period preceding the March 20, 2020 Order (i.e., January 6, 2020, to March 20, 2020), there was a daily average of 3,292 aliens in CBP custody at POEs and USBP stations. In the time since March 21, 2020, the daily average has declined to 629 aliens in

CBP custody. This represents an 81 percent reduction in daily custody numbers and a 93 percent reduction from the same period in 2019, likely as a result of the enactment of the CDC Order. Despite decreases in daily custody numbers, CBP enforcement encounters continue to increase month over month: CBP encountered 17,106 aliens in April 2020; 22,237 aliens in May 2020; 33,049 aliens in June 2020; 40,929 in July 2020; 50,014 in August 2020; 57,674 in September 2020; and 69,237 in October 2020. This represents an increase of 305 percent from April 2020 to October 2020. In relation to unaccompanied minors specifically, in the 75 day period preceding the March 20, 2020 Order (i.e., January 6, 2020, to March 20, 2020), there was a daily average of 105 unaccompanied minors in CBP custody at POEs and USBP stations. In the time since March 21, 2020, the daily average has declined to 84 unaccompanied minors in CBP custody. This represents a 20 percent reduction in daily custody numbers, likely as a result of the enactment of the CDC Order.

12. CBP estimates that the agency will face significant challenges due to social distancing and space constraints after accounting for COVID-19 protocols. Prior to the COVID-19 pandemic, USBP's holding capacity for aliens apprehended along the southwest border was approximately 11,200. USBP's efforts to further mitigate the spread of COVID-19 necessitated the reduction of our holding capacity to approximately 25 percent to ensure social distancing protocols are maintained, to the extent possible. Despite these internal procedures, CBP continues to be wholly reliant on partner agencies to quickly assume custody of aliens apprehended by agents and officers. Should the number of persons in custody increase or transfer of custody to those agencies be delayed beyond 72 hours, USBP facilities may rapidly become overcrowded and the spread of COVID-19 to the

population in CBP facilities, CBP employees, CBP contractors, and the general public is likely.

13. Based on current unaccompanied minor apprehension trends, if ORR's capacity was completely exhausted, the best case scenario, if nothing else changes, would be that USBP's current holding capacity of approximately 2,800 would be exceeded within 24 days. However, there are numerous ways CBP could exceed its holding capacity at a substantially quicker rate. For example, in my experience and as discussed above, should the District Court Order remain in place, it will likely create a pull factor, leading to an increasing number of unaccompanied minors entering or attempting to enter the U.S. Rising apprehensions along the southwest border would decrease the amount of time it would take to exceed CBP's holding capacity. A significant influx like the 2019 southwest border humanitarian crisis could likewise lead to a substantially shorter timeframe. An influx of aliens apprehended while CBP is operating at a reduced capacity, which could risk infecting numerous agents and/or officers who may become sick and unable to perform their duties, could severely diminish CBP's ability to perform its functions and duties. Further, an outbreak within a CBP facility could quickly handicap CBP's ability to utilize that facility's maximum capacity, lowering the overall detention capacity along the southwest border. The need to quarantine subjects and deep clean/sanitize infected holding cells will also quickly deplete CBP's detention capacity.

14. Separate and apart from CBP's overall detention capacity along the southwest border, a particular location's holding capacity could be overwhelmed almost immediately depending on the specific circumstances. For example, an apprehension of a large number of individuals, a significant number of CBP personnel becoming infected or

9

quarantined, or an outbreak of COVID-19 amongst aliens in custody, etc., might lead to that location being overwhelmed within a number of hours or days. The same would be true if there is a surge in COVID-19 infections or quarantined CBP personnel. Of course, CBP will always transfer unaccompanied alien children to ORR as quickly as possible. But, this data shows the constraints in the overall system, including that the system is made up of multiple interdependent agency partners.

15. Reducing the number of and time spent by persons in CBP custody lowers the risk that officers and agents will contract COVID-19 in carrying out their official responsibilities and fulfilling the CBP mission to protect the American people, safeguard our borders, and enhance the Nation's economic prosperity. It also reduces the risk that persons in CBP custody will contract COVID-19. I believe the CDC Order has greatly reduced the risk of CBP employees becoming infected with, or needing to self-quarantine because of their exposure to, COVID-19 in the course of carrying out their official duties.

16. CBP examined a hypothetical case study of what would happen if a COVID-19 positive subject had been apprehended during the 2019 southwest border humanitarian crisis; the peak of which saw around 20,000 aliens in custody throughout USBP's facilities. The case examined the typical processing lifecycle of an actual subject apprehended last year in a group of 53 people who were brought into custody in El Paso, Texas's Centralized Processing Center. A subject positive with COVID-19 would have come into contact with, and potentially infected, anywhere from nearly 400 to over 1,800 other subjects, both aliens in CBP custody and CBP personnel. At most CBP facilities, without the CDC Order in place for all covered aliens, maintaining adequate social distancing may not be possible. As of November 19, 2020, USBP has encountered 274 aliens who tested

positive for COVID-19 while in USBP custody. The first known encounter occurred in April 2020 and encounters increased rapidly through the summer of 2020 and have remained steady since then. On average, USBP encounters at least one verified COVID-19 positive alien per day; to date, each of those individuals have been encountered at the U.S.-Mexico border.

17. I am also aware of strained resource capacities at CBP's facilities caused by the effects of COVID-19. As of November 22, 2020, 3,504 CBP employees have tested positive for COVID-19, including 1,001 actively positive cases. There was more than a 200 percent increase from September 2020 (235) to October 2020 (522) in positive cases; November 2020 positive cases (712) have already surpassed October 2020 positive cases. As of November 12, 2020, of the 307 CBP employees actively positive with COVID-19 in the State of Texas, 145 work in El Paso or Laredo along the southwest border. As of November 22, 2020, CBP had a total of 3,504 COVID-19 cumulative positive employee cases, out of approximately 63,911 employees (reflecting employee data current as of November 7, 2020). Therefore, I estimate that CBP's COVID-19 infection rate is approximately 5.48 percent. As of November 23, 2020, the U.S. had a total of 12,175,921[2] positive COVID-19 cases, and a population of 331,783,275[3]. Therefore, I estimate that the U.S.'s COVID-19 infection rate is approximately 3.67 percent. As such, CBP's infection rate already exceeds the national rate, indicating that CBP employees are disproportionately affected by COVID-19, and it is likely that CBP's workforce overall infection rate will grow even faster if the District Court Order remains in place. Unfortunately, there have been fourteen line of duty deaths of CBP employees, and one

---

[2] https://covid.cdc.gov/covid-data-tracker/#cases_casesper100klast7days. (last viewed November 23, 2020)..
[3] https://www.worldometers.info/world-population/us-population/. (last viewed November 23, 2020).

11

contractor has also died, as a result of COVID-19, the last 10 of whom were stationed along the southwest border. USBP Agent Enrique Rositas, Jr. died in the line of duty after serving over 23 years with USBP. Agent Rositas was a line officer in the McAllen Station part of the Rio Grande Valley Sector, which is consistently the busiest in the nation in terms of the apprehension of illegal immigrants crossing the border. By comparison, from FY 15 through FY 19 there were seven total line of duty deaths of CBP employees with no more than two line of duty deaths in a given year.

18. An outbreak of COVID-19 in a CBP facility could lead to further significant reductions in available personnel, which could lead to severe vulnerabilities and gaps in securing the border. CBP officers and agents are not readily replaceable, in part because their missions include complex immigration, customs, and national security functions that require specialized training. For example, gaps in the USBP's ability to patrol the border caused by personnel shortages and facility closures would create severe safety and national security risks for the United States, particularly in fulfillment of the core mission priorities involving counter terrorism, combatting transnational crime, securing the border, and impeding the further introduction of COVID-19 into the United States.

19. CBP also sees an increase in strained resources when more aliens need to be transported to hospitals for diagnosis, treatment, or care. In the 50 day period before implementation of the CDC Order, over 1,600 trips were made by USBP to community hospitals to provide aliens advanced medical care. In the last 60 days, as of November 2, 2020, a significantly lower 985 trips have been made for aliens in CBP custody to receive medical care from community hospitals. Moreover, many CBP facilities, particularly along the southern land border, are located in remote locations distant from hospitals and

other medical care and supplies. Also, I am aware that the closest hospitals are often overwhelmed, and I have heard directly from local elected officials that hospitals along the border in California are even airlifting patients hundreds of miles away to handle the influx.[4]

20. I am also aware of the increase of COVID-19 cases in Texas counties along the U.S.-Mexico border. Texas is experiencing a second surge of COVID-19 hospitalizations, up more than 75 percent since the beginning of October 2020.[5] On October 28, 2020, there were more than 5,600 people with COVID-19 in Texas hospitals, a patient volume not seen since August 2020.[6] The latest surge has significantly impacted cities along the U.S.-Mexico border such as El Paso, where a convention center was converted into an emergency medical site to provide additional hospital beds, which are so overrun that some patients are being airlifted out of the city.[7]

21. CBP has policies and procedures in place to mitigate the threats posed by communicable diseases, but the unprecedented challenges posed by the COVID-19 pandemic cannot reliably be addressed by those policies and procedures. CBP is a law enforcement agency, versus a medical/public health agency, and although CBP has basic contract medical support on location at certain CBP facilities to provide limited, focused medical support, even this contracted medical support is not sufficient to address a widespread COVID-19 outbreak or provide COVID-19 testing, diagnosis, and treatment, which requires local health resources.

---

[4] *See also* Miriam Jordan, *Coronavirus Jumps the Border, Overwhelming Hospitals in California*, N.Y. TIMES, June 7, 2020, https://www.nytimes.com/2020/06/07/us/coronavirus-border-mexico-california-el-centro.html.
[5] Edgar Walters, *Texas' new coronavirus surge is leaving critically sick patients stranded in rural areas, hospitals say*, THE TEXAS TRIBUNE, October 29, 2020, https://www.texastribune.org/2020/10/29/texas-coronavirus-rural-hospitals/.
[6] *Id.*
[7] *Id.*

13

22. An outbreak of COVID-19 at a CBP facility could cause significant harm to individuals beyond just those in the facility. CBP is generally just the first entity to encounter a migrant in the United States. In general, CBP would otherwise rapidly process and transfer persons in custody to U.S. Immigration and Customs Enforcement or the Department of Health and Human Services. If aliens in CBP custody or CBP personnel are exposed to COVID-19, this could lead to the further spread of COVID-19, with spillover effects on local communities and throughout the nation. The CDC Order protects CBP personnel and persons in CBP custody first, but it also protects against additional exposure throughout local communities and the nation.

23. An outbreak of COVID-19 in a CBP facility may force CBP to temporarily close that facility, which would limit where CBP can hold aliens whom it apprehends. Aliens would need to be transferred to another facility, which could result in additional agent/officer and migrant exposure over longer transportation times and could further harm capacity issues at that facility. In an incident over the summer, after an alien tested positive while in a USBP facility in California in May 2020, the potentially contaminated areas where the alien had been were closed for three days to allow for proper cleaning, reducing facility detention capacity during that time. On the day of exposure, 56 aliens were in the facility awaiting expulsion to Mexico.

24. Closing a facility would also limit how CBP conducts operations even beyond the scope of enforcing immigration law. For example, if the World Trade Bridge in Laredo, Texas were to close due to limited staffing from COVID-19 positive exposures, approximately $514,478,446 (upwards of 7,000 trucks) of daily commercial goods that cross would be impacted, causing disruptions to the auto industry and other essential operations. Along

14

the entire southwest border with Mexico, the daily average of cross border trade (imports and exports) includes over 18,000 commercial trucks carrying $1.6 billion in goods essential to the economies of both countries. Further, CBP processes all persons and cargo entering and departing the United States, and any substantial reduction in CBP staffing capacity at ports of entry, or need to divert resources to impacted areas, could have enormous consequences on facilitating lawful trade, protecting revenue, and the economy.

25. The effectiveness of CBP's mission to protect the American people, safeguard our borders, and enhance the Nation's economic prosperity is dependent on the ability of our officers and agents to effectively perform their duties at the POEs and between the POEs. It would seriously compromise CBP's ability to perform its counter terrorism, law enforcement, and lawful trade and travel facilitation mission priorities if the number of officers and agents were diminished due to infections with COVID-19.

26. I have determined that should the District Court Order remain in place, its restrictions on the use of the CDC Order as a tool available to CBP to manage the influx of class members would have grave consequences to public safety and national security by diminishing the ability of CBP to effectively and efficiently perform its mission and fulfill the agency's enduring mission priorities.

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge, information, and belief.

Executed this 25th day of November, 2020.

_____ 11/25/2020
Mark A. Morgan
Senior Official Performing the
Duties of Commissioner
U.S. Customs and Border Protection