**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| P.J.E.S., A MINOR CHILD, by and through his father and NEXT FRIEND, Mario Escobar Francisco, on behalf of himself and others similarly situated,<br><br>    Plaintiff,<br><br>  v.<br><br>CHAD WOLF, Acting Secretary of Homeland Security, et al.,<br><br>    Defendants. | Civil Docket No. 1:20-cv-02245-EGS |

# EXHIBIT C

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

P.J.E.S., A MINOR CHILD, by and through
his father and NEXT FRIEND, Mario Escobar
Francisco, on behalf of himself and others
similarly situated,

      Plaintiff,

   v.

CHAD WOLF, Acting Secretary of Homeland
Security, et al.,

      Defendants.

Civil Docket No. 1:20-cv-02245-EGS

### DECLARATION OF RUSSELL HOTT

I, Russell Hott, declare the following under 28 U.S.C. § 1746, and state that under

penalty of perjury the following is true and correct to the best of my knowledge and belief:

### I.  Personal Background

1.  I am currently employed by the U.S. Department of Homeland Security (DHS),

U.S. Immigration and Customs Enforcement (ICE), Enforcement and Removal Operations

(ERO) as the Acting Assistant Director for the Custody Management Division (CMD).  I have

held this position since February 2020.  CMD provides policy direction and oversight for the

administrative custody of ICE's highly transient and diverse population of immigration

detainees.  CMD is composed of three divisions led by three Deputy Assistant Directors under

my direct supervision:  (1) the Alternatives to Detention Division; (2) the Detention

Management Division; and (3) the Custody Programs Division.

2.  As the Acting Assistant Director, I am responsible for the effective and proficient

performance of these three divisions and their various units, including the oversight of

compliance with ICE's detention standards and conditions of confinement at ICE detention

1

facilities generally.  I am further responsible for managing ICE detention operations efficiently

and effectively to provide for the safety, security, and care of an average of about 40,000

detainees daily and roughly 500,000 detainees annually, at approximately 250 facilities

nationwide, including three family residential centers located in Texas and Pennsylvania.

3.      From May 2017 to February 2020, I served as the Field Office Director for the

Washington, DC ERO Field Office, responsible for the District of Columbia and Virginia.  In my

role as Field Office Director, I provided operational and policy oversight for ERO's interior

enforcement efforts within the local area of responsibility, spanning 43,000 square miles, three

district court jurisdictions, and with an operating budget of $53 million dollars, a cadre of nearly

200 employees, and 1,400 detention beds.

4.      I began my career with the U.S. Government as a detention enforcement officer

with the former Immigration and Naturalization Service in New York, NY.  I advanced through a

variety of positions including Immigration Enforcement Agent, Deportation Officer, Instructor at

the Federal Law Enforcement Training Center, Supervisory Detention and Deportation Officer,

Acting Assistant Field Office Director, National Program Manager, Unit Chief, Acting Deputy

Chief of Staff for ERO, Chief of Staff for the ICE Deputy Director, Deputy Field Office Director

for both the Boston and Washington Field Offices, Field Office Director, and Acting Deputy

Assistant Director.

5.      ICE is charged with enforcement of more than 400 federal statutes, and its

mission is to protect the United States from the cross-border crime and illegal immigration that

threaten national security and public safety through enforcement of the federal laws governing

border control, customs, trade, and immigration.  To carry out this mission, ICE focuses on

enforcing federal immigration laws, preventing terrorism, and combating transnational criminal

threats.  As an operational program of ICE, ERO is responsible for the planning, management, and direction of broad programs relating to the supervision, detention, and removal of aliens who are removable from the United States under the U.S. immigration laws.

6.      ERO's mission is to identify, arrest, and remove aliens who present a danger to national security or are a risk to public safety, as well as those who enter the United States illegally or otherwise undermine the integrity of our immigration laws and our border control efforts.  CMD is one of six ERO headquarters divisions.  The other five are:  Enforcement, Removal, Field Operations, the ICE Health Service Corps (IHSC), and Operations Support.

7.      CMD provides policy and oversight for the administrative custody of one of the most highly transient and diverse populations of any correctional or detention system in the world.  CMD manages ICE detention operations efficiently and effectively to provide for the safety, security, and care of aliens detained in ICE custody.

8.      As a part of my official duties, I am familiar with the Memorandum Opinion and Order in *P.J.E.S. v. Wolf,* No. 20-2245 (D.D.C. Nov. 18, 2020), ECF Nos. 79, 80.  I submit this declaration to explain the extensive and continuing impact ICE will experience in response to this order and unprecedented pandemic.  The information in this declaration is based upon my personal knowledge and experience as a law enforcement officer and on information provided to me in my official capacity.  Due to the constantly evolving nature of this crisis, operational realities are fluid with new decisions being required on a regular basis.  The information in this declaration is current and accurate as of the time I signed below.

II.      **Impacts of the District Court's Order on ICE Operations**

9.      The health, welfare and safety of ICE detainees is one of the agency's highest priorities. Since the initial reports of COVID-19, ICE epidemiologists have been tracking the

outbreak, regularly updating infection prevention and control protocols, and issuing guidance to

staff for the screening and management of potential exposure among detainees.

10.     ICE continues to adapt and, through daily monitoring of the Centers for Disease

Control and Prevention (CDC) website,[1] incorporates in its procedures any updates to the CDC's

COVID-19 guidance, which is built upon well-established infectious disease monitoring and

management protocols already in use by the agency.

11.     On July 23, 2020, ICE directed contractor DLH Holding Corp. to perform an

independent inspection of its hotel operations.  The review confirmed that the operation was

working very well, that staff were performing effectively, that staff were committed to the

mission, and that the focus of the operation was on the best interest of the children and families.

The standard operating procedures were found to be up to date and detailed.  All staff and Title

42 aliens were observed wearing PPE, including goggles, face shields, and gloves.  Minors and

family members have their temperatures taken and logged hourly.  Minors and family members

were provided with onsite daily medical screenings from IHSC.  Minors and family members

were provided three hot meals each day, and special dietary needs were accommodated.

Unlimited snacks, games, toys, puzzles, and television were available for passive recreation, and

an ample supply of clothes, personal hygiene items, cribs, blankets, and towels were also

available.

12.     As a result of the district court's preliminary injunction, ERO anticipates that U.S.

Customs and Border Protection (CBP) will resume processing unaccompanied alien children

(UAC) pursuant to Title 8 authorities and procedures in compliance with the Trafficking Victims

---

[1] Specifically, ICE closely follows the CDC's *Interim Guidance on Management of Coronavirus 2019 (COVID-19) in Correctional and Detention Facilities* at https://www.cdc.gov/coronavirus/2019-ncov/community/correction-detention/guidance-correctional-detention.html, and its general public guidance at https://www.cdc.gov/coronavirus/2019-ncov/index.html.

Protection Reauthorization Act and the *Flores* Settlement Agreement.  Pursuant to these

procedures, ERO's role with UAC encountered at the border is, upon notification of placement

by U.S. Health and Human Services, Office of Refugee Resettlement (ORR), to assume custody

of the UAC and escort them to facilities operated by ORR.  In the midst of a surging pandemic,

ERO will be obligated to increase transportation operations, conducting the escorts of UAC

using commercial airlines and ground transportation, as appropriate.  This poses an increased

risk to the general public aboard commercial airlines as the Title 42 order was enacted to

mitigate the public health risks of aliens attempting to unlawfully enter the United States in the

midst of the pandemic.  It also poses an increased risk to ERO employees.

      13.      Due to laboratory certification requirements and limited availability of testing

equipment, DHS is unable to conduct COVID-19 testing in advance of transfers.  Furthermore,

tests can take up to 10 days to produce results, far in excess of the 72 hours Congress afforded

DHS to effectuate transfers to ORR.

      14.      Upon information and belief, ORR has been reserving space in its facilities

located along the southwest border specifically for border apprehensions.  However, ERO does

not determine ORR capabilities, nor can it dictate where any particular juvenile is placed.

Although this generally enables ERO to utilize ground transportation for transfers to ORR, the

large number of cases is likely to quickly result in those facilities reaching and exceeding

capacity.  As a result, ERO will need to increasingly resort to commercial air travel for

placement at ORR facilities not located near the border.  In fiscal year 2019, DHS referred

69,488 juveniles to ORR for placement.  Of those, approximately 93% (64,718) were transported

by ERO.  In fiscal year 2020, ERO provided transportation and/or temporary housing for 15,289

juveniles.  Given the anticipated need for additional commercial transportation movement in the

interior of the United States, there is an increased likelihood of unnecessary exposure to the

public, ICE employees, and contractors.  Furthermore, given the seriousness of the virus, many

commercial airline carriers have canceled flights and/or terminated routes altogether.  If airlines

decline to permit ERO transportation contractors to board aircraft, it would further exacerbate the

situation.

15.     The risk of COVID-19 transmission in these circumstances is substantial.  For

example, on November 18, 2020, a flight departed the United States for Guatemala at 10:12am

EST, shortly before ICE was informed of the Court's injunction in this case, carrying 35 juvenile

aliens who had been processed pursuant to Title 42.  Upon landing in Guatemala, it was

determined based upon testing by the Guatemalan government that four of the individuals –

nearly 12% of those onboard – were positive for COVID-19.  As a result, ERO needed to

sanitize the aircraft and notify employees and flight crew of the potential contagion.

16.     ERO and its contractors have a robust sanitation system and process in place to

safeguard UAC, employees, and contractors.  The current processes in place include disinfecting

offices, vehicles, and equipment.  The use of personal protective equipment (PPE) (i.e. masks,

shields, gloves, gowns, etc.) is in compliance with CDC age specific guidelines.  Prior to

accepting a UAC from CBP, ERO reviews the CBP medical clearance is reviewed.  UAC who

have a fever, are experiencing any medical problems, or appear to have COVID-19 symptoms

are quickly identified for additional measures while in transport.  ERO and its contractors will

continue to take the temperature of all UAC prior to accepting custody from CBP and will retake

their temperature every four hours until the UAC is transferred to ORR custody.  During

transport, if a UAC develops a fever or begins to display any signs of illness, ERO and its

contractors divert to the nearest urgent care center or emergency room as outlined in the contract

and operating procedures.  Mitigation measures for ground and air transportation are limited,

however.  Due to the confined space in a vehicle or aircraft, many of which have HVAC systems

that merely recirculate air within an enclosed space, PPE alone may not satisfactorily protect

occupants from the virus.

17.     In order to comply with CDC recommended mitigation strategies, ERO

employees and contractors are increasingly likely to be subject to 14-day quarantine

requirements upon either exposure to COVID-19 positive aliens or through contact tracing.  With

increased personnel unavailable due to quarantine requirements, further delays and bottlenecks

are likely to occur.

18.     COVID-19 has significantly strained ERO resources.  ERO has realized

workforce reductions among its contractors as a result of sickness, quarantine, and other leave.

Through November 19, 2020, 153 ICE employees have tested positive for COVID-19 as a result

of potential exposure on the job.  This has a real impact on operations, limiting the number of

ICE personnel available to execute the ICE mission, including the identification, apprehension,

and removal of criminal aliens from the United States, and the investigation and apprehension of

national security threats.  In many locations, due to state or local mandates, ERO staffing levels

are at 25% or less of full capacity.  In fact, should the district court's order remain in effect, the

necessary diversion of resources could impact capacity to address other ICE mission areas such

as national security investigations, human trafficking investigations, and gang enforcement.  The

pandemic has significantly reduced ERO's operating posture from the detention of 41,670 aliens

on January 2, 2020, to 16,614 on November 20, 2020.  Regrettably, six ERO employees have

died after contracting COVID-19 since the onset of the pandemic in February 2020.

19.     ERO leverages a multitude of transportation assets, including 50-passenger busses, 135-passenger airframes, 15-passenger vans, and 4/5-passenger sedans, as necessary. ERO employees and contractors often transport groups of 10 or more aliens, and groups as large as 135 occur regularly.  In light of the 12% positivity rate on the flight noted above, which we have concluded is representative, there is significant likelihood of spreading the virus to other minors, employees, contractors, and the general public.

20.     Upon issuance of the district court's order, ERO instructed its transportation contractor to enhance its fleet to account for the anticipated impacts.  However, capacity development and acquisition will take substantial time to occur.  As a result, unaccompanied juveniles are likely to remain at CBP processing stations for longer periods of time while awaiting transportation to ORR.

21.     For these and other reasons, ICE requires an emergency stay in order to mitigate the impact of the district court's November 18, 2020 order.

This declaration is based upon my personal and professional knowledge, information obtained from other individuals employed by ICE, and information obtained from various records and systems maintained by DHS.  I provide this declaration based on the best of my knowledge, information, belief, and reasonable inquiry for the above captioned case.

Signed on this 25th day of November, 2020.

_____
Russell Hott
Acting Assistant Director

Custody Management Division
ICE Enforcement and Removal Operations

8