**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| P.J.E.S., A MINOR CHILD, by and through his father and Next Friend, Mario Escobar Francisco, on behalf of himself and others similarly situated,<br><br>*Plaintiff*,<br><br>v.<br><br>CHAD F. WOLF, ACTING SECRETARY OF HOMELAND SECURITY, in his official capacity, et al.,<br><br>*Defendants*. | No. 20-cv-02245-EGS-GMH |

**PLAINTIFF'S OPPOSITION TO DEFENDANTS' MOTION FOR RECONSIDERATION OF DENIAL OF STAY PENDING APPEAL**

**INTRODUCTION**

Defendants' motion does not contest that the Class is likely to succeed on the merits of its claim that the government lacks statutory authority for the Title 42 Process. *See* Defs.' Mot. for Recons. ("Defs. Mot."), ECF No. 82, 6-13; Mem. Op., ECF No. 80, at 18-30. Nor do Defendants dispute that the Class Members are likely to suffer grievous harm absent a preliminary injunction—including exploitation, physical harm and abuse, and the deprivation of their opportunity to seek humanitarian relief in this country. *See* Defs.' Mot. at 6-13; Mem. Op. at 39-41.

Instead, Defendants argue that even if it is illegal to summarily expel unaccompanied children under the statutes Congress has enacted, and even if expulsions would cause grievous and possibly fatal harm to young children, the Court should nonetheless allow it to continue unlawfully expelling children for months while the appeal goes forward. But the Court properly rejected the stay request the first time and should do likewise here.

*First*, Defendants' contentions that Class Member children will burden local health care resources in the Southwest border states are undermined by the fact that, by Defendants' own admission, no child in ORR custody has yet required hospitalization due to COVID-19, and that studies show that children generally require comparatively little hospitalization and are less likely to transmit the disease. *Second*, although Defendants present grim predictions about the increased numbers of unaccompanied children who they believe will come to the United States in the near future, those predictions are based on false assumptions as well as misleading and exaggerated statistics. *Third*, and relatedly, Defendants' claim that the increasing flow of children will soon overwhelm the system, particularly along the southwest border, is not supported by the evidence. Even if Defendants' prediction about the increase in unaccompanied children proves correct, Defendants have various measures at their disposal to increase capacity, which they have not yet undertaken, and which Defendants would take if they genuinely sought to reconcile the statutory rights of the children with measures to protect public health.

Plaintiff does not minimize the effect that the COVID-19 pandemic has had on life in the United States, or the dangers it poses. However, this country's struggles with COVID-19 have

2

everything to do with domestic handling of the crisis, not with unaccompanied children coming to the United States to seek humanitarian protection. As Plaintiff's declarants make clear, the child Class Members present no more risk of spreading COVID-19 in the United States than the tens of thousands of truck and transport drivers that Defendants admittedly let into the country every day.

Indeed, recent news articles report that the program was in reality forced upon the CDC by White House officials. Those reports note that multiple CDC officers, including the Director of Global Migration and Quarantine, objected to the Title 42 Process as a politically motivated program unjustified by public health concerns. *See* James Bandler, et al., *Inside the Fall of the CDC*, ProPublica (Oct. 15, 2020), https://www.propublica.org/article/inside-the-fall-of-the-cdc; *see also* Lena H. Sun & Nick Miroff, *Trump administration pressures CDC to back detention of migrant children in border hotels amid coronavirus*, Wash. Post (Oct. 23, 2020), https://www.washingtonpost.com/health/2020/10/23/immigrant-minors-hotels-trump/ ("Career CDC officials have declined to sign off on a declaration requested by [HHS] affirming that the use of hotels to detain migrant children is the best way to protect them from the spread of the novel coronavirus."); Jason Dearen & Garance Burke, *Pence Ordered Borders Closed After CDC Experts Refused*, AP News (Oct. 3, 2020), https://apnews.com/article/virus-outbreak-pandemics-public-health-new-york-health-4ef0c6c5263815a26f8aa17f6ea490ae; Michelle Hackman, et al., *CDC Officials Objected to Order Turning Away Migrants at Border*, The Wall Street Journal (Oct. 3, 2020), https://www.wsj.com/articles/cdc-officials-objected-to-order-turning-away-migrants-at-border-11601733601.

Defendants' attempt to keep this illegal program in place by wrapping themselves in supposed public health expertise thus falls flat. Moreover, should Defendants' dire predictions someday come to pass, and all reasonable available options have actually been tried, Defendants of course can return to this Court for additional flexibility in implementing the preliminary injunction. But Defendants have not carried their burden to show that reconsideration of the Court's denial of a stay pending appeal is warranted at this time.

**LEGAL STANDARD**

Under Rule 54(b), the district court may reconsider an interlocutory order "as justice requires." Fed. R. Civ. P. 54(b). "Courts in this district interpret that abstract phrase narrowly and will grant a motion to reconsider 'only when the movant demonstrates: (1) an intervening change in the law; (2) the discovery of new evidence not previously available; or (3) a clear error in the first order.'" *Ferrer v. CareFirst, Inc.*, 278 F. Supp. 3d 330, 332 (D.D.C. 2017) (quoting *Zeigler v. Potter*, 555 F. Supp. 2d 126, 129 (D.D.C. 2008)). "[W]here litigants have once battled for the court's decision, they should neither be required, nor without good reason permitted, to battle for it again.'" *Lewis v. District of Columbia*, 736 F. Supp. 2d 98, 102 (D.D.C. 2010) (quoting *Singh v. George Washington Univ.*, 383 F. Supp. 2d 99, 101-02 (D.D.C. 2005)); *see also Capitol Sprinkler Inspection, Inc. v. Guest Servs., Inc.*, 630 F.3d 217, 227 (D.C. Cir. 2011) (affirming denial of reconsideration because movant raised "no arguments for reconsideration the court had not already rejected on the merits").

A stay pending appeal is "always an extraordinary remedy." *United States v. Philip Morris USA, Inc.*, 449 F. Supp. 2d 988, 990 (D.D.C. 2006) (quoting *Brotherhood of Ry. & S.S. Clerks, Freight Handlers, Express and Station Emps. v. Nat'l Mediation Bd.*, 374 F.2d 269, 275 (D.C. Cir. 1966)). When considering whether to grant a stay, courts apply a four-factor test substantially similar to the preliminary injunction standard: "(1) whether the stay applicant has made a strong showing that he is likely to succeed on the merits; (2) whether the applicant will be irreparably injured absent a stay; (3) whether issuance of the stay will substantially injure the other parties interested in the proceeding; and (4) where the public interest lies." *Nken v. Holder*, 556 U.S. 418, 426, 434 (2009); *Cuomo v. U.S. Nuclear Regulatory Comm'n*, 772 F.2d 972, 974 (D.C. Cir. 1985).

**ARGUMENT**

**I.    DEFENDANTS DO NOT DISPUTE THAT PLAINTIFF IS LIKELY TO SUCCEED ON THE MERITS.**

For the reasons explained in the Court's opinion, the Magistrate Judge's report and recommendation, and the record in this case, the Title 42 Policy is unlawful. *See* Mem. Op. at

23-39; Report & Recommendation ("R&R"), ECF No. 65, 23-38; Pl.'s Mot. for Prelim. Inj., ECF No. 15-1, 12-29; Pl.'s Opp. to Defs.' Objs., ECF No. 72, 4-18.  Defendants' failure to contest the Court's merits ruling is "an arguably fatal flaw for a stay application" and should be determinative here, *Citizens for Responsibility & Ethics in Washington v. FEC* ("*CREW*"), 904 F.3d 1014, 1019 (D.C. Cir. 2018), particularly given Defendants' additional failure to contest the irreparable harm to the children, *see* Defs. Mot. at 6-13.  *Nken*, 556 U.S. at 434 (noting that likelihood of success on the merits and irreparable harm are "the most critical" stay factors).

II. **DEFENDANTS NEWLY-SUBMITTED EVIDENCE SUPPLIES NO BASIS TO RECONSIDER THE COURT'S DECISION ON THE STAY REQUEST.**

   **A. Defendants' Own Evidence Belies the Notion that Unaccompanied Children Will Strain Health Care Resources in Border States.**

Defendants devote considerable space in their brief and declarations describing the strain COVID-19 has put on local health care resources along the southwest border, and speculate that because "ORR facilities must rely on local hospitals and medical systems," minors in ORR custody "who need treatment in a hospital in a severely impacted area . . . would [] further strain the local healthcare systems already struggling to meet the needs of the local population."  Defs.' Mot. at 11; *see also* Kadlec Decl., ECF No. 82-1, ¶ 58.  Like Defendants' other claimed harms, Dr. Kadlec's predictions are based on the flawed notion that migration of unaccompanied children will increase dramatically in the coming months.  As explained below, *infra* Section II.B, that assumption amounts to unfounded speculation.

But even if such an increase occurs, Defendants' own evidence undermines the assertion that children in ORR custody will overwhelm local health care resources in southern border states.  As Nicole Cubbage, ORR's Acting Director, candidly acknowledges, "*no* UAC in ORR custody has yet to require hospitalization for a COVID-19 infection," Cubbage Decl., ECF No. 82-4, ¶ 26 (emphasis added), even though ORR has housed thousands of children during the pandemic.  *Id.*, ¶ 14.  And Ms. Cubbage states that ORR has implemented some kind of staging and intake plan *without* any hospital admissions due to COVID-19 thus far.  *Id.*, ¶ 17.

The lack of any required hospitalizations is consistent with the consensus, discussed by Plaintiff's medical declarants, that children with COVID-19 are far more likely to be asymptomatic than adults, and therefore less likely to require hospitalization. *See* Decl. of Public Health Experts, ¶ 13 (explaining that children infrequently require hospitalization or get seriously ill from COVID-19, compared to adults); *see also* Roberts & Kachur Decl., ECF No. 15-7, ¶ 13. Indeed, unaccompanied children—who are tested, quarantined, and monitored for two weeks, Cubbage Decl., ECF No. 82-4, ¶ 17—are less likely to drain health care resources than, for example, the thousands of truck and transport drivers that Defendants still allow into the country every day, all of whom are as likely to have COVID-19 as any of the child Class Members. *See* Morgan Decl., ECF No. 82-2, ¶ 24 (noting that 18,000 trucks cross daily along southern border, including 7,000 trucks at Laredo alone); Decl. of Public Health Experts, ¶ 14 (explaining that children are less likely to contract and spread COVID-19 than adults).[1]

Defendants have therefore not shown that unaccompanied children coming into ORR custody will disproportionately engulf healthcare resources in the southwest border states, even assuming Defendants' predictions about increased numbers are correct.

---

[1] Notably, after creating the Title 42 Process, CDC repeatedly downplayed the potential transmission of COVID-19 by children and called for schools to reopen, even though doing so would place children and adults in congregate settings. *See* Abby Goodnough, *C.D.C. Calls on Schools to Reopen, Downplaying Health Risks*, N.Y. Times (July 24, 2020), https://www.nytimes.com/2020/07/24/health/cdc-schools-coronavirus.html. Defendants' characterization of the COVID-19 risk posed by children is also inconsistent with the public statements of federal officials, including the President. *See, e.g.*, Nathaniel Weixel, *Trump says children unlikely to catch coronavirus, unconcerned about reports of infections*, The Hill (Aug. 10, 2020), https://thehill.com/policy/healthcare/511408-trump-says-children-unlikely-to-catch-coronavirus-unconcerned-about-reports (President Donald Trump stating that children "don't get very sick, they don't catch it very easily, and . . . they don't transfer it to other people, or certainly not very easily"); Interview with Betsy Devos, U.S. Secretary of Education (July 15, 2020), https://www.foxnews.com/transcript/devos-we-need-to-stop-focusing-on-adults-and-focus-on-what-kids-need ("[T]he science tells us that in—being in school is safe for children. There was just a study . . . that suggests that actually kids might even be stoppers of the virus. That it was over 2,000 kids studied and the virus did not spread, did not grow in any way.").

### B. Defendants' Speculation Concerning Future Migration Patterns Is Unsupported.

Defendants speculate that "apprehensions of unaccompanied minors will increase by 50 percent within 120 days." Defs.' Mot. at 17; Morgan Decl., ¶ 6; Cubbage Decl., ¶ 19. But Defendants' prediction about increased numbers is riddled with inconsistencies and misdirection.

For example, CBP's Acting Commissioner, Mark Morgan, repeatedly—and misleadingly—compares current migration increases to "the 2019 southwest border humanitarian crisis." Morgan. Decl., ¶ 5. But the summer of 2019 saw an unusually high number of children and families coming to the U.S-Mexico border—at its peak, 2.5 times as many unaccompanied children were coming per month as now, and *almost nineteen times* as many family units. *See* Southwest Border Migration FY 2019, U.S. Customs & Border Protection, https://www.cbp.gov/newsroom/stats/sw-border-migration. While migration of children to the U.S.-Mexico border has been increasing incrementally over the last several months, it remains in line with previous years where migration was not so unusually substantial. *Compare, e.g.*, Southwest Border Migration FY 2018, U.S. Customs & Border Protection, https://www.cbp.gov/newsroom/stats/sw-border-migration/fy-2018 (noting that CBP apprehended approximately 3,972 unaccompanied children in November 2017, and 4,061 in December 2017).

Defendants also raise the specter that the preliminary injunction will be a "pull factor" for future migration. Defs.' Mot. at 8. But as former CBP Commissioner Gil Kerlikowske explains, "court orders concerning CBP policies generally do not serve as either a pull factor or a deterrent factor for prospective migrants," in part "because such court orders are not widely publicized in Mexico or Central America and are not easily understood by asylum seekers and other migrants." *See* Kerlikowske Decl., ¶ 9. Moreover, CBP's own data demonstrate that border apprehensions increased each month between April and October 2020, indicating that the Title 42 Policy "did not serve as a deterrent" to migration generally, "or as to unaccompanied noncitizen minors specifically." *Id.*, ¶ 7; *see* Morgan Decl., ¶¶ 5, 11. As Mr. Kerlikowske states, "[b]ecause enforcement of the CDC Orders has not itself suppressed or deterred migration numbers, it follows that there is no reason to expect that this Court's order . . . will lead to an

7

increase in apprehensions of unaccompanied noncitizen minors at the southwest border." Kerlikowske Decl., ¶ 8.

Similarly, Dr. Cecilia Menjivar, an expert in migration to the United States, notes that Defendant's claim that the Court's order will be a pull factor is based on highly questionable premises. She explains that migration flows to the southwest border are at historic lows compared to previous decades, and that unaccompanied children and other asylum seekers are driven far more by conditions in their home countries than they are by the vagaries of U.S. immigration policy and court orders. Menjivar Decl., ¶¶ 8-20. Not surprisingly, therefore, other courts have rejected similar arguments. *See Flores v. Sessions*, No. 85-CV-4544-DMG-AGRX, 2018 WL 4945000, at *2 (C.D. Cal. July 9, 2018) (rejecting government's argument that court order enjoining family detention caused increase in border crossings); *R.I.L-R v. Johnson*, 80 F. Supp. 3d 164, 190 (D.D.C. 2015) (rejecting government assertion that detention of asylum seekers would deter migration).[2]

Ultimately, Mr. Morgan does not cite a single court order that caused a migration influx to the southern border. The one example he cites concerns children migrating due not to a court order, but rather a controversial DHS policy that forces families to remain in Mexico pending their asylum hearings.[3] *See* Morgan Decl., ¶ 7 (discussing MPP). And in any event, the "[g]overnment cannot suffer harm from an injunction that merely ends an unlawful practice." *R.I.L-R*, 80 F. Supp. 3d at 191 (citation and quotation marks omitted).

In short, while the number of unaccompanied minors has risen in recent months (even when the Title 42 Policy was in effect), Defendants engage in sheer speculation that the numbers will increase to the extent they suggest. As even Defendants' declarant Ms. Cubbage acknowledges, migration flows are based on a complex set of factors, making predictions

---

[2] *See also* Adam Cox & Ryan Goodman, *Detention of Migrant Families as "Deterrence": Ethical Flaws & Empirical Doubts*, Just Security (June 22, 2018), https://www.justsecurity.org/58354/detention-migrant-families-deterrence-ethical-flaws-empirical-doubts/.

[3] While a district court preliminarily enjoined this DHS policy, that injunction was stayed by the Supreme Court. *See Wolf v. Innovation Law Lab*, 140 S. Ct. 1564, 1564 (2020).

difficult. *See* Cubbage Decl., ¶ 14. And as discussed below, even if Defendants' predictions prove accurate, the fundamental point is that the government is more than capable of safely handling the increased numbers through various means, should the administration genuinely want to do so.

### C. Defendants Have Not Demonstrated That CBP or ORR Facilities Lack Additional Capacity to Hold Children Even if the Numbers Substantially Increase.

The Court's memorandum opinion, Magistrate Judge Harvey's report and recommendation, and the record evidence in this case all show that Defendants will not incur irremediable harm from the preliminary injunction because they have other means of preventing the spread of COVID-19 while complying with their statutory obligations. *See* Mem. Op. at 39-47; R&R at 38-47. This is true even if migration of unaccompanied children rises.

*CBP Stations*

Mr. Morgan testifies that enjoining the CDC Orders with respect to children will cause dramatic overcrowding at U.S. Border Patrol facilities. *See* Morgan Decl., ECF No. 82-2, ¶¶ 8-11. Yet he acknowledges that before Title 42 went into effect, CBP held a daily average of 105 children in border facilities. *Id.*, ¶ 11. After Title 42 went into effect, that number went down to 84. *Id.* Assuming CBP returns to its pre-Title 42 numbers, this means that CBP will see an increase of merely *twenty children per day* held in border facilities. It is hard to believe CBP's vast resources will be overwhelmed by processing about two dozen additional children per day.[4]

Moreover, even if the numbers go even higher, CBP can adapt. As former Commissioner Kerlikowske notes, an essential part of CBP's mission is to respond quickly to changing events and that there is no reason why CBP cannot do so during COVID-19. Kerlikowske Decl., ¶ 16. CBP is also far wealthier and more well-resourced than it was in the past, and can also meet

---

[4] Defendants also assert that the Title 42 Policy saves space at CBP facilities because the agency can process Mexican children under Title 42 "usually within approximately 2 hours of encounter." Morgan Decl., ECF No. 82-2, ¶ 8. But as Plaintiff's declarant explains, when CBP screened and processed Mexican children under Title 8 before the CDC Orders went into effect, such processing typically occurred in a matter of hours. *See* Declaration of Jennifer Podkul, ¶¶ 4-9.

staffing shortfalls by enlisting additional federal personnel. *Id.*, ¶¶ 14-17. In short, even assuming Defendants' migration projections prove accurate, "it is well within CBP's experience and capabilities to manage the projected 50 percent increase in [unaccompanied child] arrivals over the next four months, notwithstanding the operational challenges posed by the ongoing pandemic." *Id.*, ¶ 19.

*ORR Facilities*

Defendants also claim that ORR facilities will be overwhelmed if the number of children increases. There is no support for that assertion.

Defendants proffer a declaration from a new ORR declarant[5] who states that ORR's current capacity at the southwestern border could be exhausted by December 12. Cubbage Decl., ECF No. 82-4, ¶ 4. Yet Ms. Cubbage merely states conclusions without providing the factual detail necessary to show how the agency has *no path forward* to reconcile its statutory obligations with any challenges associated with the pandemic.

First, Ms. Cubbage's calculations concerning the number of children ORR expects to receive are hard to follow. She repeats Mr. Morgan's testimony regarding recent numbers of daily apprehensions of children, and states that "CBP has apprehended an average of 163 UAC [per day] in a span of five days following the November 18 injunction." Cubbage Decl., ECF No. 82-4, ¶ 19. She then states that CBP expects the number of apprehensions to increase by 50% within 120 days of the Court's injunction. *Id.* From these estimates, she leaps to saying that "ORR anticipates receiving 300 to 400 referrals *per day* in the near future," *id.*, ¶ 20 (emphasis added), a figure that does not follow from the statistics she has just repeated.

Ms. Cubbage's figures concerning new referrals to ORR appear misguided for another reason: she seems to assume that *all* children apprehended by CBP will be referred directly to ORR. However, Mr. Morgan testifies that currently about 66 percent of unaccompanied minors CBP apprehends are Mexican. Morgan Decl., ECF No. 82-2, ¶ 8. Under the TVPRA, Mexican

---

[5] Ms. Cubbage became ORR director about three months ago, and joined the agency six months ago. Admin. for Children and Families, *Nicole Cubbage* (last visited Dec. 1, 2020), https://www.acf.hhs.gov/about/leadership/nicole-cubbage.

children are given a screening for claims of fear and trafficking, as well as their ability to make an independent decision to return to Mexico. *See* 8 U.S.C. § 1232(a)(2)(A)-(C); Podkul Decl., ¶¶ 4-10. Those children with fear or trafficking-based claims, or who cannot make an independent decision to return, are referred to ORR custody, *see* 8 U.S.C. § 1232(a)(3), while the remainder are repatriated to Mexico, *id.* § 1232(a)(4)-(5). In prior years, CBP referred only 4-5% of Mexican children to ORR after the TVPRA screening. Podkul Decl., ¶ 7. So, unless CBP intends to dramatically revisit its screening procedures for Mexican children, this means that of the 163 daily child apprehensions CBP projects, only about 60-65 of them will likely end up in ORR custody after CBP screens and repatriates many of the Mexican children. Ms. Cubbage's declaration does not explain how ORR's resources will be overwhelmed in weeks with that rate of referral into ORR custody—even if that figure increases over time.

Second, Ms. Cubbage's declaration is notable for what it does *not* say about ORR's capacity. She does not describe what protocols ORR is currently employing, or discuss what analysis ORR conducted to conclude that their COVID-19 protocols require reduction of their total shelter bed capacity by forty percent. She does not describe what specific measures ORR has taken to move children who clear quarantine swiftly out of the southwest border facilities to those in the interior, or why that process cannot be sped up to free up space along the border.

Ms. Cubbage also does not state that ORR lacks the ability to add shelter capacity. To the contrary, she admits that ORR can create additional bed space by activating influx facilities near the southwest border that can house additional children. Cubbage Decl., ECF No. 82-4, ¶¶ 5-8; *see also* Chavla Decl., ¶¶ 5-7 (discussing ORR's use of influx facilities to house unaccompanied children). And while Ms. Cubbage discusses her concern that ORR may lack personnel to adequately staff the agency's shelters, she omits that ORR imposed a hiring freeze during much of the pandemic, which it has only recently lifted. *See* Chavla Decl., ¶ 9.

Also absent from Ms. Cubbage's testimony is any discussion of ORR's ability to release children from custody more swiftly. As Plaintiff previously noted, ORR's current rate of release is artificially depressed because the agency had stopped receiving new children, and most of the children remaining in ORR care likely presented difficult cases for sponsorship placement. *See*

11

Greenberg Decl., ECF No. 52-4, ¶ 17.  Because this Court's Order will return the ORR system to the pre-Title 42 status quo, most of the new children coming into ORR care will have sponsors available to receive them (including parents), consistent with past experience.  And ORR can employ mechanisms—such as devoting more resources and staffing to the sponsorship process, and reducing administrative inefficiencies—to further expedite the safe release of children from custody, particularly where sponsors are ready to receive them.  *See* Chavla Decl., ¶ 10.[6]  Expediting releases would free up bed space throughout the ORR system, enabling ORR to safely house and process additional children.[7]

\* \* \*

Defendants offer only unsupported speculation that the Court's Order will substantially increase the flow of unaccompanied children, and insufficient explanation for why they cannot employ various means of creating new capacity should that be necessary.  They have failed to establish that they are entitled to the "extraordinary remedy" of a stay pending appeal, *Philip Morris USA, Inc.*, 449 F. Supp. 2d at 990, much less demonstrate that there was "a clear error" in this Court's first order denying such a stay, *Ferrer*, 278 F. Supp. 3d at 332.

---

[6] The testimony of Russell Hott adds nothing.  Indeed, almost none of it is *new* evidence, as much of it describes facts and policies that predate this Court's order.  Even on its own terms, Mr. Hott's testimony underscores that Defendants' operation of the Title 42 Process carries as much risk—if not more—than bringing children into ORR custody.  Mr. Hott attempts to portray hotel custody as safer than ORR care, based on the evaluation of the contractor's own paid consultant.  Hott Decl., ECF No. 82-3, ¶¶ 10-11.  Notably, no health expert offers this testimony, perhaps because (according to news reports) CDC officers would not sign such a declaration. *See supra*.

[7] Defendants also raise the fear that if ORR fills its shelter capacity along the southwest border, they may have to put children on flights directly from the border to shelters in the interior, thereby increasing the risk of COVID-19 spread.  Defs'. Mot. at 2, 12.  But that would only come to pass if Defendants truly exhaust their capacity along the border and cannot find sponsors for children leaving quarantine.  Moreover, Defendants readily admit that they continue to conduct deportation flights with children, apparently without testing the children beforehand.  Hott. Decl., ., ECF No. 82-3, ¶ 15 (describing deportation where children tested positive only after landing in Guatemala).  What Defendants are essentially saying is that ICE is willing to bear the risk of COVID-19 exposure for the purpose of expelling children, but not to transport them to places where they can isolate and quarantine in safe settings.

Given the patent illegality of this unprecedented policy, the grievous harm faced by the children, and the fact that CDC did not believe it was warranted as a public health measure, Defendants must take all the readily available steps to provide these children with their statutory rights. Defendants cannot simply throw up their hands and claim that the burden is too great.

## CONCLUSION

This Court should deny Defendants' motion for reconsideration.

Dated: December 1, 2020

Stephen B. Kang*
Cody Wofsy*
Morgan Russell*
American Civil Liberties Union Foundation,
Immigrants' Rights Project
39 Drumm Street
San Francisco, CA 94111
Tel: (415) 343-0770

Andre Segura
Kathryn Huddleston
Rochelle Garza
Brantley Shaw Drake
American Civil Liberties Union Foundation
of Texas, Inc.
5225 Katy Freeway, Suite 350
Houston, Texas 77007
Tel. (713) 942-8146

Karla M. Vargas*
Texas Civil Rights Project
1017 W. Hackberry Ave.
Alamo, Texas 78516
Tel: (956) 787-8171

Respectfully submitted,

*/s/Lee Gelernt*_____
Lee Gelernt*
Daniel A. Galindo*
Celso J. Perez (D.C. Bar No. 1034959)
Omar Jadwat*
Ming Cheung*
American Civil Liberties Union Foundation,
Immigrants' Rights Project
125 Broad Street, 18th Floor
New York, NY 10004
Tel: (212) 549-2600

Robert Silverman*
Oxfam America
Boston, MA 02115, Suite 500
Tel: (617) 482-1211

Scott Michelman (D.C. Bar No. 1006945)
Arthur B. Spitzer (D.C. Bar No. 235960)
American Civil Liberties Union Foundation of
the District of Columbia
915 15th Street NW, Second Floor
Washington, D.C. 20005
Tel: (202) 457-0800

Jamie Crook (D.C. Bar No. 1002504)
Blaine Bookey
Karen Musalo
Center for Gender & Refugee Studies
200 McAllister St.
San Francisco, CA 94102
Tel: (415) 565-4877

*Attorneys for Plaintiff*

*\*Admitted pro hac vice*