**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

P.J.E.S., A MINOR CHILD, by and through
his father and NEXT FRIEND, Mario Escobar
Francisco, on behalf of himself and others
similarly situated,

                Plaintiff,

      v.

CHAD WOLF, Acting Secretary of Homeland
Security, *et al.*,

                Defendants.

Civil Docket No. 1:20-cv-02245-EGS

**DEFENDANTS' REPLY IN SUPPORT OF THEIR MOTION TO
RECONSIDER THE COURT'S DENIAL OF A STAY OF
PRELIMINARY INJUNCTION PENDING APPEAL**

**INTRODUCTION**

Defendants explained in their opening brief that the public health crisis posed by the COVID-19 pandemic has worsened since they initially requested a stay in September 2020. Medical systems in southwestern border States are stressed to the breaking point, while the number of unaccompanied minors attempting to cross the southern border has increased dramatically. The Office of Refugee Resettlement ("ORR"), which is primarily responsible for unaccompanied alien minors in U.S. Government custody, now faces severe capacity limitations due to the spread of COVID-19 and the worsening conditions at the border. Because enjoining the challenged order issued by the Director of the Centers for Disease Control and Prevention ("CDC Order") at this time would interfere with ongoing efforts to combat COVID-19 and potentially have an irreversible impact on public health, Defendants respectfully request that the Court reconsider its denial of a stay of the preliminary injunction pending appeal.

Resisting this request, Plaintiff presses three points.

*First*, Plaintiff disputes that the number of unaccompanied minors entering the United States will increase at the levels Defendants anticipate. But as Defendants have demonstrated, apprehensions and encounters of unaccompanied minors along the southern border have increased dramatically recently. As the agencies directly responsible for managing incoming aliens, Defendants' predictions, based on the most recent data and their historical experience, are entitled to deference.

*Second*, Plaintiff brushes off the possibility that the influx of unaccompanied minors covered by the CDC Order will burden the already overtaxed healthcare and medical systems, arguing that minors are infrequently hospitalized for COVID-19. Plaintiff ignores, however, the fact that minors may introduce additional cases of the virus into the United States and transmit COVID-19 to others, regardless of whether the minors themselves require hospitalization.

*Third*, Plaintiff mistakenly asserts that facilities of U.S. Customs and Border Protection ("CBP") and ORR have capacity to handle an increasing number of unaccompanied minors safely. In fact, ORR's capacity along the southwestern border to medically stage certain vulnerable minors

1

has been exhausted since Defendants filed their opening brief merely a week ago, and thus some minors are now being transported long distances on buses and airplanes to faraway facilities, increasing the risk of transmission of COVID-19.  This comes at a time when the pandemic is raging across the border.  In fact, the CDC recently issued Level 4 travel alert–the highest level– warning against traveling to Mexico because such "[t]ravel may increase your chance of getting and spreading COVID-19."[1]  COVID-19 cases are rapidly increasing across Mexico, which reports over 105,000 COVID-19 related deaths,[2] and has the second highest mortality rate in the world.[3]

**ARGUMENT**

I.    **Increasing Levels of Encounters and Apprehensions of Unaccompanied Minors Increase the Risk of Further Transmission of COVID-19.**

Defendants explained in their opening memorandum the potentially dire consequences of enjoining the CDC Order in light of CBP officers' and agents' increasing encounters with unaccompanied minors covered by the CDC Order.  *See generally* Defs.' Mem. in Support of their Motion to Reconsider the Court's Denial of a Stay of Preliminary Injunction Pending Appeal, ECF No. 82 ("Opening Br.").  Plaintiff questions Defendants' prediction that the number of unaccompanied minors traveling from Mexico will increase in the near future.  *See* Pl.'s Opp'n to Defs.' Mot. for Reconsideration of Denial of Stay Pending Appeal, ECF No. 84 ("Opp'n") at 7-9; *see also id.* at 5.  But Defendants explained how the number of unaccompanied minors apprehended or encountered along the southern border has already climbed dramatically, such as the 109 percent increase in the Rio Grande Valley sector from the 72-day period prior to when Defendants opposed Plaintiff's motion for a preliminary injunction, to the 72-day period after that filing.  *See* Opening Br. at 7-8; Declaration of Mark A. Morgan ("Morgan Decl."), ECF No. 82-2,

---

[1]    CDC, COVID-19 in Mexico, https://wwwnc.cdc.gov/travel/notices/covid-4/coronavirus-mexico.

[2]    WHO, Corona Virus Disease (COVID-19) Dashboard, https://www.who.int/countries/mex/.

[3]    Johns Hopkins University & Medicine, Coronavirus Resource Center, https://coronavirus.jhu.edu/data/mortality

¶ 5.  Moreover, Senior Official Performing the Duties of Commissioner Morgan explained that there has been a "543 percent increase from April to October 2020" in the number of unaccompanied minors that CBP apprehended along the southwestern border, reflecting "levels not seen since the 2019 humanitarian crisis."  Morgan Decl. ¶ 5.  Plaintiff baselessly argues that it is somehow "misleading[]" to "compare[] current migration increases" to the 2019 crisis, Opp'n at 7 (citing Morgan Decl. ¶ 5), but there is nothing misleading about stating the plain fact that the increases are at the highest levels since then.

Such increases in the midst of the historic pandemic have strained the resources and operational capacities of ORR to house unaccompanied alien minors.  *See* Opening Br. at 9-13. According to ORR Acting Director Nicole Cubbage, ORR has exhausted its medical staging capacity along the southwestern border for pregnant, parenting, or tender age unaccompanied minors since Defendants filed their motion to reconsider last week.  *See* Declaration of Nicole Cubbage ("Cubbage Supp. Decl.") ¶¶ 3-6.[4]  Accordingly, ORR has begun placing such aliens in facilities further inland, requiring that they be transported long distances on commercial flights or buses, increasing the risk of COVID-19 exposure for other minors being transported, for ICE personnel, and for the traveling public when commercial airlines are used.  *Id.*  Moreover, ORR has confronted an unexpectedly large group of referrals in certain areas, creating acute bed capacity shortages in parts of the southwestern border, particularly the El Paso and Phoenix sectors.  *Id.* ¶¶ 7-8.

Largely ignoring the alarming increase in apprehensions of unaccompanied minors covered by the CDC Order, Plaintiff also disputes that the injunction will serve as a "pull factor."  Opp'n at 7-8.  Mr. Morgan testified that "[b]ased on [his] experience both as the Chief of the [U.S. Border Patrol] and in his current role," he expected this Court's injunction to "serve as a pull factor leading to additional numbers of class members apprehended and referred to ORR."  Morgan Decl. ¶ 7.

---

[4] Defendants are simultaneously filing a motion for leave to submit this supplemental declaration from Acting Director Cubbage.

In addition, ORR anticipates that a confluence of factors—including the injunction—will cause a surge in the number of ORR referrals.  *See* Opening Br. at 9-10 (citing Cubbage Decl. ¶¶ 14-15).

Plaintiff suggests that because apprehensions increased between April and October 2020 while the CDC Order remained in effect, *see* Opp'n at 7 (citing Morgan Decl. ¶¶ 5, 7, 11), the injunction cannot serve as a pull factor.  He further asserts that "migration flows to the southwest border are at historic lows compared to previous decades."  Opp'n at 8 (citing Menjivar Decl. ¶¶ 8-20).  That logic is fallacious.  As an initial matter, the CDC Order initially greatly reduced the number of persons CBP has in its custody.  *See* Morgan Decl. ¶ 11.  The record does not show whether the number of apprehensions would have increased *even more* in the absence of the CDC Order.  And an increase in apprehensions does not mean that the injunction would not serve as an incentive for additional migration.  Plaintiff conflates the potential deterrence value of the CDC Order with the incentive that migrants may have, in concert with several other factors, to enter the country when that Order is enjoined.

In any event, Plaintiff's assertions are beside the point:  in the midst of a historic pandemic, the CDC Director found the Order necessary to help avert the serious danger of COVID-19 further spreading into the United States because covered aliens are typically held in congregate settings for immigration processing, and the CDC Order has proven effective in mitigating the spread of COVID-19, by minimizing or eliminating the number and frequency of those sorts of gatherings.  *See* Order Suspending the Right to Introduce Certain Persons from Countries Where a Quarantinable Communicable Disease Exists, 85 Fed. Reg. 65806 (Oct. 16, 2020, effective on Oct. 13, 2020) at 6-7;[5] Final Rule, 85 Fed. Reg. at 56,433.  Plaintiff notes that the example of a pull factor cited by Mr. Morgan is the Migrant Protection Protocols, not a court order, Opp'n at 8, but the relevant point is that migrants can and have tailored their actions to perceived U.S. policies, *see* Morgan Decl. ¶ 7.  And while Plaintiff points to instances where a court order was found not to "cause[] [a] surge" in crossings, *Flores v. Sessions*, No. CV854544DMGAGRX, 2018 WL

---

[5]      *Available at* https://www.cdc.gov/coronavirus/downloads/10.13.2020-CDC-Order-Prohibiting-Introduction-of-Persons-FINAL-ALL-CLEAR-encrypted.pdf.

4945000, at *2 (C.D. Cal. July 9, 2018), or that a policy did not "achieve[] its [ ] desired effect" of deterring potential migrants, *R.I.L-R v. Johnson*, 80 F. Supp. 3d 164, 189-90 (D.D.C. 2015), such findings do not discount Mr. Morgan's experienced and reasoned judgment that the injunction may serve as *a factor* leading to additional numbers of class members apprehended and referred to ORR, Morgan Decl. ¶ 7.

## II.    The Evidence Clearly Shows that the Increasing Referrals of Unaccompanied Minors Will Strain the Healthcare Systems of Border States.

In their opening brief, Defendants demonstrated that the pandemic has severely impacted the medical systems and hospitals of the border States in the last few months, such that any increase in the transfer of class members into those States' health care systems is likely to cause irreparable harm to the public.  Opening Br. at 11.  Plaintiff fails to rebut this evidence.  Instead, Plaintiff disputes that the increasing numbers of unaccompanied minors referred to ORR will overwhelm local healthcare systems.  Opp'n at 5-6.  But in doing so, Plaintiff erroneously conflates rates of hospitalization with overall effects on local healthcare systems:  According to Plaintiff's logic, if unaccompanied minors in the care of ORR are not themselves being hospitalized for COVID, then an influx of such minors cannot have any effect burdening the local healthcare systems.  That is simply wrong, because it fails even to consider a large part of the equation.

As Defendants pointed out, encounters with aliens who test positive for COVID-19 increased rapidly through the summer.  Opening Br. at 8.  Holding potentially infected minors in congregate settings in border facilities ill-equipped to address the public health exigencies during this unprecedented pandemic increases the risk of infection and transmission of COVID-19 not just for the detained minors, but for other aliens processed in the same facilities, for  DHS personnel and, if the minors must be transported, for the traveling public.  Even if minors themselves do not require hospitalization for COVID, they may infect others who *will* require hospitalization, thereby overtaxing already strained health and medical systems in border States. Indeed, Defendants previously explained the dramatic increase in the number of CBP employees who have tested positive for COVID-19, and that CBP personnel have tragically continued to die.

Opening Br. at 10.  In fact, CBP employees have a higher COVID-19 infection rate than the general U.S. population.  Morgan Decl. ¶ 17.

Likewise wide of the mark, Plaintiff argues that unaccompanied minors "are less likely to drain health care resources than" truck and transport drivers.  Opp'n at 6.  As an initial matter, Plaintiff provides no evidence for this proposition, instead basing this statement on conclusory assertions about children and adults in general.  In any event, such comparisons are meaningless because these populations implicate different concerns.  Unaccompanied minors who are covered by the CDC Order pose public health risks by virtue of their being held in congregate settings at border facilities; truck drivers with valid travel documents do not.  The CDC Director—the Nation's designated public health expert—determined that ports of entry and Border Patrol stations at or near the northern and southern borders are not structured or equipped to effectively mitigate the risks presented by COVID-19—*i.e.*, to implement quarantine, isolation, or social distancing protocols—for even small numbers of aliens.  Opp'n to PI, ECF No. 42, at 11.  The Director found that conditional release is not a viable option because there is significant uncertainty as to whether covered aliens could effectively self-quarantine, self-isolate, or otherwise comply with existing social distancing guidelines.  *Id*. at 12.  These findings demonstrate the inaptness of a comparison between unaccompanied minors and truck drivers:  Only the former are held in congregate settings at border facilities, which exacerbates the risk of transmission and infection of COVID-19.

Moreover, despite Plaintiff's suggestion to the contrary, the CDC's guidance in July and August regarding schools is not inconsistent with Defendant's request for a stay of the preliminary injunction.  Opp'n at 6 n.1.  The cited CDC guidance on schools cannot blindly be applied to border facilities.  Whereas schools may engage risk mitigation measures such as cohorting and staggering classes,[6] border facilities have no such capabilities.  Whereas schools may engage risk

---

[6]     CDC, Operating schools during COVID-19, CDC's considerations, https://www.cdc.gov/coronavirus/2019-ncov/community/schools-childcare/schools.html?CDC_ AA_refVal=https%3A%2F%2Fwww.cdc.gov%2Fcoronavirus%2F2019-ncov%2Fcommunity %2Fschools-childcare%2Freopening-schools.html.

mitigation measures such as cohorting and staggering classes,[7] border facilities have no such capabilities.   And as discussed above, the CDC Director determined that the CDC Order was necessary to prevent the spread of COVID-19 in border facilities.

### III.   The Office of Refugee Resettlement Currently Faces Severe Capacity Limitations and Has Exhausted Capacity in Certain Areas Along the Southern Border.

The capacity of ORR now has been exhausted in certain respects.   As ORR Acting Director Nicole Cubbage attests in her supplemental declaration, a recent increase in referrals of pregnant, parenting, and tender age unaccompanied minors that occurred since Defendants filed their motion to reconsider has exhausted ORR's capacity along the southwestern border to medically stage these populations.   Cubbage Supp. Decl. ¶ 2.   ORR is now transporting some minors in its care on buses and airplanes to facilities located further inland—as it predicted might occur.   *Id.*   In particular, ORR is moving pregnant, parenting, and tender age minors to facilities further inland, which requires transporting potentially infected individuals on commercial flights or buses.   *Id.* ¶ 4.   This transportation, in turn, exposes minors, ORR personnel, and the general public to an increased risk of exposure to COVID-19.   *Id.*

Plaintiff's assertions that ORR will not exhaust its capacity even with an increase in referrals, *see* Opp'n at 10-11, are simply contrary to the existing facts on the ground.   Because ORR cannot and does not treat all alien minors in its custody the same due to consideration of their needs, increases in the count of some categories of minors has already exhausted available space at border area facilities.   ORR facilities consist of a nationwide network of grantee care providers, who are licensed by the States in which they operate to care for minors on ORR's behalf.   *Id.* ¶ 6. This means that all "ORR facilities" are independent, state-licensed care providers who operate under a number of restrictions that are not within the control of ORR.   *Id.*   State licensing requirements may prescribe the number and demographics of minors that may be housed in a

---

[7]     CDC, Operating schools during COVID-19, CDC's considerations, https://www.cdc.gov/coronavirus/2019-ncov/community/schools-childcare/schools.html?CDC_ AA_refVal=https%3A%2F%2Fwww.cdc.gov%2Fcoronavirus%2F2019-ncov%2Fcommunity %2Fschools-childcare%2Freopening-schools.html.

particular facility. *Id.* For example, ORR cannot place a pregnant or parenting minor in a facility that houses only teen males. *Id.* This means that the number of beds that are available for pregnant, parenting, and tender age minors in the care of ORR is limited, and the recent influxes of these demographic groups have exhausted the space that was available for these groups at the southwestern border. *Id.* ¶ 6.

In addition to an unexpected increase in referrals of pregnant, parenting, and tender age minors, since November 25, 2020, ORR has also received large groups of referrals that have resulted in acute bed capacity shortages in certain facilities at the southwestern border, particularly in El Paso and Phoenix. *Id.* ¶ 7. On November 25, 2020, ORR confronted a capacity shortage when the medical staging facilities in the Phoenix sector lacked sufficient capacity to cohort or quarantine a group of approximately sixty teenage minors. *Id.* ¶ 8. DHS then had to transport this group to Houston, which had the nearest facility with available bed space, an approximately 13- to 18-hour bus ride from the Phoenix area. *Id.* As Defendants explained in their opening brief, transporting minors in this way creates increased risk of COVID-19 exposure for the minors and DHS personnel. Opening Br. at 9; *see* Cubbage Decl. ¶ 8.

Additionally, increases in the referrals of teenaged minors further reduce the available space for tender age minors by exhausting capacity in those ORR facilities at the southwestern border that are licensed to house a range of ages (e.g., ten to 17 year olds). Cubbage Supp. Decl. ¶ 9. And as referrals continue to increase, ORR will need to make more placements that require transporting minors by buses or plane, which risks COVID-19 transmission among the minors and government personnel, and can seed new outbreaks in ORR facilities and U.S. communities located further inland. *Id.* ¶ 10. Though Plaintiff takes issue with what Acting Director Cubbage "does *not* say about ORR's capacity," such as ORR's public health protocols or the procedures that it uses to move minors from ORR, Opp'n at 11, this information is beside the point in light of the fact that ORR has already exhausted capacity with regard to certain demographics of minors in facilities along the border. Cubbage Decl. ¶ 3.

Plaintiff also makes too much of Acting Director Cubbage's attestation that ORR could

build capacity through influx facilities.  Opp'n at 11.  As Acting Director Cubbage previously stated, ORR could supplement the number of available beds by activating two unlicensed influx care facilities and constructing temporary, soft-sided structures to house additional minors. Declaration of Nicole Cubbage, ECF No. 84-4 (Nov. 25, 2020) ¶ 6.  But Acting Director Cubbage also explained that these facilities and temporary soft-sided structures were an option of last resort because of operational difficulties.  *Id.* ¶¶ 7-8.  Moreover, the influx facilities can only provide approximately 1,500 additional beds, which will not cover the anticipated shortage of beds that will result from the rapidly increasing rate of referrals.  *See id.* ¶ 6.

Plaintiff also suggests that ORR could release minors in its custody in a swifter manner. Opp'n at 12.  But Acting Director Cubbage is uniquely qualified to opine on the myriad operational considerations that bear on ORR's ability to safely intake, accommodate, and discharge unaccompanied alien minors.  As the acting head of ORR, her judgments in this regard are entitled to deference.  The same is true with her estimates of the likely increases in referrals.  Although Plaintiff quibbles with her estimates, *see* Pl's Opp at 10-11, she is the one charged with the responsibility of making such estimates and is presumed to carry out her duties with regularity. *See Comcast Corp. v. FCC*, 526 F.3d 763, 769 n.2 (D.C. Cir. 2008); *Sussman v. U.S. Marshals Serv.*, 494 F.3d 1106, 1117 (D.C. Cir. 2007).

In a similar manner, Plaintiff finds it "hard to believe" that CBP lacks the resources to process the number of minors that it had on an average daily basis before the CDC Order went into effect, Opp'n at 9.  According to Plaintiff, if numbers increase further, CBP "can adapt."  *Id.* As an initial matter, as Mr. Morgan explained, as part of U.S. Border Patrol's efforts to mitigate the spread of COVID-19, it reduced its holding capacity to approximately twenty-five percent to ensure social distancing protocols are maintained, to the extent possible.  Morgan Decl. ¶ 12.  But in any event, Plaintiff's assertions merely try to second-guess the CDC Director—the Nation's designated public health expert—whose determination finds ample support in the record. Based on information provided by DHS and a U.S. Public Health Service Scientist Officer's visit to the El Paso Port of Entry, Paso del Norte Border Crossing, *see* CDC Order at 13; Ex. 1 to Order, the

CDC Director determined that ports of entry and Border Patrol stations simply are not structured or equipped to effectively mitigate the risks of COVID-19.  CDC Order at 2, 15, and housing infected aliens in these facilities risks infecting other aliens and CBP personnel with COVID-19, *see* CDC Order at 12, 14.

The CDC Director also determined that it would be inadvisable to structurally expand border facilities and to equip and train DHS personnel to contain COVID-19 because such an endeavor would consume a significant amount of scarce medical resources that could otherwise be used to meet the needs of the domestic population, and such interventions—particularly those involving structural and engineering additions or changes to hundreds of DHS facilities—could not be implemented quickly enough to mitigate the current risk of allowing covered aliens to be introduced to border facilities.  Amendment and Extension of Order Suspending Introduction of Certain Persons from Countries Where a Communicable Disease Exists, 85 Fed. Reg. 31503-02 (May 26, 2020), ECF No. 42-3 at 8.  In short, the CDC Director already determined that given these limitations, CBP cannot simply "adapt" as Plaintiff suggest, and Plaintiff's policy disagreements with the Nation's designated public health expert provide no reason to block the CDC Director's public health measure in the midst of a historic pandemic.  *Cf. Jacobson v. Massachusetts*, 197 U.S. 11, 30 (1905) (explaining that "[i]t is no part of the function of a court or a jury to determine" how best to protect the public from a disease); *Inv. Co. Inst. v. CFTC*, 720 F.3d 370, 380 (D.C. Cir. 2013) ("This argument amounts to nothing more than another policy disagreement with [the agency], so we must reject it.").  As Chief Justice Roberts observed, "[o]ur Constitution principally entrusts '[t]he safety and the health of the people' to the politically accountable officials of the [government] 'to guard and protect,'" and "[w]hen those officials 'undertake[ ] to act in areas fraught with medical and scientific uncertainties,' their latitude 'must be especially broad.'" *S. Bay United Pentecostal Church v. Newsom*, 140 S. Ct. 1613, 1613 (2020) (Roberts, C.J., concurring in denial of application for injunctive relief) (first quoting *Jacobson v. Massachusetts*, 197 U.S. 11, 38 (1905), and then quoting *Marshall v. United States*, 414 U.S. 417, 427 (1974)).

* * *

Finally, Plaintiff makes an issue of Defendants not addressing in their motion to reconsider the merits of Plaintiffs' claims, asserting that not addressing the merits is "arguably a fatal flaw for a stay application."  Opp'n at 5 (quoting *Citizens for Responsibility & Ethics in Washington v. FEC*, 904 F.3d 1014, 1019 (D.C. Cir. 2019) ("*CREW*").  But *CREW* was only referencing whether a stay requires a likelihood of success on the merits, not the requirements for a motion to reconsider.  Here, Defendants did not rehash arguments concerning their likelihood of success on appeal in their motion to reconsider because the motion is justified by significant changes in the public health crisis since Defendants filed their opposition to Plaintiff's motion for a preliminary injunction in September.  In any case, Defendants respectfully disagree with the Court's ruling on the merits, *see, e.g.*, Objs. at 38, ECF No. 69 (arguing that "Defendants have demonstrated a likelihood of success on the merits" in requesting a stay of an injunction).

## CONCLUSION

For all of the foregoing reasons, Defendants respectfully request that the Court reconsider its denial of Defendants' request for a stay of injunction pending appeal.


Dated:  December 2, 2020

Respectfully submitted,

JEFFREY BOSSERT CLARK
Acting Assistant Attorney General

JOHN V. COGHLAN
Deputy Assistant Attorney General

/s/ *Jean Lin*
JEAN LIN (NY Bar 4074530)
Special Litigation Counsel
KEVIN SNELL
TANYA SENANAYAKE (D.C. Bar 1006218)
Trial Attorneys
Federal Programs Branch
Civil Division, Department of Justice
1100 L Street, N.W.

11

Washington, D.C. 20005
(202) 514-3716
Jean.Lin@usdoj.gov
*Attorneys for Defendants*