**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

P.J.E.S., A MINOR CHILD, by and through
his father and NEXT FRIEND, Mario Escobar
Francisco, on behalf of himself and others
similarly situated,

               Plaintiff,

v.

CHAD WOLF, Acting Secretary of Homeland
Security, et al.,

               Defendants.

Civil Docket No. 1:20-cv-02245-EGS

**DECLARATION OF EVAN C. KATZ**

      I, Evan C. Katz, pursuant to 28 U.S.C. § 1746, under penalty of perjury, and based upon

personal knowledge, information provided to me in my official capacity, and information

obtained from various records and systems maintained by the U.S. Department of Homeland

Security (DHS) and reasonably relied upon in the course of my employment, hereby declare as

follows relating to the above-captioned matter.

1.  I am currently employed as the Deputy Assistant Director for the Removal Management

     Division (RMD) within the DHS, U.S. Immigration and Customs Enforcement (ICE),

     Enforcement and Removal Operations (ERO).  I have held this position since January 2015.

     Since January 1, 2021, I have also been serving as the Acting Deputy Assistant Director for

     the International Operations Division (IOD).

2.  I began my federal law enforcement career in November 1997, with the legacy Immigration

     and Naturalization Service.  Since I began my employment with ICE in March 2003, I held

     positions of Lead Detention Enforcement Officer, Immigration Enforcement Agent,

Deportation Officer, Detention and Deportation Officer, Chief of Staff to the ERO Deputy

Director, and Unit Chief within RMD.  I have been assigned to RMD since December of

2010.

3.   The ICE ERO Removal Division is one of six ERO Headquarters divisions and is responsible

for executing the removal of aliens with final removal orders using commercial or charter

aircraft.  The Removal Division is comprised of IOD, which manages 25 internationally

deployed Assistant Attachés for Removal at embassies and consulates worldwide, the ICE

Air Operations Division (IAO), which manages the contracting and operations of all ICE

aircraft to affect removals, and RMD, which supports ERO field offices nationwide in the

coordination of removals through coordination within the agency, as well as interagency

stakeholders, foreign embassies and consulates, and international networks.  As the Deputy

Assistant Director for RMD, I am responsible for ERO's Removal and International

Operations (RIO) teams for Africa and the Western Hemisphere.

4.   RIO supports ERO field offices nationwide in the coordination of removals and develops and

implements strategies to support ERO's mission to remove priority aliens from the United

States.  RIO is responsible for engaging foreign embassies and consulates in the United

States to resolve consular concerns and removal matters.  In collaboration with the ICE

Homeland Security Investigations Office of International Operations and the U.S.

Department of State, ERO also works with international partners to successfully execute

removal operations.

5.   I have read and am familiar with the Memorandum Opinion and Order in *P.J.E.S. v. Wolf*,

No. 20-2245 (D.D.C. Nov. 18, 2020), ECF Nos. 79, 80, issued at 10:02 a.m. Eastern

Standard Time (EST) on November 18, 2020, preliminarily enjoining the expulsion of

unaccompanied noncitizen children pursuant to the Title 42 of the United States Code.  I am

also familiar with the December 2, 2020 declaration provided by former Deputy Assistant

Director for IOD, Jeffrey D. Lynch, filed in this case.  On December 31, 2020, Mr. Lynch

retired from federal service.  This declaration serves to supplement the information

previously provided by Mr. Lynch in his declaration and to further explain the facts and

circumstances surrounding the expulsion of approximately 35 unaccompanied minors to

Guatemala on the day the preliminary injunction was issued.

6.  At approximately 12:40 p.m. EST on November 18, 2020, a flight carrying 35 individuals

believed at the time to be unaccompanied minors and 29 adults arrived in Guatemala City,

Guatemala.  All 64 individuals were transferred to Guatemalan officials within

approximately 15 minutes of landing, as there were no competing flights to wait for

disembarkment and the airport terminal was within a close walking distance from the tarmac.

7.   At approximately 12:44 p.m. EST, the Assistant Attaché for Removal (Assistant Attaché) in

Guatemala City, who was not at the airport, was advised that the media was reporting an

injunction against Title 42 expulsions in a telephone conversation on an unrelated matter

with an ERO Juvenile and Family Residential Management Unit Detention and Deportation

Officer.

8.  At approximately 12:56 p.m. EST, the Assistant Attaché received a text message via

WhatsApp from the IAO Unit Chief inquiring whether she was at the airport and advising,

"They want the single minors back."

9.  At approximately 1:09 p.m. EST, the Assistant Attaché received an email from the IAO Unit

Chief stating, "The single minors have disembarked however they want the kids to be

returned to the US."

10. At approximately 1:10 p.m. EST, the Assistant Attaché, who was not at the airport at the

time, asked the ERO Foreign Service National (FSN) employee, who was onsite to greet the

plane, to advise the ICE Flight Officer in Charge not to depart as the IAO Unit Chief was notified about the possibility that the Title 42 unaccompanied minors may have to return to the United States.  The Assistant Attaché further asked the FSN employee to explain the issue to the Guatemalan Institute of Migration Onsight Supervisor.

11. At approximately 1:12 p.m. EST, the Assistant Attaché contacted the Guatemalan Institute of Migration Deputy Director to explain the situation and discuss Guatemala's willingness to allow the return of the Title 42 unaccompanied minors back to the United States should they be required to be returned pursuant to the court order.  The Guatemalan Institute of Migration Deputy Director advised the Assistant Attaché that he would discuss the issue with Guatemalan government counterparts.

12. At approximately 1:17 p.m. EST, the Assistant Attaché contacted the FSN employee for the status of the conversation with the Guatemalan Institute of Migration Onsight Supervisor. The FSN employee notified the Assistant Attaché that 3 of the 35 individuals initially believed to be unaccompanied minors were determined to be adults by Guatemalan officials.

13. At approximately 1:23 p.m. EST, the Guatemalan Institute of Migration Operations Supervisor contacted the Assistant Attaché to advise her of the Guatemalan Government's approval for ICE to return all of the expelled unaccompanied minors to the United States.

14. At approximately 1:36 p.m. EST, *Procuraduría General de la Nación*, Guatemala's national agency with similar responsibilities to the U.S. Department of Health and Human Services, notified the ERO FSN employee that 4 of the unaccompanied minors tested positive for COVID-19 upon arrival.

15. At approximately 1:58 p.m. EST, the FSN employee received the contact information for the adults to whom the minors were to be released in Guatemala from Guatemalan officials.

16. At approximately 2:47 p.m. EST, the Guatemalan Institute of Migration Operations Supervisor notified the Assistant Attaché that Guatemala was willing to permit the United States to return only those unaccompanied minors who were willing to return to the United States.  The same is true of the three individuals initially believed to be unaccompanied minors but who were determined by the Guatemala Government to be adults.  The Guatemalan Institute of Migration Operations Supervisor further advised the Assistant Attaché that one of the three individuals determined by the Guatemalan authorities to be an adult did not want to return to the United States.  The Guatemalan Institute of Migration Operations Supervisor also advised that the Guatemalan Government was willing to hold the unaccompanied minors who had tested positive for COVID-19 for the quarantine period and that those minors could return to the United States after they were cleared from quarantine.  At 2:58 p.m. EST, the Assistant Attaché advised the ERO IOD and IAO Deputy Assistant Directors of the same.

17. At approximately 4:08 p.m. EST, the FSN employee contacted the Assistant Attaché to advise that the Guatemalan Institute of Migration, and Secretaria de Bienestar Social, who oversees unaccompanied minor shelters, advised that, if the United States was going to take the unaccompanied minors back, the Institute wanted the United States Government to remove the unaccompanied minors from the reception center because the Guatemalan officials from various agencies were just standing around and they needed to return to their respective offices.  At approximately the same time, the Assistant Attaché conveyed the same message via e-mail to the IOD Deputy Assistant Director.

18. At approximately 4:19 p.m. EST, IOD Deputy Assistant Director emailed the IAO Division Deputy Assistant Director and indicated that he was standing by for further instructions on whether ICE should bring the COVID-19 positive unaccompanied minors back to the United

States, and asked if there were any objections to boarding those unaccompanied minors who had tested negative for COVID-19 since the Guatemalan Government had requested that the minors (and the two adults) be removed from the reception center.

19. At approximately 4:25 p.m. EST, IAO Division Deputy Assistant Director responded by e-mail stating that those minors who had tested negative for COVID-19 could be boarded.

20. At approximately 4:28 p.m. EST, without notice, Secretaria de Bienestar Social took the 4 unaccompanied minors who had tested positive for COVID-19 to quarantine for 15 days.

21. At approximately 4:55 p.m. EST, the remaining 30 individuals, consisting of 28 unaccompanied minors and 2 individuals determined to be adults, were escorted back onto the plane.  At this time, the Guatemalan Institute of Migration closed the reception center and all Guatemalan agency officials departed.

22. At approximately 4:59 p.m. EST, IAO Deputy Assistant Director forwarded an e-mail from ERO leadership instructing ICE Air to return to the United States with staff and crew only and without the 28 Guatemalan minors and two adults.

23. At approximately 5:03 p.m. EST, IAO Unit Chief e-mailed advising that the Flight Officer in Charge informed him that officials from the Guatemalan Institute of Migration had left and there were no Guatemalan officials on site.

24. At approximately 5:07 p.m. EST, Assistant Attaché advised the IAO Unit Chief that she would attempt to get the Guatemalan Institute of Migration back to the reception center to accept the unaccompanied minors again.  At 5:08 p.m. EST, IOD Deputy Assistant Director e-mailed the Assistant Attaché to inquire why the Guatemalan Institute of Migration did not stand by while the matter was being discussed.

25. At approximately 5:11 p.m. EST, the Assistant Attaché responded to the IOD Deputy Assistant Director that the Guatemalan Institute of Migration was only aware that the status

6

of the COVID-19 positive unaccompanied minors were being discussed, and because those 4 unaccompanied minors were taken to the shelter for quarantining, there was no reason for the Guatemalan officials to remain.  The FSN employee advised the Assistant Attaché that the ground crew operator had notified her that the plane will be returning with only the flight crew.

26. At approximately 5:20 p.m. EST, the Assistant Attaché contacted the Guatemalan Institute of Migration Operations Supervisor to explain that the 28 unaccompanied minors and two adults would remain in Guatemala and requested that Guatemalan officials return to the reception center to accept them.

27. At approximately 5:25 p.m. EST, the FSN employee contacted Secretaria de Bienestar Social to coordinate details for their return to the reception center to process the 30 individuals.

28. At approximately 5:27 p.m. EST, the FSN employee went to pick up the Guatemalan Institute of Migration personnel as they had no transportation.

29. At approximately 5:34 p.m. EST, the 30 individuals entered the reception center to wait for processing by the Guatemalan Institute of Migration.

30. At approximately 5:40 p.m. EST, the Assistant Attaché arrived at the reception center to remain with the 30 individuals until officials of the Guatemalan Institute of Migration could return.

31. At approximately 6:00 p.m. EST, officials from the Guatemalan Institute of Migration and Secretaria de Bienestar Social arrived at the reception center and began processing the individuals.

32. At approximately 6:20 p.m. EST, the Assistant Attaché departed the reception center to purchase food for the 30 individuals after Secretaria de Bienestar Social notified her that they

did not prepare any food as they thought those 30 individuals would not be remaining in Guatemala.

33. At approximately 6:20 p.m. EST, the flight departed for the United States with 2 pilots, 1 mechanic, 3 flight attendants, 13 contract security officers, 2 contract nurses, and 1 ICE ERO Deportation Officer onboard.  The return flight lasted 4 hours and 10 minutes.

34. At approximately 7:00 p.m. EST, the Assistant Attaché and the FSN employee departed the reception center.

35. Mr. Lynch's December 2, 2020 declaration did not include all of the information detailed above because, based on my consultation with him in preparation of this declaration, he indicated that he did not believe those details were relevant as the focus on November 18, 2020 was whether to return the unaccompanied minors to the United States.

36. ICE is committed to taking immediate steps to facilitate the voluntary return to the United States of each of the 32 unaccompanied minors discussed herein (inclusive of the four minors who had tested positive for COVID-19 on November 18, 2020), including the cost of their flight to the United States, upon confirmation that they would like to return.  To that end, Assistant Attaché Jessie D. Gonzalez will serve as the point-of-contact for class counsel to coordinate the return in such cases.

Executed on this 19th of January 2021, at Washington D.C.

_____
Evan C. Katz
Deputy Assistant Director
Removal Management Division
Enforcement and Removal Operations
U.S. Immigration and Customs Enforcement